1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

E-Filed: 11.23.11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ROBERT BRISENO, individually and on
behalf of all others similarly situated,

           Plaintiff,

      vs.

CONAGRA FOODS, INC.,

           Defendant.

) CASE NO. CV 11-05379  MMM (AGRx)
)
)
) ORDER GRANTING DEFENDANT'S
) MOTION TO DISMISS
)
)
)
)
)
)

       Robert Briseno filed this putative class action against ConAgra Foods, Inc. on June 28, 2011.[1]  On August 24, 2011, ConAgra moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2]  Briseno opposes the motion.[3]

---

    [1]Class Action Complaint ("Complaint"), Docket No. 1 (June 28, 2011).

    [2]Motion to Dismiss Class Action Complaint ("Motion"), Docket No. 24 (August 24, 2011); see also Defendant ConAgra Foods, Inc. Reply Memorandum in Support of Motion to Dismiss Class Action Complaint ("Reply"), Docket No. 39 (October 24, 2011).

    [3]Plaintiff's Opposition to Defendant's Motion to Dismiss ("Opposition"), Docket No. 34 (October 10, 2011).

# I. BACKGROUND

Briseno alleges that he regularly purchased Wesson Canola Oil, a product marketed and distributed by ConAgra.[4] ConAgra purportedly sells four types of cooking oils under the Wesson brand, all bearing labels that state the product is "100% Natural."[5] ConAgra allegedly asserts that its products are "100% Natural" in its print and online advertising as well.[6] Briseno contends that contrary to these representations, ConAgra uses plants grown from genetically modified organism seeds that have been engineered to allow for greater yield and to be pesticide-resistant to make Wesson-branded oils.[7] He asserts that the genetically modified organisms are not "100% natural," and that ConAgra's labels and advertising are deceptive and likely to mislead the public as a result.[8]

Briseno seeks to represent a class of "[a]ll persons in the United States who have purchased Wesson Oils from June 27, 2007 through the final disposition of this and any and all related actions."[9] He pleads four causes of action: (1) violation of California's false advertising law ("FAL"), California Business & Professions Code §§ 17500 et seq.; (2) violation of California's unfair competition law ("UCL"), California Business & Professions Code §§ 17200 et seq.; (3) violation of California's Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 et seq.; and (4) breach of express warranty.[10] Briseno seeks (1) a declaration that ConAgra has violated these statutes and breached express warranties; (2) damages; (3) restitution of monies wrongfully obtained by ConAgra and/or disgorgement of revenues and/or profits; (4) a permanent

---

[4]Complaint, ¶ 11.

[5]*Id.*, ¶ 13.

[6]*Id.*, ¶ 14.

[7]*Id.*, ¶ 17.

[8]*Id.*, ¶ 23.

[9]*Id.*, ¶ 24.

[10]*Id.*, ¶¶ 33-70.

2

1   injunction enjoining ConAgra from continuing to harm Briseno and other members of the putative

2   class and from violating California law; (5) an order requiring ConAgra to adopt and enforce a

3   policy that requires appropriate disclosure of genetically modified ingredients and/or removal of

4   misleading natural claims, and that complies with California law; and (6) attorneys' fees and costs

5   of suit.[11]

6

## II.  DISCUSSION

### A.     Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

9        A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint.

10  A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory"

11  or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica*

12  *Police Department*, 901 F.2d 696, 699 (9th Cir. 1988).  In deciding a Rule 12(b)(6) motion, the

13  court generally looks only to the face of the complaint and documents attached thereto.  *Van*

14  *Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc.*

15  *v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).

16       The court must accept all factual allegations pleaded in the complaint as true, and construe

17  them and draw all reasonable inferences from them in favor of the nonmoving party.  *Cahill v.*

18  *Liberty Mutual Insurance Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747,

19  750 (9th Cir. 1995).  It need not, however, accept as true unreasonable inferences or legal

20  conclusions cast in the form of factual allegations.  See *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct.

21  1937, 1949 (2009) ("[B]are assertions . . . amount[ing] to nothing more than a 'formulaic

22  recitation of the elements' of a constitutional discrimination claim" are not entitled to an

23  assumption of truth, quoting *Bell Atlantic Corp. v. Twombly*, 50 U.S. 544, 555 (2007)); see also

24  *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("Such allegations are not to be

25  discounted because they are 'unrealistic or nonsensical,' but rather because they do nothing more

26  than state a legal conclusion – even if that conclusion is cast in the form of a factual allegation").

27  _____

28       [11]*Id.* at 15.

3

1   To survive a motion to dismiss, plaintiff's complaint must "contain sufficient factual

2   matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . .  A claim has

3   facial plausibility when the plaintiff pleads factual content that allows the court to draw the

4   reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at

5   1949. See also *id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks

6   for more than a sheer possibility that a defendant has acted unlawfully. . . .  Where a complaint

7   pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line

8   between possibility and plausibility of "entitlement to relief,"'" quoting *Twombly*, 550 U.S. at

9   557); *Twombly*, 550 U.S. at 545 ("While a complaint attacked by a Rule 12(b)(6) motion to

10  dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds'

11  of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation

12  of the elements of a cause of action will not do.  Factual allegations must be enough to raise a

13  right to relief above the speculative level, on the assumption that all the allegations in the

14  complaint are true (even if doubtful in fact)" (citations omitted)).  See also, e.g., *Moss*, 572 F.3d

15  at 969 ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,'

16  and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the

17  plaintiff to relief," citing *Iqbal* and *Twombly*).

