1  **MILBERG LLP**
   DAVID E. AZAR (SBN 218319)
2  NICOLE DUCKETT FRICKE (SBN 198168)
   One California Plaza
3  300 South Grand Avenue, Suite 3900
   Los Angeles, California 90071
4  Telephone:  (213) 617-1200
   Facsimile:   (213) 617-1975
5  dazar@milberg.com
   ndfricke@milberg.com
6

7  **GRANT & EISENHOFER, P.A.**
   ADAM J. LEVITT (pro hac vice)
8  EDMUND S. ARONOWITZ (pro hac vice)
   30 North LaSalle Street, Suite 1200
9  Chicago, Illinois  60602
   Telephone:  (312) 214-0000
10 Facsimile:   (312) 214-0001
   alevitt@gelaw.com
11 earonowitz@gelaw.com

12 Plaintiffs' Interim Class Counsel

13

14

15              UNITED STATES DISTRICT COURT

16            CENTRAL DISTRICT OF CALIFORNIA

17                   WESTERN DIVISION

18

19 IN RE CONAGRA FOODS, INC.      ) Case No. CV 11-05379-MMM (AGRx),
                                  ) MDL NO. 2291
20                                )
                                  ) <u>CLASS ACTION</u>
21                                )
                                  ) **EXPERT DECLARATION OF**
22                                ) **COLIN B. WEIR IN SUPPORT OF**
                                  ) **MOTION AND MOTION FOR**
23                                ) **CLASS CERTIFICATION AND**
                                  ) **APPOINTMENT OF CLASS**
24                                ) **COUNSEL**
                                  )
25                                ) DATE:      July 14, 2014
                                  ) TIME:      10:00 a.m.
26                                ) CTRM.:     780
                                  ) JUDGE:     Hon. Margaret M. Morrow
27 _____)

28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| |
|---|
| IN RE CONAGRA FOODS, INC. |

Case No. 11-cv-05379-MMM

MDL No. 2291

Declaration

of

# COLIN B. WEIR

May 5, 2014

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108.  ETI is a research and consulting firm specializing in economics, statistics, regulation, and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I hold a Masters of Business Administration, with honors from the High Technology program at Northeastern University, Boston, Massachusetts.  I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio.  I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels.  I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to household appliances, herbal remedies, HBC products, food products, electronics, and computers.  My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is annexed as Exhibit 1 hereto.  This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition.

## II.  ENGAGEMENT

2.    I have been advised by Plaintiffs' counsel that they are seeking certification of twelve separate statewide classes, with each of the classes defined as:  All persons who reside in one of the Class States[1] who have purchased Wesson Oils[2] within the applicable statute of

---

[1] The Class States are California, Colorado, Florida, Illinois, Indiana, Nebraska, New Jersey, New York, Ohio, Oregon, South Dakota, and Texas.



Declaration of Colin B. Weir
May 5, 2014
Page 2 of 12

limitations periods established by the laws of their state of residence through the final disposition of this and any and all related actions.[3]  Throughout this report, I refer to these twelve separate single-state classes as the "Class" and the persons who meet the objective criteria set forth in the class definition as "Class Members."

3.    I have been further advised by Plaintiffs' counsel that, on the outside packaging of each unit of the Wesson Oils, ConAgra, throughout the time period relevant to this litigation, represented that such Wesson Oils are "100% Natural."

4.    I have been further advised by Plaintiffs' counsel that Plaintiffs allege ConAgra's "100% Natural" statement (the "Product Claim") is unfair, false, deceptive, and/or misleading, in violation of the statutory and/or common law of each twelve states at issue, because such Wesson Oils are not, in fact, "100% Natural."

5.    I have been further advised that each of the Plaintiffs alleges they would not have purchased or would not have paid as much for Wesson Oils but for ConAgra's alleged violations of state statutory and/or common law resulting from ConAgra's allegedly unfair, false, deceptive, and/or misleading statement of the Product Claim on each unit of Wesson Oil.[4]

6.    I have been asked by counsel for Plaintiffs to determine whether it is possible to determine damages attributable to the Product Claim – in the event that the Product Claim is determined to be unfair, false, deceptive, and/or misleading as Plaintiffs allege in this litigation – on a Class-wide basis using common evidence and, if so, to provide a framework for such a calculation.

