1   Robert B. Hawk (Bar No. 118054)
    Stacy R. Hovan (Bar No. 271485)
2   HOGAN LOVELLS US LLP
    4085 Campbell Ave., Ste. 100
3   Menlo Park, California  94025
    Telephone:   (650) 463-4000
4   Facsimile:    (650) 463-4199
    robert.hawk@hoganlovells.com
5   stacy.hovan@hoganlovells.com

6   Douglas M. Schwab (Bar No. 43083)
    Benjamin T. Diggs (Bar No. 245904)
7   HOGAN LOVELLS US LLP
    3 Embarcadero Center, 15th Floor
8   San Francisco, CA  94111
    Telephone:  (415) 374-2300
9   Facsimile:    (415) 374-2499
    douglas.schwab@hoganlovells.com
10  benjamin.diggs@hoganlovells.com

11  Attorneys for Defendant
    CONAGRA FOODS, INC.

12

13                    UNITED STATES DISTRICT COURT

14                   CENTRAL DISTRICT OF CALIFORNIA

15

16  IN RE CONAGRA FOODS, INC.      CASE NO. 11-CV-05379MMM (AGRX)
                                   MDL NO. 2291

17                                 **DECLARATION OF KEITH R.
                                   UGONE, PH.D. IN OPPOSITION TO
18                                 PLAINTIFFS' MOTION FOR CLASS
                                   CERTIFICATION**

19                                 **REDACTED VERSION**

20

21                                 Date:      July 14, 2014
                                   Time:      10:00 a.m.
22                                 Judge:     Hon. Margaret M. Morrow

23

24

25

26

27

28

Hogan Lovells US
LLP
Attorneys At Law
Menlo Park

\\029207/000019 - 1120626 v1

UGONE DECL. IN OPP. TO MTN. FOR CLASS CERT.
CASE NO. 11-CV-05379MMM (AGRX);  MDL NO. 2291

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

IN RE CONAGRA FOODS, INC.                )
                                         )
                                         )
                                         )
                                         )
                                         )        Case No. CV 11-05379-MMM
(AGRx)                                   )
                                         )
                                         )        MDL No. 2291
                                         )
                                         )
                                         )

**DECLARATION OF KEITH R. UGONE, PH.D.**

**June 2, 2014**

# DECLARATION OF KEITH R. UGONE, PH.D.

## June 2, 2014

I.    OVERVIEW OF ASSIGNMENT ................................................................1

II.   SUMMARY OF OPINIONS................................................................4

    A. Evaluation of the Weir Declaration..............................................5

    B. Claimed Injury And Claimed Monetary Recovery Cannot Be Reliably Calculated On A Class-Wide Basis...........................................11

III.  QUALIFICATIONS AND EXPERIENCE..............................................13

IV.  FACTS, DATA, AND INFORMATION RECEIVED..............................15

V.   OVERVIEW OF CHALLENGED PRODUCTS.....................................16

VI.  MR. WEIR FAILED TO DEMONSTRATE THE EXISTENCE OF A PRICE PREMIUM ATTRIBUTABLE TO CHALLENGED CLAIM................................................................17

VII.  MR. WEIR'S PROPOSED APPROACHES WILL NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE (OR COMMON PROOF) BASIS.......................22

    A. Proposed Use Of An Undefined Number Of Different Price Premiums Necessitates Individual Inquiry.................................................22

    B. Ignores Additional Individualized Factors Within Each Proposed Different Price Premium To Be Calculated.............................................25

VIII. MR. WEIR FAILED TO SPECIFY DETAILS NECESSARY TO EVALUATE RELIABILITY OF PROPOSED APPROACHES...........28

    A. Hedonic Regression.................................................................28

    B. Conjoint Analysis....................................................................31

IX.  HEDONIC REGRESSION AND CONJOINT ANALYSIS HAVE NUMEROUS DRAWBACKS THAT MR. WEIR'S LIMITED DISCUSSION DOES NOT ADDRESS.......................................34

    A. Hedonic Regression.................................................................35

    B. Conjoint Analysis....................................................................37

        1. Failure To Describe The Determination Of A Price Premium From Conjoint Survey Results.............................................40

        2. Failure To Address How His Analysis Would Overcome Other Common Flaws In Conjoint Studies.....................................44

    C. Summary................................................................................47

**X.      WHETHER AND TO WHAT EXTENT ANY CLASS MEMBER WAS INJURED DEPENDS UPON INDIVIDUALIZED INQUIRY.....47**

A. Individual Inquiries Are Required To Determine Putative Class Members' Reasons For Purchasing Wesson Oil Products.......................48

B. Individual Inquiry Is Required To Determine The Specific Price Paid For Wesson Oil Products By Each Class Member...................................52

C. Average Retail Price Data Show No Consistent Price Premium Relative To Other Branded Oil Products ..................................................56

D. Summary..................................................................................................63

**XI.     LACK OF EVIDENCE TO DETERMINE INDIVIDUAL PUTATIVE CLASS MEMBERS' ALLEGED ECONOMIC INJURY.64**

## DECLARATION OF KEITH R. UGONE, PH.D.

## June 2, 2014

## I.    OVERVIEW OF ASSIGNMENT

1.    I am an economist and have been retained by counsel for ConAgra Foods, Inc. ("ConAgra" or the "Defendant") to offer my opinions regarding various economic and associated class certification issues relevant to the matter of *In Re ConAgra Foods, Inc.* I understand that individual consumers (collectively, the "Named Plaintiffs"[1]) residing in California, Colorado, Florida, Illinois, Indiana, Nebraska, New York, Ohio, Oregon, South Dakota, and Texas allege that ConAgra has engaged in false and misleading

---

[1]  The Named Plaintiffs were listed as: Mr. Robert Briseño, Ms. Michele Andrade, Ms. Christi Toomer and Ms. Lil Marie Birr (the "California Named Plaintiffs"); Ms. Jill Crouch (the "Colorado Named Plaintiff"); Ms. Julie Palmer and Ms. Janeth Ruiz (the "Florida Named Plaintiffs"); Ms. Pauline Michael (the "Illinois Named Plaintiff"); Ms. Cheri Shafstall (the "Indiana Named Plaintiff"); Ms. Bonnie McDonald (Massachusetts); Ms. Dee Hopper-Kercheval (the "Nebraska Named Plaintiff"); Ms. Brenda Krein and Ms. Phyllis Scarpelli (the "New Jersey Named Plaintiffs"); Ms. Kelly McFadden and Ms. Necla Musat (the "New York Named Plaintiffs"); Ms. Maureen Towey (the "Ohio Named Plaintiff"); Ms. Erika Heins (the "Oregon Named Plaintiff"); Ms. Rona Johnston (the "South Dakota Named Plaintiff"); Ms. Anita Willman (the "Texas Named Plaintiff"); Ms. Anne Cowan (Washington); and Ms. Patty Boyer (Wyoming).  I understand that the following individuals have since withdrawn as Named Plaintiffs: Ms. Patty Boyer (Wyoming); Ms. Anne Cowan (Washington); Ms. Brenda Krein (New Jersey); Ms. Janeth Ruiz (Florida); and Ms. Christi Toomer (California).  *See* Order Granting Plaintiffs' Motion For Withdrawal And Voluntary Dismissal Of Individual Claims dated May 2, 2014.  In addition, I understand that Plaintiffs state in their Motion for Class Certification that Ms. Bonnie McDonald (Massachusetts) is not being offered as a class representative and Plaintiffs have not moved to certify a Massachusetts class, and Ms. Li Marie Birr (California) is also not offered as a class representative.  Finally, Defendant's counsel has provided a May 14, 2014 email from Plaintiff's counsel Edmund Aronowitz ("Aronowitz Email") indicating that New Jersey Named Plaintiff Ms. Phyllis Scarpelli will no longer continue as a Plaintiff in this case and that Plaintiffs are withdrawing "all remaining New Jersey claims" and "Plaintiffs' request for certification of a New Jersey class."

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

marketing, advertising, and labeling of Wesson cooking oils.  The accused

cooking oils include Wesson Vegetable Oil, Wesson Canola Oil, Wesson

Corn Oil, and Wesson Best Blend oil (collectively, the "Challenged

Products," or "Wesson Oils").[2]

2.    Generally, the putative Class representatives allege that Wesson cooking oil

products – which bear "100% Natural" on the front of the bottle[3] – are

misbranded.  Named Plaintiffs assert these claims because the Challenged

Products allegedly "are made from unnatural, genetically-modified

organisms" or GMOs.[4] It is my understanding that the stated allegations

constitute the Challenged Claim for purposes of Plaintiffs' Motion for Class

Certification.   The Named Plaintiffs assert that they and other putative Class

members were harmed because ConAgra's conduct induces consumers to

purchase a product containing GMOs on the false promise that the product

(i.e., Wesson oil) is "100% Natural."[5] It is my understanding the Named

Plaintiffs are seeking class certification of eleven separate state-wide classes:

_____

[2]  Second Consolidated Amended Class Action Complaint ("Second Amended Complaint"), p. 1.

[3]  Named Plaintiffs also assert that product packaging imagery and design (i.e., "100% Natural"
appearing in "vibrant green", the Wesson name being "haloed by the image of the sun," and
Wesson Canola Oil featuring "a picture of a green heart") reinforce the Challenged Claim, and
that ConAgra prominently features the Challenged Claim on its website. (Second Amended
Complaint, pp. 20-21)

[4]  Second Amended Complaint, p. 1.

[5]  Second Amended Complaint, p. 2 and pp. 4 - 18.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

> All persons who reside in California, Colorado, Florida, Illinois,
> Indiana, Nebraska, New York, Ohio, Oregon, South Dakota, or Texas
> who have purchased Wesson Oils within the applicable statute of
> limitation periods[6] established by the laws of their respective states of
> residence through the final disposition of this and any and all related
> actions.[7, 8]

3.    Mr. Colin Weir ("Mr. Weir") submitted a declaration on May 5, 2014 in

support of class certification in this matter ("Weir Declaration").[9]   Mr. Weir

proposes the following two approaches to "determine damages attributable

to the Product Claim on a Class-wide basis using common evidence"

according to a "price premium" method of damages.[10]

a.    a "hedonic regression" method[11]; and

_____

[6]  I understand that the putative Class periods relevant to the various states vary. While I use the
terms "time period", "putative Class period" and similar terms in my declaration, I intend that
these terms reflect the specific definitions established by the applicable statutes of limitations of
the various states, respectively.

[7]  Excluding ConAgra and its subsidiaries and affiliates, all persons who make a timely election
to be excluded, government entities, and the judges to whom this case is assigned and any of
their immediate families members.   Plaintiffs' Memorandum Of Points and Authorities In
Support of their Motion For Class Certification, p. 12; with respect to New Jersey, *see* Aronowitz
Email.

[8]  Plaintiffs have indicated that they are not seeking to certify a class for the following states
originally named: Massachusetts, New Jersey, Washington, and Wyoming, yielding eleven
remaining states. (Order Granting Plaintiffs' Motion for Withdrawal and Voluntary Dismissal of
Individual Claims, pp. 3 and 7.) With respect to New Jersey, *see* Aronowitz Email.

[9]  Expert Declaration of Colin B. Weir. in Support of Motion and Motion for Class Certification
and Appointment of Class Counsel dated May 5, 2014 ("Weir Declaration").

[10]  Weir Declaration, p. 3.

[11]  According to Mr. Weir, hedonic regression is a method "that measures the value of various
product attributes"    and "can be specified to separate out the prices that consumers pay for each
of the Product attributes (e.g., the Product Claim, the value of the Wesson brand, etc.)." (Weir
Declaration, pp. 4 - 5.)

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

b.    a "conjoint analysis" method.[12]

4.    I have been requested by counsel for ConAgra to independently evaluate

from an economic perspective:

a.    the opinions contained in the Weir Declaration, including Mr. Weir's
proposed approach to calculate damages under the price premium
method; and

b.    whether standard economic analysis can be used to quantify the
claimed measures of monetary recovery in this matter on a Class-wide
basis.

## II.    SUMMARY OF OPINIONS[13]

5.    My evaluation of the Named Plaintiffs' Class-wide monetary recovery and

damages-related assertions and my evaluation of the opinions contained in

the Weir Declaration are based upon (a) my economics and damage

quantification training and experience, (b) documentary evidence, (c)

deposition testimony from the Named Plaintiffs and Mr. Weir, (d) the Weir

Declaration, and (e) sales and retail pricing data obtained from Information

_____

[12]  According to Mr. Weir, conjoint analysis "is a representative survey technique that analyzes consumer responses directly to determine attribute value." (Weir Declaration, p. 9.)

