UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

IN RE CONAGRA FOODS, INC.

Case No. 11-cv-05379-MMM

MDL No. 2291

Declaration

of

# Dr. Elizabeth Howlett

June 30, 2014

I, Elizabeth Howlett, declare as follows:

## I.      ASSIGNMENT

1.      I have been retained by Plaintiffs' counsel in the above-referenced action to provide expert testimony on the level of importance that consumers attach to "natural" claims on food products in general and, in particular, to the "100% Natural" claim on the labels of Wesson Oils. In addition, I was asked to analyze and respond to the Declaration of Dominique M. Hanssens, describing the survey that he conducted for ConAgra in this case (the "Hanssens Survey"). I was also asked to review and comment on a survey conducted for Plaintiffs by Dr. John C. Kozup.

## II.     SUMMARY OF QUALIFICATIONS AND EXPERIENCE

2.      I am a Professor in the Department of Marketing, Sam M. Walton College of Business, University of Arkansas, Fayetteville.

3.      My responsibilities include teaching at the undergraduate and graduate levels. I have taught courses in marketing research, consumer behavior, integrated marketing communications, and public policy. Additionally, I mentor and supervise research projects with junior faculty and students that involve a variety of issues such as nutrition labeling, information disclosures, and unethical marketing practices. My individual research covers these topics and more, with a focus on consumer health and welfare issues.

4.      I completed my Ph.D. degree from Duke University in Marketing (primary field) with an emphasis in Behavioral Decision Research and Theory. I have a Master of Science degree in Psychology from Lehigh University. My dissertation examined the impact of attribute information on consumer decision making.

5.      I was confirmed to an appointment as a Special Government Employee in September of 2013. I serve as a Food and Drug Administration ("FDA") Consultant for the Risk Communication Advisory Committee for a term ending September 30, 2017.

6.      I have provided expert testimony to the United States Congress regarding nutrition labeling on restaurant menus.

7.      During 2010-2012, I served as a member of the Institute of Medicine Committee on the Examination of Front-of-Package Nutrition Rating Systems and Symbols. I am one of only a handful of marketing experts who have been asked to serve the National Academies.

8.      I have been invited to speak at a variety of universities (*e.g.*, Tufts University, Lehigh University, University of California, Berkeley, Ohio State University, University of North Carolina, Chapel Hill, University of Oklahoma) to discuss how my research has impacted public policy.

9.      I have won numerous awards for best papers submitted to the premier marketing conferences. In addition, my paper was selected as "best paper" during a two-year period at the Journal of Consumer Affairs.

10.     From 2009 until 2011, I served as President of the Marketing and Society Special Interest group of the American Marketing Association, an organization that represents over 30,000 marketing professionals.

11.     I have held positions at the Stern School of Business, New York University, The Tippie College of Business, University of Iowa, and the Sam M. Walton College of Business, University of Arkansas, Fayetteville.  I have also served as a visiting professor at the University of Queensland in Brisbane, Queensland Australia and at École Supérieure de Commerce de Toulouse in Toulouse France.

12.     I have published over 60 scholarly articles.  A list of my recent publications from the past ten years may be found attached as Appendix A.  Note my previous surname was Creyer.

13.     I am being compensated at my usual rate of $350 per hour. A list of my prior testimony is attached as Appendix B.

## III.     SUMMARY OF CONCLUSIONS

14.     Based on a thorough review of prior literature published in the fields of economics, marketing, consumer behavior, nutrition, and food science, I conclude that a "natural" claim on food products in general and, in particular, the "100% Natural" claim on the label of Wesson Oils, is material to the reasonable consumer.[1]  Many of these studies also show that a substantial percentage of consumers believe that a "natural" label on food products indicates an absence of bioengineered ingredients.[2]

15.     Furthermore, the results of ███████████████████████████ ████████ clearly demonstrate that the "100% Natural" claim on the label of Wesson Oils is material to purchasers of Wesson Oils.  These research findings strongly support my conclusion that the "100% Natural" claim on the label of Wesson Oils is an important factor in consumers' purchase decisions.

16.     Based on thorough review of the methodology of the survey performed for Plaintiffs by Dr. John C. Kozup on June 25 - 28, 2014, I conclude that the survey results are reliable and valid.  I further conclude that the survey results provide overwhelming evidence that consumers of Wesson Oils do not believe that the "100% Natural" claim on the Wesson label is consistent with the bioengineering methods used to produce Wesson Oils.

17.     Finally, as I explain below, the Hanssens Survey suffers from a number of shortcomings and fatal methodological flaws that render the survey results meaningless.  Consequently, Hanssens' conclusions based on the survey results have no basis in fact and should not be considered by the Court.  More specifically, the Hanssens Survey provides absolutely no evidence to support the conclusion that the "100% Natural" claim on the label of Wesson Oils is

---

[1] By "material to the reasonable consumer," I mean sufficiently important to most consumers to affect their purchase decisions.
[2] In this Report, I use the terms "bioengineered," "genetically modified" and "GMO" to mean containing ingredients made from plants whose DNA has been altered by the insertion of genetic material from species other than plants using modern scientific techniques.

not material to consumers' purchase decisions.  Furthermore, the Hanssens Survey provides no valid information on the question of whether the "100% Natural" claim on Wesson Oils affects consumers' beliefs concerning the product's GMO content.

## IV.     "NATURAL" CLAIMS ARE MATERIAL TO REASONABLE CONSUMERS

### A.     *Labels Matter*

18.     California's Supreme Court has recognized what decades of extensive research within the field of marketing has shown:  "Simply stated: labels matter.  The marketing industry is based on the premise that labels matter—that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source."[3]

19.     Labels matter because they assist consumers in dietary management and contribute to nutrition education.  Labels also serve as useful information tools for consumers in evaluating product attributes.

20.     For example, a number of studies conducted over the past twenty years clearly demonstrate that health and nutrient content claims presented on product labels impact a variety of consumer product attitudes, beliefs, and purchase intentions.[4]  Prior research on product labeling has shown that it can positively impact product perceptions, including the perceived healthfulness of a product.[5]  Researchers have also demonstrated that health-related claims on a product have significant effects on product-related beliefs.[6]

21.     Research conducted by the International Food Information Council (IFIC) Foundation and reported in an article published in *The American Journal of Clinical Nutrition* shows that consumers refer to food labels when deciding which foods to purchase or eat.[7]  In fact, more than 8 of 10 consumers (83%) looked at ingredients or nutrition information at least some of the time.[8]

### B.     *Consumers Value "Natural" Labels*

22.      A trip to any supermarket or supercenter provides evidence that consumer packaged goods manufacturers recognize the power of "natural" claims.  Sales of food products with "natural" claims exceed $20 billion dollars annually.  Since 2010, "natural" has been the most popular claim on new foods and beverages launched in the United States.[9]  Consumers who seek out natural products have significant purchasing power and a steadily increasing share of the overall market for consumer goods.  Indeed, the U.S. retail sales of natural and organic food and beverages are expected to double from $39 billion in 2010 to $78 billion in 2015.  Almost half,

---

[3] *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 889 (Cal. 2011).
[4] Andrews, Burton and Kees, 2011.
[5] *See, e.g.*, Mazis and Raymond, 1997; Urala, Arvola, and Lahteenmaki, 2003; Andrews, Burton, and Kees, *supra* n.4.
[6] Ford et al., 1996; Mazis and Raymond, *supra* n.5.
[7] *See* Bora, 2006.
[8] *See id.*
[9] Packaged Facts, 2011

