1  **MILBERG LLP**
2  DAVID E. AZAR (SBN 218319)
   NICOLE DUCKETT FRICKE (SBN 198168)
   One California Plaza
3  300 South Grand Avenue, Suite 3900
   Los Angeles, California 90071
4  Telephone:   (213) 617-1200
   Facsimile:    (213) 617-1975
5  dazar@milberg.com
   ndfricke@milberg.com
6

7  **GRANT & EISENHOFER, P.A.**
   ADAM J. LEVITT (pro hac vice)
8  EDMUND S. ARONOWITZ (pro hac vice)
   30 North LaSalle Street, Suite 1200
9  Chicago, Illinois  60602
   Telephone:   (312) 214-0000
10 Facsimile:    (312) 214-0001
   alevitt@gelaw.com
11 earonowitz@gelaw.com

12 Plaintiffs' Interim Class Counsel

13 [Additional Counsel on Signature Page]

14

15                  UNITED STATES DISTRICT COURT

16                  CENTRAL DISTRICT OF CALIFORNIA

17                        WESTERN DIVISION

18
   IN RE CONAGRA FOODS, INC.           )  Case No. CV 11-05379-MMM
19                                      )  (AGRx)MDL NO. 2291
                                        )
20                                      )  CLASS ACTION
                                        )
21                                      )  **PUBLIC REDACTED VERSION OF**
                                        )  **PLAINTIFFS' MEMORANDUM OF**
22                                      )  **POINTS AND AUTHORITIES IN**
                                        )  **SUPPORT OF THEIR MOTION**
23                                      )  **FOR CLASS CERTIFICATION**
                                        )
24                                      )  DATE:       July 14, 2014
                                        )  TIME:       10:00 a.m.
25                                      )  CTRM.:      780
                                        )  JUDGE:      Hon. Margaret M. Morrow
26 _____     )

27

28

# Table of Contents

**Page**

I.  INTRODUCTION ................................................................................ 1

II. SUMMARY OF FACTS ..................................................................... 3

  A.  ConAgra Made the Challenged "100% Natural" Claim on the Label of Every Bottle of Wesson Oil Sold Throughout the Class Period to Boost Demand for Wesson Oils ........................................... 3

  B.  ConAgra's "100% Natural" Claim is False, Unfair, Deceptive, and/or Misleading Because Wesson Oils Are Made from GMOs and Are Thus Not Natural .................................................................. 8

  C.  Plaintiffs Purchased Wesson Oils in Reliance on ConAgra's "100% Natural" Claim ......................................................................... 11

III. THE PROPOSED CLASSES ............................................................ 11

IV. ARGUMENT ..................................................................................... 12

  A.  Legal Standards Governing Class Certification ................................ 12

  B.  Rule 23(a) Prerequisites .................................................................... 14

    1.  Numerosity ................................................................................ 14

    2.  Commonality ............................................................................. 14

    3.  Typicality ................................................................................... 15

    4.  Adequacy of Representation ..................................................... 18

  C.  Ascertainability ................................................................................. 19

  D.  Rule 23(**b**)(3)—Predominance and Superiority ............................... 21

    1.  Predominance ............................................................................ 21

    2.  Superiority ................................................................................. 30

  E.  Rule 23(**b**)(2)—Injunctive and Declaratory Relief ........................... 32

  F.  Alternatively This Court May Employ Rule 23(**c**)(4) to Certify a Class on Designated Issues ............................................................... 33

V.  CONCLUSION .................................................................................. 34

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amchem Prods. v. Windsor*,
521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ........................... 12, 21

*Amgen v. Conn. Ret. Plans & Trust*,
568 U.S. __, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013) ...................... 13, 14, 21

*Anderson v. Jamba Juice Co.*,
888 F. Supp. 2d 1000 (N.D. Cal. 2012) ............................................................ 17

*Ang v. Bimbo Bakeries USA, Inc.*,
No. 13-cv-01196-WHO, 2014 U.S. Dist. LEXIS 34443 (N.D. Cal. Mar.
13, 2014) ............................................................................................................ 17

*Astiana v. Dreyer's Grand Ice Cream, Inc.*,
No. 11–cv–2910, 2012 U.S. Dist. LEXIS 101371 (N.D. Cal. July 20,
2012) .................................................................................................................. 17

*Astiana v. Kashi Co.*,
291 F.R.D. 493 (S.D. Cal. 2013) ...................................................................... 30

*Brown v. Hain Celestial Grp., Inc.*,
913 F. Supp. 2d 881 (N.D. Cal. 2012) ............................................................. 17

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ...................................................................... 22, 29

*Chavez v. Blue Sky Nat. Bev. Co.*,
268 F.R.D. 365 (N.D. Cal. 2010) ................................................................ 19, 23

*Colucci v. ZonePerfect Nutrition Co.*,
No. 12–cv–2907, 2012 U.S. Dist. LEXIS 183050 (N.D. Cal. Dec. 28,
2012) .................................................................................................................. 17

*Comcast v. Behrend*,
133 S. Ct. 1426 (2013) ...................................................................................... 29

*Degelmann v. Advanced Med. Optics, Inc.*,
  659 F.3d 835 (9th Cir. 2011).....................................................................28

*Ebin v. Kangadis Food*,
  No. 13 Civ. 2311, 2014 U.S. Dist. LEXIS 25838 (S.D.N.Y. Feb. 24,
  2014)............................................................................................................20

*Ellis v. Costco Wholesale Corp.*,
  285 F.R.D. 492 (N.D. Cal. 2012).................................................................32

*Evon v. Law Offices of Sidney Mickell*,
  688 F.3d 1015 (9th Cir. 2012).....................................................................14

*Forcellati v. Hyland's, Inc.*,
  No. CV 12-1983-GHK, 2014 U.S. Dist. LEXIS 50600 (C.D. Cal. Apr. 9,
  2014)............................................................................................................20

*Guido v. L'Oreal, USA, Inc.*,
  284 F.R.D. 468 (C.D. Cal. 2012) .............................................................2, 27

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998)................................................................16, 25

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013).....................................................................28

*In re Northrop Grumman Corp. Erisa Litig.*,
  No. CV 06-06213, 2011 U.S. Dist. LEXIS 94451 (C.D. Cal. Mar. 29,
  2011)  ..........................................................................................................16

*In re Nucoa Real Margarine Litig.*,
  No. CV 10-00927, 2012 U.S. Dist. LEXIS 189901 (C.D. Cal. June 12,
  2012)......................................................................................................passim

*Jefferson v. Ingersoll Intern. Inc.*,
  195 F.3d 894 (7th Cir. 1999).......................................................................13

*Johns v. Bayer Corp.*,
  280 F.R.D. 551 (S.D. Cal. 2012)..................................................................31

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013).......................................................................27

iii

*Marilley v. Bonham*,
　No. C-11-02418-DMR, 2012 U.S. Dist. LEXIS 33678 (N.D. Cal. Mar.
　13, 2012) ................................................................................................18

*McCrary v. Elations Co., LLC*,
　No. EDCV 13-00242, 2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13,
　2014) ..................................................................................16, 19, 23, 28

*Nw. Fruit Co. v. A. Levy & J. Zentner Co.*,
　116 F.R.D. 384 (E.D. Cal. 1986) ..........................................................13

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
　85 N.Y.2d 20 (1995) ................................................................................2

*Phillips Petroleum Co. v. Shutts*,
　472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985) .....................12

*Ries v. Arizona Beverages USA LLC*,
　287 F.R.D. 523 (N.D. Cal. 2012) ....................................................14, 19

*Rodriguez v. Hayes*,
　591 F.3d 1105 (9th Cir. 2010) .........................................................16, 32

*Staton v. Boeing Co.*,
　327 F.3d 938 (9th Cir. 2003) .................................................................18

*Sullivan v. DB Inv., Inc.*,
　667 F.3d 273 (3rd Cir. 2011) .................................................................26

*United Steel, Paper & Forestry v. ConocoPhillips*,
　593 F.3d 802 (9th Cir. 2010) .................................................................13

*Valentino v. Carter–Wallace, Inc.*,
　97 F.3d 1227 (9th Cir. 1996) .................................................................30

*Wal-Mart Stores, Inc. v. Dukes*,
　131 S. Ct. 2541 (2011) ...........................................................13, 14, 32

*Weeks v. Kellogg Co.*,
　No. CV 09-08102, 2011 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23,
　2011) ................................................................................................13, 14

*Wolin v. Jaguar Land Rover N. Am., L.L.C.*,
　617 F.3d 1168 (9th Cir. 2010) ...............................................................17

*Zeisel v. Diamond Foods, Inc.*,
  No. C 10-1192, 2011 U.S. Dist. LEXIS 60608 (N.D. Cal. June 7, 2011) ... 19, 28

**STATUTES**

Agriculture Code Section 52300 ............................................................ 10

Fed. R. Civ. P. 23............................................................................ passim

## I.    INTRODUCTION

Defendant ConAgra Foods, Inc. ("Defendant" or "ConAgra") sells millions of containers of Wesson Canola Oil, Wesson Corn Oil, Wesson Vegetable Oil, and Wesson Best Blend (collectively, "Wesson Oils" or the "Products") to consumers throughout the United States every year.  On the front label of every one of these millions of containers, ConAgra prominently represents that its Wesson Oils are "100% Natural."  Wesson Oils, however, are not "100% Natural"; rather, they are made from corn, soy, and canola seeds that come from plants whose DNA has been deliberately altered by the forced introduction of DNA from other species so that the plants will express specific traits they do not possess in nature or through traditional cross-breeding methods, such as resistance to certain herbicides and pesticides.   These plants are commonly referred to as "genetically modified organisms," or "GMOs."   Simply put, Wesson Oils are not "100% Natural" because they are made from or contain GMOs.

