UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN RE CONAGRA FOODS, INC.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 11-05379 MMM (AGRx)

ORDER DENYING PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION;
GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION TO
STRIKE

On June 28, 2011, Robert Briseno filed a complaint against ConAgra.[1]  Between October and December 2011, the court consolidated several cases filed against ConAgra under the caption indicated above.[2]  On January 12, 2012, plaintiffs filed a First Consolidated Amended Complaint.[3]

---

[1]Complaint, Docket No. 1 (June 28, 2011).

[2]Minutes (In Chambers): Order Taking Off Calendar and Denying as Moot Motion of Plaintiffs Briseno and Toomer to Consolidate Related Actions and Designate Interim Class Counsel, Docket No. 33 (Oct. 6, 2011); Order Consolidating Cases, Docket No. 56 (Nov. 28, 2011); Order Re Stipulation to Consolidate Related Actions, Docket No. 59 (Dec. 9, 2011); Amended Order Granting Stipulation Re Amended Consolidated Complaint, Response to Amended Consolidated Complaint, and Consolidation of Additional Action, Docket No. 61 (Dec. 9, 2011). The consolidated cases are *Robert Briseno v. Conagra Foods, Inc.*, CV 11-05379 MMM(AGRx); *Christi Toomer v. Conagra Foods, Inc.*, CV 11-06127 MMM(AGRx); *Kelly McFadden v.*

On February 24, 2012, ConAgra filed a motion to dismiss,[4] which the court granted in part and denied in part on November 15, 2012.[5]  On December 19, 2012, plaintiffs filed a Second Consolidated Amended Complaint.[6]  On February 20, 2014, they filed a motion seeking an order permitting the withdrawal of several named plaintiffs and the dismissal of their claims;[7] the court granted this motion on May 5, 2014.[8]  That same day, plaintiffs filed a motion for class certification,[9] which ConAgra opposes.[10]  On June 2, 2014, ConAgra filed a motion to strike the

<hr />

*Conagra Foods, Inc.*, CV 11-06402 MMM(AGRx); *Janeth Ruiz v. Conagra Foods, Inc.*, CV 11-06480 MMM(AGRx); *Brenda Krein v. Conagra Foods, Inc.*, CV 11-07097 MMM(AGRx); *Phyllis Scarpelli, et al. v. Conagra Foods, Inc.*, Case No. CV 11-05813 MMM (AGRx); *Michele Andrade v. ConAgra Foods Inc.*, CV 11-09208 MMM (AGRx); and *Lil Marie Virr v. Conagra Foods, Inc.*, CV 11-08421 MMM (AGRx).

[3]Consolidated Amended Class Action Complaint, Docket No. 80 (Jan. 12, 2012).

[4]Motion to Dismiss, Docket No. 84 (Feb. 24, 2012).

[5]Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Docket No. 138 (Nov. 15, 2012).

[6]Second Amended Class Action Complaint ("SAC"), Docket No. 143 (Dec. 19, 2012).

[7]Motion for Order for Allowing Withdrawal and Voluntary Dismissal, Docket No. 190 (Feb. 20, 2014).  See also Corrected Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Order Allowing Withdrawal and Voluntary Dismissal ("Motion"), Docket No. 191 (Feb. 20, 2014) at 4, 5, 6.

[8]Order Granting Plaintiffs' Motion for Withdrawal and Voluntary Dismissal of Individual Claims, Docket No. 238 (May 2, 2014).  Following the court's order, no named plaintiffs remain who reside in Washington or Wyoming; this required dismissal of the claims asserted by the putative Washington and Wyoming classes.  (*Id.*)

[9]Motion to Certify Class, Docket No. 241 (May 5, 2014).  See also Memorandum of Points and Authorities in Support ("Cert. Motion"), Docket No. 241-1 (May 5, 2014).

[10]Opposition to Plaintiffs' Motion for Class Certification ("Opp. Cert."), Docket No. 265 (June 2, 2014).

2

declarations of plaintiffs' experts, Colin B. Weir and Charles M. Benbrook.[11]  Plaintiffs oppose ConAgra's motion.[12]

## I.  BACKGROUND

Plaintiffs are consumers residing in twelve different states who purchased Wesson Oils between January 2007 and their entry into this case.[13]  They allege that from at least June 27, 2007 to the present, ConAgra Foods, Inc. ("ConAgra") deceptively and misleadingly marketed its Wesson brand cooking oils, made from genetically-modified organisms ("GMO"), as "100% Natural."  Throughout the proposed class period, every bottle of Wesson Oil carried a front label stating that the product was "100% Natural."[14]

Plaintiffs propose certification of twelve separate statewide classes as follows:

> "All persons who reside in the States of California, Colorado, Florida, Illinois, Indiana, Nebraska, New Jersey, New York, Ohio, Oregon, South Dakota, or Texas who have purchased Wesson Oils within the applicable statute of limitations period established by the laws of their state of residence (the 'Class Period') through the final disposition of this and any and all related actions."[15]

---

[11]Motion to Strike, Docket No. 262 (June 2, 2014).

[12]Opposition to Motion to Strike ("Opp. Motion to Strike"), Docket No. 280 (June 26, 2014).

[13]Although Bonnie McDonald of Massachusetts is presently a named plaintiff, plaintiffs do not ask that the court appoint her as a class representative, and they have filed a motion to permit her to withdraw as a plaintiff.  Plaintiffs also seek an order permitting Phyllis Scarpelli of New Jersey to withdraw as a plaintiff.  Her withdrawal will not affect the putative New Jersey class, however, because another plaintiff from New Jersey, Brenda Krein, remains a named plaintiff. (Cert. Motion at 11 n. 35; Motion to Withdraw Individual Claims of Plaintiffs McDonald and Scarpelli, Docket No. 273 (June 3, 2014).)

[14]Answer to Amended Complaint, Docket No. 145 (Jan. 16, 2013), ¶¶ 2, 11-31.

[15]Cert. Motion at 11-12.

Plaintiffs allege claims for violation of state consumer protection laws, breach of express warranty, breach of the implied warranty of merchantability, and unjust enrichment. Specifically, they plead the following claims:

- <u>California</u>: (1) California Consumer Legal Remedies Act, CAL. CIV. CODE §§ 1750, *et seq.* and California Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200, *et seq.* and §§ 17500, *et seq.*; (2) CAL. COM. CODE § 2313; CAL. COM. CODE § 2314.

- <u>Colorado</u>: (1) Colorado Consumer Protection Act, COLO. REV. STAT. §§ 6-1-101, *et seq.*; (2) COLO. REV. STAT. § 4-2-313; (2) COLO. REV. STAT. § 4-2-314; (4) Unjust Enrichment.

- <u>Florida</u>: (1) Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. ANN. §§ 501.201, *et seq.*; (2) Unjust Enrichment.

- <u>Illinois</u>: (1) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1, *et seq.*; (2) Unjust Enrichment.

- <u>Indiana</u>: (1) IND. CODE § 26-1-2-313; (2) IND. CODE § 26-1-2-314; (3) Unjust Enrichment.

- <u>Nebraska</u>: (1) Nebraska Consumer Protection Act, NEB. REV. STAT. §§ 59-1601, *et seq.*; (2) NEB. REV. STAT. § 2-313; (3) NEB. REV. STAT. § 2-314; (4) Unjust Enrichment.

- <u>New Jersey</u>: (1) New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, *et seq.*; (2) N.J. STAT. ANN. § 12A:2-313; (3) N.J. STAT. ANN. § 12A:2-314;

- <u>New York</u>: (1) New York Consumer Protection Act, N.Y. GEN. BUS. LAW §§ 349, *et seq.*; (2) N.Y. U.C.C. Law § 2-313; (3) Unjust Enrichment.

- <u>Ohio</u>: (1) Ohio Consumer Sales Practices Act, OHIO REV. CODE §§ 1345.01, *et seq.*; (2) Unjust Enrichment.

- <u>Oregon</u>: (1) Oregon Unfair Trade Practices Act, OR. REV. STAT. §§ 646.605, *et seq.*; (2) OR. REV. STAT. § 72-3130; (3) Unjust Enrichment.

- <u>South Dakota</u>: (1) South Dakota Deceptive Trade Practices and Consumer

1 Protection Law, S.D. Cod. Laws §§ 37 24 1, *et seq.*; (2) S.D. Cod. Laws § 57A-

2 2-313; (3) S.D. Cod. Laws § 57A-2-314; (4) Unjust Enrichment.

3 •  Texas: (1) Texas Deceptive Trade Practices - Consumer Protection Act, Tex. Bus.

4 & Com. Code §§ 17.41, *et seq.*; (2) Unjust Enrichment.[16]

## II. DISCUSSION

### A. Evidentiary Objections to the Testimony of the Parties' Respective Experts

Before addressing the merits of the certification motion, the court must consider the parties' challenges to their opponent's experts. While courts in this circuit had previously concluded that expert testimony was admissible in evaluating class certification motions without conducting a rigorous analysis under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993), the Supreme Court in *Dukes* expressed "doubt that this [was] so." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011). After *Dukes*, the Ninth Circuit approved the application of *Daubert* to expert testimony presented in support of or opposition to a motion for class certification. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) ("In its analysis of Costco's motions to strike, the district court correctly applied the evidentiary standard set forth in *Daubert*. . ."). As a result, the court applies that standard to the parties' expert witnesses.[17]

---

[16]SAC, ¶¶ 64-103.

[17]Citing *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466 (C.D. Cal. 2012), plaintiffs argue that the court need not conduct a full *Daubert* analysis at the class certification stage. (Opp. Motion to Strike at 4-5.) In *Tait*, the court reviewed Ninth Circuit cases concerning consideration of expert testimony at the class certification stage, both prior to and following the Supreme Court's decision in *Dukes*. It held that "district courts must conduct an analysis tailored to whether an expert's opinion was sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as commonality and predominance." *Id.* at 495. See *id.* ("'At this early stage, robust gatekeeping of expert evidence is not required; rather, the court should ask only if expert evidence is 'useful in evaluating whether class certification requirements have been met.' This means that a district court need only conduct a 'tailored *Daubert* analysis' which 'scrutinize[s] the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence,'" quoting *Ellis*, 657 F.3d at 982, and *In re Zurn Pex Plumbing Products Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011)); *id.* at 496 ("Plaintiff responds that the

Under Rule 702,

"[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702.

See also *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) ("[Rule 702] consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion"); *Sterner v. U.S. Drug Enforcement Agency*, 467 F.Supp.2d 1017, 1033 (S.D. Cal. 2006) ("There are three basic requirements that must be met before expert testimony can be admitted. First, the evidence must be useful to a finder of fact. Second, the expert witness must be qualified to provide this testimony. Third, the proposed evidence must be reliable or trustworthy" (citations omitted)).

Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; see also *Ellis*, 657 F.3d at 982 ("Under *Daubert*, the trial court must act as

---

Court's analysis of Expert Clark's opinion at the class certification stage must be limited to the purpose for which it is presented, namely, to establish the Rule 23(a) requirement of commonality by showing that the issue of whether the class members' Washers had a propensity to develop BMFO is susceptible to common proof. . . . [T]he Court agrees"). The court does not interpret the motions to strike the parties have filed as motions to exclude expert testimony at trial. Consequently, the court evaluates the admissibility of the expert testimony under *Daubert* in light of the purpose for which it is offered – i.e., to demonstrate that it is appropriate to certify a class under Rule 23. "Any determination the court makes regarding the admissibility of expert testimony (other than a finding that an expert is not qualified), is not a final conclusion that will control the admissibility of the expert's testimony at trial." *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 542 n. 53 (C.D. Cal. 2012).

a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable"). In conducting this preliminary assessment, the trial court is vested with broad discretion. See, e.g., *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly erroneous").

"The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. CV 02-2258 JM (AJB), 2007 WL 935703, *4 (S.D. Cal. Mar. 7, 2007) (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) ( in turn citing *Daubert*, 509 U.S. at 592 n. 10)); see also *Walker v. Contra Costa County*, No. C 03-3723 THE, 2006 WL 3371438, *1 (N.D. Cal. Nov. 21, 2006) (same, citing *Bourjaily v. United States*, 483 U.S. 171, 172 (1987), and *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).[18]

"In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind [the rule's] broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (internal quotation marks omitted); see also *Jinro Am. Inc. v. Secure Invests., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001) ("Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony" (internal quotation marks omitted)). On a motion for class certification, it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiff's claims; instead, the testimony must be relevant in assessing "whether there was a common pattern and practice that could affect the class as a whole." *Ellis*, 657 F.3d at 983.

---

[18]This showing must be by a preponderance of the evidence. See *Daubert*, 509 U.S. at 594 n. 10 (citing *Bourjaily*, 483 U.S. at 175-76).

### 1.   Plaintiffs' Expert: Colin B. Weir

Colin Weir is plaintiffs' economic expert.   Weir is Vice President of Economics and Technology, Inc. (ETI), a research and consulting firm specializing in economics, statistics, regulation, and public policy, where he has worked for eleven years.[19]   Weir holds an MBA from the High Technology program at Northeastern University, and a BA in Business Economics from the College of Wooster.[20]   Weir's academic studies included work on hedonic regression analysis and conjoint analysis.[21]   His work at ETI involves econometric and statistical analysis, multiple linear regression, statistical sampling, micro and macroeconomic modeling and other economic analyses.[22]   Weir has given expert testimony in federal and state courts, and before the Federal Communications Commission and state regulatory commissions.[23]   He has also consulted on a variety of consumer and wholesale products cases, calculating damages related to household appliances, herbal remedies, HBC products, food products, electronics, and computers.[24]

Weir opines that it is possible to determine damages attributable to plaintiffs' claims on a classwide basis by determining whether class members paid a "price premium" – i.e., an additional amount paid for Wesson Oils as a result of the 100% Natural Claim – using ConAgra's available business records, market research data concerning retail prices for the products at issue and a series of benchmark products, and consumer survey data.[25]   Weir discusses two techniques that purportedly allow for the comparison of prices across sales channels, retailers, geographies,

---

[19]Expert Declaration of Colin B. Weir ("Weir Decl."), Docket No. 243 (July 14, 2014) at 3; Opp. Motion to Strike, Exh. C ("Weir Depo.") at 47:8-12.

[20]*Id.*

[21]*Id.* at 9:20-10:21; 13:13-14:7.

[22]*Id.*, Exh. 1 at 1.

[23]Weir Decl. at 3.

[24]*Id.*

[25]*Id.*, ¶ 9 & nn. 5-6.

time periods, and various other product attributes.[26]  The first technique, hedonic regression, is used to isolate the effect of one or more product attributes on the price of a product.[27]  Weir states that the data necessary for this analysis "should be easily obtained" from ConAgra's business records and market research data from companies like IRI and Nielsen, or independent market research.[28]  The second technique, conjoint analysis, is used to assess the relative importance of product attributes, and their price components.[29]  Unlike hedonic regression, conjoint analysis does not require use of existing data, but instead relies on data generated through a survey process.[30]  Weir states that the data necessary to select the survey sample and conduct the conjoint analysis are easily obtainable from one of several sources, including ConAgra's business records, market research data from companies such as IRI and Nielsen, and independent research.[31]  Although he describes hedonic regression and conjoint analysis, Weir does not actually perform either analysis or describe in any detail their specific application to this case.

ConAgra first moves to exclude Weir's testimony on the basis that he lacks relevant training and experience, and is therefore not qualified to opine on methodologies of conducting a damages analysis.[32]  It argues that Weir lacks the requisite experience to offer an expert opinion on hedonic regression or conjoint analysis because he has never previously calculated and testified to damages in a case employing these methodologies.[33]  ConAgra asserts that Weir also lacks the

---

[26]*Id.*, ¶ 11.

[27]*Id.*, ¶ 12.

[28]*Id.*, ¶ 33.

[29]*Id.*, ¶ 13.

[30]*Id.*, ¶ 46.

[31]*Id.*

[32]Motion to Strike at 3.

