1

**MILBERG LLP**
DAVID E. AZAR (SBN 218319)
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90071
Telephone:  (213) 617-1200
Facsimile:   (213) 617-1975
dazar@milberg.com

2

3

4

5

**GRANT & EISENHOFER, P.A.**
ADAM J. LEVITT (pro hac vice)
EDMUND S. ARONOWITZ (pro hac vice)
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
Telephone:  (312) 214-0000
Facsimile:   (312) 214-0001
alevitt@gelaw.com
earonowitz@gelaw.com

6

7

8

9

10

*Interim Class Counsel for PLAINTIFFS*

11

12

UNITED STATES DISTRICT COURT

13

CENTRAL DISTRICT OF CALIFORNIA

14

WESTERN DIVISION

15

16

IN RE CONAGRA FOODS, INC.

17

18

19

20

21

22

23

24

25

Case No. CV 11-05379-MMM (AGRx)
MDL No. 2291

<u>CLASS ACTION</u>

<u>REDACTED</u>

EXPERT AMENDED DECLARATION
OF COLIN B. WEIR IN SUPPORT OF
PLAINTIFFS' AMENDED MOTION
FOR CLASS CERTIFICATION

DATE:       November 17, 2014
TIME:       10:00 a.m.
CTRM.:      780
JUDGE:      Hon. Margaret M. Morrow

26

27

28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

IN RE CONAGRA FOODS, INC.

Case No. 11-cv-05379-MMM

MDL No. 2291

Amended Declaration

of

# COLIN B. WEIR

September 5, 2014

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108.  ETI is a research and consulting firm specializing in economics, statistics, regulation, and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.     I am the same Colin B. Weir who has previously submitted testimony in this litigation.  My Statement of Qualifications is attached hereto as Exhibit 1.  I incorporate the contents of my May 5, 2014 Declaration ("Weir Declaration" attached hereto as Exhibit 4), and June 30, 2014 Rebuttal Declaration ("Weir Rebuttal Declaration" attached hereto as Exhibit 5) for completeness.

## II. SUMMARY OF OPINIONS

2.     As further explained and elaborated upon below, based on my preliminary analysis of historical (February 2009 – February 2014) retail price data (over 1.26-billion transaction data points) and product attribute data (including 20 such attributes) for Wesson Oil and over 100 competitor cooking oils,[1] and my application of the well-accepted econometric technique of hedonic regression with a semi-log specification to that data, it is my opinion that the presence of the "100% Natural" claim on the label of every bottle of Wesson Oil caused the retail price per ounce of all Wesson Oil to have been sold at a higher price than it otherwise would have been without the presence of that "100% Natural" claim.  The preliminary, positive coefficient for the Natural Claim, nationwide, across all four types of Wesson Oil, across all sizes, and across multiple years, is 2.28%.  At this stage, the preliminary model is more useful in determining the

---

[1] CAG0031947.  The data in this excel spreadsheet was collected by the Nielsen Company and produced by ConAgra in this litigation in response to Plaintiffs' discovery requests.  This data, along with other relevant price data obtained by Plaintiffs through the course of discovery in this litigation, is described in further detail in section IV below.



ECONOMICS AND TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 2 of 34

general directional nature of the Natural Claim coefficient (i.e., the fact that there is a positive, significant coefficient—indicating that there is a price premium associated with the Natural Claim), than it is for determining its specific value.

3.   In other words, because ConAgra chose to place the product claim "100% Natural" on every bottle of Wesson Oil, consumers nationwide paid a retail "Price Premium" on every ounce of Wesson Oil that they purchased.[2]

4.   By multiplying this Price Premium (or alternatively, more geographically or temporarily specific price premiums obtained by applying the same hedonic regression techniques to, for example, single state or single year, as opposed to nationwide or multi-year, historical retail price data) as described in detail below, with the total amount consumers spent to purchase Wesson Oil at retail (or the total amount spent to purchase Wesson Oil at retail in just one state or in just one year), I would be able to calculate the total consumer impact, in dollars, caused by the "100% Natural" claim ConAgra placed on every bottle of Wesson Oil.

5.   My understanding of Plaintiffs' theory of liability in this case is that ConAgra violated state consumer protection laws (or breached, express and implied warranties or was unjustly enriched) by placing the "100% Natural" claim on every bottle of Wesson Oil because that "100% Natural" claim is objectively false, deceptive, misleading, and/or unfair to a reasonable consumer.

6.   I further understand that Plaintiffs claim the reason ConAgra's "100% Natural" claim is objectively false, deceptive, misleading, and/or unfair to a reasonable consumer is because Wesson Oil is made from GMO ingredients and that a product made from GMO ingredients

---

[2] As used throughout this declaration, the term "Price Premium" is used to indicate the additional amount that consumers paid for Wesson Oils as a direct result of the 100% Natural Claim only, and not the overall premium that Wesson Oils may command in the marketplace vis-a-vis competitor products.  Mazola is sometimes more expensive than Wesson, Wesson is sometimes more expensive than Crisco, and name brands are almost always more expensive than store brands.  Merely observing these retail price differences, however, is not enough to determine whether or not the "100% Natural" claim on Wesson Oil caused the retail price of Wesson Oil to have been higher or lower than it would have been without the claim.  Hedonic regression analysis (or other technique) is necessary to determine the Price Premium attributable to the "Natural" claim from the raw retail price data.

ECONOMICS AND
TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 3 of 34

cannot truthfully and fairly be marketed as "100% Natural" because GMO ingredients are artificial, synthetic, and not natural.

7.    Thus, it is my opinion that, if Plaintiffs are correct as to their theory of liability – that it was a violation of law for ConAgra to have placed the "100% Natural" claim on the label of each bottle of Wesson Oil – then the total (i.e., Classwide) economic harm suffered by Plaintiffs and all other members of the proposed Class is the amount of additional money they paid for Wesson Oil because of the presence of the "100% Natural" claim on the label of every bottle of Wesson Oil they purchased.

8.    In my opinion, the individual meaning any one consumer ascribes to the term "100% Natural" is irrelevant to this analysis because their individual subjective belief does not alter the market price of Wesson Oil nor does their individual subjective belief alter the amount they paid for Wesson Oil at retail.  Regardless of whether an individual consumer believed "100% Natural" meant GMO-free, preservative free, nothing artificial, a combination of these attributes, or even nothing at all, that individual consumer still paid more for Wesson Oil because of the presence of the "100% Natural" claim on the label because it is the market as a whole, and not the individual consumer, that determines the retail price of Wesson Oil—and the market as a whole places a premium on natural products.  Individual Class Members have no control over the price of Wesson Oil, or the price premium resulting from the "100% Natural" claim.  Individual reasons consumers may have for purchasing Wesson Oil do not alter this price premium, nor do they alter the injury arising from paying that premium because the price, and resulting price premium are set by the market.  Thus, individual interpretation of the claim is not relevant for the determination of class-wide damages.  The "100% Natural" label is a binary "yes or no question" -- the label either says it or it does not.  Calculating a but-for price premium does not depend on interpretation of the label.

9.    Thus, it is my opinion that, in the event Plaintiffs establish that ConAgra's label claim that Wesson Oil is "100% Natural" is unfair, false, deceptive, and/or misleading as they



Amended Declaration of Colin B. Weir
September 5, 2014
Page 4 of 34

allege in this litigation, and that therefore ConAgra's "100% Natural" claim should not have been made on the label of every bottle of Wesson Oil sold, it *is* possible to determine damages, with a reasonable degree of specificity, certainty, and accuracy, attributable to ConAgra's conduct of placing the "100% Natural" claim on the label of every bottle of Wesson Oil by applying the scientifically valid economic methodology of hedonic regression to common, class-wide, aggregate historical retail price and attribute data for Wesson Oil and competing cooking oils to calculate a class-wide Price Premium, and then multiplying that Price Premium by the total retail amounts all Class Members paid for Wesson Oil to yield total class-wide damages.[3]

10.   It is *also* possible to determine damages attributable to ConAgra's conduct of placing the "100% Natural" claim on the label of every bottle of Wesson Oil by using a conjoint analysis survey (such a survey would be common, classwide evidence) to calculate the price premium for Wesson Oil labeled as "100% Natural" and Wesson Oil without such a label and multiply the price premium as calculated by the conjoint analysis by the total retail amounts all Class Members paid for Wesson Oil to yield total class-wide damages.

11.   I will discuss these techniques, and their specific application to this litigation, including a preliminary application of the hedonic regression technique to the available data, in detail below.   I will note here, however, that neither of these techniques requires any individual

---

[3] In this report, I discuss the calculation of "price premium" damages, which, in my opinion, is an economically sound method of providing restitution to Class Members should liability be established in this litigation.  The economic harm to Class Members stems from the retail prices they paid, not from the wholesale revenues that ConAgra received.  (Though these are related concepts: *ceteris paribus,* ConAgra charging a premium at wholesale will result in a corresponding premium in retail prices.)  I understand, however, that legal considerations may affect the chosen method for determining damages in this case.  For example, the court may instead prescribe a disgorgement of the full retail purchase price paid for the Products, a disgorgement of the money obtained by ConAgra through the sale of the Products, or a disgorgement of the profits that inured to ConAgra from the sale of the Products.  Should one of these, or another alternate method of calculating damages be prescribed by the Court, it is my opinion that I would be able to calculate and measure such damages using ConAgra's internal sales and profit data, described below.  ConAgra has already provided data relating to its wholesale revenues from the sale of Products, and acquires market research data that provides detailed information about the retail sales of the Products. Along with information about the quantity of Products sold during the class period (which is also maintained by ConAgra in the normal course of business), information of this sort would be sufficient to calculate damages under such alternate methodologies.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 5 of 34

inquiry of any particular Class Member because these techniques produce Class-wide results using common evidence, consisting of historical price and attribute information (such as that collected by Nielsen and/or IRI), and in the case of a conjoint analysis, an additional survey.  The result of each of these analyses will be the determination of a price premium that Class Members paid as a result of ConAgra's "100% Natural" claim (hereinafter, the "Product Claim") on Wesson Oils (hereinafter, the "Product").  Multiplying this price premium with the total amount consumers paid for Wesson Oils allows for the computation of an economically valid Class-wide damage figure.

## III.  ENGAGEMENT AND ASSUMPTIONS PROVIDED BY COUNSEL

12.  I have been advised by Plaintiffs' counsel that they are seeking certification of eleven (11) separate statewide classes, with each of the classes defined as:  All persons who reside in one of the Class States[4] who have purchased Wesson Oils[5] within the applicable statute of limitations periods established by the laws of their state of residence through the final disposition of this and any and all related actions.[6]  Throughout this report, I refer to these eleven (11) separate single-state classes as the "Class" and the persons who meet the objective criteria set forth in the class definition as "Class Members."

13.  I have been further advised by Plaintiffs' counsel that, on the outside packaging of each unit of the Wesson Oils, ConAgra, throughout the time period relevant to this litigation, represented that such Wesson Oils are "100% Natural."

---

[4] The Class States are California, Colorado, Florida, Illinois, Indiana, Nebraska, New York, Ohio, Oregon, South Dakota, and Texas.

[5] Wesson brand cooking oils, including Wesson Vegetable Oil, Wesson Canola Oil, Wesson Corn Oil, and Wesson Best Blend, in a variety of sizes, hereinafter "Wesson Oils" or "Products."

[6] I understand these statutes of limitations may vary to some extent depending on the state and legal claim at issue.


ECONOMICS AND TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 6 of 34

14.   I have been further advised by Plaintiffs' counsel that Plaintiffs allege ConAgra's "100% Natural" statement (the "Product Claim") is unfair, false, deceptive, and/or misleading, in violation of the statutory and/or common law of each state at issue, because such Wesson Oils are not, in fact, "100% Natural."

15.   I have been further advised that each of the Plaintiffs alleges they would not have purchased or would not have paid as much for Wesson Oils but for ConAgra's inclusion of the Product Claim on the label of each unit of Wesson Oil sold.[7]

16.   I have been asked by counsel for Plaintiffs to determine whether it is possible to determine Class-wide damages attributable to the Product Claim--in the event that the Court (and/or jury) find that the Product Claim is unfair, false, deceptive, and/or misleading as Plaintiffs allege in this litigation, and hence should not have been made by ConAgra in the first place--on a Class-wide basis using common evidence and, if so, to provide a framework for such a calculation.

17.   ETI is being compensated at the rate of $600 per hour for my work on this case.

18.   The documents that I reviewed in the course of preparing this declaration are outlined in Exhibit 2.

---

[7] *See, generally,* December 19, 2012 Second Consolidated Amended Class Action Complaint ("Complaint").  I have reviewed the Complaint.  *See also*, Deposition of Robert Briseño, July 17, 2013; Deposition of Michele Andrade, August 19, 2013; Deposition of Jill Crouch, August 20, 2013; Deposition of Pauline Michael, August 21, 2013; Deposition of Necla Musat, March 12, 2014; Deposition of Maureen Towey, March 13, 2014.  I have reviewed the transcripts of these depositions.

ECONOMICS AND TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 7 of 34

## IV.  ECONOMIC SCIENTIFIC METHOD AS APPLIED

## TO THIS CASE

**The Central Question of the Litigation**

19.  The question I seek to answer through the application of economic analysis in this litigation is whether, in fact, between 2007 and the present, consumers would have paid more for, less for, or the same amount for Wesson Oil had ConAgra *not* labeled every bottle of Wesson Oil "100% Natural."

20.  The presence of a "100% Natural" label claim is a binary "yes or no question" -- the label either says "100% Natural" or it does not.  As such, we are dealing with a simple but-for question:  What did the Class pay for Wesson Oil with the "100% Natural" Claim (i.e., the actual, historical sales data), and what would they have paid had the Claim not been made (the but-for, hypothetical price had ConAgra not violated the law).  Calculating a but-for price premium does not depend on an individual interpretation of the Claim because there is no middle ground.  If the market price for Wesson Oils was higher as a result of the "100% Natural" Claim, then ALL consumers will have paid a higher price than if the claim had not been made.

████████████████████████████████████████████

**Hypothesis**

22.  My hypothesis is that ConAgra caused the price of Wesson Oil to have been higher, from 2007 through the present, than it otherwise would have been, by including the "100%

---

[8] Deposition of Keith Ugone, June 18, 2014, ("Ugone Deposition"), at 59, attached as Exhibit 42 to the Declaration of David E. Azar In Support of Plaintiffs' Memorandum of Points and Authorities In Support of Plaintiffs' Amended Motion for Class Certification ("Azar Decl.").

ECONOMICS AND
TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 8 of 34

Natural" Product Claim on the label of every bottle of Wesson Oil sold at retail to consumers, including all Plaintiffs and all Class Members.



**Economic Literature Supports This Hypothesis**

24.   Even before analyzing data specific to the prices and attributes of Wesson Oil and other cooking oils, I have reason to believe that this hypothesis is correct because numerous economic studies of other products have confirmed that consumers place a positive value on "natural" claims, and that inclusion of a "natural" label on a product causes that product to have a higher market price than it otherwise would have had.

25.   The bulk of the literature testing for the presence of such price premiums associated with production standard claims like "natural" begins with the same logical hypothesis that such a premium exists, and affirms the hypothesis after testing.[14]

---

[9] Ugone Deposition, at 5-6.

[10] Ugone Deposition, at 6-7.

[11] Ugone Deposition, at 8-9.

[12] Ugone Deposition, at 59-60.

[13] Ugone Deposition, at 179-180.

[14] My review of the literature did not turn up a study that concluded that the labeling of a product with a production standard claim such as "organic" or "natural" did not produce a price premium.



ECONOMICS AND TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 9 of 34

26.  One hedonic regression study shows that a product with an "all natural" or "natural" label acquires a price premium very similar to one with an "organic" label.  While organic products must satisfy many more requirements in order to be labeled "organic," both labels have a similar positive effect on the price of a product.  This study, (examining the different effects of the terms "all natural" and "organic" in the yogurt market) finds the positive price premiums attributable to "natural" and "organic" labels to be statistically similar.[15]

27.  Another hedonic regression study examines the price attributes of retail eggs.  An examination of retail price data established that "organic feeding" has a positive effect on the retail price of eggs.[16]

28.  In another case, the same method was used in order to examine the impact of nutrition labeling on breakfast foods.  "Organic" was found to also have a significant positive effect on the retail price of breakfast bars, granola and hot cereals.[17]

29.   Indeed, the price premium associated with "natural" or "organic" production standard claims is a very common attribute tested in the literature.[18]

---

[15] *Organic and All Natural: Do Consumers Know the Difference?* Anstine, Jeffrey, Journal of Applied Economics and Policy 26.1 (2007):15-27.

[16] *Hedonic Analysis of Retail Egg Prices*, Karipidis, Philippos I., *et* al, Journal of Food Distribution Research 36.3 (2005).

[17] *The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals,* Muth, Mary K., *et al Contributed Paper prepared for presentation at the International Associate of Agricultural Economists Conference, Beijing, China*. August 2009. RTI International and Food and Drug Administration, Center for Food Safety and Applied Nutrition. 10 March 2014.
http://ageconsearch.umn.edu/bitstream/50333/2/Manuscript_Value_of_Labeling_Statements_IAAE%20174.pdf

[18] *See, e.g., The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices*, Chang, Jae Bong, *et al*, Journal of Agricultural and Resource Economics 35.3 (2010): 406-423; *Organic Premiums of U.S. Fresh Produce*, Smith, T. A. *et al*, 2008 Proceedings of the NCCC-134 Conference on Applied Commodity Price Analysis, Forecasting, and Market Risk Management. St. Louis, MO. [http://www.farmdoc.uiuc.edu/nccc134]; *see also The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints*, Doane, Michael (Analysis Group) and Hartman, Raymond, Journal of Law, Economics, & Organization, Vol. 3, No. 2 (Autumn, 1987), pp. 351-372; *see also, When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013)
http://www.analysisgroup.com/assessing_false_advertising_claims.aspx.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 10 of 34

**ConAgra's Own Research Supports the Hypothesis**

    30.  In addition to the background literature I discussed immediately above, I have also reviewed internal ConAgra marketing studies that lend further support to my hypothesis that inclusion of a "natural" label on a product causes that product to have a higher price than it otherwise would have because ConAgra's internal studies state that the "natural" claim on Wesson Oil drives consumer demand for Wesson Oil.[19]

    31.  In research conducted by or for ConAgra, it was determined that the "100% Natural Claim" was very important to consumers and that it was a motivating purchase driver.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 11 of 34





Amended Declaration of Colin B. Weir
September 5, 2014
Page 12 of 34

physical volume, net sales, net sales/case, and "PCM"[27] (again, broken down by fiscal year) of each Wesson Oil "Promo Group"[28] sold to each of ConAgra's retailer customers.[29]  This document appears to have been created internally by ConAgra ███████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████  These figures are useful in calculating total class-wide damages, from common evidence, after a "Price Premium" for the "100% Natural" claim is determined using either the hedonic regression or conjoint analysis technique I describe below.  These figures are also common evidence that can be used should it be determined by the Court that disgorgement of ConAgra's profits (in the alternative to, or as a supplement to, restitution of the additional amount consumers may have paid for Wesson Oil as a result of ConAgra' "100% Natural" claim) is an appropriate remedy in this case.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[30] "Net Sales" is defined in the document as including "list price, trade deductions to customers, coupons, and slotting expenses."  It is unclear whether these Net Sales figures are based on the wholesale price of Wesson Oil to retailers or the retail price of Wesson Oil to consumers, though from the context in which the data is presented, I believe the former to be more likely.

ECONOMICS AND
TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 13 of 34

39.  CAG0005560 is an excel spreadsheet named "WESSON-PPGs.xlsm" created by the market research company IRI.  This spreadsheet includes data from each four (4) week period from July 26, 2009 through February 23, 2014 on 35 particular Wesson Oil products (as identified by name, size in ounces, and UPC) as well as on 54 competitive "PPGs"[31] including Wesson, Crisco, Mazola, Private Brands, 123, and Lou Ana.  The data includes dollar sales, unit sales, units sold, and average price per unit (on both promoted and non-promoted basis).  The data can be further broken down as coming from particular geographic locations (i.e., Los Angeles, Chicago, etc.), particular retailers (i.e., Publix, Ralley's, etc.), or particular groups of retailers (i.e., Food, Drug, or Mass Merchandiser retailers).  The data from this spreadsheet, after being properly formatted, can be used as an input into a hedonic regression analysis  (or as the basis for a conjoint analysis) to determine more geographically, temporally, or promoted product group specific price premiums.

40.  CAG0005561 is an excel spreadsheet named "COOKING_SALAD OILS-BRANDS.xlsm" created by the market research company IRI.  This spreadsheet includes dollar sales, unit sales, units sold, and average price per unit (on both promoted and non-promoted basis) data from each four (4) week period from July 26, 2009 through February 23, 2014 that can be broken down by geography, retailer, or retailer type similar to CAG0005560 described above.  However, instead of listing data on a UPC or PPG basis, this data set presents data on a brand-by-brand basis for 401 different brands of cooking or salad oils.  While the data in this spreadsheet may not be directly input into the regression I describe below, it may be useful as

ECONOMICS AND
TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 14 of 34

another source from which brand equity values can be compared, and is an indication of the

availability of pricing and unit sales data.

41.   CAG0005562 is an excel spreadsheet named "FDMx Wesson.xlsx" created by the

market research company Nielsen.  This spreadsheet includes, on an annual basis for the 52

weeks ending February 20, 2010 through the 52 weeks ending February 15, 2014 (i.e., data from

February 2009-2014), total retail dollar volume, unit volume, and price (on both promoted and

non-promoted basis) data on nearly 5,000 different shortening/oil products as identified by name,

brand, type (i.e., grade of olive oil, corn oil, canola oil, etc.), size (in ounces or pounds), and

UPC.  This data, after proper formatting, and after matching with relevant attributes, may be

input into a hedonic regression model to determine price premiums attributable to known and

properly coded product attributes, as further explained below.