18  **B.      Federal Preemption under the NLEA**

19  The Supremacy Clause of the United States Constitution empowers Congress to enact

20  legislation that preempts state law.  See *Gibbons v. Ogden*, 22 U.S. 1, 82 (1824) ("In every such

21  case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in

22  the exercise of powers not controverted, must yield to it"); *Law v. General Motors Corp.*, 114

23  F.3d 908, 909 (9th Cir. 1997) ("The Supremacy Clause empowers Congress to supplant

24  decentralized, state-by-state regulation with uniform national rules").

25  "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts

26  state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative

27  field to such an extent that it is reasonable to conclude that Congress left no room for state

28  regulation in that field."  *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (quoting *Tocher*

1   *v. City of Santa Ana*, 219 F.3d 1040, 1045 (9th Cir. 2000), abrogated on other grounds by *City*

2   *of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424 (2002)).

3          ConAgra contends that Briseno's claims are preempted by the Federal Food, Drug, and

4   Cosmetic Act ("FDCA").   In assessing this argument, the court must be mindful of the

5   presumption against preemption. See *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("In all

6   preemption cases, and particularly in those in which Congress has 'legislated . . . in a field which

7   the States have traditionally occupied,' we 'start with the assumption that the historic police

8   powers of the States were not to be superseded by the Federal Act unless that was the clear and

9   manifest purpose of Congress'"); see also *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449

10  (2005) ("[B]ecause the States are independent sovereigns in our federal system, we have long

11  presumed that Congress does not cavalierly preempt state-law causes of action"); *Law*, 114 F.3d

12  at 909-10 ("Given the  importance of federalism in our constitutional structure, however, we

13  entertain a strong presumption that federal statutes do not preempt state laws; particularly those

14  laws directed at subjects – like health and safety – 'traditionally governed' by the states.  'Thus,

15  pre-emption will not lie unless it is the clear and manifest purpose of Congress'" (citations

16  omitted)); see also *In re Farm Raised Salmon Cases*, 42 Cal.4th 1077, 1088 (2008) (noting that

17  consumer protection laws such as the UCL, false advertising law and CLRA are within the states'

18  historic police powers and therefore subject to the presumption against preemption).   Where

19  Congress has expressly preempted state law, the presumption against preemption requires the

20  court to read the federal statute narrowly.  See *Lohr*, 518 U.S. at 485 (citing *Cipollone v. Liggett*

21  *Group, Inc.*, 505 U.S. 504, 518 (1992)).  This is particularly true in cases involving food labeling,

22  "an area historically governed by state law."  *Astiana v. Ben & Jerry's Homemade, Inc.*, Nos.

23  C 10–4387 PJH, C 10–4937 PJH, 2011 WL 2111796, *8 (N.D. Cal. May 26, 2011).

24         The FDCA was enacted in 1938 as a successor to the 1906 Pure Food and Drugs Act,

25  which was the first piece of comprehensive federal legislation designed to protect consumers from

26  fraud and misrepresentation in the sale of food and drugs.  See James T. O'Reilly, FOOD AND

27  DRUG ADMINISTRATION § 3:1-13 (3d ed. 2009).  The FDCA empowers the Food and Drug

28  Administration ("FDA") (a) to protect the public health by ensuring that "foods are safe,

5

wholesome, sanitary, and properly labeled," 21 U.S.C. § 393(b)(2)(A); (b) to promulgate regulations to implement the statute; and (c) to enforce its regulations through administrative proceedings. see 21 C.F.R. § 7.1 et seq.  The FDCA deems a food "misbranded" if its labeling "is false or misleading in any particular."  21 U.S.C. § 343(a).

In 1990, Congress amended the FDCA by enacting the Nutrition Labeling and Education Act ("NLEA") "to 'clarify and to strengthen the Food and Drug Administration's legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about the nutrients in foods.'" *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 223 (2d Cir.1998) (citing H.R.Rep. No. 101-538, at 7 (1990)).  "The NLEA amended the FDCA in several significant respects: it expanded the coverage of nutrition labeling requirements; it changed the form and substance of ingredient labeling on packages; it imposed limitations on health claims; it standardized the definitions of all nutrient content claims; and it required more uniform serving sizes."  *Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG)(RML), 2010 WL 2925955, *3 (E.D.N.Y. July 21, 2010) (citing *The Impact of the Nutrition Labeling and Education Act of 1990 on the Food Industry*, 47 ADMIN.L.REV. 605, 606 (1995)).  The NLEA also added an express preemption provision to the FDCA.  See 21 U.S.C. § 343-1(a)(5) ("Except as provided in subsection (b), no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce . . . any requirement respecting any claim of the type described in section 343(r)(1) of this title, made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title").