7.    ETI is being compensated at the rate of $600 per hour for my work on this case.

---

[2] Wesson brand cooking oils, including Wesson Vegetable Oil, Wesson Canola Oil, Wesson Corn Oil, and Wesson Best Blend, in a variety of sizes, hereinafter "Wesson Oils" or "Products."

[3] I understand these statute of limitations may vary to some extent depending on the state and legal claim at issue.

[4] *See, generally,* December 19, 2012 Second Consolidated Amended Class Action Complaint ("Complaint").  I have reviewed the Complaint.  *See also,* Deposition of Robert Briseño, July 17, 2013; Deposition of Michele Andrade, August 19, 2013; Deposition of Jill Crouch, August 20, 2013; Deposition of Pauline Michael, August 21, 2013; Deposition of Necla Musat, March 12, 2014; Deposition of Maureen Towey, March 13, 2014.  I have reviewed the transcripts of these depositions.



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 3 of 12

8.   The documents that I reviewed in the course of preparing this declaration are outlined in Exhibit 2.

### III.  SUMMARY

9.   As a threshold matter, it is my opinion that, in the event Plaintiffs establish that the Product Claim is unfair, false, deceptive, and/or misleading as they allege in this litigation, it *is* possible to determine damages attributable to the Product Claim on a Class-wide basis using common evidence by determining, through the application of methods widely accepted in the field of economics, whether Class Members paid a "price premium"[5] for the Products because of the Product Claim, and that it *is* possible to determine Class-wide damages in this case using ConAgra's own available business records, market research data concerning retail prices for the Products at issue in this case and a series of benchmark products, and/or consumer survey data.[6]

10.   The price of the Products, and any price premium resulting from the Product Claim is set by the marketplace.  Individual Class Members have no control over the price of the Products, or the price premium resulting from the Product Claim.  Individual reasons consumers may have for purchasing the Products do not alter this price premium, nor do they alter the injury

---

[5] As used throughout this declaration, the term "Price Premium" is used to indicate the additional amount that consumers paid for Wesson Oils as a direct result of the 100% Natural Claim only, and not the overall premium that Wesson Oils may command in the marketplace vis-a-vis competitor products.

[6] In this report, I discuss the calculation of "price premium" damages, which, in my opinion, is an economically sound method of providing restitution to Class Members should liability be established in this litigation.  The economic harm to Class Members stems from the retail prices they paid, not from the wholesale revenues that ConAgra received.  (Though these are related concepts: *ceteris paribus,* ConAgra charging a premium at wholesale will result in a corresponding premium in retail prices.)  I understand, however, that legal considerations may affect the chosen method for determining damages in this case.  For example, the court may instead prescribe a disgorgement of the full retail purchase price paid for the Products, a disgorgement of the money obtained by ConAgra through the sale of the Products, or a disgorgement of the profits that inured to ConAgra from the sale of the Products.  Should one of these, or another alternate method of calculating damages be prescribed by the Court, it is my opinion that I would be able to calculate and measure such damages, and to do so using common evidence of the sort described at Paragraphs 33 and 46 below. ConAgra has already provided data relating to its wholesale revenues from the sale of Products, and acquires market research data that provides detailed information about the retail sales of the Products.  Along with information about the quantity of Products sold during the class period (which is also maintained by ConAgra in the normal course of business), information of this sort would be sufficient to calculate damages under such alternate methodologies.



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 4 of 12

arising from paying that premium.[7]  The price premium, and economic damages resulting therefrom, exist Class-wide, and can be proven using common evidence.

11.   Several common economic and statistical techniques allow for the comparison of prices across sales channels, retailers, geographies, time periods, and various other product attributes.

12.   One such technique is called hedonic regression, and is widely used to isolate the effect of one or more product attributes on the price of a product.

13.   Another is called Conjoint analysis, which is also widely used to reveal the relative importance and price components of product attributes.

14.   I will discuss these techniques, and their application to this litigation in detail below. I will note here, however, that neither of these techniques requires any individual inquiry, and can produce Class-wide results using common evidence.  The result of each of these analyses will be the determination of a price premium, if any, that Class Members paid as a result of the Product Claim.