[13]  This Summary of Opinions is intended to be an overview.   A full description of my opinions is contained throughout my declaration (i.e., narrative, associated exhibits, and appendices). **Appendix A** provides background information associated with the Named Plaintiffs. **Appendix B** presents the variation in average retail prices of Wesson oil products across multiple dimensions in California by year.   **Appendix C** presents variation in average retail prices between products sold on and off promotion by state by year.    **Appendix D** provides the results of a comparison of average retail prices between Wesson oil products and Mazola-branded products by state by year.   **Appendix E** presents details of the variation in average retail prices of Wesson oil products across multiple dimensions by state.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

Resources, Inc. ("IRI").   Based upon a detailed analysis, I have concluded
that:

    a.    the Class-wide (or common proof) approaches proposed by Mr. Weir
to calculate a Class-wide monetary recovery would not provide a
reliable or relevant measure of the economic injury (if any) suffered
by putative Class members; and

    b.    the claimed injury and/or claimed damages suffered by the putative
Class members as a result of the Challenged Claim cannot be
evaluated appropriately using Class-wide proof.

6.    As presented throughout my declaration (and summarized here), individual
inquiry is required to evaluate the claimed injury and/or damages allegedly
suffered by putative Class members.

## A.     **Evaluation of the Weir Declaration**

7.    Mr. Weir submitted a declaration in support of class certification in this
matter.   Mr. Weir proposed two approaches for evaluating claimed damages
on a Class-wide basis (i.e., a "Hedonic Regression" approach and a
"Conjoint Analysis" approach).[14]   He claims "neither of these techniques
requires any individual inquiry, and can produce Class-wide results using
common evidence."[15]   As detailed throughout my declaration, Mr. Weir has
not demonstrated that the claimed injury to putative Class members, and a

_____

[14]  Weir Declaration, p. 4.

[15]  Weir Declaration, p. 4

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

corresponding monetary recovery (if any), can be reliably or accurately

determined using Class-wide proof under either approach.

a.  <u>Mr. Weir Failed to Demonstrate Existence of a Price Premium Attributable to the Challenged Claim</u>. Mr. Weir acknowledged in his deposition testimony that he assumes the fact of a price premium in this case.[16]  Mr. Weir acknowledged that he has not specified or estimated a model, or "perform[ed] any calculations with any of the pricing or sales data from IRI or Nielsen in preparing [his] declaration."[17] Mr. Weir hasn't "done the work"[18] to establish the actual existence of a price premium.  Mr. Weir makes these admissions despite the fact he asserts he could perform a hedonic regression with the data he has already been given, "depend[ing] on which way you would like to do the hedonic regression."[19]

In assuming that every putative Class member was injured, Mr. Weir appears to rely upon a "fraud on the market" type theory.  However, class certification issues and class-wide damages issues in consumer product class action matters can differ significantly from those present in "fraud on the market" security class action matters.  These differences are discussed in detail in **Section VI**.

b.  <u>Inappropriate Common Proof Approaches</u>.  The hedonic regression and conjoint analysis approaches proposed in the Weir Declaration would not provide a reliable or relevant Class-wide measure of the economic injury (if any) suffered by putative Class members.

i.  <u>The Proposed Use Of An Undefined Number Of Different Price Premiums Necessitates Individual Inquiry.</u>  Mr. Weir testified that there would potentially be many different price premiums based upon factors such as (a) variety of Wesson Oil purchased, (b) size of product purchased, (c) distribution channel of purchase, and (d) promotional versus non-promotional pricing. To the extent that a

---

[16]  Weir Deposition, p. 55.

[17]  Weir Deposition, p. 113.

[18]  Weir Deposition, p. 192.   *See also* Weir Deposition, pp. 190, 195.

[19]  Weir Deposition, p. 115.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

claimed price premium exists and varies across these dimensions, information would be required on geography (e.g., city, county or state), time period (e.g., week or year of purchase), distribution channel, and whether or not the purchase was made on-promotion for each purchase of the Challenged Products.  None of this information likely is available without individual inquiry or receipts.

ii.  <u>Ignores Additional Individualized Factors Within Each Proposed Different Price Premium To Be Calculated</u>. Each price premium estimated by Mr. Weir's proposed approaches ignores additional variation in (a) knowledge and perceptions relating to the Challenged Claim, (b) reasons for purchasing the Challenged Products, and (c) the prices paid for Wesson oil products.

- <u>Failure To Account For Differing Knowledge And Perceptions Of The Challenged Claim</u>.  Even if Mr. Weir's hedonic regression approach identifies a price premium associated with the Challenged Claim, it is not capable of differentiating between (i) a price premium attributable to a non-misleading interpretation of the Challenged Claim (e.g., "no preservatives" or "no chemicals added") and (ii) a price premium attributable to the interpretation that Plaintiffs allege to be misleading.  A price premium driven by a non-misleading interpretation of the Challenged Claim would not be an appropriate measure of economic damages. A price premium driven by a non-misleading interpretation of the Challenged Claim would confound the identification of claimed damages.

- <u>Failure To Account For Diversity In Reasons For Purchase</u>. Neither of Mr. Weir's proposed approaches addresses the fact that the alleged injury across putative Class members would not be uniform given variations in consumer purchase considerations and the varying weight placed upon the Challenged Claim relative to other product attributes.

- <u>Failure To Account For Significant Price Variation</u>.  Mr. Weir failed to address how his single price premium calculation for all putative Class members would overcome the hurdle of potential windfall gains to consumers who purchased Wesson

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

oil at a significant discount or at a discount exceeding the claimed "price premium."

c.   Mr. Weir Failed to Specify Details Necessary to Evaluate Reliability of Proposed Approaches. Mr. Weir provided an incomplete discussion of his proposed approaches – failing to specify numerous important details.   These details are necessary for evaluating whether his proposed approaches could reliably determine a price premium attributable to the Challenged Claim (if one exists).

i.   Hedonic Regression - Availability Of Necessary Data.  Mr. Weir asserted, without support, that "[t]he data necessary to conduct a hedonic regression analysis and damage calculation in this litigation should be easily obtained." [20]   Mr. Weir failed to acknowledge in the Weir Declaration that the "100% Natural" label appeared on the Challenged Products throughout the entire time period. [21]   Thus, a direct "before-and-after" comparison using Wesson-specific data is not possible (i.e., there is no "before" period for which the Challenged Claim did not appear – which Mr. Weir does not challenge).

ii.   Hedonic Regression - Failure To Identify Explanatory Variables. Mr. Weir presented a general equation in his declaration, but there are numerous considerations he failed to address regarding what variables to include and how to include them.

iii.   Conjoint Analysis.   Mr. Weir failed to address numerous uncertainties regarding the execution of his conjoint model including: (a) identification of product features to include in the survey, (b) specification of the survey and model, and (c) methods to analyze results and determine a price premium (if any).

d.   Hedonic Regression and Conjoint Analysis Have Numerous Drawbacks that Mr. Weir's Limited Discussion Does Not Address. Mr. Weir's limited description of his proposed techniques includes no

_____

[20]  Weir Declaration, p. 8.   (Bracketed text added for clarification.)

[21]  Declaration of Raquelle Hunter ("Hunter Declaration").

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

sample regressions, pilot conjoint surveys, or other developed economic models for evaluation.[22]

i.   <u>Hedonic Regression</u>. Mr. Weir claims that "the hedonic regression can be specified to separate out the prices that consumers pay for each of the Product attributes."[23]   However, Mr. Weir's proposed hedonic regression has at least the following potential drawbacks that he failed to acknowledge and failed to explain how they would be overcome.

- <u>Exclusion Of Relevant Variables and Perfectly Correlated Variables May Render Analysis Unreliable</u>. In his deposition, Mr. Weir mentioned a common statistical issue in regressions, or multicollinearity.   The issue of multicollinearity is particularly relevant because the Challenged Claims always appear on Wesson Oil products in conjunction with other claims (e.g. "Pure," "cholesterol free," and "0g Trans Fat") that would be expected to have value to a purchaser.   Mr. Weir has failed to demonstrate how his analysis could determine a price premium attributable to the Challenged Claim separately from these other product attributes.[24]

- <u>Proposed Hedonic Regression Cannot Distinguish Between An Asserted Misleading And A Non-Misleading Interpretation Of The Challenged Claim</u>. Mr. Weir's proposed regression cannot interpret between a price premium attributable to a misleading interpretation of the Challenged Claim and a non-misleading interpretation of the Challenged Claim.

_____

[22]   According to Mr. Weir, he has never testified to an amount of class-wide damage using a hedonic regression analysis (Weir Deposition, p. 43) and that "[a]s of [the date of his deposition]", his testimony concerning hedonic regression has never been accepted by a court as a basis to certify a damages class." (Weir Deposition, p. 250)

[23]   Weir Declaration, p. 5.

[24]   In addition, as part of his proposed regression analysis, Mr. Weir assumed that there would be sufficient variation in the data to accurately determine a price premium (if one exists). However, he has not presented any preliminary regressions or other statistical evidence to demonstrate this.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

    ii. <u>Conjoint Analysis</u>. Mr. Weir's proposed conjoint analysis has at least the following potential drawbacks that he failed to acknowledge and failed to explain how they would be overcome.

- <u>Failure To Describe How He Will Determine A Price Premium From The Conjoint Survey Results</u>. Mr. Weir's methods for converting conjoint information into price tend to greatly overstate the value of the product features. Any method relying on conjoint data to determine price must also incorporate information about cost, the nature of competition, and the set of competitive offers. Mr. Weir appears to dismiss this requirement.

- <u>Failure To Address How His Analysis Would Overcome Other Common Flaws In Conjoint Studies</u>. There are many other potential difficulties in successfully designing and executing a conjoint survey that Mr. Weir fails to address.

  - <u>Failure To Distinguish Between An Asserted Misleading And A non-Misleading Interpretation Of The Challenged Claim</u>. Even if Mr. Weir were to determine a price premium attributable to the Challenged Claim, he actually would be measuring a price premium driven solely (or in part) by a non-misleading interpretation of the Challenged Claim. A price premium driven by a non-misleading interpretation of the Challenged Claim would not be an appropriate measure of economic damages.

  - <u>Overemphasis Of Certain Product Features.</u> Conjoint analysis draws attention to the features used in the survey exercise (e.g., the Challenged Claim) at the expense of features not included in the survey. Mr. Weir did not provide any sample survey questions in his declaration that would allow for the determination of whether this concern could be overcome.

  - <u>Possible Exclusion Of Important Product Features.</u> Conjoint analysis is unreliable when important features of the product are omitted from the choice set. Mr. Weir claims, without support, that the "relevant product attributes

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

('natural' claims, brand, etc.) are all easily identifiable and determined in this litigation."

- ▪ <u>No Account Of Variation Over Time</u>.  Conjoint analysis generally measures the value of features at the point in time of the survey and cannot determine the value of features of the product in the past.  To the extent that the value consumers place on the Challenged Claim varies over time, Mr. Weir's proposed methodology would not appropriately measure the "relative utility" for individuals who purchased the Challenged Products earlier in the Class period (which began as early as 2007).

**B.    <u>Claimed Injury And Claimed Monetary Recovery Cannot Be Reliably Calculated On A Class-Wide Basis</u>**

8.    Mr. Weir does not address additional important considerations in his declaration.  Whether and to what extent any putative Class member was injured as a result of the Challenged Claim is not amenable to proof on a Class-wide basis for reasons beyond those stated in my evaluation of Mr. Weir's opinions.  Proof of alleged injury, if any, would depend upon individualized inquiry into the facts and circumstances of each putative Class member for at least the following reasons.

a.  <u>Reasons For Purchase</u>.  Documentary evidence and deposition testimony indicate that sales of the Challenged Products are driven by several factors other than the Challenged Claim, including but not limited to brand value, taste, price, and other information present on the product labels.  Consumers who purchased the Challenged Products for these reasons were not injured (or were not injured to the same degree) as consumers who purchased in substantial part because of the Challenged

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

Claim.  Individual inquiry would be required to evaluate each putative Class member's reasons for purchasing the Challenged Products.

b. <u>Significant Variations In Retail Prices Of Challenged Products</u>. Analysis of aggregate pricing data (which still masks significant variations in the retail prices paid by putative Class members within a given distribution channel or retail outlet and time period) shows that the price paid by one consumer in one location at one time for the Challenged Products is not indicative of the price paid by another consumer in a different location at a different time.  Under these varied conditions, to determine the actual price paid by any particular putative Class member (and whether there was any price premium paid that was associated with the Challenged Claim) would require consideration of circumstances particular to that transaction.  The applicable transactions occurred at different times, in different locations, and at different retailers.  Hence, there are many individual variables affecting prices (including but not limited to distribution channel, geographic location, time, discount utilized, and particular variety and product purchased). There also are many individual actual prices paid – all of which negate the ability of a Class-wide proof approach to yield a reliable and accurate estimate of claimed damages.

c. <u>Failure To Account For Lack Of A Systematic and Persistent Price Premium</u>.  Based upon an analysis of retail sales and pricing data collected by IRI, the average retail prices of the Challenged Products generally were <u>lower</u> than the average retail prices of other branded products in similar segments (i.e., Mazola) without the Challenged Claim.  In other words, the claimed price premium associated with Wesson oil products is often <u>negative</u> when Mazola is used as a benchmark product for comparison purposes. [25]   Therefore, many putative Class members would have suffered no economic damages under a "benefit-of-the-bargain" approach when other branded competitor products are used as benchmarks.