49%, of natural food sales are derived from mass market retailers including conventional supermarkets, drugstores, and mass merchandisers such as Walmart.[10]

23.     Consumer demand for natural products is very strong.  Studies show that consumers exhibit a preference for natural products, purchase those products, and willingly pay a premium for those products.[11]  Among the primary reasons consumers cite for their willingness to pay a premium is that natural products are perceived to be higher quality, safer, healthier and better for the environment.[12]

24.     A major study released in June 2014 by Consumer Reports National Research Center reported that 59% of consumers look for "natural" claims when shopping for food.[13]  The study also found that 64% of consumers believe that a "natural" label on packaged foods means that "[n]o GMOS, that is genetically modified ingredients, were used."[14]  This study clearly confirms the materiality of "natural" claims to the majority of consumers.  Based on my review of the published methodological data, the Consumer Reports National Research Center Survey appears to be a valid and reliable study.[15]

25.     A 2010 survey conducted by Mintel Group, Ltd., a well-respected global market research firm, reported that 65% of respondents stated that they are "somewhat interested" or "very interested" in natural products,[16] and that 62% of respondents who use natural and organic products agreed that "It's worth paying more for natural products for some types of items, but not for others."[17]  These findings indicate that many consumers accept the price premiums common to these products because they justify the expense with other factors in mind (*e.g.*, overall health, the environment, and lifestyle).  Based on my review of the published methodological data, this appears to be valid and reliable study.[18]

26.     A 2010 study by the Hartman Group, a well-regarded research and consulting firm, found that 61% of consumers surveyed associated "natural" with the "absence of genetically

---

[10] *Id.*

[11] *See, e.g.*, *infra* n.13 & 16 and accompanying text.

[12] Packaged Facts, 2008.

[13] Levitt Decl., Ex. A, Consumer Reports National Research Center, Food Label Survey (2014), at 17.

[14] *Id.* at 19; *see also id.* at 20 (noting that 85% of consumers say that a "natural" label on packaged food *should* mean "[n]o GMOs, that is, genetically modified ingredients, were used").

[15] The nationwide phone survey, conducted in April 2014, reached a nationally representative sample of 1,004 adults who were demographically and geographically representative of the U.S. population.  The survey has a margin of error of +/- 3% at a 95% confidence level.  According to Consumer Reports, the National Research Center is "free of corporate influence and advertising.  Our surveys are not commissioned or financed by industry.  Rather, these surveys are designed to gather unbiased, objective information from consumers for the sole purpose of informing and empowering them."  Consumer Reports, How We Survey, http://www.consumerreports.org/cro/about-us/whats-behind-the-ratings/research/index.htm.

[16] *See* Levitt Decl., Ex. B, Mintel, Consumer Attitudes Toward Natural And Organic Food And Beverages (2010). at 15.

[17] *Id.* at 44.

[18] Mintel conducted its study using two samples.  First, a 2,000 member online panel that represented the U.S. population in terms of gender, age, household income, and region.  Mintel then analyzed and cross-checked its results against data from two Simmons National Consumer Surveys drawn from a sample of 25,318 adults representing the U.S. population.  Based on the available information, this appears to be reliable study.  *See id.* at 2.

modified foods."[19]  The study also found that 36% of what Hartman termed "primary shoppers" were buying more natural products than they had in the prior year.[20]  Based on my review of the published methodological data, this appears to be a valid and reliable study.[21]

27.    A 2011 study by HealthFocus International, a well-regarded research and consulting firm, found that 72% of consumers surveyed associated "natural" with the "absence of genetically modified foods."[22]  Based on my review of the published methodological data and my prior knowledge of HealthFocus International, this appears to be a valid and reliable study.[23]

28.    Based on all of my knowledge and experience in the fields of marketing research, marketing communications and consumer behavior, including my review of the sources discussed above, it is my opinion that "natural" labels on packaged food products are material to consumers; and that consumers are willing to pay, and often do in fact pay, a premium price for food products labeled as "natural."

## V.    THE "100% NATURAL" CLAIM IS MATERIAL TO WESSON PURCHASERS AND THAT IS WHY CONAGRA PUTS IT ON THE FRONT LABEL

29.    ConAgra's own documents, including ███████████████████████████████ ██████████████████ show that the "100% Natural" claim on Wesson Oils is material to and is a purchase motivator for Wesson consumers, and that ConAgra has known the importance of the "100% Natural" claim to Wesson purchasers since at least ██████.

30.    Further, ConAgra's documents strongly support an inference that ConAgra has maintained the "100% Natural" claim on Wesson Oil labels through a series of label design changes in order to benefit from the increased demand for Wesson Oils resulting from the presence of the claim on the labels.

31.    For example, a study conducted for ConAgra by ██████████████████████ ████████████████  The study reported that ████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████

32.    In November 2006, ConAgra commissioned ██████████████████████████ ████████████████████ for the Wesson line of oils.[26]  ConAgra specified that it was

---

[19] Levitt Decl., Ex. C, Hartman Group, "Beyond Organic & Natural 2010,"at 34, 43.

[20] Id. at 26.

[21] The Hartman Group study included in-person interviews in Seattle and Atlanta, followed by a nationwide survey of 1,679 adults representative of the U.S. population.   The survey's conclusions had a +/- 3% sampling error at the 95% confidence level.  See id. at 12.

[22] Levitt Decl., Ex. D, HealthFocus00003465, at 3481.

[23] The HealthFocus study relied on an online survey of 2,974 "primary grocery shoppers."  Id. at 5.

[24] Levitt Decl., Ex. E, CAG0003542 at 3545-46.

[25] Id. at 3543.

[26] Levitt Decl., Ex. F, CAG0003706.



[redacted][27] The estimated cost of the study was [redacted].[28]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

33. [redacted]

---

[27] *Id.*
[28] *Id.*
[29] Kelston Decl., Ex. 8, CAG0000055.
[30] *See id.* at 61.
[31] *Id.* at 66.
[32] *Id.* at 84.
[33] *Id.* at 88-89. ConAgra's claim that this study shows [redacted] is erroneous, as illustrated by the finding that only [redacted] It is self-evident that the Wesson name is seen by all consumers who view the label. [redacted]
[34] *Id.* at 116.
[35] *Id.* at 69.
[36] Kelston Decl., Ex. 25, CAG0000789.



34.    In May 2009, ConAgra published an ███████████████████████
██████[39]

35.    In June 2011, ConAgra commissioned ██████████████████████
████████[42]

        c.    ████████████████████████████████████████████[45]

36.    Based on my knowledge and experience in the fields of marketing research, marketing communications, and consumer behavior, including my review of the documents discussed above, it is my opinion that, from at least ████, ConAgra has been aware that the "100% Natural" claim on the front label of Wesson Oils is material to Wesson purchasers and that it is an important factor motivating their purchases of Wesson Oils.

37.    It is also my opinion that it is reasonable to conclude that ConAgra acted on this knowledge in deciding to maintain the "100 Natural" claim on the front label of Wesson Oils ████████████████████████████ in order to gain the benefit of the increased demand for Wesson Oils caused by the presence of the claim on the labels.