Robert Briseño, Michele Andrade, Jill Crouch, Julie Palmer, Pauline Michael, Cheri Shafstall, Dee Hopper-Kercheval, Phyllis Scarpelli, Kelly McFadden, Necla Musat, Maureen Towey, Erika Heins, Rona Johnston, and Anita Willman ("Plaintiffs") are each ordinary consumers, living in twelve different states, who purchased Wesson Oils between January 2007 and their entry into this case.  Each of these Plaintiffs saw the phrase "100% Natural" printed on the label of the Wesson Oil(s) that they purchased and based their purchasing decision, at least in part, on the veracity of that "100% Natural" phrase.

Plaintiffs allege that ConAgra's claim that Wesson Oils made from GMOs are "100% Natural" is false, unfair, deceptive, and/or misleading.  Plaintiffs assert causes of action under the statutory and common laws of the states in which they respectively reside (the "Class States") on behalf of themselves and the other residents of those states who purchased the Products during the Class Periods (as

defined in Section III, below).   Plaintiffs seek certification of twelve separate statewide classes (the "Classes") of similarly situated purchasers of Wesson Oil(s) within each of those states (collectively, the "Class Members") under (i) Fed. R. Civ. P. 23(b)(3) for damages and other relief, and (ii) Fed. R. Civ. P. 23(b)(2) for injunctive and declaratory relief to end ConAgra's deceptive and misleading marketing.   Plaintiffs also alternatively seek certification of the Classes under Fed. R. Civ. P. 23(c)(4) on the issue of whether ConAgra's use of the term "100% Natural" is false, unfair, deceptive, and/or misleading.

The dispute between the parties over whether ConAgra's "100% Natural" claim on the labels of Wesson Oils made from GMOs is false, unfair, deceptive, and/or misleading is the key question underlying each and every one of the claims asserted by the Plaintiffs in this proposed class action.   The common and single answer to this question will drive the resolution of this case.   Put another way, this question predominates over all others in this litigation.

Resolution of this question does not require analysis of individualized evidence, such as purchasing behavior, subjective opinions, or each Class Member's individual experiences.   Rather, the resolution will be based entirely on class-wide evidence because, under each of the legal claims asserted, the falsity, unfairness, deceptiveness, and/or misleading nature of ConAgra's "100% Natural" claim, and the capacity of that claim to deceive or mislead a "reasonable consumer," is an objective question susceptible to objective proof—regardless of variations in the beliefs, motivations, and knowledge of different individuals in different circumstances who purchased Wesson Oils at retail.   *See*, *e.g.*,   *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 481-83 (C.D. Cal. 2012); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995).[1] Either Wesson Oils are fairly labeled as "100% Natural" despite being made from

---

[1] *See also* Plaintiffs' Appendix 1:  Predominant Questions Susceptible to Class-Wide Proof for Each State Law Claim Asserted.

GMO ingredients, as ConAgra contends, or they are not fairly labeled as "100% Natural" because of their derivation from GMO ingredients, as Plaintiffs allege. Similarly, Plaintiffs offer two methods of proving damages on a class-wide basis without the need for individualized inquiries, both of which are widely recognized and accepted and supported by expert testimony. Thus, Rule 23(b)(3)'s "predominance" requirement, which would appear to be the primary battleground here, is readily satisfied.

The other applicable Rule 23(a) prerequisites (numerosity, commonality, typicality, and adequacy), the judicially-created "ascertainability" doctrine, the additional Rule 23(b)(3) requirements (superiority and manageability), and the prerequisites for injunctive and declaratory relief for Rule 23(b)(2) certification are also satisfied in this case, as more fully demonstrated below. Accordingly, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for class certification, certify the proposed Classes, designate Plaintiffs as class representatives of the separate statewide classes they respectively seek to represent, appoint Plaintiffs' Interim Co-Lead Counsel as Class Counsel, and direct ConAgra to issue notice to the Classes in a form to be determined.[2]

## II.   SUMMARY OF FACTS

### A.   ConAgra Made the Challenged "100% Natural" Claim on the Label of Every Bottle of Wesson Oil Sold Throughout the Class Period to Boost Demand for Wesson Oils

ConAgra admits that throughout the Class Period, each and every bottle of Wesson Oil claimed on its front label that its product was "100% Natural."[3]

---

[2] Alternatively, Plaintiffs request certification of these proposed classes under Fed. R. Civ. P. 23(c)(4), as fully discussed infra at Sec. IV(F).

[3] Defendant ConAgra Foods, Inc.'s Answer to Second Consolidated Amended Class Action Complaint, dated Jan. 16, 2013 (Dkt. 145) ("Answer"), ¶¶ 2, 11-31, 33; Declaration of Henry J. Kelston in Support of Plaintiffs' Motion for Class Certification, submitted herewith ("Kelston Decl."), Ex. 4, Deposition of Raquelle Hunter Pursuant to Rule 30(b)(6) (Apr. 29, 2014) ("Hunter Dep.") at 65:5-6 ("100 percent natural … has been on our product since well before 2007").

Specifically, at least as far back as June 25, 2005 (prior to the Class Period), ConAgra claimed on the front label of Wesson Oils, directly below the brand name, that they were "100% Natural."[4]  The decision to make a particular claim on the front of a package is not one that consumer goods manufacturers make lightly, and ConAgra is no exception.  By placing the "100% Natural" claim on the front of all of its Wesson Oils, ConAgra demonstrates its belief, ███████████ ██████, that a "natural" claim on food products is important to consumers in general, and that the "100% Natural" statement on Wesson Oils labels specifically motivates consumers to purchase the Products.

Consumer demand for "natural" products has skyrocketed in recent years.[5] At the same time, consumers' interest in, and concerns about, GMOs have also increased dramatically.[6]  Reflecting consumer concerns, some major retailers such as BJ's, have imposed their own guidelines banning GMOs in foods labeled as

---

[4]  *See*, *e.g.*, Kelston Decl., Ex. 1, CAG0001414, CAG0001429, CAG0001431, CAG0001436 (proofs of labels for 48oz Wesson vegetable, corn, canola, and best blend oil dated between July 25, 2005 and August 10, 2005).

[5]  According to Nielsen, food labeled as "natural" generated $22.3 billion in sales in 2008, up 10% from 2007, and up 37% from 2004.  *See  "Natural" Beats "Organic" in Food Sales According to Nielsen's Healthy Eating Report* (Jan. 21, 2009), http://www.nielsen.com/us/en/newswire/2009/%C3%A2%C2%80%C2%9Cnatural%C3%A2%C2%80%C2%9D-beats-%C3%A2%C2%80%C2%9Corganic%C3%A2%C2%80%C2%9D-in-food-sales-according-to-nielsen%C3%A2%C2%80%C2%99s-healthy-eating-report.html (last visited May 2, 2014).

[6]  The New York Times reported in 2013 that "[t]hree-quarters of Americans expressed concern about genetically modified organisms in their food, with most of them worried about the effects on people's health."  Allison Kopicki, *Strong Support for Labeling Modified Foods*, N.Y. Times, July 27, 2013, *available at* http://www.nytimes.com/2013/07/28/science/strong-support-for-labeling-modified-foods.html.

"natural."[7]    Meijer, a large Midwest grocery chain, introduced a brand called Meijer Naturals, which is GMO-free.[8]

ConAgra, on the other hand, has taken advantage of the increased demand by continuing to emphasize the "natural" claim on Wesson Oils while, at best, adopting a willful blindness about the extent to which that claim is misleading consumers about the nature of the Products, which are made entirely from oils containing GMOs, in contravention of its own public statements.

In  2007,  ███████ █ ███████ ███ ████ ████ ███████ ████ ████████ ████████████ ████ ████████████████ that continued to prominently display the "100% Natural" representation on the front label, now set off in a gold bar directly below the "Wesson" brand name.[9] ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

_____

[7] Preserving the Earth for Future Generations, http://www.bjs.com/bjs-environmental-commitment.content.about_environmental.A.about_community2# (last visited May 2, 2014).