[33]*Id.*

requisite training because he does not have a Ph.D., and did not complete a particular

concentration when obtaining an MBA that would prepare him to conduct such analyses.[34]

In the Ninth Circuit, an expert may be qualified to offer a particular opinion either as a

result of practical training or academic experience. *Thomas v. Newton Int'l Enterprises*, 42 F.3d

1266, 1269 (9th Cir. 1994) ("[T]he advisory committee notes emphasize that Rule 702 is broadly

phrased and intended to embrace more than a narrow definition of qualified expert"); *Rogers v.*

*Raymark Industries. Inc.*, 922 F.2d 1426, 1429 (9th Cir.1991) ("A witness can qualify as an

expert through practical experience in a particular field, not just through academic training").  See

also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert

might draw a conclusion from a set of observations based on extensive and specialized

experience").

"The threshold for qualification is low for purposes of admissibility; minimal foundation

of knowledge, skill, and experience suffices." *PixArt Imaging, Inc. v. Avago Tech. Gen. IP*

*(Singapore) Pte. Ltd.*, No. C 10–00544 JW, 2011 WL 5417090, *4 (N.D. Cal. Oct. 27, 2011).

Prior experience need not consist of prior expert witness testimony on the same issue.  See *Matuez*

*v. Lewis*, No. CV 11-7411-JVS (JPR), 2012 WL 13582122, *8 (C.D. Cal. May 9, 2012), report

and recommendation adopted by 2012 WL 3582629 (C.D. Cal. Aug 20, 2012) ("If witnesses

could not testify for the first time as experts, we would have no experts").

The court concludes that Weir's academic training and practical experience qualify him to

testify to the calculation of damages using hedonic regression and conjoint analysis.  First, Weir's

academic training is directly relevant to his testimony.  He holds an MBA; his undergraduate

course work specifically included hedonic regression and conjoint analysis, the two models he

wishes to utilize here.  Weir also has many years of practical experience with economic modeling

and regression analysis.   In addition, he has served as an expert witness in numerous cases,

including *Ebin v. Kangadis Foods, Inc.*, 297 F.R.D. 561, 571 (S.D.N.Y. 2014), a class action

in which the court cited with approval his expert report that "detail[ed] several models for

---

[34]*Id.* at 4 n. 1.

calculating damages for [defendant's] alleged misrepresentation." This combination of educational training and professional experience suffices to qualify him under Rule 702. *Kingsbury v. U.S. Greenfiber, LLC*,No. CV 08–00151 DSF (AGRx), 2013 WL 7018657 (C.D. Cal. Nov. 5, 2013), a case cited by ConAgra, is not to the contrary.[35]  In *Kingsbury*, the court found that a real estate salesman who was designated an expert witness was not qualified to offer an opinion on a developer's duty to disclose to purchasers the use of a particular insulation product at the property because he "had never heard of" the product prior to the litigation, had never sold a home containing it, and had encountered a disclosure issue involving insulation less than six times in his career.  Weir, by contrast, has prior knowledge of, and experience with, the subject of his testimony because he studied and worked with the analytical models forming the basis for his opinion prior to the commencement of this action.

ConAgra next argues that Weir's testimony lacks a reliable factual foundation because he provides an incomplete description of hedonic regression.[36]  Specifically, it asserts that Weir's hedonic regression analysis is unreliable because he fails (1) to identify or define the variables – including the relevant attributes of Wesson products – that he plans to use in his econometric model, (2) to confirm that the data required to execute the planned regression analysis exist or are obtainable, (3) to identify the set of comparator products he would include in his analysis, and (4) to determine the portion of any calculated price premium attributable to interpreting the "100% Natural" label statement as "GMO-free" as opposed to other possible interpretations that are not challenged, e.g., "free of synthetic chemicals" or "free of preservatives."[37]

ConAgra contends that Weir's alternate model of calculating damages, conjoint analysis, is likewise unreliable because Weir has not determined the characteristics of the survey sample he would use in the analysis, the list of relevant product attributes, the sample size of the survey, or whether he would conduct separate surveys in each proposed class state or one large multi-state

---

[35]Reply to Motion to Strike, Docket No. 296 (July 3, 2014) at 6.

[36]Motion at Strike at 5.

[37]*Id.* at 5, 7-8.

survey.[38]  It asserts that Weir fails to provide a concrete methodology for converting output from a conjoint analysis to an actual price premium paid by putative class members, and likewise fails to provide an exhaustive list of product features that he would include in his proposed conjoint survey.[39]  ConAgra also contends that Weir's methodology cannot reliably account for any changes in consumer perceptions of the "100% Natural" statement over the several years of the class period, and cannot demonstrate that consumer perceptions measured at the time the analysis is conducted will reliably reflect perceptions that existed at the beginning of the putative class period.[40]

Plaintiffs counter that a damages expert's testimony at the class certification stage need not be complete, so long as the expert proposes a "reasonable" method of calculating damages.[41] They argue that Weir's declaration satisfies this standard by offering a basic description of the manner in which hedonic regression and conjoint analysis operate, and assert that the exact specifications Weir will use will be solidified as discovery progresses.[42]  They state that any shortcomings in Weir's methodology go only to the merits of his final damages calculation and are not properly considered at the class certification stage.[43]

The court finds plaintiffs' argument unavailing, and the authorities they cite distinguishable. In *Ralston v. Mortg. Investors Grp., Inc.*, No. 08–536–JF (PSG), 2011 WL 6002640, *9 (N.D. Cal. Nov. 30, 2011), defendant Countrywide moved to exclude testimony by Ralston's damages expert, Lyons, on the grounds that his report "offers nothing more than a simplistic spreadsheet amortization table that lacks justification for its assumptions, and furthermore offers only

---

[38]*Id.* at 5-6.

[39]*Id.* at 8.

[40]*Id.*

[41]Opp. Motion to Strike at 12.

[42]*Id.* at 13.

[43]*Id.* at 15.

conclusory assurances that missing functionality can be added with ease." The court disagreed, noting that Lyons had provided "two tables showing hypothetical loan amortization schedules based on whether the additional payment amounts during years 2 through 5 of the loans (due to the annual payment increase included in the loan terms) are applied either to interest only or to principal only." *Id.* at *3, 9. It concluded that Lyons' report "present[ed]  a structure or framework [that could be used] to analyze the actual loan data eventually provided to plaintiffs." *Id.* at *9.

In *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002), the court affirmed the admission of a damages expert's testimony over the opposing party's objection. The expert's regression analysis focused on criteria including employee experience, but did not include criteria such as the employee's qualifications, education level, and preferences. *Id.* at 1188. The defendant argued that the analysis should have been excluded because, *inter alia*, it did not "eliminate all of the possible legitimate nondiscriminatory factors" leading to lower wages and less frequent promotions for the female plaintiffs as compared to their male counterparts. *Id.* The circuit court noted that plaintiff's expert offered a regression analysis that used the "best available data, which [came] from the [defendant] itself." *Id.* at 1189. It also observed that the defendant had not proved at trial that any of the factors it contended on appeal should have been included in the model were actually important in the promotion or compensation process. *Id.* at 1188. The court explained that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility," *id.* at 1188 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)), but that in some cases, "the analysis may be 'so incomplete as to be inadmissible as irrelevant.'" *Id.* (quoting *Bazemore*, 478 U.S. at 400 n. 10).

Here, unlike the experts in *Ralston* or *Hemmings*, Weir does not provide a damages model that lacks certain variables or functionality. Rather, he provides no damages model at all. Although the methodologies he describes may very well be capable of calculating damages in this action, Weir has made no showing that this is the case. He does not identify any variables he intends to build into the models, nor does he identify any data presently in his possession to which the models can be applied. The court is thus left with only Weir's assurance that he can build a

model to calculate damages.  Stated differently, his declaration is "'so incomplete as to be inadmissible as irrelevant.'"  *Hemmings*, 285 F.3d at 1188 (quoting *Bazemore*, 478 U.S. at 400 n. 10).  See *Building Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012) (district court did not abuse its discretion in rejecting the declaration of an expert who "offered unsupported assertions" with "no data forming the basis for [the expert's] assumptions or conclusions"); see *id.* ("The party offering expert testimony has the burden of establishing its admissibility").  Accordingly, the court finds that Weir's declaration does not satisfy the requirements of Rule 702.  The court therefore grants ConAgra's motion to strike Weir's declaration, and will not consider his testimony in deciding the certification motion.

### 2.    Plaintiff's Expert: Charles M. Benbrook, Ph.D

ConAgra next moves to strike the declaration of Dr. Charles M. Benbrook.[44]  Dr. Benbrook has more than thirty years of experience working on the impact of agricultural technology and regulations on pesticides, and the risks they pose to food quality and safety.[45] From 1981 to 1983, Dr. Benbrook served as the staff director for the House subcommittee with jurisdiction over the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).[46] He served as chief scientist for the Organic Center from 2006-2012, and was responsible for tracing developments in the scientific literature, government agencies, food industry, and non-profit organizations with the potential to impact consumer understanding of, and confidence in, the official U.S. Department of Agriculture "certified organic" seal appearing on labels of certified organic food products.[47]  He served on the USDA's AC-21 Agricultural Biotechnology Advisory Committee, which issued a report in 2013 on coexistence between farmers planting fields of

---

[44]Motion to Strike at 8.

[45]Declaration of Charles M. Benbrook, Ph.D. ("Benbrook Decl."), Docket No. 242 (May 5, 2014), ¶ 14.

[46]Benbrook Decl., ¶ 15.

[47]*Id.*, ¶ 17.

organic, conventional non-GE (genetically engineered), and those planting GE crops.[48]   Dr. Benbrook has also served on the technical standards committee of the Non-GMO Project, which manages a labeling program that verifies the absence of GE content in food products.[49]   Since 1990, he has served as president of Benbrook Consulting Services, a small consulting firm that conducts projects on agricultural technology, food safety and quality, and pesticide use and regulation.   He has published a peer-reviewed paper on the impact of GE crops on pesticide use in the United States,[50] and has studied and written extensively on the impact of the commercialization of GE crops on pesticide use and efficacy, as well as their impact on human health and the environment.[51]

Dr. Benbrook opines that GMOs and the food manufactured from them, such as Wesson Oil products, cannot be considered and represented as "natural," based on the definitions, usage, and meaning ascribed to "natural" in various food- and agriculture-related contexts, including consumer surveys.[52]   He bases this opinion on his review of the facts of the case, as well as his analysis of the impacts of the genetic engineering process on the genetic integrity and composition of raw agricultural products, including those from which Wesson Oils are extracted.[53]

ConAgra argues that Dr. Benbrook's testimony is unreliable because it is not based on scientific methods or data, but is merely rhetorical, and therefore incapable of being tested.[54]   It asserts that Dr. Benbrook simply cites the opinions of various governmental agencies, and

---

[48]*Id.*, ¶ 19.

[49]*Id.*, ¶ 20.

[50]*Id.*, ¶ 27.

[51]*Id.*, ¶ 23.

[52]*Id.*, ¶¶ 1-2, 4.

[53]*Id.*, ¶ 5.

[54]Motion to Strike at 9.

definitions of industry groups, to support his semantic conclusion that GMOs are not "natural."[55] This testimony, ConAgra contends, does not assist the trier of fact because it largely discusses and describes widely available facts, including basic genetic terminology and processes.[56]

The mere fact that Dr. Benbrook does not rely on a testable methodology does not render his testimony inadmissible under *Daubert*. The Supreme Court has repeatedly clarified that the "factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue. . . ." *Kumho Tire*, 526 U.S. at 150. The *Daubert* factors are not exhaustive, and the Court's task is not to apply *Daubert* as "a definitive checklist or test," but to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the field." *Id.* at 152. See *Boyd v. City and County of San Francisco*, 576 F.3d 938, 945 n. 4 (9th Cir. 2009) (noting that *Daubert's* list of factors neither necessarily nor exclusively applies to all experts in every case); *Liberty Life Ins. Co. v. Myers*, No. CV 10–2024–PHX–JAT, 2013 WL 524587, *3 (D. Ariz. Feb. 11, 2013) ("It is also well-settled that the four Daubert factors – testing, peer review, error rates, and acceptability in the relevant scientific community – are merely illustrative, not exhaustive, and may be inapplicable in a given case"). While courts often focus on whether an expert's methodology can be tested, see, e.g., *Daubert*, 43 F.3d 1311, 1319 (9th Cir. 1995) (holding that expert testimony was inadmissible under Rule 702 where the expert offered "no tested or testable theory to explain how, from [ ] limited information, he was able to eliminate all other potential causes"); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, 978 F.Supp.2d 1053, 1077 (C.D. Cal. 2013) ("Muckenhirn may not testify regarding the existence or effect of the software bug identified as the FTB, nor may any other expert" because "although the FTB was testable, it had not been tested"), this is not an absolute. Rather, some expert testimony is properly based on relevant knowledge and experience of a type that cannot be tested. See, e.g., *Speicher v. Union Pacific R.R.*, No. C07–05524 RBL, 2009 WL

---

[55]*Id.* at 10.

[56]*Id.* at 11.

250026, *3 (W.D. Wash. Feb. 2, 2009) ("General views about railroad operations and safety cannot be tested, are not appropriate subjects of peer review, and do not have a known potential rate of error.  Further, no relevant scientific community exists to accept the views. . . .  Due to the generic nature of Mr. Beall's testimony, an intense, methodical investigation of its merits is unnecessary.  The Court is satisfied merely to evaluate whether Mr. Beall's testimony is properly grounded in relevant experience and knowledge").

Given the wide variety of expert testimony that is offered in cases pending in federal court, a district court has broad discretion in determining the relevant factors to employ in assessing the reliability of expert testimony.  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) ("Indeed, not only must the trial court be given broad discretion to decide whether to admit expert testimony, it 'must have the same kind of latitude in deciding how to test an expert's reliability'").  Here, the bulk of Dr. Benbrook's declaration focuses on the process of genetic engineering, the impacts of that process on GE crops and the products derived therefrom, and whether those impacts occur – or could occur – absent the application of GE techniques.  These opinions are testable because they can be independently verified or objectively challenged.  See FED.R.EVID. 702 Advisory Committee Notes (*Daubert*'s testability factor means capable of being "challenged in some objective sense").  Consequently, the court finds these opinions sufficiently reliable.

The court also concludes that Dr. Benbrook's testimony regarding the processes used to create GE foods, and whether the crops created through genetic engineering could develop in nature and absent genetic engineering, will assist the trier of fact.  "Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702."  *Mukhtar v. California State Univ.*, 299 F.3d 1053, 1063 n. 7 (9th Cir. 2002).  Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert "may testify thereto."  FED.R.EVID. 702.  "Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact."  *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002).  Here, the genetic engineering process described by Dr. Benbrook is highly technical and certainly cannot be considered common knowledge.  The

same can be said of Dr. Benbrook's testimony regarding the increase in the production of GE crops.

The court reaches a different conclusion, however, regarding Dr. Benbrook's opinions regarding the meaning of the word "natural." "Natural" is a commonly understood term, and it is questionable that the jury needs any help defining it. That this is so is confirmed by the dictionary definitions and government communications and regulations he cites, all of which employ a common sense definition of "natural" – i.e., existing in nature, and nothing artificial or synthetic. The court does not believe that jurors need assistance defining "natural" because it is not a matter that is beyond their ordinary competence or experience. See *United States v. Seschillie*, 310 F.3d 1208, 1212 (9th Cir. 2012) ("'A district court does not abuse its discretion when it refuses expert testimony where the subject does not need expert 'illumination' and the proponent is otherwise able to elicit testimony about the subject,'" quoting *United States v. Ortland*, 109 F.3d 539, 545 (9th Cir. 1997)). Accordingly, the court strikes those portions of Dr. Benbrook's declaration that discuss the meaning of the word natural as found in dictionaries and government communications or regulations. As noted *infra*, however, based on his understanding of the process used to make genetically engineered foods, Dr. Benbrook can testify that in his opinion, foods that contain genetically engineered ingredients are not natural. If this opinion is challenged on the basis that he is interpreting natural in an unusual or abnormal way, Dr. Benbrook can testify to the sources on which he relied in formulating his definition of the term "natural."