42.   CAG0031911 is an excel spreadsheet named "ALB OIL ALL UPC.xlsx"  created by

the market research company Nielsen.  This spreadsheet includes, for the 52 weeks ending

March 16, 2013 and the 52 weeks ending March 15, 2014, dollar volume, unit volume, and price

data (on both promoted and non-promoted basis) for over 2800 different shortening oils (as

identified by UPC, brand name, type, and size) sold by retailers Albertsons, Acme, Jewel, and

Shaws, in a number of different geographic areas (e.g., "Albertsons Idaho CEN TA," "Jewel

Chicago CEN TA," "Shaws Mass[achusetts] Rhode Island CEN TA," etc.).  This data, after

proper formatting, and after matching with relevant attributes, may be input into a hedonic

software model to evaluate the price premium based on specific retailer or specific geographical

area.

43.   CAG0031912 is an excel spreadsheet named "MEJ OIL ALL UPC YEAR 1 of

2.xlsx" created by the market research company Nielsen.  This spreadsheet includes, for the 52

weeks ending March 16, 2013, dollar volume, unit volume, and price data (on both promoted and

non-promoted basis) for over 1800 different shortening oils (as identified by UPC, brand name,

type, and size) sold by the retailer Meijer in a number of different geographic areas (e.g.,



Amended Declaration of Colin B. Weir
September 5, 2014
Page 15 of 34

"Eastern Meijer Trading Area," "Total Meijer Trading Area," Southern Meijer Trading Area," etc.). This data, after proper formatting, and after matching with relevant attributes, may be input into a hedonic regression model to evaluate the price premium based on a specific retailer or specific geographical area.

44. CAG0031913 is an excel spreadsheet named "MEJ OIL ALL UPC YEAR 2 of 2.xlsx" created by the market research company Nielsen. This spreadsheet includes, for the 52 weeks ending March 15, 2014, dollar volume, unit volume, and price data (on both promoted and non-promoted basis) for over 1800 different shortening oils (as identified by UPC, brand name, type, and size) sold by the retailer Meijer in a number of different geographic areas (e.g., "Eastern Meijer Trading Area," "Total Meijer Trading Area," Southern Meijer Trading Area," etc.). This data, after proper formatting, and after matching with relevant attributes, may be input into a hedonic regression model to evaluate the price premium based on specific retailer or specific geographical area.

45. CAG0031914 is an excel spreadsheet named "SyndAccts Nitro Wesson ex DG ex SAL.xlsx" created by the market research company Nielsen. This spreadsheet includes for the 52 weeks ending March 16, 2013 and the 52 weeks ending March 15, 2014, dollar volume, unit volume, and price data (on both promoted and non-promoted basis) for over 6,290 different shortenings and oils (as identified by UPC, brand name, type, and size) sold by retailers Ingles, Meijer, and Roundys, in a number of different geographic areas for Meijer (e.g., "Central Meijer Trading Area," etc.) and in total for Ingles and Roundys. This data, after proper formatting, and after matching with relevant attributes, may be input into a hedonic regression model to evaluate the price premium based on specific retailer or specific geographical area.

46. CAG0031947 is an excel spreadsheet named "FDMx Wesson – all char.xlsx" created by the market research company Nielsen and is the source of the data I use in the preliminary hedonic regression I describe below. This spreadsheet contains all of the same categories of data as CAG0005562 (annual price and volume data on nearly 5,000 different shortening/oil products



Amended Declaration of Colin B. Weir
September 5, 2014
Page 16 of 34

identified by UPC) but adds columns of data of over 20 different cooking oil product attributes, including brand names, unit sizes, oil variety, and product label claims such as "natural," "gmo free," "cholesterol free," "preservative free" or "no preservatives added," "no salt or sodium," "organic," and "omega 3 presence," among others.  Because this data set combines price and attribute information (including specifically "natural" claim attribute information) for a wide variety of competitive cooking oil products, including Wesson, Crisco, Mazola, and private labels, I am able to input this data, after formatting, into a regression model to calculate hedonic values of various product attributes for particular products.

47.  CAG0031948 is excel spreadsheet named "WESSON 042514.xlsx" that appears to supplement CAG0001412 with profit contribution margin information for 2013-2014.  This document appears to have been created internally by ConAgra.

48.  CAG0031949 is an excel spreadsheet named "Wesson updated financials – Revised 4 21 14.xlsx" setting forth a FY2008-FY2014 Wesson Oil Profit and Loss Summary (broken down by fiscal year), updating CAG0001411 with two (2) years of additional data.  This document appears to have been created internally by ConAgra. ███████████████████

████████████████████████████████████████████████████████████████████

████████████ These figures are useful in calculating total classwide damages, from common evidence, after a Price Premium for the "100% Natural" claim is determined using either the hedonic regression or conjoint analysis technique I describe below.  These figures are also common evidence that can be used should it be determined by the Court that disgorgement of ConAgra's profits (in the alternative to, or as a supplement to, restitution of the amount consumers may have paid more for Wesson Oil as a result of ConAgra's "100% Natural" claim) is an appropriate remedy in this case.

49.  I have also received three (3) spreadsheets of data directly from IRI, containing oil sales data from 2009-mid 2014, on a four (4)-week basis, both nationwide and by state for each



Amended Declaration of Colin B. Weir
September 5, 2014
Page 17 of 34

of the proposed classes in this case.  These spreadsheets contain dollar and unit sales information for more than 1,000 oil products.

50.  While this is all the price, cost, and attribute information I have obtained thus far, these documents affirm my understanding that more geographically and temporally specific information is available from the market research companies IRI and Nielsen that would allow me to conduct more refined regressions using more specific data, and that Plaintiffs' counsel are working to obtain that data from those companies.

**Methodology 1:  Use of Hedonic Regression to Test Hypothesis**

51.  Regression analysis is an econometric tool commonly used by economists. Regression analysis identifies and quantifies the relationship between two or more variables. Regression analysis seeks to identify the variation in the so-called "dependent variable" (such as the price of oil) through its relationship with one or more "independent" or "explanatory" variables (such as whether or not a bottle of oil is labeled as "100% Natural").[32]  Regression analysis can identify both whether a particular effect is present (such as to confirm that a "Natural" claim does increase the price of oil) and the overall amount of such an effect (by how much does a "Natural" claim increase the price of oil).

52.  As a very simple example, one could use regression analysis to determine whether cars with air conditioning are more expensive than cars without air conditioning.  In this example, the dependent variable would be the price of a car, and the independent variable would be a yes-or-no variable that identifies whether a car in the dataset has air conditioning.  In this simple example, it might seem like a simple comparison of a car with air conditioning and one without could be informative as to how air conditioning affects the price of cars, and that regression is not necessary.

---

[32] An error term, also called the "disturbance" term, captures the effects of chance events, unmeasured variables, and other residuals as calculated by the regression model.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 18 of 34

53.  In a slightly more complex example, the goal is to determine whether air
conditioning commands a price premium in automobiles but the comparison is between the price
of a Mercedes without air conditioning against the price of a Kia that has air conditioning.  The
price of the Mercedes is always going to be higher than the price of the Kia because of the
Mercedes brand.  This direct comparison tells us nothing about the price of the Kia (or
Mercedes) with and without air conditioning.

54.  Here, regression analysis can be used to identify the relationship and isolate the
effects of multiple factors that influence price (both brand *and* air conditioning).  The regression
analysis will demonstrate that, even though the total price of the Mercedes will be higher than
the price of the Kia, the price of the Kia will be higher if the car comes with air conditioning than
the price of the Kia without air conditioning.  Hedonic regression can model data about the these
cars to measure the hypothetical premium that a Mercedes with air conditioning would command
over a Mercedes without air conditioning.

55.  Hedonic regression is an application of standard regression techniques that measures
the value of various product attributes.  Hedonic regression is based on the concept that each
product attribute has a different and measurable impact on aggregate consumer utility, i.e.,
consumers will pay a certain amount for each product attribute.

56.  Stated another way, the theory behind hedonic regression is that the price of any
particular product can be broken apart into the prices of that product's many attributes, even
though the attributes themselves are not sold separately.

57.  First detailed by Sherwin Rosen in 1974,[33] hedonic regression is now widely used by
economists to measure the value of all types of product attributes.  Indeed, there are numerous
studies that apply the hedonic regression technique to myriad consumer products and the practice

---

[33] *Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition.* Rosen, Sherwin, The Journal
of Political Economy, Vol. 82, No. 1. (Jan. - Feb., 1974) ("Rosen").



Amended Declaration of Colin B. Weir
September 5, 2014
Page 19 of 34

has been adopted by statistical agencies with a focus on measuring consumer prices (e.g., the U.S. Bureau of Economic Analysis, the U.S. Bureau of Labor Statistics).[34]

58.   Hedonic regression has a long history of use for determining damages in class action litigation.

59.   Recently, various courts have found that hedonic regression analysis is a suitable method for determining class-wide damages in consumer class action lawsuits.[35]

60.   The Defendant's expert's own firm also supports the use of hedonic regression (and conjoint analysis) for use in class actions.  One article, co-written by former Analysis Group principal Michael J. Doane and professor Raymond Hartman, stated:

> We have proposed the use of hedonic regression analysis as a tool to assist the courts in dealing with the difficult procedural decisions involved in these certification proceedings. Our proposed use of hedonic analysis fundamentally links class certification to the estimation of damages. In our application, we have used hedonic analysis to help certify class *specifically* by estimating the uniform and common damage caused to plaintiffs by the tortious behavior of defendant.[36]

61.   In another more recent publication sent to Analysis Group clients, Laura Stamm, Analysis Group Managing Principal, and Prof. Joel Steckel, Analysis Group Academic Affiliate, endorse the use of both hedonic regression and conjoint analysis, not just in class action cases generally, but specifically to determine damages in class action cases involving "all natural" claims:

---

[34] The use of hedonic regression in individual studies is too widespread to exhaustively document in detail. *See, e.g., The Expanding Role of Hedonic Methods in the Official Statistics of the United States,* Moulton, Brent R., Bureau of Economic Analysis, U.S. Department of Commerce, June 2001.  Additional examples of studies using hedonic regression have been set forth above.

[35] *See, e.g., Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, *17-19 (N.D. Cal. May 30, 2014); and *Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, *24-26 (N.D. Cal. May 23, 2014).

[36] *The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints*, Doane, Michael (Analysis Group) and Hartman, Raymond, Journal of Law, Economics, & Organization, Vol. 3, No. 2 (Autumn, 1987), pp. 351-372.  (Emphasis original.)



Amended Declaration of Colin B. Weir
September 5, 2014
Page 20 of 34

> [U]sing econometric analysis, we can isolate the portion of the price of the "all
> natural" product at issue that can be attributed to its claims of being healthful.
> [....]
>
> We still have to examine the claim's impact on consumers – only now we must
> define harm somewhat differently.  Instead of defining harm in terms of lost
> sales, we would likely define it as the difference between what the consumer
> paid for a product or service and what she received.  We can use a variety of
> tools to assess this.  We can employ hedonic price models, discrete choice
> analysis, or conjoint analysis to conduct market research that will help
> determine the economic value of a claim to consumers.[37]



63.   Hedonic regression allows for the study of any variety of product attributes ranging from quality, geo-location and brand, to production standard claims such as "natural" and "organic," including the "100% Natural" production standard claim at issue here.

64.   In a hedonic regression, regression analysis is run on historic pricing and attribute data.  The result is the determination of which attributes[39] explain which portions of the price.

---

[37]*When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013)
http://www.analysisgroup.com/assessing_false_advertising_claims.aspx

The piece also responds to the question, "what is conjoint analysis?": Respondents are offered product-choice sets from which they select their favorite alternative; Experts analyze consumer responses to determine the relative value of product features; Experts can identify "must have" features and can compare the relative importance *and value of various product features*.  Emphasis added.

[38] Ugone Deposition, at 12.

ECONOMICS AND
TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 21 of 34

65.  Before a regression is run, economic theory is used to hypothesize how and why one "dependent" variable is explained by one or more "independent" or "explanatory" variables.

66.  In this litigation, the "dependent variable" I am seeking to explain is the price of Wesson Oil, and as noted above, my hypothesis is that presence of the "100% Natural" claim on the label of Wesson Oil – one of the "product attributes" of Wesson Oil and hence one of the explanatory variables for the total price of Wesson Oil – caused the price of Wesson of Oil to have been higher than it would have been in that claim's absence.

67.  Product attributes fall into one of three (3) broad categories.

68.  Observational (or Search) Attributes are qualities of a product that the consumer can determine by inspection prior to purchase, such as the product's price, or the product's brand name.  The observational attribute of brand can serve as a proxy for other qualities of a product, and because the brand is something a consumer can easily determine on their own just by looking, brand is a search attribute.

69.  Experience Attributes are those that are not determined prior to purchase by inspection, but that are determined after purchase by consumption, like the way a product (such as cooking oil) tastes.  As discussed below, in a hedonic regression, experience attributes can be accounted for in the observational attribute of brand.

70.  Credence Attributes are attributes where consumption of the product provides no information and the consumer is reliant on third-party or external information to identify the existence of the attribute in the product, usually because the cost of verifying the attribute is too expensive to justify.  These are attributes that are accepted by consumers on the faith of the seller's truthfulness.  The "100% Natural" claim at issue in this case is a credence attribute, as

---

[39] Attributes can be input into a regression as actual measures/values – i.e., price in dollars, or size in ounces – or as a "dummy variable" valued as either 0 or 1, where, for example, 0 indicates the variable is not present in the product and 1 indicates that the variable is present in the product, i.e., a product has or does not have a 'natural' claim, a 'cholesterol free' claim, etc., or is or is not a particular brand.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 22 of 34

consumers have no cost effective way to test or determine, even after consuming Wesson Oil,

whether or not the Wesson Oil was indeed "100% Natural" as ConAgra represented it to be.

71.   As noted above, IRI and Nielsen have collected, and ConAgra has produced, price

and attribute data for Wesson Oil and a number of competitor oils in a number of different

geographies and across several years of time.

72.   I have price and attribute data for other competitive cooking oil products in addition

to Wesson Oil, some of which have a "natural" label, like Crisco (at least until 2014), making the

value of the "natural" labeling variable for those products "1" in a regression, and some of which

do not, like Mazola, making the value of the "natural" labeling variable for those products "0."

73.   Thus, I am able to conduct a regression analysis of price data because the attribute I

am seeking to test as an explanatory variable – the presence or absence of a "100% Natural"

labeling claim – does vary when competitive cooking oil products are considered.

74.   This type of hedonic regression analysis is known as "cross-sectional" because it

makes use of data across a cross-section of competitive products.

75.   Another type of hedonic regression analysis, and a type I do not propose to

undertake here, is a "before and after" or "time-series" analysis.  In a time series analysis, an

economist compares data across time, including time periods where the value of the explanatory

variable of interest varies.

76.   Both cross-sectional and time series regressions use the same general regression

methodology.

77.   The basic hedonic regression mathematical function can be expressed as:

$$P_i(Z) = P_i(Z_1, Z_2, \ldots Z_N)$$

In this function, P is the Price of product "i," each Z factor (1 through "n") is a product attribute

variable.  Each product attribute Z factor can have either a positive, negative, or null effect on the

total Price, P.  This model can be used to determine the value of the specific attributes of various

products.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 23 of 34

78.  One potential hedonic regression model specification would be:

$$P(Wesson) = \sum_{n=1}^{N} (\beta_n * z_n) + \varepsilon$$

where P(Wesson) is the price per unit of the Product.  This price is set equal to the sum of Betas, $\beta_n$, the coefficients for the vector $z_n$ (where $z_n$ is a vector representing the bundle of product attributes being measured), and $\varepsilon$, the error term.[40]

79.  A vector is essentially a list, and the vector of product attributes is the list of attributes to be included in the regression analysis.  As noted below, the list of attributes I am analyzing include brand name and the various product standard claims (such as "Natural" and "cholestorol free").

80.  A coefficient is the basic output of a regression analysis.  These coefficients are the quantification or measures of the characteristics (in this case each product attribute) being studied.

81.  The hedonic regression technique permits analysis across any set of variables. Geography and time can be accounted for in a hedonic regression model of the price of Wesson Oil.  Thus, I can measure the impact of different times and geographies, or even measure coefficients for particular attributes using temporally and geographically specific data, such that I may apply the hedonic regression technique separately within the geographic confines of each of the Class States and the temporal confines of each class period at issue here.

82.  By analyzing the separate effects of each product attribute, there is no need to identify any one single benchmark product for regression price analyses against the price of Wesson Oil.  Instead, I can run regressions of the price and attributes of Wesson Oil against a field of benchmark products.  This is because the regression isolates and separately measures the

---

[40] Also called the "disturbance" term, $\varepsilon$ captures the effects of chance events, unmeasured variables, and other residuals as calculated by the model.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 24 of 34

effects on price of each attribute, and accounts for differences between the price of the Wesson Oil and the prices of other differentiated competitor oils in the marketplace.

83.   In economics and marketing, "product differentiation" is the process of distinguishing one product from another with the goal of increasing sales of that product.

84.   Wesson Oil is differentiated from other cooking oils in different ways.  One such differentiation between Wesson Oil and its competitors is the Wesson brand itself.  Another differentiation is the "100% Natural" claim.

85.   As noted above, brand is a search attribute – a consumer can tell which brand of cooking oil they are purchasing just by looking at it on a shelf.

86.   To the extent consumers are choosing different oils based on experiential attributes, for example, if they like the way an oil tastes, those experiential attributes are accounted for in a hedonic regression within the brand attribute.  This is because the only way a consumer could expect to have the same experience with a particular bottle of cooking oil before purchasing (and then tasting) it would be based on observing that the oil was the same brand as the oil they had prior experience with.

87.   Accordingly, it is not necessary to include separate experiential attribute variables in the hedonic regression of the value of the "100% Natural" claim on Wesson Oil because all of the experiential attributes of Wesson Oil (and all of the experiential attributes of other competitor cooking oils) are already included in the search attribute of brand, which is already included as one of several explanatory variables in the preliminary hedonic regression model I propose below.

88.   The regression analyses can be calculated in a variety of forms, including "linear" and "semi-log."

89.   In a linear format, the dependent variable is the unit price in dollars.  The results of the regression--the coefficients for the explanatory variables-- are interpreted as the value of each attribute in dollars and cents.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 25 of 34

90.   The semi-log format constitutes a "transformation" of the data.  In the semi-log format, the dependent variable is the logarithm of the unit price in dollars.  The use of natural logarithms[41] for the transformation means that the results of the regression are interpreted as a percentage change in price.[42]

91.   Once the data is collected, formatted, and prepared for the regression, common statistical software is used to actually perform the regression.

92.   After the regression results are obtained, they can be verified by objective statistical measures that are calculated automatically by the statistical regression software, such as the R-squared statistic, the F-statistic, and T-statistic.  Questions about the reliability or explanatory power of these models can be answered by examining these and other measures of reliability.



---

[41] The logarithm of a number is the exponent to which another fixed value, the base, must be raised to produce that number.  This expression is often notated as $log_{base}(x)$.  The natural logarithm has the number $e$ (approx. 2.718) as its base.  Natural logarithms are often notated without reference to the base as $ln(x)$.

[42] Such transformations are routine in regression analysis.

ECONOMICS AND TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 26 of 34



*R-squared and Adjusted R-squared*

94. The R-squared and adjusted R-squared are common tools to evaluate the explanatory power of a regression model. ████████████████████████████
████████████████████████████████████████████████████████████████

*F-statistic*

95. Another commonly used measure of the explanatory power of a model is the F-statistic. The F-statistic helps to determine the overall goodness of fit of the model. ████
████████████████████████████████████████████████████████████████

*T-statistic*

96. The T-statistic is yet another objective measure of the reliability of the results of a statistical model. Each explanatory variable will produce a result from the model-- a "coefficient"-- and a T-statistic to evaluate whether the result is statistically significant. ████
████████████████████████████████████████████████████████████████

---

[43] Ugone Deposition, at 217-218.

[44] Ugone Deposition, at 218.

[45] Ugone Deposition, at 222.

ECONOMICS AND
TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 27 of 34

**Preliminary Hedonic Regression of Data Currently Available**

97.   Because I have price, sales and attribute data for a wide range of cooking oils, including Wesson Oils and competitors, hedonic regression is an ideal method for isolating the value of the "natural" claim on the label of Wesson Oils.[47]

98.   I have conducted a preliminary hedonic regression that confirms the existence of a price premium attributable to the "100% Natural" claim.  These results apply generally nationwide, across all four (4) types of Wesson Oil, across all sizes, and across multiple years. This analysis is preliminary and is offered for the purpose of demonstrating how hedonic regression can work in this case.  As stated earlier, regressions may be run for each state Class or each Class period and may be subject to refinement as new, different and/or additional data becomes available.  However, these results demonstrate that, consistent with the economics literature and ConAgra's own market research, the 100% Natural claim does impact the market price for Wesson Oils.  The results confirm that the hedonic regression technique is capable of making such a determination in this case.

99.   I conducted my analysis using Stata, "a fast, powerful statistical package designed for researchers of all disciplines."[48]  Stata is commercially available (for sale) to any economist, and is widely used in the profession:  "Stata is distributed in more than 200 countries and is used

---

[46] Ugone Deposition, at 221.

[47] As noted above, the 100% Natural label claim is a "yes or no question" -- the label either says it or it does not.  As such, we are dealing with a simple but-for question: What did the Class pay for Wesson Oil with the 100% Natural Claim, and what would they have paid had the Claim not been made. Calculating a but-for price premium does not depend on an individual interpretation of the Claim because there is no middle ground.  If the market price for Wesson Oils was higher as a result of the 100% Natural Claim, then ALL consumers will have paid a higher price than if the claim had not been made.

[48] http://www.stata.com/products/

ECONOMICS AND
TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 28 of 34

by hundreds of thousands of professional researchers in many fields of research."[49] Stata has

been used numerous times to conduct regression analysis in litigation damages contexts.[50]

100. I have analyzed twenty (20) product attributes as potential explanatory variables of

price in this preliminary hedonic regression of the prices of all varieties and sizes of Wesson Oil

contained in the CAG0031947 data set.[51]

101. As noted above, that dataset appears to contain nationwide price (including base and

promoted "on sale" price levels), unit sales, and attribute (including "natural" labeling claims)

data for the broad cooking oil market, including data on the sales of the Wesson Oils, competitor

branded cooking oils, and private label competitors for the period 2009-2014.