### 1.    Whether Briseno's Claims Are Preempted

ConAgra argues that Briseno's claims are preempted because the Food and Drug Administration has repeatedly concluded that bioengineered foods are not meaningfully different from foods developed by traditional plant breeding, and thus that the fact that a food product is derived from bioengineered plants need not be reflected on a product's label.[12]  As Briseno notes,

---

[12]Motion at 5–6.

however, this misstates the issue.[13]  Briseno's primary argument is not that ConAgra was required to state whether its products were made from genetically modified plants.  Rather, he contends that ConAgra's affirmative decision to label its products "100% Natural" was misleading, given that the products were made from genetically modified plants.[14]

Several courts in this circuit have addressed similar issues.  In *Lockwood v. Conagra Foods, Inc.*, 597 F.Supp.2d 1028 (N.D. Cal. Feb. 3, 2009), plaintiffs contended that ConAgra misled the public by advertising its pasta sauce as "all natural," when in fact it contained high fructose corn syrup.  *Id.* at 1029.  In reaching this result, the court rejected ConAgra's argument that the claim was preempted by the NLEA.  *Id.* at 1031.  While the NLEA preempts claims that product labeling fails to identify that the product contains artificial flavors, colors, or preservatives, and claims that product labeling does not disclose that the product is an imitation of another food, the court concluded that plaintiffs had not alleged such circumstances, and had asserted only that the pasta sauce was "not 'all natural' because it is made with high fructose corn syrup."  *Id.*

Similarly, in *Wright v. General Mills, Inc.,* Civil No. 08cv1532 L(NLS), 2009 WL 3247148 (S.D. Cal. Sept. 30, 2009), plaintiff asserted that marketing "Nature Valley" crunchy granola bar products as "100% Natural" was misleading, because the products contained high fructose corn syrup.  *Id.* at *1.  The court concluded that plaintiff's deceptive advertising claims were not preempted, noting that "[b]ecause the FDA has deferred taking regulatory action with respect to the term 'natural,' plaintiff's state law claims do not stand as an obstacle to accomplishing Congress's objectives of uniformity and consistency in regulating labeling."  *Id.* at *3; see also *Holk v. Snapple Beverage Corp.* 575 F.3d 329, 342 (3d Cir. 2009) (holding that

---

[13]Opposition at 9.

[14]Briseno does request "[a]n order requiring defendant to adopt and enforce a policy that requires appropriate disclosure of GM ingredients."  (Complaint at 15.)  The court addresses this prayer for relief *infra*.  The bulk of the complaint, however, alleges that use of the phrase "100% Natural" is misleading, and does not contend that additional information must be added to Wesson Oil labels.

a claim predicated on defendant's use of the word "natural" was not preempted because "there is no FDA policy with which state law could conflict"); *Astiana*, 2011 WL 2111796 at *10 ( claim that defendant misrepresented ice cream as being "all natural" when the alkalized cocoa used in the product was processed with potassium carbonate, which was allegedly not natural, was not preempted); *Hitt v. Arizona Beverage Co., LLC*, No. 08cv809 WQH (POR), 2009 WL 449190, *5 (S.D. Cal. Feb. 4, 2009) (claim that defendants deceptively promoted drinks as "100% Natural" and "All Natural" when they contained high fructose corn syrup was not preempted).

The court concurs with the result reached by these courts. While the FDA has acknowledged that "[t]he meaning and use of the term 'natural' on the label are of considerable interest to consumers and industry," and that common uses of the term are "confusing and misleading to consumers and frequently breach the public's legitimate expectations about their meaning," 56 FR 60421-01, "[b]ecause of resource limitations and other agency priorities," the agency has not engaged in rulemaking to establish a definition of the word. 58 FR 2302-01; *see also Hitt*, 2009 WL 449190 at *3-4.

ConAgra asserts, however, that Briseno's claims are barred by 21 U.S.C.A. § 343 (i)(1), which states that a food is misbranded unless its label bears "the common or usual name of the food."[15] Additionally, it suggests that the claims are preempted by 21 U.S.C. § 343(i)(2), which requires that each product list its ingredients by their "common or usual name," and by regulations requiring that vegetable oils be denominated "_____ oil," 21 CFR § 101.4(b)(14).[16] These provisions are inapplicable. Briseno's central argument is not that ConAgra cannot use the common or usual names of canola oil, vegetable oil or corn oil, or that ConAgra must modify the list of ingredients on its labels. Rather, he contends that labeling the oils "100% Natural" is misleading.

The cases cited by ConAgra do not compel a different result. In *Dvora v. General Mills, Inc.*, No. CV 11–1074–GW(PLAx), 2011 WL 1897349 (C.D. Cal. May 16, 2011), plaintiff

---

[15]Motion at 11.