15.   The damages in this litigation will be a straightforward calculation of the quantity of the Products sold and the price premium for those products.

## IV. HEDONIC REGRESSION

16.   Hedonic regression is a commonly used economic method that measures the value of various product attributes.  Hedonic regression is based on the concept that each product attribute has a different and measurable impact on aggregate consumer utility, i.e., consumers will pay a certain amount for each product attribute.

17.   First detailed by Sherwin Rosen in 1974,[8] hedonic regression is now widely used by economists.  Indeed, there are numerous studies that apply the hedonic regression technique to

---

[7] Similarly, because the price and price premium is determined in the marketplace, individual valuation of the Products does not alter the price premium or injury arising from paying that premium.


ECONOMICS AND TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 5 of 12

myriad consumer products and the practice has been adopted by statistical agencies with a focus on measuring consumer prices (e.g., the U.S. Bureau of Economic Analysis, the U.S. Bureau of Labor Statistics).[9]  The analysis is conducted using aggregated pricing and product attribute information.

18.   The hedonic regression function can be expressed as:

$$P_i(Z) = P_i(Z_1, Z_2, \ldots Z_N)$$

In this function, P is the Price of product "i", each Z factor is a product attribute variable.  Each product attribute Z factor can have either a positive, negative, or null effect on the total Price, P. This model can be used to determine the value of the specific attributes of various products.

19.   In this litigation, the hedonic regression can be specified to separate out the prices that consumers pay for each of the Product attributes (e.g., the Product Claim, the value of the Wesson brand, etc.).

20.   The regression can be calculated in a variety of forms, including "linear" and "semi-log."

21.    In a linear format, the regression will calculate the dollar component amount of each product attribute (the value of each attribute is expressed in dollars and cents).

22.   In the semi-log format, the use of natural logarithms[10] allows the regression to calculate a percentage price premium or discount for each product attribute (the value of each attribute is expressed as a percentage of the price).

23.   One potential model specification would be:

$$P(Wesson) = \sum_{n=1}^{N} (\beta_n * z_n) + \varepsilon$$

---

[8] *Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition.* Rosen, Sherwin, The Journal of Political Economy, Vol. 82, No. 1. (Jan. - Feb., 1974) ("Rosen").

[9] The use of hedonic regression in individual studies is too widespread to exhaustively document in detail. *See, e.g., The Expanding Role of Hedonic Methods in the Official Statistics of the United States,* Moulton, Brent R., Bureau of Economic Analysis, U.S. Department of Commerce, June 2001.  Additional examples of studies using hedonic regression are set forth below.  *See,* footnote 12 below.

[10] The logarithm of a number is the exponent to which another fixed value, the base, must be raised to produce that number.  This expression is often notated as $log_{base}(x)$.  The natural logarithm has the number $e$ (approx. 2.718) as its base.  Natural logarithms are often notated without reference to the base as $ln\ (x)$.


ECONOMICS AND TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 6 of 12

where P(Wesson) is the price per unit of the Product or Products.  Beta, $\beta$, is the coefficient for the vector $z$, $z_{ni}$ is a vector representing the bundle of product attributes being measured, and $\varepsilon$ is the error term.[11]

### A review of sample literature

24.   Hedonic regression is routinely used to calculate the value of product attributes. The hedonic regression model has been used to evaluate pricing in many different types of markets, but there is particularly extensive literature on this method in consumer product mass markets—the stated marketplace for the Products at issue in this litigation.

25.   Any variety of attributes can be studied, ranging from quality, geo-location and brand, to production standard claims such as "natural" and "organic," including the "100% Natural" production standard Claim at issue here.  Indeed, the price premium associated with these production standard claims is a very common attribute tested in the literature.[12]

26.   The bulk of the literature testing for the presence of such price premiums associated with production standard claims begins with the logical hypothesis that such a premium exists, and affirms the hypothesis after testing.[13]

27.   Here, ConAgra's own extensive market research confirms that the Product Claim is a major driver of purchase intent and consumer value.[14]

---

[11] Also called the "disturbance" term, $\varepsilon$ captures the effects of chance events, unmeasured variables, and other residuals as calculated by the model.