_____

[25]  I understand that Crisco also is a "branded competitor" to Wesson oil.   I also understand that, while corresponding Crisco oil products bore an "All Natural" label over "much of the last few years," the "'All Natural' claim appears to have been removed from at least some most recent labels." (*See* Hunter Declaration.) Because Crisco did not lack the Challenged Claim over the entire relevant time period(s), and because the timing of such changes to Crisco's label are unknown, I have focused on a comparison with Mazola.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

9.  Absent individualized analyses into (a) reasons for purchase of Wesson oil products, (b) the specific prices paid for the Challenged Products, and (c) the specific prices of the alternative products, calculation of damages would not be reliable from an economic perspective.  Failure to conduct such individualized inquiry would result in over-compensation to at least some Class members.

## III.  <u>QUALIFICATIONS AND EXPERIENCE</u>

10.  I am a Managing Principal at Analysis Group, Inc. ("AG").  AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models.   Nationally, AG consists of approximately 600 professionals who specialize in, among other things, the fields of economics, accounting, finance, statistics, and strategy consulting.

11.  My primary responsibility at AG is to provide economic, financial, and/or damages-related consulting services to clients.   Throughout my career I have provided these consulting services in class certification matters, breach of contract cases, intellectual property cases, antitrust cases, fraud-related cases, business tort cases, business interruption cases, employment / loss of earnings matters, lender liability cases, and securities-related cases.  I have provided expert testimony in deposition and trial settings numerous times.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

12.    In consumer product class action matters, I have addressed economic and

damages-related issues relating to class-wide proof of claimed economic

harm and price premium claims, including analyses of demand drivers

affecting consumer purchase decisions and product pricing patterns observed

at wholesale and retail levels.   Pricing analyses I have performed include

the examination of pricing patterns across distribution channels, geographic

areas, retailers, and by promotional activities.   I have submitted reports and

provided deposition testimony on class certification issues numerous times

in false advertising and commercial matters involving a variety of products

and industries.

13.    I received my B.A. in Economics from the University of Notre Dame in

1977, my M.A. in Economics from the University of Southern California in

1979, and my Ph.D. in Economics from Arizona State University in 1983.

Attached as **Exhibit 1** is a true and correct copy of my current resume.   A

listing of publications I have authored is contained in my resume.   Attached

as **Exhibit 2** is my trial and deposition testimony experience.   My business

address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd.,

Suite 600, Dallas, Texas 75219.

14.    AG is being compensated based upon hours incurred and the hourly rates of

the personnel involved.   Payment to AG is not contingent upon my findings

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

or the outcome of this matter.  AG is being compensated at a rate of $600 per hour for my time.  Hourly rates for other staff at AG working on this matter range from $190 to $500 per hour, depending upon the level and experience of the staff involved.

## IV.  FACTS, DATA, AND INFORMATION RECEIVED

15.  The facts, data, and information available to me in forming my opinions are contained in **Exhibit 3** or elsewhere in my declaration (including footnotes and exhibits).  Contained in **Exhibit 4** is a listing of the individuals whose deposition transcripts, Answers to Interrogatories, and declarations are cited in the text of my declaration.  Examples of the types of information available to me include the following:

a.  legal documents (e.g., Second Amended Class Action Complaint; Motion for Class Certification; Plaintiffs' Answers to Defendant's First Set of Interrogatories; Order Granting Plaintiffs' Motion For Withdrawal And Voluntary Dismissal Of Individual Claims dated May 2, 2014);

b.  deposition transcripts (e.g., deposition transcript of Robert Briseno taken July 17, 2013; deposition transcript of Michele Andrade taken August 19, 2013; deposition transcript of Jill Crouch taken August 20, 2013; deposition transcript of Pauline Michael taken August 21, 2013; deposition transcript of Necla Musat taken on March 12, 2014; deposition transcript of Maureen Towey taken March 13, 2014; deposition transcript of Mr. Colin B. Weir taken May 23, 2014; deposition transcript of Raquelle Hunter taken on April 29, 2014);

c.  declarations (e.g., Declaration of Mr. Colin B. Weir dated May 5, 2014; Expert Declaration of Dr. Charles M. Benbrook dated May 5, 2014; Declaration of Raquelle Hunter dated June 2, 2014);

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

    d. <u>documents produced by ConAgra in the action</u> (e.g., IRI sales and pricing data relating to Wesson and competitors; product labels; marketing materials; Wesson financial data; Wesson Consumer Insights Report; consumer studies); and

    e. <u>information independently obtained</u> (e.g., information from ConAgra's website; ConAgra's 2013 Annual Report; various academic articles relating to conjoint analyses).

16. My analyses and opinions are based upon the information available, standard economic theory, and my education and training. The information I am relying upon is information typically relied upon by experts in my field. I reserve the ability to (a) review documents, deposition transcripts, expert reports, or other information still to be produced by the Parties to this dispute and (b) supplement my opinions based upon that review, if appropriate. I also reserve the ability to use demonstrative exhibits and/or other information at hearings/trial to explain and illustrate my opinions.

## V.  <u>OVERVIEW OF CHALLENGED PRODUCTS</u>

17. Wesson offers four principal product varieties:

    a. vegetable oil (sold in 16, 24, 48, 64, 128, and 160 ounce sizes);

    b. canola oil (sold in 16, 24, 48, 64, 96, 128, 160, and 432 ounce sizes);

    c. corn oil (sold in 24, 48, 64, and 128 ounce sizes); and

    d. Best Blend oil, a combination of vegetable and canola oil (sold in a 48 ounce size).[26]

---

[26] Hunter Declaration.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

18.    Not all presentations are offered for sale in all states. [27]    It is my understanding that the "100% Natural" claim is present on all vegetable, canola, corn and Best Blend products, and has been throughout the putative Class period. [28]

## VI.    MR. WEIR FAILED TO DEMONSTRATE THE EXISTENCE OF A PRICE PREMIUM ATTRIBUTABLE TO CHALLENGED CLAIM

19.    Mr. Weir asserted that "the result of each of these analyses [hedonic regression and Conjoint analysis] will be the determination of a price premium, if any, that Class Members paid as a result of the Product Claim." [29]    However, Mr. Weir acknowledged in his deposition that he has not performed any work to specify and implement a regression model to prove the assertion that a price premium attributable to the Challenged Claim exists.

> Q. Well, my question goes to your prior testimony, that you said you did not -- first of all, you didn't perform any calculations with any of the pricing or sales data from IRI or Nielsen in preparing your declaration, correct?
> A. I have not yet done that, yes. [30]
>
> Q. Did you even consider doing a preliminary or test regression and including that in your declaration?

---

[27] Hunter Declaration.

[28] Hunter Declaration.

[29] Weir Declaration, p. 4. (Bracketed text added for clarification.)

[30] Weir Deposition, p. 113.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

A. I don't believe I gave it any serious consideration, no.[31]

20. Mr. Weir's proposed analysis is predicated on the premise that there is a single price premium (either on a dollar basis or on a percentage basis) that is applicable to all Class members.  However, Mr. Weir has failed to establish that putative Class members paid any price premium attributable to the Challenged Claim, much less that there is an appropriate single price premium applicable to all Class members.

21. The assumed fact of injury, which underlies Mr. Weir's suggested approaches, is questionable and flawed in light of the negative price difference observed between Wesson oil products and comparable benchmark products.  Mazola-branded cooking oils of the same variety (e.g., vegetable, canola, corn oil) and package size that were not labeled with the Challenged Claim are priced higher than the Challenged Products (i.e., the Challenged Products are lower-priced than corresponding Mazola products without a "100% Natural" claim).[32]  Mr. Weir's hypothesis that "I

_____

[31]  Weir Deposition, p. 117.

[32]  I performed illustrative price comparisons between Wesson oil products and Mazola-branded cooking oil products of corresponding varieties and package sizes (and in corresponding geographies) to evaluate the claimed common proof damages framework presented in the Second Amended Complaint.   These comparisons show that Wesson oil commands no systematic and persistent price premium (across geographic locations, sales channels, retailers) relative to Mazola-branded cooking oils without the Challenged Claim.   In fact, the price differences are often negative – meaning Wesson oil products are often lower-priced. The results of these comparisons (by product variety, year, geography and distribution channel) are presented in my

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

think there is sufficient evidence in the record to go forward with the understanding that there is one [a price premium associated with the "100% Natural" claim]"[33] appears to be contradicted by the lack of a price premium relative to other comparable branded cooking oils of the same variety without the Challenged Claim (e.g., corresponding Mazola oil products).

22.   Perhaps most importantly, a "before-and-after" comparison of Wesson oil products with and without the Challenged Claim cannot be performed (and therefore I have not presented the results of such comparisons) because "100% Natural" appeared on the labels for the Wesson Products throughout the entire time period.[34]   Mr. Weir will be unable to perform such a direct comparison using Wesson-specific data.   As a result, Mr. Weir must rely on an *a priori* assumption that any price premium analyses he performs based upon either (a) a "before-and-after" comparison using other (non-Wesson) brands or (b) a "with-and-without-the-label" comparison across Wesson and

_____

Declaration at **Section XI. C**, and in the Appendices to my Declaration. I understand that Crisco also is a "branded competitor" to Wesson oil.  I also understand that, while corresponding Crisco oil products bore an "All Natural" label over "much of the last few years," the "'All Natural' claim appears to have been removed from at least some most recent labels." (*See* Hunter Declaration.) Because Crisco did not lack the Challenged Claim over the entire relevant time period(s), and because the timing of such changes to Crisco's label are unknown, I have focused on a comparison with Mazola.

[33]   Weir Deposition, p. 55.    (Bracketed text provided for clarification.)

[34]   Ms. Hunter (Senior Brand Manager for Wesson Oil at ConAgra Foods, Inc.) confirms this understanding.   According to Ms. Hunter, "Wesson Oil labels have referenced the term 'natural' since at least the mid-1980s."    (Declaration of Hunter.)

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

other brands for the same time period will accurately capture the impact of the Challenged Claim on the Wesson Products.  Mr. Weir must rely on asserting that such an approach would not be irreparably tainted by other factors (such as the identity and value of each specific brand, such as Wesson and Mazola, to the consumer – which also did not change over the entire period).

23.    As an additional observation, class certification issues and class-wide damages issues in consumer product class action matters can differ significantly from those present in "fraud on the market" security class action matters the courts more generally face (to the extent comparisons are attempted).

   a. A "fraud on the market" type of security class action generally is predicated upon an efficient market premise.  It is generally assumed that new information is disseminated quickly and reflected in the market price of the security in question.  Generally, shareholders observe one market price of the security (at any moment in time) due to the national exchange nature of the security at issue.  The allegedly fraudulent misrepresentation or omission is assumed to be incorporated into this single market price, as is the asserted corrective disclosure, and most putative Class members (in many cases) are asserted to have been impacted equally on a per share basis.

   b. In contrast, in a consumer product-related case, a different set of dynamics often is present.  Consumers may purchase a cooking oil product and derive value for many different reasons (e.g., brand loyalty, taste, perceived quality, convenience, heat point, purity, other claims).  Even with the same allegedly misleading labeling, the impact of the Challenged Claim(s) on putative Class members may be different for a

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

number of reasons. In addition, instead of one market price (as in the case of a security), the retail prices of a consumer product vary by sales channel, retailer, geographic area, timing, and whether promotional discounts are applied – leading to the necessity of individualized inquiry.

24. Moreover, after information was made publicly available relating to the GMO content of Wesson oils (*see*, for example, Wesson's 2011 Corporate Responsibility Report and the filing of and media coverage relating to the original complaint in this dispute[35]), I do not observe substantial changes in the average retail price and/or number of units sold that appear to be correlated with the release of this information[36]. In particular, to the degree that Named Plaintiffs all state in the Second Amended Complaint that they "would not have purchased Wesson [] Oil, but for ConAgra's misrepresentation that it is '100% Natural,'" and to the degree their statements are allegedly representative of all or many Wesson oil consumers, a substantial downward impact would have been expected. However, I have examined historical data on quantity sold and average retail price before and after the above disclosures and do not observe the kind of fluctuations that would be associated with Named Plaintiffs' contentions.

_____

[35] Growing for Good: 2011 Corporate Responsibility Report ("Corporate Responsibility Report"), p. 22. Available at: http://www.conagrafoods.com/investor-relations/financial-reports/citizenship-reports, viewed on June 2, 2014.