---

[37] *Id.* at 794.
[38] *Id.* at 792.
[39] Kelston Decl., Ex. 24, CAG0000711.
[40] *Id.* at 712.
[41] *Id.* at 725.
[42] Kelston Decl., Ex. 10, CAG0002537.
[43] *Id.* at 2539.
[44] *Id.* at 2559.
[45] *Id.*

38.     Because they are found in internal ConAgra documents not created specifically for this litigation, the findings discussed above are both highly reliable and highly indicative of ConAgra's belief that ███████████████████████████████████████ ███████████.  As discussed in detail below, the opinions offered by Dr. Hanssens, based on a severely flawed survey, contradict ConAgra's own information about the materiality of the "100% Natural" claim.  Dr. Hanssens' failure to review ConAgra's existing data on issues upon which he renders opinions was a serious error on his part, possibly reflecting a "willful blindness" toward information that might undermine the survey results that he know ConAgra needed to support its claims in this litigation.

## VI.     THE HANSSENS SURVEY DOES NOT MEET THE BASIC STANDARDS OF ACCEPTABLE SURVEY DESIGN AND IMPLEMENTATION AND DR. HANSSENS' OPINIONS BASED ON THE SURVEY ARE COMPLETELY INVALID

39.     In its opposition to Plaintiffs' motion for class certification, ConAgra relies on the opinions of Dr. Hanssens, based on the Hanssens Survey, as evidence that the "100% Natural" claim on the labels of Wesson Oils is "not a significant factor in driving purchases of Wesson Oil."  (Opp'n at 16.)

40.     After careful review of the Hanssens Survey and the deposition testimony of Dr. Hanssens, I have concluded that the Hanssens Survey suffers from methodological flaws so severe that it fails to meet the basic standards of acceptability for survey design and implementation.

41.     Dr. Hanssens' opinion that "the survey evidence demonstrates that '100% Natural' statement on Wesson cooking oils did not have a material effect on consumer purchase intent or on consumer beliefs as to whether Wesson cooking oils are free of GMO ingredients,"[46] based on a deeply flawed and biased survey, is meaningless and should not be considered by the Court.

### A.     Background: The Hanssens Survey Design

42.     In the Hanssens Survey, participants were assigned to the Test Group or the Control Group.  As part of the survey, the Test Group was shown a Wesson Vegetable Oil label including the "100% Natural" claim, while the Control Group saw an identical label, but with all references to "100% Natural" removed.  "The only difference in the survey experience between the two groups was the product label they viewed."[47]

43.      The Test and Control Groups were then asked a series of questions concerning their beliefs and attitudes about GMOs, Wesson Oil, and vegetable oils in general.  The key questions (as Dr. Hanssens described them) were:

> Question 1A: "Assuming you were intending to buy vegetable oil today, how likely would you be to buy this product based on the information you've been provided?"

---

[46] Hanssens Decl. ¶ 14.
[47] Hanssens Decl. ¶ 42.

and

Question 5: Do you believe that the product you have been shown is free of GMO ingredients?[48]

44.     In the Hanssens Survey results, the responses of the two groups to these questions were not significantly different.  Based solely on the absence of a between-group difference, Dr. Hanssens concluded that "the '100% Natural' on Wesson cooking oils did not have a material effect on consumer purchase intent or on consumer beliefs as to whether Wesson cooking oils are free of GMO ingredients."[49]

45.     Due to the fundamental flaws and biases of the survey, Dr. Hanssens' conclusions have absolutely no validity.

46.     Given its Test vs. Control design, the Hanssens Survey results can be valid only if the Test and Control Groups actually differed in the manner Hanssens intended; that is, if the participants in the Test Group actually perceived the "100% Natural" claim on the Wesson label shown in the survey.

47.     Social scientists describe this by saying that the validity of the survey depends on there having been a successful "manipulation."  In layman's terms, it means that if the Test Group respondents did not actually perceive the "100% Natural" statement on the Wesson label oil shown in the survey, the survey is completely useless.

**B.     *The Hanssens Survey Lacked Standard Survey Design Features to Show that a Manipulation Has Occurred.***

48.     The Hanssens Survey fails to provide any evidence that the Test Group respondents perceived the "100% Natural" claim.  This failure is due primarily to three fundamental defects in the survey methodology:

a.      **Failure to ensure exposure for adequate time**:  It is common practice to present the stimulus for a given amount of time to make sure the participant is adequately exposed to the stimulus.[50]  This is important because it prevents respondents from rushing to answer the questions without paying attention to the stimulus (*e.g.,* the picture of the bottle of Wesson Oil).  Hanssens' failure to include this basic safeguard undermines any confidence that respondents actually perceived the "100% Natural" claim on the bottle of Wesson Oil.

b.      **Failure to obtain exposure time data**:  Dr. Hanssens failed to review readily available data showing the amount of time respondents actually were exposed to image of the Wesson bottle during the survey.[51]  Exposure time data is routinely tracked in Internet surveys and should be reviewed for evidence of unsuccessful

---

[48] Hanssens Decl. ¶¶ 51, 57.
[49] Hanssens Decl. ¶ 14.
[50] Cozby, Paul and Scott Bates, Methods in Behavioral Research, 11th Edition, McGraw Hill.
[51] Levitt Decl., Ex. K ("Hanssens Dep.") 73:25-74:3.

manipulations or other anomalies.[52]  Dr. Hanssens' deposition testimony that he did not obtain the exposure time data because "[he] was not interested in that— in that statistic"[53] indicates either a lack of comprehension of basic survey principles or, more likely, a purposeful effort to avoid considering data that might invalidate the survey.

      c.    **Failure to include appropriate manipulation checks**:  It is a basic principle of experimental design to include questions to determine whether a successful manipulation has occurred.[54]  A "manipulation check" is a question whose answer is expected to be affected by the manipulation.  For example, in the Hanssens Survey, respondents could have been asked:  "Did the Wesson label you viewed in this survey include any reference to the product being natural?"  Responses would have provided some evidence as to the effectiveness of the survey manipulation—the exposure of Test Group respondents to the "100% Natural" claim.

49.     These methodological flaws, in and of themselves, are sufficiently severe to render the Hanssens Survey wholly invalid and unreliable.

      *C.*     *A Significant Number of Respondents Likely Failed to Perceive the "100% Natural" Claim During the Survey*

50.     While the Hanssens Survey offers no evidence that survey participants perceived the "100% Natural" claim on the Wesson label, other factors (for which Dr. Hanssens also failed to control) likely caused many participants not to perceive the critical claim.[55]

      a.    **Brand Familiarity**:  The vast majority of respondents in the Hanssens Survey were familiar with the Wesson Oil label—73% of them had purchased Wesson at least once in the prior 12 months.  It is well-established (and hardly surprising) that consumers spend much less time looking for information on familiar labels as compared to unfamiliar ones.[56]  Dr. Hanssens readily admitted in his deposition that brand familiarity might have led some respondents to essentially ignore the image of the label they were exposed to during the survey.[57]

      b.    **Lack of Motive**:  Survey participants simply had no reason to study the label.  The survey instructions did not indicate that respondents would be asked

---

[52] Osborne, Jason W. & Amy Overbay (2004), The Power of Outliers (and why researchers should always check for them), Practical Assessment, Research & Evaluation, 9(6).

[53] Hanssens Dep. 75:21-22.

[54] *See* Cozby, *supra* n.50.