[8] Press Release, Meijer, Meijer Goes Natural with New Branded Line of Wholesome, Healthy, and Great-Tasting Grocery Items (Apr. 16, 2009), *available at* http://www.meijer.com/assets/cms/pdfs/news/20090416MeijerNaturals.pdf.

[9] *See* Kelston Decl., Ex. 2, CAG0001476, CAG0001486, CAG0001492, CAG0001493 (proofs of labels for one gallon Wesson vegetable, corn, and canola oils incorporating new design dated March 15, 2007); *see also* Kelston Decl., Ex. 3, CAG0001992 ██████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
(emphasis in bold added).



In 2013, ConAgra updated its Wesson Oils labels ███████████████ █████████████, moving the "100% Natural" claim from below the Wesson brand name to a spot above the brand name and combining it with the word "Pure" such that Wesson Oils all now claim that they are "Pure & 100% Natural."[12]

Even after this lawsuit was filed, as ConAgra sought to increase the appeal to consumers of the "natural" claim by changing its size and position and combining it with "pure" in a new claim ("Pure and 100% Natural"), which first appeared on Wesson labels in 2013, ConAgra did nothing to evaluate the "natural" claim in light of evolving science or consumer expectations to determine whether

---

[10] Kelston Decl., Ex. 8, CAG0000055 at CAG0000116-117.

[11] *Id.* at CAG0000075.

[12] *See, e.g.,* Kelston Decl., Ex. 6, CAG0001482, CAG0001489, CAG0001500, CAG0001502 (proofs of labels for 48oz Wesson vegetable, corn, canola, and best blend oils dated May 9, 2013).

[13] Kelston Decl., Ex. 10, CAG0002537 at CAG0002546-2547.

[14] Kelston Decl., Ex. 7, CAG0001949 at CAG0001950.



1  the claim is accurate and not misleading.[15]  In fact, Raquelle Hunter,

10      ConAgra's motivation for placing the "100% Natural" claim on every bottle

11  of Wesson Oils—to increase demand and thus command a higher price and sell

12  more products—is clear.  The success of ConAgra's marketing is also clear, as

13  Wesson Oils are the leading branded cooking oils by both market share and market

14  volume.[19]

[15] Kelston Decl., Ex. 4, Hunter Dep. at 67:9-14

[16] Kelston Decl., Ex. 4, Hunter Dep. at 79:24.

[17] Kelston Decl., Ex. 4, Hunter Dep. at 76:1-78:21.

[18] Kelston Decl., Ex. 5, CAG0005106

[sic]).

[19] Kelston Decl., Ex. 10, CAG0002537 at CAG0002538

1   ███████.[20]   As Plaintiffs allege, however, ConAgra's "100% Natural" claim, a key

2   piece of Wesson Oils packaging, is false, unfair, deceptive, and/or misleading to

3   consumers and damages consumers by reason of its false, unfair, deceptive, and/or

4   misleading nature, including by the amount of the price of Wesson Oil attributable

5   to the challenged "100% Natural" claim.[21]

**B.   ConAgra's "100% Natural" Claim is False, Unfair, Deceptive, and/or Misleading Because Wesson Oils Are Made from GMOs and Are Thus Not Natural**

8        ConAgra acknowledges in documents produced in this litigation that

9   "Wesson Oil products … are produced with bio-engineered oil seeds."[22] ████████

10  ███████████████████████████████████████████████████████████████████████

11

12  _____

[20] *See* Kelston Decl., Ex. 11, CAG0001874 at CAG0001894 ███████████████████
████████████████████████████████████████████████ Kelston Decl.,
Ex. 12, CAG0000355 at CAG0000366 ███████████████████████
████████████████████████████████████████ █
████████████████████████████████ (emphasis in original); *Id*. at CAG0000400
███████ ██ ████ ██ ███ ██ ██ █████ ██ ████████████████ *Id*. at
CAG0000413 ████████ █ ██ ███████████████████████████████

[21] As discussed in Section IV.D.1 below, Plaintiffs have retained Colin Weir, Vice President at Economics and Technology, Inc. ("ETI"), who has offered his expert economic opinion that the total price of any product can be broken up into the separate prices of that product's various attributes, which are all set by the marketplace and can be proven using common evidence. *See* Declaration of Colin Weir ("Weir Decl."), ¶¶ 9-10, 14-15.  Mr. Weir proposes two separate and widely accepted methods, hedonic regression and conjoint analysis, to measure the amount of Wesson Oils' retail price that corresponds to the "100% Natural" claim. *Id*. ¶¶ 12-13.  Hedonic regression is "generally accepted, ha[s] been tested, and [is] part of peer-reviewed studies." *In re Toyota Motor Corp. Hybrid Brake Mktg.*, No. MDL 10-02172-CJC(RNBx), 2012 U.S. Dist. LEXIS 151559, at *18 (C.D. Cal. Sept. 20, 2012).   Conjoint analysis is also a widely accepted economic methodology. *See, e.g. Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 12-CV-00630-LHK, 2014 U.S. Dist. LEXIS 24506, at *60-76 (N.D. Cal. Feb. 25, 2014).

[22] Kelston Decl., Ex. 13, CAG0002222 at CAG0002243; *see also* Kelston Decl., Ex. 14, CAG0004822 at CAG0004827 (same).

██████████████████████████████████████████████████

████████████████████████,"[23]

As discussed in detail in the Declaration of Dr. Charles Benbrook ("Benbrook Decl."), submitted in conjunction with and incorporated by reference into this Memorandum, the prevalence of genetically modified corn, soy and canola in the U.S. grain supply makes it a virtual certainty that Wesson oils are made from or contain GMOs.[24]   According to the United States Department of Agriculture, "U.S. farmers have adopted genetically engineered (GE) crops widely since their commercial introduction in 1996, notwithstanding uncertainty about consumer acceptance and economic and environmental impacts."[25]   The U.S.D.A. estimates that the percentage of genetically engineered corn grown in the U.S. was 25% in 2000, 73% in 2007, and 90% in 2013.[26]   Genetically engineered soy constituted 3% of the U.S. crop in 2000, 91% in 2007, and 93% in 2013.[27]   In 2010, over 90% of canola (rapeseed) grown in Canada (the main source for U.S. food producers) was genetically modified.[28]

---

[23]   Kelston Decl., Ex. 15, CAG0002187; *see also* Declaration of Dr. Charles Benbrook, Section IV.  Plaintiffs have retained Charles Benbrook, Ph.D. to opine on the science underlying genetically modified crops and why products manufactured or otherwise derived from those crops are not "natural" and thus cannot be represented as such.

[24] Benbrook Decl., Section VIII.

[25] UNITED STATES DEPARTMENT OF AGRICULTURE, ADOPTION OF GENETICALLY ENGINEERED CROPS IN THE U.S. (2013), http://ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us/documentation.aspx.

[26] *See* UNITED STATES DEPARTMENT OF AGRICULTURE, GENETICALLY ENGINEERED VARIETIES OF CORN, UPLAND COTTON, AND SOYBEANS, BY STATE AND FOR THE UNITED STATES, 2000-13, (July 8, 2013), http://ers.usda.gov/datafiles/Adoption_of_Genetically_Engineered_Crops_in_the_US/alltables.xls.

[27] *Id.*

[28] Benbrook Decl., Section VIII.

9

1   Bioengineered seeds are not natural by any measure.   For example,
2   California Food and Agriculture Code Section 52300 defines a "genetically
3   engineered plant" as a plant or plant part, "including, but not limited to, seeds and
4   pollen, in which the genetic material has been changed through modern
5   biotechnology in a way that does not occur naturally by multiplication or natural
6   recombination."[29]   The World Health Organization explicitly defines GMOs as
7   "organisms in which the genetic material (DNA) has been altered in a way that
8   does not occur naturally."[30]

9   The United States Environmental Protection Agency has stated that
10  genetically engineered products like corn are designed to produce a "pesticidal
11  protein" that does not occur naturally.[31]   Monsanto, a leading supplier of
12  genetically engineered seeds in the United States, defines GMOs as "[p]lants or
13  animals that have had their genetic makeup altered to exhibit traits *that are not*
14  *naturally theirs*.   In general, genes are taken (copied) from one organism that
15  shows a desired trait and transferred into the genetic code of another organism."
16  (emphasis added).[32]

17  Additional factual details concerning precisely how GMOs and the foods
18  manufactured from them are not natural are contained in Dr. Charles Benbrook's
19  expert declaration.   Dr. Benbrook also provides evidence showing that a significant

20  _____
21  [29] CAL. FOOD & AGRIC. CODE § 52300(b) (Deering 2014).  The Code also makes
    clear that genetic engineering is accomplished through modern technological
22  processes that "are not techniques used in traditional breeding and selection." *Id.* §
    52300(c)(2).