ConAgra moves specifically to strike Dr. Benbrook's opinions concerning consumers understanding of "natural" based on consumer surveys he has read.[57] In particular, it seeks to strike his opinion that "[t]here is considerable agreement across surveys on the core elements of what a 'natural' food product is, and the most frequently cited core attributes of a 'natural' food typically include minimally processed, no use of pesticides, no added synthetic or artificial ingredients, and 'not genetically engineered' (in the case of fresh, whole foods), or 'not derived

---

[57]*Id.* at 14. See Benbrook Decl., ¶¶ 35-45.

from a genetically engineered crop' (in surveys encompassing processed foods)."[58]   ConAgra argues that Dr. Benbrook is not qualified to testify regarding consumer surveys because he lacks any marketing experience or expertise.[59]   It asserts his opinion that "[t]here is considerable agreement across surveys" that "natural food products" are not made of, or derived from, genetically engineered crops is based on two surveys only, neither of which supports his opinion.[60] Furthermore, it contends the opinion is not reliable because Dr. Benbrook has not read the surveys he purportedly interprets, as the exhibit to his declaration that identifies references cited in his report or on which he relied lists only partial summaries of the studies.[61]   Because he has not reviewed the full surveys, ConAgra argues, Dr. Benbrook cannot evaluate the study methodology or determine the relevance of the studies' findings.[62]   ConAgra asserts the opinions should be stricken for the additional reason that Benbrook merely repeats numbers from documents, which will not assist the trier of fact.[63]

So long as the surveys are relevant and reliable, Dr. Benbrook need not be an expert in survey methodology to incorporate the results of surveys into his work.  See *Cook v. Rockwell Intern. Corp.*, 580 F.Supp.2d 1071, 1138 n. 72 (D. Colo. 2006) ("Defendants contend Mr. Hunsperger is not qualified to use the survey results in any fashion because he is not an expert in designing, administering or interpreting raw data from public opinion surveys.  Mr. Hunsperger, however, need not be qualified as an expert in these matters in order to incorporate the Flynn/Slovic survey results in his own work, particularly when I have already found that the survey is relevant, reliable and admissible in its own right").  As the court has already concluded,

---

[58]Motion to Strike at 14; Benbrook Decl., ¶ 36.

[59]Motion to Strike at 14.

[60]*Id.*; Benbrook Decl., ¶ 36.

[61]Motion to Strike at 15.

[62]*Id.*

[63]*Id.* at 16.

however, the general meaning of "natural" is not a subject as to which jurors need assistance. Jurors might benefit from assistance as to whether consumers generally equate "natural" with an absence of genetically modified ingredients, however.  Nonetheless, the court has no means of judging the reliability of the two surveys Dr. Benbrook cites, since neither is before the court. Compare *id.* at 1124-29.    Thus, the court cannot determine that it was appropriate for Dr. Benbrook to rely on the survey results.  Moreover, Dr. Benbrook's rather sweeping conclusion that "[t]here is considerable agreement across surveys,"[64] when he relies on only two does not seem to be a reliable opinion.

ConAgra asserts that Dr. Benbrook's testimony regarding survey data consists merely of repeating figures generated by studies conducted by other experts.  An expert's sole or primary reliance on the opinions of other experts raises serious reliability questions.  See *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 629 (W.D. Wash. 2011) ("Dr. Polissar's expert report is deficient in several ways. First, although his opinions are based on Dr. Siskin's data and methodology, there is nothing in the record to indicate that Dr. Polissar has tested Dr. Siskin's underlying data to ensure its reliability or that Dr. Polissar even has access to Dr. Siskin's underlying data"); *In re Imperial Credit Indus., Inc. Securities Litig.*, 252 F.Supp.2d 1005, 1012 (C.D. Cal. 2003) ("The rules do not permit an expert to rely upon excerpts from opinions developed by another expert for the purposes of litigation"); see also *Tokio Marine & Fire Ins. Co., Ltd. v. Norfolk & Western Ry. Co.*, No. 98–1050, 98–1077, 1999 WL 12931, *4 (4th Cir. Jan. 14, 1999) (Unpub. Disp.) ("[O]ne expert may not give the opinion of another expert who does not testify"); *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not").

By contrast, an expert can appropriately rely on the opinions of others if other evidence supports his opinion and the record demonstrates that the expert conducted an independent evaluation of that evidence.  See *Jerpe v. Aerospatiale*, No. CIV. S–03–555 LKK/DAD, 2007 WL

---

[64]Benbrook Decl., ¶ 36.

1394969, *6 (E.D. Cal. May 10, 2007) (crediting an expert's declaration that he "independently arrived" at his opinions despite "deposition testimony [that] was somewhat ambiguous on the issue of whether [expert] was merely relying on the same underlying data set produced at the direction of [another expert]"); *Gray v. United States*, No. 05cv1893 J(BLM), 2007 WL 4644736, *8 (S.D. Cal. Mar. 17, 2007) ("Ms. Hyland[ ] . . . states that she considered all of the input and also considered information from the San Diego County Medical Society and from a compendium of physician compensation studies. In light of Ms. Hyland's indication that she has interviewed Dr. Gray, reviewed medical records, as well as consulted with search firms, the Court declines to, at this time, take the drastic measure of excluding her report and testimony").

As proof that Dr. Benbrook is merely "parroting" the opinions of other experts and presenting them as his own, ConAgra cites a sentence Benbrook copied verbatim from the Leatherhead article, *Do "natural" claims cut the mustard?* It states that "Leatherhead Food Research delivers integrated scientific expertise, international regulatory advice and independent market insights to the global food, drink and related industries."[65] While Dr. Benbrook appears to have copied this statement from Leatherhead's materials, it is merely a description of Leatherhead's business, not an opinion relevant to the issues raised by this litigation. ConAgra cites no other portions of Benbrook's declaration that have been lifted from source materials. Nonetheless, as Dr. Benbrook has no expertise in marketing or consumer reactions, the fact that he offers opinions concerning consumers' interpretation of the word "natural" based on two market surveys indicates that he has merely reviewed the surveys prepared by marketing experts and is reporting what they found. There is no indication in his declaration that he has independently tested or evaluated the results of the surveys or otherwise personally researched what consumers believe "natural" in terms of the presence of absence of genetically modified organisms or GMO ingredients. Consequently, the court concludes that Dr. Benbrook cannot

---

[65]Compare Benbrook Decl., ¶ 39, with Declaration of Henry J. Kelston ("Kelston Decl."), Docket No. 244 (May 5, 2014), Exh. 23 at 3.

offer an expert opinion concerning whether or not consumers believe that a food labeled "natural" contains GMO ingredients.[66]

ConAgra argues finally that Dr. Benbrook's declaration includes opinions on the ultimate issue in this case: whether the "100% Natural" label on Wesson Oil products is fraudulent and misleads consumers.  It asserts that as a result, his opinion constitutes an improper legal conclusion.[67]  Specifically, ConAgra contends that the following opinions Dr. Benbrook offers are legal conclusions, and must be stricken:

1.      "It is my opinion, based on my preliminary examination of the facts in this case, that, since 1997, an increasing share of Wesson Oils were extracted from GE corn, soybeans, or canola, thus rendering it impossible for ConAgra to honestly represent that the Wesson Oil products at issue in this litigation are 'natural[.]'"[68]

2.      "[F]ood ingredients and products derived from such GE crops are not natural[.]";[69]

---

[66]ConAgra also contends that Dr. Benbrook did not review full versions of the studies he cites.  Plaintiffs acknowledge that Dr. Benbrook did not have access to the full 2010 Hartman report, *Beyond Natural and Organic*, at the time he prepared his declaration, but state that he has access to it now, has reviewed it, and is prepared to testify regarding its contents.  Plaintiffs proffer no declaration by Dr. Benbrook to this effect, however.  Thus, this statement is merely attorney argument, and is not evidence the court can consider in determining the reliability of Dr. Benbrook's testimony.  Plaintiffs further state, however, that the data set forth in paragraphs 43 and 44 of Dr. Benbrook's declaration, which discusses the Hartman Report, are extracted from another study referenced in Appendix D, *Consumer confusion about the difference: "Natural" and "Organic" product claims*, a White Paper by the Canada Organic Trade Organization.  Even had Dr. Benbrook reviewed full copies of both surveys, the court would exclude his opinion concerning consumer interpretation of the term "natural" for the reasons stated in text.

Because the court reaches this conclusion, it need not consider ConAgra's argument that other surveys contradict the findings of the Leatherhead and Hartman surveys.

[67]Motion to Strike at 12.

[68]Benbrook Decl., ¶ 7.

[69]*Id.*, ¶ 8(c).

3.   "[T]he attributes in a food product that consumers seek when they choose a product, like Wesson Oil, that is labeled '100% Natural' are inherently inconsistent with that product's derivation from GE crops."[70]

4.   "Regardless of the specific methods used to create a given GE event within an existing, commercial corn, soybean, or canola variety, the process relied upon is inherently artificial and unnatural."[71]

5.   "Biotechnology industry leaders have issued formal statements and definitions discussing the nature of food produced from GE crops that confirm the unnatural nature thereof."[72]

6.   "Accordingly, based on my expert understanding of the genetic engineering process and my experience in this field, it is my opinion that the evidence summarized above demonstrates that the Wesson Oils that ConAgra, during the Class Period, represented and sold as being '100% Natural' were falsely and deceptively labeled, in that they unquestionably contained oils derived from unnatural GE corn, soybeans, and canola."[73]

While an expert witness may not testify to a legal conclusion, he may testify to an ultimate issue of fact. *Mukhtar*, 299 F.3d at 1066 n. 10 ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law"); *Wiles v. Dep't of Educ.*, Nos. 04–00442 ACK–BMK, 05–00247 ACK–BMK, 2008 WL 4225846, *1 (D. Haw. Sept. 11, 2008) ("[W]hile an expert witness generally may give opinion testimony that embraces an ultimate issue to be decided by the trier of fact, that expert may not express a legal opinion as to the ultimate legal issue"); see FED.R.EVID. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue"); see also *id.*, 1972 Advisory Committee Notes ("The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In

---

[70]*Id.*, ¶ 8(e).

[71]*Id.*, ¶ 141.

[72]*Id.*, ¶ 196.

[73]*Id.*, ¶ 320.

1   order to render this approach fully effective and to allay any doubt on the subject, the so-called

2   'ultimate issue' rule is specifically abolished by the instant rule").

3   "Courts have held that expert witnesses' use of 'judicially defined terms,' 'terms that

4   derived their definitions from judicial interpretations,' and 'legally specialized terms' . . .

5   constitute[s] [an] expression of opinion as to the ultimate legal conclusion." *Wiles*, 2008 WL

6   4225846 at *1. Dr. Benbrook's opinions that Wesson Oil products are not natural go only to the

7   ultimate issue of fact, and are therefore admissible. The same can not be said, however, regarding

8   his opinion that ConAgra "falsely and deceptively labeled" its products. "False" and "deceptive"

9   are judicially defined terms. Accordingly, his use of these terms constitutes the offering of an

10  improper legal opinion that usurps the role of the court. See *S.E.C. v. Leslie*, No. C 07–3444,

11  2010 WL 2991038, *9 (N.D. Cal. July 29, 2010) (excluding expert's opinion because "it is for

12  the jury to determine whether Defendants' statements in fact were misleading"); *F.T.C. v.*

13  *Stefanchik*, No. C04-1852RSM, 2007 WL 4570879, *1 (W.D. Wash. Feb. 15, 2007) (expert's

14  opinion that defendant's materials are not unfair, false, misleading or deceptive was an

15  impermissible legal conclusion).[74]

16

---

17  [74]ConAgra also argues more broadly that because plaintiffs argued in their opposition to

18  its motion to dismiss that no expert testimony would be necessary to determine whether the "100%

    Natural" claim is misleading, they are now judicially estopped from offering expert testimony on

19  the subject. "Judicial estoppel is an equitable doctrine that precludes a party from gaining an

20  advantage by asserting one position, and then later seeking an advantage by taking a clearly

    inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir.

21  2001). "Th[e] court invokes judicial estoppel not only to prevent a party from gaining an

22  advantage by taking inconsistent positions, but also because of 'general consideration[s] of the

    orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect

23  against a litigant playing fast and loose with the courts.'" *Id.* (quoting *Russell v. Rolfs*, 893 F.2d

    1033, 1037 (9th Cir. 1990)).

24  In determining whether to find that a party is judicially estopped, courts consider

25  (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) whether

    the party succeeded in persuading the court to accept the earlier position, such that judicial

26  acceptance of a later inconsistent position would create "the perception that either the first or

27  second [time the] court was misled"; and (3) whether the party seeking to assert an inconsistent

    position would derive an unfair advantage or impose an unfair detriment on the opposing party

28  if not estopped. *Id.* at 782-83 (citing *New Hampshire v. Maine*, 532 U.S. 742 (2001)). See also

For all of these reasons, the court grants ConAgra's motion to strike Dr. Benbrook's testimony regarding definitions of the word "natural" on the grounds that it will not assist the trier of fact. The court also strikes Dr. Benbrook's testimony concerning consumer surveys regarding the meaning on the word "natural" and whether it encompasses genetically modified organisms or GMO ingredients. Finally, the court strikes Dr. Benbrook's opinion that ConAgra "falsely and deceptively labeled" its products. The court declines to strike Dr. Benbrook's testimony regarding GE processes, their impact on crops and food products, and whether those impacts occur in nature without the application of GE techniques. It also declines to strike his opinion, based on his understanding of the process used to make genetically engineered foods, that foods that contain genetically engineered ingredients are not natural.

### 3.   ConAgra's Expert Dominique M. Hanssens, Ph.D

Dr. Dominique M. Hanssens is a professor of marketing at the UCLA Anderson School of Management, where he has served on the faculty since 1977.[75] He has taught course on Elements of Marketing, Marketing Strategy & Planning, and Customer Information Strategy.[76] His research focuses on strategic marketing problems involving data-analytic methods such as econometrics and time-series analysis.[77] From July 2005 to June 2007 he served as the Executive

---

*Ceja-Corona v. CVS Pharm., Inc.*, No. 1:12–cv–01703–AWI–SAB, 2014 WL 1679410, *9 (E.D. Cal. Apr. 28, 2014) (listing factors).

In opposing ConAgra's motion to dismiss, plaintiffs argued that the action should not be stayed or dismissed under the "primary jurisdiction" doctrine because FDA agency expertise was not required to determine whether the "100% Natural" claim is misleading. Here, plaintiffs proffer Dr. Benbrook's testimony under Rule 702, which requires only that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." FED.R.EVID. 702. The two positions are not "clearly inconsistent"; rather, they are compatible. Accordingly, the court concludes that judicial estoppel does not apply to bar Dr. Benbrook's testimony.

[75] Hanssens Decl., ¶ 1.

[76] *Id.*, ¶ 1.

[77] *Id.*, ¶ 2.

Director of the Marketing Science Institute in Cambridge, Massachusetts.[78] He is also a founding partner of MarketShare, a global marketing analytics firm.[79]

Dr. Hanssens opines that there is a high degree of heterogeneity in the consumer purchase process, and that consumer purchase decisions are influenced by a variety of factors upon which consumers place different weights.[80] Dr. Hanssens opines that the term "100% Natural" has no fixed or universal meaning, and that the sources on which Dr. Benbrook relied in forming his opinion are not to the contrary.[81] Dr. Hanssens conducted a survey in which participants were divided between a "Test Group" and a "Control Group." The former were shown an actual Wesson Vegetable Oil label, while the latter were shown the same label but with all references to "100% Natural" removed.[82] Participants were asked: "Assuming you were intending to buy vegetable oil today, how likely would you be to buy this product based on the information you've been provided?" The two groups' responses differed by just 1.1%, an amount that is not statistically significant.[83] When asked whether they believed the product was free of GMO ingredients, 40.3% and 35.7% of respondents in each group respectively answered "yes," a difference of 4.6%, which likewise is not statistically significant.[84] Dr. Hanssens opines that the survey's results show that the "100% Natural" label on Wesson cooking oils does not have a material effect on consumer purchasing intent, or on consumer beliefs as to whether Wesson cooking oils are free of GMO ingredients.[85]

---

[78]*Id.*, ¶ 3.