102. Accordingly, I have chosen to use a broad array of independent/explanatory

variables from this data set in this regression including:  the Natural Claim, brand, numerous

other product label claims, size of the container sold, type of oil, promotional price, and time

period.

103. Every variable which was included in this preliminary regression is listed in Exhibit

3 to this report[52] -- each line represents one explanatory variable.  The regression takes into

account data on oil variety (canola, corn, blend, or vegetable), size, promotional price, brands

(with each of the 111 brands listed in the regression constituting a separate dummy variable),

five (5) different years,  and twenty (20) different product attributes, including the "natural" label

that is the subject of this litigation.

---

[49] http://www.stata.com/why-use-stata/

[50] See, e.g., *In re: Cellphone Termination Fee Cases*, Ramzy Ayyad, et al, Plaintiff, v. Sprint Spectrum, L.P., Defendant, JCCP No. 4332, Case No. RG03-121510.

[51] Observations were dropped from the dataset if there were fewer than 99 unit sales in a year; if the recorded price per unit was zero, and for aerosol/pump style products.

[52] With three exceptions: the Wesson brand, Corn, and Year1, each of which serves as the reference variable, respectively, for the brand, oil type, and year categories of variables.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 29 of 34

104. However, identification of explanatory variables is an ongoing process that starts

with economic theory, and then involves collecting and reviewing data, and then analyzing the

data to make an empiric determination about the use of the variable.  Sometimes a variable may

seem relevant theoretically, but may later be discovered to not be proper for inclusion in the

model, and vice versa.

105. The Stata command used to run this regression specification that I used in this

litigation is:

```
reg LogPriceUnitOz CONOLA BLEND VEGETABLE SIZE SIZE2 Promo
GMOFREE GLUTENFREE NATURAL ORGANIC CHOLESTEROLFREE
ABSENCEOFSPECIFICFAT FATFREE LOWFAT
NATURALSOURCEOFOMEGA OMEGA3PRESENCE
OMEGA6PRESENCE PRESERVATIVEFREE
EXCELLENTSOURCEOFVITAMIN GOODSOURCEOFVITAMINS
PRVTLBLSMART HEARTHEALTHY HEARTHLTH
HEARTHLTHRECIPES year2 year3 year4 year5 L APLUS ADELITA
ADMIRATION ALBERTOANO1 ALBERTOA1 ALPINEGOURMET
ANGELINO ATLANTICORGANIC BAKERBOY BESTVALUE
BLUEPLATE BOLIO BUTCHERBOY CADIA CANOLAHARVEST
CAPULLO CAPULLODEMAZOLA CAPUTO CARUSO CENTO
CHEFWAY CLARITY COLAVITA CONCHITA CONDAL CORA
CORNOLA CRISCO CRISCOPURITAN CTLBR CWP DELPUEBLO
DELALLO DRAGONFLY ELMEXICANO ELSEMBRADOR FAMILIAR
FAMILY FARMERSBEST FONTOLIVA GABRIELA GEM GLICKS
GOLCHIN GOLDENCHOICE GOLDNSWEET GOODIES GOYA
GREENLIFE HAIN HANSENS HEAVENLYCHEF HOGAR HOLSUM
IBERIA KARTAMUS LACENA LAFE LAFLORITA LAMAZORCA
LAPREFERIDA LARUSSA LASPAGNOLA LATORRE LIEBERS
LONGLIFE LORIVA LOUANA MADAMEGOUGOUSSE
MANISCHEWITZ MARCONI MARINA MAZOLA MELLOGOLD
MICHIGANVALLEYBRAND MIDEAST MILPAS
MOLINOSNATURESIDEAL MONTERREY NAPAVALLEYNATURALS
NATURALVALUE NUTOLA NUTRIOLI PAMPA PAMPLONA
PERFECTO PETERS PREFER PREMIUM PUREMAID PUREOLA PURO
REX RICHTEX RITA ROYALSUPREME SBLAYU SEVILLAMIA
SOLIOFAMILY SORIANA SPECTRUMNATURALS STREITS SUNERA
SYSCOCLASSIC SYSCORELIANCE THEMISHPACHA TOPHE
TRUTHFARMS VITARROZ WHIRL WILDLYDELICIOUSFINEFOODS
```

ECONOMICS AND
TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 30 of 34

106. The preliminary model produced robust results.  I have reproduced the R-Squared,

F-statistic, and independent variable information for the Natural Claim in Table 1 below.  The

complete results of the preliminary model are reproduced in Exhibit 3.

| Table 1. | | | |
|---|---|---|---|
| Preliminary Hedonic Regression Results | | | |
| R-Squared | .7448 | | |
| Adjusted R-Squared | .7447 | | |
| F-Statistic | 26464.22 | | |
| Natural Claim Coefficient | .0225583 | Natural Claim T-Statistic | 39.25 |

107. As can be seen in the table, the preliminary model produced a relatively high R-

Squared value, indicating that the model is explaining 74% of the variation of the dependent

variable.  The F-Statistic also confirms that the preliminary model has good explanatory power.

108. The preliminary, positive coefficient for the Natural Claim indicates that, generally,

consumers do place a value on the Natural Claim, and that market wide there is a price premium

attributable to the Claim:  that price premium, nationwide, across all four types of Wesson Oil,

across all sizes, and across multiple years, is 2.28%.[53, 54]  This coefficient is statistically

---

[53] To interpret a coefficient in this log-linear regression, it must first be exponentiated to undo the log
transformation.  This is done by taking the mathematical constant e (roughly 2.71828), and raising it to the
exponent of the coefficient, and then subtracting 1 from the result. This result can then be interpreted as the
percentage price premium or discount for that attribute, when all other attributes are held constant.  When
interpreting the effects of more than one coefficient at a time, one must understand that the model
coefficients in total are relative to a base price without any attributes at all.  The price premium calculated here is the
extra amount consumers would have paid above a base amount had the claim not been made.  The actual available
sales data in this case are sales dollars that occurred *with* the claim.  To determine damages, you need the
corresponding discount, which is calculated as $[premium] \div [1 + premium] = .022815 \div 1.022815 = .022306$
or 2.23%.

[54] Each of the product attribute coefficients can be interpreted, as above in footnote 53, as the price premium or
discount for that attribute, when all else is equal.  The coefficients for the collections of category variables (brand,
oil type, and year) are interpreted as the price premium or discount above or below the reference variable for that
category (see footnote 52).  For example, each of the coefficients for the many brands included in the model
represent that brand's price premium or discount *above or below the Wesson brand*, which serves as the reference
variable for the brand category.  Similarly, the year variables represent the changes in price relative to the first year.


ECONOMICS AND
TECHNOLOGY, INC.

Amended Declaration of Colin B. Weir
September 5, 2014
Page 31 of 34

significantly different from zero, with a T-Statistic of 39.25 (significant at the 99% confidence

level).

109. At this stage, the preliminary model is more useful in determining the general

directional nature of the Natural Claim coefficient (i.e., the fact that there is a positive,

significant coefficient—indicating that there is a price premium associated with the Natural

Claim), than it is for determining its specific value.   As new and additional data is input into the

model, and the final model specification is completed, this value is likely to change.   The

preliminary model is also helpful in understanding the usefulness of the hedonic regression

technique in this particular application.   The R-Squared and F-Statistic values indicate that the

model has the ability to produce useful, reliable results.

**Methodology 2: Use Conjoint Analysis to Test Hypothesis**

110. Much like hedonic regression analysis, Conjoint analysis permits an economist to

analyze the value of various product attributes.[55]

111. Conjoint analysis, however, takes a different approach to these calculations than

hedonic regression does.   Rather than analyzing retail prices and product attributes to determine

attribute value, Conjoint analysis is a representative survey technique that analyzes consumer

responses directly to determine attribute value.

112. Conjoint analysis was initially developed in the 1960s as part of the marketing

discipline, and continues to evolve primarily as a marketing tool.   Typically, Conjoint analysis is

used to determine consumer preferences and price/attribute information during the development

and marketing of a product.

---

[55] Conjoint analysis as a discipline is quite broad, and can be used to facilitate many other sorts of research beyond
the specific application that I discuss here.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 32 of 34

113. Despite its roots and typical application, Conjoint analysis is founded on rigorous statistical and economic principles, and is not required to be used as part of a traditional marketing program.[56]

114. In a typical Conjoint analysis, survey panelists are confronted with various choices of product attributes, prices, and other alternatives, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof.

115. Through Conjoint analysis, by systematically varying the attributes of the product and observing how respondents react to the resulting product profiles, one can statistically deduce information about the individual attributes.

116. In contrast to a survey asking direct questions about individual product features, Conjoint survey respondents cannot simply say that all features are important; rather, they must trade off different aspects of the product, allowing for a measurement of the actual value of any attribute in the marketplace.

117. Statistical methods (often linear regression) are then applied to the survey responses to calculate attribute value.[57]

118. The geographies, and relevant product attributes ("natural" claims, brand, etc.) are all easily identifiable and determinable in this litigation.  It is precisely this interplay of product attributes that permits Conjoint analysis to measure the value of the Product Claim relative to the specific Product herein.

119. Conjoint analysis, as a survey tool, does not rely on an existing data set for its analysis because it relies on data generated through the survey process.  Common Conjoint

---

[56] *See, e.g.*, Sawtooth Software technical papers, available online at http://www.sawtoothsoftware.com/support/technical-papers; *When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013) http://www.analysisgroup.com/assessing_false_advertising_claims.aspx

[57] *See, e.g.*, *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*, Bryan K. Orme, Research Publishers 2006; *See also, Note on Conjoint Analysis*, Hauser, John R.  Some practitioners have raised questions about this standard method.  The facts and circumstances in this litigation do not appear to raise these concerns here.  It should be noted that alternate methods of determining dollar value from conjoint results exist and could be used here.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 33 of 34

analysis software would permit the administration of a representative sample survey, and the analysis of the results therefrom.  The data necessary to select the sample for, and conduct the Conjoint analysis and calculate damages is easily obtained from one of several sources, including:  ConAgra's own business records (e.g., target demographics, sales volumes); market research data from companies such as IRI and/or Nielsen (e.g., demographic information); and independent research (e.g., sampling technique and product attribute information).

120. No individualized analysis, or Class-Member-specific inquiry will be required.  All relevant data needed to complete the Conjoint analysis will be Class-wide, common evidence.


## V.  CALCULATING DAMAGES

121. Calculating damages in this litigation will be simple and straightforward once the price premium that ConAgra was able to command for the Wesson Oils due to the Product Claim and total Product sales (in units or dollars) are determined using either hedonic regression or conjoint analysis.

122. If the price premium for the Wesson Oils is determined on a dollar basis, the calculation of Class-wide damages for any Product will be:

$$\$Price\ Premium \times Qty.\ Units\ Sold\ = Damages$$

Alternatively, if the price premium for the Wesson Oils is determined on a percentage basis, as I have done on a preliminary basis, the calculation of Class-wide damages for any Product will be:

$$\%Price\ Premium \times \$Units\ Sold\ = Damages\ [58]$$

123. These calculations can be performed on a Class-wide basis, across specific geographies, and for any defined time period, including the Class Period(s) in this litigation.

---

[58] As discussed above in footnote 53, the price premium must be adjusted to reflect the $Units Sold as already including the price premium.



Amended Declaration of Colin B. Weir
September 5, 2014
Page 34 of 34

## VI. CONCLUSION

124. I have specified two well accepted methodologies from which the but-for price difference, if any, caused by the presence of the "100% Natural" label on Wesson Oil can be reliably and accurately determined – hedonic regression and conjoint analysis.  I have conducted a preliminary regression on actual data using the first methodology.  From this preliminary regression, it is evident that ConAgra's decision to label Wesson Oil "100% Natural" label does indeed result in a positive, statistically significant, market wide price premium for Wesson Oil.  I have been able to conduct this preliminary regression without the need for any individualized inquiry of any class member and will be able to further refine this analysis without individual inquiry of class members.  ConAgra has produced data demonstrating the total retail sales of Wesson Oils.  By multiplying the price premium resulting from ConAgra's allegedly illegal conduct with the total retail amount spent by consumers on Wesson Oil, I am able to determine Class-wide damages from common proof solely from common, class wide evidence.

## VII. RESERVATION OF RIGHTS

My testimony is based upon the information and data presently available to me.  I understand that additional, different, and/or updated data including market research data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony.

## VERIFICATION

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Boston, Massachusetts, this 5th day of September, 2014.

Colin B. Weir



**Exhibit 1**

**Statement of Qualifications**
**of**

**COLIN B. WEIR**



## Statement of Qualifications

## COLIN B. WEIR

Colin B. Weir is Vice President at Economics and Technology, Inc. Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple regression, statistical sampling, micro- and macroeconomic modeling and other economic analysis. Such analysis often involves analysis of databases, call detail records, and other voluminous business records. Mr. Weir is familiar with common statistical and econometric software packages such as STATA and SHAZAM. Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations. Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels. Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation; liquidated damages provisions; lost profits; false claims; merger/antitrust analysis; diminution in value; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue, Thomas v. Global Vision, (class action litigation, Superior Court, County of Alameda), Ayyad v. Sprint (class action litigation, Superior Court, County of Alameda), Forcellati v. Hylands (class action, U.S. District Court, Central District of California), and Ebin v. Kangadis Foods (class action, U.S. District Court, Southern District of New York).

Mr. Weir holds an MBA with honors from Northeastern University. He also holds a Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, a business member of the Boston Bar Association, and serves as the comptroller for the Sybaris Investment Partnership.

## Publications and Testimony of Colin B. Weir

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market*

1



ECONOMICS AND TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

(with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.

*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York* (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.

2



*Statement of Qualifications – Colin B. Weir*

Mr. Weir has submitted the following testimony:

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Family Management LLC, Aristidia Kangadis a/k/a "Mr. Aris," Andromahi Kangadis a/k/a "Mrs. Mahi," and Themis Kangadis*, Case No. 14-cv-1324-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 5, 2014.

**United States District Court, Northern District of California, San Francisco Division,** *Erin Allen, on behalf of herself and all others similarly situated, v. Con Agra Foods, Inc.*, Case No. 13-cv-01279-VC, on behalf of Hagens Berman Sobol Shapiro LLP and The Eureka Law Firm; Declaration filed August 11, 2014.

**United States District Court, Eastern District of California,** *Kyle Dei Rossi and Mark Linthicum, on behalf of themselves and those similarly situated, v. Whirlpool Corporation*, Case No. 12-cv-00125-TLN-CKD, on behalf of Bursor & Fisher, P.A.; Declaration filed July 31, 2014, Deposition on August 20, 2014.

**United States District Court, Northern District of Illinois, Eastern Division,** *In re: Southwest Airlines Voucher Litigation.*, Case No. 11-cv-8176, Hon. Matthew Kennelly,  on behalf of Siprut PC; Declaration filed June 4, 2014; Oral testimony and cross examination on June 16, 2014.

**United States District Court, Central District of California, Western Division,** *In re: ConAgra Foods, Inc.*, Case No. 11-cv-05379-MMM, MDL No. 2291 on behalf of Milberg LLP and Grant & Eisenhofer, P.A.; Declaration filed May 5, 2014; Deposition on May 23, 2014; Declaration filed June 30, 2014.

**United States District Court, Southern District of New York,** *In re: Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB, on behalf of Bursor & Fisher, PA; Declaration filed March 31, 2014; Deposition on May 21, 2014.

**United States District Court, Central District of California,** *Julie Fagan, Michael Fagan, Melissa Pennalatore, Amy Sapeika and Shelley Trinchero, individually and on behalf of all others similarly situated v. Neutrogena Corporation*, Case No. 13-cv-01316-SVW, on behalf of Izard Nobel LLP; Declaration filed March 21, 2014; Deposition on April 3, 2014; Supplemental Declaration filed August 4, 2014, Deposition on August 13, 2014.

**United States District Court, Central District of California,** *Enzo Forcellati and Lisa Roemmich, individually and on behalf of all others similarly situated v. Hyland's Inc., Standard Homeopathic Laboratories, Inc. and Standard Homeopathic Company*, Case No. 12-cv-01983-GHK, on behalf of Faruqi and Faruqi; Declaration filed December 13, 2013; Deposition on February 27, 2014.

**United States District Court, Southern District of Florida,** *Adam Karhu, on behalf of himself and all others similarly situated, v. Vital Pharmaceuticals, Inc., d/b/a VPX Sports*, Case No. 13-cv-60768-JIC, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed December 13, 2013; Declaration filed January 6, 2014; Declaration filed March 31, 2014.

3


ECONOMICS AND TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**Trial Court of Massachusetts, District of Edgartown,** *Schepici v. JetBlue Airways Corp.,* on behalf of plaintiff; Mediation on December 4, 2013.

**Superior Court of California, County of Alameda,** *In re: Cellphone Termination Fee Cases, Ramzy Ayyad, et al, Plaintiff, v. Sprint Spectrum, L.P., Defendant,* JCCP No. 4332, Case No. RG03-121510, on behalf of the Executive Committee; Declaration filed September 18, 2013.

**United States District Court, Northern District of California,** *Maria Torres, Gabriel Rojas, and Ian Kerner, individually and on behalf of all others similarly situated v. JC Penney Corporation, Inc.; and JC Penney Company, Inc.,,* Case No. cv-12-01105-RS, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration filed September 13, 2013; Deposition on October 2, 2013.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Foods Inc,* Case No. 13-cv-02311-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 26, 2013, Deposition on October 21, 2013.

**United States District Court, Northern District of California,** *Desiree Moore, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs v. Verizon Communications,* Case No. 4:09-cv-01823-SBA, on behalf of David Schachman and Associates PC, Jacobs Kolton Chtd., and Keller Grover, LLP; Declaration filed June 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection],* on behalf of Claimant; Oral testimony and cross examination on March 1, 2013.

**American Arbitration Association,** *[Redacted for public inspection],* on behalf of Claimant; Oral testimony and cross examination on February 20, 2013.

**American Arbitration Association,** *[Redacted for public inspection],* on behalf of Claimant; Oral testimony and cross examination on February 19, 2013.

**American Arbitration Association,** *[Redacted for public inspection],* on behalf of Claimant; Oral testimony and cross examination on February 13, 2013.

**American Arbitration Association,** *[Redacted for public inspection],* on behalf of Claimant; Oral testimony and cross examination on February 7, 2013.

**American Arbitration Association,** *[Redacted for public inspection],* on behalf of Claimant; Oral testimony and cross examination on February 4, 2013.

**American Arbitration Association,** *[Redacted for public inspection],* on behalf of Claimant; Oral testimony and cross examination on January 24, 2013.



*Statement of Qualifications – Colin B. Weir*

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 12, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 10, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on November 28, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declarations filed October 4, 2012 and November 5, 2012; Oral testimony and cross examination on November 27, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declaration filed April 16, 2012; Oral testimony and cross examination on May 11, 2012.

**United States District Court, District of Massachusetts,** *Marcy Cruz v. Justin Kagan, Arthur Hegarty, Ronald Teachman, and the City of New Bedford*, Case No. 1:09-cv-11793-RGS, on behalf of Marcy Cruz, Expert Report filed February 28, 2011; Oral testimony and cross examination on December 1, 2011.

**United States District Court, Southern District of New York,** *Bursor & Fisher P.A., v. Federal Communications Commission*, Case No. 1:11-cv-05457-LAK, on behalf of Bursor & Fisher P.A., Declaration filed August 17, 2011.

**United States District Court, District of New Jersey,** *In Re: Sprint Premium Data Plan Marketing and Sales Practices Litigation,* Master Case No. 10-6334 (SDW) MDL No. 2228, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed August 11, 2011.

**United States District Court, Northern District of California,** *Patrick Hendricks, on behalf of himself and all others similarly situated, Plaintiffs, v. AT&T Mobility LLC, Defendant*, Case No. C11-00409, on behalf of Bursor & Fisher, P.A., Declaration filed August 7, 2011.

**Federal Communications Commission,** *In the Matter of Applications of AT&T Inc. & Deutsche Telekom AG for Consent to Assign or Transfer Control of Licenses and Authorizations*, WT Docket No. 11-65, on behalf of Butch Watson, Declaration filed June 20, 2011.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. O1 Communication, Inc. (U 6065 C), Defendant*, Case No. C.08-03-001, on behalf of the O1 Communications, Inc., Reply Testimony filed November 6, 2009; Oral testimony and cross examination on November 16, 2009.



*Statement of Qualifications – Colin B. Weir*

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis, Defendants,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Oral testimony and cross examination on November 9, 2009.

**United States District Court, District of New Jersey,** *Judy Larson, Barry Hall, Joe Milliron, Tessie Robb, and Willie Davis, individually and on behalf of all others similarly situated, v. AT&T Mobility LLC f/k/a Cingular Wireless LLC and Sprint Nextel Corporation and Sprint Spectrum L.P. d/b/a Sprint Nextel and Nextel Finance Company, Civ. Act. No. 07-5325 (JLL)*, on behalf of PinilisHalpern, LLP and Law Offices of Scott A. Bursor, Declaration filed *under seal* October 19, 2009.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. Pac-West Telecomm, Inc. (U 5266 C), Defendant*, Case No. C.08-09-017, on behalf of the Pac-West Telecomm, Inc., Rebuttal Testimony filed May 1, 2009.

**Illinois Commerce Commission,** Illinois Bell Telephone Company Annual Rate Filing for Non-Competitive Services Under an Alternative Form of Regulation, Ill. C. C. Docket No. 08-0249, on behalf of the People of the State of Illinois, Declaration filed May 2, 2008.

**Federal Communications Commission,** Qwest Petition for Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of AT&T Inc, For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of BellSouth Corporation For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of the Embarq Local Operating Companies for Forbearance Under 47 U.S.C. §160(c) From Application of *Computer Inquiry* and certain Title II Common Carriage Requirements; WC Docket Nos. 06-125 and 06-147, on behalf of the AdHoc Telecommunications Users Committee, Declaration filed October 9, 2007.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis, Defendants,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Declaration filed January 5, 2007; Deposition on November 13, 2007; Oral testimony and cross-examination on December 19, 2007; Oral testimony on January 9, 2008.