[16]*Id.* at 14.

alleged a number of violations of California law based on an allegation that the labeling and advertising of defendant's "Total Blueberry Pomegranate" cereal was false and misleading.  *Id.* at \*1.  The court noted that the FDA, through the FDCA and accompanying regulations, had implemented a comprehensive scheme that governed the labeling of flavors and flavoring in food products.  These included requirements that products containing artificial flavoring state that fact; detailed requirements on how to characterize a flavor; and rules on how fruit could be depicted when used to reference the flavor of a product not actually containing the fruit.  *Id.* at \*4.  The court concluded that plaintiff's claims were preempted, noting:

> "Defendant persuasively argues that Plaintiff's lawsuit seeks to impose requirements that are 'not identical' to this regulatory scheme. First, Plaintiff apparently seeks to forbid General Mills from labeling its product 'Total Blueberry Pomegranate,' even though such descriptions of 'characterizing flavor' are expressly authorized by federal law.  Second, Plaintiff appears to demand that General Mills affirmatively state on the package that the cereal 'does not actually contain blueberries or pomegranates,' even though FDA regulations would not require this.  Third, Plaintiff objects to the depiction of brown colored 'clusters' that (according to Plaintiff) allegedly 'resemble blueberries and/or pomegranate seeds,' even though FDA regulations would have permitted General Mills to depict even fresh blueberries and pomegranates on its box." *Id.*

Similarly, in *Turek v. General Mills, Inc.*, 754 F.Supp.2d 956 (N.D. Ill. 2010), the court determined that plaintiff's claim that General Mills misleadingly labeled snack bars and yogurt as rich in fiber, when in fact they contained non-natural fibers, was preempted by the NLEA.  The court relied in part on the statute's "thorough regulation of fiber."  *Id.* at 962.  The *Turek* court contrasted the facts of the case with those in *Holk*, where the court determined that the NLEA did not preempt state consumer fraud claims based on Snapple Beverage Company's use of the term "natural" on its drinks.  The *Turek* court noted that the decision in *Holk* rested in part on the court's conclusion that "the FDA contained no requirement regarding the term 'natural.'" *Id.* at 961 (citing *Holk*, 575 F.3d at 341).

The same is true of this court's recent decision in *Yumul v. Smart Balance, Inc.*, No. CV 10-00927 MMM (AJWx), 2011 WL 1045555 (C.D. Cal. Mar. 14, 2011).  There, the court's conclusion that claims were preempted depended heavily on the fact that "Yumul [sought] to enjoin Smart Balance from placing a 'No Cholesterol' label on its product – something the FDA regulations expressly permit Smart Balance to do. . . ."  Consequently, the court concluded, "a liability finding in this action would impose a requirement 'that is not identical' to federal law." *Id.* at *9; see also *Peviani v. Hostess Brands, Inc.*, 750 F.Supp.2d 1111, 1119 (C.D. Cal. 2010) ("The FDA regulations explicitly define the term '0 Grams of Trans Fat' and the NLEA expressly prohibits any state from directly or indirectly establishing any requirement that is not identical to the relevant federal requirements.  21 U.S.C. § 343-1(a)(5).  Plaintiff's claims seek to enjoin the use of the very term permitted by the NLEA and its accompanying regulations.  Plaintiff's claims must therefore fail because they would necessarily impose a state-law obligation for trans fat disclosure that is not required by federal law").  In contrast, ConAgra cites no provision in the FDCA nor any FDA regulation that concerns use of the phrase "100% Natural," or specifies that a product cannot be labeled "natural" despite being produced from genetically modified plants.

ConAgra argues that the FDA has repeatedly indicated that bioengineered foods are not meaningfully different from foods developed through traditional plant breeding.[17]  It cites a 2001 draft FDA report, which provided non-binding guidance on labeling "indicating whether foods have or have not been developed using bioengineering."[18]  The document reiterates the FDA's 1992 policy position that it "has no basis for concluding that bioengineered foods differ from other

---

[17]Motion at 4.

[18]Request for Judicial Notice, Docket No. 25 (August 24, 2011), Exh. A ("Guidance for Industry").  The court can judicially notice the document, which is non-binding regulatory guidance disseminated by a regulatory agency.  *Peviani*, 750 F.Supp.2d at 1116 ("Defendants request that the Court take judicial notice of the FDA Food Labeling Guide, which is a regulatory guideline disseminated by the FDA in order to provide nonbinding guidance regarding requirements for trans fat labeling.  The Court finds that the FDA Food Labeling Guide is a judicially noticeable document"); *Ries v. Hornell Brewing Co.*, No. 10-1139-JF (PVT), 2010 WL 2943860, *5 n. 3 (N.D. Cal. July 23, 2010) (taking judicial notice of a document on the FDA's website).

foods in any meaningful or uniform way, or that, as a class, foods developed by the new techniques present any different or greater safety concern than foods developed by traditional plant breeding."[19] ConAgra reads too much into the guidance, however, when it argues that "[p]laintiff in essence seeks to create a distinction – between 'natural' oils and those made from bioengineered plants – whe[n] the FDA has determined that no such distinction exists."[20] If anything, the guidance reinforces the view that a food producer's statement as to whether a product contains genetically modified ingredients can be misleading, and supports Briseno's assertion that there is a distinction between affirmatively representing that a product is 100% Natural and omitting the fact that the product contains bioengineered foods from its label. The FDA states:

> "The agency is providing the following guidance to assist manufacturers who wish to voluntarily label their foods as being made with or without the use of bioengineered ingredients. While the use of bioengineering is not a material fact, many consumers are interested in the information, and some manufacturers may want to respond to this consumer desire. The guidance . . . is intended to help ensure that labeling is truthful and not misleading."[21]

The guidance then addresses what terms can be used to convey accurate information, stating, for example, that "[t]erms like 'not genetically modified' and 'GMO free' that include the word 'modified' are not technically accurate unless they are clearly in a context that refers to bioengineering technology."[22] As a result, the document does not support ConAgra's assertion that the FDA has concluded that there is no distinction between natural and bioengineered foods, or that statements concerning genetic modification, or the lack thereof, cannot be misleading.