[12] *See, e.g., The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices*, Chang, Jae Bong, *et al*, Journal of Agricultural and Resource Economics 35.3 (2010): 406-423; *Organic Premiums of U.S. Fresh Produce*, Smith, T. A. *et al*, 2008 Proceedings of the NCCC-134 Conference on Applied Commodity Price Analysis, Forecasting, and Market Risk Management. St. Louis, MO. [http://www.farmdoc.uiuc.edu/nccc134].

[13] My review of the literature did not turn up a study that concluded that the labeling of a product with a production standard claim such as "organic" or "natural" did not produce a price premium.

[14] See, e.g., Kelston Decl., Exh. 24, CAG0000711 at 719 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Kelston Decl., Exh. 25, CAG0000789 *et seq.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Kelston Decl., Ex. 26, CAG0003889 *et seq.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

These Bates numbers refer to documents produced by ConAgra in this litigation that I have reviewed.



Declaration of Colin B. Weir
May 5, 2014
Page 7 of 12

28.   One hedonic regression study shows that a product with an "all natural" or "natural" label acquires a price premium very similar to one with an "organic" label.  While organic products must satisfy many more requirements in order to be labeled "organic," both labels have a similar positive effect on the price of a product.  This study, (examining the different effects of the terms "all natural" and "organic" in the yogurt market) finds the positive price premiums attributable to "natural" and "organic" labels to be statistically similar.[15]

29.   Another hedonic regression study examines the price attributes of retail eggs.  An examination of retail price data established that "organic feeding" has a positive effect on the retail price of eggs.[16]  In another case, the same method was used in order to examine the impact of nutrition labeling on breakfast foods.  "Organic" was found to also have a significant positive effect on the retail price of breakfast bars, granola and hot cereals.[17]

**Use of Hedonic Regression in This Litigation**

30.   Hedonic regression appears to be an ideal technique for calculating the price premium that Class Members paid for Products, and the economic harm Class Members sustained as a result of the Product Claim, in the event that the Product Claim is determined to be unfair, false, deceptive, and/or misleading in violation of law, as Plaintiffs allege.

31.   The hedonic regression is designed to model the price premium or discount resulting from each of many product attributes, and is used routinely to evaluate the price premium associated with production standard claims such as the Product Claim in this litigation.[18]

---

[15] *Organic and All Natural: Do Consumers Know the Difference?* Anstine, Jeffrey, Journal of Applied Economics and Policy 26.1 (2007):15-27.

[16] *Hedonic Analysis of Retail Egg Prices,* Karipidis, Philippos I., *et* al, Journal of Food Distribution Research 36.3 (2005).

[17] *The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals,* Muth, Mary K., *et al Contributed Paper prepared for presentation at the International Associate of Agricultural Economists Conference, Beijing, China.* August 2009. RTI International and Food and Drug Administration, Center for Food Safety and Applied Nutrition. 10 March 2014.
http://ageconsearch.umn.edu/bitstream/50333/2/Manuscript_Value_of_Labeling_Statements_IAAE%20174.pdf

[18] As discussed above, the hedonic regression technique permits analysis across geographic locations – or, indeed, within several distinct geographic locations, such that the technique can be applied separately within the geographic



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 8 of 12

32.   The time periods, geographies, and relevant product attributes ("natural" claims, brand, etc). are easily identifiable and determinable in this litigation.

33.   The data necessary to conduct a hedonic regression analysis and damage calculation in this litigation should be easily obtained, and, indeed, elements of this data are regularly used by ConAgra in the normal course of its business operations.  Such data would come from one of several sources: ConAgra's own business records ████████████████████████ ██████████ market research data from companies such as IRI and/or Nielse ███████████ ██████████████████████████████████████████████████████████ and independent market research (e.g., pricing and product attribute information). [21]

34.   No individualized analyses, or Class-Member-specific inquiry will be required.  All relevant data needed to complete the hedonic regression analysis will be Class-wide, common evidence.

35.   The results of the hedonic regression will be applicable across each of the proposed Classes, but is not a calculation of average damages per class member.

---

confines of each of the Class States at issue here – and time periods.  By analyzing the separate effects of each product attribute, there is no need to identify any one single benchmark product.  This is because the regression isolates and separately measures the effects on price of each attribute, and accounts for differences between the Products in question and other products in the marketplace.