[36] IRI data: <CAG0005560.xlsm>.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

## VII.  MR. WEIR'S PROPOSED APPROACHES WILL NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE (OR COMMON PROOF) BASIS

25.   The hedonic regression and conjoint analysis approaches presented in the Weir Declaration will not yield a reliable or relevant estimate of the economic harm allegedly suffered by individual putative Class members (i.e., a loss caused by the Challenged Claim) for at least the following reasons.

   a.   The proposed use of an undefined number of price premiums that may be relevant to a given individual necessitates individual inquiry (e.g., a price premium based upon the different varieties of Wesson oil purchased, different sizes of Wesson oil purchased, different channels distribution, and whether or not the product was purchased on-promotion).[37]

   b.   Mr. Weir ignores additional individualized factors within each potential constant price premium situation envisions.

## A.   Proposed Use Of An Undefined Number Of Different Price Premiums Necessitates Individual Inquiry

26.   Mr. Weir claims that "neither of these techniques [hedonic regression or conjoint analysis] requires any individual inquiry, and can produce Class-wide results using common evidence."[38] However, Mr. Weir testified that he would consider calculating different price premiums for each Challenged Product across at least different product sizes, states, time periods,

_____

[37]  Weir Deposition, pp. 191-195.

[38]  Weir Declaration, p. 4. (Bracketed text added for clarification.)    Emphasis added.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

distribution channels, and whether or not the product is purchased on-promotion.

27.    Mr. Weir did not explain how he would overcome the requirement for individual inquiry in determining the price premium relevant to each putative Class member.   Based upon the limited description Mr. Weir has provided, there potentially could be <u>many different price premiums</u> and an individual putative Class member could potentially be affected by multiple price premiums, whether defined on a dollar or percentage basis.   For example, Mr. Weir testified that there would potentially be many different price premiums based upon factors such as (a) variety of Wesson Oil purchased, (b) size of product purchased, (c) distribution channel where the purchase was made, and (d) promotional versus non-promotional pricing.[39]

As an example:

> Q. So it's possible that for each class, you may have to have at least four different price  premiums? It's possible?
> Q. Based on the different varieties of Wesson Oil?
> A. It's possible.[40]

28.    Mr. Weir demonstrates that his proposed methodologies will require individual inquiry in order to properly evaluate and then allocate total claimed damages to individual putative Class members. Mr. Weir failed to

_____

[39]  Weir Deposition, pp. 191 – 195.

[40]  Weir Deposition, p. 191

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

assure the Court that a reliable methodology exists to perform an allocation

of total claimed damages for an individual putative Class member.

> Q. In this case do you know of any methodology that you could
> employ that would determine the amount of damages that
> individual class members would be entitled to?
> A. Again, that's beyond the scope what I'm looking at here.[41]

29.    Mr. Weir's description is totally apart from the claims administration

process and, as described by Mr. Weir, would require individual inquiry.

Mr. Weir's proposed approaches not only require individual inquiry to

determine varying levels of price premium (and therefore damages) per

putative Class member, but also are complicated by the lack of receipts.

a.    Awarding a claimed price premium "on a dollar basis" would require
information on at least the quantity, and likely the size and variety, of the
Challenged Products each putative Class member purchased.  This
information is not likely to be available.

b.    Awarding a claimed price premium "on a percentage basis" would
require an even greater amount of information from each putative Class
member (i.e., the purchase price(s) and quantities, and likely the size and
variety, of the Challenged Products each putative Class member
purchased).

30.    To the extent that a claimed price premium varies across some of the

dimensions Mr. Weir considers for the as-yet-to-be-specified hedonic

regression and conjoint analysis models, information would be required on

_____

[41]  Weir Deposition, p. 84.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

geography (e.g., city, county or state[42]), time period (e.g., week or year of purchase), distribution channel, and whether or not the purchase was made on-promotion for each purchase of the Challenged Products. None of this information is likely available without individual inquiry or receipts.

## B. Ignores Additional Individualized Factors Within Each Proposed Different Price Premium To Be Calculated

31.   Mr. Weir asserted that the results of his proposed approaches "will be applicable across each of the proposed Classes, but is not a calculation of average damages per class member." [43]  To the contrary, Mr. Weir's proposed approaches only yield a single value (either a constant dollar price premium or a constant percentage price premium) for each price premium estimated by Mr. Weir's two methods.[44]  However, each price premium estimated by Mr. Weir's approaches ignores variations in (a) reasons for purchasing the Challenged Products, (b) knowledge and perceptions relating to the Challenged Claim, and (c) prices paid for Wesson oil products.

   a.   Failure To Account For Diversity In Reasons For Purchase.  Mr. Weir claimed that "(i)ndividual reasons consumers may have for purchasing the Products do not alter this price premium, nor do they alter the injury

_____

[42]  IRI market areas (e.g., San Francisco) are defined as aggregations of specific counties.

[43]  Weir Declaration, pp. 8 and 11.

[44]  Mr. Weir acknowledges there may be multiple different price premiums across the putative Class (e.g, by product size, state, time period, distribution channel, and whether or not the product is purchased on-promotion).

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

arising from paying that premium." [45]  Mr. Weir also claimed that "(s)imilarly, because the price and price premium is determined in the marketplace, individual valuation of the Products does not alter the price premium or injury arising from paying that premium." [46]  Contrary to Mr. Weir's assertion, evaluating individual reasons for purchase is essential to determining whether a putative Class member suffered injury and if so, the extent of the injury.

Neither of Mr. Weir's proposed approaches addresses the fact that consumers who purchased Wesson oil products for reasons entirely unrelated to the Challenged Claim suffered no economic loss.  Mr. Weir himself acknowledged in his testimony that "I would agree in the aggregate, some consumers will receive, the class will receive some value from the purchase of the products regardless of whether the claim is false." [47]

Neither of Mr. Weir's proposed approaches addresses the fact that even for those purchasers who may have experienced harm as a result of the Challenged Claim, the injuries would not be uniform given variations in consumer purchase considerations and the varying weight placed upon the Challenged Claim relative to other product attributes.

b.  <u>Failure To Account For Differing Knowledge And Perceptions Of The Challenged Claim</u>.  Mr. Weir claimed that putative Class members' knowledge and perceptions relating to the Challenged Claim are largely irrelevant to his analysis in that "[w]hat percentage of the California class that you're going to assess class-wide damages for, what percentage of that class has ever been deceived by the '100% Natural' claim on Wesson Oil" "doesn't impact [his] analysis." [48]  Contrary to Mr. Weir's assertion, this is an important inquiry relevant to evaluating and quantifying claimed injury, if any.

Neither of Mr. Weir's proposed approaches takes into account that the general term "natural" may mean different things to different consumers.

_____

[45]  Weir Declaration, pp. 3-4.

[46]  Weir Declaration, p. 4.

[47]  Weir Declaration, pp. 280 - 281.

[48]  Weir Deposition, p. 77.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

The general term "natural" may be interpreted in non-misleading ways (e.g., "no preservatives") that would lead consumers to pay more for the product. Mr. Weir's model would make no distinction between (i) putative Class members who interpret the Challenged Claim other than as a non-GMO claim (e.g., "no preservatives" or "no chemicals added" – which is not a Challenged Claim) and (ii) putative Class members who interpret the Challenged Claim as meaning "ingredients are not sourced from GMOs" (i.e., Plaintiffs' claimed interpretation and a Challenged Claim). The former group of putative Class members would not have suffered economic loss attributable to the alleged message communicated by the Challenged Claim.

Mr. Weir testified that he has no plans to gather or incorporate any information regarding consumers' understanding of the term "100% Natural" and whether, and to what extent, they are in fact misled.[49]

In his testimony, <u>Mr. Weir confirmed that his hedonic regression model will not test the effect of a claim that Wesson Oil "ingredients are not sourced from GMOs," the very question at issue</u>. According to Mr. Weir, "GMO free is not an attribute of Wesson Oil. So it can't be a relevant product attribute specifically to Wesson Oil."[50] Therefore, Mr. Weir's damages models cannot distinguish between an estimated effect on price due to consumers (1) being misled or (2) not being misled. As a result, his damages methodology is irreparably flawed.

c.  <u>Failure To Account For Significant Price Variation</u>.  In his declaration, Mr. Weir failed to address how his proposed approaches would account for variability in prices arising from discounts or promotional pricing. Mr. Weir claimed that his proposed approaches are "widely used to isolate the effect of one or more product attributes on the price of a product" (in the case of hedonic regression) and "also widely used to reveal the relative importance and price components of product attributes." (in the case of conjoint analysis).[51]  However, for at least the claimed price premium "on a dollar basis," Mr. Weir failed to address how his single price premium calculation for all putative Class members

_____

[49]  Weir Deposition, pp. 76 - 78.

[50]  Weir Deposition, p. 167.    (Emphasis added.)

[51]  Weir Declaration, p. 4.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

would overcome the hurdle of potential windfall gains to consumers who
purchased Wesson oil at a significant discount or at a discount exceeding
the claimed constant "price premium."

## VIII.  MR. WEIR FAILED TO SPECIFY DETAILS NECESSARY TO EVALUATE RELIABILITY OF PROPOSED APPROACHES

32.    Mr. Weir presented in his declaration a brief overview of two approaches he

claims to be able to use to calculate a "price premium" that Class members

paid for Wesson "Products because of the Product Claim."[52]   Mr. Weir

proposed a hedonic regression analysis as "an ideal technique for calculating

the price premium"[53] as well as a conjoint analysis methodology as "another

alternative for calculating the price premium."[54]   Mr. Weir provided an

incomplete discussion of his proposed approaches – failing to specify

numerous important details.   These details are necessary for evaluating

whether his proposed approaches could reliably determine a price premium

attributable to the Challenged Claim (if one exists).

## A.    Hedonic Regression

33.    In his deposition, Mr. Weir acknowledged numerous uncertainties regarding

the details of how his proposed hedonic regression would be implemented,

_____

[52]  Weir Declaration, p. 3.

[53]  Weir Declaration, p. 7.

[54]  Weir Declaration, p.10.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

including (a) the availability of necessary data and (b) the identification of

explanatory variables.

a. <u>Availability Of Necessary Data</u>.   Mr. Weir asserted that "[t]he data necessary to conduct a hedonic regression analysis and damage calculation in this litigation should be easily obtained."[55]   However, as noted earlier, the "100% Natural" label appeared on the labels for the Wesson Products throughout the entire time period.[56]  Thus, a "before-and-after" comparison of Wesson-specific prices and quantities is not possible (i.e., there is no "before" period during which the Challenged Claim did not appear, which Mr. Weir does not challenge).

In addition, there are numerous uncertainties regarding the specific types of data required to execute Mr. Weir's planned hedonic regression and whether such data is available.   Specific issues include at least the following.

i. <u>Mr. Weir lacks the data necessary to distinguish between different private label brands</u>. Mr. Weir states with regard to data on private label brands, "[b]oth IRI and Nielsen have different ways of providing that data," and asserts that data is available that breaks out individual private label brands in this case.[57]   Mr. Weir is mistaken; I am not aware of any data source that breaks out the sales and prices of individual private label brands at the level required for Mr. Weir's analysis.   In particular, the IRI data obtained for this case demonstrates that data on <u>individual</u> private label brands is not available from this source.[58]

_____

[55]  Weir Declaration, p. 8.   (Bracketed text added for clarification.)

[56]  Hunter Declaration.

[57]  Weir Deposition, p. 141.

[58]  IRI data: <CAG0005560.xlsm>.   Ms. Hunter of ConAgra confirms she "understand[s] that IRI or Nielsen data for private label cooking oils is only available at the aggregate level, and therefore it would not be possible to segregate the private label data based on variations in each product's labeling" and "I am not aware of any comprehensive source of information about whether private label oils make any sort of 'pure' or 'natural' claims on their packaging, but in my experience, some private label brands do and others do not, and these labels may also change over time."   (Hunter Declaration.)

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

Moreover, even if such data were available (which it is not), for it to be useful for Mr. Weir's hedonic regression method, Mr. Weir would <u>also</u> need corresponding labels for each private label brand over time (which is likely not available). Mr. Weir acknowledged as much in his testimony that for his hedonic regression, as he would include "competitor products in the model, [he] would need to appropriately mark them as either having the "All Natural" claim or not."[59]   Mr. Weir will also need to compile such information systematically for branded comparators; information which he currently lacks for products other than Wesson oils.

b. <u>Identification Of Explanatory Variables</u>.  With respect to Mr. Weir's regression model, Mr. Weir presented a general equation in his declaration.[60] However, there are numerous considerations he failed to address regarding what variables to include and how to include them.

ii. <u>Mr. Weir has not identified the variables he will include</u>.  Mr. Weir stated that he has "not made a final determination about which variables are going to be included one way or the other with the exception of the brand and the product claim."[61] He noted that "perhaps, some other factors" in addition to "product attributes that we've talked about today"[62] would be included.

iii. <u>Mr. Weir has failed to specify the competitive products he will include</u>.  Mr. Weir stated that in his proposed hedonic regression approach, "there is no need to identify any **one** single benchmark product,"[63] but that the model will include "marketplace data from multiple products"[64] and relevant product attributes of "Wesson Oil and also other products."[65]   Whether, and/or to the extent Mr. Weir intends to use numerous or all competitive products in performing his

---

[59] Weir Deposition, p. 139.