[55] Dr. Hanssens' deposition testimony regarding the importance of respondent's actual perception of the test stimulus was evasive and, at times, incomprehensible.  For example when asked if it was important that respondents perceive the stimulus being tested, Dr. Hanssens took exception to the use of the word "perceive," explaining:  "I cannot perceive you.  I can perceive that you have glasses, but—so you don't perceive a stimulus."  Hanssens Dep. 176:2-4.

[56] Cowburn, Gill and Lynn Stockley Consumer understanding and use of nutrition labelling: a systematic review, Public Health Nutrition: 8(1), 21–28

[57] Hanssens Dep. 69:12-70:6.

questions about the label and, although respondents were able to return to the label image at any time during the survey, none of the survey questions were about the appearance of the label or the information on it.

      c.      **Consistency Principle**:  The likelihood that participants would attend to the Wesson labels was further diminished by fact that 302 of the 316 participants had already stated their intention to purchase Wesson Oils in the near future.  Having already stated their intention to purchase, respondents were unlikely to act in manner inconsistent with that intention, for example, by examining a label as would an undecided, information-seeking potential purchaser.[58]

      d.      **Failure to Control for Use of Mobile Devices**:  The Hanssens Survey failed to control for whether respondents completed the survey on a phone, tablet, or computer.  Experts designing surveys that test the impact of visual stimuli consider this a basic control element in conducting online survey research.[59]  Rather than acknowledge such a flaw in his survey design, Dr. Hanssens' instead claimed during his deposition that the size at which the "100% Natural" claim appeared on cellphone screens was unimportant because users hold the devices close enough to their faces to compensate for any legibility problems.[60]

51.    These factors, combined with the absence of any evidence in the Hanssens Survey confirming the manipulation, raise the possibility that a significant portion of survey respondents were not meaningfully exposed to the "100% Natural" claim on the Wesson label, the stimulus the Hanssens Survey was purportedly testing.  The presence of these additional defects further negates any possibility that the Hanssens Survey provides useful or reliable information.

      **D.**      **The Hanssens Survey Failed to Consider the Respondents' Prior Knowledge and Pre-existing Beliefs**

52.    The Hanssens Survey included only respondents who were already familiar with the Wesson Oil.  In fact, of the 316 respondents, 233 had purchased Wesson Oil during the prior 12 months and all of the respondents had either Wesson or selected it as a brand they would consider purchasing in the next 12 months.  As noted earlier, the "100% Natural" claim is a major aspect of Wesson's product positioning.  Thus, it is highly likely that prior to taking the Hanssens Survey, respondents were aware that the "100% Natural" claim appears on Wesson Oils labels.

53.    The failure to take into account respondents' prior knowledge about the product is a fatal flaw in the experimental design.  Dr. Hanssens simply asked respondents, "Assuming you were

---

[58] As explained by noted psychologist Robert Cialdini: "[W]e have a nearly obsessive desire to be and to appear to be consistent with what we have already committed to.  Once we have taken a stand and made a choice, we behave in ways that justify our earlier decision and commitment." Robert Cialdini, Influence, the Psychology of Persuasion.
[59] Compare, for example, the survey in *Algarin v. Maybelline, LLC*, No.12cv3000 AJB (DHB) (S.D. Cal.) ("Maybelline"), which disqualified respondents using smartphones or cellphones. "This step was considered necessary because the survey was not designed for cellphone use, and I therefore could not guarantee that the images presented in the questionnaire would display properly on cellphones." Levitt Decl., Ex. G, Declaration of Dr. Eli Seggev, dated December 9, 2013 (Dkt.69) at ¶ 35-36.
[60] *See* Hanssens Dep. 179:6-21; 182:6-23.

intending to buy vegetable oil today, how likely would you be to buy this product *based on the information you've been provided*?"[61]  He did not ask critical questions to determine the respondent's knowledge or belief about the "naturalness" of Wesson Oils prior to their exposure to the images in the survey.

54.    For an experiment to be internally valid, researchers should control for extraneous variables such as prior knowledge.[62]

55.    Dr. Hanssens could have easily controlled for prior knowledge by using an unfamiliar or fictitious product.  This would have forced respondents to carefully consider the package label and would have controlled for prior knowledge about Wesson Oils.  Dr. Hanssens' failure to do this is a severe defect that renders his conclusions invalid.

### E.    *The Hanssens Survey and the Hanssens Declaration Suffer Other Significant Defects*

56.    **Failure to Control for Confusion about the Meaning of "GMOs"**:  Dr. Hanssens claims that his survey is "a precise instrument for measuring the impact of exposure to the '100% Natural' label claim on respondents' understanding of whether or not the product is GMO-free."[63]

   a.     Dr. Hanssens concluded that "the '100% Natural' on Wesson cooking oils did not have a material effect on … consumer beliefs as to whether Wesson cooking oils are free of GMO ingredients."[64]

   b.    His conclusion was based on Question 5: "Do you believe that the product you have been shown is free of GMO ingredients?"

   c.    Respondents were also asked in Question 6A, "Do you know what a GMO ingredient is in food?"  If they answered "yes," they were asked Question 6B, "What is your understanding of what a GMO ingredient in food is?"[65]

   d.    Respondents' answers to Question 6B clearly show that many of the respondents did not have a good understanding of the term "GMO."  Approximately half of the responses consisted of the words "genetically modified" and little else.  Other responses were (in their entirety): "chemicals," "Coloring," "different," "bad," "general modified," "growth hormones," "natural fat," "nice" and "yuk."[66]

   e.    It is abundantly clear that respondents had an extremely low level of understanding of the terms  "GMO" and "genetically modified organisms."

---

[61] Hanssens Decl. ¶ 51.
[62] *Cozby, Paul and Scott Bates, Methods in Behavioral Research, 11th Edition, McGraw Hill*
[63] Hanssens Decl. ¶ 57.
[64] *Id.* ¶ 14.
[65] *Id.*, Ex. 2.1.
[66] Levitt Decl., Ex I.

      f.      Therefore, respondents' answers to Question 5 ("Do you believe that the product you have been shown is free of GMO ingredients?") are utterly meaningless and, even if Test Group respondents did actually perceived the "100% Natural" claim on the label shown in the Hanssens Survey, their responses to Question 5 provide no useful information about consumers' understanding of the "100% Natural" claim.

      g.      For Dr. Hanssens to draw a key conclusion based on respondents' answers to Question 5, which included a key term that most respondents obviously did not comprehend—as they demonstrated in answering Question 6A—is an obvious and fundamental error so severe as to render his conclusions meaningless.

57.   **Misinterpretation of the Heterogeneity of Purchase Factors**:  Fifteen paragraphs in the Hanssens Declaration are devoted to establishing the uncontroversial notion that consumers consider many factors in making purchase decisions.[67]  However, as Dr. Hanssens admitted in his deposition, the heterogeneity of factors affecting consumers' purchase decisions does not preclude the possibility that a large percentage of consumers are affected by any one particular factor.[68]  Dr. Hanssens provides no evidence to demonstrate that the "100% Natural" claim is NOT an important factor to consumers.