23  [30] WORLD HEALTH ORGANIZATION, 20 QUESTIONS ON GENETICALLY MODIFIED
    (GM) FOODS 1, *available at*
24  http://www.who.int/foodsafety/publications/biotech/en/20questions_en.pdf (last
    visited April 29, 2014).

25
26  [31] EPA's Regulation of Biotechnology for Use in Pest Management (Jan. 2012),
    http://www.epa.gov/oppbppd1/biopesticides/reg_of_biotech/eparegofbiotech.htm.

27  [32] Monsanto Glossary, http://www.monsanto.com/newsviews/pages/glossary.aspx
28  (last visited April 29, 2014).

percentage of consumers are misled by "natural" claims on food packaging to believe that the products do not contain GMOs.[33]

### C. Plaintiffs Purchased Wesson Oils in Reliance on ConAgra's "100% Natural" Claim

Plaintiffs all allege that they purchased one or more Wesson Oils during the Class Period and, further, that they purchased those Products because they "believed and relied on ConAgra's representation that [the Wesson Oils at issue] are '100% Natural,'" meaning GMO-free.[34]

## III. THE PROPOSED CLASSES

Plaintiffs' Complaint alleges causes of action under the statutory and common laws of the twelve states (the "Class States") in which the named Plaintiffs reside.[35]   Specifically, Plaintiffs assert claims or remedies under the laws of each of their states of residency for (a) false and misleading advertising, unfair competition, and/or unfair and deceptive acts and practices (generally described as Consumer Protection claims); (b) breach of express warranty; (c) breach of implied warranty; and (d) unjust enrichment.  *See* Complaint, ¶¶ 64-102.

---

[33] *See* Benbrook Decl.*,* Section III.

[34] *See* Second Consolidated Amended Class Action Complaint, dated Dec. 19, 2012 (Dkt. 143) ("Complaint"), ¶¶ 11, 13, 15-16, 18-19, 21, 23-29; *see also* Kelston Decl., Ex. 16 (excerpts of Plaintiffs' Deposition Testimony).

[35] The Class States at issue are California, Colorado, Florida, Illinois, Indiana, Nebraska, New Jersey, New York, Ohio, Oregon, South Dakota, and Texas. Since the Complaint was filed, plaintiffs Patty Boyer, Anne Cowan, Brenda Krein, Janeth Ruiz, and Christi Toomer have been granted leave to withdraw from the litigation. *See* Order Granting Plaintiffs' Motion for Withdrawal and Voluntary Dismissal of Individual Claims, dated May 2, 2014 (Dkt. 238). As discussed in Plaintiffs' Motion for Withdrawal or Voluntary Dismissal of Individual Claims (Dkt. 190), the withdrawal of these plaintiffs from the litigation does not change the analysis of the state class claims because other representative plaintiffs remain active in this case from the remaining states at issue.  In addition, Plaintiff Bonnie McDonald of Massachusetts is not being offered as a class representative at this time, and a motion to withdraw her from this case as a Plaintiff (should ConAgra continue to refuse to stipulate to any Plaintiff's voluntary dismissal) is anticipated.  Plaintiff Lil Marie Birr of California, although she remains a named Plaintiff, is not being proposed as a class representative at this time since two other California resident Plaintiffs—Robert Briseño and Michele Andrade—are being proposed as the California class representatives.

Thus, Plaintiffs propose certification of twelve separate statewide classes.[36] Plaintiffs propose that the Court define the Classes as:

> All persons who reside in the States of California, Colorado, Florida, Illinois, Indiana, Nebraska, New Jersey, New York, Ohio, Oregon, South Dakota, or Texas who have purchased Wesson Oils within the applicable statute of limitations periods established by the laws of their state of residence (the "Class Period"), through the final disposition of this and any and all related actions.[37]

Plaintiffs seek certification of these proposed Classes under Fed. R. Civ. P. 23(b)(3) for monetary relief and under Fed. R. Civ. P. 23(b)(2) for injunctive relief. Alternatively, Plaintiffs seek certification of these proposed classes on the issue of whether ConAgra's use of the term "100% Natural" on its Wesson Oils was false, unfair, deceptive, and/or misleading under Fed. R. Civ. P. 23(c)(4).

## IV.   ARGUMENT

### A.   Legal Standards Governing Class Certification

Class actions "permit the plaintiffs to pool claims which would be uneconomical to litigate individually" and ensure that plaintiffs have a right to redress wrongs that would otherwise "have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985); *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 617, 117 S. Ct. 2231, 2246, 138 L. Ed. 2d 689, 708-09 (1997). Plaintiffs' claims here are ideally suited to satisfy the class certification standards under federal law.

---

[36] Collectively, the "Classes", and separately, the "California Class," "Colorado Class," "Florida Class," "Illinois Class," "Indiana Class," "Nebraska Class," "New Jersey Class," "New York Class," "Ohio Class," "Oregon Class," "South Dakota Class," and "Texas Class." *See also* Complaint, ¶ 53.

[37] The state statutes of limitations for each claim alleged differ to some extent. Plaintiffs set forth the relevant statute of limitations for all the claims presently at issue in Plaintiffs' Appendix 2 to this Memorandum. To the extent that ConAgra's conduct is found to support a claim of equitable tolling of any the applicable statutes of limitations, Plaintiffs request appropriate extensions of the relevant limitations periods.

1      To certify a class action under Rule 23, Plaintiffs must first establish each of

2 the following prerequisites: (1) numerosity, (2) commonality, (3) typicality, and (4)

3 adequacy of representation.   *United Steel, Paper & Forestry v. ConocoPhillips*,

4 593 F.3d 802, 806 (9th Cir. 2010).   There is also an implied requirement of

5 ascertainability.   *See In re Nucoa Real Margarine Litig.*, No. CV 10-00927, 2012

6 U.S. Dist. LEXIS 189901, at *18 (C.D. Cal. June 12, 2012) (Morrow, J.); *Weeks v.*

7 *Kellogg Co.*, No. CV 09-08102, 2011 U.S. Dist. LEXIS 155472, at *20 (C.D. Cal.

8 Nov. 23, 2011) (Morrow, J.).

9      Once these prerequisites are met, Plaintiffs must demonstrate satisfaction of

10 Rule 23(b)(3)'s predominance and superiority requirements to obtain monetary

11 relief, or Rule 23(b)(2)'s general applicability requirement to obtain injunctive or

12 declaratory relief.   Class actions for monetary and injunctive relief are not

13 exclusive to each other, and a class can be certified for both types of relief.   *See*

14 *Nw. Fruit Co. v. A. Levy & J. Zentner Co.*, 116 F.R.D. 384, 389 (E.D. Cal. 1986)

15 (certifying a class action under Rule 23(b)(2) & (b)(3)); *Jefferson v. Ingersoll*

16 *Intern. Inc.*, 195 F.3d 894, 898 (7th Cir. 1999) (divided certification allows courts

17 "to certify the injunctive aspects of the suit under Rule 23(b)(2) and the damages

18 aspects under Rule 23(b)(3), achieving both consistent treatment of class-wide

19 equitable relief and an opportunity for each affected person to exercise control over

20 the damages aspects").[38]

21      While the Court must conduct a "rigorous analysis" to ensure that the

22 requirements of Rule 23 are satisfied, *Wal-Mart Stores, Inc. v. Dukes*,  131 S. Ct.

23 2541 (2011), this analysis must be restrained because "Rule 23 grants courts no

24 license to engage in free-ranging merits inquiries at the certification stage." *Amgen*

25 *v. Conn. Ret. Plans & Trust*, 568 U.S. __, 133 S. Ct. 1184, 1194-95, 185 L. Ed. 2d

26

---

27 [38]   Likewise, pursuant to Rule 23(c)(4), "[w]hen appropriate, a class may be
brought or maintained as a class action with respect to particular issues."   Plaintiffs

28 thus alternatively move for certification of issues Classes. *See* Section IV.F.

308 (2013).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at 1195.

### B.    Rule 23(a) Prerequisites
#### 1.    Numerosity

Rule 23(a)(1) requires that the proposed classes be "so numerous that joinder of all members is impractical."  This standard only requires a showing that joinder of all claims would be difficult or inconvenient, not impossible.  *See Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (concluding numerosity was satisfied because there were 262 potential class members).

Here, ConAgra admits that millions of consumers purchased the relevant Wesson Oil Products during the Class Period.[39]  It cannot be reasonably disputed that the numerosity requirement of Rule 23(a)(1) is satisfied for each of the twelve separate state classes.  *See Weeks*, 2011 U.S. Dist. LEXIS 155472, at *23 ("Common sense dictates . . . that the numerosity requirement is met.").