[79]*Id.*, ¶ 4.

[80]*Id.*, ¶ 12.

[81]*Id.*, ¶¶ 15-16.

[82]*Id.*, ¶ 42.

[83]*Id.*, ¶¶ 51-52.

[84]*Id.*, ¶ 58.

[85]*Id.*, ¶¶ 13-14.

Plaintiffs argue that Dr. Hanssens failed to use an acceptable survey design, and that his findings are rebutted by surveys conducted by other organizations as well as by ConAgra's own market research.[86]  They proffer the declaration of Dr. Elizabeth Howlett, who opines that Dr. Hanssens' survey suffers from "a number of shortcomings and fatal methodological flaws that render the survey results meaningless."[87]  The methodological flaws she identified include (1) a

---

[86]Objections to Declaration of Dominique M. Hanssens ("Obj. to Hanssens Decl."), Docket No. 282 (June 30, 2014) at 2.

[87]Declaration of Dr. Elizabeth Howlett ("Howlett Decl."), Docket No. 288 (June 30, 2014), ¶ 17.  Dr. Howlett also opines on the level of importance consumers attach to "natural" claims on food products in general and to the "100% Natural" label on Wesson Oils in particular. She also discusses a survey conducted for plaintiffs by Dr. John C. Kozup that was designed to measure consumer perceptions as to whether a "100% Natural" claim is consistent with the use of GMO ingredients.  (*Id.*, ¶ 1; Declaration of Adam J. Levitt ("Levitt Decl."), Docket No. 287 (June 30, 2014), Exh. J (Kozup Survey).)  ConAgra objects that Dr. Howlett's declaration is untimely and that the court should not consider evidence offered for the first time in reply.  (Reply to Motion to Strike at 13-14.)  In general, a court will not consider evidence submitted for the first time in reply without giving the opposing party an opportunity to respond. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (district court should not consider new evidence presented in a reply without giving the non-movant an opportunity to respond); see *Green v. Baca*, 219 F.R.D. 485, 487 n. 1 (C.D. Cal. 2003) (exercising discretion to consider evidence presented in reply but affording plaintiff an opportunity to depose a key declarant).  Evidence submitted in direct response to evidence raised in the opposition, however, is not "new." *Edwards v. Toys "'R' US*, 527 F.Supp.2d 1197, 1205 n. 31 (C.D. Cal. 2007 ) ("Evidence is not 'new,' however, if it is submitted in direct response to proof adduced in opposition to a motion"); see *Terrell v. Contra Costa County*, 232 Fed. Appx. 626, 629 n. 2 (9th Cir. Apr. 16, 2007) (Unpub. Disp.) (evidence adduced in reply was not new where "[t]he Reply Brief addressed the same set of facts supplied in Terrell's opposition to the motion but provides the full context to Terrell's selected recitation of the facts").  Here, Dr. Howlett's opinions regarding Dr. Hanssens' survey respond directly to evidence adduced by ConAgra in its opposition to plaintiffs' class certification motion.  Dr. Howlett's testimony on this topic, therefore, is not "new," and the court will consider it deciding plaintiffs' motion.  The same cannot be said for Dr. Howlett's other opinions, which either constitute additional evidence supporting arguments plaintiffs raised in their motion or constitute completely new evidence offered for the first time in reply, e.g., Dr. Kozup's survey.  The court therefore declines to consider Dr. Howlett's opinions regarding the importance consumers attach to "natural" claims on food products and the Kozup survey.

On July 11, 2014 – the Friday before the Monday hearing on plaintiffs' motion – plaintiffs filed a response to ConAgra's evidentiary objections to Howlett's declaration and the Kozup survey, as well as to a rebuttal declaration filed by Weir (see *infra* n. 133).  (Plaintiffs' Response to Defendant ConAgra Foods, Inc.'s Evidentiary Objections to New Evidence Submitted for the

failure to adduce any evidence Test Group participants actually perceived the "100% Natural" label, (2) a failure to control for participants' prior knowledge and pre-existing beliefs, (3) a failure to control for participants' confusion regarding the meaning of "GMO," (4) a failure to include measures to ensure participants are paying attention to the survey, (5) a failure to screen for contradictory or meaningless responses, (6) a failure accurately to interpret open-ended answers, (7) a failure to utilize a representative sample, (8) a failure to analyze non-response and dropout rates, and (9) a failure to control for bias.[88]

While plaintiffs are correct that *Daubert* governs the admissibility of survey data, the Ninth Circuit has held that "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997). See *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n. 8 (9th Cir. 1997) ("However, 'as long as they are conducted according to accepted principles,' survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value," quoting *Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992)); *id.* at 1143 (the fact that a survey that was conducted only in the southern portion of the state and asked leading questions went to the weight of the evidence, not the admissibility of the survey); see also *Clicks Billiards,*

---

First Time on Reply in Support of Plaintiffs' Motion for Class Certification ("Reply Evidence Response"), Docket No. 299 (July 11, 2014).) Plaintiffs argued that Kozup's survey was rebuttal evidence because it was proffered in response to Hanssens' survey. (*Id.* at 10.) For the reasons already stated, the court does not agree with this characterization of plaintiffs' evidence. Citing *Smith v. Microsoft Corp.*, No. 11-CV-1958 JLS (BGS), 2013 WL 6497073 (S.D. Cal. Dec. 10, 2013) and *All Star Seed v. Nationwide Agribusiness Ins. Co.*, No. 12cv146 L(BLM), 2014 WL 1286561 (S.D. Cal. Mar. 31, 2014), plaintiffs contended that even if the filings do not qualify as rebuttal evidence, the court should still consider them, afford ConAgra an opportunity "orally [to] rebut the new evidence during [the] hearing," or construe ConAgra's objections as a legally sufficient response. (*Id.* at 8.) The court finds the cases cited distinguishable, as the *Smith* and *All Star* courts each determined that evidence or argument submitted for the first time in reply was not "new." Moreover, given the technical nature of the new evidence plaintiffs have adduced, affording ConAgra an opportunity to rebut it orally or considering ConAgra's evidentiary objections a sufficient response would prejudice ConAgra.

[88]Howlett Decl., ¶¶ 48-63.

*Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) ("Treatment of surveys is a two-step process.  First, is the survey admissible?  That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles?  This threshold question may be determined by the judge.  Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility. These are issues for a jury or, in a bench trial, the judge"); *Alcantar v. Hobart Serv.*, No. ED CV 11–1600 PSG (SPx), 2013 WL 156530, *4 (C.D. Cal. Jan. 15, 2013) ("[A]ny problems with the response rate affect the weight, and not the admissibility of the study"); *Microsoft Corp. v. Motorola Inc.*, 904 F.Supp.2d 1109, 1120 (W.D. Wash. 2012) (criticisms of a conjoint analysis concerned "issues of methodology, survey design, reliability, and critique of conclusions, and therefore [went] to the weight of the survey rather than admissibility"); *Harris v. Vector Marketing Corp.*, 753 F.Supp.2d 996, 1001-02 (N.D. Cal. 2010) ("[Plaintiff] criticizes the content of the survey conducted and prepared by [defendant's expert] as well as the response rate to the survey. The problem for [Plaintiff] is that, as she herself admits in her brief, even challenges to defects in methodology normally affect the weight to be accorded the survey and not its admissibility"); *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 780 F.Supp. 1283, 1296 (N.D. Cal.1991) (holding that the alleged under-inclusiveness of a survey in a copyright infringement action affected "the weight of the survey, not its admissibility"), aff'd, 964 F.2d 965 (9th Cir. 1992), cert. denied, 507 U.S. 985 (1993).

Plaintiffs do not challenge Dr. Hanssens' expertise, nor does it appear they could, given his extensive experience.  As for the relevance of the survey results, Dr. Hanssens' findings regarding the impact the "100% Natural" label has on consumer purchasing decisions, and whether consumers associate "100% Natural" with products free of GMO ingredients, are probative as to whether the label misleads consumers and causes them to believe Wesson Oil products do not contain GMO ingredients.  The court has some concerns regarding the survey design, particularly Dr. Hanssens' decision to utilize a sample consisting of unequal proportions of females in the Test Group and Control Group – 62.9% and 52.9% respectively.  Both of these

percentages fall below the 80% ConAgra requires in the marketing studies it commissions, suggesting that it believes women make up approximately 80% of its consumers.[89]  The court concludes, however, that such concerns go to the weight of Dr. Hanssens' survey, and do not render it inadmissible under Rule 702.[90]

Plaintiffs also urge the court to exclude the survey as unduly prejudicial under Rule 403 of the Federal Rules of Evidence.  Rule 403 requires the court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  FED.R.EVID. 403.  Although the survey is prejudicial to plaintiffs' position, the prejudice is not "unfair."  See *Hankey*, 203 F.3d at 1172 (evidence is unfairly prejudicial only if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one," citing FED. R. EVID. 403 , Advisory Committee Notes); see also *Old Chief v. United States*, 519 U.S. 172, 179 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged" (citation omitted)).  Nor does any prejudice substantially outweigh the probative value of the evidence.  The court therefore declines to strike Dr. Hanssens' testimony.

---

[89]Hanssens Decl., Exh. 5.1 at 107; Howlett Decl. at 15; Levitt Decl., Exh. F at 3706.

[90]Dr. Howlett's other criticisms likewise go to the weight of the survey data, but do not render it inadmissible.  He asserts, for example, that the survey fails to ensure respondents actually viewed the "100% Natural" label, because the survey did not obtain data concerning the length of time respondents viewed the label, did not ask whether the label said "100% Natural," and did not include attention checks to ensure respondents were paying attention.  She also states that the survey failed to consider respondents' prior knowledge and beliefs.  While these purported deficiencies may affect the weight to be given to the survey's conclusions about consumer attitudes toward the "100% Natural" label, they are proper subjects for cross-examination, not a basis for excluding Dr. Hanssens' testimony regarding the survey. See *Wendt*, 125 F.3d at 814; *Southland Sod Farms*, 108 F.3d at 1143 n. 8.

### B.     Legal Standard Governing Class Certification

A district court may certify a class only if:

"(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

FED.R.CIV.PROC. 23(a).

In addition, a district court must also find either that at least one of the several conditions set forth in Rule 23(b) is met.  "Rule 23(b)(1) allows a class to be maintained where 'prosecuting separate actions by or against individual class members would create a risk of' either '(A) inconsistent or varying adjudications,' or '(B) adjudications . . . that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede[ ] their ability to protect their interests.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2549 n. 2 (2011).

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED.R.CIV.PROC. 23(b)(2).  The Supreme Court has not yet decided whether this rule "applies only to requests for such injunctive or declaratory relief and does not authorize the class certification of monetary claims at all." *Dukes*, 131 S. Ct. at 2557.  It has concluded, however, "that, at a minimum, claims for individualized relief . . . do not satisfy the Rule." *Id.*  Thus, "it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.*

"Rule 23(b)(3) states that a class may be maintained where 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id.* at 2549 n. 2.

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 2551.  Thus, "[t]he party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir.), amended, 273 F.3d 1266 (9th Cir. 2001)); see also *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  A class can be certified only if the court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-61 (1982).  As the Supreme Court has noted, "[f]requently . . . 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 131 S. Ct. at 2551.

Plaintiffs seeks to certify the following twelve separate statewide classes:

> All persons who reside in the States of California, Colorado, Florida, Illinois, Indiana, Nebraska, New Jersey, New York, Ohio, Oregon, South Dakota, or Texas who have purchased Wesson Oils within the applicable statute of limitations periods established by the laws of their state of residence (the "Class Period") through the final disposition of this and any and all related actions.[91]

### C.   Whether the Proposed Class Should Be Certified

#### 1.   Standing

As a threshold matter, ConAgra contends that the named plaintiffs lack standing because they have suffered no injury.[92]  Specifically, ConAgra argues that after filing the lawsuit, plaintiffs continued to purchase cooking oils and other products that were labeled "natural" but contained

---

[91]Motion at 11-12.

[92]Opp. Cert. at 15.

non-organic GMO ingredients.[93]  It asserts plaintiffs cannot prove measurable damages because although they allege they paid a premium for Wesson Oils because it was labeled "100% Natural," they are unable determine the price they paid for Wesson products and have no means of acquiring this information.[94]

The court finds these arguments unavailing.  First, each plaintiff testified that he or she purchased Wesson Oil during the class period.[95]  Plaintiffs contend they were damaged because

---

[93]*Id.*

[94]*Id.*

[95]ConAgra argues that plaintiff Pauline Michael testified she did not purchase Wesson Oil products during the three-year limitations period for consumer protection claims in Illinois, 815 ILCS §§ 505/1 *et seq.*, and that she accordingly lacks standing to represent an Illinois class on this claim.  ("Q. Have you bought any Wesson Oil since June 27, 2007?  A. No, I don't believe so." (Declaration of Robert B. Hawk ("Hawk Decl."), Docket No. 269 (June 2, 2014), Exh. D at 80:1-4.)) With their reply, plaintiffs submitted Michael's declaration, in which she states that she incorrectly recalled the date of her last purchase of Wesson Oil during her deposition, and that she in fact has in fact purchased the product since June 27, 2007.  (Reply Declaration of Plaintiff Pauline Michael ("Michael Decl."), Docket No. 286 (June 30, 2014), ¶¶ 6-8.)  Although submitted in reply, this evidence responds directly to the deposition testimony ConAgra adduced in support of its opposition.  Accordingly, Michael's reply declaration is not "new" and the court will not decline to consider it on this basis.  Ordinarily, however, when a declaration directly contradicts prior deposition testimony, the deposition testimony controls and the declaration must be disregarded.  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony").  To determine whether such a declaration can be considered, the court must make a factual determination as to whether the declaration is a "sham." *Id.* at 266-67 (limiting the rule first articulated in *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543-44 (9th Cir. 1975)).  An affidavit is not a sham if: (1) it "merely elaborat[es] upon, explain[s] or clarif[ies] prior testimony," *Messnick v. Horizon Industries , Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995); (2) if "the witness was confused at that time of the earlier testimony and provides an explanation for the confusion," *Pacific Ins. Co. v. Kent*, 120 F.Supp.2d 1205, 1213 (C.D. Cal. 2000) (citing *Kennedy*, 952 F.2d at 266); or (3) if the declaration concerns newly discovered evidence, *id.*  See also *Van Asdale v. Int'l Game Tech .*, 577 F.3d 989, 998-99 (9th Cir. 2009) ("the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit"); *id.* at 999 ("minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit"); *Kennedy*, 952 F.2d at 267 (before testimony is designated "sham," it must "flatly contradict[ ] earlier testimony").  Michaels states

ConAgra misleadingly labeled the products "100% Natural," which "caus[ed] them to pay higher market prices for those Wesson Oils than [they] would have otherwise paid . . . without that claim."[96]  Although plaintiffs' purchases of other products labeled "natural" and containing GMO ingredients may seriously undercut their claim that their purchasing decision was influenced by ConAgra's "100% Natural" label, the purchases do not deprive plaintiffs of standing to assert the claims they plead in this action.  Moreover, although the court has stricken Weir's declaration for purposes of this proceeding, it notes that plaintiffs can prove damages without recalling the price they paid for Wesson Oils or producing documentation of their purchases.  Data from Information Resources, Inc. may well permit plaintiffs to determine the price range of Wesson Oil in their region of the country during the class period or at the times they recall purchasing the product.[97]

---

that she was asked repeatedly during her deposition when she last purchased Wesson, and had trouble recalling the date. (Michael Decl., ¶ 5.)  She states that she stopped purchasing Wesson Oils after making changes to her diet, and that she estimated the year of her last purchase by estimating the year when she altered her diet; she based her estimate on her probable age at the time of the dietary changes. (*Id.*, ¶¶6-7.)  She explains she later realized that because the dietary changes were prompted by a car accident that occurred in September 2008, her last purchase of Wesson Oils must have occurred after June 27, 2007.  (*Id.*, ¶ 8.)  The court is satisfied by Michaels' explanation and concludes that the contradictory testimony was the result of an honest discrepancy or mistake.  See *Van Asdale*, 577 F.3d at 999; *Calloway v. Contra Costa County Jail Correctional Officers*, No. C 01-2689 SBA, 2007 WL 134581, *17 (N.D. Cal. Jan. 16, 2007) ("Defendants offer many instances from Plaintiff's deposition testimony where he was unable to remember dates, but the *Kennedy* court was clear that discrepancies due to honest mistake do not constitute 'sham' testimony.  The Court declines to exclude the declaration as a sham").  Accordingly, the court declines to strike the declaration, and finds that Michaels has standing to represent the Illinois class on the consumer protection claim.