Mr. Weir has served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional publications and testimony at the state, federal, and international levels.

6



**Exhibit 2**

**Additional Facts, Data, and
Other Information Considered**

ECONOMICS AND
TECHNOLOGY, INC.

-Declaration of Keith R. Ugone in Opposition to Plaintiffs' Motion for Class Certification (with all exhibits and appendices thereto)

-Defendant ConAgra Foods, Inc.'s Notice of Motion and Motion to Strike Declarations of Colin B. Weir and Charles M. Benbrook, Ph.D.

-June 18, 2014 Transcript of Deposition of Keith R. Ugone

- *The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints*, Doane, Michael (Analysis Group) and Hartman, Raymond, Journal of Law, Economics, & Organization, Vol. 3, No. 2 (Autumn, 1987), pp. 351-372

- Efficient Capital Markets: A Review of Theory and Empirical Work, Fama, Eugene, *The Journal of Finance*, Vol. 25, No. 2, Papers and Proceedings of the Twenty-Eighth Annual Meeting of the American Finance Association New York, N.Y. December, 28-30, 1969 (May, 1970), pp. 383-417.

-CAG00000055

-CAG00001992

-CAG0002144

-CAG0002537

-CAG0003651

-CAG0004764

-CAG0031947

-CAG0031948

-CAG0031949

-CAG0031950

-IRI0000001

-IRI0000002

-IRI0000003

-The Stata website www.stata.com



# EXHIBIT 3

# Preliminary Regression Results



```
   Source |      SS       df       MS              Number of obs = 1269823
----------------+------------------------------        F(140,1269682) =26464.22
    Model | 73516.3095   140  525.116497          Prob > F     =  0.0000
 Residual | 25193.6716 1269682 .019842505         R-squared    =  0.7448
----------------+------------------------------        Adj R-squared =  0.7447
    Total | 98709.9811 1269822  .07773529          Root MSE     =  .14086
```

```
---------------------------------------------------------------------------------
        LogPriceUnitOz |   Coef.   Std. Err.      t    P>|t|    [95% Conf. Interval]
-----------------------+---------------------------------------------------------
               CANOLA |  .0729582  .0005661   128.87   0.000    .0718486   .0740678
                BLEND |  .0245409  .0019747    12.43   0.000    .0206705   .0284112
            VEGETABLE |  .0190472  .0005416    35.17   0.000    .0179857   .0201086
                 SIZE | -.0190096  .0000204  -929.66   0.000   -.0190496  -.0189695
                SIZE2 |  .0000981  1.23e-07   798.97   0.000    .0000979   .0000984
                Promo | -.2154372  .0002679  -804.20   0.000   -.2159622  -.2149121
              GMOFREE |  .2119587  .0192446    11.01   0.000     .17424    .2496773
           GLUTENFREE |  .1857015  .0575437     3.23   0.001    .0729179   .2984851
              NATURAL |  .0225583  .0005747    39.25   0.000    .0214318   .0236847
              ORGANIC |  .8717222  .0195376    44.62   0.000    .8334292   .9100152
       CHOLESTEROLFREE |   .132583  .0009021   146.98   0.000    .1308149    .134351
   ABSENCEOFSPECIFICFAT| -.0735794  .0011277   -65.25   0.000   -.0757897  -.0713692
              FATFREE | -.1807639  .0016885  -107.06   0.000   -.1840732  -.1774546
               LOWFAT | -.1970276   .005477   -35.97   0.000   -.2077624  -.1862928
   NATURALSOURCEOFOMEGA| -.1692781  .0289362    -5.85   0.000    -.225992  -.1125642
        OMEGA3PRESENCE | -.2673516  .0023346  -114.52   0.000   -.2719274  -.2627759
        OMEGA6PRESENCE | -.0163234  .0079318    -2.06   0.040   -.0318695  -.0007773
```



| | | | | | | |
|---|---|---|---|---|---|---|
| PRESERVATIVEFREE | -.0724736 | .0015527 | -46.68 | 0.000 | -.0755168 | -.0694304 |
| EXCELLENTSOURCEOFVITAMIN | .3385848 | .0065729 | 51.51 | 0.000 | .3257021 | .3514675 |
| GOODSOURCEOFVITAMINS | .056584 | .001316 | 43.00 | 0.000 | .0540047 | .0591633 |
| PRVTLBLSMART | -.0182542 | .0012107 | -15.08 | 0.000 | -.0206272 | -.0158812 |
| HEARTHEALTHY | -4.958781 | .0080072 | -619.29 | 0.000 | -4.974474 | -4.943087 |
| HEARTHLTH | -.0252183 | .001605 | -15.71 | 0.000 | -.028364 | -.0220727 |
| HEARTHLTHRECIPES | .0324582 | .0034898 | 9.30 | 0.000 | .0256183 | .0392981 |
| year2 | -.0614536 | .0003883 | -158.27 | 0.000 | -.0622146 | -.0606926 |
| year3 | .0990389 | .0003939 | 251.43 | 0.000 | .0982669 | .0998109 |
| year4 | .0970937 | .0003956 | 245.44 | 0.000 | .0963183 | .097869 |
| year5 | .0757673 | .0003969 | 190.90 | 0.000 | .0749894 | .0765452 |
| L | -.2596151 | .0018534 | -140.08 | 0.000 | -.2632477 | -.2559825 |
| APLUS | -.7350511 | .039078 | -18.81 | 0.000 | -.8116427 | -.6584594 |
| ADELITA | .1095279 | .0253194 | 4.33 | 0.000 | .0599028 | .159153 |
| ADMIRATION | -.4990568 | .0147454 | -33.84 | 0.000 | -.5279572 | -.4701564 |
| ALBERTOANO1 | -.0792147 | .0813313 | -0.97 | 0.330 | -.2386214 | .0801919 |
| ALBERTOA1 | -.175679 | .0076309 | -23.02 | 0.000 | -.1906352 | -.1607227 |
| ALPINEGOURMET | -.123532 | .0086873 | -14.22 | 0.000 | -.1405587 | -.1065053 |
| ANGELINO | -.2833937 | .0064507 | -43.93 | 0.000 | -.2960369 | -.2707505 |
| ATLANTICORGANIC | .2009157 | .0393885 | 5.10 | 0.000 | .1237155 | .2781158 |
| BAKERBOY | -.1617729 | .0996147 | -1.62 | 0.104 | -.3570143 | .0334684 |
| BESTVALUE | -.443729 | .0162004 | -27.39 | 0.000 | -.4754812 | -.4119769 |
| BLUEPLATE | .2155376 | .0184544 | 11.68 | 0.000 | .1793676 | .2517076 |
| BOLIO | -.3857556 | .0996157 | -3.87 | 0.000 | -.5809989 | -.1905122 |
| BUTCHERBOY | -.3209218 | .0025729 | -124.73 | 0.000 | -.3259645 | -.3158791 |
| CADIA | .2870779 | .0376226 | 7.63 | 0.000 | .2133389 | .360817 |
| CANOLAHARVEST | .3867646 | .010953 | 35.31 | 0.000 | .365297 | .4082321 |



| | | | | | | |
|---|---|---|---|---|---|---|
| CAPULLO | -.1920658 | .0065639 | -29.26 | 0.000 | -.2049309 | -.1792008 |
| CAPULLODEMAZOLA | -.1223643 | .0064334 | -19.02 | 0.000 | -.1349736 | -.109755 |
| CAPUTO | -.0429866 | .0813348 | -0.53 | 0.597 | -.2024 | .1164267 |
| CARUSO | .06687 | .0180525 | 3.70 | 0.000 | .0314878 | .1022522 |
| CENTO | .1015111 | .0575161 | 1.76 | 0.078 | -.0112184 | .2142407 |
| CHEFWAY | -.2247927 | .0532496 | -4.22 | 0.000 | -.32916 | -.1204254 |
| CLARITY | -.2294628 | .0266385 | -8.61 | 0.000 | -.2816735 | -.1772522 |
| COLAVITA | .5275426 | .0173988 | 30.32 | 0.000 | .4934417 | .5616436 |
| CONCHITA | .2173452 | .019371 | 11.22 | 0.000 | .1793787 | .2553117 |
| CONDAL | -.0473835 | .0996107 | -0.48 | 0.634 | -.2426172 | .1478501 |
| CORA | .5996897 | .1408673 | 4.26 | 0.000 | .3235947 | .8757847 |
| CORNOLA | .1285297 | .0086622 | 14.84 | 0.000 | .111552 | .1455074 |
| CRISCO | -.078175 | .0012043 | -64.91 | 0.000 | -.0805354 | -.0758147 |
| CRISCOPURITAN | .9005628 | .0039604 | 227.39 | 0.000 | .8928005 | .9083252 |
| CTLBR | -.206096 | .000921 | -223.77 | 0.000 | -.2079011 | -.2042908 |
| CWP | -.2315896 | .0996103 | -2.32 | 0.020 | -.4268224 | -.0363569 |
| DELPUEBLO | -3.147271 | .0236635 | -133.00 | 0.000 | -3.19365 | -3.100891 |
| DELALLO | -.0072675 | .0088887 | -0.82 | 0.414 | -.0246891 | .0101541 |
| DRAGONFLY | .3455506 | .0332171 | 10.40 | 0.000 | .2804461 | .410655 |
| ELMEXICANO | -.1197267 | .0112443 | -10.65 | 0.000 | -.1417652 | -.0976882 |
| ELSEMBRADOR | .0957327 | .0575238 | 1.66 | 0.096 | -.017012 | .2084774 |
| FAMILIAR | -.3012042 | .0037389 | -80.56 | 0.000 | -.3085322 | -.2938761 |
| FAMILY | -.1047869 | .0086457 | -12.12 | 0.000 | -.1217322 | -.0878417 |
| FARMERSBEST | .1728069 | .0179186 | 9.64 | 0.000 | .1376869 | .2079268 |
| FONTOLIVA | .1289946 | .0088287 | 14.61 | 0.000 | .1116906 | .1462987 |
| GABRIELA | -.0897336 | .0575155 | -1.56 | 0.119 | -.2024619 | .0229948 |
| GEM | -.4180854 | .0069705 | -59.98 | 0.000 | -.4317473 | -.4044235 |


ECONOMICS AND TECHNOLOGY, INC.

| | | | | | | |
|---|---|---|---|---|---|---|
| GLICKS | .2571003 | .0182361 | 14.10 | 0.000 | .2213582 | .2928424 |
| GOLCHIN | -.1982774 | .1408688 | -1.41 | 0.159 | -.4743754 | .0778206 |
| GOLDENCHOICE | .3059766 | .0364104 | 8.40 | 0.000 | .2346135 | .3773398 |
| GOLDNSWEET | -.2167126 | .0175017 | -12.38 | 0.000 | -.2510153 | -.1824099 |
| GOODIES | .2844306 | .0996194 | 2.86 | 0.004 | .0891801 | .4796812 |
| GOYA | .2682407 | .0031772 | 84.43 | 0.000 | .2620135 | .2744679 |
| GREENLIFE | -.2768092 | .0063101 | -43.87 | 0.000 | -.2891768 | -.2644417 |
| HAIN | .7590664 | .0102238 | 74.24 | 0.000 | .739028 | .7791048 |
| HANSENS | -.1790839 | .0193728 | -9.24 | 0.000 | -.217054 | -.1411138 |
| HEAVENLYCHEF | .3010315 | .0630191 | 4.78 | 0.000 | .1775163 | .4245467 |
| HOGAR | -.3502419 | .0097724 | -35.84 | 0.000 | -.3693955 | -.3310882 |
| HOLSUM | -.1746624 | .029386 | -5.94 | 0.000 | -.2322579 | -.1170669 |
| IBERIA | .1950333 | .0135394 | 14.40 | 0.000 | .1684965 | .22157 |
| KARTAMUS | -.3440431 | .0091216 | -37.72 | 0.000 | -.3619212 | -.326165 |
| LACENA | .3643923 | .0276658 | 13.17 | 0.000 | .3101682 | .4186163 |
| LAFE | .0171782 | .0215233 | 0.80 | 0.425 | -.0250068 | .0593632 |
| LAFLORITA | .4857025 | .0813345 | 5.97 | 0.000 | .3262896 | .6451154 |
| LAMAZORCA | .2379721 | .0179373 | 13.27 | 0.000 | .2028157 | .2731285 |
| LAPREFERIDA | .2766215 | .0276435 | 10.01 | 0.000 | .2224411 | .3308019 |
| LARUSSA | .0388433 | .0088347 | 4.40 | 0.000 | .0215276 | .056159 |
| LASPAGNOLA | .0016511 | .0046761 | 0.35 | 0.724 | -.0075139 | .0108161 |
| LATORRE | -.4187891 | .0156825 | -26.70 | 0.000 | -.4495264 | -.3880519 |
| LIEBERS | .1273007 | .0363843 | 3.50 | 0.000 | .0559888 | .1986127 |
| LONGLIFE | -.0750224 | .0106355 | -7.05 | 0.000 | -.0958676 | -.0541772 |
| LORIVA | 1.251367 | .0201504 | 62.10 | 0.000 | 1.211873 | 1.290861 |
| LOUANA | -.106697 | .0012847 | -83.05 | 0.000 | -.109215 | -.104179 |
| MADAMEGOUGOUSSE | -.1955312 | .0996159 | -1.96 | 0.050 | -.3907749 | -.0002874 |



| | | | | | | |
|---|---|---|---|---|---|---|
| MANISCHEWITZ | .5383045 | .0119061 | 45.21 | 0.000 | .514969 | .56164 |
| MARCONI | -.0770039 | .0231773 | -3.32 | 0.001 | -.1224306 | -.0315771 |
| MARINA | -3.515486 | .1409535 | -24.94 | 0.000 | -3.79175 | -3.239222 |
| MAZOLA | .1430601 | .0016177 | 88.43 | 0.000 | .1398894 | .1462308 |
| MELLOGOLD | -.0229361 | .0630102 | -0.36 | 0.716 | -.146434 | .1005618 |
| MICHIGANVALLEYBRAND | -.1692723 | .0575263 | -2.94 | 0.003 | -.282022 | -.0565227 |
| MIDEAST | -.1545607 | .0341975 | -4.52 | 0.000 | -.2215867 | -.0875347 |
| MILPAS | .0353095 | .0307689 | 1.15 | 0.251 | -.0249964 | .0956154 |
| MOLINOSNATURESIDEAL | -.5853249 | .0469753 | -12.46 | 0.000 | -.6773948 | -.493255 |
| MONTERREY | .2377144 | .0996107 | 2.39 | 0.017 | .0424807 | .4329481 |
| NAPAVALLEYNATURALS | .3745508 | .0285106 | 13.14 | 0.000 | .318671 | .4304306 |
| NATURALVALUE | -.3811965 | .040279 | -9.46 | 0.000 | -.460142 | -.3022511 |
| NUTOLA | .421781 | .0498164 | 8.47 | 0.000 | .3241426 | .5194193 |
| NUTRIOLI | .0822696 | .0036128 | 22.77 | 0.000 | .0751885 | .0893506 |
| PAMPA | -.4608701 | .0023148 | -199.10 | 0.000 | -.4654069 | -.4563332 |
| PAMPLONA | .1394691 | .0996162 | 1.40 | 0.161 | -.0557752 | .3347134 |
| PERFECTO | -.928968 | .0704475 | -13.19 | 0.000 | -1.067043 | -.7908932 |
| PETERS | .3671943 | .0498273 | 7.37 | 0.000 | .2695346 | .4648541 |
| PREFER | -.1811498 | .0054188 | -33.43 | 0.000 | -.1917705 | -.1705292 |
| PREMIUM | .3597891 | .1408847 | 2.55 | 0.011 | .0836598 | .6359184 |
| PUREMAID | -.0501564 | .0064354 | -7.79 | 0.000 | -.0627696 | -.0375433 |
| PUREOLA | -.2985055 | .0132568 | -22.52 | 0.000 | -.3244884 | -.2725226 |
| PURO | .1083235 | .026638 | 4.07 | 0.000 | .0561139 | .160533 |
| REX | -.3835488 | .1408685 | -2.72 | 0.006 | -.6596462 | -.1074513 |
| RICHTEX | -.2996994 | .0498084 | -6.02 | 0.000 | -.3973222 | -.2020766 |
| RITA | .0531788 | .0469635 | 1.13 | 0.257 | -.0388679 | .1452256 |
| ROYALSUPREME | -.1298547 | .0532494 | -2.44 | 0.015 | -.2342218 | -.0254876 |



| | | | | | | |
|---|---|---|---|---|---|---|
| SBLAYU | 2.616513 | .0630091 | 41.53 | 0.000 | 2.493018 | 2.740009 |
| SEVILLAMIA | .3067121 | .0323297 | 9.49 | 0.000 | .2433469 | .3700772 |
| SOLIOFAMILY | .1124452 | .142174 | 0.79 | 0.429 | -.166211 | .3911013 |
| SORIANA | -.343033 | .0996151 | -3.44 | 0.001 | -.5382753 | -.1477908 |
| SPECTRUMNATURALS | .3058385 | .0200251 | 15.27 | 0.000 | .26659 | .345087 |
| STREITS | .3818569 | .0352255 | 10.84 | 0.000 | .3128161 | .4508976 |
| SUNERA | .2154011 | .0150446 | 14.32 | 0.000 | .1859143 | .244888 |
| SYSCOCLASSIC | -.0198301 | .0704379 | -0.28 | 0.778 | -.157886 | .1182257 |
| SYSCORELIANCE | -21.12634 | .0860461 | -245.52 | 0.000 | -21.29499 | -20.95769 |
| THEMISHPACHA | .7031184 | .0323494 | 21.74 | 0.000 | .6397147 | .7665222 |
| TOPHE | 1.24535 | .0630055 | 19.77 | 0.000 | 1.121862 | 1.368839 |
| TRUTHFARMS | -.4822861 | .0234967 | -20.53 | 0.000 | -.5283388 | -.4362333 |
| VITARROZ | -.5840025 | .0166622 | -35.05 | 0.000 | -.6166599 | -.5513451 |
| WHIRL | .7006712 | .09961 | 7.03 | 0.000 | .5054391 | .8959033 |
| WILDLYDELICIOUSFINEFOODS | 1.224519 | .0532525 | 22.99 | 0.000 | 1.120145 | 1.328892 |
| _cons | -1.906865 | .001315 | -1450.09 | 0.000 | -1.909442 | -1.904287 |

ECONOMICS AND TECHNOLOGY, INC.

**Exhibit 4**

**Declaration of Colin B. Weir**

ECONOMICS AND TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| |
|---|
| IN RE CONAGRA FOODS, INC. |

Case No. 11-cv-05379-MMM

MDL No. 2291

Declaration

of

# COLIN B. WEIR

May 5, 2014

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108. ETI is a research and consulting firm specializing in economics, statistics, regulation, and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I hold a Masters of Business Administration, with honors from the High Technology program at Northeastern University, Boston, Massachusetts. I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio. I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels. I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to household appliances, herbal remedies, HBC products, food products, electronics, and computers. My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is annexed as Exhibit 1 hereto. This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition.

## II. ENGAGEMENT

2.    I have been advised by Plaintiffs' counsel that they are seeking certification of twelve separate statewide classes, with each of the classes defined as: All persons who reside in one of the Class States[1] who have purchased Wesson Oils[2] within the applicable statute of

---

[1] The Class States are California, Colorado, Florida, Illinois, Indiana, Nebraska, New Jersey, New York, Ohio, Oregon, South Dakota, and Texas.



Declaration of Colin B. Weir
May 5, 2014
Page 2 of 12

limitations periods established by the laws of their state of residence through the final disposition of this and any and all related actions.[3]  Throughout this report, I refer to these twelve separate single-state classes as the "Class" and the persons who meet the objective criteria set forth in the class definition as "Class Members."

3.    I have been further advised by Plaintiffs' counsel that, on the outside packaging of each unit of the Wesson Oils, ConAgra, throughout the time period relevant to this litigation, represented that such Wesson Oils are "100% Natural."

4.    I have been further advised by Plaintiffs' counsel that Plaintiffs allege ConAgra's "100% Natural" statement (the "Product Claim") is unfair, false, deceptive, and/or misleading, in violation of the statutory and/or common law of each twelve states at issue, because such Wesson Oils are not, in fact, "100% Natural."

5.    I have been further advised that each of the Plaintiffs alleges they would not have purchased or would not have paid as much for Wesson Oils but for ConAgra's alleged violations of state statutory and/or common law resulting from ConAgra's allegedly unfair, false, deceptive, and/or misleading statement of the Product Claim on each unit of Wesson Oil.[4]

6.    I have been asked by counsel for Plaintiffs to determine whether it is possible to determine damages attributable to the Product Claim – in the event that the Product Claim is determined to be unfair, false, deceptive, and/or misleading as Plaintiffs allege in this litigation – on a Class-wide basis using common evidence and, if so, to provide a framework for such a calculation.

7.    ETI is being compensated at the rate of $600 per hour for my work on this case.

---

[2] Wesson brand cooking oils, including Wesson Vegetable Oil, Wesson Canola Oil, Wesson Corn Oil, and Wesson Best Blend, in a variety of sizes, hereinafter "Wesson Oils" or "Products."
[3] I understand these statute of limitations may vary to some extent depending on the state and legal claim at issue.
[4] *See, generally,* December 19, 2012 Second Consolidated Amended Class Action Complaint ("Complaint").  I have reviewed the Complaint.  *See also*, Deposition of Robert Briseño, July 17, 2013; Deposition of Michele Andrade, August 19, 2013; Deposition of Jill Crouch, August 20, 2013; Deposition of Pauline Michael, August 21, 2013; Deposition of Necla Musat, March 12, 2014; Deposition of Maureen Towey, March 13, 2014.  I have reviewed the transcripts of these depositions.