Even if the document supported ConAgra's position, however, it would not be entitled to preemptive effect. As the guidance makes clear, it is merely a non-binding draft distributed for

---

[19]Guidance for Industry at 1.

[20]Motion at 15.

[21]Guidance for Industry at 2.

[22]*Id.* at 3.

comment purposes.[23]   The guidance was not the product of a formal administrative process suggesting fairness and deliberation by the agency; it therefore cannot be said to have the force of federal law.  See *Holk*,  575 F.3d at 342.[24]

_____

[23]*Id.* at 1.

[24]ConAgra also cites a 1992 statement of policy by the FDA, for which written comments were sought.  In that document, the FDA stated that "the regulatory status of a food, irrespective of the method by which it is developed, is dependent upon objective characteristics of the food," rather than the methods by which it was developed.  (Request for Judicial Notice, Exh. B at 2-3.) The statement concerns how the FDA views its regulatory role, not how consumers analyze whether to purchase genetically modified foods.  Elsewhere, it states that "the agency does not believe that the method of development of a new plant variety (including the use of new techniques including recombinant DNA techniques) is normally material information within the meaning of 21 U.S.C. 321(n) and would not usually be required to be disclosed in labeling for the food"). *Id.* at 9.

It does not follow from these agency statements that ConAgra can make affirmative representations about whether its products are genetically engineered (assuming, *arguendo*, that that is what is implied by labeling a product "100% Natural") that are untrue.  The fact that the information is not "normally" material, such that it must be disclosed, does not necessarily mean that it is immaterial if a food producer affirmatively states that a product does not include any genetically modified ingredients.  Information that may "normally" be immaterial in the face of silence by a food producer can become material if the manufacturer makes an affirmative representation regarding the subject.  Here, for example, in the face of silence from ConAgra, a consumer of Wesson Oil who wished to know whether genetically modified plants were used in the product would have had to look beyond the label, because it is not information that the FDA requires be disclosed.  Assuming that consumers would reasonably understand the term 100% Natural to mean that no genetically modified plants were used, however, ConAgra's affirmative representation that the product was 100% Natural would have dissuaded an interested consumer from conducting an investigation.  Consequently, it could be found to have been material.  See *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993) ("Materiality is not judged in the abstract, but in light of the surrounding circumstances"); see also *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994) (same); *Newman v. United States*, 58 F.2d 751, 754 (9th Cir. 1932) (stating, in a case where defendant convicted of perjury in a bankruptcy proceeding. that "[i]t has been said that 'materiality' is a word to be measured by surrounding circumstances").  This is confirmed by the FDA's 2001 guidance, which specifically indicates that food producers can make statements regarding whether their foods' ingredients have been genetically modified that are misleading.  As a result, the court cannot conclude, as a matter of law, that the FDA's guidance compels the conclusion either that ConAgra's labeling is not misleading or that any claim regarding the labeling is preempted.

ConAgra does correctly note,[25] however, that Briseno seeks an order "requiring [d]efendant to adopt and enforce a policy that requires appropriate disclosure of GM ingredients."[26]  Congress and the FDA have thoroughly regulated the manner in which ingredients must be listed on packages, including specifying how oil products must be labeled.  See, e.g., 21 U.S.C. § 343(i)(2); 21 CFR § 101.4(b)(14).  Entering an order of the type Briseno seeks would impose a requirement that is not identical to federal law, and his prayer for such relief is thus preempted.  As this is not the gravamen of his complaint, however, the court cannot accept ConAgra's argument that because Briseno has incuded this prayer for relief in the complaint all of his claims are preempted.  Rather, only this aspect of the prayer is preempted.

C.    **Whether the Court Should Dismiss or Stay the Case Under the Doctrine of Primary Jurisdiction**

As an alternate argument, ConAgra asserts that the court should dismiss or stay the action under the doctrine of primary jurisdiction.  This doctrine "seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within a regulatory regime."  *Pharmaceutical Research and Mfrs. of America v. Walsh*, 538 U.S. 644, 674 (2003) (Breyer, J., concurring); *Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.*, 307 F.3d 775, 780 (9th Cir. 2002) ("[I]t is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts.").  As the *Syntec* court stated:

"[P]rimary jurisdiction is properly invoked when a claim is cognizable in federal court but requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency.  It is not . . . a doctrine that requires that all claims within an agency's purview to be decided by the agency.  Nor is it intended to secure expert advice for the courts from

---

[25]Reply at 7.

[26]Complaint at 15.

13

regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit." *Id.* (citations and quotation marks omitted).