[19] See, e.g., Kelston Decl., Exh. 27, CAG0001411 ███████████████████████████

[20] See, e.g., Kelston Decl., Exh. 28, CAG0001228, *et seq.*, ████████████████████; Kelston Decl., Exh. 29, CAG0001786, *et seq.*, ████████████████ ████████████████████; Kelston Decl., Exh. 30, CAG0001807, *et seq.*, ████████████████████████████████.

[21] Given my experience, I have no reason to believe that the data necessary to perform a hedonic regression analysis in this litigation will not be available. ███████████████████████████████ ████████████████████  However, in the unlikely event that the necessary data is absent or unobtainable, a second technique, Conjoint analysis (outlined below) would still be possible.


ECONOMICS AND TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 9 of 12

## V.  CONJOINT ANALYSIS

36.  Much like hedonic regression analysis, Conjoint analysis permits an economist to
analyze the value of various product attributes.[22]

37.  Conjoint analysis, however, takes a different approach to these calculations than
hedonic regression does.  Rather than analyzing retail prices and product attributes to determine
attribute value, Conjoint analysis is a representative survey technique that analyzes consumer
responses directly to determine attribute value.

38.  Conjoint analysis was initially developed in the 1960s as part of the marketing
discipline, and continues to evolve primarily as a marketing tool.  Typically, Conjoint analysis is
used to determine consumer preferences and price/attribute information during the development
and marketing of a product.

39.  Despite its roots and typical application, Conjoint analysis is founded on rigorous
statistical and economic principles, and is not required to be used as part of a traditional
marketing program.[23]

40.  In a typical Conjoint analysis, survey panelists are confronted with various choices
of product attributes, prices, and other alternatives, and asked either to rank their preferences, or
to choose the most preferred attribute or combination thereof.

41.  Through Conjoint analysis, by systematically varying the attributes of the product
and observing how respondents react to the resulting product profiles, one can statistically
deduce information about the individual attributes.

42.  In contrast to a survey asking direct questions about individual product features,
Conjoint survey respondents cannot simply say that all features are important; rather, they must
trade off different aspects of the product, allowing for a measurement of the actual value of any

---

[22] Conjoint analysis as a discipline is quite broad, and can be used to facilitate many other sorts of research beyond
the specific application that I discuss here.
[23] *See, e.g.*, Sawtooth Software technical papers, available online at
http://www.sawtoothsoftware.com/support/technical-papers; *When "All Natural" May Not Be*, Analysis Group
Forum (Winter 2013) http://www.analysisgroup.com/assessing_false_advertising_claims.aspx



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 10 of 12

attribute in the marketplace.  Statistical methods (often linear regression) are then applied to the survey responses to calculate attribute value.[24]

**Use of Conjoint Analysis in This Litigation**

43.   Conjoint analysis appears to be another alternative for calculating the price premium paid for the Products and measuring, with common proof, the economic harm that Class Members sustained as a result of the Product Claim.

44.   As discussed above, Conjoint analysis is designed to determine a product's price components based upon each of the product's many product attributes.  The Conjoint technique also permits analysis across geographic locations.

45.   The geographies, and relevant product attributes ("natural" claims, brand, etc.) are all easily identifiable and determinable in this litigation.  It is precisely this interplay of product attributes that permits Conjoint analysis to measure the value of the Product Claim relative to the specific Products herein.

46.   Conjoint analysis, as a survey tool, does not rely on an existing data set for its analysis because it relies on data generated through the survey process.  Common Conjoint analysis software would permit the administration of a representative sample survey, and the analysis of the results therefrom.  The data necessary to select the sample for, and conduct the Conjoint analysis and calculate damages is easily obtained from one of several sources, including: ConAgra's own business records (e.g., target demographics, sales volumes); market research data from companies such as IRI and/or Nielsen (e.g., demographic information); and independent research (e.g., sampling technique and product attribute information).[25]

47.   No individualized analyses, or Class-Member-specific inquiry will be required.  All relevant data needed to complete the Conjoint analysis will be Class-wide, common evidence.