[60] Weir Declaration, p. 5.

[61] Weir Declaration, p. 151.

[62] Weir Declaration, p. 272.

[63] Weir Declaration, p. 8.   (Emphasis added.)

[64] Weir Deposition, p. 231.

[65] Weir Deposition, p. 167.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

proposed hedonic regression, Mr. Weir "hasn't made a final selection" of the specific competitive products he intends to use.[66]  Mr. Weir testified that he has "not yet reached the final selection of products to go in. That part of my assignment has not yet come to fruition."[67]

Given the variability in product attributes and the variability in product prices, the choice of which products to include could significantly alter the outcome of Mr. Weir's proposed regression. For example, I understand "that the '1-2-3' brand of cooking oil tends to be stocked in the ethnic foods section of the grocery store, such that it is not typically stocked on the same aisle or shelves as Wesson Oil products"[68] and therefore would not be considered a reliable "side-by-side" comparator for Wesson.  Including data on the "1-2-3" brand would violate Mr. Weir's own requirement that they be "sold side by side".[69]

## B.    **Conjoint Analysis**

34.    For Mr. Weir's alternative (i.e., conjoint analysis) choice, there also are numerous uncertainties regarding the details of his analysis, including but not limited to the following.

a.    Identification Of Product Features. Mr. Weir does not define the product attributes or the brands he will include in his proposed conjoint survey. With regard to what product attributes he would include in his conjoint analysis, Mr. Weir states that he "ha[s] a strong sense about certain

_____

[66]  Weir Deposition, p. 232.

[67]  Weir Deposition, p. 233.

[68]  Hunter Declaration.

[69]  *See* Weir Deposition, pp. 172 – 173.

   Q. Is there some reason you wouldn't include them [Whole Foods 360 brand products] in the model?
   A. There could be myriad reasons why I wouldn't include them in the model.

   Q. Well, are there any? Why don't you tell us.
   A. Sure. If Wesson is not sold side by side with the 360 brand, then it's not a consumer choice that's going to be made.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

product attributes and then would need to make determinations about
others." According to Mr. Weir, he "would definitely include the
product claim at issue in this case, the "100% Natural" claim" and
"[u]nless we did studies, separate studies for the different sizes of
products, I [Mr. Weir] would include a size attribute, and there needs to
be a varying price attribute in order to ascribe a monetary value to the
product claim,"[70] "subject to additional work."[71]  With regard to other
attributes he might include, Mr. Weir "would have to do additional work
to determine whether or not to include any other potential product
attributes."[72]  Mr. Weir has not identified on what basis he will "pick
and choose" among the potential variables, including some and excluding
others. Mr. Weir testified that omitting relevant variables can have
significant impacts.

> Q. [O]mitting important attributes in a conjoint analysis could lead
> to incorrectly valuing the included feature or attribute being
> tested; is that right?

> A. That's theoretically possible.[73]

b. <u>Specification Of Survey and Model</u>. Mr. Weir has not conducted any
design of a consumer sample, survey design, or preliminary quantitative
analysis.

  i. <u>Mr. Weir has not determined or described his consumer sample</u>. With
  regard to the consumer sample to be used, Mr. Weir stated, "Like
  many of the factors in this hedonic regression, that has yet to be
  determined."[74] Elsewhere, he observes that he is "in the process of
  forming the conclusion as to the sample. That work is incomplete at
  this time."[75]

  ii. <u>Mr. Weir has not determined the number of surveys to be conducted</u>.

_____

[70]  Weir Deposition, p. 260.

[71]  Weir Deposition, p. 261.

[72]  Weir Deposition, p. 261.

[73]  Weir Deposition, pp. 264 – 265.

[74]  Weir Deposition, p. 254.

[75]  Weir Deposition, p. 255.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

Q. But you haven't determined whether or not you would do 10 or 12 separate surveys or whether you would do a survey that would be one survey that was aimed at getting the characteristics or getting a representation from each of the 10 or 12 states that would be involved; is that true?

A. That is true.[76]

iii. <u>Mr. Weir has not described how the to-be-tested product attributes would be varied</u>. Mr. Weir states that his proposed conjoint analysis would "systematically vary[] the attributes of the product[s]" but he failed to provide even one illustrative example of how he would implement this in practice.[77]   In a conjoint analysis, each variable must be described to consumers, and consumers are given a discrete set of possible choices for each variable.[78]   Mr. Weir did not acknowledge the potential challenges in describing and quantifying important features of the Challenged Products.

Mr. Weir acknowledges that there may be purchase drivers of cooking oil products (e.g., perceived taste among repeat purchasers) which would be difficult (if not impossible) to properly quantify and describe in a survey methodology where consumers "rank their preferences, or [] choose the most preferred attribute or combination thereof."[79, 80]   Mr. Weir failed to describe the full set of attributes that would be relevant for a conjoint study, and how he would overcome the difficulties in describing and quantifying them.

c. <u>Methods to Analyze Results and Determine Price Premium</u>.   With regard to the specific method used to convert conjoint survey responses into calculations of attribute value, Mr. Weir "ha[s] not

_____

[76]  Weir Deposition, p. 257.

[77]  Weir Declaration, p. 9.   (Bracketed text added for clarification.)

[78]  According to a Sawtooth Software technical paper cited in the Weir Declaration, conjoint analysis uses "specific, realistic product specifications" which "grounds attributes in concrete descriptions."   (Understanding The Value Of Conjoint Analysis, p. 20. (http://www.sawtoothsoftware.com/support/technical-papers/general-conjoint-analysis/ interpreting-conjoint-analysis-data-2009, viewed on March 28, 2014.))

[79]  Weir Declaration, p. 9.   (Bracketed text added for clarification.)

[80]  Weir Deposition, p. 164.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

made that determination yet."[81]    This may be the most important omission by Mr. Weir with respect to his proposed conjoint analysis.

35.    Mr. Weir has not provided the specific information necessary to permit anything but unsupported assurances that, given his proposed conjoint analysis, he will be able to estimate his assumed price premium (and the impact of that assumed price premium on his conclusions).

## IX.    HEDONIC REGRESSION AND CONJOINT ANALYSIS HAVE NUMEROUS DRAWBACKS THAT MR. WEIR'S LIMITED DISCUSSION DOES NOT ADDRESS

36.    Mr. Weir's limited description of his proposed techniques includes no sample regressions, pilot conjoint surveys, or other developed economic models for evaluation.[82]    Based upon the information contained in Mr. Weir's deposition and Mr. Weir's declaration, Mr. Weir is asking the trier of fact to accept his ability to successfully perform these analyses when there are many known drawbacks to both techniques.    Mr. Weir also is asking the trier of fact to accept his ability to successfully perform these analyses when he had not provided explanations for how he plans to overcome the known drawbacks in light of the facts of this case.    In light of these unaddressed

_____

[81]    Weir Deposition, p. 268.

[82]    According to Mr. Weir, he has never testified to an amount of class-wide damage using a hedonic regression analysis (Weir Deposition, p. 43) and that "[a]s of [the date of his deposition]", his testimony concerning hedonic regression has never been accepted by a court as a basis to certify a damages class." (Weir Deposition, p. 250)

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

drawbacks, there can be no assurances that Mr. Weir's proposed approaches would reliably isolate a claimed price premium attributable to the Challenged Claim.

37.   I now provide a description of some of the many drawbacks Mr. Weir failed to address in his description of his proposed analyses.

## A.   **Hedonic Regression**

38.   Mr. Weir claims that "the hedonic regression can be specified to separate out the prices that consumers pay for each of the Product attributes."[83] However, Mr. Weir's proposed hedonic regression has at least the following potential drawbacks that he failed to acknowledge or failed to explain how they would be overcome.

    a.   Exclusion Of Relevant Variables May Render Analysis Unreliable.   In his deposition, Mr. Weir mentioned a common statistical issue in regressions, multicollinearity, which occurs when there are two or more perfectly (or highly) correlated variables.[84]   In a regression model, it can be difficult, if not impossible, to determine the impact of one variable if it is highly correlated with another relevant variable.   However, Mr. Weir's discussion of this issue significantly downplays the importance of this problem as it relates to this case.   Mr. Weir seems to imply that an appropriate strategy for dealing with this phenomenon would be to exclude a variable that has an impact on price.[85]   However, excluding

---

[83]  Weir Declaration, p. 5.

[84]  Weir Deposition, p. 204.

[85]  Weir Deposition, p. 127, 131.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

such a variable because it is correlated with the Challenged Claims <u>would
lead to unreliable results</u>.[86]

The issue of multicollinearity is particularly relevant because the
Challenged Claims always appear on Wesson Oil products in conjunction
with other claims (e.g. "Pure," "cholesterol free," and "0g Trans Fat")
that may have a price premium associated with them.[87]   Mr. Weir's
failure to properly address this potentially irreparable flaw in his
proposed regression, much less actually identify a solution that
overcomes this flaw, demonstrates that it is likely impossible to uniquely
determine the price premium attributable to the Challenged Claim.

b. <u>Proposed Hedonic Regression Cannot Distinguish Between An Asserted
Misleading And A Non-Misleading Interpretation Of The Challenged
Claim</u>. How a putative Class member interpreted the Challenged Claim
affects whether that purchaser suffered injury attributable to the alleged
message communicated by the Challenged Claim.

i. <u>Putative Class members have differing understandings of the
Challenged Claim</u>. Certain putative Class members (e.g., those who
interpret the Challenged Claim as "no preservatives" or "no chemicals
added") were affected differently than others those who adopted the
interpretation Plaintiffs allege to be misleading (i.e., "ingredients are
not sourced from GMOs"). Putative Class members who interpreted
the Challenged Claim as meaning "no preservatives" or "no chemicals
added" suffered no economic damages. This is because at least some
consumers likely were willing to pay more for a cooking oil with a

_____

[86] When excluding one variable because it is correlated with another variable, the new
measurement actually "measures almost all of the joint impact on the dependent variable of the
multicollinear explanatory variables." (A.H. Studenmund, <u>Using Econometrics: A Practical
Guide</u> (5th Edition), pp. 260 – 263.)   In other words, omitting a variable (such as other product
claims) would lead Mr. Weir's regression to actually measure the combined price premium
attributable to both the Challenged Claims and the other product claims (which is an irrelevant
value from a damages perspective).   Thus, omitting a variable would lead Mr. Weir's proposed
regression to no longer measure the variable of interest (the value solely attributable to the
misleading interpretation of the Challenged Claims).

[87] According to Ms. Hunter, "The terms 'Pure' and '100% Natural' as well as the statements
'cholesterol free' and '0g trans fat' are present on these Wesson vegetable, canola, corn and Best
Blend products, and have been throughout the putative class periods (the earliest of which runs
from January 12, 2006 to the present)."   (Hunter Declaration.)

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

"no preservatives" "or no chemicals added" claim while understanding that this claim did not imply that "ingredients are not sourced from GMOs."

ii. <u>Mr. Weir's hedonic regression approach would not be capable of differentiating between (i) a price premium attributable to a non-misleading interpretation of the Challenged Claim and (ii) a price premium attributable to the interpretation that Plaintiffs allege to be misleading</u>. A price premium driven by a non-misleading interpretation of the Challenged Claim would not be an appropriate measure of economic damages as it would not be tied to alleged wrongful conduct. A price premium driven by a non-misleading interpretation of the Challenged Claim would lead to an excessive estimate of the price premium and excessive damages by including amounts not derived from the alleged Challenged Claim.

c. <u>No Analysis Of Whether Sufficient Variation In The Explanatory Variables Exists</u>. As part of his proposed regression analysis, Mr. Weir assumed that there would be sufficient variation in the variables he proposes using to estimate the proportion of observed prices attributable to each product feature. However:

i. Mr. Weir did not present in his declaration any preliminary regressions he actually performed with respect to this case; and

ii. Mr. Weir did not present in his declaration any preliminary results relating to attempts to collect the type of data that would be required to perform his proposed hedonic regression.

As a result, Mr. Weir did not present any analysis to determine whether such variation in the explanatory variables actually exists or whether the necessary data exists to reliably implement the hedonic regression technique he is proposing.

**B.    <u>Conjoint Analysis</u>**

39.    Mr. Weir claims that "Conjoint analysis appears to be another alternative for calculating the price premium paid for the Products and measuring, with common proof, the economic harm that Class Members sustained as a result

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

of the Product Claim."[88]   However, Mr. Weir's brief description overlooks

many challenges in performing a conjoint analysis and fails to describe a

reliable methodology to determine an actual price premium (if one exists).

Mr. Weir's proposed conjoint analysis has at least the following potential

drawbacks that he failed to acknowledge or failed to explain how they would

be overcome.