58.   **Absence of Attention Checks:**  All surveys have a potentially serious problem: it is difficult to know whether respondents are paying attention.  Unlike research in a laboratory, it is not possible to watch respondents complete their tasks.  The way to make sure respondents are actually paying attention is to plant questions in the survey that can be used to score attention and validate results.  For example Paolacci et al. (2010) used as an example: "While watching the television, have you ever had a fatal heart attack?"  If a respondent answered 'always' or 'sometimes', the survey is discarded.  Another common technique is to include a nonsense answer, such as "Mickey Mouse," among the responses to a multiple choice question.  Dr. Hanssens failed to implement this most basic aspect of survey design.  There is no proof that respondents were actually carefully reading the questions.  They could have easily been double-tasking for example, by participating in the survey while surfing the internet, talking on the phone, watching television, and so forth.[69]

59.   **Failure to Screen for Contradictory or Meaningless Responses**:  Dr. Hanssens testified in his deposition that he outsourced the task of screening the survey responses for indications of confusion, inattention or other anomalies.[70]  However, in reviewing the raw data from the Hanssens Survey, I identified a significant number of contradictory or nonsensical answers by respondents.  It is clear that either the questions were misunderstood or the respondents were not paying attention.

---

[67] *See* Hanssens Decl., § V.
[68] Hanssens Dep. 274:3-23.
[69] Compare *Maybelline*, where respondents were asked to examine a list of musical artists and indicate whether respondents have one or more of their songs in their musical collection. "One of the artists ('Marcus Abrams Band') was a fabricated band that did not exist at the time of the survey. Respondents who selected the fabricated band were eliminated."
[70] Hanssens Dep. 245:6-14; 246:13-20.

For example, respondents were asked the following questions: "If a bottle of vegetable oil states "100% Natural," does it mean that it is free of GMO (i.e., genetically modified organism) ingredients?" and "Do you believe that the product you have been shown is free of GMO ingredients?"  Any respondent who answered "yes" the first question, and was shown a bottle of Wesson oil with the "100% Natural" claim on the label, would be expected to answer "yes" to the second question as well.  However, a number of such respondents answered "no" the second question or said they did not know or weren't sure if the product was free of GMO ingredients.[71]  Clearly a number of respondents were either confused by the questions or were not paying sufficient attention.  Dr. Hanssens' failure to look for these contradictions or willingness to accept them as problematic undermines his conclusions.

60.      **Misleading Interpretation of Open-Ended Answers**:  Dr. Hanssens misinterprets the responses to the open-ended question is his survey and erroneously claims that the responses support his ultimate conclusions.  He states:

> The results for the purchase intent question are buttressed by the responses to open-ended questions 1B and 2. In question 1B, respondents were given the opportunity to detail the reason(s) for their purchase intent answer (e.g., why they answered that they would probably buy the product). Then in question 2 they were given the opportunity to detail the factors they consider important, as a general matter, in buying cooking oil. These two questions were designed to allow respondents to tell, in their own words, what factors influence their purchase decisions in regards to cooking oil.  In question 1B, only 8 respondents (5.0%) in the Test Group and 0 in the Control Group answered that "100% Natural," or a similar reason (e.g., "All Natural"), was behind their purchase intent answer. All of them had answered that they would definitely buy or would probably buy Wesson Vegetable Oil. Similarly, in question 2, only 9 respondents (5.7%) in the Test Group and 4 (2.5%) in the Control Group answered that "100% Natural," or a similar term, was an important factor to them in buying cooking oil. In all, across the two questions, 18 respondents (14 in the Test Group and 4 in the Control Group) mentioned something using the word "natural." Clearly, the portion of respondents claiming that "100% Natural," or any similar perception related to nature or natural, was a reason to buy the product, and/or an important consideration in buying cooking oil, was very small. These results indicate that only a small percentage of consumers, estimated at 9% or less, consider the "100% Natural" claim to be important to their purchase decisions.[72]

This line of reasoning is seriously flawed.  As Dr. Hanssens admits throughout his declaration, purchase decisions are influenced by many factors.[73]  Review of the answers provided by the

---

[71] Hanssens Dep. 212:10-217:23; Levitt Decl., Ex I (raw data results from the Hanssens Survey).
[72] Hanssens Decl. ¶¶ 54-55.
[73] *See id.* § V.

respondents clearly show that the vast majority provided only ONE reason for purchasing the product.[74]  For example, their responses include the following: trusted product, looks upscale, nice, have used it in the past, like it, I like the brand, looks natural, good quality, trusts the name, cheap, and so forth.[75]  Failure to mention the 100% natural claim simply means that this characteristic is not the most salient attribute.  It does not mean that this attribute is unimportant. Consumers were not asked to rank order factors influencing their decision to purchase Wesson products, nor were they asked to weight the impact of each factor in their purchasing decision. Both methods would have given a clearer picture of consumer's decision-making process. [76]

61.     **Unrepresentative Survey Sample:**  The validity of a survey depends, in part, on the survey sample being representative of the population to which its results are being extrapolated.[77] The Hanssens Survey respondents differ in several important respects from the larger group they are supposed to represent (*i.e.*, the members of the classes Plaintiffs seek to represent). According to ConAgra's own testing standards, the sample was not representative of Wesson oil purchasers.

The Hanssens survey sample was 50% men and 50% women.  The marketing research studies commissioned by ConAgra require the firms to select 80% women and 20% men.[78]  This requirement suggests that approximately 80% of Wesson's consumers are women.  It also indicates the Hanssens Survey does not meet ConAgra's own standards for market research concerning Wesson products.[79]

Further, Hanssens survey respondents were drawn only from California, not across the 11 states in which Plaintiffs seek class certification.  For purposes of the Hanssens Survey, California residents cannot be presumed to be typical of U.S. residents.  For number of reasons, including the high profile campaign concerning Proposition 37 concerning the labeling of bioengineered foods, and high number of "natural" labeling cases brought in California courts, residents of that state are much more likely to be aware and informed on these issues.

There are also likely to be additional lifestyle, demographic, social, and cultural factors that make California residents a non-representative sample.  This conclusion is bolstered by ConAgra's own testing methodology.  When conducting consumer research, ConAgra uses two different shelf sets to test Wesson oils, a national set and a southern set.  Manufacturers like ConAgra use different shelf sets when there are significant, and actionable, differences between consumer segments.  Therefore, inclusion of only California residents in the survey does not permit generalization of the results to any of the other class states.

62.     **Failure to Analyze High Non-Response and Dropout Rates**:  The Hanssens Survey's non-response rate is quite high as is the dropout rate.  Almost 92% of those invited to participate

---

[74] *See* Levitt Decl., Ex I.

[75] *See id.*

[76] Shiv, Edell and Payne 1997.

[77] Shari Seidman Diamond, "Reference Guide on Survey Research", in National Academy of Sciences, Reference Manual on Scientific Evidence 3'd edition, (2011) ("Diamond").

[78] *See, e.g.*, Levitt Decl., Ex. F, CAG0003706.