#### 2.    Commonality

Rule 23(a)(2) requires that there are questions of law or fact common within each proposed Class, and for purposes of this Rule, "even a single question will do."  *Wal-Mart Stores*, 131 S. Ct. at 2556 (internal punctuation omitted).  This "common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 2551.  Furthermore, "variation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality."  *Ries v. Arizona Beverages USA LLC*,

---

[39] Answer, ¶ 57.

287 F.R.D. 523, 537 (N.D. Cal. 2012) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

In this case, there are common questions of law or fact within each proposed Class, and indeed, across all of the Classes.  The first, and foremost, common question is whether ConAgra's "100% Natural" assertion in the marketing and sale of its Wesson Oils—even though they are made from or contain GMOs—is false, unfair, deceptive, and/or misleading.  This question is central to each cause of action Plaintiffs allege on behalf of each of the proposed Classes they respectively seek to represent relating to ConAgra's violations of state consumer protection laws and breaches of its warranties to its customers.[40]  Similarly, it is the false, unfair, deceptive, and/or misleading nature of ConAgra's claim that Wesson Oils are "100% Natural" that makes ConAgra's enrichment from consumer purchases of Wesson Oils unjust.[41]

Additional common questions include: (a) whether ConAgra acted knowingly or recklessly; (b) whether ConAgra's practices violate applicable law; (c) whether Plaintiffs and the other members of the Classes are entitled to actual, statutory, or other forms of damages, and other monetary relief; and (d) whether Plaintiffs and the other members of the Classes are entitled to equitable relief, including but not limited to injunctive relief and restitution.[42]

### 3.    Typicality

Rule 23(a)(3) requires that the claims of the proposed class representatives be typical of the claims of the other class members they seek to represent.  Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove

---

[40] *See* Plaintiffs' Appendix 1.

[41] *Id.*

[42] *See* Complaint, ¶ 58.

the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (citation omitted)).    The typicality requirement is a "permissive standard[]" and "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; *see also In re Northrop Grumman Corp. Erisa Litig.*, No. CV 06-06213, 2011 U.S. Dist. LEXIS 94451, at *34 (C.D. Cal. Mar. 29, 2011) (Morrow, J.).

In this case, Plaintiffs allege a common pattern of wrongdoing—ConAgra's persistent and consistent claim that its Wesson Oils are "100% Natural," including through its labeling and marketing of the Products.  Plaintiffs will present the same evidence (based on the same legal theories) to support their claims, as well as the other Class Members' claims.  Plaintiffs were all exposed to the same allegedly false advertising on the Wesson Oils labels.  *See McCrary v. Elations Co., LLC*, No. EDCV 13-00242, 2014 U.S. Dist. LEXIS 8443, at *39 (C.D. Cal. Jan. 13, 2014) ("[A] presumption of exposure is inferred where, as here, the alleged misrepresentations were on the outside of the packaging of every unit for an extended period.").    Additionally, Plaintiffs have all alleged that the "100% Natural" claim was a factor in their decisions to purchase the Products.[43]

---

[43] *See, e.g.*, Kelston Decl., Ex. 16, Pauline Michael Dep. (Aug. 21, 2013) at 78:8-15 ("Q. And you believe you were misled by the natural label on Wesson Oil in 2007 when you last bought the oil? A. Right. Q. And why do you believe you were misled by that natural label? A. Natural to me, again, is not genetically modified."); Jill Crouch Dep. (Aug. 20, 2013) at 181:11-17 ("You testified that you stopped purchasing Wesson oil because you felt misled by the label; is that right? A. Right. Q. And what misled you about the label? A. It says it's all-natural, so it's misleading because it has GMO Canola."); Michele Andrade Dep. (Aug. 19, 2013) at 22:6-10 ("Q. Why are you bringing this lawsuit? A. I feel that [ConAgra's] advertising is deceptive. Q. In what way do you believe it's deceptive? A. It says "100% Natural" and I don't believe that it is."); Robert Briseño Dep. (July 17, 2013) at 117:9-18 ("Q. Well, let's go back to the last time you purchased Wesson Canola Oil, the first quarter of 2011. What did the word 'natural' mean to you at that time on a food label? A. Natural, free of preservatives, free of things that—GMOs, free of GMOs. Q. So 'natural' in the first quarter of 2011 to you meant free of preservatives and free of GMOs. Is that

1    Plaintiffs' claims are typical of all other Class Members' claims regardless
2  of which variety (Best Blend, Corn, Canola, or Vegetable) or size (16oz, 24oz,
3  40oz, 48oz, 64oz, one gallon, and five quart) of Wesson Oils they purchased,
4  because all varieties and sizes of Wesson Oils were similarly labeled "100%
5  Natural."    Where misrepresentations across product lines are identical, "the
6  dissimilarity of the accused products is relatively unimportant." *Brown v. Hain
7  Celestial Grp., Inc*., 913 F. Supp. 2d 881, 892 (N.D. Cal. 2012).  Likewise, in other
8  cases where courts have considered product type and composition, the similarity of
9  the alleged misrepresentations holds significant weight.   *See Ang v. Bimbo
10 Bakeries USA, Inc.*, No. 13-cv-01196-WHO, 2014 U.S. Dist. LEXIS 34443, at
11 *10-29 (N.D. Cal. Mar. 13, 2014) (examining cases); *see also Astiana v. Dreyer's
12 Grand Ice Cream, Inc.*, No. 11–cv–2910, 2012 U.S. Dist. LEXIS 101371, at *37
13 (N.D. Cal. July 20, 2012) ("That the different ice creams may ultimately have
14 different ingredients is not dispositive as Plaintiffs are challenging the same basic
15 mislabeling practice…."); *Anderson v. Jamba Juice Co.*, 888 F. Supp. 2d 1000,
16 1006 (N.D. Cal. 2012) (plaintiff who purchased several flavors of at-home
17 smoothie kits labeled "All Natural" had standing to bring claims on behalf of
18 purchasers of other flavors because the "same alleged misrepresentation was on all
19 of the smoothie kit[s] regardless of flavor…."); *Colucci v. ZonePerfect Nutrition
20 Co.*, No. 12–cv–2907, 2012 U.S. Dist. LEXIS 183050, at *14 (N.D. Cal. Dec. 28,
21 2012) ("Most importantly, all twenty flavors bear the same challenged label: 'All–
22 Natural Nutrition Bars.'"); *Wolin v. Jaguar Land Rover N. Am., L.L.C.*, 617 F.3d
23 1168, 1175 (9th Cir. 2010) ("Typicality can be satisfied despite different factual
24 circumstances surrounding the manifestation of the [injury].").
25
26

27  your testimony? A. Yes."); *see also* Kelston Decl., Ex. 16 *passim* (excerpts of the relevant depositions).
28

#### 4.      Adequacy of Representation

Rule 23(a)(4) requires that the class representative "fairly and adequately protect the interests of the class."   This requirement entails answering two questions:   "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citation omitted). Plaintiffs easily meet both of these prerequisites.

First, Plaintiffs' interests do not, in any way, conflict with the other Class Members' interests.   Indeed, there is nothing to suggest that any of the Plaintiffs have any interests antagonistic to their vigorous pursuit of the Classes' claims. Furthermore, each Class Member's claims arise under the same legal theories and each Class Member was harmed in the same way as Plaintiffs, so that the Plaintiffs' interests align with the interests of the absent members of the Classes they seek to represent.   Plaintiffs have also demonstrated their adequacy through their participation in this litigation, including by providing or agreeing to provide deposition testimony in this case.[44]

Second, Plaintiffs have retained highly experienced counsel with significant experience in litigating class actions.   *See Marilley v. Bonham*, No. C-11-02418-DMR, 2012 U.S. Dist. LEXIS 33678, at *23-24 (N.D. Cal. Mar. 13, 2012) ("In determining adequacy of proposed class counsel, a court must consider '(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.'" (quoting Fed. R. Civ. P. 23(g)(1)(A))).   Plaintiffs' law firms, including, in

---

[44] *See, e.g.*, Kelston Decl., Ex. 16 *passim* (excerpts of the relevant depositions).

particular, Interim Co-Lead Counsel, have been at the forefront of class action litigation.[45]   The combined experience of Proposed Class Counsel and their firms in class action litigation and consumer advocacy is more than sufficient for them to act on behalf of the Classes.

### C.   Ascertainability

Although not mentioned in Rule 23, courts have often imputed a judicially-created "ascertainability" requirement into the class certification analysis.   *In re Nucoa Real Margarine Litig.*, 2012 U.S. Dist. LEXIS 189901, at *17.   This requirement is satisfied if the characteristics of the members of the classes are adequately defined and can be identified by reference to objective criteria.   *Id.*   In this case, there is a single objective criterion that determines whether any particular individual is a member of the class:   whether they purchased Wesson Oils during the Class Period.   *See McCrary*, 2014 U.S. Dist. LEXIS 8443, at *25 (certifying consumer class action because "the class definition clearly defines the characteristics of a class member by providing a description of the allegedly offending product and the eligible dates of purchase").