[96]Reply in Support of Motion to Certify Class ("Reply"), Docket No. 284 (June 30, 2014) at 12-13.

[97]The court is cognizant that due to market factors, prices for the same product may vary widely.  See, e.g., *Werdebaugh v. Blue Diamond Growers*, Case No.: 12–CV–2724–LHK, 2014 WL 2191901, *23 (N.D. Cal. May 23, 2014) ("Werdebaugh testified that consumers typically pay a premium simply by purchasing from Whole Foods, a distinction for which Dr. Capps does not account in his Price Premium Model"); *Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742(DLC), 2011 WL 196930, *3 (S.D.N.Y. Jan. 21, 2011) ("[P]laintiffs have offered no evidence of the prices of competing or comparable beverages that did not contain the alleged mislabeling, much less the prices of such beverages at locations and periods of time that

1   This, coupled with evidence concerning the portion of that price that constituted a "premium" for

2   the product's "100% Natural" ingredients would suffice to send the question of damages to the

3   jury.  See *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10–4387 PJH, 2014 WL 60097, *12

4   (N.D. Cal. Jan. 7, 2014) ("One method of quantifying the amount of restitution to be awarded is

5   computing the effect of unlawful conduct on the market price of a product purchased by the class.

6   This measure of restitution contemplates the production of evidence that attaches a dollar value

7   to the 'consumer impact or advantage' caused by the unlawful business practices.  Restitution can

8   then be calculated by taking the difference between the market price actually paid by consumers

9   and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business

10  practices.   Expert testimony may be necessary to determine the amount of price inflation

11  attributable to the challenged practice" (internal citations omitted)).  Compare *Colgan v.*

12  *Leatherman Tool Grp., Inc.*, 135 Cal.App.4th 663, 700 (2006) ("There was expert testimony that

13  'Made in U.S.A.' claims have a significant positive impact on consumers and that Leatherman

14  realized a 'substantial advantage' by using a 'Made in U.S.A.' representation; however, the expert

15  did not attempt to quantify either the dollar value of the consumer impact or the advantage realized

16  by Leatherman. The record therefore contains no evidence concerning the amount of restitution

17  necessary to restore purchasers to the status quo ante").   At least on the basis of the present

18  record, the court is unwilling to conclude that lack standing to sue because they cannot prove they

19  suffered a concrete injury.   Whether plaintiffs' failure to present evidence that Weir has

20  constructed a model that adequately accounts for all variables, and that isolates the effect of the

21

22  _____

approximate those at which the two plaintiffs purchased Snapple.  Again, this would be a difficult

23  task since it is undisputed that the prices of beverages in the retail market vary widely and are

24  affected by the nature and location of the outlet in which they are sold, and the availability of

discounts, among many other factors").  ConAgra asserts that the price of Wesson Oil and its

25  competitors' products is set by retailers and varied widely during the class period.  It proffers the

26  declaration of its expert, Keith Ugone, as evidence of this.  (See Declaration of Keith R. Ugone,

Docket No. 268 (June 2, 2014), ¶ 50 and App. E.)  Without further information concerning the

27  nature of the data available through Information Resources, Inc. or from other sources, however,

the court is unwilling at this point to conclude that no plaintiff could show that he or she suffered

28  in injury in fact for Article III purposes.

"100% Natural" label on the price of Wesson Oils undercuts their ability to show that damages are susceptible of measurement across the class such that common questions of fact predominate under Rule 23(b)(3) is another question altogether.

## 2.   Rule 23(a) Requirements

### a.   Whether Plaintiffs Have Identified an Ascertainable Class

Although not specifically mentioned in Rule 23, plaintiffs must, in addition to showing numerosity, commonality, typicality and adequacy, demonstrate that the members of the class are ascertainable. See, e.g., *Lukovsky v. San Francisco*, No. C 05-00389 WHA, 2006 WL 140574, *2 (N.D. Cal. Jan. 17, 2006) ("'Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed,'" quoting *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999)); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 163 (C.D. Cal. 2002) ("Prior to class certification, plaintiffs must first define an ascertainable and identifiable class.  Once an ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)" (citation and footnote omitted)); *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (holding that a class definition must be "precise, objective and presently ascertainable"); *Bishop v. Saab Automobile A.B.*, No. CV 95-0721 JGD (JRx), 1996 WL 33150020, *4 (C.D. Cal. Feb. 16, 1996) ("To file an action on behalf of a class, the named plaintiffs must be members of the class that they purport to represent at the time the class action is certified.  The named plaintiffs must also demonstrate that the class is ascertainable" (citation omitted)).

A class is sufficiently defined and ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member." *O'Connor*, 184 F.R.D. at 319; accord *Davoll v. Webb*, 160 F.R.D. 142, 143 (D. Colo. 1995); see also *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 347 (S.D. Ga. 1996) ("[T]he 'description of the class must be sufficiently definite to enable the court to determine if a particular individual is a member of the proposed class,'" quoting *Pottinger v. Miami*, 720 F.Supp. 955, 957 (S.D. Fla. 1989)).

Plaintiffs argue that the classes they propose are ascertainable because membership in each is governed by a single objective criterion – whether the individual purchased Wesson Oils during the class period.[98]  ConAgra counters that the classes are not ascertainable because it has no way of determining the identity of consumers who purchased its products,[99] and that the vast majority of possible class members will be unable to self-identify.  Specifically, it asserts, it is unlikely consumers retained receipts, and given the product's relatively low purchase price, they will be unlikely to recall the quantity, type, and date of purchases made during the class period.[100]

District courts in this circuit are split as to whether the inability to identify the specific members of a putative class of consumers of low priced products makes the class unascertainable. Some courts have concluded that it does.  See *Sethavanish v. ZonePerfect Nutrition Co.*, No. 12–2907–SC, 2014 WL 580696, *5-6 (N.D. Cal. Feb. 13, 2014) ("Plaintiff has yet to present any method for determining class membership, let alone an administratively feasible method.  It is unclear how Plaintiff intends to determine who purchased ZonePerfect bars during the proposed class period, or how many ZonePerfect bars each of these putative class members purchased.  It is also unclear how Plaintiff intends to weed out inaccurate or fraudulent claims.  Without more, the Court cannot find that the proposed class is ascertainable"); see also *Carrera v. Bayer Corp.*, 727 F.3d 300, 308-11 (3d Cir. 2013) (holding a putative class of consumers who purchased a diet supplement was not ascertainable because (1) there was insufficient evidence to show that retailer records could be used to identify class members, (2) the use of affidavits to identify class members would deprive defendant of the opportunity to challenge class membership, (3) a proposed screening model to ensure the affidavits are reliable was not shown to be reliable for certification purposes, and (4) the inclusion of fraudulent or inaccurate claims could dilute the recovery of absent class members, who could then argue they were not adequately represented and thus not bound by the judgment); *In re POM Wonderful LLC*, No. ML 10–02199 DDP (RZx), 2014 WL

---

[98]Cert. Motion at 19.

[99]Opp. Cert. at 12.

[100]*Id.* at 12-13.

37

1225184, *6 (C.D. Cal. Mar. 25, 2014) (observing that "[i]n situations where purported class members purchase an inexpensive product for a variety of reasons, and are unlikely to retain receipts or other transaction records, class actions may present such daunting administrative challenges that class treatment is not feasible," and holding that a class of consumers of a juice product was not ascertainable, particularly where "[n]o bottle, label, or package included any of the alleged misrepresentations").

Other courts have rejected the reasoning underlying such decisions as effectively foreclosing class actions involving low priced consumer goods. See *Forcellati v. Hyland's, Inc.*, No. CV 12–1983–GHK (MRWx), 2014 WL 1410264, *5 (C.D. Cal. Apr. 9, 2014) (rejecting an argument that a putative class of consumers of children's cold/flu products was not ascertainable, and stating that "[g]iven that facilitating small claims is '[t]he policy at the very core of the class action mechanism,' we decline to follow *Carrera*," quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)); *McCrary v. Elations Co., LLC*, No. EDCV 13–00242 JGB (OPx), 2014 WL 1779243, *8 (C.D. Cal. Jan. 13, 2014) ("*Carrera* eviscerates low purchase price consumer class actions in the Third Circuit. It appears that pursuant to *Carrera* in any case where the consumer does not have a verifiable record of its purchase, such as a receipt, and the manufacturer or seller does not keep a record of buyers, *Carrera* prohibits certification of the class. While this may now be the law in the Third Circuit, it is not currently the law in the Ninth Circuit. In this Circuit, it is enough that the class definition describes 'a set of common characteristics sufficient to allow' a prospective plaintiff to 'identify himself or herself as having a right to recover based on the description. As discussed above, the class definition clearly defines the characteristics of a class member by providing a description of the allegedly offending product and the eligible dates of purchase. A prospective plaintiff would have sufficient information to determine whether he or she was an Elations customer who viewed the specified label during the stated time period,'" quoting *Moreno v. AutoZone, Inc.*, 251 F.R.D. 417, 421 (N.D. Cal. 2008) (citations omitted)); *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 535 (N.D. Cal. 2012) ("Defendants' real concern with the proposed class definition appears to be that members of the class do not have actual proof that they are in the class. Defendants suggest that simply because most members of

the proposed class will not have retained all of their receipts for AriZona Iced Tea over the past few years, the administration of this class will require 'fact-intensive mini trials' to establish whether each purported class member had in fact made a purchase entitling them to class membership. This is simply not the case. If it were, there would be no such thing as a consumer class action. There is no requirement that 'the identity of the class members . . . be known at the time of certification'").

The court agrees with those courts that have found such classes ascertainable and follows their reasoning. ConAgra's argument would effectively prohibit class actions involving low priced consumer goods – the very type of claims that would not be filed individually – thereby upending "[t]he policy at the very core of the class action mechanism." *Amchem Prods.*, 521 U.S. at 617; see *Ebin v. Kangadis Food, Inc.*, 297 F.R.D. 561, 567 (S.D. N.Y. 2014) ("Yet the class action device, at its very core, is designed for cases like this where a large number of consumers have been defrauded but no one consumer has suffered an injury sufficiently large as to justify bringing an individual lawsuit. Against this background, the ascertainability difficulties, while formidable, should not be made into a device for defeating the action").

Here, the class definition identifies putative class members by objective characteristics; this is the mark of an ascertainable class. See *Forcellati*, 2014 WL 1410264 at *5 ("'The requirement of an ascertainable class is met as long as the class can be defined through objective criteria,'" quoting *Guido v. L'Oreal, USA, Inc.*, Nos. CV CV 11–1067 CAS (JCx), CV 11–5465 CAS (JCx), 2013 WL 335385, *18 (C.D. Cal. July 1, 2013)); *id.* ("A class is sufficiently ascertainable if 'the proposed class definition allows prospective plaintiffs to determine whether they are class members with a potential right to recover,'" quoting *Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 593–94 (C.D. Cal. 2008)). While it is true that identifying class members may well require the creation of a claim form or declaration that those asserting membership in the class must submit (likely under penalty of perjury), courts have concluded that such a procedure makes the class ascertainable, at least where the alleged mislabeling occurred throughout the class period, and on a single product or narrow group of products. See, e.g., *Werdebaugh*, 2014 WL 2191901 at *11; *Brazil v. Dole Packaged Foods, LLC*, Case No.: 12–CV–01831–LHK, 2014 WL 2466559,

*4-6 (N.D. Cal. May 30, 2014) (certifying a class of consumers who purchased Dole fruit products allegedly mislabeled "All Natural" during the class period and finding that the submission of consumer affidavits as a means of identifying class members was likely to produce reliable affidavits because all products included in the class definition contained the alleged mislabeling consistently throughout the class period). ConAgra may also be able to test an individual's claim that he or she is a class member by comparing information about the individual's purchase with information it maintains concerning the retailers that sold its products during the class period or other similar information. See *Galvan v. KDI Distribution Inc.*, SACV 08–0999–JVS (ANx), 2011 WL 5116585, *4 (C.D. Cal. Oct.25, 2011)

ConAgra next argues that the classes are not ascertainable for the additional reason that they include individuals who were not injured, i.e., consumers who did not read or notice the "100% Natural" claim and thus could not have been deceived by it.[101] ConAgra cites *Diacakis v. Comcase Corp.*, No. C 11–3002 SBA, 2013 WL 1878921, *1 (N.D. Cal. May 3, 2013), in support of this argument. There, plaintiff filed a putative class action alleging six state law claims, and moved to certify a class that included all purchasers of a Triple Play package (which bundles internet, television and telephone services) from Comcast who were charged rental or lease fees. Citing the Seventh Circuit's decision in *Oshana v. Coca–Cola* Co., 472 F.3d 506 (7th Cir. 2006), the court held the class was not ascertainable because proof of plaintiff's claims required consumer deception, and the class included all individuals who purchased a Triple Play package, whether or not the consumer was deceived by Comcast's alleged failure to disclose the existence of additional modem charges. *Id.* at *4.

Plaintiffs counter that the inclusion of uninjured class members does not necessarily render a class unascertainable, citing *Rodman v. Safeway, Inc.*, No. 11–cv–03003–JST, 2014 WL 988992, (N.D. Cal. Mar. 10, 2014). There, plaintiff moved to certify a nationwide class of all persons who registered to purchase groceries through Safeway.com, and who purchased groceries that were subject to a price markup. *Id.* at *15. Safeway argued that the class was not

---

[101]Opp. Cert. at 13-14.

1  ascertainable because it included individuals who, for various reasons, did not have viable claims

2  or who could not prove damages. *Id.* The court rejected this argument, noting that such a rule

3  would effectively require a plaintiff to plead a "fail-safe" class. *Id.* See 7A Wright & Miller,

4  FEDERAL PRACTICE & PROCEDURE CIVIL § 1760 (3d ed.) ("Some courts also have considered

5  whether the class definition must exclude anyone who does not have a viable claim. In effect, this

6  interpretation means that plaintiffs must plead what effectively is a 'fail-safe' class").[102]

7  Other courts in this circuit have reached similar conclusions, see *Rodman*, 2014 WL

8  988992 at *15 (collecting cases), and the Seventh and Tenth Circuits are in accord. See *Kohen*

9  *v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (the fact that a proposed class

10  "will often include persons who have not been injured by the defendant's conduct . . . does not

11  preclude class certification," but it is also the case that "a class should not be certified if it is

12  apparent that it contains a great many persons who have suffered no injury at the hands of the

13  defendant"); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010) ("That a

14  class possibly or even likely includes persons unharmed by a defendant's conduct should not

15  preclude certification"). The *Rodman* court concluded that while "[t]here is a place in the Rule

16  23 analysis for considering whether a class definition is sufficiently 'overbroad' as to preclude

17

18

19

20

---

21  [102]"Fail-safe classes are defined by the merits of their legal claims, and are therefore

22  unascertainable prior to a finding of liability in the plaintiffs' favor." *Velasquez v. HSBC Finance Corp.*, No. 08-4592 SC, 2009 WL 112919, *4 (N.D. Cal. Jan. 16, 2009); see also *Boucher v.*

23  *First American Title Ins. Co.*, No. C10–199RAJ, 2011 WL 1655598, *5 (W.D. Wash. May 2,

24  2011) ("Second, the definition conditions a customer's class membership on a finding that First American is liable to him or her. . . . So, for example, if the court certified the class and later

25  determined on summary judgment that First American correctly discounted all class members'

26  premiums, then the class would have no members. A 'fail-safe class' like this ensures that a

27  defendant cannot prevail against the class, because if the defendant prevails, the class will not exist"); *Lewis v. First American Title Ins. Co.*, 265 F.R.D. 536, 551 (D. Idaho 2010) (defining

28  a fail-safe class as one that "impermissibly determines membership based upon a determination of liability").