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 3 of 12

8.   The documents that I reviewed in the course of preparing this declaration are outlined in Exhibit 2.

### III.  SUMMARY

9.   As a threshold matter, it is my opinion that, in the event Plaintiffs establish that the Product Claim is unfair, false, deceptive, and/or misleading as they allege in this litigation, it *is* possible to determine damages attributable to the Product Claim on a Class-wide basis using common evidence by determining, through the application of methods widely accepted in the field of economics, whether Class Members paid a "price premium"[5] for the Products because of the Product Claim, and that it *is* possible to determine Class-wide damages in this case using ConAgra's own available business records, market research data concerning retail prices for the Products at issue in this case and a series of benchmark products, and/or consumer survey data.[6]

10.   The price of the Products, and any price premium resulting from the Product Claim is set by the marketplace.  Individual Class Members have no control over the price of the Products, or the price premium resulting from the Product Claim.  Individual reasons consumers may have for purchasing the Products do not alter this price premium, nor do they alter the injury

---

[5] As used throughout this declaration, the term "Price Premium" is used to indicate the additional amount that consumers paid for Wesson Oils as a direct result of the 100% Natural Claim only, and not the overall premium that Wesson Oils may command in the marketplace vis-a-vis competitor products.

[6] In this report, I discuss the calculation of "price premium" damages, which, in my opinion, is an economically sound method of providing restitution to Class Members should liability be established in this litigation.  The economic harm to Class Members stems from the retail prices they paid, not from the wholesale revenues that ConAgra received.  (Though these are related concepts: *ceteris paribus*, ConAgra charging a premium at wholesale will result in a corresponding premium in retail prices.)  I understand, however, that legal considerations may affect the chosen method for determining damages in this case.  For example, the court may instead prescribe a disgorgement of the full retail purchase price paid for the Products, a disgorgement of the money obtained by ConAgra through the sale of the Products, or a disgorgement of the profits that inured to ConAgra from the sale of the Products.  Should one of these, or another alternate method of calculating damages be prescribed by the Court, it is my opinion that I would be able to calculate and measure such damages, and to do so using common evidence of the sort described at Paragraphs 33 and 46 below. ConAgra has already provided data relating to its wholesale revenues from the sale of Products, and acquires market research data that provides detailed information about the retail sales of the Products.  Along with information about the quantity of Products sold during the class period (which is also maintained by ConAgra in the normal course of business), information of this sort would be sufficient to calculate damages under such alternate methodologies.



Declaration of Colin B. Weir
May 5, 2014
Page 4 of 12

arising from paying that premium.[7]  The price premium, and economic damages resulting therefrom, exist Class-wide, and can be proven using common evidence.

11.   Several common economic and statistical techniques allow for the comparison of prices across sales channels, retailers, geographies, time periods, and various other product attributes.

12.   One such technique is called hedonic regression, and is widely used to isolate the effect of one or more product attributes on the price of a product.

13.   Another is called Conjoint analysis, which is also widely used to reveal the relative importance and price components of product attributes.

14.   I will discuss these techniques, and their application to this litigation in detail below. I will note here, however, that neither of these techniques requires any individual inquiry, and can produce Class-wide results using common evidence.  The result of each of these analyses will be the determination of a price premium, if any, that Class Members paid as a result of the Product Claim.

15.   The damages in this litigation will be a straightforward calculation of the quantity of the Products sold and the price premium for those products.

## IV.  HEDONIC REGRESSION

16.   Hedonic regression is a commonly used economic method that measures the value of various product attributes.  Hedonic regression is based on the concept that each product attribute has a different and measurable impact on aggregate consumer utility, i.e., consumers will pay a certain amount for each product attribute.

17.   First detailed by Sherwin Rosen in 1974,[8] hedonic regression is now widely used by economists.  Indeed, there are numerous studies that apply the hedonic regression technique to

---

[7] Similarly, because the price and price premium is determined in the marketplace, individual valuation of the Products does not alter the price premium or injury arising from paying that premium.



Declaration of Colin B. Weir
May 5, 2014
Page 5 of 12

myriad consumer products and the practice has been adopted by statistical agencies with a focus on measuring consumer prices (e.g., the U.S. Bureau of Economic Analysis, the U.S. Bureau of Labor Statistics).[9]  The analysis is conducted using aggregated pricing and product attribute information.

18.   The hedonic regression function can be expressed as:

$$P_i(Z) = P_i(Z_1, Z_2, \dots Z_N)$$

In this function, P is the Price of product "i", each Z factor is a product attribute variable.  Each product attribute Z factor can have either a positive, negative, or null effect on the total Price, P.  This model can be used to determine the value of the specific attributes of various products.

19.   In this litigation, the hedonic regression can be specified to separate out the prices that consumers pay for each of the Product attributes (e.g., the Product Claim, the value of the Wesson brand, etc.).

20.   The regression can be calculated in a variety of forms, including "linear" and "semi-log."

21.    In a linear format, the regression will calculate the dollar component amount of each product attribute (the value of each attribute is expressed in dollars and cents).

22.   In the semi-log format, the use of natural logarithms[10] allows the regression to calculate a percentage price premium or discount for each product attribute (the value of each attribute is expressed as a percentage of the price).

23.   One potential model specification would be:

$$P(Wesson) = \sum_{n=1}^{N} (\beta_n * z_n) + \varepsilon$$

[8] *Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition.* Rosen, Sherwin, The Journal of Political Economy, Vol. 82, No. 1. (Jan. - Feb., 1974) ("Rosen").

[9] The use of hedonic regression in individual studies is too widespread to exhaustively document in detail. *See, e.g., The Expanding Role of Hedonic Methods in the Official Statistics of the United States,* Moulton, Brent R., Bureau of Economic Analysis, U.S. Department of Commerce, June 2001.  Additional examples of studies using hedonic regression are set forth below.  *See,* footnote 12 below.

[10] The logarithm of a number is the exponent to which another fixed value, the base, must be raised to produce that number.  This expression is often notated as $log_{base}(x)$.  The natural logarithm has the number $e$ (approx. 2.718) as its base.  Natural logarithms are often notated without reference to the base as $ln(x)$.



Declaration of Colin B. Weir
May 5, 2014
Page 6 of 12

where P(Wesson) is the price per unit of the Product or Products.  Beta, $\beta$, is the coefficient for the vector $z$,  $z_{nt}$ is a vector representing the bundle of product attributes being measured, and $\varepsilon$ is the error term.[11]

## A review of sample literature

24.   Hedonic regression is routinely used to calculate the value of product attributes. The hedonic regression model has been used to evaluate pricing in many different types of markets, but there is particularly extensive literature on this method in consumer product mass markets— the stated marketplace for the Products at issue in this litigation.

25.   Any variety of attributes can be studied, ranging from quality, geo-location and brand, to production standard claims such as "natural" and "organic," including the "100% Natural" production standard Claim at issue here.  Indeed, the price premium associated with these production standard claims is a very common attribute tested in the literature.[12]

26.   The bulk of the literature testing for the presence of such price premiums associated with production standard claims begins with the logical hypothesis that such a premium exists, and affirms the hypothesis after testing.[13]

27.   Here, ConAgra's own extensive market research confirms that the Product Claim is a major driver of purchase intent and consumer value.[14]

---

[11] Also called the "disturbance" term, $\varepsilon$ captures the effects of chance events, unmeasured variables, and other residuals as calculated by the model.

[12] *See, e.g., The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices*, Chang, Jae Bong, *et al*, Journal of Agricultural and Resource Economics 35.3 (2010): 406-423; *Organic Premiums of U.S. Fresh Produce*, Smith, T. A. *et al*, 2008 Proceedings of the NCCC-134 Conference on Applied Commodity Price Analysis, Forecasting, and Market Risk Management. St. Louis, MO. [http://www.farmdoc.uiuc.edu/nccc134].

[13] My review of the literature did not turn up a study that concluded that the labeling of a product with a production standard claim such as "organic" or "natural" did not produce a price premium.

[14] See, e.g., Kelston Decl., Exh. 24, CAG0000711 at 719 ███████████████████████████████████ Kelston Decl., Exh. 25, CAG0000789 *et seq.* ███████████████████████████ Kelston Decl., Ex. 26, CAG0003889 *et se* ███████████████████████████████████
These Bates numbers refer to documents produced by ConAgra in this litigation that I have reviewed.


ECONOMICS AND TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 7 of 12

28.  One hedonic regression study shows that a product with an "all natural" or "natural" label acquires a price premium very similar to one with an "organic" label.  While organic products must satisfy many more requirements in order to be labeled "organic," both labels have a similar positive effect on the price of a product.  This study, (examining the different effects of the terms "all natural" and "organic" in the yogurt market) finds the positive price premiums attributable to "natural" and "organic" labels to be statistically similar.[15]

29.  Another hedonic regression study examines the price attributes of retail eggs.  An examination of retail price data established that "organic feeding" has a positive effect on the retail price of eggs.[16]  In another case, the same method was used in order to examine the impact of nutrition labeling on breakfast foods.  "Organic" was found to also have a significant positive effect on the retail price of breakfast bars, granola and hot cereals.[17]

**Use of Hedonic Regression in This Litigation**

30.  Hedonic regression appears to be an ideal technique for calculating the price premium that Class Members paid for Products, and the economic harm Class Members sustained as a result of the Product Claim, in the event that the Product Claim is determined to be unfair, false, deceptive, and/or misleading in violation of law, as Plaintiffs allege.

31.  The hedonic regression is designed to model the price premium or discount resulting from each of many product attributes, and is used routinely to evaluate the price premium associated with production standard claims such as the Product Claim in this litigation.[18]

---

[15] *Organic and All Natural: Do Consumers Know the Difference?* Anstine, Jeffrey, Journal of Applied Economics and Policy 26.1 (2007):15-27.
[16] *Hedonic Analysis of Retail Egg Prices*, Karipidis, Philippos I., *et* al, Journal of Food Distribution Research 36.3 (2005).
[17] *The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals,* Muth, Mary K., *et al Contributed Paper prepared for presentation at the International Associate of Agricultural Economists Conference, Beijing, China*. August 2009. RTI International and Food and Drug Administration, Center for Food Safety and Applied Nutrition. 10 March 2014.
http://ageconsearch.umn.edu/bitstream/50333/2/Manuscript_Value_of_Labeling_Statements_IAAE%20174.pdf
[18] As discussed above, the hedonic regression technique permits analysis across geographic locations – or, indeed, within several distinct geographic locations, such that the technique can be applied separately within the geographic



Declaration of Colin B. Weir
May 5, 2014
Page 8 of 12

32.  The time periods, geographies, and relevant product attributes ("natural" claims, brand, etc). are easily identifiable and determinable in this litigation.

33.  The data necessary to conduct a hedonic regression analysis and damage calculation in this litigation should be easily obtained, and, indeed, elements of this data are regularly used by ConAgra in the normal course of its business operations.  Such data would come from one of several sources: ConAgra's own business records ███████████████████████████

███████  market research data from companies such as IRI and/or Nielsen ████████████

████████████████████████████████████████████████████████████ and independent market research (e.g., pricing and product attribute information). [21]

34.  No individualized analyses, or Class-Member-specific inquiry will be required.  All relevant data needed to complete the hedonic regression analysis will be Class-wide, common evidence.

35.  The results of the hedonic regression will be applicable across each of the proposed Classes, but is not a calculation of average damages per class member.

---

confines of each of the Class States at issue here – and time periods.  By analyzing the separate effects of each product attribute, there is no need to identify any one single benchmark product.  This is because the regression isolates and separately measures the effects on price of each attribute, and accounts for differences between the Products in question and other products in the marketplace.

[19] See, e.g., Kelston Decl., Exh. 27, CAG000141 ███████████████████████████████

[20] See, e.g., Kelston Decl., Exh. 28, CAG0001228, *et seq.*, ███████████████ Kelston Decl., Exh. 29, CAG0001786, *et seq.*, ████████████████████████████████████████
████████████████████████████ Kelston Decl., Exh. 30, CAG0001807,  *et seq.,*

[21] Given my experience, I have no reason to believe that the data necessary to perform a hedonic regression analysis in this litigation will not be available. ████████████████████████████████  However, in the unlikely event that the necessary data is absent or unobtainable, a second technique, Conjoint analysis (outlined below) would still be possible.



Declaration of Colin B. Weir
May 5, 2014
Page 9 of 12

## V.  CONJOINT ANALYSIS

36.   Much like hedonic regression analysis, Conjoint analysis permits an economist to analyze the value of various product attributes.[22]

37.   Conjoint analysis, however, takes a different approach to these calculations than hedonic regression does.  Rather than analyzing retail prices and product attributes to determine attribute value, Conjoint analysis is a representative survey technique that analyzes consumer responses directly to determine attribute value.

38.   Conjoint analysis was initially developed in the 1960s as part of the marketing discipline, and continues to evolve primarily as a marketing tool.  Typically, Conjoint analysis is used to determine consumer preferences and price/attribute information during the development and marketing of a product.

39.   Despite its roots and typical application, Conjoint analysis is founded on rigorous statistical and economic principles, and is not required to be used as part of a traditional marketing program.[23]

40.   In a typical Conjoint analysis, survey panelists are confronted with various choices of product attributes, prices, and other alternatives, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof.

41.   Through Conjoint analysis, by systematically varying the attributes of the product and observing how respondents react to the resulting product profiles, one can statistically deduce information about the individual attributes.

42.   In contrast to a survey asking direct questions about individual product features, Conjoint survey respondents cannot simply say that all features are important; rather, they must trade off different aspects of the product, allowing for a measurement of the actual value of any

---

[22] Conjoint analysis as a discipline is quite broad, and can be used to facilitate many other sorts of research beyond the specific application that I discuss here.

[23] *See, e.g.*, Sawtooth Software technical papers, available online at http://www.sawtoothsoftware.com/support/technical-papers; *When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013) http://www.analysisgroup.com/assessing_false_advertising_claims.aspx


ECONOMICS AND TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 10 of 12

attribute in the marketplace.  Statistical methods (often linear regression) are then applied to the survey responses to calculate attribute value.[24]

**Use of Conjoint Analysis in This Litigation**

43.   Conjoint analysis appears to be another alternative for calculating the price premium paid for the Products and measuring, with common proof, the economic harm that Class Members sustained as a result of the Product Claim.

44.   As discussed above, Conjoint analysis is designed to determine a product's price components based upon each of the product's many product attributes.  The Conjoint technique also permits analysis across geographic locations.

45.   The geographies, and relevant product attributes ("natural" claims, brand, etc.) are all easily identifiable and determinable in this litigation.  It is precisely this interplay of product attributes that permits Conjoint analysis to measure the value of the Product Claim relative to the specific Products herein.

46.   Conjoint analysis, as a survey tool, does not rely on an existing data set for its analysis because it relies on data generated through the survey process.  Common Conjoint analysis software would permit the administration of a representative sample survey, and the analysis of the results therefrom.  The data necessary to select the sample for, and conduct the Conjoint analysis and calculate damages is easily obtained from one of several sources, including: ConAgra's own business records (e.g., target demographics, sales volumes); market research data from companies such as IRI and/or Nielsen (e.g., demographic information); and independent research (e.g., sampling technique and product attribute information).[25]

47.   No individualized analyses, or Class-Member-specific inquiry will be required.  All relevant data needed to complete the Conjoint analysis will be Class-wide, common evidence.

---

[24] *See, e.g., Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*, Bryan K. Orme, Research Publishers 2006.
[25] See footnotes 19, 20 and 21,  *supra.*

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
May 5, 2014
Page 11 of 12

48.  The results of the Conjoint analysis will be applicable across each of the proposed Classes, but is not a calculation of average damages per class member.

## VI.  CALCULATING DAMAGES

49.  Calculating damages in this litigation will be simple and straightforward once the price premium that ConAgra was able to command for the Wesson Oils due to the Product Claim and total Product sales (in units or dollars) are determined.

50.  If the price premium for the Wesson Oils is determined on a dollar basis, the calculation of Class-wide damages for any Product will be:

$$\$Price\ Premium \times Qty.Units\ Sold\ = Damages$$

Alternatively, if the price premium for the Wesson Oils is determined on a percentage basis, the calculation of Class-wide damages for any Product will be:

$$\%Price\ Premium \times \$Units\ Sold\ = Damages$$

51.  These calculations can be performed on a Class-wide basis, across specific geographies, and for any defined time period, including the Class Period(s) in this litigation.

## VII.  RESERVATION OF RIGHTS

My testimony is based upon the information and data presently available to me.  I understand that additional, different, and/or updated data including market research data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony.



Declaration of Colin B. Weir
May 5, 2014
Page 12 of 12

VERIFICATION

I declare under penalty of perjury of the laws of the United States that the foregoing is true and

correct to the best of my knowledge, information, and belief, and that this declaration was

executed at Boston, Massachusetts, this 5th day of May, 2014.

Colin B. Weir

ECONOMICS AND
TECHNOLOGY, INC.

**Exhibit 1**

**Statement of Qualifications**
**of**

**COLIN B. WEIR**



## Statement of Qualifications

## COLIN B. WEIR

Colin B. Weir is Vice President at Economics and Technology, Inc. Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple linear regression, statistical sampling, micro- and macroeconomic modeling and other economic analysis. Such analysis often involves analysis of databases, call detail records, and other voluminous business records. Mr. Weir is familiar with common statistical and econometric software packages such as STATA and SHAZAM. Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations. Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels. Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation; liquidated damages provisions; lost profits; false claims; diminution in value; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue, Thomas *et al* (class action litigation, Superior Court, County of Alameda), Ayyad *et al* (class action litigation, Superior Court, County of Alameda), and White *et al* (class action litigation, Superior Court, County of Alameda).

Mr. Weir holds an MBA with honors from Northeastern University. He also holds a Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, a business member of the Boston Bar Association, and serves as the comptroller for the Sybaris Investment Partnership.

### Publications and Testimony of Colin B. Weir

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

1



*Statement of Qualifications – Colin B. Weir*

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.

*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York* (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.



*Statement of Qualifications – Colin B. Weir*

Mr. Weir has submitted the following testimony:

**United States District Court, Southern District of New York,** *In re: Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB, on behalf of Bursor & Fisher, PA; Declaration filed March 31, 2014.

**United States District Court, Central District of California,** *Julie Fagan, Michael Fagan, Melissa Pennalatore, Amy Sapeika and Shelley Trinchero, individually and on behalf of all others similarly situated v. Neutrogena Corporation*, Case No. 13-cv-01316-SVW, on behalf of Izard Nobel LLP; Declaration filed March 21, 2014; Deposition on April 3, 2014.

**United States District Court, Central District of California,** *Enzo Forcellati and Lisa Roemmich, individually and on behalf of all others similarly situated v. Hyland's Inc., Standard Homeopathic Laboratories, Inc. and Standard Homeopathic Company*, Case No. 12-cv-01983-GHK, on behalf of Faruqi and Faruqi; Declaration filed December 13, 2013; Deposition on February 27, 2014.

**United States District Court, Southern District of Florida,** *Adam Karhu, on behalf of himself and all others similarly situated, v. Vital Pharmaceuticals, Inc., d/b/a VPX Sports*, Case No. 13-cv-60768-JIC, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed December 13, 2013; Declaration filed January 6, 2014; Declaration filed March 31, 2014.

**Trial Court of Massachusetts, District of Edgartown,** *Schepici v. JetBlue Airways Corp.,* on behalf of plaintiff; Mediation on December 4, 2013.

**Superior Court of California, County of Alameda,** *In re: Cellphone Termination Fee Cases, Ramzy Ayyad, et al, Plaintiff, v. Sprint Spectrum, L.P., Defendant,* JCCP No. 4332, Case No. RG03-121510, on behalf of the Executive Committee; Declaration filed September 18, 2013.

**United States District Court, Northern District of California,** *Maria Torres, Gabriel Rojas, and Ian Kerner, individually and on behalf of all others similarly situated v. JC Penney Corporation, Inc.; and JC Penney Company, Inc.,*, Case No. cv-12-01105-RS, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration filed September 13, 2013; Deposition on October 2, 2013.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Foods Inc*, Case No. 13-cv-02311-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 26, 2013, Deposition on October 21, 2013.

**United States District Court, Northern District of California,** *Desiree Moore, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs v. Verizon Communications*, Case No. 4:09-cv-01823-SBA, on behalf of David Schachman and Associates PC, Jacobs Kolton Chtd., and Keller Grover, LLP; Declaration filed June 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on March 1, 2013.

3



*Statement of Qualifications – Colin B. Weir*

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 20, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 19, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of  Claimant; Oral testimony and cross examination on February 13, 2013.

**American Arbitration Association,**  *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 7, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 4, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on January 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 12, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 10, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on November 28, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declarations filed October 4, 2012 and November 5, 2012; Oral testimony and cross examination on November 27, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declaration filed April 16, 2012; Oral testimony and cross examination on May 11, 2012.

**United States District Court, District of Massachusetts,** *Marcy Cruz v. Justin Kagan, Arthur Hegarty, Ronald Teachman, and the City of New Bedford*, Case No. 1:09-cv-11793-RGS, on behalf of Marcy Cruz, Expert Report filed February 28, 2011; Oral testimony and cross examination on December 1, 2011.

**United States District Court, Southern District of New York,** *Bursor & Fisher P.A., v. Federal Communications Commission*, Case No. 1:11-cv-05457-LAK, on behalf of Bursor & Fisher P.A., Declaration filed August 17, 2011.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, District of New Jersey,** *In Re: Sprint Premium Data Plan Marketing and Sales Practices Litigation,* Master Case No. 10-6334 (SDW) MDL No. 2228**,** on behalf of Thornton, Davis, & Fein, P.A., Declaration filed August 11, 2011.

**United States District Court, Northern District of California,** *Patrick Hendricks, on behalf of himself and all others similarly situated, Plaintiffs, v. AT&T Mobility LLC, Defendant*, Case No. C11-00409, on behalf of Bursor & Fisher, P.A., Declaration filed August 7, 2011.

**Federal Communications Commission,** *In the Matter of Applications of AT&T Inc. & Deutsche Telekom AG for Consent to Assign or Transfer Control of Licenses and Authorizations*, WT Docket No. 11-65, on behalf of Butch Watson, Declaration filed June 20, 2011.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. O1 Communication, Inc. (U 6065 C), Defendant*, Case No. C.08-03-001, on behalf of the O1 Communications, Inc., Reply Testimony filed November 6, 2009; Oral testimony and cross examination on November 16, 2009.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis, Defendants,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Oral testimony and cross examination on November 9, 2009.