Application of the doctrine is not appropriate here. "[V]arious parties have repeatedly asked the FDA to adopt formal rulemaking to define the word natural and the FDA has declined to do so because it is not a priority and the FDA has limited resources. Moreover, this is not a technical area in which the FDA has greater technical expertise than the courts – every day courts decide whether conduct is misleading." *Lockwood*, 597 F.Supp.2d at 1035; see also *Wright*, 2009 WL 3247148 at *3 ("Based on the FDA's consistent determination that the term 'natural' does not need specific definition, state law claims based upon the use of the term 'natural' [do] not [present] an issue of first impression, do[ ] not require technical expertise within the special competence of the FDA, and [do] not [raise] a particularly complicated issue outside the ability of the Court to consider and decide"). ConAgra's argument that the court should not "forego the benefits of highly-developed agency experience and unique agency resources" is unavailing when there is no indication that the FDA intends to provide guidance on use of the term "natural" in the immediate future.[27] Accordingly, the court declines to dismiss or stay the action on this basis.

## D.   Whether Briseno's Claims Satisfy Rules 8 and 9(b)

ConAgra next contends that Briseno has failed to satisfy the pleading requirements of both Rule 8(a)(2) and Rule 9(b) of the Federal Rules of Civil Procedure.[28]   Under Rule 8(a)(2), a pleading need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." The more rigorous Rule 9(b) requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED.R.CIV.PROC. 9(b); see also 5A Charles A. Wright & Arthur W. Miller, FEDERAL PRACTICE AND PROCEDURE § 1297 (2006) ("[Rule 9(b)] is a special pleading requirement [that is] contrary to the general approach of the 'short and plain,' simplified pleading adopted by the federal rules. . .").

---

[27]Motion at 19.

[28]*Id.* at 20.

14

"To avoid dismissal for inadequacy under Rule 9(b)," a "complaint [must] 'state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.'" *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (quoting *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1393 (9th Cir. 1989), and *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)); see also *In re GlenFed Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc). Conclusory allegations are insufficient, and the facts constituting the fraud must be alleged with specificity. See *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) ("A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer to the allegations. While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient" (citation omitted)); see also *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (to satisfy Rule 9(b), "the complaint [must] identif[y] the circumstances of the alleged fraud so that defendants can prepare an adequate answer" (internal quotation marks omitted)).

"It is well-settled that the Federal Rules of Civil Procedure apply in federal court, 'irrespective of the source of the subject matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003)). Consequently, the Ninth Circuit has held that Rule 9(b)'s pleading requirements apply to claims under both the CLRA and the UCL:

> "The CLRA prohibits 'unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale . . . of goods or services to any consumer.' CAL. CIV. CODE § 1770. The UCL prohibits 'unlawful, unfair or fraudulent business act[s] or practice[s]' and 'unfair, deceptive, untrue or misleading advertising.' CAL. BUS. & PROF. CODE § 17200. Rule 9(b)'s particularity requirement applies to these state-law causes of action. *Vess*, 317 F.3d at 1102-05. In fact, we have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims for violations

15

of the CLRA and UCL." *Kearns*, 567 F.3d at 1125 (citing *Vess*, 317 F.3d at 1102-05).

While the Ninth Circuit acknowledged that "fraud [was] not a necessary element of a claim under the CLRA and UCL," it noted that when a plaintiff alleges "fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of th[e] claim," then "the claim [can be] said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading . . . as a whole must satisfy the particularity requirement of Rule 9(b)." *Id.*   In addition, district courts in California have consistently held that claims under California's FAL are grounded in fraud.   See, e.g., *Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 642 F.Supp.2d 1112, 1124 (C.D. Cal. 2009) ("However, this Court agrees that Plaintiff's false advertising claims are 'grounded in fraud,'" quoting *Vess*, 317 F.3d at 1103-04); *Germain v. J.C. Penney Co.*, No. CV 09-2847 CAS (FMOx), 2009 WL 1971336, *3-4 (C.D. Cal. July 6, 2009) (concluding that false advertising claims were grounded in fraud).   Briseno does not dispute that Rule 9(b) governs his pleading of claims, as each alleges false advertising and false representations regarding the properties of Wesson Oil.

As noted, to satisfy Rule 9(b), a complaint must plead "'the who, what, when, where, and how' of the misconduct charged," *Vess*, 317 F.3d at 1106 (quoting *Cooper*, 137 F.3d at 627, and further must "set forth what is false or misleading about a statement, and why it is false," *GlenFed*, 42 F.3d at 1548.   In *Kearns*, the Ninth Circuit applied these standards to CLRA and UCL claims alleging fraud in the sale of certified pre-owned ("CPO") vehicles.   Ford represented that it put the vehicles through a rigorous inspection process to certify that their safety, reliability, and road-worthiness surpassed those of non-certified used vehicles.   *Kearns*, 567 F.3d at 1122-23. Ford promoted the program through print, broadcast, online, and other media; local dealerships were responsible for the sale and servicing of the vehicles.   *Id.* at 1123.   Plaintiff asserted that Ford made false and misleading statements concerning the safety and reliability of the vehicles. Specifically, he alleged that Ford misrepresented the quality of the complete repair and accident-history report, the level of training that inspecting technicians received, and the rigor of the certification process.   *Id.*   Plaintiff contended that members of the putative class he sought to

represent were exposed to Ford's representations through its televised national marketing campaign, sales materials at the dealership where they bought their vehicles, and sales personnel working at the dealership.  *Id.* at 1125-26.  The Ninth Circuit, reviewing the complaint *de novo*, held that the allegations were not pled with particularity as required by Rule 9(b):