---

[24] *See, e.g., Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*, Bryan K. Orme, Research Publishers 2006.
[25] See footnotes 19, 20 and 21,  *supra*.



Declaration of Colin B. Weir
May 5, 2014
Page 11 of 12

48.  The results of the Conjoint analysis will be applicable across each of the proposed Classes, but is not a calculation of average damages per class member.

## VI.  CALCULATING DAMAGES

49.  Calculating damages in this litigation will be simple and straightforward once the price premium that ConAgra was able to command for the Wesson Oils due to the Product Claim and total Product sales (in units or dollars) are determined.

50.  If the price premium for the Wesson Oils is determined on a dollar basis, the calculation of Class-wide damages for any Product will be:

$$\$Price\ Premium \times Qty.Units\ Sold\ = Damages$$

Alternatively, if the price premium for the Wesson Oils is determined on a percentage basis, the calculation of Class-wide damages for any Product will be:

$$\%Price\ Premium \times \$Units\ Sold\ = Damages$$

51.  These calculations can be performed on a Class-wide basis, across specific geographies, and for any defined time period, including the Class Period(s) in this litigation.

## VII.  RESERVATION OF RIGHTS

My testimony is based upon the information and data presently available to me.  I understand that additional, different, and/or updated data including market research data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony.



ECONOMICS AND TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 12 of 12

VERIFICATION

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Boston, Massachusetts, this 5th day of May, 2014.

Colin B. Weir

ECONOMICS AND TECHNOLOGY, INC.

# Exhibit 1

# Statement of Qualifications
## of

# COLIN B. WEIR


ECONOMICS AND
TECHNOLOGY, INC.

## Statement of Qualifications

## COLIN B. WEIR

Colin B. Weir is Vice President at Economics and Technology, Inc. Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple linear regression, statistical sampling, micro- and macroeconomic modeling and other economic analysis. Such analysis often involves analysis of databases, call detail records, and other voluminous business records. Mr. Weir is familiar with common statistical and econometric software packages such as STATA and SHAZAM. Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations. Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels. Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation; liquidated damages provisions; lost profits; false claims; diminution in value; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue, Thomas *et al* (class action litigation, Superior Court, County of Alameda), Ayyad *et al* (class action litigation, Superior Court, County of Alameda), and White *et al* (class action litigation, Superior Court, County of Alameda).

Mr. Weir holds an MBA with honors from Northeastern University. He also holds a Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, a business member of the Boston Bar Association, and serves as the comptroller for the Sybaris Investment Partnership.

### Publications and Testimony of Colin B. Weir

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

1


ECONOMICS AND TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.

*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York* (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.

2



*Statement of Qualifications – Colin B. Weir*

Mr. Weir has submitted the following testimony:

**United States District Court, Southern District of New York,** *In re: Scotts EZ Seed Litigation,* Case No. 12-cv-4727-VB, on behalf of Bursor & Fisher, PA; Declaration filed March 31, 2014.

**United States District Court, Central District of California,** *Julie Fagan, Michael Fagan, Melissa Pennalatore, Amy Sapeika and Shelley Trinchero, individually and on behalf of all others similarly situated v. Neutrogena Corporation,* Case No. 13-cv-01316-SVW, on behalf of Izard Nobel LLP; Declaration filed March 21, 2014; Deposition on April 3, 2014**.**

**United States District Court, Central District of California,** *Enzo Forcellati and Lisa Roemmich, individually and on behalf of all others similarly situated v. Hyland's Inc., Standard Homeopathic Laboratories, Inc. and Standard Homeopathic Company,* Case No. 12-cv-01983-GHK, on behalf of Faruqi and Faruqi; Declaration filed December 13, 2013; Deposition on February 27, 2014**.**

**United States District Court, Southern District of Florida,** *Adam Karhu, on behalf of himself and all others similarly situated, v. Vital Pharmaceuticals, Inc., d/b/a VPX Sports,* Case No. 13-cv-60768-JIC, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed December 13, 2013; Declaration filed January 6, 2014; Declaration filed March 31, 2014.

**Trial Court of Massachusetts, District of Edgartown,** *Schepici v. JetBlue Airways Corp.,* on behalf of plaintiff; Mediation on December 4, 2013.