40.    Based upon the Weir Declaration and the Weir Deposition, I summarize Mr.

Weir's description of the three steps in his proposed conjoint analysis

immediately below.

a.    Conducting The Survey.   Mr. Weir describes a "typical Conjoint
analysis" as beginning with a survey in which "survey panelists are
confronted with various choices of product attributes, prices, and
other alternatives, and asked either to rank their preferences, or to
choose the most preferred attribute or combination thereof."[89] The
survey involves "systematically varying the attributes of the product
and observing how respondents react to the resulting product
profiles"[90] (i.e., "consumers will be confronted in this choice-based
conjoint where they are given the choice of alternate products that
have different attributes, and they have to choose either Product A or
B or, perhaps, I wouldn't buy any of those or, perhaps, you might

_____

[88]  Weir Declaration, p. 10. According to Mr. Weir, he has never testified to an amount of class-
wide damage using conjoint analysis (Weir Deposition, p. 44) and that "[a]s of [the date of his
deposition]", his testimony concerning conjoint analysis has never been accepted by a court as a
basis to certify a damages class." (Weir Deposition, p. 250)

[89]  Weir Declaration, p. 9.

[90]  Weir Declaration, p. 9.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

have A, B or C they can choose from or I wouldn't choose any of those."[91]).

b.   <u>Analyzing Survey Results To Determine Relative Utility.</u>   Mr. Weir stated the output of that survey would be "a series of data points that are analyzed, again, by regression analysis to determine the relative value of the attributes."[92]   Rather than providing a "direct output, a -- either a percentage or dollar price premium,"[93] it provides "a data worksheet that needs to go straight back into a computer for further analysis as to what the -- what preferences are revealed by those trade-off questions."[94]   "Statistical methods (often linear regression) are then applied to the survey responses to calculate attribute value."[95]

c.   <u>Assigning Monetary Value To Relative Utility.</u>   After "the relative value or utility of each of the product attributes that have been measured" is determined from the regression results, Mr. Weir testified that a method is needed to assign monetary value to that utility.   Mr. Weir provided one such method in his deposition where the relative attribute values (or "utils") of the features are scaled by the relative "utils" associated with one dollar.   Mr. Weir provided the following description in his deposition.

> A. One such method is to calculate the value of the pricing information that you have and then convert that into a sort of survey currency called utils, u-t-i-l-s, and you can then use the measure of utils of the attribute in question, plus the value of the utils to determine the price premium.   There are other methods that can be used as well.

> Q. How would you -- how do you determine the value of an util?
> A. That would be an output from the conjoint analysis itself.

_____

[91]   Weir Deposition, p. 266 - 267.

[92]   Weir Deposition, p. 265.

[93]   Weir Deposition, p. 266.

[94]   Weir Declaration, p. 267.

[95]   Weir Declaration, p. 10.   (Bracketed text added for clarification.)

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

> Q. Why don't you describe how that – how that output comes about, converting utils into dollars and cents or percentages of price?
>
> A. Again, the regression result shows you the value that the consumers place on various items or the various attributes, including the price. So it will say, for example, a dollar -- a dollar price is worth 10 utils. So you could then -- or 10 utils is worth 250. So then you divide the dollars by the utils, get a price or value per util, which you can then use to value the other attributes under that method.[96]

Mr. Weir did not explain in his declaration or deposition testimony how he intends to "assign monetary value to that utility" and "determine the price premium," stating he "ha[s] not made that determination yet."[97]

### 1. <u>Failure To Describe The Determination Of A Price Premium From Conjoint Survey Results</u>

41.    Mr. Weir did not acknowledge (or present solutions to) the difficulties that would arise if he used conjoint analysis to calculate a price premium allegedly attributable to the Challenged Claim.[98]    Mr. Weir has not described any methodology or data requirements to convert the relative utility obtained from a conjoint survey to a price premium (if any) observed

_____

[96]  Weir Deposition, pp. 267 – 268.

[97]  Weir Deposition, p. 268.

[98]  In response to the question "have you ever successfully used conjoint analysis to indicate, to estimate price premium that customers actually paid for a product attribute?", Mr. Weir acknowledges "I'm not sure that I have conducted an historic conjoint, as you're suggesting, with retail prices that have already existed." Weir Deposition, p. 253.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

in the market (i.e., the relevant figure for any proposed damages calculation).

a. Mr. Weir does not describe a valid method for converting conjoint survey results into an estimated price premium. Mr. Weir claims that "[c]onjoint analysis is designed to determine a product's price components based upon each of the product's many product attributes."[99]  Based upon the limited description Mr. Weir provided in his deposition (as cited above), Mr. Weir appears to state that he will convert his survey results into a "dollar amount or percentage premium."[100] Neither of these methods as described would provide a measure of the actual price premium observed in the market (if one exists) associated with any particular feature.

i. According to a source on conjoint analysis referenced in the Weir Declaration, "[t]he idea of converting utilities to dollar values can be very appealing . . . [b]ut in [the authors'] experience what begins with much promise usually turns out to be a poor use of conjoint data."[101] The paper states that "[t]he common practice of converting differences between attribute levels to a monetary scale is potentially misleading."[102]

ii. While Mr. Weir states that "There are other methods that can be used as well,"[103] he has not defined how he intends to do this in either his

_____

[99] Weir Declaration, p. 10.   (Bracketed text added for clarification.)

[100] Weir Deposition, p. 267.

[101] Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions, p. 1.    (Bracketed text added for clarification.)    (http://www. sawtoothsoftware.com/support/technical-papers/general-conjoint-analysis/assessing-the-monetary-value-of-attribute-levels-with-conjoint-analysis-warnings-and-suggestions-2001, viewed on May 25, 2014.)   Mr. Weir cited generally to Sawtooth Software technical papers. (Weir Declaration, footnote 23, p. 9.)   This research paper is one of the papers available in the Sawtooth Software webpage provided in the Weir Declaration.

[102] Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions, p. 5.    (Bracketed text added for clarification.)    (http://www. sawtoothsoftware.com/support/technical-papers/general-conjoint-analysis/assessing-the-monetary-value-of-attribute-levels-with-conjoint-analysis-warnings-and-suggestions-2001, viewed on May 25, 2014.)

[103] Weir Deposition, p. 267.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

declaration or his deposition testimony.  While acknowledging that he "understand[s] that it's important to – in calculating damages here, to use a technique that will provide a calculation of damage that stems from the particular claim that's being challenged in this case,"[104] Mr. Weir has drawn no nexus between (a) the monetary value he will "assign" to the relative utility associated with the Challenged Claim and (b) the actual price (if any) paid by putative Class members for the Challenged Claim in light of the competitive market for cooking oil.

b. <u>Mr. Weir omits important economic considerations</u>. Mr. Weir's proposed analysis relies solely on (a) marketplace prices for products to the degree that "you wouldn't want to include attributes in the process that weren't available in the marketplace"[105] and (b) the conjoint survey which measures the "relative value of the attributes" from the point of view of "a representative survey of the appropriate demographic group for purchasers of Wesson Oil."[106]

i. However, in order to estimate the market price actually paid by consumers for a feature, "assumptions about competitive offerings and cost are required."[107]  While conjoint analysis "is designed to measure and simulate demand in situations where products are assumed to be comprised of bundles of features," it does not measure market equilibrium outcomes.[108]  Mr. Weir's methods for converting conjoint information into price tend to greatly overstate the value of the product features.[109]  Thus, any method relying on conjoint data to determine price must also incorporate information about "cost and the

_____

[104] Weir Deposition, pp. 29-30.

[105] Weir Deposition, p. 237.

[106] Weir Deposition, pp. 265 and 254.

[107] Allenby, G., Brazell, J., Howell, J., and Rossi, P., "Economic Valuation of Product Features," October 2013 Working Paper, p. 1.

[108] Allenby, G., Brazell, J., Howell, J., and Rossi, P., "Economic Valuation of Product Features," October 2013 Working Paper, pp. 3 – 4.

[109] Allenby, G., Brazell, J., Howell, J., and Rossi, P., "Economic Valuation of Product Features," October 2013 Working Paper, p. 3 – 4.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

nature of competition and the set of competitive offers."[110]   Mr. Weir appears to dismiss this requirement.[111]

ii. More generally, Mr. Weir testified that features related to market supply such as the underlying costs were not necessary for his proposed approach.

> Q. I mean there are other drivers of retail pricing for cooking oils other than product attributes, correct?
> A. How the market prices the products? Sure.
>
> Q. Right.  The cost of the product, the cost of Wesson Oil, of crude oil that ConAgra buys and refines into cooking oil, that's one input in ultimate retail pricing, correct?
> A. On the supply side of things, yes.
>
> Q. Right.  And the price that ConAgra charges to its customers, the retailers, that is one driving factor of the price at retail for Wesson Oil, right?
> A. Again, on the supply side, yes.
>
> Q. Well, what significance -- why are you making the distinction on the supply side?
> A. Because what we are measuring in this case is the consumer demand for the product and that interaction may be impacted by supply, but <u>we are measuring only how the consumer side of things will affect the price</u>.
>
> Regardless of whether ConAgra charges more or less and that shifts general market prices up or down, <u>the price premium that consumers pay because of their understanding of what's on the product label or whether that product label was taken away and how that might</u>

_____

[110]  Allenby, G., Brazell, J., Howell, J., and Rossi, P., "Economic Valuation of Product Features," October 2013 Working Paper, p. 4.

[111]  See for instance, Weir Deposition, p. 269 ("I don't need to know, for example, ConAgra's marginal cost of production in order to gain a value from the conjoint analysis.")

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

impact consumer pricing has nothing to do with the
supply.[112]

42.    More simply explained, Mr. Weir has provided no concrete method by
which his measurement of the relative utility associated with the Challenged
Claim can be converted into a portion of the Challenged Products' actual
(and market-determined) price.   Even if Mr. Weir acknowledged the above
necessary elements to calculate price components using a conjoint survey, it
is not clear that Mr. Weir would be able to (a) obtain reliable information on
costs associated with Wesson and competitor products (or the cost of certain
attributes), (b) identify what competitive offerings would be appropriate to
include, or (c) identify necessary inputs about the nature of competition to
properly model supply as would be appropriate in this setting (i.e., to allow
for the interaction of supply and demand considerations to determine various
price components).

### 2. Failure To Address How His Analysis Would Overcome Other Common Flaws In Conjoint Studies

43.    In addition to the difficulties associated with using a conjoint analysis to
obtain an actual price premium, there are many other potential difficulties in
successfully designing and executing a conjoint survey.   Mr. Weir has not

_____

[112]  Weir Deposition, pp. 178 – 179.   (Emphasis added.)

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

described how he would overcome the many challenges in designing and

executing his proposed analysis, which include but are not limited to the

following.

a.    <u>Failure To Distinguish Between An Asserted Misleading And A Non-
Misleading Interpretation Of The Challenged Claim.</u>  Similar to his
proposed hedonic regression approach discussed in detail above, Mr.
Weir proposes to use conjoint analysis to determine a single price
premium for each putative Class member attributable to the
Challenged Claim (or, alternatively a price premium that varies by
product size, state, etc.).  However, his proposed conjoint analysis
does not account for the likelihood that the price premium (if one
exists) would be driven in part by consumers interpreting the
Challenged Claim in a non-misleading, manner.  Thus, even if Mr.
Weir were to determine a price premium attributable to the
Challenged Claim, he actually also may be measuring a price
premium driven in part by a non-misleading interpretation of the
Challenged Claim.  A price premium driven by a non-misleading
interpretation of the Challenged Claim would not be an appropriate
measure of economic damages.

b.    <u>Overemphasis Of Certain Product Features.</u>  Conjoint analysis draws
attention to the features used in the survey exercise (e.g., the
Challenged Claim) at the expense of features not included in the
survey.  By drawing additional attention to the Challenged Claim, the
conjoint analysis runs the risk of measuring a larger impact of the
feature(s) on consumer preferences than that actually observed in the
marketplace.  Presented with a description of the Challenged Claim
in a survey, respondents may ascribe more value to the Challenged
Claim than they would when making actual purchase decisions.  Mr.
Weir did not address how he will overcome this drawback.  Mr. Weir
did not provide for evaluation any sample survey questions in his
declaration that would allow for the determination of whether this
concern could be overcome.  Other factors held constant, it would
overestimate any price premium, and thus overestimate damages.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

c.    <u>Possible Exclusion Of Important Product Features.</u>   Conjoint analysis is unreliable when important features of the product are omitted from the choice set, an outcome Mr. Weir admits is a potential concern.

> Q. All right. Well, then, let's assume you are not going to do too many, but my question was omitting important attributes in a conjoint analysis could lead to incorrectly valuing the included feature or attribute being tested; is that right?
> A. That's theoretically possible.[113]

Mr. Weir claims, without support, that the "relevant product attributes ('natural' claims, brand, etc.) are all easily identifiable and determined in this litigation."[114] While Mr. Weir claims the important attributes are "easily identifiable," he failed to provide an exhaustive list of proposed features – which makes it impossible to properly evaluate the reliability of his proposed analysis.  To the extent that Mr. Weir intends to use his results on either a percentage basis or a cash basis and apply that to the purchase price that actually took place in the market, any exclusion of important product features could lead to an overstatement of the value attributable to the Challenged Claim.

d.    <u>No Account Of Variation Over Time</u>.   Survey methodologies such as conjoint analysis generally measure the value of features at the point in time of the survey and cannot determine the value of features of the product in the past.  To the extent that the value consumers place on the Challenged Claim varies over time, Mr. Weir's proposed methodology would not appropriately measure the "relative utility" for individuals who purchased the Challenged Products earlier in the Class period (which began as early as 2007).