[79] Hanssens stated in his deposition that the proper way to correct for such a gender discrepancy is to provide for a subtest.  *See* Hanssens Dep. 142:23-143:22.  However, the sample size in the survey too small to yield valid results for this type of subtest.

in the survey declined.[80]   108 respondents terminated during the screening questions or during the actual study—about 25%.[81]   Where non-response and drop-out rates are high, characteristics of the non-participants and dropouts should be analyzed; if those groups exhibit a high incidence of any relevant characteristics compared to the pool of potential participants, those characteristics are likely to be underrepresented in the actual survey sample.[82]

63.     **Failure to Control for Bias:**  Dr. Hanssens outsourced many key tasks in the design, implementation and analysis of the survey to Cornerstone Research.  Cornerstone helped write the questions, revise the questions after conducting "informal pretests, and analyze the results. Cornerstone also, without Dr. Hanssens' participation, discarded responses it deemed "problematic" after the survey was conducted.[83]   In his deposition, Dr. Hanssens testified that his contacts at Cornerstone were aware that the survey was being done for ConAgra for use in this litigation, and that they were familiar with the main issue in the litigation.[84]   The Hanssens Declaration includes no attestation to the qualifications and expertise of the individuals at Cornerstone who carried out these critical and discretionary tasks.  In this arrangement, Dr. Hanssens failed to institute basic safeguards against bias in the survey, further tainting the survey and any conclusions based on the results.[85]

## VII.   PLAINTIFFS' SURVEY PROVIDES VALID AND RELIABLE EVIDENCE CONCERNING CONSUMER BELIEFS ABOUT THE MEANING OF "100% NATURAL"

64.     I have reviewed in detail a survey conducted for Plaintiffs by Dr. John C. Kozup.  A copy of the full survey is attached to the Levitt Declaration as Ex. J ("Plaintiffs' Survey").

65.     Dr. Kozup is an Associate Professor of Marketing in the College of Commerce and Finance at Villanova University.[86]   I am familiar with Dr. Kozup and his work in the field of consumer surveys and I know him to be a well-qualified expert in the field.

66.     I did not participate in the design or administration of the survey.

67.     I have reviewed all of the survey data personally and the opinions that I offer regarding Plaintiffs' Survey are entirely my own.

68.     The survey method provides an economical way to gather a great deal of information about a large number of consumers and are widely used in business, government, and judicial proceedings.  Given the important role played by survey research in judicial proceedings,

---

[80] *See* Hanssens Decl., Ex. 4.

[81] *See id.*

[82] Levitt Decl., Ex. H, Diamond at 385.

[83] Hanssens Dep. 79:5-80:3; 85:16-21; 90:12-17.

[84] *Id.* at 94:20-96:8.

[85] Compare *Maybelline*, where, in a section called "Bias Management," the survey protocol was described as follows: "[T]he study was conducted under 'double blind' conditions--neither the data collection agency nor the survey participants knew the purpose of the study or the sponsoring party. Double blind research removes any possible external or circumstantial bias from the survey process and is the yardstick by which all research projects are evaluated for meeting standard scientific inquiry requirements."

[86] Dr. Kozup's curriculum vitae is available at: http://www29.homepage.villanova.edu/john.kozup/VITA2005.doc.

Diamond wrote a highly regarded Reference Guide on Survey Research "to assist judges in identifying, narrowing, and addressing issues bearing on the adequacy of surveys either offered as evidence or proposed as a method for developing information."[87]

69.     In my opinion, Plaintiffs' Survey adheres to the  guidelines and procedures identified by Diamond in order to ensure that this research can help inform the Court about important consumer beliefs and behaviors with regard to the "100% Natural" claim on Wesson Oil labels.

### A.     Background: The Plaintiffs' Survey Design

70.     Respondents in Plaintiffs' Survey were divided into a Control Group and Treatment Group.  A series of questions were posed in order to understand whether or not ordinary consumers expected a cooking oil with a "100% Natural" claim on its product label to contain bioengineered ingredients.

71.     However, to avoid uncertainty or confusion about terms such as "GMOs," "genetically modified ingredients," "bioengineering," or "biotechnology," rather than using those terms, Plaintiffs' Survey provided descriptions of certain aspects of the genetic modification process.

72.     Respondents in the Control Group were given the following information about a fictitious brand of cooking oil, ABC Oils: "ABC Oils (canola, corn, vegetable, and blended) are used for baking, frying and sautéing foods as well as marinades and vinaigrettes."

73.     Respondents in the Treatment Group were given the following information about ABC Oils:  "ABC Oils (canola, corn, vegetable, and blended) are used for baking, frying and sautéing foods as well as marinades and vinaigrettes.  ABC Oils are made from plants whose DNA (genetic makeup) has been altered through laboratory processes.  During these processes, the genetic material from species other than plants (for example certain bacteria or viruses) is inserted into the DNA of those plants to make them resistant to certain herbicides and toxic to certain insects."

74.     Respondents were exposed to the relevant information statements for a minimum of 15 seconds.

75.     The descriptions of the bioengineering process used in the survey accurately reflect the description of the relevant processes described in the Declaration of Plaintiff's Expert Charles C. Benbrook.  Furthermore, the descriptions used in the survey are consistent with my understanding of the bioengineering processes based on my extensive work in the area of food labeling, including my work as a consultant to the FDA.

76.     Using descriptions of the bioengineering process rather than "GMOs" or similar terms avoided the obvious confounding of results due to confusion that was present in the Hanssens Survey (discussed *supra* ¶ 56).

77.     The descriptions of bioengineering processes used in the questions are, in my expert opinion, factual, straightforward, and understandable to the average consumer.

---

[87] Levitt Decl., Ex. H, Diamond at 362.

78.     The use of a fictitious brand, "ABC Oils," in Plaintiffs' Survey effectively eliminated any effects of respondents' prior knowledge or beliefs pertaining to Wesson Oils that so severely tainted the results of the Hanssens Survey.

79.     An appropriate sample was selected in Plaintiffs' Survey.  For example, the survey sample was 80% women and 20 % men; this is the same gender proportion that ConAgra used when conducting marketing research for Wesson Oils, according to the internal ConAgra documents I reviewed.[88]  In contract, the Hanssens Survey sample was 50% men and 50% women.[89]

80.     Respondents in Plaintiffs' Survey reside in all 11 states in which Plaintiffs seek class certification.  Thus, results of the survey are generalizable to the larger population of Wesson oil users Plaintiffs seek to represent.  In contrast, the Hanssens Survey included only respondents in California, who are atypical of consumers in other states in a number of relevant dimensions.

81.     For Plaintiffs' Survey, Qualtrics, a highly respected marketing research firm, was used to select a representative sample of respondents from a large web-based panel.  Use of a representative sample drawn from a large internet consumer research panel reduces the likelihood of bias.  The sample excluded anyone working in marketing research, advertising, public relations, or for a manufacturer, distributor, or retailer of food products (or anyone living in their household.).

82.     The survey questions were, in my judgment, clear, precise, and unbiased.

83.     Yes/No questions included a "Don't know" option to discourage guessing.

84.     Plaintiffs' Survey included an attention check question (Q15) in which respondents were asked to indicate agreement or disagreement with a series of statements, with one of the statements being:  "Please select Strongly Disagree for this statement."  All respondents selected "Strongly Disagree," confirming that they were paying attention to the survey questions.

85.     Plaintiffs' Survey included a manipulation check in the form of a comparison between responses of the Control and Treatment Groups to Questions 15 and 23, respectively.  For example, when asked to indicate agreement or disagreement with the statement: "As part of its production, ABC Oils contain genetic material altered in a laboratory," 243 members of the Treatment Group chose "Strongly Agree" compared to 92 members of the Control Group, indicating that a successful manipulation had occurred.