It is irrelevant whether these Class Members can be specifically identified prior to class certification.   *See Ries*, 287 F.R.D. at 535 (holding ascertainability requirement was satisfied because "[t]here is no requirement that 'the identity of the class members . . . be known at the time of certification'") (citation omitted); *Zeisel v. Diamond Foods, Inc.*, No. C 10-1192, 2011 U.S. Dist. LEXIS 60608, at *20-21 (N.D. Cal. June 7, 2011) (rejecting argument that class of consumers who purchased misleading walnut products was "not administratively feasible" because the class "includes objective characteristics that would permit a consumer to identify themself [sic]"); *Chavez v. Blue Sky Nat. Bev. Co.*, 268 F.R.D. 365, 377 (N.D. Cal. 2010) (concluding that class of persons was ascertainable if they

---

[45] *See* Kelston Decl., Ex. 17 (firm resumes of Plaintiffs' Interim Co-Lead Counsel).

purchased beverages bearing disputed mark or brand); *In re Nucoa Real Margarine Litig.*, 2012 U.S. Dist. LEXIS 189901, at *18 ("Here, although class members may have difficulty establishing that they are purchasers of [defendant's product], the class definition itself is clearly defined.   As a result, the ascertainability requirement is met.").

Recently, Central District of California Chief Judge King issued an opinion granting certification over a defendant's ascertainability challenge because the plaintiffs "precisely defined their class based on an objective criteria: purchase of Defendants' children's cold or flu products within a prescribed time frame.  This is enough to satisfy Rule 23(a)'s implied ascertainability requirement." *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK (MRWx), 2014 U.S. Dist. LEXIS 50600, at *13 (C.D. Cal. Apr. 9, 2014) (citations omitted).  Similarly, the court in *Ebin v. Kangadis Food*, No. 13 Civ. 2311, 2014 U.S. Dist. LEXIS 25838, at *15 (S.D.N.Y. Feb. 24, 2014), certified a consumer class action against a company that deceptively labeled products as being "100% Pure Olive Oil" when they were not, and noted that individually identifying purchasers "should not be made into a device for defeating the action."  The Class definition proposed here—individuals from specified states who purchased Wesson Oils during specified time periods— thus comports with ascertainability jurisprudence in this Circuit.[46]

---

[46] ConAgra likely will seek to rely on the Third Circuit's decision in *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013).  *Bayer*, however, is not controlling precedent here, and runs counter to the law in the Ninth Circuit, which bases ascertainability on the presence of "objective criterion" rather than, as the *Bayer* court held, the ability to identify every individual member of the proposed class with near-perfect accuracy.  *See McCrary*, 2014 U.S. Dist. LEXIS 8443, at *24 ("While [*Bayer*] may now be the law in the Third Circuit, it is not currently the law in the Ninth Circuit."); *see also Lanovaz v. Twinings N. Am., Inc.*, No. C-12-02646-RMW, 2014 U.S. Dist. LEXIS 57535, at *7-9 (N.D. Cal. Apr. 24, 2014) (collecting cases).

### D.    Rule 23(b)(3)—Predominance and Superiority

To certify a class under Rule 23(b)(3), Plaintiffs must establish that common questions predominate over questions affecting individual plaintiffs and that a class action is superior to other means of adjudicating the case. Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) specifies several "matters pertinent to these findings," and, as discussed below, Plaintiffs and the other members of the proposed Classes here satisfy each of these Rule 23(b)(3) standards.

### 1.    Predominance

Under Rule 23(b)(3), Plaintiffs must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Amgen Inc.*, 133 S. Ct. at 1191. "Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'" *Id.* at 1196 (citation omitted) (emphasis in original). In part for this reason, "predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods.*, 521 U.S. at 625. In this case, common questions predominate because the answers to them will drive the resolution of this litigation.[47]

---

[47] *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. at 2551 ("What matters . . . is not the raising of common questions—even in droves—but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.") (emphasis and internal quotation marks omitted); *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 859 (6th Cir. 2013) ("Whirlpool does not point to any 'fatal dissimilarity' among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making.  Instead, Whirlpool points to 'a fatal similarity—[an alleged] failure of proof as to an element of the plaintiffs' cause of action.'  That contention, the Supreme Court instructs, 'is properly addressed at trial or in a ruling on a summary-judgment motion.  The allegation should not be resolved in deciding whether to certify a proposed class.'  Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones.  Simply put, this case comports with the 'focus of the predominance inquiry'—it is 'sufficiently cohesive to warrant adjudication by representation.'") (internal citations omitted).

The critical question that will drive the resolution of this litigation is whether ConAgra's "100% Natural" claim in connection with the marketing and sale of Wesson Oils—all of which were made from or contain GMOs—is false, unfair, deceptive, and/or misleading. *Cf. Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801-02 (7th Cir. 2013) ("There is a single, central, common issue of liability: whether the Sears washing machine was defective.  Two separate defects are alleged, but remember that this class action is really two class actions.  In one the defect alleged involves mold, in the other the control unit. Each defect is central to liability.").  Here, it is inarguable that ConAgra made its "100% Natural" representation on the front of every label of the Wesson Oil Products in question in this litigation, and, further, that ConAgra *admits* that its Wesson Oils are made from bioengineered seeds.[48]  Moreover, the evidence necessary to demonstrate the materiality of ConAgra's "100% Natural" misrepresentation and Class Members' reliance on the misrepresentation (in the states where such a showing is required) is also common to all members of the various Classes.

While ConAgra now asserts in defense to this litigation that describing a product as "100% Natural" is not a claim about the GMO characteristics of that product's  ingredients, ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

_____

[48] *See* above, Section II & nn.2, 20-21; *see also* Hunter Dep., at 113:15-114:17 ("Q.  Is Wesson vegetable oil made from plants that have been genetically modified using biotechnology?  A.  Wesson vegetable oil is made from soybeans that are available on the open market.  Q.  And the majority—and I believe you said the majority of those soybeans are from genetically modified plants, is that correct?  A.  That is my understanding.  Q.  Is it fair then to conclude that Wesson vegetable oil is made from crops that were genetically modified using biotechnology?  A.  It's fair to conclude that Wesson does have some—that Wesson vegetable oil is made from some soybeans that have used genetically modified seeds.  I don't know that all of it is, but it's fair to say there is some portion.  Q.  Okay.  And is that true also of Wesson corn oil?  A.  Yes, I believe that would apply as well.")

ConAgra nonetheless chose to prominently label its Wesson Oils throughout the Class Period as being "100% Natural," despite the fact that it continued to use genetically altered ingredients to make those oils and also despite the fact that ConAgra was well aware that labeling those Products as "natural" was inconsistent (*i.e.*, false, unfair, deceptive, and/or misleading) with the truth.

Plaintiffs will also be able to show that ConAgra's "100% Natural" claim is material to the "reasonable consumer" and not mere puffery, even though this showing is not required at this stage. *See McCrary*, 2014 U.S. Dist. LEXIS 8443, at *42 ("[A]t the class certification stage Plaintiff need not prove that the [defendant's misrepresentations] were material to all consumers of [the product] or that they relied on those claims."); *Chavez,* 268 F.R.D. at 376 ("[R]eliance on the alleged misrepresentations may be inferred as to the entire class if the named plaintiff can show that material misrepresentations were made to the class members."); *In re Nucoa Real Margarine Litig*., 2012 U.S. Dist. LEXIS 189901, at *30 ("Here, it is clear that common questions of fact and law predominate over issues individual to class members.   This is so because the test is not each consumer's individual reliance on defendant's representations.   Rather, the

---

[49] Kelston Decl., Ex. 18, CAG00003536 at 3538-39 (emphasis added).

23

pertinent inquiry is whether a reasonable consumer would likely have been deceived by the representations.").[50]



[54]   Regardless of whether consumers think GM foods are good or bad, ConAgra knows that consumers want to be presented with fair information on product labels so that they can make these decisions for themselves without being misled by a product claiming to be "100% Natural" when it is not.[55]

[50]   *See Amgen Inc.*, 133 S. Ct. at 1191 (regarding materiality of allegedly false representations in proposed class action, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.  Because materiality is judged according to an objective standard, the materiality of [defendant's] alleged misrepresentations and omissions is a question common to all members of the class [plaintiffs] would represent. . . . As to materiality, therefore, the class is entirely cohesive: It will prevail or fail in unison. In no event will the individual circumstances of particular class members bear on the inquiry.").

[51]   *See* Kelston Decl., Ex. 8, CAG0000055 at CAG0000116.

[52]   *See* Kelston Decl., Ex. 10, CAG0002537 at CAG0002547.

[53]   *See* Benbrook Decl., Section III, "Consumer Expectations Triggered by 'Natural' Label Claims" citing, among other references, Hartman Group (2010), "Beyond Natural and Organic."