1   certification," the issue was better analyzed as part of the commonality inquiry.  2014 WL 988992

2   at *16.[103]

3          Moreover, "[c]onsumer action classes that have been found to be overbroad generally

4   include members who were never exposed to the alleged misrepresentations at all."  *Algrain v.*

5   *Maybelline LLC*, __ F.R.D. __, 2014 WL 1883772, *7 (S.D. Cal. May 12, 2014).  See *id.* ("In

6   the instant case, Plaintiffs have alleged a widespread advertising campaign promoting the alleged

7   misrepresentations as well as uniform labeling for each of the Class Products.  That the proposed

8   class may include purchasers who did not rely on the misrepresentations and/or were satisfied with

9   the products does not render the class 'overbroad' where Maybelline has failed to demonstrate a

10  lack of exposure as to some class members"); compare *Red v. Kraft Foods, Inc.*, No. CV

11  10–1028–GW (AGRx), 2012 WL 8019257, * 5 (C.D. Cal. Apr.12, 2012) (finding a class that

12  included consumers who were not exposed to the misleading statements overbroad); *Sevidal v.*

13  *Target Corp.*, 189 Cal.App.4th 905, 926-28 (2010) (finding a class overbroad where a majority

14  of class members were never exposed to the alleged misrepresentations and there was absolutely

15  no likelihood they were deceived by the allegedly false advertising).

16         Here, every putative class member has been exposed to the alleged misrepresentation,

17  because every bottle of Wesson Oil sold during the class period was labeled "100% Natural."  The

18  court therefore finds the class ascertainable, and agrees with the *Stearns* and *Rodman* courts that

19  the inclusion of uninjured class members is more properly analyzed under Rule 23(a)(2) or

20  23(b)(3).[104]

21

22

23         [103]*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011), a case cited by ConAgra,

24  is not to the contrary.  In *Stearns*, plaintiffs alleged a website induced people to purchase
    inadvertently services they neither expected, wanted, or used.  The court held that the proposed

25  class was overbroad under Rule 23(b)(3), because it included members who were not misled and
    who intentionally signed up for the services.  *Id.* at 1022, 1024.  Thus, while finding the presence

26  of uninjured class members defeated predominance, the court did not conclude that this fact

27  rendered the class unascertainable.

28         [104]ConAgra raises this argument with respect to Rule 23(b)(3), but not Rule 23(a)(2).

### b. Numerosity

Before a class can be certified under the Federal Rules of Civil Procedure, the court must determine that it is "so numerous that joinder of all members is impracticable." See FED.R.CIV.PROC. 23(a)(1). "Impracticability does not mean impossibility, [however,] . . . only . . . difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (internal quotations omitted). There is no set numerical cutoff used to determine whether a class is sufficiently numerous; courts must examine the specific facts of each case to evaluate whether the requirement has been satisfied. See *General Tel. Co. v. EEOC*, 446 U.S. 318, 329-30 (1980). "As a general rule, [however,] classes of 20 are too small, classes of 20-40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) (citing 3B J. Moore & J. Kennedy, MOORE'S FEDERAL PRACTICE ¶ 23-05[1] (2d ed. 1987)). Here, ConAgra admits that millions of consumers purchased Wesson Oil products during the class period.[105] Consequently, plaintiffs have met their burden of demonstrating that the proposed classes are sufficiently numerous.[106]

### c. Commonality

Commonality requires "questions of law or fact common to the class." See FED.R.CIV.PROC. 23(a)(2). The commonality requirement is construed liberally, and the existence of some common legal and factual issues is sufficient. *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1320 (9th Cir. 1982); accord *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively"); see also, e.g., *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989) ("Unlike the 'predominance' requirement of Rule 23(b)(3), Rule 23(a)(2) requires only that the class movant show that a common question of law or fact exists; the movant need not show, at this

---

[105]Answer to Amended Complaint,  ¶ 57.

[106]ConAgra does not dispute plaintiffs' showing as to this requirement.

43

stage, that the common question overwhelms the individual questions of law or fact which may be present within the class"). As the Ninth Circuit has noted: "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019.

That said, the putative class's "claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551. Although for purposes of Rule 23(a)(2) even a single common question will do, *id.* at 2556, "'[w]hat matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Id.* at 2551 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.REV. 97, 132 (2009)). As the Ninth Circuit recently articulated by way of example, "it is insufficient to merely allege any common question, for example, 'Were Plaintiffs passed over for promotion?' Instead, they must pose a question that 'will produce a common answer to the crucial question why was I disfavored.'" *Ellis*, 657 F.3d at 981 (quoting *Dukes*, 131 S. Ct. at 2552).

Plaintiffs argue the commonality element is satisfied for all classes because their claims pose a common question – whether ConAgra's "100% Natural" marketing and labeling of Wesson Oil products was false, unfair, deceptive, and/or misleading.[107] Because all class members were exposed to the statement and purchased Wesson Oil products, there is "a common core of salient facts." *Hanlon*, 150 F.3d at 1019. Indeed, courts routinely find commonality satisfied in false advertising cases such as the case at bar. See, e.g., *Ries*, 287 F.R.D. at 537 ("[H]ere, variation

---

[107]Cert. Motion at 15.

among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality"); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 377 (N.D. Cal. 2010) (holding that the commonality requirement was satisfied by allegations that the defendant beverage supplier's "packaging and marketing materials are unlawful, unfair, deceptive or misleading to a reasonable consumer").   Accordingly, the court finds the commonality requirement satisfied.[108]

### d.   Typicality

Typicality requires a determination as to whether the named plaintiff's claims are typical of those of the class members she seeks to represent.   See FED.R.CIV.PROC. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; see also *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985) ("A plaintiff's claim meets this requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory").

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (citation and internal quotations omitted).   Typicality, like commonality, is a "permissive standard[ ]." *Hanlon*, 150 F.3d at 1020.   Indeed, in practice, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157-58 n. 13.  See also *Dukes*, 131 S. Ct. at

---

[108]Once again, ConAgra does not dispute that this requirement is satisfied.  Plaintiffs assert that additional common questions include: (a) whether ConAgra acted knowingly or recklessly; (b) whether ConAgra's practices violate applicable law; (c) whether Plaintiffs and the other members of the Classes are entitled to actual, statutory, or other forms of damages, and other monetary relief; and (d) whether Plaintiffs and the other members of the Classes are entitled to equitable relief, including but not limited to injunctive relief and restitution.  (Cert. Motion at 15.) Because whether ConAgra's "100% Natural" assertion in the marketing and sale of its Wesson Oils is false, unfair, deceptive, and/or misleading satisfies the commonality requirement, the court need not address plaintiffs' other asserted bases for establishing commonality.

2551 n. 5 ("We have previously stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.  Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest,'" citing *Falcon*, 457 U.S. at 158 n. 13).

Typicality may be lacking "if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'"  *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)); see also *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation").  To be typical, a class representative need not prove that she is immune from any possible defense, or that her claim will fail only if every other class member's claim also fails.  Instead, she must establish that she is not subject to a defense that is not "typical of the defenses which may be raised against other members of the proposed class."  *Id.*; see also *Ellis*, 657 F.3d at 984.

The named plaintiffs argue that the typicality requirement is satisfied because they allege a common pattern of wrongdoing – i.e., ConAgra's labeling of all Wesson Oils as "100% Natural."  As a consequence, they contend, each class member was exposed to the same allegedly false advertising on the Wesson Oils labels.  Plaintiffs also assert that they have alleged the "100% Natural" label was a factor in their decision to purchase the products, and that the same evidence supports their claims as supports other class members' claims.[109]  ConAgra counters that plaintiffs' claims are not typical because the record evidence demonstrates that the "100% Natural" label was

---

[109]Cert. Motion at 16.

not a significant factor driving purchases of Wesson Oil.[110]  It cites Dr. Hanssens' finding that there is no statistically significant difference between the purchasing decisions of survey respondents shown a "100% Natural" label and those who saw a label without the phrase.  It also cites Dr. Hanssens' finding that only 5-6% of respondents who saw the "100% Natural" label mentioned "natural" ingredients when describing why they would or would not buy a Wesson Oil product, and what factors were important to them when purchasing cooking oil.[111]

Plaintiffs assert that Dr. Hanssens' findings are contradicted by ConAgra's own documents, which show the materiality of the "100% Natural" claim.[112]  Plaintiffs proffer documents detailing the results of ConAgra's marketing research; they contend this research demonstrates that pure and natural claims play a significant role in consumer purchasing decisions.  Because the documents were filed under seal, the court does not detail the findings here.  It concurs, however, in plaintiffs' description of the documents.[113]

While the evidence concerning the materiality of the "100% Natural" label is in dispute, the question is whether under the applicable law, the fact that the "100% Natural" label may not have been a significant factor in the purchasing decision of all class members makes plaintiffs' claims atypical.  Plaintiffs argue that the court need not address materiality in determining whether

---

[110]Opp. Cert. at 16.

[111]Opp. Cert. at 16.  ConAgra further contends that the named plaintiffs' lack standing renders them atypical.  (*Id.* at 17 n. 14.)  The court has already rejected ConAgra's standing argument, however, and need not address it again here.

[112]Reply at 32-33.  Plaintiffs also cite the Kozup survey and a Consumer Reports survey as additional evidence supporting their contention that the "100% Natural" claim is material.  (*Id.* at 33.)  Because plaintiffs submitted the Kozup survey for the first time in reply, the court will not consider it because ConAgra has had no opportunity to respond.  See *Provenz*, 102 F.3d at 1483; *Green*, 219 F.R.D. at 487 n. 1.  Nor will the court consider the Consumer Reports survey, which was similarly filed in support of plaintiffs' reply.  (See Levitt Decl., Exh. A.)

[113]While the reports suggest that "pure and natural" claims are significant factors motivating consumer purchasing decisions regarding cooking oils, (Declaration of Henry J. Kelston ("Kelston Decl."), Docket No. 244 (May 5, 2014), Exh. 3 at 1944, Exh. 10 at 2546; Levitt Decl., Exh. M), none of the studies directly addresses whether consumers equate "natural" or "100% Natural" with the absence of genetically modified organisms or GMO ingredients.

to certify the proposed classes, because materiality is determined according to a "reasonable consumer" standard and should be resolved at the merits stage.  It is true that for claims brought under California's CLRA and UCL, causation can be proved on a classwide basis by showing that the manufacturer's representation was material.  This is true because the CLRA employs a "reasonable consumer" standard to determine materiality. See, e.g., *Falk v. Gen. Motors Corp*., 496 F.Supp.2d 1088, 1095 (N.D. Cal. 2007) ("Materiality, for CLRA claims, is judged by the effect on a 'reasonable consumer,' " citing *Consumer Advocates v. Echostar Satellite Corp*., 113 Cal.App.4th 1351, 1360 (2003)).  Under the UCL,  the court asks whether "'members of the public are likely to [have] be[en] deceived.'" *Shein v. Canon U.S.A., Inc*., No. CV 08-7323 CAS (Ex), 2010 WL 3170788, *7 (C.D. Cal. Aug. 10, 2010) (quoting *In re Tobacco II*, 46 Cal.4th 298, 312 (2009)).  Thus, plaintiffs are entitled to a classwide inference of reliance if they can show (1) that uniform misrepresentations were made to the class, and (2) that those misrepresentations were material.  *Id.* (stating that "relief under [the] UCL is available without individualized proof" if plaintiff can show that defendant employed "'uniform conduct to mislead the entire class'" and "the alleged misrepresentation was material," citing *Kaldenback v. Mut. of Omaha Life Ins. Co.*, 178 Cal.App.4th 830, 850 (2009), and *Kingsbury v. U.S. Greenfiber, LLC*, No. CV 08-00151 AHM (JTLx), 2009 WL 2997389, *10 (C.D. Cal. Sept.14, 2009)).  See also *Wiener v. Dannon Co., Inc*., 255 F.R.D. 658, 669 (C.D. Cal. 2009) ("Courts have found that an inference of reliance may be appropriate for claims for violations of the UCL and the CLRA. . . .  For a class action, an inference of reliance arises as to the entire class only if the material misrepresentations were made to all class members," citing *Vasquez v. Superior Court*, 4 Cal.3d 800, 805 (1971) ("It is sufficient for our present purposes to hold that if the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class")).  There is no suggestion here that the "100% Natural" claim was not uniformly made to members of the class.  Thus, as respects plaintiffs' CLRA and UCL claims, the fact that the "100% Natural" label may not have been a significant factor in the purchasing decision of all class members, as it purportedly was in plaintiffs' purchasing decision, does not make plaintiffs' claims atypical of the class.

Plaintiffs, however, fail to address whether individualized reliance and an individualized showing of causation are elements of the balance of their claims.  They do not demonstrate, for example, that the reasonable consumer standard applies to their California express warranty claim.[114]  Nor do they adequately address the claims they assert under Colorado, Florida, Illinois, Indiana, Nebraska, New Jersey, New York, Ohio, Oregon, South Dakota, and Texas law; as discussed *infra*, plaintiffs' appendix of legal authority does not demonstrate that no individualized showing of reliance and/or causation is required to prove the common law and statutory claims the proposed state classes plead.

Because the typicality requirement focuses on whether the named plaintiffs' claims arise from the same course of conduct as the class members' claims, and whether *the named plaintiffs* are subject to unique defenses, however, and because it is not an onerous requirement, the court concludes that the fact that some *class members* may not have relied on the "100% Natural" label in purchasing Wesson Oils does not render the named plaintiffs' claims atypical.   Stated differently, if the named plaintiffs' claims were subject to the unique defense that they did *not* rely on the "100% Natural" label in purchasing Wesson Oils, then as to any claims that require proof of individualized reliance, there might be a concern about typicality.   The situation posited by ConAgra is the converse of that, however.   The concerns it raises concerning the need for individualized proof of reliance or causation, moreover, are better addressed in assessing whether

---

[114]In this regard, there is some authority for the proposition that a breach of express warranty claim under the California Commercial Code does not require proof of reliance on specific promises made by the seller.  See *Weinstat v. Dentsply International, Inc.*, 180 Cal.App.4th 1213, 1226-28 (2010) (noting, however, that the California Supreme Court has declined to resolve the issue).  Several courts, however, have held that to the extent *Weinstat* correctly reflects the state of California law, it is limited to situations in which a plaintiff is in privity with the manufacturer of the product.  See, e.g., *Coleman v. Boston Scientific Corp.*, 1:10–CV–01968, 2011 WL 3813173, *4 (E.D. Cal. Aug. 29, 2011) (stating that *Weinstat* did not support "[p]laintiff's erroneous contention that reliance is not required where privity is absent"); *id.* at *5 (stating that "reliance (or some other substitute for privity) is required for an express warranty claim against a non-selling manufacturer of a product").  Here, it would not appear that plaintiffs are in privity with ConAgra.

Rule 23(b)(3)'s predominance requirement is met.  Consequently, the court finds the typicality requirement satisfied.

### e.    Adequacy

The adequacy of representation requirement set forth in Rule 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiff[ ] and [her] counsel have any conflicts of interest with other class members and (2) will the named plaintiff[ ] and [her] counsel prosecute the action vigorously on behalf of the class?"  *Hanlon*, 150 F.3d at 1020; accord *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees."  *Ellis*, 657 F.3d at 985.   Individuals are not adequate representatives of a class when "it appears that they have abdicated any role in the case beyond that of furnishing their names as plaintiffs."  *Helfand v. Cenco, Inc.*, 80 F.R.D. 1, 7 (N.D. Ill. 1977).  ConAgra challenges the adequacy of the named plaintiffs on the same grounds that it challenges the typicality of their claims.  Because the court was not persuaded by those arguments, it cannot conclude that plaintiffs are not adequate class representatives.