**United States District Court, District of New Jersey,** *Judy Larson, Barry Hall, Joe Milliron, Tessie Robb, and Willie Davis, individually and on behalf of all others similarly situated, v. AT&T Mobility LLC f/k/a Cingular Wireless LLC and Sprint Nextel Corporation and Sprint Spectrum L.P. d/b/a Sprint Nextel and Nextel Finance Company, Civ. Act. No. 07-5325 (JLL)*, on behalf of PinilisHalpern, LLP and Law Offices of Scott A. Bursor, Declaration filed *under seal* October 19, 2009.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. Pac-West Telecomm, Inc. (U 5266 C), Defendant*, Case No. C.08-09-017, on behalf of the Pac-West Telecomm, Inc., Rebuttal Testimony filed May 1, 2009.

**Illinois Commerce Commission,** Illinois Bell Telephone Company Annual Rate Filing for Non-Competitive Services Under an Alternative Form of Regulation, Ill. C. C. Docket No. 08-0249, on behalf of the People of the State of Illinois, Declaration filed May 2, 2008.



*Statement of Qualifications – Colin B. Weir*

**Federal Communications Commission,** Qwest Petition for Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of AT&T Inc, For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of BellSouth Corporation For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of the Embarq Local Operating Companies for Forbearance Under 47 U.S.C. §160(c) From Application of *Computer Inquiry* and certain Title II Common Carriage Requirements; WC Docket Nos. 06-125 and 06-147, on behalf of the AdHoc Telecommunications Users Committee, Declaration filed October 9, 2007.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis, Defendants,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Declaration filed January 5, 2007; Deposition on November 13, 2007; Oral testimony and cross-examination on December 19, 2007; Oral testimony on January 9, 2008.

Mr. Weir has served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional publications and testimony at the state, federal, and international levels.

ECONOMICS AND TECHNOLOGY, INC.

**Exhibit 2**

**Facts, Data, and
Other Information Considered**



-CAG0000711

-CAG0000789

-CAG0001228

-CAG0001249

-CAG0001318

-CAG0001411

-CAG0001786

-CAG0001807

-CAG0001960

-CAG0003805

-CAG0003889

-CAG0003898

-CAG0005560

-CAG0005561

-CAG0005562

-CAG0031700

-CAG0031701

-CAG0031702

-CAG0031843

-CAG0031898

-CAG0031904

-CAG0031905

-CAG0031906

-CAG0031907

-CAG0031908

-CAG0031909

-CAG0031910



-CAG0031911

-CAG0031912

-CAG0031913

-CAG0031914

- Second Consolidated Amended Class Action Complaint, December 19, 2012

-Deposition of Robert Briseño, July 17, 2013

-Deposition of Michele Andrade, August 19, 2013

-Deposition of Jill Crouch, August 20, 2013

-Deposition of Pauline Michael, August 21, 2013

-Deposition of Necla Musat, March 12, 2014

-Deposition of Maureen Towey, March 13, 2014

-*Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition.* Rosen, Sherwin, The Journal of Political Economy, Vol. 82, No. 1. (Jan. - Feb., 1974)

-*The Expanding Role of Hedonic Methods in the Official Statistics of the United States*, Moulton, Brent R., Bureau of Economic Analysis, U.S. Department of Commerce, June 2001.

-*The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices*, Chang, Jae Bong, *et al*, Journal of Agricultural and Resource Economics 35.3 (2010): 406-423.

-*Organic Premiums of U.S. Fresh Produce*, Smith, T. A. *et al*, 2008 Proceedings of the NCCC-134 Conference on Applied Commodity Price Analysis, Forecasting, and Market Risk Management. St. Louis, MO. [http://www.farmdoc.uiuc.edu/nccc134].

-*Organic and All Natural: Do Consumers Know the Difference?* Anstine, Jeffrey, Journal of Applied Economics and Policy 26.1 (2007):15-27.

-*Hedonic Analysis of Retail Egg Prices*, Karipidis, Philippos I., *et* al, Journal of Food Distribution Research 36.3 (2005).

-*The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals,* Muth, Mary K., *et al* Contributed Paper prepared for presentation at the International Associate of



Agricultural Economists Conference, Beijing, China, August 2009 on behalf of RTI International and Food and Drug Administration, Center for Food Safety and Applied Nutrition.

-*The Dynamics of Brand Equity: A Hedonic Regression Approach to the Laser Printer Market*, Auer, Ludwig von, *et al*, Research Papers in Economics, Universitat Trier, March 2010.

-*Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*, Bryan K. Orme, Research Publishers 2006.

-Generally, Sawtooth Software technical papers, available online at

http://www.sawtoothsoftware.com/support/technical-papers

-*When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013)

http://www.analysisgroup.com/assessing_false_advertising_claims.aspx

-*Note on Conjoint Analysis,* Hauser, John R., MIT Sloan Courseware

- *Do 'Natural' Claims Cut the Mustard?*, Emma Gubisch, Leatherhead Food Research (2013)

ECONOMICS AND
TECHNOLOGY, INC.

# Exhibit 5

# Rebuttal Declaration of
# Colin B. Weir

ECONOMICS AND
TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

IN RE CONAGRA FOODS, INC.

Case No. 11-cv-05379-MMM

MDL No. 2291

Rebuttal Declaration

of

# COLIN B. WEIR

June 30, 2014

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108.  ETI is a research and consulting firm specializing in economics, statistics, regulation, and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I am the same Colin B. Weir who has previously submitted testimony in this litigation.  I incorporate the contents of my May 5, 2014 Declaration ("Weir Declaration") by reference.

## II. ENGAGEMENT

2.    I have been asked by counsel for Plaintiffs to review and respond to the Declaration of Keith Ugone, and to offer additional opinions regarding whether it is possible to determine damages attributable to the Product Claim on a Class-wide basis using common evidence.

3.    ETI is being compensated at the rate of $600 per hour for my work on this case.

4.    The additional documents that I reviewed in the course of preparing this declaration are outlined in Exhibit 1.

## III. SUMMARY

5.    Dr. Ugone admits that product labeling claims can influence the market price of a product;[1] that all else equal, consumers are better off paying less for a product;[2] that individual consumer preferences do not alter the shelf price for Wesson Oils;[3] that if a labeling claim causes

---

[1] Deposition of Keith Ugone, June 18, 2014, ("Ugone Deposition") at 5-6, attached as Exhibit L to the Declaration of Adam J. Levitt In Support of Plaintiffs' Reply Memorandum of Points and Authorities In Further Support of Plaintiffs' Motion for Class Certification ("Levitt Decl.").
[2] Ugone Deposition, at 6-7.
[3] Ugone Deposition, at 8-9.



Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 2 of 29

an increase in market price, then all consumers will pay more;[4] and that hedonic regression can be used to determine the price premium effect of a labeling claim on the market price that consumers pay for Wesson Oils.[5]  On these points, Dr. Ugone and I are in agreement.

6.    In fact, we have only one disagreement: whether such a price premium--specific to the natural claim at issue in this case--constitutes an appropriate measure of classwide damages. It is my opinion that this is an appropriate measure of economic damages. As set forth in my first declaration, and confirmed by Dr. Ugone in his deposition, this price premium is easily calculated using either hedonic regression or conjoint analysis.

7.    Dr. Ugone purportedly explains this disagreement in his declaration.[6]  However, Dr. Ugone's declaration, is deeply flawed in that:

- Dr. Ugone's conclusions are not supported by sound empirical analysis;[7]

- Dr. Ugone's conclusions are not supported by economic literature;[8]

- Dr. Ugone's conclusions are based in part upon an analytical technique that Ugone himself admits is incapable of making determinations as to the price premium at issue in this case;[9]

- Dr. Ugone's conclusions are not based upon empirical consumer preference research;[10]

- Dr. Ugone's conclusions fail to consider ConAgra's own consumer preference research;[11] and

---

[4] Ugone Deposition, at 59-60.
[5] Ugone Deposition, at 179-180,
[6] Declaration of Keith R. Ugone, In Opposition to Plaintiffs' Motion for Class Certification, June 2, 2014 (Dkt. 268), ("Ugone Declaration").
[7] Ugone Deposition, at 34, 51-52.
[8] Ugone Deposition, at 195, 196-197, 277; I cite a number of economic treatises outlining the value of all natural claims in my first declaration, see Expert Declaration of Colin B. Weir In Support of Motion for Class Certification, May 5, 2014 (Dkt. 243) ("Weir Declaration") at 6-7, 9-10, Exhibit 2.
[9] Ugone Deposition, at 334-335.
[10] Ugone Deposition, at 294-295.
[11] Ugone Deposition, at 280-281.



Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 3 of 29

- Dr. Ugone's conclusions are antithetical to research published--and opinions offered--by other principals at the Analysis Group, Dr. Ugone's own company.[12]

As such, the conclusions Dr. Ugone draws in his declaration ("Ugone Declaration") are unreliable.

8.    I also address the following issues raised in the Ugone Declaration in greater detail below:

- Hedonic regression and conjoint analysis do not require individual analysis to provide a class-wide result.  This is a mechanical truth as to how these techniques work.

- Individual interpretation of the claim is not relevant for the determination of class-wide damages.  The 100% Natural label is a "yes or no question" -- the label either says it or it does not.  Calculating a but-for price premium does not depend on interpretation of the label.

- As noted in the Ugone deposition, a consumer's individual reasons for purchase do not change the price paid by that individual.  If there is a price premium incorporated into the total price of Wesson Oils as a result of the 100% Natural label and a consumer buys the product, they will pay that premium regardless of their reasons for purchase.

- Variations in purchase price do not alter the calculation of total, class-wide damages.  How the Court ultimately distributes class-wide damages does not affect the calculation of the total amount.

---

[12] *The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints*, Doane, Michael (Analysis Group) and Hartman, Raymond, Journal of Law, Economics, & Organization, Vol. 3, No. 2 (Autumn, 1987), pp. 351-372; *see also*, *When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013) http://www.analysisgroup.com/assessing_false_advertising_claims.aspx.



Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 4 of 29

- Both hedonic regression and conjoint analysis produce statistical measures, such as the R-squared statistic, the F-statistic, and T-statistic, all of which can be used to evaluate the results of the study. These measures are objective, mathematical calculations produced mechanically by statistical software packages. Questions about the reliability or explanatory power of these models can be answered by examining these and other measures of reliability.

- In hedonic regression, variables that are multicollinear are identified automatically by modern statistical software. In this case, the data I have seen does not indicate that the 100% Natural variable will suffer from multicollinearity.

- There are at least two methods of conducting a hedonic regression: a before and after analysis, or a cross-sectional analysis. I will be using cross-sectional data in this case--which Dr. Ugone agrees is common practice in hedonic regression. This obviates the need for before and after data.

- Dr. Ugone's testimony is inconsistent, in that he criticizes, on the one hand, a lack of specification of methods to convert conjoint results into dollar values, and on the other how my "methods for converting conjoint information into price tend to greatly overstate the value of the product features."

- The Ugone Declaration cites an article that discusses how to convert conjoint results to dollar values, and suggests that the article questions the ability to convert conjoint results to dollar values. Dr. Ugone makes this assertion by cherry-picking a single sentence, and ignores the entire remainder of the article, which actually sets forth a method to "[] review a common technique for converting conjoint utilities to a monetary scale, and then we'll suggest what we believe is a better approach." Both methods discussed in the article are commonly used, and are supported by the literature cited in my first declaration.



Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 5 of 29

- The only "analysis" performed in the Ugone Declaration is a side-by-side comparison of the retail prices of Wesson and Mazola oils. This analysis is the only support Dr. Ugone offers for his (false) assertion that there is no systematic or persistent price premium with respect to the 100% Natural Claim. Dr. Ugone admitted in his deposition that this technique can only demonstrate a high level retail price difference--not a price premium associated with a specific product attribute. He further admits that this side by side comparison does not use regression analysis as I propose. Finally, Dr. Ugone admitted that his own side by side approach is, as a method of determining damages in this case, "very weak for doing that."

- The Ugone Declaration asserts that my analysis relies on a theory of so-called "fraud on the market." This ignores a very basic economic principle: product differentiation. Dr. Ugone summarizes this concept in his deposition: "Product differentiation is introducing attributes to the product that allows the consumer to differentiation [sic] between the products, and sometimes that's done, you know, with the hope of making, you know, additional sales."[13] This is the very heart of this case: did ConAgra's differentiation of its Wesson Oils cause increased consumer demand and price, and was that differentiation false.

9.    Nothing said in the Ugone Declaration or at his Deposition causes me to change or alter my opinion that class-wide damages can be calculated in this case using common evidence.

10.    As discussed in greater detail below, I have conducted a preliminary hedonic regression that confirms the existence of a price premium attributable to the "100% Natural" claim. These results apply generally nationwide, across all four types of Wesson Oil, across all sizes, and across multiple years. This analysis is preliminary and subject to refinement as new, different and/or additional data becomes available. However, these results demonstrate that,

---

[13] Ugone Deposition, at 140.

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 6 of 29

consistent with the economics literature, the 100% Natural claim does impact the market price for Wesson Oils, and that the hedonic regression technique is capable of making such a determination in this case.

## IV.  THE UGONE DECLARATION HAS NO BASIS IN FACT, ANALYSES, OR LITERATURE

11.   The Ugone Declaration is deeply flawed and completely unsupported by facts, empirical analysis, research, or economic literature.  In fact, the Ugone Declaration is directly contradicted by other managing Principals and affiliates of the Analysis Group. As such, the conclusions drawn in the Ugone Declaration are wrong and unreliable.

**The Ugone Declaration is not supported by any sound empirical analysis**

12.   The only empirical analysis Dr. Ugone has performed--a straight up side-by-side comparison of retail prices--is an approach Dr. Ugone openly admits is a "weak" method for determining damages.[14]  As I discuss in detail below, this method of analysis is unusable in this litigation because in the instant case, side-by-side retail price comparisons cannot determine the price premium directly attributable only to the 100% Natural Claim.

13.   Dr. Ugone did not conduct any regression analyses or conjoint to support his conclusion that such analyses could not determine class wide damages in this case.[15]

14.   Dr. Ugone has thus performed no sound empirical analyses in support of his conclusions whatsoever.

---

[14] Ugone Declaration, at 56 *et seq.*; Ugone Deposition, at 334-335.
[15] Ugone Deposition, at 34, 51-52.

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 7 of 29

**The Ugone Declaration is not supported by economic literature**

15.   The conclusions in the Ugone Declaration are not supported by economic literature.[16]  Dr. Ugone admits that a review of economic literature "may give you some additional insights" beyond just past experience.[17]  Nonetheless, Dr. Ugone did not review any economic literature in preparing his declaration.[18]  This is striking, as it is common practice in the economics profession to examine the related work of other economists, and the vast majority of peer reviewed economic analysis includes a review of relevant past literature.

16.   Surprisingly, Dr. Ugone did not even bother to review the literature cited in my first declaration: "I did not look at those articles."[19]  The articles that I cited found that consumers do prefer, and pay a premium for, products with a production standard labeling claim such as "100% Natural" or "organic."  Dr. Ugone has, in the past, seen such articles that reach the same conclusion, but apparently chose to ignore them:

> A.   I mean, over the course of my career and working on these cases, I've seen articles, some of which talk about some consumers having preferences for either all natural or -- not that it's the same or organic, those sort of things[...][20]

17.   Dr. Ugone fails to cite any economic literature that contradicts the finding that consumers prefer, and pay a premium for, products with a production standard labeling claim such as "100% Natural" or "Organic".  Nor has Dr. Ugone cited economic literature challenging the use of hedonic regression or conjoint analysis to determine such premiums.  Dr. Ugone asserts that there is no price premium in this case, despite the economics literature rife with

---

[16] Ugone Deposition, at 195, 196-197, 277; I cite a number of economic treatises outlining the value of all natural claims in my first declaration, see Weir Declaration at 6-7, 9-10, Exhibit 2.
[17] Ugone Deposition, at 233-234.
[18] *Id.*; Ugone Declaration, Exhibit 3, Documents Reviewed.
[19] Ugone Deposition, at 196-197.
[20] Ugone Deposition, at 38.



Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 8 of 29

studies that show that production standard claims cause an increase in the prices that consumers pay for such products.

**The Ugone Declaration is not based upon empirical consumer preference research and ignores ConAgra's own consumer preference research.**

18.   The Ugone Declaration makes many undocumented assertions as to consumer perception of the 100% Natural Claim, and the Claim's effect on the market price for Wesson Oils.[21] Not only did Dr. Ugone not review relevant economic literature on this topic, he also failed to conduct any empirical consumer preference research.  When asked about whether the 100% Natural Claim on Wesson Oils drives consumer demand, Dr. Ugone states: "I think that's an empirical question, and I haven't tested that."[22]

19.   Worse, Dr. Ugone's own client, ConAgra, *did* perform such research.  These documents confirm the value of the 100% Natural Claim, and that ConAgra was very thoughtful about its use on the Wesson Oil packaging.  In research conducted by or for ConAgra, it was determined that the 100% Natural Claim was very important to consumers, and that it was a motivating purchase driver.

20.   Specifically, this research discovered that:

- [Wesson] Features the natural benefits of cooking oils that consumers are looking for: 100% natural[23]

- All natural in the top three messages to consumers[24]

- Consumers rate 100% Natural...as the most important and appropriate health benefits for a cooking oil to communicate.[25]

---

[21] See, e.g., Ugone Declaration at 7, 9, and 27.
[22] Ugone Deposition, at 294-295.
[23] Kelston Declaration In Support of Plaintiffs' Motion for Class Certification, May 5, 2014 (Dkt. 246-1) ("Kelston Decl.") Exhibit 24, CAG0000711.
[24] Kelston Decl. Exhibit 25, CAG0000789.
[25] Kelston Decl. Exhibit 3, CAG0001992.



Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 9 of 29

- Pure and 100% Natural ... is the single most compelling message we can communicate to the growth market.[26]

- Pure and 100% natural on its own motivates more than half of the growth targets and two thirds of the core target.[27]

- Pure and 100% Natural maximizes Wesson purchasing over a bundle without it.[28]

- Consumers do not know the difference between Organic and Natural foods, yet they see both as healthier than their non-organic/non-natural counterparts.[29]

21.    Incredibly, Dr. Ugone did not examine these studies before drawing his conclusions:

> Q. Okay.  Have you seen any internal ConAgra documents indicating that the natural claims on Wesson Oils do not drive consumer demand or purchase intent or the Wesson pricing?
>
> A. Yeah.  I don't recall seeing documents one way or another on that.
>
> Q.  Okay.  So you're saying, as we sit here today, that you didn't consider any ConAgra documents dealing with these issues, correct?
>
> A.  I would agree with that in the sense that given the tasks that I was asked to evaluate, I did not look at those documents.[30]

22.  Dr. Ugone asserts that there is no price premium in this case despite internal ConAgra studies (and "Marketing 101" common sense) that suggest otherwise.

---

[26] Levitt Decl. Exhibit M, CAG0004764.
[27] Kelston Decl. Exhibit 10, CAG0002537.
[28] *Id.*
[29] Levitt Decl. Exhibit N, CAG0003651.
[30] Ugone Deposition, at 280-281.  (Objections and interjections omitted). Also troubling is the fact that Dr. Ugone listed these documents as "documents considered" in his declaration, despite having never read them.



Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 10 of 29

**The conclusions in the Ugone Declaration are directly antithetical to research published--and opinions offered by other Analysis Group Principals**

23.   Apparently, Dr. Ugone was so determined to isolate himself from the economic realities of this case that he ignored the findings of his own colleagues at the Analysis Group.

24.   In a recent publication sent to Analysis Group clients, Laura Stamm, Analysis Group Managing Principal, and Prof. Joel Steckel, Analysis Group Academic Affiliate, endorse the use of both hedonic regression and conjoint analysis, not just in class action cases generally, but specifically to determine damages in class action cases involving "all natural" claims:

> [U]sing econometric analysis, we can isolate the portion of the price of the "all natural" product at issue that can be attributed to its claims of being healthful[....]
>
> We still have to examine the claim's impact on consumers – only now we must define harm somewhat differently. Instead of defining harm in terms of lost sales, we would likely define it as the difference between what the consumer paid for a product or service and what she received. We can use a variety of tools to assess this. We can employ hedonic price models, discrete choice analysis, or conjoint analysis to conduct market research that will help determine the economic value of a claim to consumers. [31]

25.   When asked about this document at his deposition, Dr. Ugone admits that he read the article in question:

Q.  Have you seen this document --

A.  Yeah, I've seen --

---

[31]*When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013)
http://www.analysisgroup.com/assessing_false_advertising_claims.aspx

The piece also responds to the question, "what is conjoint analysis?": Respondents are offered product-choice sets from which they select their favorite alternative; Experts analyze consumer responses to determine the relative value of product features; Experts can identify "must have" features and can compare the relative importance *and value of various product features.*  Emphasis added.



Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 11 of 29

    Q.  -- before?

    A.  Yeah, because I get these.

    Q.  Okay.  Did you read -- and you've read it before also?

    A.  Yes.  Again, I can't say that I've read every word.  I did read -- I have read
-- I'm assuming you're ultimately going to get to some questions dealing with
the cover article, and I have read the cover article in the past, and I usually
look through -- I usually look through the whole --

    Q.  Okay.

    A.  -- document.[32]

And yet Dr. Ugone goes on to admit that he did not consider this article when preparing his

report in this case:

    Q.  Did you review it, though, in conjunction with preparing your report?

    A.  No.[33]

    26.  In a separate peer reviewed study, co-author Michael Doane, former Analysis Group

Principal, San Francisco Office Manager, and Director on the Board, discusses the use of

hedonic analysis for certification and damage calculations in class action complaints:

> We have proposed the use of hedonic regression analysis as a tool to assist the
> courts in dealing with the difficult procedural decisions involved in these
> certification proceedings. Our proposed use of hedonic analysis fundamentally
> links class certification to the estimation of damages. In our application, we
> have used hedonic analysis to help certify class *specifically* by estimating the
> uniform and common damage caused to plaintiffs by the tortious behavior of
> defendant.[34]

---

[32] Ugone Declaration at 317.
[33] *Id.*
[34] *The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints*, Doane,
Michael (Analysis Group) and Hartman, Raymond, Journal of Law, Economics, & Organization, Vol. 3, No. 2
(Autumn, 1987), pp. 351-372.  Emphasis original.



Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 12 of 29

27.  Both of these sources highlight and validate the techniques that I have proposed for use in this case as alternative methods to determine class-wide damages that stem specifically from the challenged behavior of the defendant--in this case, the 100% Natural Claim on each bottle of Wesson Oil sold during the time period relevant to this litigation.  The Ugone Declaration makes no attempt to reconcile these opinions--that class damages can be calculated using hedonic regression or conjoint analysis--with his own unsupported claim that they cannot.

28.  Moreover, despite the objections levied in his Declaration, Dr. Ugone admits that hedonic regression is a generally accepted methodology for calculating class-wide damages:

> Q.  Right.  So but you would consider hedonic regression a tool that economists can use to establish class-wide damages for a consumer product sold at retail, correct?
>
> A.  So it's a methodology.  It's a generally accepted methodology.[35]

## V.  RESPONSE TO DR. UGONE'S UNSUPPORTED CONTENTIONS

**Hedonic regression and conjoint analysis do not require individual analysis to provide a class-wide result**

29.  Neither Hedonic regression nor conjoint analysis require individual analysis to provide a class-wide damages result in this litigation.  This is a mechanical truth as to how these techniques work.

30.  Hedonic regression accepts as inputs market and product data, while conjoint analysis is derived from survey data.  Both techniques will result in the final output of a price premium associated with, and stemming from, the 100% Natural Claim.  Dr. Ugone does not appear to disagree that these are purely mechanical calculations.

---

[35] Ugone Deposition, at 12.

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 13 of 29

31.  Dr. Ugone does seem to assert that the calculation of this but-for price premium is not a suitable measure of damages in this case, and that further individual inquiry is required.

> Q.  Okay.  And is the but-for price of Wesson Oils with 100 percent natural on it versus without 100 percent natural on it, in your view, not a valid measure of class-wide damages?
>
> A.  Not just as a mechanical calculation, not as it's being proposed in this case by the plaintiffs.[36]

32.  I respectfully disagree.  The plaintiffs assert in this case that the 100% Natural Claim on Wesson Oils is false, deceptive and/or misleading.  The price premium resulting from the presence of this claim is a measure of damages arising as a direct consequence of ConAgra's behavior.

**Individual interpretation of the 100% Natural Claim is irrelevant to the determination of class-wide damages**

33.  Dr. Ugone asserts (without having undertaken any consumer research) that individual consumers may have had differing understandings of the 100% Natural Claim, and that this possibility prevents the use of hedonic regression or conjoint analysis in this litigation, because these techniques cannot disambiguate between these interpretations of the Claim.

34.  Dr. Ugone is wrong.  Individual interpretation of the 100% Natural Claim is irrelevant to the determination of class-wide damages here.

35.  The 100% Natural label is a "yes or no question" -- the label either says it or it does not.[37]  As such, we are dealing with a simple but-for question: What did the Class pay for Wesson Oil with the 100% Natural Claim, and what would they have paid had the Claim not been made.

---

[36] Ugone Deposition, at 69.
[37] *Id.*

ECONOMICS AND TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 14 of 29

36.   Calculating a but-for price premium does not depend on an individual interpretation of the Claim because there is no middle ground.  If the market price for Wesson Oils was higher as a result of the 100% Natural Claim, then ALL consumers will have paid a higher price than if the claim had not been made.

37.   *Dr. Ugone himself agrees with this point, admitting that*: "If the price was higher because of the labeling, then everybody paid a higher price because of the labeling.  That was the question you asked, and the answer has to be yes." [38]

**Individual reasons for purchase do not change the price, or price premium paid by an individual**

38.   Dr. Ugone asserts that class-wide damages cannot be calculated without individual inquiry, because consumers have varied reasons for purchasing Wesson Oils.  Again,

39.   Dr. Ugone is wrong.  Individual reasons for purchase are irrelevant in this case, because a consumer's individual reasons for purchase do not change the price paid by that individual.

40.   Dr. Ugone admits that what an individual consumer thinks about a product does not change the retail price that the consumer will pay:

> Q.   That's fine.  Let me ask you a little different question.  Two consumers go into a store. One wants to buy a bottle of light beer because it tastes great.  The other one comes in because he wants to buy it because it's less filling.  That doesn't change the price that the retailer sells it to them for; is that correct?
>
> A.   No.  I mean if you only have just those two consumers among many going into the store, that's not going to influence price.
>
> Q.   Okay.  And you would agree also that no matter what the consumer thinks about the product, that won't change the price that the retailer is charging him, correct?

---

[38] Ugone Deposition, at 59.

ECONOMICS AND TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 15 of 29

A.  And I want to make sure that we're still just talking about individual consumers, so one consumer walking into a store?

Q.  Right.

A.  So having said that, if we could just have the question read back again. (Record read.) Right.  So if we're just talking about the one consumer, I would agree with you.[39]

41.  As I have discussed above, if there is a price premium included in the price of Wesson Oils as a result of the 100% Natural Claim and a consumer buys the product, they will pay that premium regardless of their reasons for purchase, because their individual reason for purchase do not change the price they will pay.

**Variations in purchase price do not alter the calculation of total, class-wide damages**

42.  Dr. Ugone asserts that class-wide damages cannot be calculated using common proof because the "extent to which any individual Class member could have suffered economic harm depends in part upon the price paid by that individual Class member."[40] This is inapposite to the calculation of class-wide damages, because the distribution or allocation of damages to individuals does not alter the calculation of total, class-wide damages.

43.  During his deposition, Dr. Ugone testified that class-wide damages can be calculated from the bottom up as the sum of individual damages, or can be calculated from the top down, without individual inquiry, by "find[ing] a price difference and then multiply[ing] it by the number of units."[41]

44.  Dr. Ugone also testified about how the distribution of funds does not affect the measure of class-wide damages:

---

[39] Ugone Deposition, at 8-9.
[40] Ugone Declaration, at 52.
[41] Ugone Deposition, at 114-115.

ECONOMICS AND TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 16 of 29

Q.  And you would also agree that how funds are distributed to a class doesn't affect the measure of class-wide damages, does it?

A.  I could see those being separate events or separate calculations.[42]

45.  It is my understanding that the final decision of how to distribute any damages in this case will be made by the Court.  How the Court ultimately distributes class-wide damages does not affect the calculation of, or the total amount of class-wide damages.

**Both hedonic regression and conjoint analysis provide objective measures that permit an evaluation of the reliability and explanatory power of the model**

46.  Dr. Ugone asserts that my proposed approaches will not yield a reliable measure of economic harm, and that I have failed to specify the details necessary to evaluate the reliability of my approaches.

47.  Again, Dr. Ugone is wrong.  Both hedonic regression and conjoint analysis produce statistical measures, such as the R-squared statistic, the F-statistic, and T-statistic, all of which can be used to evaluate the reliability of the results of the study.  These measures are objective, mathematical calculations produced mechanically by statistical software packages.  Questions about the reliability or explanatory power of these models can be answered by examining these and other measures of reliability.

48.  Dr. Ugone agrees:

Q.  All right.  Are there ways to determine the reliability or the explanatory power of hedonic regression?

A.  Yes.

Q.  Okay.  I mean, and are you familiar with the use of statistics in evaluating regression analysis?

A.  Yes.

---

[42] Ugone Deposition, at 116.

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 17 of 29

Q.  And what do the statistics allow you to measure about regression analysis? For example, let me -- I'll shorten it up.  Is it your understanding  that certain statistics allow you to measure the fit or the explanatory power of the regression analysis?

A.  Yes.  Yes.  [sic]

Q.  Okay.  The extent to which the independent variable being analyzed explains the  result of the regression analysis?

A.  Or whether they're statistically significant, yes.

Q.  Okay.

A.  In other words, whether they're helpful in explaining.[43]

*R-squared and Adjusted R-squared*

49.  The R-squared and adjusted R-squared are common tools to evaluate the explanatory power of a regression model.  Dr. Ugone agrees: "The R[-squared] is going to tell you essentially the percent of the variation in the dependent variable that can be explained by the independent variables."[44]

50.  Dr. Ugone also agrees that the calculation of the R-squared statistic is mechanically performed by the statistical software, and that it is one of the tools that can be used to evaluate the result of a regression.[45]

*F-statistic*

51.  Another commonly used measure of the explanatory power of a model is the F-statistic.  The F-statistic helps to determine the overall goodness of fit of the model.  Dr. Ugone describes the F-statistic as "a statistic you look at to see whether you are getting appropriate results and does it all make sense and does it make sense in a statistical sense."[46]

---

[43] Ugone Deposition, at 217-218.
[44] Ugone Deposition, at 218.
[45] Ugone Deposition, at 220.
[46] Ugone Deposition, at 222.

ECONOMICS AND TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 18 of 29

52.   The F-statistic is also an objective, mechanical calculation produced by the statistical software.[47]

*T-statistic*

53.   The T-statistic is yet another objective measure of the reliability of the results of a statistical model.  Each explanatory variable will produce a result from the model-- a "coefficient"-- and a T-statistic to evaluate whether the result is statistically significant.  Dr. Ugone offers a similar description: "The Tstatistic is a statistical measure associated with a coefficient on one of your explanatory variables, and the question is is [sic] your coefficient meaningfully different than zero, so if you get a statistically significant T statistic, that gives you guidance that the coefficient is meaningful in a statistical sense."[48]

54.   The T-statistic is also produced mechanically by the statistical software.

55.   These and other objective tools will allow any economist to evaluate the reliability of the results produced by my proposed methods of calculating class-wide damages in this litigation.

**Multicollinearity will not impact the 100% Natural variable of interest in this litigation**

56.   Dr. Ugone contends that multicollinearity may lead to unreliable results in a hedonic regression, especially, in his view, since the 100% Natural Claim has always appeared on the Wesson Oils.  On this point, Dr. Ugone is wrong as well.

57.   First, in hedonic regression, variables that are multicollinear are identified automatically by modern statistical software.  The model will immediately identify any issues arising from multicollinearity.  Second, Dr. Ugone is careful in his warning to suggest that

---

[47] Ugone Deposition, at 222.
[48] Ugone Deposition, at 221.

ECONOMICS AND TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 19 of 29

multicollinearity is only a *possible* problem, and has not identified any actual collinear

variables.[49]

58.   In this litigation, the data that I have seen and analyzed does not indicate that the

100% Natural variable will suffer from multicollinearity (a relatively simple check with

statistical software), nor did my preliminary regression suffer as a result of this "possible"

problem.

**The lack of "before-and-after" data does not prevent the use of hedonic regression in this
litigation**

59.   Dr. Ugone suggests in his Declaration that the necessary data to run a hedonic

regression will not be available in this litigation because there is no "before-and-after" data for

Wesson Oils.

60.   In reaching that unsupported and incorrect conclusion, however, Dr. Ugone fails to

acknowledge that there are at least two methods of conducting a hedonic regression: before-and-

after analysis, or cross-sectional analysis.  In a cross-sectional analysis, price and attribute data

about competing products are input into the hedonic regression model.  Because some of these

competing products have the same attribute (in this case, a "natural" claim) as the product being

assessed and some do not, a hedonic regression model can make use of pricing data about these

products, along with their attribute information, to isolate the value of the specific attribute being

assessed.  I have proposed using cross-sectional data in this case.  Dr. Ugone agrees that using

cross-sectional data is common practice in hedonic regression:

> Q.  Okay.  Would you agree that economists commonly use cross-sectional
> data in hedonic regressions?
>
> A.  I would say that, yes, a cross-sectional data could be used, yes.[50]

---

[49] See, e.g., Ugone Declaration at 36.

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 20 of 29

61.   The use of cross-sectional data obviates the need for before-and-after data.

**Identification of relevant explanatory variables is an ongoing process**

62.   The Ugone Declaration asserts that I have failed to identify all of the relevant variables to include in the model, and that this somehow undermines the use of hedonic regression in this case.

63.   In fact, the identification of explanatory variables is an ongoing process that starts with economic theory, and then involves collecting a reviewing data, and analyzing the data to make an empiric determination about the use of the variable.  Sometimes a variable may seem relevant theoretically, but may later be discovered to not be proper for inclusion in the model, and vice versa.

64.   Dr. Ugone acknowledges this in his deposition:

Q.   Okay.  No problem.  Is determining the independent variables in a regression analysis an iterative process?

A.   Well, you have your theory that A, B, and C impact price, and then the question is what's your proxy measures of A, B, and C, and to the extent that you might have alternative proxy  measures of A, B, and C, then in a sense, I would  not be averse if somebody called that an iterative process.

Q.   Just so -- I understand that.  Just so we're on the same page, what I mean by an iterative process really is that an economist may consider a variable for inclusion in a model, but then make a determination after further research or trying the variable in their regression to use it or not use it.

A.   You might learn -- in other words, as you're doing your regression, you might learn some things that you didn't think about previously.  It could be that something you thought was going to be important isn't going to be important although you would want to understand why.

Q.    Uh-huh.

---

[50] Ugone Declaration, at 237.

ECONOMICS AND TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 21 of 29

A.  Or there may be things that you didn't think were going to be important that are important, but again, you want to make sure you understand why. So that's how I took your comment about the iterative process to be.  I was --

Q.  That's fine.  So we're on the same page then.

A.  Yeah.

Q.   Just wanted to make sure.  So you would agree that -- that sometimes you think that a variable should be included in a model but that you later determine otherwise, correct?

A.  That can happen.[51]

65.  Dr. Ugone has also not completed the necessary analysis to determine the relevant variables in this litigation.  For example, when asked whether a labeling claim of "Cholesterol Free" is a relevant variable to include in a model measuring the price impact of the 100% Natural Claim at issue in this case, Dr. Ugone responded: "I mean, I haven't -- I haven't done an econometric test of it."  And when asked whether he had done any test at all, Dr. Ugone responded, "No, but other than knowing that there's certain product attributes that are on the labels."[52]  Dr. Ugone gave similar answers with response to determining the relevancy of myriad label claims, and whether he has done the testing necessary to make that determination.

- With regard to "No Preservative": "I haven't done the testing, if that's what you're asking."

- With regard to "0 Grams Trans Fat": "I haven't done any empirical analysis, that's correct."

- With regard to "0 Grams Carbs": "I haven't done any analysis as to whether it's a meaningful explanatory variable."

- "Have you done any independent analysis into any of the following label claims:"

  o "The great versatile all purpose oil label claim?" "No."

---

[51] Ugone Deposition, at 228-230.
[52] Ugone Deposition, at 250-251.

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 22 of 29

- o "Zero Grams Trans Fatty Acids?" "That sounds very similar to something we talked about previously, but the same answer applies."

- With regard to food images: "I don't think I have an opinion on that."

- With regard to the color of the label: "I have not done any research on that."

- With regard to the clarity of the oil: "I don't believe I've done any research on that."

- With regard to taste of the oil: "I don't think I've done any separate research on that."[53]

66. Because this litigation is ongoing, because discovery is still in process, because new data is still becoming available, and because analysis of that data is at a preliminary stage, making a final determination of the explanatory variables for use in the model would be premature.

**Converting conjoint utilities to monetary values or price premiums is common**

67. In his Declaration, Dr. Ugone cites an article in an effort to question the ability to convert conjoint results to dollar values by cherry-picking a single sentence from that article.

68. By his selective quotation, however, Dr. Ugone appears to ignore the entire remainder of the article, which actual reaches the opposite conclusion. Indeed, the article in question sets forth to "[] review a common technique for converting conjoint utilities to a monetary scale, and then we'll suggest what we believe is a better approach." This article in no way suggests that conjoint data cannot be used to determine a price premium attributable to a product attribute.

69. Dr. Ugone also seems to ignore other available literature, including that cited in my first declaration, that suggest and describe methods for using conjoint data to determine the price premium for a product attribute.

---

[53] See, generally, Ugone Deposition, at 257-269

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 23 of 29

70.  Both methods discussed in the article are commonly used, and are supported by the literature cited in my first declaration.[54]

**The direct comparison of retail shelf prices is inappropriate in this litigation**

71.  The only "analysis" performed in the Ugone Declaration is a side-by-side comparison of the retail prices of Wesson and Mazola oils.[55]  This analysis is the *only* support Dr. Ugone offers for his (false) assertion that there is no systematic or persistent price premium attributable to the 100% Natural Claim on Wesson Oils.  Dr. Ugone falsely asserts that this is the technique I propose for use in this litigation: my declaration is quite clear that I propose hedonic regression and conjoint analysis and not side-by-side comparisons.

72.  Dr. Ugone admits in his deposition, however, that this technique can only demonstrate a high level retail price difference--not a price premium associated with a specific product attribute:

> Q.  I simply wanted a yes or no there, that the direct comparison of Wesson and a competitor, retail price against retail price, wouldn't tell you anything about the amount of the retail price of Wesson Oil attributable to the 100 percent natural claim being challenged in this case, though, right?
>
> A.  I would agree that you would need to do more detailed analysis...[56]

73.  Dr. Ugone further admits that this side by side comparison does not use regression analysis as I propose:

> Q.  And yet, the Mazola comparator you've used here and the way that you used it for many pages in your report simply -- simply talks about comparing Wesson and Mazola at retail side by side, correct?

---

[54] Weir Declaration at 6-7, 9-10, Exhibit 2.
[55] See, Ugone Declaration at 47, *et seq.*, and 56, *et seq.*
[56] Ugone Deposition, at 336.  (Objections omitted.)

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 24 of 29

A.  So we do a pricing comparison, although we do it on a number of different dimensions, but we do a pricing comparison.  I don't disagree with that.

Q.  That's not a regression, though, correct?

A.  No, that not a regression.[57]

74.  Finally, Dr. Ugone admits that his own side-by-side approach is, as a method of determining damages in this case, "very weak for doing that."[58]

75.  The problem with Dr. Ugone's side-by-side comparison is that it fails to take into effect other explanatory elements of price such as brand.  Consider the following scenario: The goal is to determine whether air conditioning commands a price premium in automobiles.  Dr. Ugone's approach would be to compare the price of a Mercedes without air conditioning with the price of a Kia that has air conditioning.  The price of the Mercedes is always going to be higher than the price of the Kia, but only because of the Mercedes brand.  This comparison tells us nothing about the price of the Kia (or Mercedes) with and without air conditioning.

76.  As can be seen from this example, Dr. Ugone conflates the concept of overall retail price premium (i.e., does one product cost more than another?) with a price premium attributable to a specific product attribute (i.e., does the product cost more because it has a specific attribute?).  Even though the price of the Mercedes will be higher than the price of the Kia, the price of the Kia will be higher if the car comes with air conditioning than the price of the Kia without air conditioning.

77.  In this case, Wesson Oils can still be priced higher as a result of the 100% Natural Claim (as compared to a but-for scenario where Wesson did not make the 100% Natural Claim), even if Wesson Oil is priced lower at retail than certain competitors.

78.  Dr. Ugone's Mazola/Wesson comparisons tell us absolutely nothing about the price premium attributable to the 100% Natural Claim on Wesson Oils.

---

[57] Ugone Deposition, at 344.
[58] Ugone Deposition, at 334-335.

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 25 of 29

**The price of retail products can be affected by product differentiation**

79.   The Ugone declaration asserts that my analysis in this litigation relies on a theory of so-called "fraud on the market."  This ignores a very basic economic principle: product differentiation.

80.   Dr. Ugone summarized the "product differentiation" concept in his deposition, testifying that: "Product differentiation is introducing attributes to the product that allows the consumer to differentiation [sic] between the products, and sometimes that's done, you know, with the hope of making, you know, additional sales."[59]  This is the very heart of this case: did ConAgra's differentiation of its Wesson Oils cause increased consumer demand and price, and was that differentiation false, deceptive, unfair, or misleading?

81.   Significantly, Dr. Ugone admits that one way to differentiate a product is to apply a "100% Natural" label to it:

> Q.  For simply a product differentiation, let's take the two buckets of wheat for your example.  Is -- would one way to differentiation the two buckets would be for you to put 100 percent natural on your bucket?
>
> A.  Okay.  If you want to put a few more parameters on the question, then I can answer.  What I was trying to say is if everybody else has 100 percent natural, it doesn't differentiation your product.  But if you have something that's different, yes, it does differentiation [sic] your  product.
>
> Q.  And you would agree that not every -- not every producer of cooking oil puts 100 percent  natural on its bottle, correct?
>
> A.  I believe that to be correct, yeah.[60]

82.   As discussed above, if ConAgra's differentiation of the Wesson Oils with the 100% Natural Claim caused the market price of the Products to increase, all purchasers will be harmed because they will all have paid the price premium for the oils.

---

[59] Ugone Deposition, at 140.
[60] Ugone Deposition, at 141.  (Objections omitted.)

ECONOMICS AND TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 26 of 29

83.  The concept of product differentiation dovetails with ConAgra's own internal research (as discussed above),  which concludes that "Consumers rate 100% Natural...as the most important and appropriate health benefits for a cooking oil to communicate" and that "Pure and 100% Natural ... is the single most compelling message we can communicate to the growth market."  By labeling the Wesson Oils as 100% Natural, ConAgra sought to increase demand and price for the Products at issue here.

84.  It is my opinion that the Court need not evaluate the conditions of fraud on the market in this litigation, because a different economic principle--product differentiation-- explains how and why the 100% Natural Claim can have a market wide effect on price. However, should the Court decide to examine the conditions of "fraud on the market" in the context of this litigation, it is my opinion that the conditions set forth in Efficient Capital Markets[61] (the general principles of which Dr. Ugone agrees with[62]) are satisfied in the market for consumer cooking oils.

## VI.  PRELIMINARY REGRESSION RESULTS

85.  In his deposition, Dr. Ugone admits that running preliminary regressions is common practice in the field of economics:

> I think it's a -- I think it's a little secret of econometrics that people run a lot of regressions just to see if the model is working, maybe some preliminary results, but then recognizing that more work needs to be done, so I can see that taking place just as in the normal course.