> "Kearns fails to allege in any of his complaints the particular circumstances surrounding such representations.  Nowhere in the [complaint] does Kearns specify what the television advertisements or other sales material specifically stated.  Nor [does] Kearns specify when he was exposed to them or which ones he found material. Kearns also fail[s] to specify which sales material he relied upon in making his decision to buy a CPO vehicle.  Kearns does allege that he was specifically told 'CPO vehicles were the best used vehicles available as they were individually hand-picked and rigorously inspected used vehicles with a Ford-backed extended warranty.'  Kearns does not, however, specify who made this statement or when this statement was made.  Kearns fail[s] to articulate the who, what, when, where, and how of the misconduct alleged.  The pleading of . . . neutral facts fails to give Ford the opportunity to respond to the alleged misconduct.  Accordingly, these pleadings do not satisfy the requirement of Rule 9(b) that 'a party must state with particularity the circumstances constituting fraud. . . .'  Because Kearns failed to plead his averments of fraud with particularity, we affirm the district court's dismissal of his [complaint]."  *Id.* at 1126.

Following the court's reasoning in *Kearns*, this court in *Yumul* concluded that plaintiff had not satisfied Rule 9(b).  It stated:

> "Yumul has failed to allege when during the period from January 1, 2000 to the present she saw or heard the particular representations upon which her complaint is based.  Although the complaint alleges that Yumul purchased Nucoa 'repeatedly' during the class period, it does not allege with any greater specificity the dates on which the purchases were made.  Moreover, the complaint does not allege that Nucoa packaging remained consistent throughout the decade, i.e., that Smart

Balance represented that the product contained no cholesterol and was healthy
(saludable) during the entire class period.  Nor does the complaint allege that each
time Yumul purchased the product, she saw one or both representations."  *Yumul
v. Smart Balance, Inc.*, 733 F.Supp.2d 1117, 1124 (C.D. Cal. 2010).

This case is similar to *Kearns* and *Yumul*.  Briseno alleges that he
"regularly purchased Wesson Canola Oil for his own and his family's consumption,
most recently in May 2011.  Plaintiff believed Defendant's representation that
Wesson Oil was 100% natural.  Plaintiff would not have purchased Wesson Canola
Oil, but for Defendant's misleading statements about the product being 100%
natural.  Plaintiff was injured in fact and lost money as a result of Defendant's
conduct of improperly describing Wesson Oils as 'natural.'  Plaintiff paid for a
100% natural product, but did not receive a product that was 100% natural.
Plaintiff received a product that was genetically engineered in a laboratory, and had
its genetic code artificially altered to exhibit not 'natural' qualities."[29]

While Briseno pleads that he relied on the company's representation that Wesson oils are
"100% Natural," his complaint contains no allegations as to whether he became aware of the
representation through ConAgra's advertising, its labeling or Wesson oils or both.[30]  *Kearns*, 567
F.3d at1126 ("Nor did Kearns specify when he was exposed to them or which ones he found
material.  Kearns also failed to specify which sales material he relied upon in making his decision
to buy a CPO vehicle").

Briseno also provides no information about how often he was exposed to the allegedly
misleading statement.  *Yumul*, 733 F.Supp.2d at 1124.  While Briseno alleges that "*[a]ll* Wesson
Oils are sold with a label stating that the product is '100% Natural,'"[31] he does not allege how

[29]Complaint, ¶ 11.

[30]*Id.*

[31]*Id.*, ¶ 13 (emphasis added).

18

frequently he purchased the product and over what period of time,[32] whether he relied on statements on canola oil labels, on ConAgra's website, in its advertisements, or all of the above, whether the statements remained the same throughout the class period, or, if they did not, on which label(s), advertisement(s) or statement(s) he relied.  Applying the standard set forth in *Kearns*, the court concludes that Briseno has not alleged with particularity when, where, and how the alleged misrepresentations were communicated to him.[33]

The court acknowledges that other courts appear to have applied Rule 9(b) less rigorously. In *Chacanaca v. Quaker Oats Co.*, 752 F.Supp.2d 1111 (N.D. Cal. 2010), the court concluded that consumers of granola bars had satisfied Rule 9(b) by identifying "the particular statements they allege are misleading, the basis for that contention, where those statements appear on the product packaging, and the relevant time period in which the statements were used.  As such, they have satisfied the requisite 'who, what, when, where, and how' of the misconduct charged." *Id.*

---

[32]Briseno does mention one specific purchase in May 2011.