**Superior Court of California, County of Alameda,** *In re: Cellphone Termination Fee Cases, Ramzy Ayyad, et al, Plaintiff, v. Sprint Spectrum, L.P., Defendant,* JCCP No. 4332, Case No. RG03-121510, on behalf of the Executive Committee; Declaration filed September 18, 2013.

**United States District Court, Northern District of California,** *Maria Torres, Gabriel Rojas, and Ian Kerner, individually and on behalf of all others similarly situated v. JC Penney Corporation, Inc.; and JC Penney Company, Inc.,,* Case No. cv-12-01105-RS, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration filed September 13, 2013; Deposition on October 2, 2013.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Foods Inc,* Case No. 13-cv-02311-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 26, 2013, Deposition on October 21, 2013.

**United States District Court, Northern District of California,** *Desiree Moore, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs v. Verizon Communications,* Case No. 4:09-cv-01823-SBA, on behalf of David Schachman and Associates PC, Jacobs Kolton Chtd., and Keller Grover, LLP; Declaration filed June 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection],* on behalf of Claimant; Oral testimony and cross examination on March 1, 2013.

3



*Statement of Qualifications – Colin B. Weir*

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 20, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 19, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of  Claimant; Oral testimony and cross examination on February 13, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 7, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 4, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on January 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 12, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 10, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on November 28, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declarations filed October 4, 2012 and November 5, 2012; Oral testimony and cross examination on November 27, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declaration filed April 16, 2012; Oral testimony and cross examination on May 11, 2012.

**United States District Court, District of Massachusetts,** *Marcy Cruz v. Justin Kagan, Arthur Hegarty, Ronald Teachman, and the City of New Bedford*, Case No. 1:09-cv-11793-RGS, on behalf of Marcy Cruz, Expert Report filed February 28, 2011; Oral testimony and cross examination on December 1, 2011.

**United States District Court, Southern District of New York,** *Bursor & Fisher P.A., v. Federal Communications Commission*, Case No. 1:11-cv-05457-LAK, on behalf of Bursor & Fisher P.A., Declaration filed August 17, 2011.

4



*Statement of Qualifications – Colin B. Weir*

**United States District Court, District of New Jersey,** *In Re: Sprint Premium Data Plan Marketing and Sales Practices Litigation,* Master Case No. 10-6334 (SDW) MDL No. 2228**,** on behalf of Thornton, Davis, & Fein, P.A., Declaration filed August 11, 2011.

**United States District Court, Northern District of California,** *Patrick Hendricks, on behalf of himself and all others similarly situated, Plaintiffs, v. AT&T Mobility LLC, Defendant*, Case No. C11-00409, on behalf of Bursor & Fisher, P.A., Declaration filed August 7, 2011.

**Federal Communications Commission,** *In the Matter of Applications of AT&T Inc. & Deutsche Telekom AG for Consent to Assign or Transfer Control of Licenses and Authorizations*, WT Docket No. 11-65, on behalf of Butch Watson, Declaration filed June 20, 2011.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. O1 Communication, Inc. (U 6065 C), Defendant*, Case No. C.08-03-001, on behalf of the O1 Communications, Inc., Reply Testimony filed November 6, 2009; Oral testimony and cross examination on November 16, 2009.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis, Defendants,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Oral testimony and cross examination on November 9, 2009.

**United States District Court, District of New Jersey,** *Judy Larson, Barry Hall, Joe Milliron, Tessie Robb, and Willie Davis, individually and on behalf of all others similarly situated, v.  AT&T Mobility LLC f/k/a Cingular Wireless LLC and Sprint Nextel Corporation and Sprint Spectrum L.P. d/b/a Sprint Nextel and Nextel Finance Company, Civ. Act. No. 07-5325 (JLL)*, on behalf of PinilisHalpern, LLP and Law Offices of Scott A. Bursor, Declaration filed *under seal* October 19, 2009.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. Pac-West Telecomm, Inc. (U 5266 C), Defendant*, Case No. C.08-09-017, on behalf of the Pac-West Telecomm, Inc., Rebuttal Testimony filed May 1, 2009.

**Illinois Commerce Commission,** Illinois Bell Telephone Company Annual Rate Filing for Non-Competitive Services Under an Alternative Form of Regulation, Ill. C. C. Docket No. 08-0249, on behalf of the People of the State of Illinois, Declaration filed May 2, 2008.