To the extent the value attributed to the Challenged Claim grows over time, using "relative utility" at a later point in time would result in an overstatement of "relative utility" at an earlier point in time.

_____

[113]   Weir Declaration, pp. 264 – 265.

[114]   Weir Declaration, p. 10.   (Bracketed text added for clarification.)

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

C.   **Summary**

44.   In light of the confounding considerations discussed throughout my declaration, and given that the Weir Declaration lacks any meaningful supporting analyses demonstrating that the proposed approaches actually could be implemented, the approaches proposed by Mr. Weir are not reliable for determining or quantifying actual harm in this case on a Class-wide basis (and related to the Challenged Claim)..

X.   **WHETHER AND TO WHAT EXTENT ANY CLASS MEMBER WAS INJURED DEPENDS UPON INDIVIDUALIZED INQUIRY**

45.   Determining whether a putative Class member suffered any economic injury as a result of the "100% Natural" claim requires individualized information relating to each Class member.  This individualized information includes, *inter alia*: (a) the putative Class member's reasons for purchasing Wesson oil products and (b) the price paid by the putative Class member for Wesson oil products.  The above circumstances relating to each individual putative Class member's purchasing decision must be considered in order to determine whether or not the individual was injured as a result of the Challenged Claim.   Further, analysis of the IRI data demonstrates that the average retail prices of Wesson oil products generally were lower than the average retail prices of other similarly-sized branded oil products of the

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

same variety (i.e., vegetable, canola, corn or blended vegetable and canola oils) available in the IRI data which do not bear the Challenged Claim (i.e., Mazola oil products).  Therefore, many putative Class members suffered no economic damages using the "benefit-of-the-bargain" approach from Named Plaintiffs' Second Amended Complaint [115] if other competitive branded products without the Challenged Claim are used as benchmarks, and either of Mr. Weir's analyses (i.e., his hedonic regression and conjoint analysis), given their dubious value, provide an indicator that no potential price premium damages exist.

A.   **Individual Inquiries Are Required To Determine Putative Class Members' Reasons For Purchasing Wesson Oil Products**

46.   Deposition testimony is consistent with the conclusion that Wesson oil products' sales are driven by several factors unrelated to the "100% Natural" claim (e.g., brand loyalty, price, perceived quality, convenience, taste, heat point, and purity).  Named Plaintiffs testified to the many drivers unrelated to the Challenged Claim influencing their purchases of Wesson oil products.

    a.  Robert Briseño.  Mr. Robert Briseño testified to the many drivers influencing his purchase of Wesson cooking oil products.  As evidenced by the following deposition excerpt, price, quality, convenience, and taste are all important factors to Mr. Briseño's food purchasing decisions.

_____

[115]  Second Amended Complaint, p. 34.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

> Q. To what extent, Mr. Briseno, are you focused on saving
> money when you buy food, on price?
> A. It's maybe a third or 40 percent of my decision making.
>
> Q. What else is – what are the other factors in your decision
> making besides price?
> A. Quality, convenience, flavor.[116]

Further, as evidence of the brand value of Wesson, Mr. Briseño indicated
that that fact that his mother is and was a user of Wesson cooking oil was
a purchase driver for Mr. Briseño.[117]   Mr. Briseño elaborated on this
point, stating that "it [Wesson oil] had built a certain loyalty with me,"[118]
and that Wesson was a "trusted name."[119]

b.  <u>Michele Andrade</u>.   Ms. Michele Andrade testified that while "100%
natural" was a contributing factor to her purchase decision, but when
asked how much of a factor it played, she replied "I don't know."[120]
When asked why she purchased Wesson over other cooking oils, Ms.
Andrade replied "[f]amiliarity,"[121] Additionally, when asked what factors
influence her cooking oil purchasing decision, Ms. Andrade replied,
"[h]eat point, flavor, and then the purity of the oil,"[122] though she failed
to mention "100% natural" as a factor.

c.  <u>Jill Crouch</u>.   Ms. Jill Crouch testified that the factors she considers when
purchasing food are brand recognition, price, and taste.[123]   Additionally,
Ms. Crouch does not appear to have put much weight on whether a
product contains GMOs, as evidence by the following deposition
testimony.

---

[116]  Briseño Deposition, p. 27.

[117]  Briseño Deposition, p. 42.

[118]  Briseño Deposition, p. 256.

[119]  Briseño Deposition, p. 146.

[120]  Andrade Deposition, p. 116.

[121]  Andrade Deposition, p. 138.

[122]  Andrade Deposition, p. 138.

[123]  Crouch Deposition, p. 31.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

> Q.   And after you first learned of GMOs, did you take any steps at that time to eliminate or reduce your consumption of GMOs?
> A.   I don't believe so.
>
> Q.   And since -- back to the period since you've filed the lawsuit, are there any products that you stopped buying altogether as a -- as a result of a desire to eliminate GMOs from your diet?
> A.   Not that I can think of.[124]

Ms. Crouch's statement at deposition is in apparent contradiction to the statement in the Second Amended Complaint that "Ms. Crouch would not have purchased Wesson Canola Oil but for ConAgra's misrepresentation that Wesson Canola Oil is '100% Natural.'"[125]

Further, as evidence of the brand value of Wesson, Ms. Crouch testified that the two factors that prompted her to first buy Wesson oil were "[p]robably the name, Wesson," and "could be because my mom used it when I was growing up."[126]

d.   <u>Pauline Michael</u>.   As evidence of the brand value of Wesson, Ms. Pauline Michael testified that "[y]ou know, it [Wesson vegetable oil] was the one that we always bought, and mom always bought it.  So I just, you know, used the same."[127]   Ms. Michael was so loyal to the Wesson brand that she would have purchased it even if it did not have the "100% natural" label (or, more generally, "natural"), as evidenced by the following deposition testimony.

> Q. So my question is that last purchase of Wesson Oil, whenever it was, if you know, would you have purchased that Wesson Oil if it had not had "natural" on the label?
> THE WITNESS:  It was a brand that I always bought.  So, you know, it was a brand I always used.

_____

[124]   Crouch Deposition, p. 114.

[125]   Second Amended Complaint, p. 7.

[126]   Crouch Deposition, p. 162.

[127]   Michael Deposition, pp. 37 – 38.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

> Q.    So you would have bought it regardless of whether it
> had natural on it; is that true?
> A.    Well, I think -- I think that the natural gave me, say, an
> additional peace of mind, but it's a brand that you know, I've
> been a loyal user since childhood and trusted.  So, yes, I
> would say.  The natural, like I said, just gave me peace of
> mind, but I've been using this product as a kid so...[128]

Further, Ms. Michael also testified that Wesson had a "mild flavor" while
Mazola, according to the members of her community, "wasn't as good
[as Wesson] or had a strong flavor."[129]

e.   Necla Musat.  Ms. Necla Musat testified that the primary factor in her
food purchasing is whether the product is organic.[130]   Additionally, as
evidenced by the following deposition excerpt, brand value was an
important factor in Ms. Musat's cooking oil purchasing decision.

> Q. Was the fact that your mother had used Wesson oil one of
> the factors that influenced your decision to buy Wesson oil?
> A. Yes.
>
> Q. How important was that in your decision-making?
> A. Well, because it was my mother, and she fed us, and it
> felt safe.  She's my mother, so I guess, you know, I just
> followed the path.
>
> Q. So that was an important factor to you?
> A. Yes.

Further, Ms. Musat went on to testify that she could not recall any other
reasons, other than the fact that her mother had used Wesson cooking
oils, for purchasing Wesson cooking oils.[131]

_____

[128]   Michael Deposition, pp. 128 – 129.

[129]   Michael Deposition, pp. 38 – 39.

[130]   Musat Deposition, p. 43.

[131]   Musat Deposition, p. 127.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

f. <u>Maureen Towey</u>.  Ms. Maureen Towey testified that if the Wesson cooking oil products were labeled as being made with GMO ingredients, she may have still purchased the products and would expect the price to be the same.[132]   Additionally, Ms. Towey indicated that price was one of the reasons that she purchased the Wesson cooking oil products.[133]

47.    These purchase drivers are unrelated to the Challenged Claim and consumers who purchased Wesson oil products for these reasons were not injured (or were not injured to the same degree) as consumers who purchased in substantial part because of the Challenged Claim.  The fact that a given customer can purchase Wesson oil products based upon multiple, different considerations necessitates individualized inquiry to determine a putative Class member's rationale for purchasing Wesson oil products and the extent of any claimed injury and corresponding damages.

**B.    <u>Individual Inquiry Is Required To Determine The Specific Price Paid For Wesson Oil Products By Each Class Member</u>**

48.    The extent to which any individual Class member could have suffered economic harm depends in part upon the price paid by that individual Class member – especially relative to a comparable or benchmark product. Absent other considerations, an individual Class member who purchased a Challenged Product for a price below that of a comparable or benchmark product would not have suffered economic harm; the lower price of the

_____

[132]  Towey Deposition, pp. 137, 154.

[133]  Towey Deposition, p. 44.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

Challenged Product is an indicator of a lack of economic evidence of a meaningful "price premium" attributable to the Challenged Claim.

49.   Therefore, knowing the prices paid by individual Class members (which differed greatly across Class members) will be a necessary factor in determining whether an individual Class member suffered economic harm. Without individual inquiry, one cannot determine the price an individual Class member paid for a Challenged Product or the extent to which they did or did not pay a "price premium" – rendering attempts to quantify damages on a Class-wide basis inaccurate and unreliable.

50.   IRI sales and pricing data support the conclusion that there is no "single" average purchase price that can be used to evaluate claimed damages on a Class-wide basis.  Analysis of the pricing data demonstrates that there are wide variations in the retail price of Wesson oil products depending upon (a) promotions utilized, (b) sales channel, (c) retailer, (d) geographic location, (e) product variety, and (f) package size purchased.  I provide a brief description of the price variation for Wesson Oil products below.  (*See* **Appendix E** for detailed discussion and results, and **Exhibits 5 – 12**.)

a.  Promotions Utilized.  In 2013, the difference between non-promoted prices and promoted prices[134] ranges from (i) 8% to 36% for Wesson 48

_____

[134] I understand that in IRI data, promoted prices reflect any combination of feature ads, displays, and price reductions.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

ounce vegetable oil, (ii) 9% to 43% for Wesson 48 ounce canola oil, (iii) 18% to 62% for Wesson 48 ounce corn oil, and (iv) 9% to 40% for Wesson 48 ounce Best Blend oil.

b.  <u>Sales Channel</u>.   Across all time periods, excluding sales channels selling fewer than 500 units, the difference in average retail prices between the highest and lowest priced U.S. sales channels ranges from (i) 26% to 62% for Wesson 48 ounce vegetable oil, (ii) 2% to 56% for Wesson 48 ounce canola oil, (iii) 3% to 32% for Wesson 48 ounce corn oil, and (iv) 0% to 25% for Wesson 48 ounce Best Blend oil.   (*See* **Exhibit 8** for an example relating to Wesson 48 ounce Vegetable Oil.)

**Figure 1**
**Wesson Oil 48 Ounce Vegetable Oil**
**Average Retail Prices By U.S. Sales Channel**



☐ Mass Merchandisers    ☐ Grocery Stores    ☐ Drug Stores

c.  <u>Retailer</u>.   Across all time periods, excluding retailers selling fewer than 500 units, the difference in average retail prices between the highest- and lowest-priced retailer ranges from (i) 43% to 68% for Wesson 48 ounce vegetable oil, (ii) 50% to 101% for Wesson 48 ounce canola oil, (iii) 37% to 72% for Wesson 48 ounce corn oil, and (iv) 42% to 73% for Wesson

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

48 ounce Best Blend oil.  (*See* **Exhibit 9** for an example relating to Wesson 48 ounce Vegetable Oil.)

**Figure 2**
**Wesson Oil 48 Ounce Vegetable Oil**
**U.S. Average Prices – Top 10 Retailers (2013)**



d. <u>Geographic Location</u>.  In 2013, the difference in average retail prices between the highest and lowest-priced markets within a given Claimed Class State with more than one metropolitan area ranges from (i) 2% to 14% for Wesson 48 ounce vegetable oil, (ii) 1% to 16% for Wesson 48 ounce canola oil, (iii) 2% to 41% for Wesson 48 ounce corn oil, and (iv) 1% to 51% for Wesson 48 ounce Best Blend oil.

e. <u>Product Variety Purchased</u>.  Across the top-selling UPC (i.e., 48 ounce) for each of the four varieties (i.e., vegetable, canola, corn, and Best Blend) of Wesson oil products present in the IRI data, the difference in the 2013 average price (weighted by volume) between the highest priced

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

and lowest priced UPC's with at least 500 units sold varied from 5% to 37% across all the Claimed Class States.

f.  <u>Package Size Purchased</u>.    Across the top-selling UPCs for Wesson vegetable oil products present in the IRI data (i.e., 24, 48, 64, 128 and 160 ounce), the price per ounce difference in 2013 between the highest priced and lowest priced UPCs with at least 500 units sold varied from 93% to 161% across all the Claimed Class States.