**B.     Plaintiffs' Survey Results Show That Consumers Presented With Information About the Genetic Modification Process Do Not Believe that GMO Cooking Oils are "100% Natural"**

86.     The key substantive question in Plaintiffs' Survey was:  "Based on the information provided, do you believe ABC Oils are 100% NATURAL?"  Respondents in the Control Group,

---

[88] *See* Levitt Decl., Ex. F, CAG0003706.
[89] *See* Hanssens Decl., Ex. 1.

who were not presented with any information about how ABC oils are made, responded as follows: Yes 36%, No 22%, Don't know 42%.[90]

87.     These results are generally consistent with the Hanssens Survey responses to the question: "If a bottle of vegetable oil states '100% Natural', does it mean that it is free of GMO (genetically modified organism) ingredients?"  Responses were: Yes 35.2%, No 26.4%, Don't know/not sure 38.4%.[91]

88.     However, when respondents in Plaintiffs' Survey Treatment Group were provided with information about how ABC Oils are made—consistent with the information provided in the Declaration of Dr. Charles Benbrook about how Wesson Oils are made—and were then asked, "Based on the information provided, do you believe ABC Oils are 100 Natural?" responses were: Yes 14%, No 73%, Don't know 13%.[92]

89.     89.     The difference in responses in Plaintiffs' Survey between the Treatment Group (73% responding that ABC Oils are not "100% Natural," when provided with information about how they are made)  and the Control Group (22% responding that ABC Oils are not "100% Natural," when informed only about the types of ABC Oils but not how the oils were made) clearly show that consumers do not believe that vegetable oil that is genetically modified in the way that Wesson Oils are genetically modified are "100% Natural."

90.     Analysis of the results indicates that there is a highly significant difference between the Treatment and the Control groups with regard to whether or not respondents perceived the product to be "100% Natural."  When the processes used in genetic modification are included in the description of the product an overwhelming number of respondents do not believe that the product is "100% Natural" (290 out of 396).  When the processes used in genetic modification are not included in the product description, only 85 out of 392 respondents report that the product is not "100% Natural."  This difference is highly significant and meaningful (Z= -14.48, p<.001).

91.     Responses to other questions on Plaintiffs' Survey confirm the validity of this finding. For example, when asked, "Do you believe that cooking oil (canola, corn, vegetable, and blended) made from plants that were genetically altered to make them toxic to certain insects can accurately be labeled '100% Natural,'" the vast majority of respondents in both the Test and Control Groups said "no" (Control Group 68%, Treatment Group 78%).

## VIII.  RESERVATION OF RIGHTS

My testimony is based upon the information and data presently available to me.  I understand that additional, different, and/or updated data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony.

---

[90] *See* Plaintiffs' Survey, Q10.
[91] *See* Hanssens Decl., Ex. 6.
[92] Plaintiffs' Survey, Q18.

VERIFICATION

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Fayetteville, Arkansas, this 30th day of June, 2014.


Elizabeth Howlett

# Appendix A

### List of Recent Publications

Cook, Laurel, Scot Burton, Elizabeth Howlett, and Christopher Newman (2014), "Broken Halos and Shattered Horns: Overcoming the Biasing Effects of Prior Expectations Through Objective Information Disclosure," *Journal of the Academy of Marketing Science,* forthcoming.

Newman, Christopher, Elizabeth Howlett; Scot Burton (2014), "Implications of fast food restaurant concentration for preschool-aged childhood obesity," *Journal of Business Research*,  67(8), 1573-1580.

Newman, Christopher, Anna Turri, Elizabeth Howlett, and Amy Stokes, (2014), Twenty Years of Country-of-Origin Food Labeling Research: A Review of the Literature and Implications for Food Marketing Systems, *Journal of Macromarketing*, forthcoming

Newman, Christopher, Elizabeth Howlett; Scot Burton (2014), "Shopper Response to Front-of-Package Nutrition Labeling Programs: Potential Consumer and Retail Store Benefits," *Journal of Retailing*, 90 (1), 13-26.

Cook, Laurel, Scot Burton, and Elizabeth Howlett (2013). "Leaner Choices? The Potential Influence of the Inclusion of Nutrition Facts Panels on Consumer Evaluations and Choices of Ground Beef Products," *Journal of Public Policy & Marketing*, Vol. 32, No. 1, pp. 97-115.

Newman, Christopher. L., Elizabeth Howlett, Scot Burton, John Kozup, and Andrea Tangari. (2012). "It Does Matter What You Think: The Influence of Consumer Concern on Framing Effects for Environmental Sustainability Messages," *International Journal of Advertising*, 31 (3), 511-528.

Puligada, Sanjay, William T. Ross, Jr., Jinje Chen, and Elizabeth Howlett, (2012). "When Loyalties Clash Purchase Behavior when a Preferred Brand is Stocked Out: The Tradeoff Between Brand and Store Loyalty," *Journal of Retailing and Consumer Services*, Volume 19, Issue 6, November 2012, Pages 570–577.

Howlett, Elizabeth A., Scot Burton, Andrea Heintz Tangari, Myla Bui-Nguyen (2012). "Hold the Salt! Effects of Sodium Information Provision, Sodium Content, and Hypertension on Perceived Cardiovascular Disease Risk and Purchase Intentions," *Journal of Public Policy & Marketing,* May 2012, Vol. 31, No. 1: 4–18.

Howlett, Elizabeth A., Scot Burton, Christopher L. Newman, and Michael Faupel (2012). "The Positive Influence of State Agricultural Marketing Programs on Adults' Fruit and Vegetable Consumption," *American Journal of Health Promotion;* September/October 2012, Vol. 27, No. 1, pp. 17-20.

Bui, My, Elyria Kemp, and Elizabeth Howlett (2011). "The Fight Against Obesity: Influences of Self-Efficacy on Exercise Regularity," *Journal of Nonprofit and Public Sector Marketing*, Vol. 23 (2), 181-208.

Cook, Laurel, Scot Burton, and Elizabeth Howlett (2011). "Health Risk Factors and Their Effect on Consumers' Use of Nutrition Facts Panels," *Journal of Consumer Affairs*, 45 (3), 516-527.

Tangari, Andrea Heintz, Scot Burton, Elizabeth Howlett, Yoon-Na Cho and Anastasia Thyroff, (2010), "Weighing In On Fast Food Consumption: The Effects of Meal and Calorie Disclosures on Consumer Fast Food Evaluations," *Journal of Consumer Affairs*, 44 (3), 431-462.    Received the Best Paper Award for the outstanding article published in the Journal of Consumer Affairs during the two-year period of 2009 and 2010.

Andrea Heintz Tangari, Scot Burton, Elizabeth Howlett, Yoon-Na Cho and Anastasia Thyroff, (2010), "Weighing In On Fast Food Consumption: The Effects of Meal and Calorie Disclosures on Consumer Fast Food Evaluations," *Journal of Consumer Affairs.* Winner best paper of the year.

Howlett, Elizabeth A., Scot Burton, Kenneth Bates, and Kyle Huggins (2009), "Coming to a Restaurant Near You? Potential Consumer Responses to Nutrition Information Disclosure on Menus," *Journal of Consumer Research, 36*(3), 494-503.

Burton, Scot, Elizabeth Howlett, and Andrea Heintz Tangari (2009), "Food for thought: How will the nutrition labeling of quick service restaurant menu items influence consumers' product evaluations, purchase intentions, and choices?," *Journal of Retailing*, 85(2), 113-128.

Bates, Kenneth, Scot Burton, Elizabeth Howlett, and Kyle Huggins (2009), "The Roles of Gender and Motivation as Moderators of the Effects of Calorie and Nutrient Information Provision on Away-from-Home Foods," *Journal of Consumer Affairs*, 43(2), 249-273.