[54]   Kelston Decl., Ex. 20, CAG0002144 at CAG0002154.

[55]   *See* Kelston Decl., Ex. 21, CAG002319 at CAG002319

*see also* Kelston Decl., Ex. 22, Claire Marris, *Public*

24

ConAgra is well aware that whether its foods, including its Wesson Oils, contain GMOs is an important consumer purchasing criterion—a fact further confirmed by its recent expenditure of millions of dollars opposing GMO labeling initiatives in, among other places, California and Washington.[56]

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████.[57]

On April 23, 2014, Vermont became the first state in the U.S. to require the labeling of GMO foods and similar labeling efforts are reported to be underway in approximately twenty other states.[58]

That the actual claims and remedies permitted may differ among the separate Classes in no way defeats predominance. *See Hanlon*, 150 F.3d at 1022 ("In this case, although some class members may possess slightly differing remedies based on state statute or common law, the actions asserted by the class representatives are not sufficiently anomalous to deny class certification. On the contrary, to the

---

*Views on GMOs: Deconstructing the Myths*, 2 Embo Rep. 545 (2001) (study *confirming* supposed myth that "people are obsessed with the idea that GMOs are 'unnatural'" finding "GMOs were indeed frequently characterised [*sic*] as 'unnatural' by focus group participants. They expressed the feeling that directly modifying the genome was qualitatively different from any previously used technique.").

[56] ConAgra contributed more than $285,000 in 2013 to defeat Washington Initiative 522, which would have required labeling of GMO foods and donated in excess of $1 million in 2012 to oppose California's Proposition 37 GMO labeling law. *See* Joel Connelly, *Pepsi, Coke, Nestle Top Multi-Million-Dollar Campaign Against I-522*, Seattlepi.com, Oct. 18, 2013, *available at*: http://blog.seattlepi.com/seattlepolitics/2013/10/18/pepsi-coke-nestle-top-multi-million-dollar-campaign-against-i-522/; Daniel Willis & Leigh Poitinger, *Proposition 37 Donor and Finance Information*, MercuryNews.com, Aug. 24, 2014, http://www.mercurynews.com/elections/ci_21386000?appSession=86160328214226.

[57] Kelston Decl., Ex. 20, CAG002144 at CAG002166.

[58] Stephanie Strom, *Vermont Will Require Labeling of Genetically Altered Foods*, N.Y. Times, April 24, 2014, *available at* http://www.nytimes.com/2014/04/24/business/vermont-will-require-labeling-of-genetically-altered-foods.html.

extent distinct remedies exist, they are local variants of a generally homogenous collection of causes which include products liability, breaches of express and implied warranties, and 'lemon laws.'"); *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 301 (3rd Cir. 2011) (en banc) (holding commonality and predominance are not "defeated merely because available rights and remedies differ under the several laws that form the basis for the class claims.  We have never required the presentation of identical or uniform issues or claims as a prerequisite to certification of a class.") (footnote omitted).

Recognizing, based on the foregoing, that Plaintiffs have alleged a predominant common issue, ConAgra will no doubt argue that proof of damages will vary so much that predominance cannot be satisfied.  ConAgra's arguments would be incorrect, however, because a number of different options exist for measuring damages from common evidence, since the price of a bottle of Wesson Oil is not individually negotiated by consumers when they purchase Wesson Oils at retail. [59]  Thus, the measure of economic impact on the retail price of Wesson Oils caused by ConAgra's allegedly false, unfair, deceptive, and/or misleading labeling of those Products is also a predominant common question to all members of the Classes, that will be answered with common, as opposed to individualized, proof.[60]

The measure of each Class Member's damages is the amount of "price premium" inherent in each bottle of Wesson Oils that Class Members purchased that corresponds to ConAgra's "100% Natural" marketing claim, which Plaintiffs allege is not actually provided by the Product because Wesson Oils are made from

---

[59] *See* Weir Decl., ¶ 10.

[60] *See* Weir Decl., ¶¶ 14, 24, 33-35, 36, 46-48.

GMOs.[61]  As Plaintiffs' economic expert Colin Weir opines, consumers are unable to individually negotiate the price they paid to purchase Wesson Oils from retailers that is attributable to the "100% Natural" claim—all consumers pay the same amount for the attribute because regardless of how they value the attribute, the price of Wesson Oils is determined collectively in the marketplace, and not by any one individual Class Member.[62]

Even though retail prices of Wesson Oils varied during the course of the Class Period, certification of a damages class is still appropriate because calculating a "price premium" that corresponds to a particular product attribute is easily accomplished by applying economic principles to common, class-wide evidence.  *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 515 (9th Cir. 2013) (holding district court abused its discretion in denying class certification based on the need to individually calculate damages); *see also Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. at 479 (certifying class action because plaintiffs are permitted "to seek recovery of a 'price premium,' regardless of whether plaintiffs were able to quantify the premium that was paid or identify other products sold at a lower price

---

[61] The term "Price Premium" is used here to indicate the additional amount that consumers paid for Wesson Oils as a direct result of the 100% Natural Claim, not the overall premium that Wesson Oils may command in the marketplace vis-à-vis competitor products.  *See* Weir Decl., n.5.

[62] Weir Decl., ¶ 10.  Plaintiffs' provision of expert testimony plainly distinguishes the instant case from *Caldera v. J.M. Smucker Co.*, in which Judge King denied class certification in a situation in which plaintiffs failed to provide any expert testimony on damages.  *See Caldera v. J.M. Smucker Co.*, Case No. CV 12-4936-GHK (VBKx), 2014 U.S. Dist. LEXIS 53912 at *11 (C.D. Cal. Apr. 15, 2014) ("This is not to say that damages can never be determined on a classwide basis under California's consumer protection statutes.  In many cases, restitution may be proven on a classwide basis by computing the effect of unlawful conduct on the market price of the product purchased by the class.  This measure of restitution, however, requires the plaintiff to produce evidence that 'attaches a dollar value to the "consumer impact or advantage" [to defendant] caused by the unlawful business practices.'  'Expert testimony may be necessary to determine the amount of price inflation attributable to the challenged practice.'  Here, Plaintiff has failed to offer any evidence, let alone expert testimony, that damages can be calculated based on the difference between the market price and true value of the products.") (internal citations omitted).

that [were properly labeled]").   Economic analysis using the well-accepted methods of hedonic regression and/or conjoint analysis is thus capable of measuring the value of the "100% Natural" marketing attribute as a part of the total retail price of Wesson Oils—the calculation of the premium that corresponds to the attribute is independent of the actual retail price any one particular consumer paid for Wesson Oils over time.[63]   Indeed, survey evidence indicates that consumers are willing to pay a premium price for natural products.[64]

Demonstrating the existence of a viable damages model that makes use of common, class-wide evidence is all that is required at the class certification stage. *See McCrary*, 2014 U.S. Dist. LEXIS 8443, at *49-50 (certifying consumer class because plaintiff presented a viable damages model and "it is not necessary to show that his method will work with certainty at this time") (quoting *Chavez*, 268 F.R.D. at 379 (certifying consumer class because plaintiffs were able to demonstrate one potential measure of damages based on the premium price paid by consumers)); *see also Zeisel*, 2011 U.S. Dist. LEXIS 60608, at *32 (accepting plaintiff's assertion for class certification purposes that "he will be able to prove the proper amount of restitution by relying on documents produced by [defendant] relating to net sales, profits, and costs, as well as retail prices of" the products at issue); *cf. Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1102 (9th Cir. 2013) (holding consumers have lost money or property if false advertising induces them to buy products they would not have purchased or to spend more than they would have otherwise spent); *Degelmann v. Advanced Med. Optics, Inc.*, 659 F.3d 835, 840 (9th Cir. 2011) (holding plaintiffs suffered damages because "[h]ad the product

---

[63] *See* Weir Decl., ¶¶ 31, 45, 49-51

[64] *See* Kelston Decl., Ex. 23, LEATHERHEAD FOOD RESEARCH, DO 'NATURAL' CLAIMS CUT THE MUSTARD? (2013).

been labeled accurately, they would not have been willing to pay as much for it as they did, or would have refused to purchase the product altogether").

In this case, as demonstrated through and explained in detail in the Colin Weir's expert report, the economic techniques of hedonic regression and/or conjoint analysis are both appropriate tools for calculating the value that may be assigned to a product attribute (and thus the amount by which Class Members are damaged when the promised attribute is not actually provided).  Moreover, such techniques "do not require any individual inquiry, and can produce Class-wide results using common evidence."[65]

Furthermore, Plaintiffs' damages theories are properly linked to Plaintiffs' theory of harm—that is, they specifically measure the amount by which consumers overpaid for a product attribute, here, ConAgra's claim that Wesson Oils are "100% Natural," that was not actually provided—in satisfaction of the Supreme Court's *Comcast* decision.  *See Comcast v. Behrend*, 133 S. Ct. 1426, 1433 (2013) ("a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory"); *Butler*, 727 F.3d at 799 ("Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide injury that the suit alleges" and noting that "[i]t follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.").