ConAgra also asserts that class counsel cannot adequately represent the interests of the class.  The adequacy of representation turns on the competence of class counsel and the absence of conflicts of interest.  *Falcon*, 457 U.S. at 157.  ConAgra argues that counsel "have proven unequal to the task of representing a class."[115]  It notes that counsel will be unable to attempt to certify four state classes that were originally identified in their complaint because the named plaintiffs representing those classes withdrew "with no real explanation" as to why withdrawal was necessary and "with no timely move by counsel to replace the withdrawing . . . [plaintiffs]" demonstrates that counsel are inadequate.[116]  ConAgra also cites the court's observation in a recent order that "plaintiffs ha[d] done little to prepare for class certification proceedings or move the

---

[115]Opp. Cert. at 17.

[116]*Id.*

case forward."[117]  It notes the court's comment that plaintiffs' "approach to discovery in this case has been dilatory. . . ,"[118] its statement that "[t]o the extent [counsel permitted] the withdrawing plaintiffs [not to comply with a discovery order issued by Judge Rosenberg], they ha[d] violated [Judge Rosenberg's] order, subjecting [their clients] to sanctions."[119]  While courts have held that counsel who have delayed in seeking class certification or have not diligently sought discovery are not adequate to represent the interests of the class, see, e.g., *Colby v. J.C. Penney Co.*, 128 F.R.D. 247, 250 (N.D. Ill. 1989) (decertifying a class based, *inter alia*, on counsel's lack of diligence in conducting discovery), aff'd on other grounds, 926 F.2d 645 (7th Cir. 1991); *Lau v. Standard Oil Co. of California*, 70 F.R.D. 526, 527-28 (N.D. Cal. 1975) (three year delay in seeking class certification), the court cannot say that class counsel's problems in this case rise to the level that would support such a finding here, particularly given their background in class action litigation.   Nor does the court discern any conflict of interest affecting the representation.  Consequently, the court finds that the named plaintiffs and class counsel satisfy the adequacy requirement.

### 3.  Rule 23(b) Requirements

Having concluded that the Rule 23(a) requirements are met, the court turns to Rule 23(b). Plaintiffs seek to certify the proposed classes separately for purposes of injunctive relief and damages under Rule 23(b)(2) and 23(b)(3).  In its decision in *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010), rev'd, 131 S. Ct. 2541 (2011) (en banc), the Ninth Circuit noted that the district court had the option of certifying a Rule 23(b)(2) equitable relief class and a separate Rule 23(b)(3) class for damages if it concluded that it could not certify a single Rule 23(b)(2) class because monetary relief predominated over the equitable relief sought.  *Id.* at 620.  The Supreme Court later "rejected the 'predominance' test for determining whether monetary damages may be included in a 23(b)(2) certification."  *Ellis*, 657 F.3d at 986.  Subsequent to the Supreme Court's

---

[117]*Id.* at 18.

[118]*Id.*

[119]*Id.* at 9.

decision in *Dukes*, however, the Ninth Circuit has suggested on multiple occasions that district courts consider certifying separate Rule 23(b)(2) and 23(b)(3) classes. See *id.* at 988 ("[T]he district court must consider how best to define the class(es) to ensure that all class members have standing to seek the requested relief. See, e.g., *Dukes*, 603 F.2d at 620 (suggesting the court certify a 'Rule 23(b)(2) class for equitable relief and a separate Rule 23(b)(3) class for damages')"); see also *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) ("Plaintiffs concede that class certification for their monetary claims under Rule 23(b)(2) cannot stand in light of *Wal-Mart*. However, the possibility of a Rule 23(b)(2) class seeking injunctive relief remains. Rule 23(b)(2) applies 'when a single injunction or declaratory judgment would provide relief to each member of the class.' . . . [S]ee . . . *Ellis*, 657 F.3d at 987 (indicating that the court could certify a Rule 23(b)(2) class for injunctive relief and a separate Rule 23(b)(3) class for damages)"). Consequently, and contrary to ConAgra's argument,[120] it does not appear to be the case that the court can certify a Rule 23(b)(2) class only if the monetary relief sought is purely incidental to the injunctive relief. Rather, Ninth Circuit precedent indicates that the court can separately certify an injunctive relief class and if appropriate, also certify a Rule 23(b)(3) damages class. Consequently, the court turns to consideration of the requirements for certification under Rule 23(b)(2).

### a.      Rule 23(b)(2)

An injunctive relief class can be certified under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED.R.CIV.PROC. 23(b)(2). As a threshold matter, the court must determine whether the named plaintiffs have standing to seek an injunction requiring ConAgra to cease marketing Wesson Oils as "100% Natural." ConAgra asserts there is no evidence that any named plaintiff would purchase Wesson Oils in the future, and that this is fatal to their ability to secure injunctive relief. Several courts have reached this conclusion. See, e.g., *Werdebaugh*, 2014 WL 2191901 at *9

---

[120]Opp. Cert. at 38.

("[B]ecause Werdebaugh has not alleged, let alone provided evidentiary proof, that he intends or desires to purchase Blue Diamond almond milk products in the future, there is no likelihood of future injury to Plaintiff that is redressable through injunctive relief, and Plaintiff lacks standing to pursue that remedy"); *Forcellati*, 2014 WL 1410264 at *13 ("Plaintiffs do not suggest that they are likely to purchase Defendants' products in the future.  Instead, they contend that the Article III standing requirement for injunctive relief does not apply in the consumer protection context.  Some district courts in this Circuit have taken this approach, holding that a plaintiff in a false advertising case retains standing to pursue injunctive relief so long as the products continue to be deceptively marketed and sold by the defendant.  These courts have reasoned that to hold otherwise would severely undermine the efficacy of California's consumer protection laws.  We decline to adopt this approach.  We find more persuasive the courts that have insisted that it is improper to carve out an exception to Article III's standing requirements to further the purpose of California consumer protection laws" (internal quotation marks and citation omitted); *Rahman v. Mott's LLP*, No. 13–3482, 2014 WL 325241, *10 (N.D. Cal. Jan. 29, 2014) ("to establish standing, [a plaintiff] must allege that he intends to purchase the products at issue in the future"); *Jou v. Kimberly–Clark Corp.*, No. 13–3075, 2013 WL 6491158, *13 (N.D. Cal. Dec. 10, 2013) (rejecting "[p]laintiffs' contention that it is unnecessary for them to maintain any interest in purchasing the products in the future" in order to establish standing to sue for injunctive relief); *Ries*, 287 F.R.D. at 533–34 (finding that plaintiffs had standing to pursue injunctive relief where they alleged an intention to purchase the products at issue in the future); *Delarosa v. Boiron, Inc.*, No. 10–1569, 2012 WL 8716658, *3–6 (N.D. Cal. Dec. 28, 2012) (finding that plaintiff lacked standing to sue for injunctive relief where she did not dispute she had no intention to purchase product in the future); *Wang v. OCZ Tech. Group, Inc.*, 276 F.R.D. 618, 626 (N.D. Cal. 2011); see also *Mason v. Nature's Innovation, Inc.*, No. 12–3019, 2013 WL 1969957, *4 (S.D. Cal. May 13, 2013) (collecting cases and concluding that "[g]uided by the Ninth Circuit's interpretation of Article III's standing requirements, this Court agrees with the courts that hold that a plaintiff does not have standing to seek prospective injunctive relief against a manufacturer or seller engaging in false or misleading advertising unless there is a likelihood that the plaintiff would

suffer future harm from the defendant's conduct – i.e., the plaintiff is still interested in purchasing the product in question"); *Moheb v. Nutramax Labs., Inc.*, No. 12–3633, 2012 WL 6951904, *6 (C.D. Cal. Sept. 4, 2012) ("Plaintiff and other members of the Class no longer buy Cosamin and, thus, will obtain no benefit from an injunction concerning Defendant's advertising because they cannot demonstrate a probability of future injury").

There are a number of cases that reach the opposite result, however. See, e.g., *Rasmussen v. Apple Inc.*, __ F.Supp.2d __, 2014 WL 1047091 (N.D. Cal. Mar. 14, 2014) (declining to reach the issue, but noting that "[s]ome courts have disagreed with th[e] reasoning [of the cases cited above], correctly recognizing the limitation this places on federal courts to enforce California's consumer laws"); *Lanovaz v. Twinings N. Am., Inc.*, C-12-02646, 2014 WL 46822, *10 (N.D. Cal. Jan. 6, 2014) ("The court finds the reasoning of *Henderson v. Gruma* and the cases following it more convincing and accordingly finds that [plaintiff] has standing to seek injunctive relief"); *Koehler v. Litehouse, Inc.*, No. CV 12–04055 SI, 2012 WL 6217635, *6 (N.D. Cal. Dec. 13, 2012) ("If the Court were to construe Article III standing as narrowly as Defendant advocates, federal courts would be precluded from enjoining false advertising under California consumer laws because a plaintiff who had been injured would always be deemed to avoid the cause of the injury thereafter . . . and would never have Article III standing. . . .  While Plaintiffs may not purchase the same Gruma products as they purchased during the class period, because they are now aware of the true content of the products, to prevent them from bringing suit would surely thwart the objective of California's consumer protection laws," quoting *Henderson v. Gruma Corp.*, 2011 WL 1362188, *7-8 (C.D. Cal. Apr. 11, 2011)); *Ries*, 287 F.R.D. at 533 ("were the Court to accept the suggestion that plaintiffs' mere recognition of the alleged deception operates to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases, a wholly unrealistic result").

The court agrees with Judge Moskowitz that Article III's standing requirements take precedence over enforcement of state consumer protection laws. See *Mason*,  2013 WL 1969957 at *4 ("Guided by the Ninth Circuit's interpretation of Article III's standing requirements, this Court agrees with the courts that hold that a plaintiff does not have standing to seek prospective

injunctive relief against a manufacturer or seller engaging in false or misleading advertising unless there is a likelihood that the plaintiff would suffer future harm from the defendant's conduct – i.e., the plaintiff is still interested in purchasing the product in question. . . . If an ADA plaintiff must demonstrate likely injury in the future, consumer plaintiffs such as the one in this case must as well. There is no likelihood of injury in the future if a plaintiff has no interest in purchasing the product at issue again because it does not work or does not perform as advertised"); see also *Garrison v. Whole Foods Mkt. Grp., Inc.*, No. 13–5222, 2014 WL 2451290, *5 (N.D. Cal. June 2, 2014) ("It may very well be that the legislative intent behind California's consumer protection statutes would be best served by enjoining deceptive labeling…. But the power of federal courts is limited, and that power does not expand to accommodate the policy objectives underlying state law"). It does not agree, moreover, with those courts that have concluded that applying Article III's standing requirements will preclude all enforcement of state consumer protection laws. First, plaintiffs can sue in state court for injunctive relief. Second, as this very case demonstrates, it is not impossible that a plaintiff or plaintiffs will express a desire to purchase the product at issue in the future. See *Werdebaugh*, 2014 WL 2191901 at *9.

Applying Article III's requirements, the court agrees with Judge Breyer that a plaintiff does not lack standing simply because "he has learned that a label is misleading and therefore will not be fooled by it again." Rather, a plaintiff lacks standing if he has not "express[ed] an intent to purchase the products in the future." *Jones v. ConAgra Foods, Inc.*, No. C 12–01633 CRB, 2014 WL 2702726, *12 (N.D. Cal. June 13, 2014). Plaintiffs argue that two of the named plaintiffs – Pauline Michael and Maureen Towey – have expressed an intent to purchase Wesson Oils in the future.[121] Although they cite page 128 of Michael's deposition, that page does not contain any testimony concerning Michael's desire to purchase Wesson Oils in the future.[122] ConAgra, moreover, has proffered portions of Michael's deposition testimony in which she stated that she stopped purchasing Wesson Oils approximately five or six years ago because her eating

---

[121]Reply at 38.

[122]Levitt Decl., Exh. P at 2.

habits changed.[123]   Although Michael has submitted a declaration stating that she testified erroneously that she had not purchased Wesson Oils since June 27, 2007, and that she continued to purchase Wesson Oils until she was in a car accident in September 2008, which prompted the dietary changes about which she earlier testified, she nowhere states that she wishes to purchase Wesson Oils in the future.  Indeed, both her deposition testimony and her declaration indicates that due to dietary changes, she no longer buys the product.

With respect to plaintiff Maureen Towey, plaintiffs cite page 132 of her deposition.  That page, however, does not contain a statement by Towey that she wishes to purchase Wesson Oils in the future.[124]  ConAgra, moreover, has submitted excerpts of Towey's deposition in which she states that the only purchase of a Wesson Oil she can recall making was in 2010.[125] Consequently, the court cannot conclude that either Michael or Towey has expressed a desire to purchase Wesson Oils in the future.  As a result, the court concludes that none of the named plaintiffs has standing to sue for injunctive relief.  It declines to certify classes under Rule 23(b)(2) as a result.

### b.   Rule 23(b)(3)

#### i.   Whether Common Issues Predominate

##### (a)   Reliance and Causation

Certifying a class under Rule 23(b)(3) requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  FED.R.CIV.PROC. 23(b)(3); see *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004).  The predominance requirement is "far more demanding" than the commonality requirement of Rule 23(a).  *Amchem Products*, 521 U.S. at 623-24.  If common

---

[123]Declaration of Robert B. Hawk in Opposition to Motion for Class Certification ("Hawk Decl."), Docket No. 269 (June 2, 2014), Exh. D at 36-37.

[124]Levitt Decl., Exh. P at 3.

[125]Hawk Decl., Exh. F at 41, 45.

questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then "there is clear justification for handling the dispute on a representative rather than on an individual basis," and the predominance test is satisfied. *Hanlon*, 150 F.3d at 1022. "'[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.'" *Zinser*, 253 F.3d at 1190 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1778, at 535-39 (1986)). This is because, *inter alia*, "the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." *Id.*

Plaintiffs' motion asserts that predominance is easily satisfied because there is a single common question that will have a single answer – whether labeling Wesson Oils – which are made from or contain genetically modified organisms – is false, unfair, deceptive and/or misleading.[126] In this regard, they contend that they will be able to show that the "100% Natural" claim was material to a reasonable consumer and thus that they will be entitled to a classwide inference of reliance and causation.[127] ConAgra counters that individual issues predominate because reliance and causation cannot be determined on a classwide basis.[128]

Although plaintiff submitted a document they denominate Appendix 1, which purports to address the laws of the various states for which they seek to certify classes,[129] the document does not demonstrate that reliance and causation can be proved on a classwide basis with respect to each of the claims plaintiffs assert, and each of the classes they propose. Appendix 1, for example, does not address in any way the putative California class' breach of express warranty claim. For

---

[126]Cert. Motion at 21.

[127]*Id.* at 22.

[128]Opp. Cert. at 19.

[129]This document violates the Local Rules and expanded page limitations that the court authorized in this case, as it is, effectively, legal argument and citations that should have been included in plaintiff's memorandum of points and authorities.

the most part, moreover, the citations provided with respect to classes to be certified under other states' laws do not – at least as represented by plaintiffs – address, on a cause of action by cause of action basis, whether the laws of those states require individualized proof of reliance and/or causation.  ConAgra, for its part, cites several cases suggesting that such proof is required in at least certain of the states at issue.  Based on plaintiffs's submission, the court simply cannot find that they have met their burden of showing that common issues predominate over individual questions because they have not demonstrated that with respect to all claims and all classes, they are entitled to a classwide inference of reliance and causation upon adducing appropriate proof.