---

[61] Efficient Capital Markets: A Review of Theory and Empirical Work, Fama, Eugene, *The Journal of Finance*, Vol. 25, No. 2, Papers and Proceedings of the Twenty-Eighth Annual Meeting of the American Finance Association New York, N.Y. December, 28-30, 1969 (May, 1970), pp. 383-417.
[62] Ugone Deposition, at 148-149.

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 27 of 29

86.   Similarly, Michael Doane, former Analysis Group Principal, adopts a similar stance in his article discussing the use of hedonic regression to determine class-wide damages in a class action context: the authors conduct preliminary, so-called "corroborative," regressions before specifying and running a final model.[63]

87.   In this spirit, I have now conducted a preliminary hedonic regression model.  As Dr. Ugone notes, "more work needs to be done" to reach a final determination of damages in this case.  However, this preliminary model demonstrates that the hedonic regression technique can be utilized in this case, and that there is a positive, statistically significant price premium associated with the 100% Natural Claim on the Wesson Oils.

88.   I am still awaiting additional data and information that has been requested before I complete the specification and analysis of a final model.  In the interim, I have used a dataset from Nielsen, provided by ConAgra during the discovery process.   The dataset appears to contain nationwide data for the broad cooking oil market, including corn, canola, vegetable, and blended oils, and including data on the sales of the Wesson Oils, for the period 2009-2013.

89.   In this preliminary model, the dependent variable is price per ounce of oil.  I have used the semi-log specification described in my original report.   I have included a broad array of independent variables, including: the Natural Claim, brand, numerous other product attributes, size of the container sold, type of oil, promotional price, and time period.

90.   The preliminary model produced robust results.  I have reproduced the R-Squared, F-statistic, and independent variable information for the Natural Claim in Table 1 below.  The complete results of the preliminary model are reproduced in Exhibit 2.

---

[63] *The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints*, Doane, Michael (Analysis Group) and Hartman, Raymond, Journal of Law, Economics, & Organization, Vol. 3, No. 2 (Autumn, 1987), pp. 351-372

ECONOMICS AND TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 28 of 29

| Table 1. Preliminary Hedonic Regression Results | | | |
|---|---|---|---|
| R-Squared | .7448 | | |
| Adjusted R-Squared | .7447 | | |
| F-Statistic | 26464.22 | | |
| Natural Claim Coefficient | .0225 | Natural Claim T-Statistic | 39.25 |

91.   As can be seen in the table, the preliminary model produced a relatively high R-Squared value, indicating that the model is explaining 74% of the variation of the dependent variable.  The F-Statistic also confirms that the preliminary model has good explanatory power.

92.   The preliminary, positive coefficient for the Natural Claim indicates that, generally, consumers do place a value on the Natural Claim, and that market wide there is a price premium attributable to the Claim: that price premium, nationwide, across all four types of Wesson Oil, across all sizes, and across multiple years, is 2.28%.  This coefficient is statistically significantly different from zero, with a T-Statistic of 39.25 (significant at the 99% confidence level).

93.   At this stage, the preliminary model is more useful in determining the general directional nature of the Natural Claim coefficient (i.e., the fact that there is a positive, significant coefficient—indicating that there is a price premium associated with the Natural Claim), than its for its specific value.   As new and additional data is fed into the model, and the final model specification is completed, this value is likely to change.  The preliminary model is also helpful in understanding the usefulness of the hedonic regression technique in this particular application.  The R-Squared and F-Statistic values indicate that the model has the ability to produce useful, reliable results.

ECONOMICS AND
TECHNOLOGY, INC.

Rebuttal Declaration of Colin B. Weir
June 30, 2014
Page 29 of 29

## VII.  RESERVATION OF RIGHTS

My testimony is based upon the information and data presently available to me.  I understand that additional, different, and/or updated data including market research data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony.

VERIFICATION

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Boston, Massachusetts, this 30th day of June, 2014.

Colin B. Weir

ECONOMICS AND
TECHNOLOGY, INC.

**Exhibit 1**

**Additional Facts, Data, and
Other Information Considered**

ECONOMICS AND
TECHNOLOGY, INC.

-Declaration of Keith R. Ugone in Opposition to Plaintiffs' Motion for Class Certification (with all exhibits and appendices thereto)

-Defendant ConAgra Foods, Inc.'s Notice of Motion and Motion to Strike Declarations of Colin B. Weir and Charles M. Benbrook, Ph.D.

-June 18, 2014 Transcript of Deposition of Keith R. Ugone

- *The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints*, Doane, Michael (Analysis Group) and Hartman, Raymond, Journal of Law, Economics, & Organization, Vol. 3, No. 2 (Autumn, 1987), pp. 351-372

- Efficient Capital Markets: A Review of Theory and Empirical Work, Fama, Eugene, *The Journal of Finance*, Vol. 25, No. 2, Papers and Proceedings of the Twenty-Eighth Annual Meeting of the American Finance Association New York, N.Y. December, 28-30, 1969 (May, 1970), pp. 383-417.

-CAG00000055

-CAG00001992

-CAG0002144

-CAG0002537

-CAG0003651

-CAG0004764

-CAG0031947

-CAG0031948

-CAG0031949

-CAG0031950

ECONOMICS AND TECHNOLOGY, INC.

# EXHIBIT 2

# Preliminary Regression Results

ECONOMICS AND
TECHNOLOGY, INC.

```
   Source |       SS       df      MS              Number of obs = 1269823

-------------+------------------------------        F(140,1269682) =26464.22

    Model | 73516.3095   140  525.116497          Prob > F      =  0.0000

 Residual | 25193.67161269682 .019842505          R-squared     =  0.7448

-------------+------------------------------        Adj R-squared =  0.7447

    Total | 98709.98111269822  .07773529          Root MSE      =  .14086
```

```
------------------------------------------------------------------------------

       LogPriceUnitOz |    Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]

-------------+----------------------------------------------------------------

             CANOLA |  .0729582   .0005661   128.87   0.000    .0718486   .0740678

              BLEND |  .0245409   .0019747    12.43   0.000    .0206705   .0284112

          VEGETABLE |  .0190472   .0005416    35.17   0.000    .0179857   .0201086

               SIZE | -.0190096   .0000204  -929.66   0.000   -.0190496  -.0189695

              SIZE2 |  .0000981   1.23e-07   798.97   0.000    .0000979   .0000984

              Promo | -.2154372   .0002679  -804.20   0.000   -.2159622  -.2149121

            GMOFREE |  .2119587   .0192446    11.01   0.000     .17424    .2496773

         GLUTENFREE |  .1857015   .0575437     3.23   0.001    .0729179   .2984851

            NATURAL |  .0225583   .0005747    39.25   0.000    .0214318   .0236847

            ORGANIC |  .8717222   .0195376    44.62   0.000    .8334292   .9100152

     CHOLESTEROLFREE |   .132583   .0009021   146.98   0.000    .1308149    .134351

 ABSENCEOFSPECIFICFAT | -.0735794   .0011277   -65.25   0.000   -.0757897  -.0713692

            FATFREE | -.1807639   .0016885  -107.06   0.000   -.1840732  -.1774546

             LOWFAT | -.1970276    .005477   -35.97   0.000   -.2077624  -.1862928

 NATURALSOURCEOFOMEGA | -.1692781   .0289362    -5.85   0.000    -.225992  -.1125642

      OMEGA3PRESENCE | -.2673516   .0023346  -114.52   0.000   -.2719274  -.2627759

      OMEGA6PRESENCE | -.0163234   .0079318    -2.06   0.040   -.0318695  -.0007773
```



| | | | | | | |
|---|---|---|---|---|---|---|
| PRESERVATIVEFREE | -.0724736 | .0015527 | -46.68 | 0.000 | -.0755168 | -.0694304 |
| EXCELLENTSOURCEOFVITAMIN | .3385848 | .0065729 | 51.51 | 0.000 | .3257021 | .3514675 |
| GOODSOURCEOFVITAMINS | .056584 | .001316 | 43.00 | 0.000 | .0540047 | .0591633 |
| PRVTLBLSMART | -.0182542 | .0012107 | -15.08 | 0.000 | -.0206272 | -.0158812 |
| HEARTHEALTHY | -4.958781 | .0080072 | -619.29 | 0.000 | -4.974474 | -4.943087 |
| HEARTHLTH | -.0252183 | .001605 | -15.71 | 0.000 | -.028364 | -.0220727 |
| HEARTHLTHRECIPES | .0324582 | .0034898 | 9.30 | 0.000 | .0256183 | .0392981 |
| year2 | -.0614536 | .0003883 | -158.27 | 0.000 | -.0622146 | -.0606926 |
| year3 | .0990389 | .0003939 | 251.43 | 0.000 | .0982669 | .0998109 |
| year4 | .0970937 | .0003956 | 245.44 | 0.000 | .0963183 | .097869 |
| year5 | .0757673 | .0003969 | 190.90 | 0.000 | .0749894 | .0765452 |
| L | -.2596151 | .0018534 | -140.08 | 0.000 | -.2632477 | -.2559825 |
| APLUS | -.7350511 | .039078 | -18.81 | 0.000 | -.8116427 | -.6584594 |
| ADELITA | .1095279 | .0253194 | 4.33 | 0.000 | .0599028 | .159153 |
| ADMIRATION | -.4990568 | .0147454 | -33.84 | 0.000 | -.5279572 | -.4701564 |
| ALBERTOANO1 | -.0792147 | .0813313 | -0.97 | 0.330 | -.2386214 | .0801919 |
| ALBERTOA1 | -.175679 | .0076309 | -23.02 | 0.000 | -.1906352 | -.1607227 |
| ALPINEGOURMET | -.123532 | .0086873 | -14.22 | 0.000 | -.1405587 | -.1065053 |
| ANGELINO | -.2833937 | .0064507 | -43.93 | 0.000 | -.2960369 | -.2707505 |
| ATLANTICORGANIC | .2009157 | .0393885 | 5.10 | 0.000 | .1237155 | .2781158 |
| BAKERBOY | -.1617729 | .0996147 | -1.62 | 0.104 | -.3570143 | .0334684 |
| BESTVALUE | -.443729 | .0162004 | -27.39 | 0.000 | -.4754812 | -.4119769 |
| BLUEPLATE | .2155376 | .0184544 | 11.68 | 0.000 | .1793676 | .2517076 |
| BOLIO | -.3857556 | .0996157 | -3.87 | 0.000 | -.5809989 | -.1905122 |
| BUTCHERBOY | -.3209218 | .0025729 | -124.73 | 0.000 | -.3259645 | -.3158791 |
| CADIA | .2870779 | .0376226 | 7.63 | 0.000 | .2133389 | .360817 |
| CANOLAHARVEST | .3867646 | .010953 | 35.31 | 0.000 | .365297 | .4082321 |



| | | | | | | |
|---|---|---|---|---|---|---|
| CAPULLO | -.1920658 | .0065639 | -29.26 | 0.000 | -.2049309 | -.1792008 |
| CAPULLODEMAZOLA | -.1223643 | .0064334 | -19.02 | 0.000 | -.1349736 | -.109755 |
| CAPUTO | -.0429866 | .0813348 | -0.53 | 0.597 | -.2024 | .1164267 |
| CARUSO | .06687 | .0180525 | 3.70 | 0.000 | .0314878 | .1022522 |
| CENTO | .1015111 | .0575161 | 1.76 | 0.078 | -.0112184 | .2142407 |
| CHEFWAY | -.2247927 | .0532496 | -4.22 | 0.000 | -.32916 | -.1204254 |
| CLARITY | -.2294628 | .0266385 | -8.61 | 0.000 | -.2816735 | -.1772522 |
| COLAVITA | .5275426 | .0173988 | 30.32 | 0.000 | .4934417 | .5616436 |
| CONCHITA | .2173452 | .019371 | 11.22 | 0.000 | .1793787 | .2553117 |
| CONDAL | -.0473835 | .0996107 | -0.48 | 0.634 | -.2426172 | .1478501 |
| CORA | .5996897 | .1408673 | 4.26 | 0.000 | .3235947 | .8757847 |
| CORNOLA | .1285297 | .0086622 | 14.84 | 0.000 | .111552 | .1455074 |
| CRISCO | -.078175 | .0012043 | -64.91 | 0.000 | -.0805354 | -.0758147 |
| CRISCOPURITAN | .9005628 | .0039604 | 227.39 | 0.000 | .8928005 | .9083252 |
| CTLBR | -.206096 | .000921 | -223.77 | 0.000 | -.2079011 | -.2042908 |
| CWP | -.2315896 | .0996103 | -2.32 | 0.020 | -.4268224 | -.0363569 |
| DELPUEBLO | -3.147271 | .0236635 | -133.00 | 0.000 | -3.19365 | -3.100891 |
| DELALLO | -.0072675 | .0088887 | -0.82 | 0.414 | -.0246891 | .0101541 |
| DRAGONFLY | .3455506 | .0332171 | 10.40 | 0.000 | .2804461 | .410655 |
| ELMEXICANO | -.1197267 | .0112443 | -10.65 | 0.000 | -.1417652 | -.0976882 |
| ELSEMBRADOR | .0957327 | .0575238 | 1.66 | 0.096 | -.017012 | .2084774 |
| FAMILIAR | -.3012042 | .0037389 | -80.56 | 0.000 | -.3085322 | -.2938761 |
| FAMILY | -.1047869 | .0086457 | -12.12 | 0.000 | -.1217322 | -.0878417 |
| FARMERSBEST | .1728069 | .0179186 | 9.64 | 0.000 | .1376869 | .2079268 |
| FONTOLIVA | .1289946 | .0088287 | 14.61 | 0.000 | .1116906 | .1462987 |
| GABRIELA | -.0897336 | .0575155 | -1.56 | 0.119 | -.2024619 | .0229948 |
| GEM | -.4180854 | .0069705 | -59.98 | 0.000 | -.4317473 | -.4044235 |



| | | | | | | |
|---|---|---|---|---|---|---|
| GLICKS | .2571003 | .0182361 | 14.10 | 0.000 | .2213582 | .2928424 |
| GOLCHIN | -.1982774 | .1408688 | -1.41 | 0.159 | -.4743754 | .0778206 |
| GOLDENCHOICE | .3059766 | .0364104 | 8.40 | 0.000 | .2346135 | .3773398 |
| GOLDNSWEET | -.2167126 | .0175017 | -12.38 | 0.000 | -.2510153 | -.1824099 |
| GOODIES | .2844306 | .0996194 | 2.86 | 0.004 | .0891801 | .4796812 |
| GOYA | .2682407 | .0031772 | 84.43 | 0.000 | .2620135 | .2744679 |
| GREENLIFE | -.2768092 | .0063101 | -43.87 | 0.000 | -.2891768 | -.2644417 |
| HAIN | .7590664 | .0102238 | 74.24 | 0.000 | .739028 | .7791048 |
| HANSENS | -.1790839 | .0193728 | -9.24 | 0.000 | -.217054 | -.1411138 |
| HEAVENLYCHEF | .3010315 | .0630191 | 4.78 | 0.000 | .1775163 | .4245467 |
| HOGAR | -.3502419 | .0097724 | -35.84 | 0.000 | -.3693955 | -.3310882 |
| HOLSUM | -.1746624 | .029386 | -5.94 | 0.000 | -.2322579 | -.1170669 |
| IBERIA | .1950333 | .0135394 | 14.40 | 0.000 | .1684965 | .22157 |
| KARTAMUS | -.3440431 | .0091216 | -37.72 | 0.000 | -.3619212 | -.326165 |
| LACENA | .3643923 | .0276658 | 13.17 | 0.000 | .3101682 | .4186163 |
| LAFE | .0171782 | .0215233 | 0.80 | 0.425 | -.0250068 | .0593632 |
| LAFLORITA | .4857025 | .0813345 | 5.97 | 0.000 | .3262896 | .6451154 |
| LAMAZORCA | .2379721 | .0179373 | 13.27 | 0.000 | .2028157 | .2731285 |
| LAPREFERIDA | .2766215 | .0276435 | 10.01 | 0.000 | .2224411 | .3308019 |
| LARUSSA | .0388433 | .0088347 | 4.40 | 0.000 | .0215276 | .056159 |
| LASPAGNOLA | .0016511 | .0046761 | 0.35 | 0.724 | -.0075139 | .0108161 |
| LATORRE | -.4187891 | .0156825 | -26.70 | 0.000 | -.4495264 | -.3880519 |
| LIEBERS | .1273007 | .0363843 | 3.50 | 0.000 | .0559888 | .1986127 |
| LONGLIFE | -.0750224 | .0106355 | -7.05 | 0.000 | -.0958676 | -.0541772 |
| LORIVA | 1.251367 | .0201504 | 62.10 | 0.000 | 1.211873 | 1.290861 |
| LOUANA | -.106697 | .0012847 | -83.05 | 0.000 | -.109215 | -.104179 |
| MADAMEGOUGOUSSE | -.1955312 | .0996159 | -1.96 | 0.050 | -.3907749 | -.0002874 |



| | | | | | | |
|---|---|---|---|---|---|---|
| MANISCHEWITZ | .5383045 | .0119061 | 45.21 | 0.000 | .514969 | .56164 |
| MARCONI | -.0770039 | .0231773 | -3.32 | 0.001 | -.1224306 | -.0315771 |
| MARINA | -3.515486 | .1409535 | -24.94 | 0.000 | -3.79175 | -3.239222 |
| MAZOLA | .1430601 | .0016177 | 88.43 | 0.000 | .1398894 | .1462308 |
| MELLOGOLD | -.0229361 | .0630102 | -0.36 | 0.716 | -.146434 | .1005618 |
| MICHIGANVALLEYBRAND | -.1692723 | .0575263 | -2.94 | 0.003 | -.282022 | -.0565227 |
| MIDEAST | -.1545607 | .0341975 | -4.52 | 0.000 | -.2215867 | -.0875347 |
| MILPAS | .0353095 | .0307689 | 1.15 | 0.251 | -.0249964 | .0956154 |
| MOLINOSNATURESIDEAL | -.5853249 | .0469753 | -12.46 | 0.000 | -.6773948 | -.493255 |
| MONTERREY | .2377144 | .0996107 | 2.39 | 0.017 | .0424807 | .4329481 |
| NAPAVALLEYNATURALS | .3745508 | .0285106 | 13.14 | 0.000 | .318671 | .4304306 |
| NATURALVALUE | -.3811965 | .040279 | -9.46 | 0.000 | -.460142 | -.3022511 |
| NUTOLA | .421781 | .0498164 | 8.47 | 0.000 | .3241426 | .5194193 |
| NUTRIOLI | .0822696 | .0036128 | 22.77 | 0.000 | .0751885 | .0893506 |
| PAMPA | -.4608701 | .0023148 | -199.10 | 0.000 | -.4654069 | -.4563332 |
| PAMPLONA | .1394691 | .0996162 | 1.40 | 0.161 | -.0557752 | .3347134 |
| PERFECTO | -.928968 | .0704475 | -13.19 | 0.000 | -1.067043 | -.7908932 |
| PETERS | .3671943 | .0498273 | 7.37 | 0.000 | .2695346 | .4648541 |
| PREFER | -.1811498 | .0054188 | -33.43 | 0.000 | -.1917705 | -.1705292 |
| PREMIUM | .3597891 | .1408847 | 2.55 | 0.011 | .0836598 | .6359184 |
| PUREMAID | -.0501564 | .0064354 | -7.79 | 0.000 | -.0627696 | -.0375433 |
| PUREOLA | -.2985055 | .0132568 | -22.52 | 0.000 | -.3244884 | -.2725226 |
| PURO | .1083235 | .026638 | 4.07 | 0.000 | .0561139 | .160533 |
| REX | -.3835488 | .1408685 | -2.72 | 0.006 | -.6596462 | -.1074513 |
| RICHTEX | -.2996994 | .0498084 | -6.02 | 0.000 | -.3973222 | -.2020766 |
| RITA | .0531788 | .0469635 | 1.13 | 0.257 | -.0388679 | .1452256 |
| ROYALSUPREME | -.1298547 | .0532494 | -2.44 | 0.015 | -.2342218 | -.0254876 |



| | | | | | | |
|---|---|---|---|---|---|---|
| SBLAYU | 2.616513 | .0630091 | 41.53 | 0.000 | 2.493018 | 2.740009 |
| SEVILLAMIA | .3067121 | .0323297 | 9.49 | 0.000 | .2433469 | .3700772 |
| SOLIOFAMILY | .1124452 | .142174 | 0.79 | 0.429 | -.166211 | .3911013 |
| SORIANA | -.343033 | .0996151 | -3.44 | 0.001 | -.5382753 | -.1477908 |
| SPECTRUMNATURALS | .3058385 | .0200251 | 15.27 | 0.000 | .26659 | .345087 |
| STREITS | .3818569 | .0352255 | 10.84 | 0.000 | .3128161 | .4508976 |
| SUNERA | .2154011 | .0150446 | 14.32 | 0.000 | .1859143 | .244888 |
| SYSCOCLASSIC | -.0198301 | .0704379 | -0.28 | 0.778 | -.157886 | .1182257 |
| SYSCORELIANCE | -21.12634 | .0860461 | -245.52 | 0.000 | -21.29499 | -20.95769 |
| THEMISHPACHA | .7031184 | .0323494 | 21.74 | 0.000 | .6397147 | .7665222 |
| TOPHE | 1.24535 | .0630055 | 19.77 | 0.000 | 1.121862 | 1.368839 |
| TRUTHFARMS | -.4822861 | .0234967 | -20.53 | 0.000 | -.5283388 | -.4362333 |
| VITARROZ | -.5840025 | .0166622 | -35.05 | 0.000 | -.6166599 | -.5513451 |
| WHIRL | .7006712 | .09961 | 7.03 | 0.000 | .5054391 | .8959033 |
| WILDLYDELICIOUSFINEFOODS | 1.224519 | .0532525 | 22.99 | 0.000 | 1.120145 | 1.328892 |
| _cons | -1.906865 | .001315 | -1450.09 | 0.000 | -1.909442 | -1.904287 |

ECONOMICS AND TECHNOLOGY, INC.