[33]In *Marolda v. Symantec Corp.*, 672 F.Supp.2d 992 (N.D. Cal. 2009), Judge Marilyn Hall Patel of the Northern District of California offered a well-reasoned interpretation of *Kearns* as it applies to omitted information. While Briseno alleges affirmative misrepresentations rather than omissions, the court finds Judge Patel's opinion informative in assessing the level of detail necessary to meet Rule 9(b)'s requirements:

> "In this case, to plead the circumstances of omission with specificity, plaintiff must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information. Plaintiff's complaint should also include samples of materials documenting both her 2006 and 2007 purchases that leave out the essential information." *Id.* at 1001.

See also *id.* at 1005 ("[P]laintiff must first identify with some specificity what the allegedly false representations contained, who made them, where, and whether plaintiff had even seen them"). The plaintiff in Marolda alleged a precise date on which the product was purchased; as a result, failure to plead this information was not a subject on which Judge Patel touched.

The court recognizes that the product at issue in *Marolda* is of a different type than the consumer food product at issue here.  The court would not expect Briseno to be able to produce and attach an exhibits to the complaint receipts for his purchases of Wesson Oils.  Nonetheless, the court believes that some level of detail between that which Judge Patel required in *Marolda* and that provided here (and endorsed in *Chacanaca* and *Astiana*) is required.

at 1126.  Similarly, in *Astiana*, the court concluded that plaintiffs had pled facts with sufficient particularity because it could discern from their allegations that

> "[t]he 'who' is Ben & Jerry's, Breyers, and Unilever.  The 'what' is the statement that ice cream containing alkalized cocoa is 'all natural.'  The 'when' is alleged as 'since at least 2006,' and 'throughout the class period.'  The 'where' is on the ice cream package labels.  The 'how the statements were misleading' is the allegation that defendants did not disclose that the alkalizing agent in the alkalized cocoa was potassium carbonate, which plaintiffs allege is a 'synthetic.'"  *Astiana*, 2011 WL 2111796 at *6.

The court is, of course, bound to apply *Kearns*, and it concludes, for the reasons stated above, that the general allegations Briseno makes about when he purchased the product, where he purchased it, and how he was made aware of ConAgra's representations about do not afford ConAgra adequate opportunity to respond.  *Kearns*, 567 F.3d at 1126.  Consequently, defendant's motion to dismiss Briseno's complaint is granted.  Briseno may replead the claims in a manner that satisfied the particularity requirement of Rule 9(b).[34]

### E.    ConAgra's Final Arguments for Dismissal

While the court dismisses the complaint under Rule 9(b), it takes this opportunity to address ConAgra's additional arguments for dismissal.  First, ConAgra asserts that "[w]idely accessible public information makes clear that 88-94% of the nation's crops of corn, soy and canola [are] grown from seeds that are the product of bioengineering."[35]  It is unclear how the court could take judicial notice of this fact, or what the import of the statistic would be if it did.  The fact that genetically modified foods are common does not indicate that identifying foods that are bioengineered as "natural" is not material to consumers.  Indeed, the fact that Conagra has a specific line of products made entirely from non-bioengineered ingredients suggests that some

---

[34]*Id.* at 15.

[35]Motion at 23.

1   consumers opt not to buy genetically engineered products, no matter how common they may be.[36]

2          The court is similarly unpersuaded by ConAgra's argument that the very existence of its

3   Lightlife and organic lines – made entirely from ingredients that have not been biologically

4   engineered – defeats Briseno's claim.[37]   The fact that Briseno knew about these product lines at

5   the time he filed his complaint does not compel the conclusion that he knew of them at the time

6   he purchased Wesson Oil.[38]

7          Nor is the court persuaded at this stage of the proceedings that Briseno's claims are so

8   implausible that they must be dismissed with prejudice.[39]   While courts have dismissed food

9   labeling claims on this basis, Briseno's allegations cannot readily be analogized to cases involving

10  consumers who were purportedly misled by the use of names such as "Cap'n Crunch with

11  Crunchberries" and "Froot Loops" into concluding that the cereals contained real fruit. *Sugawara*

12  *v. Pepsico, Inc.*, No. 2:08-cv-01335-MCE-JFM, 2009 WL 1439115, *1 (E.D. Cal. May 21,

13  2009); *McKinnis v. Kellogg USA*, No. CV 07-2611 ABC (RCx),  2007 WL 4766060, *1 (C.D.

14  Cal. Sept. 19, 2007).   Briseno's claim that he was misled is not so dubious that the court can

15  resolve it as a matter of law.   Drawing, as it must, all reasonable inferences in favor of plaintiff,

16  the court concludes that a reasonable consumer could have been misled by the labeling, marketing,

17  and advertising at issue in this case.

18

19                              **III.  CONCLUSION**

20         For the reasons stated, the court grants defendant's motion to dismiss.  Plaintiff's prayer

21  for an order requiring ConAgra to adopt and enforce a policy that requires appropriate disclosure

22  of genetically modified ingredients is preempted.  Accordingly, that prayer may not be included

23  in any amended complaint.  With that exception, Briseno may file an amended complaint within

24  ───────────────

25  [36]*Id.* at 24.

26  [37]*Id.*

27  [38]Complaint, ¶ 18.

28  [39]Motion at 24.

1  twenty (20) days of the date of this order.

2

3  DATED: November 23, 2011

4                                          MARGARET M. MORROW
                                           UNITED STATES DISTRICT JUDGE
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28