5



*Statement of Qualifications – Colin B. Weir*

**Federal Communications Commission,** Qwest Petition for Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of AT&T Inc, For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of BellSouth Corporation For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of the Embarq Local Operating Companies for Forbearance Under 47 U.S.C. §160(c) From Application of *Computer  Inquiry* and certain Title II Common Carriage Requirements; WC Docket Nos. 06-125 and 06-147, on behalf of the AdHoc Telecommunications Users Committee, Declaration filed October 9, 2007.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis, Defendants,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Declaration filed January 5, 2007; Deposition on November 13, 2007; Oral testimony and cross-examination on December 19, 2007; Oral testimony on January 9, 2008.

Mr. Weir has served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional publications and testimony at the state, federal, and international levels.

6



# Exhibit 2

# Facts, Data, and
# Other Information Considered



-CAG0000711

-CAG0000789

-CAG0001228

-CAG0001249

-CAG0001318

-CAG0001411

-CAG0001786

-CAG0001807

-CAG0001960

-CAG0003805

-CAG0003889

-CAG0003898

-CAG0005560

-CAG0005561

-CAG0005562

-CAG0031700

-CAG0031701

-CAG0031702

-CAG0031843

-CAG0031898

-CAG0031904

-CAG0031905

-CAG0031906

-CAG0031907

-CAG0031908

-CAG0031909

-CAG0031910



ECONOMICS AND
TECHNOLOGY, INC.

-CAG0031911

-CAG0031912

-CAG0031913

-CAG0031914

- Second Consolidated Amended Class Action Complaint, December 19, 2012

-Deposition of Robert Briseño, July 17, 2013

-Deposition of Michele Andrade, August 19, 2013

-Deposition of Jill Crouch, August 20, 2013

-Deposition of Pauline Michael, August 21, 2013

-Deposition of Necla Musat, March 12, 2014

-Deposition of Maureen Towey, March 13, 2014

-*Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition.* Rosen, Sherwin, The Journal of Political Economy, Vol. 82, No. 1. (Jan. - Feb., 1974)

-*The Expanding Role of Hedonic Methods in the Official Statistics of the United States*, Moulton, Brent R., Bureau of Economic Analysis, U.S. Department of Commerce, June 2001.

-*The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices*, Chang, Jae Bong, *et al*, Journal of Agricultural and Resource Economics 35.3 (2010): 406-423.

-*Organic Premiums of U.S. Fresh Produce*, Smith, T. A. *et al*, 2008 Proceedings of the NCCC-134 Conference on Applied Commodity Price Analysis, Forecasting, and Market Risk Management. St. Louis, MO. [http://www.farmdoc.uiuc.edu/nccc134].

-*Organic and All Natural: Do Consumers Know the Difference?* Anstine, Jeffrey, Journal of Applied Economics and Policy 26.1 (2007):15-27.

-*Hedonic Analysis of Retail Egg Prices*, Karipidis, Philippos I., *et* al, Journal of Food Distribution Research 36.3 (2005).

-*The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals,* Muth, Mary K., *et al* Contributed Paper prepared for presentation at the International Associate of



ECONOMICS AND TECHNOLOGY, INC.

Agricultural Economists Conference, Beijing, China, August 2009 on behalf of RTI International and Food and Drug Administration, Center for Food Safety and Applied Nutrition.

-*The Dynamics of Brand Equity: A Hedonic Regression Approach to the Laser Printer Market*, Auer, Ludwig von, *et al*, Research Papers in Economics, Universitat Trier, March 2010.

-*Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*, Bryan K. Orme, Research Publishers 2006.

-Generally, Sawtooth Software technical papers, available online at

http://www.sawtoothsoftware.com/support/technical-papers

-*When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013)

http://www.analysisgroup.com/assessing_false_advertising_claims.aspx

-*Note on Conjoint Analysis,* Hauser, John R., MIT Sloan Courseware

- *Do 'Natural' Claims Cut the Mustard?*, Emma Gubisch, Leatherhead Food Research (2013)

ECONOMICS AND
TECHNOLOGY, INC.