## C.  <u>Average Retail Price Data Show No Consistent Price Premium Relative To Other Branded Oil Products</u>

51.    Mr. Weir failed to identified any example benchmark products that are comparable to Wesson oil products which would be used to potentially perform either his two stated analyses (i.e., a hedonic regression or a conjoint analysis), or the "benefit of the bargain" damages calculation referenced in Named Plaintiffs' Second Amended Complaint.[135]

52.    While acknowledging that the products I discuss below differ from Wesson oil products on a number of important dimensions which drive prices and consumer choice other than the Challenged Claim, I show that Wesson oil products command no consistent premium over other branded oil products of the same variety and size that did not have the Challenged Claim during the putative Class period.    In fact, Wesson oil products generally are priced <u>lower</u> than its primary branded competitor, Mazola, which did not have the Challenged Claim during the putative Class period.    I selected Mazola for

_____

[135]  Second Amended Complaint, p. 34.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

my analysis because it was it was identified as a competitor cooking oil to Wesson and during the putative Class period was not labeled as "100% Natural".[136]

53.    I calculated the total unit sales of each of the 48 ounce Mazola oil products (across the three varieties available, i.e., vegetable/blend, canola, corn oil) available in the IRI data in each of the Claimed Class States over the June 29, 2009 to February 23, 2014 time period.   I present the total unit sales for each of the Mazola competitive oil products in **Exhibit 13**.

54.    These products share some traits with Wesson oil products (i.e., they are branded cooking oil products with significant sales to customers in each of the Claimed Class States over the Class period) and I understand they do not have the Challenged Claim.[137]

55.    According to the IRI data I analyzed, the average retail prices of Wesson oil products were not consistently higher than the average retail prices of the corresponding Mazola-branded oil products of the same variety and size on the market.   Thus, even using average retail price data (which mask important variations in prices actually paid by individual Class members), a

_____

[136]  Hunter Declaration.

[137]  As stated above, there are still many differences other than the Challenged Claim between Wesson oil products and these competitive products that would make a "benefit-of-the-bargain" analysis inappropriate with respect to these products.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

"benefit-of-the-bargain" approach would fail to demonstrate a consistent or
systematic "price premium" associated with Wesson oil products and caused
by the Challenged Claim relative to similarly-situated cooking oil products
on the market.

56.   Furthermore, the observed retail price differences between these products
varied over time, geography and channel.  These pricing patterns confirm
that the alleged price difference paid by any one putative Class member at
any particular time and place is not indicative of the alleged price difference
paid by another putative Class member at another time and place.
Therefore, individualized inquiries are required to assess economic injury, if
any, to putative Class members.

### i.  No Consistent Premium In Claimed Class States

57.   In most of the price comparisons across the markets available in the IRI data
in the Claimed Class States discussed below, Wesson oil products generally
were priced lower than the corresponding Mazola-branded competitive
products.  (**Exhibit 13**.)

a.  Vegetable/Blend Oil (48 ounce).   Across all markets in the Claimed
Class States in 2013, the price difference between Wesson and Mazola
ranged from -64% to 21%[138] (excluding Colorado, in which Mazola sold
fewer than 500 units, the corresponding range would be -52% to 21%).

_____

[138] A negative value indicates that the Wesson oil product was priced lower than the
corresponding Mazola oil product.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

As an illustrative example, the average price difference in 2013 for Wesson and Mazola 48 ounce vegetable/blend oil products in each of the Claimed Class States is presented in **Figure 3**. Corresponding figures for each year for each of the Claimed Class States are presented in **Appendix D** to my declaration.

**Figure 3**
**Vegetable/Blend Oil (48 ounce):**
**Wesson and Mazola Competitive Products**
**Difference in Average Retail Prices in Claimed Class States (2013)**



Note: Percent difference calculated as the amount to be applied to Wesson to yield the figure for Mazola. (i.e., Wesson figure * [1 + % difference] = Mazola figure). A negative figure indicates Wesson is lower-priced.

b. <u>Canola Oil (48 ounce)</u>.   Across all markets in the Claimed Class States in 2013, the price difference between Wesson and Mazola ranged from -64% to 21%. As an illustrative example, the average price difference in 2013 for Wesson and Mazola 48 ounce canola oil products in each of the Claimed Class States is presented in **Figure 4**. Corresponding figures for each year for each of the Claimed Class States are presented in **Appendix D** to my declaration.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

**Figure 4**
**Canola Oil (48 ounce): Wesson and Mazola Competitive Products**
**Difference in Average Retail Prices in Claimed Class States (2013)**



Note: Percent difference calculated as the amount to be applied to Wesson to yield the figure for Mazola. (i.e., Wesson figure * [1 + % difference] = Mazola figure). A negative figure indicates Wesson is lower-priced.

c.  Corn Oil (48 ounce).  Across the markets in the Claimed Class States in 2013, the price difference between Wesson and Mazola ranged from -87% to 1% (excluding Oregon, in which Wesson sold fewer than 500 units, the corresponding range would be -82% to 1%).  As an illustrative example, the average price difference in 2013 for Wesson and Mazola 48 ounce corn oil products in each of the Claimed Class States is presented in **Figure 5**.  Corresponding figures for each year for each of the Claimed Class States are presented in **Appendix D** to my declaration.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

**Figure 5**
**Corn Oil (48 ounce): Wesson and Mazola Competitive Products**
**Difference in Average Retail Prices in Claimed Class States (2013)**



Note: Percent difference calculated as the amount to be applied to Wesson to yield the figure for Mazola. (i.e., Wesson figure * [1 + % difference] = Mazola figure). A negative figure indicates Wesson is lower-priced.

### ii. No Consistent Premium Across Channels

58.    When examining average retail prices at the channel level, consistent with the price comparisons discussed above, Wesson oil products have no consistent price premium relative to corresponding Mazola-branded cooking products. Further, the observed price differences vary across channel. I analyze the price differences observed using U.S. sales and prices from the three channels available in the IRI data: mass merchandisers, grocery, and drug store. (**Exhibit 14**.)

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

     a. Vegetable/blend oil (48 ounce). Wesson oil was priced lower than Mazola in grocery stores and mass merchandisers in each year where both brands sold more than 500 units in each channel. Drug store data are not available for Mazola vegetable/blend oil (48 ounce).

     b. Canola oil (48 ounce). Wesson oil was priced lower than Mazola in grocery stores and mass merchandisers in each year where both brands sold more than 500 units in each channel. Drug store data are not available for Mazola vegetable/blend oil (48 ounce).

     c. Corn oil (48 ounce). Wesson oil was priced lower than Mazola in grocery stores in each year where both brands sold more than 500 units in a given channel. Mazola was priced 13% lower than Wesson in mass merchandisers in the one year where both brands had more than 500 units of sales. There were no years were both brands had more than 500 units of sales in drug stores.

59.    As an illustrative example, the difference in average retail prices between Wesson and Mazola-branded cooking oil products in 2011 is shown in **Table 1** below. A "negative" figure in the table below indicates that the Mazola competitive product was higher priced than the corresponding Wesson oil product.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

**Table 1**
**Difference In Average Prices Between Wesson and Mazola**
**Cooking Oil Products (48 ounce)**
**By Channel (2011)**

| Product | Mass Merchandisers – Difference in Price | Grocery – Difference in Price | Drug Store – Difference in Price |
|---|---|---|---|
| 48 ounce Vegetable/Blend Oil | -31% | -17% | N/A |
| 48 ounce Canola Oil | -22% | -32% | N/A |
| 48 ounce Corn Oil | N/A | -47% | N/A |

Note: Percent difference calculated as the amount to be applied to Wesson to yield the figure for Mazola. (i.e., Wesson figure * [1 + % difference] = Mazola figure). A negative figure indicates Wesson is lower-priced.

**D.    Summary**

60.    Based upon the analyses discussed above, Class-wide proof using aggregate pricing data does not produce a reliable or accurate way to demonstrate the fact of injury or the quantum of injury.  Class-wide proof would not correlate with actual harm, if any, to consumers and likely would yield windfall damages to a significant number of consumers.  Any determination of damages absent individualized analyses would result in a windfall gain to putative Class members who suffered no injury.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

## XI.  LACK OF EVIDENCE TO DETERMINE INDIVIDUAL PUTATIVE CLASS MEMBERS' ALLEGED ECONOMIC INJURY

61.    Even on an individual basis, there is a lack of evidence that would allow a

reliable determination of the claimed economic injury.

a.  Based upon Mr. Briseño's deposition testimony, Mr. Briseño could not remember the specific prices he paid for any Wesson oil products.[139]

b.  Based upon Ms. Andrade's deposition testimony, (i) Ms. Andrade did not retain any of her Wesson oil product receipts[140] and (ii) Ms. Andrade could not remember the specific prices she paid for the Challenged Products.[141]

c.  Based upon Ms. Virr's answers to Defendant's first set of interrogatories, Ms. Virr only indicated that she paid the "average retail price" for Wesson vegetable oil, without further specificity.[142]

d.  Based upon Ms. Crouch's deposition testimony, (i) Ms. Crouch did not retain any of her Wesson oil product receipts[143] and (ii) Ms. Crouch could not remember the specific prices she paid for the Challenged Products.[144]

e.  Based upon Ms. Michael's deposition testimony, Ms. Michael could not remember the specific prices she paid for the Challenged Products.[145]

_____

[139]  Briseño Deposition, pp. 41 – 42.

[140]  Andrade Deposition, p. 151.   Ms. Andrade retained some of her receipts, but does not have receipts for all of her purchases of Wesson oil products during the Class Period.

[141]  Andrade Deposition, p. 126.

[142]  Plaintiff Lil Marie Virr's Answers to Defendant's First Set of Interrogatories, p. 5.

[143]  Crouch Deposition, pp. 23, 186.   Ms. Crouch did not save her receipts prior to the lawsuit starting.

[144]  Crouch Deposition, pp. 156 – 157.

[145]  Michael Deposition, p. 120.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014
_____

    f.  Based upon Ms. Shaffstall's answers to Defendant's first set of interrogatories, Ms. Shaffstall could not remember the specific prices she paid for the Challenged Products.[146]

    g.  Based upon Ms. Hopper-Kercheval's answers to Defendant's first set of interrogatories, Ms. Hopper-Kercheval could not remember the specific prices she paid for the Challenged Products.[147]

    h.  Based upon Ms. Musat's deposition testimony, (i) Ms. Musat did not retain any of her Wesson oil product receipts[148] and (ii) Ms. Musat could not remember the specific prices she paid for the Challenged Products.[149]

    i.  Based upon Ms. Towey's deposition testimony, (i) Ms. Towey did not retain any of her Wesson oil product receipts[150] and (ii) Ms. Towey could not remember the specific prices she paid for the Challenged Products.[151]

    j.  Based upon Ms. Hein's answers to Defendant's first set of interrogatories, Ms. Heins could not remember the specific prices she paid for the Challenged Products.[152]

    k.  Based upon Ms. Willman's answers to Defendant's first set of interrogatories, Ms. Willman could not remember the specific prices she paid for the Challenged Products.[153]

62.    In the absence of documentary evidence that substantiates Named Plaintiffs' purchases of the Challenged Products (including the quantity of their purchases and the actual prices paid for the Challenged Products), it would

---

[146]  Plaintiff Cheri Shaffstall's Answers to Defendant's First Set of Interrogatories, pp. 1 – 2.

[147]  Plaintiff Dee Hopper-Kercheval's Answers to Defendant's First Set of Interrogatories, p. 6.

[148]  Musat Deposition, p. 47.

[149]  Musat Deposition, pp. 56 – 57.

[150]  Towey Deposition, p. 62.   While Ms. Towey may retain her receipts for upwards of a year but discards them thereafter.

[151]  Towey Deposition, p. 42.

[152]  Plaintiff Erika Heins's Answers to Defendant's First Set of Interrogatories, p. 2.

[153]  Plaintiff Anita Willman's Answers to Defendant's First Set of Interrogatories, p. 2.

Declaration of Keith R. Ugone, Ph.D.
June 2, 2014

_____

not be possible to reliably determine the economic damages allegedly suffered by the Named Plaintiffs, let alone on a Class-wide basis for putative Class members.

\*   \*   \*   \*   \*   \*

63.    My analyses, observations, and opinions contained in this declaration are based upon information available to date.  I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the Parties to this dispute and to supplement my opinions based upon that review.


I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Dallas, Texas on June 2 , 2014.


Keith R. Ugone, Ph.D.