Howlett, Elizabeth, Jeremy Kees, and Elyria Kemp (2008), "The Role of Self-Regulation, Future Orientation, and Financial Knowledge in Long-Term Financial Decisions," *Journal of Consumer Affairs,* Volume 42(2), 223-242.

Bui, My, Scot Burton, Elizabeth Howlett, and John Kozup (2008), "What Am I Drinking? An Exploration of the Effects of Serving Facts Information on Alcohol Beverage Containers," *Journal of Consumer Affairs*, 42(1), 81-99.

Howlett, Elizabeth, John Kozup, and Mike Pagano (2008), "The Effects of Summary Information on Consumer Perceptions of Mutual Fund Characteristics," *Journal of Consumer Affairs,* 42(1), 37-59.

Howlett, Elizabeth, Scot Burton, and John Kozup (2008), "How Modification of the Nutrition Facts Panel Influences Consumers At-Risk for Heart Diseases:  The Case of Trans Fat," *Journal of Public Policy and Marketing,* 27(1), 83-97.

Kemp, Elyria, Scot Burton, Elizabeth H. Creyer, and Tracy Suter (2007), "When Do Nutrient Content and Nutrient Content Claims Matter? Assessing Consumer Tradeoffs Between Carbohydrates and Fat," *Journal of Consumer Affairs,* 41 (Summer), 47-73.

Burton, Scot, Elizabeth H. Creyer, Jeremy Kees, and Kyle Huggins (2006), "Attacking the Obesity Epidemic: An Examination of the Potential Health Benefits of Nutrition Information Provision for Restaurant Menu Items," *American Journal of Public Health,* (September), 1669-1675.

Kozup, John, Scot Burton, and Elizabeth H. Creyer (2006), "The Provision of Trans Fat Information and Its Interaction with Consumer Knowledge," *Journal of Consumer Affairs*, 40 (Summer), 163-176.

Kozup, John, and Elizabeth H. Creyer (2006), "Boundary Conditions of the Impact of a Hypervigilant Coping Style on the Subjective Decision Making Experience," *Psychology and Marketing,* 23 (11), 905-926.

Kwortnik, Robert, Elizabeth H. Creyer, and William T. Ross (2006),"Usage-Based versus Measure-Based Unit Pricing: Is There a Better Index of Value?," *Journal of Consumer Policy*, 29 (1), 37-66.

Creyer, Elizabeth H., William T. Ross, and John Kozup (2006), "Consumer response to a pro-social marketing initiative: The case of discount stores and gun sales," *Journal of Applied Social Psychology*.Volume 34(1), 206-221.

Burton, Scot and Elizabeth H. Creyer (2004), "What consumers don't know can hurt them: Consumer evaluations and disease risk perceptions of restaurant menu items," *Journal of Consumer Affairs,* 38 (1), 121-145.

Creyer, Elizabeth H. and John C. Kozup (2003), "An examination of the relationships between coping styles, task-related affect, and the desire for decision assistance," *Organizational Behavior and Human Decision Processes*, 90 (1), 37-49.

Kozup, John. C., Elizabeth H. Creyer, and Scot Burton (2003), "Making healthful food choices: The influence of health claims and nutrition information on consumers' evaluations of packaged food products and restaurant menu items," *Journal of Marketing*, 67(2), 19-34.

# Appendix B

Testimony History

Astiana et al. v. Kashi Co., Case No. 11-CV-1967-H (BGS) (S.D.Cal.)

Thurston et al. v. Bear Naked, Inc., Case No. Case No 11-CV-2890-H (BGS) (S.D.Cal.)

Enzo Forcellati et al. v. Hylands, Inc., Standard Homeopathic Laboratories, Inc. And Standard Homeopathic Company, Case Number: 2:12-cv-01983 GHK(MRWx)

Julie Fagan, et al. v. Neutrogena Corporation, Case Number 13-cv-01316-SVW-OP

Kimberly S. Sethavanish et al. v. Zoneperfect Nutrition Company, CASE NO.: 3:12-CV-02907-SC

# Appendix C

Documents Consulted

## Pleadings and Declarations

Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Class Certification, dated May 5, 2014 (Dkt. 241).

Defendant ConAgra Foods, Inc's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification, dated June 2, 2014 (Dkt. 265).

Expert Declaration of Charles M. Benbrook, Ph.D. in Support of Motion and Motion for Class Certification and Appointment of Class Counsel, dated May 5, 2014 (Dkt. 242).

Declaration of Dominique M. Hanssens, Ph.D., in Opposition to Plaintiffs' Motion for Class Certification and Appointment of Counsel, dated June 2, 2014 (Dkt. 267).

Deposition of Dominique M. Hanssens, Ph.D., dated June 19, 2014.

## Academic Literature

Andrews, J. Craig, Scot Burton, and Jeremy Kees (2011), "Is Simpler Always Better? Consumer Evaluations of Front-of-Package Nutrition Symbols," Journal of Public Policy & Marketing 30(2), 175-190.

Borra, S (2006), Consumer perspectives on food labels, American Journal of Clinical Nutrition Volume: 83(5),  1235S.

Cozby, Paul and Scott Bates, Methods in Behavioral Research, 11th Edition, McGraw Hill.

Cowburn, Gill and Lynn Stockley Consumer understanding and use of nutrition labelling: a systematic review, Public Health Nutrition: 8(1), 21-28.

Diamond, S (2011), Reference Guide on Survey Research in Reference Manual on Scientific Evidence 3d ed., 359.

Ford, Gary T., Manoj Hastak, Anusree Mitra, and Debra Jones Ringold (1996), "Can Consumers Interpret Nutrition Information in the Presence of a Health Claim?  A Laboratory Investigation," Journal of Public Policy & Marketing, 15 (Spring), 16-27.

Mazis, Michael B., and Mary Anne Raymond. "Consumer perceptions of health claims in advertisements and on food labels." Journal of Consumer Affairs 31, no. 1 (1997): 10-26.

Osborne, Jason W. & Amy Overbay (2004), The Power of Outliers (and why researchers should always check for them), Practical Assessment, Research & Evaluation, 9(6).

Shiv, B., J.A. Edell, and J.W. Payne (1997), "Factors Affecting the Impact of Negatively and Positively Framed Ad Messages," Journal of Consumer Research, 24 (December), 285-94.

Urala, Nina, Anne Arvola, and Liisa Lähteenmäki. "Strength of health-related claims and their perceived advantage." International journal of food science & technology 38, no. 7 (2003): 815-826.

**Bates-Numbered Documents**

CAG0000055

CAG0000711

CAG0000789

CAG0002537

CAG0003542

CAG0003706

HealthFocus00003465

**Survey Data**

Plaintiffs' Survey

Wesson_final_raw.xlsx

**Other Documents**

Consumer Reports National Research Center, Food Label Survey (2014).

Declaration of Dr. Eli Seggev in *Algarin v. Maybelline, LLC*, No.12cv3000 AJB (DHB) (Dkt. 69) (S.D. Cal.).

Hartman Group, Beyond Organic & Natural (2010).

Mintel, Consumer Attitudes Toward Natural and Organic Food and Beverages (2010),

Robert Cialdini, Influence: the Psychology of Persuasion (HarperBusiness 2006).