Accordingly, common questions predominate over individualized questions in establishing ConAgra's liability under all of the claims Plaintiffs allege on behalf of all of the Classes, because all claims depend on the false, unfair, deceptive, and/or misleading nature of ConAgra's claim that Wesson Oils are

---

[65] *See* Weir Decl., ¶ 14.

"100% Natural," as well as the measure of damages arising therefrom, thus satisfying Rule 23(b)(3)'s predominance requirement.[66]

## 2.     Superiority

Rule 23(b)(3)'s superiority requirement tests whether "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).   Here, classwide litigation over whether labeling a product made from GMOs as "100% Natural" is false, unfair, deceptive, and/or misleading to consumers, and over the measure of economic impact such labeling had on the price those consumers paid for Wesson Oils, is far more efficient than millions of individual trials by millions of different consumers in different forums over a relatively low-cost consumer food product.

Where, as here, the damages suffered by each proposed Class Member are not large, a class proceeding is favored.  *See Astiana v. Kashi Co.*, 291 F.R.D. 493, 507 (S.D. Cal. 2013) ("Where a case involves multiple claims for relatively small individual sums, some plaintiffs may not be able to proceed as individuals because of the disparity between their litigation costs and what they hope to recover.").[67]   It is more efficient to resolve the common and predominant question of whether ConAgra's claim that its Wesson Oils are "100% Natural" is a false, unfair, deceptive, and/or misleading claim (an essential question for all of the consumer protection, breach of warranty, and unjust enrichment claims at issue in this case)

---

[66] Should the Court conclude that the predominance requirement of Rule 23(b)(3) is not satisfied due to issues related to damages, Plaintiffs alternatively seek certification under Rule 23(c)(4), as discussed in Section IV.F. (below).

[67] *See also Amchem Prods.*, 521 U.S. at 615 (noting the superiority requirement was added to the Federal Rules by the Advisory Committee "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results'") (citation omitted).

in a single proceeding rather than to have individual courts separately adjudicate this issue—a point this Court confirmed in *In re Nucoa Real Margarine Litig.*, 2012 U.S. Dist. LEXIS 189901, at *33 ("In a consumer class action of this type involving the purchase of a relatively inexpensive food product, injured consumers are extremely unlikely to pursue their claims on an individual basis."); *see also Johns v. Bayer Corp.*, 280 F.R.D. 551, 559 (S.D. Cal. 2012).   Plaintiffs are unaware of any other cases challenging ConAgra's "100% Natural" claim on its Wesson Oils under any state's law, and the JPML already determined that it was more efficient for any such cases to be transferred to this Court for coordinated or consolidated pretrial proceedings, confirming the efficiency of the class vehicle in this context.[68]   And there is no evidence that this consumer class action will be difficult to manage, because the questions at issue concerning liability and damages are all objective questions determinable from common, class-wide evidence.

Additionally, Plaintiffs are not seeking certification of a nationwide class at this time.  Rather, they seek certification of separate statewide classes based on common facts and their own individual state laws regarding (a) consumer protection; (b) breach of express warranty; (c) breach of implied warranty; and/or (d) unjust enrichment.   This framework significantly simplifies any questions regarding manageability regardless of variations in state law because no choice of law analysis is necessary as each of the separate statewide Classes only seeks to apply the law of their states of residence to the claims of the separate Classes.[69]

---

[68] *See In re Wesson Oil Mktg. & Sales Practices Litig.*, 818 F. Supp. 2d 1383 (J.P.M.L. 2011).

[69] Because Plaintiffs only seek relief under the laws of their own states of residence, this Court does not need to determine "'whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.'" *Mazza v. Am. Honda*, 666 F.3d 581, 590 (9th Cir. 2012) (citation omitted).

1    Finally, it is likely no other realistic opportunity exists for adjudicating this

2    controversy.[70] Thus, the Rule 23(b)(3) superiority requirement is met here.

3    **E.    Rule 23(b)(2)—Injunctive and Declaratory Relief**

4    In addition to seeking certification of damages Classes under Rule 23(b)(3),

5    Plaintiffs also seek certification under Rule 23(b)(2) for declaratory and injunctive

6    relief.  "[I]n an appropriate case, a Rule 23(b)(2) class and a Rule 23(b)(3) class

7    may be certified where there is a real basis for both damages and an equitable

8    remedy."  *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 538 n.37 (N.D.

9    Cal. 2012) (certifying claims under both (b)(2) and (b)(3)) (quoting *Kartman v.*

10   *State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 895 (7th Cir. 2011) (citations

11   omitted)).

12   In this case, the Classes meet the Rule 23(b)(2) certification requirements

13   because ConAgra's deceptive marketing of its "100% Natural" Products is a matter

14   of general applicability to all Class Members "so that final injunctive relief or

15   corresponding declaratory relief is appropriate respecting the class[es] as a whole."

16   Rule 23(b)(2); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)

17   ("The fact that some class members may have suffered no injury or different

18   injuries from the challenged practice does not prevent the class from meeting the

19   requirements of Rule 23(b)(2).").

20   The Supreme Court has clarified that "[t]he key to the (b)(2) class is 'the

21   indivisible nature of the injunctive or declaratory remedy warranted—the notion

22   that the conduct is such that it can be enjoined or declared unlawful only as to all

23   of the class members or as to none of them.'"  *Wal-Mart Stores, Inc.*, 131 S. Ct. at

24   2557 (citation omitted).  "In other words, Rule 23(b)(2) applies only when a single

---

25   [70] *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("the

26   more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this

27   single class 17 million suits each seeking damages of $15 to $30. . . . The realistic alternative to a class action is not 17 million individual suits, but zero individual

28   suits, as only a lunatic or a fanatic sues for $30.").

injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.*

Here, Plaintiffs seek declaratory and injunctive relief that enjoins ConAgra from continuing to market its Wesson Oils as being "100% Natural" as long as those oils contain GMO ingredients.  (Complaint, Request for Relief, ¶ D.)  This type of relief generally applies to all Class Members, because ConAgra does not customize the labels on Wesson Oils for each individual consumer, and an injunction barring ConAgra from continuing to label Wesson Oils as being "100% Natural" is appropriate relief for the Classes as a whole.  As such, the Classes for declaratory and injunctive relief meet the Rule 23(b)(2) requirements.

### F.    Alternatively This Court May Employ Rule 23(c)(4) to Certify a Class on Designated Issues

In the event this Court holds that any particular class claim fails to satisfy the requirements of Rule 23(b), Plaintiffs alternatively move for certification of relevant issues classes under Rule 23(c)(4).  Consumer false advertising cases based on false labels are suitable for full certification under Rules 23(b)(2) and 23(b)(3), but Rule 23(c)(4) can be used to certify issue classes to resolve predominating disputed issues common to all class members.[71]  Here, the question

---

[71] Fed. R. Civ. P. 23(c)(4) ("When appropriate, (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."); *Ellis*, 285 F.R.D. at 544 ("[E]ven if individualized issues were to predominate with respect to Plaintiffs' monetary relief claims, the Court would utilize the mechanism under Rule 23(c)(4) to adjudicate those issues capable of classwide resolution separately."); *see also* 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1790 (3d ed. 2005) (stating that subsection (c)(4) "may be used to designate appropriate classes or class issues at the certification stage" so that "the court can determine whether, as so designated, the other Rule 23 requirements are satisfied").

of whether ConAgra has misled consumers by labeling Wesson Oils as being "100% Natural" when, in fact, they are made from GMOs is a question involving a single manufacturer and a uniform representation, placed prominently on the front of all Wesson Oil labels sold throughout the Class Period.  This simple question fits squarely within the bounds of warranting Rule 23(c)(4) certification.

## V.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for class certification in the form of the proposed Order proffered contemporaneously herewith.

DATED:  May 5, 2014

MILBERG LLP
DAVID E. AZAR
NICOLE DUCKETT FRICKE


*/s/*
DAVID E. AZAR
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90071
Telephone:  (213) 617-1200
Facsimile:   (213) 617-1975
dazar@milberg.com
ndfricke@milberg.com

MILBERG LLP
ARIANA J. TADLER (pro hac vice)
HENRY J. KELSTON (pro hac vice)
One Pennsylvania Plaza
New York, New York  11030
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229
atadler@milberg.com
hkelston@milberg.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**GRANT & EISENHOFER, P.A.**
ADAM J. LEVITT (pro hac vice)
EDMUND S. ARONOWITZ (pro hac vice)
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
Telephone:   (312) 214-0000
Facsimile:    (312) 214-0001
alevitt@gelaw.com
earonowitz@gelaw.com

*Plaintiffs' Interim Class Counsel*