Even had plaintiffs adequately shown that a classwide inference of reliance and causation is available for all claims and all classes, the court would not be able to find on the present record that they had demonstrated an entitlement to such an inference.  Citing California law, the Ninth Circuit has held that if a misrepresentation is not material as to all class members, the issue of reliance "var[ies] from consumer to consumer," and no classwide inference arises.  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011) (citing *In re Vioxx Class Cases*, 180 Cal.App.4th 116, 129 (2009)).  Here, as the court noted earlier, the evidence regarding the materiality of "100% Natural" is in conflict.  The evidence plaintiffs proffer to show materiality, moreover, is weak at best.  First, plaintiffs adduce no survey evidence concerning the actual reaction of consumers to the "100% Natural" label on Wesson Oils specifically or the presence of such a label on cooking oils generally.[130]  The portions of ConAgra's market research on which they rely, moreover, do not link consumers' understanding of "100% Natural" to the specific issue raised in this case – i.e., whether consumers believe the label means the product contains no genetically modified organisms or GMO ingredients.  Although plaintiffs' expert, Dr. Benbrook, cites the November 2011 Leatherhead survey and the 2010 Hartman Group survey, it appears that at the time Dr. Benbrook prepared his declaration, he had not read a complete version

---

[130]Although plaintiffs submitted the survey conducted by Dr. Kozup in reply, the court has declined to consider it for the reasons stated in note 88 *supra*.

of at least one of the reports he cites.   The surveys themselves, moreover, have not been submitted.[131]   Consequently, the court has difficulty according them great weight.[132]

### (b)   Damages

Putting aside issues of reliance and causation, Rule 23(b)(3) is satisfied only if plaintiffs establish that "damages are capable of measurement on a classwide basis."   *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).   While plaintiffs have submitted Colin Weir's declaration in which he states that it is possible to determine damages on a classwide basis, Weir has made no attempt to do so.   Although Weir describes the methods he would use to make the calculation – hedonic regression and conjoint analysis – he does not report that he has actually employed them to identify the price premium he believes will provide the classwide measure of relief.[133]   This

---

[131]Plaintiffs request that, in the event the court grants ConAgra's motion to strike Dr. Benbrook's declaration, it take judicial notice of various of the documents he discusses, including the Leatherhead and Hartman Group surveys.   (Request for Judicial Notice, Docket No. 292 (July 1, 2014), Exhs. 8, 28.)   Under Rule 201, the court can judicially notice "[o]fficial acts of the legislative, executive, and judicial departments of the United States," and "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."   The contents of the Leatherhead and Hartman Group surveys are not capable of immediate and accurate determination.   Moreover, plaintiffs ask only that the court take judicial notice "of the fact that the respective agencies, industry groups, and scientific journals published these reports to consumers."   (*Id.* at 2.)   Granting plaintiffs' request thus would not provide a basis on which to accept, or even evaluate, the contents of the surveys.

[132]The court also notes that the Leatherhead survey involved respondents from Italy, France, Germany and the United Kingdom in addition to the United States.   (Benbrook Decl., ¶ 38; Hanssens Decl., ¶ 75.)   As Dr. Hanssens notes, the survey authors commented on the fact that the term natural was less important to U.S. consumers than to European consumers. (Hanssens Decl., ¶ 75.)   Thus, results based on both U.S. and European consumers may have skewed the outcome of the survey.   Hanssens also asserts that the survey data do not specifically address genetically modified organisms, and that 61% of respondents did not equate "natural" with "coming from nature."   (*Id.*, ¶ 76.)

[133]Weir Decl., ¶ 9; Hawk Decl., Exh. G at 113-14.   Weir submitted a rebuttal declaration with plaintiffs' reply, which states that he conducted a preliminary hedonic regression analysis. (Rebuttal Declaration of Colin B. Weir, Docket No. 285 (June 30, 2014), ¶¶ 10, 87-93.)   Because Weir's preliminary analysis is new evidence submitted for the first time in reply, the court declines to consider it.   *Provenz*, 102 F.3d at 1483.   Plaintiffs contend that Weir was unable to complete

alone suffices to support a finding that plaintiffs have not shown that damages can be calculated on a classwide basis.[134]  See, e.g., *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 25 (2012) ("Defendant also argues that the methodology offered by [plaintiff's expert] Capps is too vague for the Court to even evaluate.  The Court concurs.  Capps says he plans to run a regression analysis to determine which products increased in price and by how much as a result of the merger.  Yet, admittedly, he cannot simply compare before-and-after prices; instead, he has to account for other non-merger factors that may have affected price.  Capps's expert report mentions some 'possible explanatory factors' that he might use in his regression . . . but his proposal is tentative at best.  He notes that '[t]he result of merits discovery may further refine this assessment and provide the basis for including additional explanatory factors to be considered as

---

his preliminary analysis by the class certification deadline because ConAgra did not produce Nielsen data until April 28, 2014, four weeks after the March 31, 2014 deadline for production set by Judge Rosenberg, and one week prior to the class certification deadline. (Reply Evidence Response at 14.)  Plaintiffs assert they should not be held responsible for failing to request a continuance because they had previously filed an *ex parte* application seeking an extension of the class certification deadline, which ConAgra opposed.  (*Id.* at 15.)  The application to which plaintiffs refer was filed on March 16, 2014. (*Ex Parte* Application to Modify Scheduling Order or, in the Alternative, for Expedited Scheduling Conference, Docket No. 220 (Mar. 16, 2014).)  The court issued an order on March 28, 2014, *inter alia*, continuing the class certification deadline to May 5, 2014.  (Order Granting Plaintiffs' *Ex Parte* Application to Modify Scheduling Order, Docket No. 230 (Mar. 28, 2014) at 7.)  Thus, plaintiffs' application, and the court's order, predate the events about which plaintiffs complain.  Accordingly, they should have brought ConAgra's failure to comply with the March 31 production deadline to the court's attention and requested appropriate relief.

[134]At the hearing, plaintiffs cited *Werdebaugh*, 2014 WL 2191901 at *25, for the proposition that they were not required to produce a regression analysis and provide final results at the class certification stage.  The case is distinguishable.  There, plaintiffs' damages expert, Dr. Capps, proposed a regression model to isolate damages arising from defendant's allegedly misleading label claims.  The court determined that the proposed model satisfied Rule 23(b)(3), noting that it identified various factors Dr. Capps sought to isolate in order to calculate the price differential resulting from the mislabeling; these included "regional price variance, price changes that result from increasing or decreasing demand for complementary products, and inflation." *Id.* at *26.  Here, by contrast, Weir has identified no factors he seeks to isolate in the models he proposes to create for this litigation.  Moreover, in contrast to the expert in *Werdebaugh,* the court has stricken Weir's declaration under Rule 702 of the Federal Rules of Evidence, and thus is unable to consider even his proposed methodology in deciding plaintiffs' motion.

part of any regression model.'  In other words, not only had Capps not yet performed a single regression, but also he could not even tell the Court the precise analyses he intended to undertake"); *Weiner*, 2010 WL 3119452 at *8 (concluding that plaintiffs had not demonstrated that damages could be proved on a classwide basis because their expert, "Goedde[,] himself concedes that he has done nothing to confirm that his proposed approaches would be workable in this case. For instance, Goedde admits that if he is unable to identify comparable products for Snapple's 'All Natural' beverages, then his 'yardstick' approach will not work.  And yet, Goedde has not even attempted to identify any comparable products to be used in his analysis.  Nor has Goedde attempted to use his two approaches to actually build an empirical algorithm to determine whether a price premium was paid for Snapple's beverages as a result of the 'All Natural' labeling.  He has stated that he will not do so until after a decision on class certification"),

More fundamentally, *Comcast* stands for the proposition that plaintiffs' method of proving damages must be tied to their theory of liability.  *Comcast*, 133 S. Ct. at 1433 ("If respondents prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court.  It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)").  Weir proposes to calculate the price premium attributable to ConAgra's use of the term "100% Natural."[135]  He concedes, however, that "100% Natural" and "non-GMO" are not equivalent.  Specifically, he testified at his deposition that he did not believe the terms were equivalent "because non-GMO is extremely specific about one thing and I – my understanding of the general claim of "All Natural" is that it has many implications."[136]  This is confirmed by the studies Benbrook cites, which list multiple

---

[135]Weir Decl., ¶¶ 4, 9.

[136]Hawk Decl., Exh. G at 66.

possible characteristics that consumers associate with a "natural" label.[137]  Plaintiffs' specific theory of liability in this case is that the "100% Natural" label misled consumers and caused them to believe that Wesson Oils contained no genetically modified organisms or GMO ingredients. Under *Comcast*, therefore, Weir must be able to isolate the price premium associated with misleading consumers in that particular fashion.  It does not appear from his declaration and deposition testimony that he intends to do so.  Rather, it appears he intends merely to calculate the price premium attributable to use of the term "100% Natural" and all of the meanings consumers ascribe to it.  This does not suffice under *Comcast*. See *Vaccarino v. Midland Nat. Life Ins. Co.*, No. 2:11–cv–05858–CAS(MANx), 2014 WL 572365, *7 (C.D. Cal. Feb. 3, 2014 ("In *Comcast*, the plaintiffs advanced four separate theories of antitrust violation, which collectively resulted in subscribers overpaying for cable TV service.  The district court only accepted one of these four theories as susceptible of classwide proof.  The plaintiffs' method of computing damages, however, did not segregate out the harm caused by each of the four theories of antitrust violation proffered by the plaintiffs.  The Supreme Court found that this damages model did not satisfy the requirements of Rule 23(b)(3) because it conflated all four theories of antitrust violation without differentiating between the harms caused by each theory" (citations omitted)).

### (c)    Conclusion Regarding Predominance

For all of the reasons stated, the court concludes that plaintiffs have not shown that common questions predominate over individualized questions.

### ii.    Superiority

The second requirement imposed by Rule 23(b)(3) is that a class action be superior to other methods of resolving class members' claims.  "Under Rule 23(b)(3), the court must evaluate whether a class action is superior by examining four factors: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the

---

[137]Benbrook Decl., ¶ 41.

desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 992 (C.D. Cal. 2006) (quoting *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 469 (N.D. Cal. 2004)).

"Where damages suffered by each putative class member are not large, th[e first] factor weighs in favor of certifying a class action." *Zinser*, 253 F.3d at 1190. Given the low average price of a bottle of Wesson Oil,[138] the price premium attributable to consumers' belief that "100% Natural" means the product contains no genetically modified organisms or GMO ingredients will, if calculable, be quite small. Thus, even if an individual purchased Wesson Oils on a regular basis during the class period, the damages he or she could recover in an individual suit would not be sufficient to induce the class member to commence an action. The funds required to marshal the type of evidence, including expert testimony, that would be necessary to pursue such a claim against a well-represented corporate defendant would discourage individual class members from filing suit when the expected return would be so small. See *Amchem Products*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights").

The second factor likewise favors a finding that a class action is a superior means of litigating these claims. The only litigation of which the court is aware raising the claims asserted here are the cases that are presently pending before the court. These cases were either voluntarily transferred to this jurisdiction by the parties or transferred here by the Panel on Multidistrict Litigation. Given the small recovery that any individual plaintiff can expect, moreover, concentrating the litigation in a single forum is appropriate. Thus, the third factor too favors a finding of superiority.

---

[138]See, e.g., Ugone Decl., Exh. 11 at 309 (showing average retail cooking oil prices generally in the $3-5 range).

63

ConAgra does not address the first three factors.  Rather, it focuses on the fourth – the difficulties likely to be encountered in the management of a class action.  ConAgra asserts that the case will be unmanageable if the court certifies twelve different state classes, each of which alleges multiple claims.[139]  It contends that variations in state law would make a single trial unworkable, as there would have to be different jury instructions and verdict forms for the claims of each state class.[140]   Plaintiffs counter that "courts frequently certify classes under the laws of multiple jurisdictions." *In re Static Random Access memory (SRAM) Antitrust Litigation*, 264 F.R.D. 603, 615 (N.D. Cal. 2009).[141]   Although ConAgra complains that plaintiffs have not submitted a workable trial plan,[142] the Ninth Circuit has held that "[n]othing in the Advisory Committee Notes [to Rule 23] suggests grafting a requirement for a trial plan onto the rule." *Chamberlain v. Ford Motor Co.*, 402 F.3d 952, 961 n. 4 (9th Cir. 2005).  The court notes, however, that it has concerns about the manageability of any trial proceeding.  Thus, if at some point it determines that some or all of plaintiffs' classes can be certified, it will direct plaintiffs to submit a trial plan for its consideration.[143]  See *Gartin v. S&M NuTec LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007) ("Neither Plaintiff nor her counsel has provided any suggestions – much less a plan – to this Court regarding managing the proposed class action"); see also *Zinser*, 253 F.3d at 1189 ("[The] court cannot rely merely on assurances of counsel that any problems with predominance or superiority

---

[139]Opp. Cert. at 36.

[140]*Id.* at 37.

[141]Reply at 28.

[142]Opp. Cert. at 37 (citing *Zinser*, 253 F.3d at 1189)

[143]In their reply, plaintiffs offer some suggestions – (1) severing the claims of each of the state classes, and having a "bellwether" trial as to the claims of one or more of the classes; (2) having a single trial of the common elements of all twelve state classes' claims; or (3) severing the claims of each of the state classes and returning them to their respective jurisdictions for trial. Plaintiffs do not clearly indicate which, if any, of these approaches they favor, although certain of their comments suggest they believe a single trial would be workable.  Because plaintiffs' failure to satisfy other requirements of Rule 23 preclude certification, the court need not evaluate at this time which, if any, of plaintiffs' proposed methods of trying their claims would be workable.

can be overcome"). Because the court is not in a position to certify classes now, it need not address the question of a trial plan in any greater detail at this time. It notes simply that absent the additional information concerning the variations in state law discussed elsewhere in this order, it is not in a position to assess how manageable or unmanageable a trial of plaintiffs' claims would be.

### iii.   Conclusion Regarding Rule 23(b)(3)

Because plaintiffs have not demonstrated that common questions predominate over individual issues, and because they have proffered insufficient information concerning variations in the law of the twelve states in which they seek to certify classes to permit the court to determine finally whether a class action is superior, they have not satisfied Rule 23(b)(3).

### 4.   Rule 23(c)(4)

Plaintiffs argue alternatively that if the court determines that classes cannot be certified under Rule 23(b), it should certify relevant issue classes under Rule 23(c)(4). This rule provides: "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." FED.R.CIV.PROC. 23(c)(4). The Ninth Circuit has endorsed the use of issue classes where individualized questions predominate and make certification under Rule 23(b)(3) inappropriate. See *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues"); see also *Dukes*, 603 F.3d at 620 n. 43 ("Relying on Rule 23(c)(4), our own precedent also generally allows class treatment of common issues even when not all issues may be treated on a class basis"). As Judge Wilson noted in *Amador v. Baca*, __ F.R.D. __, 2014 WL 1679013 (C.D. Cal. Mar. 12, 2014), the Ninth Circuit "did not explain which cases might be 'appropriate cases' for severance of particular issues" because "[i]t was unnecessary to address th[at] question in view of the numerous 'deficiencies in th[e district court's] certification [order].'" *Id.* at *17.

Plaintiffs propose that the court certify an issue class to litigate "whether ConAgra has misled consumers by labeling Wesson Oils as being '100% Natural' when, in fact, they are made from GMOs."[144]  While this is certainly an issue that is common to all members of all proposed classes – as the court found above – it is unclear, at this stage, what ultimate objective certifying a class to try this issue would advance.  Specifically, if members of various of the state classes must prove individualized reliance and causation – an issue the court cannot determine based on the deficiencies in plaintiffs' showing – certifying this type of issue class might simply consume time and resources (both the parties' and the court's) without fundamentally advancing the resolution of the litigation.  Stated differently, trying this issue would not necessarily determine even the question of ConAgra's liability.  Thus, the court presently declines to certify the issue class plaintiffs have identified.

### III.  CONCLUSION

For the reasons stated, the court denies plaintiffs' motion for class certification without prejudice.  If plaintiffs can address the deficiencies noted in this order, they can file an amended motion for class certification within thirty (30) days of the date of this order.

DATED: August 1, 2014

_____

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[144]Cert. Motion at 33.

66