**MILBERG LLP**
DAVID E. AZAR (SBN 218319)
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90071
Telephone:   (213) 617-1200
Facsimile:    (213) 617-1975
dazar@milberg.com

**GRANT & EISENHOFER P.A.**
ADAM J. LEVITT (pro hac vice)
EDMUND S. ARONOWITZ (pro hac vice)
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
Telephone:   (312) 214-0000
Facsimile:    (312) 214-0001
alevitt@gelaw.com
earonowitz@gelaw.com

Plaintiffs' Interim Class Counsel

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| IN RE CONAGRA FOODS, INC. | Case No. CV 11-05379-MMM (AGRx)MDL NO. 2291 |
| | CLASS ACTION |
| | REDACTED |
| | PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AMENDED MOTION FOR CLASS CERTIFICATION |
| | DATE:         November 17, 2014 |
| | TIME:         10:00 a.m. |
| | CTRM.:       780 |
| | JUDGE:       Hon. Margaret M. Morrow |

# Table of Contents

I.      INTRODUCTION ................................................................................. 1

II.     SUMMARY STATEMENT OF FACTS ................................................ 5

III.    PROCEDURAL HISTORY .................................................................. 6

IV.     ARGUMENT ........................................................................................ 6

        A.      Plaintiffs Have Satisfied The Requirements of Rule 23(a) ................. 6

        B.      Plaintiffs Have Presented Classwide Evidence Establishing The Materiality of the "100% Natural" Claim on Wesson Oils ................. 9

                1.      The "100% Natural" Claim on Wesson Oils is Material to Wesson Purchasers ........................................................ 9

                2.      Reasonable Consumers Believe That a "Natural" Label Includes A "Non-GMO" Claim ................................... 12

        C.      Common Questions Predominate For Each and Every State Law Claim Plaintiffs Seek to Certify ........................................... 15

                1.      Common Questions Predominate for Each California Claim Plaintiffs Seek to Certify ........................................ 15

                2.      Common Questions Predominate For Each Colorado Claim Plaintiffs Seek to Certify ........................................ 21

                3.      Common Questions Predominate For Each Florida Claim Plaintiffs Seek to Certify ........................................ 26

                4.      Common Questions Predominate For Each Illinois Claim Plaintiffs Seek to Certify ........................................ 30

                5.      Common Questions Predominate For Each Indiana Claim Plaintiffs Seek to Certify ........................................ 33

                6.      Common Questions Predominate For Each Nebraska Claim Plaintiffs Seek to Certify ........................................ 35

                7.      Common Questions Predominate For Each New York Claim Plaintiffs Seek to Certify ........................................ 38

                8.      Common Questions Predominate For Each Ohio Claim Plaintiffs Seek to Certify ........................................ 43

                9.      Common Questions Predominate For Each Oregon Claim Plaintiffs Seek to Certify ........................................ 47

                10.     Common Questions Predominate For Each South Dakota Claim Plaintiffs Seek to Certify ........................... 50

11. Common Questions Predominate For Each Texas Claim Plaintiffs Seek to Certify ........................................................ 52

D. Plaintiffs' Damages Model Satisfies The *Comcast* Standard. ............ 54

1. Plaintiffs' Proposed Damages Model Is Not Analogous To The Model Offered By The Comcast Plaintiffs ...................... 55

2. Post-*Comcast* Case Law Supports The Viability of Plaintiffs' Damages Theory ........................................... 58

3. ConAgra's Argument on The Merits of Plaintiffs' Damages Does Not Make Plaintiffs' Damages Model Run Afoul of *Comcast* ......................................................... 61

4. Weir's Amended Declaration Satisfies All of the Concerns Articulated By The Court in the August 1, 2014 Order .......... 63

E. Plaintiffs Can Measure Damages Caused By Misleading Consumers in a Particular Fashion If Required ..................... 64

F. A Class Action Is Superior to Other Methods for Fairly and Efficiently Adjudicating this Controversy, Satisfying Rule 23(b)(3)'s Superiority Requirement ..................................... 66

G. Certification of a Rule 23(b)(2) Class for Injunctive and Declaratory Relief Is Appropriate ..................................... 68

1. Some Plaintiffs Would Purchase Wesson Oil In the Future If It Were Truthfully Labeled ..................................... 69

2. Article III Standing Does Not Depend on Future Intent to Purchase and Plaintiffs Continue To Be Harmed Regardless of Their Knowledge of ConAgra's Deception ................... 70

H. Alternatively, The Court Should Employ Rule 23(c)(4) to Resolve the Falsity Question ...................................... 73

V. CONCLUSION ........................................................... 74

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**FEDERAL CASES**

4

*Ackerman v. Coca-Cola Co.*,
No. 09 CV 395(DLI)(RML), 2013 WL 7044866 (E.D.N.Y. July 18,
2013) ....................................................................................................... 39, 73

5

6

7

*Ackerman v. Coca-Cola Co.*,
No. CV-09-0395 (JG) (RML), 2010 WL 2925955 (E.D.N.Y. July 21,
2010) ............................................................................................................. 39

8

9

*In re Alexia Foods, Inc. Litigation*,
No. 4:11-cv-06119-PJH (N.D. Cal. 2013) ..................................................... 69

10

11

*Algarin v. Maybelline, LLC*,
Civil No. 12cv3000 AJB (DHB), 2014 U.S. Dist. LEXIS 65173 (S.D.
Cal. May 12, 2014) ........................................................................................ 72

12

13

14

*Anderson v. Gulf Stream Coach, Inc.*,
662 F.3d 775 (7th Cir. 2011) ......................................................................... 35

15

16

*Apple Inc. v. Samsung Elecs. Co.*,
735 F.3d 1352 (Fed. Cir. 2013) ..................................................................... 65

17

18

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
No. 12-CV-00630-LHK, 2014 U.S. Dist. LEXIS 24506 (N.D. Cal. Feb.
25, 2014) .................................................................................................. 61, 65

19

20

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001) ........................................................................... 8

21

22

*Astiana v. Ben & Jerry's Homemade, Inc.*,
Case No. C 10-4387 PJH, 2014 U.S. Dist. LEXIS 1640 (N.D. Cal. Jan. 7,
2014) ............................................................................................................. 59

23

24

*Astiana v. Kashi Co.*,
291 F.R.D. 493 (S.D. Cal. 2013) .............................................................. 20, 60

25

26

*Ault v. J.M. Smucker Co.*,
13 CIV. 3409 PAC, 2014 WL 1998235 (S.D.N.Y. May 15, 2014) ................... 42

27

28

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) ................................................................ 17

*Brazil v. Dole Packaged Foods, LLC*,
   Case No. 12-CV-01831-LHK, 2014 U.S. Dist. LEXIS 74234 (N.D. Cal. May 30, 2014) .............................................................................. 60, 68

*Brookings Mun. Utils., Inc. v. Amoco Chem. Co.*,
   103 F. Supp. 2d 1169 (D.S.D. 2000) ..................................................... 50

*Butler v. Sterling, Inc.*,
   210 F.3d 371, 2000 WL 353502 (6th Cir. 2000) ................................... 46

*Carnegie v. Household Int'l, Inc.*,
   376 F.3d 656 (7th Cir. 2004) ................................................................. 68

*Chacanaca v. Quaker Oats Co.*,
   752 F. Supp. 2d 1111 (N.D. Cal. 2010) ................................................. 16

*Cirone–Shadow v. Union Nissan of Waukegan*,
   955 F.Supp. 938 (N.D. Ill. 1997) .......................................................... 31

*Clemens v. DaimlerChrysler Corp.*,
   534 F.3d 1017 (9th Cir. 2008) ............................................................... 21

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ................................................................... passim

*Cortez v. Neb. Beef, Inc.*,
   266 F.R.D. 275 (D. Neb. 2010) ............................................................. 36

*Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*,
   250 F.3d 570 (7th Cir. 2001) ................................................................. 31

*Ebin v. Kangadis Food, Inc.*,
   297 F.R.D. 561 (S.D.N.Y. 2014) ......................................... 38, 39, 40, 67

*Elias v. Hewlett-Packard Co.*,
   903 F. Supp. 2d 843 (N.D. Cal. 2012) ................................................... 16

*Ellis v. Costco Wholesale Corp.*,
   285 F.R.D. 492 (N.D. Cal. 2012) .......................................................... 68

*Ersler v. Toshiba Am., Inc.*,
    No. CV-07-2304 (SMG), 2009 WL 454354 (E.D.N.Y. Feb. 24, 2009) ........... 40

*Evon v. Law Offices of Sidney Mickell*,
    688 F.3d 1015 (9th Cir. 2012) ........................................................................ 7

*In re Ferrero Litig.*,
    794 F.Supp. 2d 1107 (S.D. Cal. 2011) ........................................................... 21

*Ferron v. MetaReward, Inc.*,
    698 F. Supp. 2d 992 (S.D. Ohio 2010) ..................................................... 44, 46

*Fitzpatrick v. Gen. Mills, Inc.*,
    263 F.R.D. 687 (S.D. Fla. 2010), *reasoning expressly adopted but
    vacated on other grounds*, 635 F.3d 1279 (11th Cir. 2011) .............................. 27

*Forcellati v. Hyland's, Inc.*,
    No. CV 12-1983-GHK, 2014 U.S. Dist. LEXIS 50600 (C.D. Cal. Apr. 9,
    2014) ................................................................................................ 9, 16, 17

*Francis v. Mead Johnson & Co.*,
    No. 1:10-CV-00701-JLK, 2010 WL 3733023 (D. Colo. Sept. 16, 2010) .......... 25

*Garner v. Healy*,
    184 F.R.D. 598 (N.D. Ill. 1999) ..................................................................... 31

*Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    114 F.R.D. 48 (S.D.N.Y. 1987) ...................................................................... 40

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
    13-CV-3073 NSR, 2014 WL 1285137 (S.D.N.Y. Mar. 27, 2014) ............. 42, 43

*In re Great S. Life Ins. Co. Sales Prac. Litig.*,
    192 F.R.D. 212 (N.D. Tex. 2000) ................................................................... 54

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................... 7, 67

*HealthONE of Denver, Inc. v. UnitedHealth Group, Inc.*,
    805 F.Supp.2d 1115 (D. Colo. 2011) ......................................................... 22, 23

*Henderson v. Gruma Corp.*,
    Case No. CV 10-04173 AHM, 2011 U.S. Dist. LEXIS 41077 (C.D. Cal.
    Apr. 11, 2011) .............................................................................................. 71

*Hinojos v. Kohl's Corp.*,
 718 F.3d 1098 (9th Cir.2013) ............................................................ 18

*Hughes v. Chattem, Inc.*,
 818 F.Supp. 2d 1112 (S.D. Ind. 2011) ............................................. 35

*James D. Hinson Elec. Contr. Co. v. BellSouth Telecomms., Inc.*,
 275 F.R.D. 638 (M.D. Fla. 2011) ...................................................... 29

*Jermyn v. Best Buy Stores, L.P.*,
 256 F.R.D. 418 (S.D.N.Y. 2009) ........................................................ 41

*Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals Co.*,
 No. 91-7099, 1993 U.S. Dist. LEXIS 1016 (E.D. Pa. Jan. 29, 1993), *aff'd*
 19 F.3d 125 (3d Cir. 1994) .............................................................. 13

*Jones v. ConAgra*,
 Case No. C 12-01633 CRB, 2014 WL 2702726 (N.D. Cal. June 13, 2014) ..... 59

*Jones v. ConAgra Foods, Inc.*,
 Case No. C 12-01633 CRB, 2014 U.S. Dist. LEXIS 81292 (N.D. Cal. June 13, 2014) ........................................................................ 71

*JTH Tax, Inc. v. H&R Block E. Tax Servs.*,
 128 F. Supp. 2d 926 (E.D. Va. 2001) ............................................... 13

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
 634 F.3d 883 (7th Cir. 2011) ........................................................... 68

*Keegan v. American Honda*,
 284 F.R.D. 504 (C.D. Cal. 2012) ................................................. 20, 27

*Keilholtz v. Lennox Hearth Products Inc.*,
 268 F.R.D. 330 (N.D. Cal. 2010) ...................................................... 67

*Khoday v. Symantec Corp.*,
 Civil No. 11-180, 2014 U.S. Dist. LEXIS 43315 (D. Minn. Mar. 31, 2014) ........................................................................................ 65

*Kowalsky v. Hewlett-Packard Co.*,
 771 F.Supp. 2d 1156 (N.D. Cal. 2011) ............................................. 16

*Kuklachev v. Gelfman*,
   600 F. Supp. 2d 437 (E.D.N.Y. 2009) ................................................................. 39

*Lanovaz v. Twinings N. Am., Inc.*,
   Case No. C-12-02646-RMW, 2014 U.S. Dist. LEXIS 1639 (N.D. Cal.
   Jan. 6, 2014) ....................................................................................................... 71

*Lindell v. Synthes USA*,
   11-CV-02053-LJO-BAM, 2014 U.S. Dist. LEXIS 27706 (E.D. Cal. Mar.
   4, 2014) ................................................................................................................ 54

*Lockwood Motors, Inc. v. Gen. Motors Corp.*,
   162 F.R.D. 569 (D. Minn. 1995) ......................................................................... 23

*Lutz Farms v. Asgrow Seed Co.*,
   948 F.2d 638 (10th Cir. 1991) ............................................................................. 24

*MacMorris v. Wyeth, Inc.*,
   No. 2:04-CV-596-FtM-29DNF, 2005 WL 1528626 (M.D. Fla. June 27,
   2005) .................................................................................................................... 29

*McCrary v. Elations Co., LLC*,
   No. 13-00242 JGB, 2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13,
   2014) ............................................................................................................... 9, 18

*McDaniel v. Qwest Communications Corp.*,
   Case No. 05 C 1008, 2006 WL 1476110 (N.D. Ill. May 23, 2006) ..................... 73

*McManus v. Fleetwood Enters., Inc.*,
   320 F.3d 545 (5th Cir. 2003) ............................................................................... 53

*Meyer v. Portfolio Recovery Assocs., LLC*,
   707 F.3d 1036 (9th Cir. 2012) ............................................................................... 7

*Microsoft Corp. v. Motorola, Inc.*,
   904 F. Supp. 2d 1109 (W.D. Wash. 2012) ........................................................... 65

*Mims v. Stewart Title Guar. Co.*,
   590 F.3d 298 (5th Cir. 2009) ............................................................................... 54

*Muehlbauer v. General Motors Corp.*,
   431 F. Supp. 2d 847 (N.D. Ill. 2006) ................................................................... 32

*In re Nassau County Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006) ............................................................. 73

*N. Valley Commc'ns, LLC v. Qwest Commc'ns Corp.*,
   659 F. Supp. 2d 1062 (D.S.D. 2009) ................................................. 51

*Nicholson v. UTI Worldwide, Inc.*,
   No. 3:09-cv-722-JPG-DGW, 2011 U.S. Dist. LEXIS 49890 (S.D. Ill.
   May 10, 2011) ...................................................................................... 33

*Nw. Pub. Serv. v. Union Carbide Corp.*,
   236 F. Supp. 2d 966 (D.S.D. 2002) ................................................... 50

*In re Northrop Grumman Corp. Erisa Litig.*,
   No. CV 06-06213, 2011 U.S. Dist. LEXIS 94451 (C.D. Cal. Mar. 29,
   2011) (Morrow, J) ................................................................................ 7

*In re Nucoa Real Margarine Litig.*,
   Case No. CV 10-00927, 2012 U.S. Dist. LEXIS 189901 (C.D. Cal. June
   12, 2012) (Morrow, J.) ......................................................................... 8

*O'Connor v. Boeing North American, Inc.*,
   184 F.R.D. 311 (C.D. Cal. 1998) ........................................................ 9

*Ortega v. Natural Balance, Inc.*,
   No. CV 13-5942, 2014 WL 2782329 (C.D. Cal., June 19, 2014).......... 17, 18, 19

*Oshana v. Coca-Cola Co.*,
   No. 04 C 3596, 2005 U.S. Dist. LEXIS 14184 (N.D. Ill. July 13, 2005),
   *aff'd* 472 F.3d 506 (7th Cir. 2006) .................................................... 13

*Parker v. J.M. Smucker Co.*,
   Case No. C 13-0690 SC, 2013 U.S. Dist. LEXIS 120374 (N.D. Cal. Aug.
   23, 2013) ........................................................................................ 57, 58

*Pecover v. Electronic Arts Inc.*,
   No. C 08–2820 VRW, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ............. 66

*Pelman v. McDonald's Corp.*,
   396 F. Supp. 2d 439 (S.D.N.Y. 2005) ................................................. 39

*Phelps v. 3PD, Inc.*,
   261 F.R.D. 548 (D. Or. 2009) ............................................................. 49

*In re Processed Egg Prods. Antitrust Litig.*,
  851 F. Supp. 2d 867 (E.D. Pa. 2012)..........................................................29, 41

*Quinn v. Walgreen Co.*,
  958 F. Supp. 2d 533 (S.D.N.Y. 2013) ................................................................42

*Lilly v. Hewlett–Packard Co.*, n. 05–cv–465, 2006 WL 1064063, at *5 (S.D.
  Ohio Apr. 21, 2006).........................................................................................46

*Rainbow Play Sys., Inc. v. Backyard Adventure, Inc.*,
  No. CIV. 06–4166, 2009 U.S. Dist. LEXIS 93623 (D.S.D. Sept. 28,
  2009) ..................................................................................................................50

*Rasmussen v. Apple Inc.*,
  Case No. C-13-4923 EMC, 2014 U.S. Dist. LEXIS 35352 (N.D. Cal.
  Mar. 14, 2014) ..................................................................................................71

*Reeves v. PharmaJet, Inc.*,
  846 F. Supp. 2d 791 (N.D. Ohio 2012) .............................................................46

*Ries v. AriZona Beverages USA LLC*,
  287 F.R.D. 523 (N.D. Cal. 2012) .................................................................71, 72

*Robinson v. Match.com, L.L.C.*,
  3:10-CV-2651-L, 2012 U.S. Dist. LEXIS 150116 (N.D. Tex. Oct. 17,
  2012) ..................................................................................................................52

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) .............................................................................8

*Rodriguez v. It's Just Lunch, Int'l*,
  Case No. 07 Civ 9227 (SHS), 2014 U.S. Dist. LEXIS 66409 (S.D.N.Y.
  May 14, 2014).............................................................................................40, 67

*Romano v. Motorola, Inc.*,
  No. 07-CV-60517, 2007 U.S. Dist. LEXIS 86472 (S.D. Fla. Nov. 26,
  2007) ..................................................................................................................29

*Rosales v. FitFlop USA, LLC*,
  882 F.Supp. 2d 1168 (S.D. Cal. 2012) ...............................................................20

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) .............................................................................58

*Seekamp v. It's Huge, Inc.*, 1:09-CV-00018 (LEK/DRH), 2012 U.S. Dist LEXIS 33295 (N.D.N.Y. Mar. 13, 2012) ........................................................... 41

*Spiegel, Inc. v. Fed. Trade Comm'n,* 540 F.2d 287 (7th Cir. 1976) ....................................................................... 26

*Staton v. Boeing Co.,* 327 F.3d 938 (9th Cir. 2003) .............................................................. 8

*Suchanek v. Sturm Foods, Inc.,* No. 13-3843, --- F.3d ---, 2014 WL 4116493 (7th Cir. Aug. 22, 2014) ........... 58

*Temple v. Fleetwood Ent., Inc.,* 133 Fed. Appx. 254 (6th Cir. 2005) ..................................................... 46

*In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672 (S.D. Fla. 2004) ................................................... 51, 52

*In re Toyota Motor Corp.,* 790 F.Supp. 2d 1152 (C.D. Cal. 2011) ........................................... 16, 17

*In re Toyota Motor Corp. Hybrid Brake Mktg.,* No. MDL 10-02172-CJC(RNBx), 2012 U.S. Dist. LEXIS 151559 (C.D. Cal. Sept. 20, 2012) ............................................................... 61

*TV Interactive Data Corp. v. Sony Corp.,* 929 F. Supp. 2d 1006 (N.D. Cal. 2013) .......................................... 65

*U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.,* 719 F. Supp. 2d 1020 (S.D. Ind. 2010) ........................................... 35

*Vaccarino v. Midland Nat'l Life Ins. Co.,* Case No. 2:11-CV-05858-CAS(MANx), 2014 U.S. Dist. LEXIS 18601 (C.D. Cal. Feb. 3, 2014) ...................................................... 55, 65

*Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227 (9th Cir. 1996) ...................................................... 73

*Von Koenig v. Snapple Beverage Corp.,* 713 F.Supp.2d 1066 (E.D. Cal. 2010) ............................................ 19

*Wal-Mart Stores v. Dukes,* 131 S. Ct. 2541 (2011) .......................................................... 7

*Waldman v. New Chapter, Inc.*,
   714 F. Supp. 2d 398 (E.D.N.Y. 2010) ................................................................. 41

*Werdebaugh v. Blue Diamond Growers*,
   Case No. 12-CV-2724-LHK, 2014 WL 2191901 (N.D. Cal. May 23,
   2014) ............................................................................................................ passim

*Young v. Wells Fargo & Co.*,
   671 F. Supp. 2d 1006 (S.D. Iowa 2009) .............................................................. 50

**STATE CASES**

*Anderson v. Dunn*,
   4 N.W.2d 810 (S.D. 1942) ................................................................................... 51

*Arthur Glick Leasing, Inc. v. William J. Petzold, Inc.*,
   51 A.D.3d 1114, 858 N.Y.S.2d 405 (N.Y. App. Div. 2008) .............................. 43

*Avery v. State Farm Mut. Auto. Ins. Co.*,
   216 Ill. 2d 100, 835 N.E.2d 801 (Ill. 2005) ....................................................... 30

*Barbara's Sales, Inc. v. Intel Corp.*,
   227 Ill. 2d 45, 879 N.E. 2d 910 (Ill. 2007) ........................................................ 32

*Beck v. City of Rapid City*,
   650 N.W.2d 520 (S.D. 2002) ............................................................................... 51

*Bel Fury Inv. Group, L.L.C. v. Palisades Collection, L.L.C.*,
   814 N.W.2d 394 (Neb. Ct. App. 2012) ............................................................... 36

*CBS, Inc. v. Ziff-Davis Pub. Co.*,
   75 N.Y.2d 496, 553 N.E.2d 997 (N.Y. 1990) ..................................................... 42

*Clark v. TAP Pharm. Prods., Inc.*,
   343 Ill.App.3d 538, 798 N.E.2d 123 (Ill. App. Ct. 2003) ............................. 32, 33

*Coffee Pot Plaza P'ship v. Arrow Air Conditioning & Refrigeration, Inc.*,
   412 So. 2d 883 (Fla. Dist. Ct. App. 1982) .......................................................... 29

*ConAgra, Inc v. Farrington*,
   635 N.E.2d 1137 (Ind. Ct. App. 1994) ................................................................ 34

*Connick v. Suzuki Motor Co.*,
   174 Ill. 2d 482, 675 N.E.2d 584 (Ill. 1996) ................................................... 30, 31

*Cope v. Metro. Life Ins. Co.*,
   696 N.E.2d 1001 (Ohio 1998) ..................................................................... 44, 46

*Davis v. Powertel, Inc.*,
   776 So.2d 971 (Fla. Dist. Ct. App. 2000) ............................................ 26, 27, 28

*De Bouse v. Bayer*,
   235 Ill. 2d 544, 922 N.E. 2d 309 (Ill. 2009) ....................................................... 30

*Divis v. Clarklift of Nebraska, Inc.*,
   256 Neb. 384, 590 N.W.2d 696 (Neb. 1999) ..................................................... 37

*Dix v. Am. Bankers Life Assurance Co.*,
   415 N.W. 206 (Mich. 1987) ................................................................................ 27

*El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*,
   199 Neb. 697, 261 N.W.2d 358 (Neb. 1978) ..................................................... 38

*Essex Group, Inc. v. Nill*,
   594 N.E.2d 503 (Ind. Ct. App. 1992) ................................................................. 35

*Extraordinary Title Servs., LLC v. Fla. Power & Light Co.*,
   1 So. 3d 400, 404 (Fla. Dist. Ct. App. 2009) ..................................................... 29

*Farmers Ins. Exch. v. Benzing*,
   206 P.3d 812 (Colo. 2009) .................................................................................. 23

*Feitler v. Animation Celection, Inc.*,
   13 P.3d 1044 (Or. Ct. App. 2000) ................................................................. 47, 49

*Garcia v. Medved Chevrolet, Inc.*,
   263 P.3d 92 (Colo. 2011) .................................................................................... 23

*Georgia Malone & Co., Inc. v. Ralph Rieder*,
   19 N.Y.3d 511, 973 N.E.2d 743 (N.Y. 2012) .............................................. 40, 41

*Hall v. Walter*,
   969 P.2d 224 (Colo. 1998) .................................................................................. 23

*Hansen v. Mercy Hospital, Denver*,
   40 Colo. App. 17, 570 P.2d 1309 (Colo. Ct. App. 1977) .................................. 24

*Hayna v Arby's, Inc.*,
   99 Ill App. 3d 700 425 N.E.2d 1174 (Ill. App. Ct. 1981) .................................. 31

*Helena Chem. Co. v. Wilkins*,
  47 S.W.3d 486 (Tex. 2001) ............................................................... 53

*Henry Schein, Inc. v. Stromboe*,
  102 S.W.3d 675 (Tex. 2003) ............................................................. 53

*Hillcrest Country Club v. N.D. Judds Co.*,
  236 Neb. 233, 461 N.W.2d 55 (Neb. 1990) ....................................... 37

*Hofeldt v. Mehling*,
  658 N.W.2d 783 (S.D. 2003) ............................................................. 51

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
  131 Ill.2d 145, 545 N.E.2d 672 (Ill. 1989) ........................................ 32

*Hyundai Motor Am., Inc. v. Goodin*,
  822 N.E.2d 947 (Ind. 2005) ............................................................... 34

*In re Tobacco II Cases*,
  46 Cal.4th 298, 93 Cal. Rptr. 3d 559 (Cal. 2009) ................... 16, 17, 18

*Jackson v. Unocal Corp.*,
  262 P.3d 874 (Colo. 2011) ................................................................. 25

*Kanne v. Visa U.S.A.*,
  272 Neb. 489, 723 N.W.2d 293 (Neb. 2006) ..................................... 36

*Kasky v. Nike, Inc.*,
  27 Cal. 4th 939, 119 Cal. Rptr. 2d 296 (Cal. 2002) ........................... 58

*KC Leisure, Inc. v. Haber*,
  972 So.2d 1069 (Fla. Dist. Ct. App. 2008) ........................................ 26

*King v. Club Med, Inc.*,
  76 A.D.2d 123, 430 N.Y.S.2d 65 (N.Y. App. Div. 1981) ................... 43

*Koch v. Acker, Merrall & Condit Co.*,
  18 N.Y.3d 940, 967 N.E.2d 675 (N.Y. 2012) ................................ 38, 39

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310, 120 Cal. Rptr. 3d 741 (Cal. 2011) ..................... 19, 20

*Latman v. Costa Cruise Lines, N.V.*,
  758 So. 2d 699 (Fla. Dist. Ct. App. 2000) ..................................... 27, 28

*Lavie v. Procter & Gamble Co.*,
    105 Cal. App. 4th 496, 129 Cal. Rptr. 2d 486 (Cal. Ct. App. 2003)..................58

*Lewis v. Lewis*,
    189 P.3d 1134 (Colo. 2008) ....................................................................25

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.3d 173, 944 N.E.2d 1104 (N.Y. 2011) ........................................41

*Manufacturers Hanover Transp. Co. v. Chem. Bank*,
    160 A.D.2d 113 (N.Y. App. Div. 1990)....................................................41

*Martin v. Heinhold Commodities*,
    163 Ill. 2d 33, 643 N.E.2d 734 (Ill. 1994)...............................................30

*Mass. Mut. Life Ins. Co. v. Superior Court*,
    97 Cal. App. 4th 1282, 119 Cal. Rptr. 2d 190 (Cal. Ct. App. 2002)..................17

*Miekow v. Faykus*,
    297 S.W.2d 260 (Tex. App. 1956) ...........................................................54

*Newman v. Tualatin Devel. Co., Inc.*,
    597 P.2d 800 (Or. 1979) .........................................................................48

*Office of the Attorney Gen. v. Wyndham Int'l, Inc.*,
    869 So. 2d 592 (Fla. Dist. Ct. App. 2004).................................................27

*Oliveira v. Amoco Oil Co.*,
    201 Ill.2d 134, 776 N.E.2d 151 (Ill. 2002)...............................................30

*Paduano v. Am. Honda Motor Co.*,
    169 Cal.App.4th 1453, 88 Cal. Rptr. 3d 90 (Cal. App. Ct. 2009).....................16

*Patterson v. BP Am. Prod. Co.*,
    240 P.3d 456 (Colo. Ct. App. 2010).........................................................23

*Pearson v. Philip Morris, Inc.*,
    306 P.3d 665 (Or. App. 2013) ............................................................47, 48

*Peterson v. North American Plant Breeders*,
    218 Neb. 258, 354 N.W.2d 625 (Neb. 1984) ...........................................38

*Pruitt v. Rockefeller Ctr. Props.*,
    167 A.D.2d 14 (N.Y. App. Div. 1991)..................................................40, 43

*Randy Knitwear, Inc. v. Am. Cyanamid Co.*,
    11 N.Y.2d 5, 181 N.E.2d 399 (N.Y. 1962) ....................................................... 43

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
    62 P.3d 142 (Colo. 2003) ......................................................................... 22, 23

*Richards v. Goerg Boat and Motors, Inc.*,
    384 N.E.2d 1084 (Ind. Ct. App. 1979) ............................................................ 34

*Rosenblum v. First State Bank*,
    581 P.2d 515 (Or. 1978) ............................................................................. 49

*Salzman v. Bachrach*,
    996 P.2d 1263 (Colo. 2000) ........................................................................ 25

*Samuels v. King Motor Co. of Fort Lauderdale*,
    782 So.2d 489 (Fla. Dist. Ct. App. 2001) ...................................................... 26

*Schlosser v. Welk*,
    193 Ill. App. 3d 448, 550 N.E.2d 241 (Ill. App. Ct. 1990) ............................... 32

*Schmidt v. Avco Corp.*,
    (1984), 473 N.E.2d 822 (Ohio 1984) ............................................................. 46

*Shaver v. Standard Oil Co.*,
    623 N.E.2d 602 (Ohio Ct. App. 1993) ........................................................... 46

*Shordan v. Kyler*,
    87 Ind. 38, 1882 WL 6505 (Ind. 1882) .......................................................... 35

*Showpiece Homes Corp. v. Assur. Co. of Am.*,
    38 P.3d 47 (Colo. 2001) ............................................................................. 22

*Shumaker v. Hamilton Chevrolet, Inc.*,
    920 N.E.2d 1023 (Ohio Ct. App. 2009) ..................................................... 44, 45

*Small v. Lorillard Tobacco Co.*,
    94 N.Y.2d 43, 720 N.E.2d 892 (N.Y. 1999) ................................................... 39

*Smith v. Baldwin*,
    611 S.W.2d 611 (Tex. 1980) ....................................................................... 52

*Smith v. Rubel*,
    13 P.2d 1078 (Or. 1932) ............................................................................. 49

*Spradling v. Williams*,
  566 S.W.2d 561 (Tex. 1978) .............................................................53

*State ex rel. Brown v. Hartman*,
  No. 81-CV-1587, , OPIF # 10000070 (Ohio Ct. Com. Pl. Nov. 15, 1982) ......44

*State ex rel. Brown v. Town & Country Food Distributors*,
  No. 73840, OPIF # 100000432 (Ohio Ct. Com. Pl. Nov. 5, 1979) ..................45

*State ex rel Cordray v. The Dannon Company, Inc.*,
  No. 10 CVH-12-18225, OPIF # 10002917 (Ohio Ct. Com. Pl. Dec. 22,
  2010) ...............................................................................................45

*State ex rel. Redden v. Discount Fabrics*,
  615 P.2d 1034 (Or. 1980) ...................................................................48

*Strawn v. Farmers Ins. Co. of Or.*,
  258 P.3d 1199 (Or. 2011) ...................................................................48

*Swindell v. Crowson*,
  712 So.2d 1162 (Fla. Dist. Ct. App. 1998).............................................28

*Taylor v. Am. Bankers Ins. Group, Inc.*,
  267 A.D.2d 178 (N.Y. App. Div. 1999)..................................................40

*Tex. Integrated Conveyor Sys. v. Innovative Conveyor Concepts, Inc.*,
  300 S.W.3d 348 (Tex. App. 2009) ........................................................54

*Thurman v. CUNA Mutual Ins. Soc'y*,
  836 N.W.2d 611 (S.D. 2013)..........................................................50, 51

*Turner Greenberg Assocs., Inc. v. Pathman*,
  885 So.2d 1004 (Fla. Dist. Ct. App. 2004)..............................................27

*Volt Servs. Group v. Adecco Emp't Servs.*,
  35 P.3d 329 (Or. App. 2001) ...............................................................49

*In re Vioxx Class Cases*,
  180 Cal.App.4th 116, 103 Cal. Rptr. 3d 83 (Cal. Ct. App. 2009).....................18

*W.S. Badcock Corp. v. Myers*,
  696 So.2d 776 (Fla. Dist. Ct. App. 1996)................................................28

*Walczak v. Onyx Acceptance Corp.*,
 365 Ill.App.3d 664, 850 N.E.2d 357 (Ill. App. Ct. 2006) .................................. 31

*Washington v. Spitzer Mgmt.*,
 2003-Ohio-1735, 2003 Ohio App. LEXIS 1640 (Ohio Ct. App. Apr. 3,
 2003) ........................................................................................................ 44, 45

*Weinberg v. Hertz Corp.*,
 116 A.D.2d 1 (N.Y. App. Div. 1986) ...................................................... 43

*Weinstat v. Dentsply Intern., Inc.*,
 180 Cal.App.4th 1213, 103 Cal. Rptr. 3d 614 (Cal. Ct. App. 2010) ................. 20

*Winters v. Cnty. of Clatsop*,
 150 P.3d 1104 (Or. App. 2007) ............................................................ 49

*Woodruff v. Ind. Family & Social Servs. Admin.*,
 964 N.E.2d 784 (Ind. 2012) ................................................................. 34

*Zekman v. Direct Am. Marketers, Inc.*,
 182 Ill.2d 359, 695 N.E.2d 853 (Ill. 1998) ........................................... 30

*Zoeller v. E. Chi. Second Century, Inc.*,
 904 N.E.2d 213 (Ind. 2009) ................................................................. 34

**STATUTES**

735 ILCS 5/13-205 ................................................................................. 2

815 ILCS 505/10a(e) .............................................................................. 2

815 ILCS §§ 505/1 *et seq.* .................................................................. 30

N.Y. C.P.L.R. § 213 ............................................................................... 2

N.Y. C.P.L.R. § 214(2) ......................................................................... 2

C.R.S. § 6-1-105(1)(e), (g), and (i) ......................................................... 22

Cal. Bus. & Prof. Code §§ 17200, *et seq.* ............................................ 15

Cal Bus. & Prof Code § 17208 ............................................................... 2

Cal. Bus. & Prof. Code §§ 17500 *et seq.* ......................................... 15, 16

Cal. Civ. Code 1780 .................................................................................... 16

Cal. Civ. Code §§ 1750, *et seq.* ........................................................ 15, 16

Cal. Civ. Code § 1783 .................................................................................. 2

Cal. Code Civ. Proc. § 338(a) ...................................................................... 2

Cal. Com. Code § 2313 ............................................................................... 15

Cal. Com. Code. § 2314 .............................................................................. 15

Cal. Com. Code § 2725 ................................................................................. 2

Colo. Rev. Stat. § 4-2-313 .......................................................................... 22

Colo. Rev. Stat. § 4-2-314 .......................................................................... 22

Colo. Rev. Stat. § 4-2-725 ............................................................................ 2

Colo. Rev. Stat. § 4–2–313(1) ..................................................................... 24

Colo. Rev. Stat. §§ 6-1-101, *et seq.* ......................................................... 21

Colo. Rev. Stat. § 6-1-115 ............................................................................ 2

Colo. Rev. Stat. § 13-80-101 ........................................................................ 2

Fla. Stat. Ann. §§ 501.201, *et seq.* .......................................................... 26

Fla. Stat. Ann. § 95.11(3) ............................................................................. 2

Ind. Code. § 26-1-2-313 ........................................................................ 33, 35

Ind. Code. § 26-1-2-314 ........................................................................ 34, 35

Ind. Code § 26-1-2-607 ............................................................................... 35

Ind. Code § 26-1-2-607(3) ........................................................................... 35

Ind. Code § 26-1-2-725 ................................................................................. 2

Ind. Code § 34-11-2-7 ................................................................................... 2

N.Y. U.C.C. § 2–313 .................................................................................... 42

N.Y. U.C.C. § 2–607(3)(a) ........................................................................... 42

Neb. Rev. Code. § 2-313 ........................................................................... 36, 38

Neb. Rev. Code. § 2-314 ........................................................................... 36, 38

Neb. Rev. Stat. § 2-314(2)(f) ............................................................................ 38

Neb. Rev. Stat. § 25-206 .................................................................................... 2

Neb. Rev. Stat. § 25-212 .................................................................................... 2

Neb. Rev. Stat. §§ 59-1601, *et seq.* .................................................................. 35

N.Y. Gen. Bus. L. §§ 349, *et seq.* ............................................................... 38, 39

O.R.C. 1345.09(B) ........................................................................................... 44

Ohio Rev. Code Ann. § 1345.10 ........................................................................ 2

Ohio Rev. Code §§ 1345.01, *et seq.* ............................................................... 43

Or. Rev. Stat. Ann. §§ 646.607, 646.605(10), 646.608(1)(e) ............................. 47

Or. Rev. Stat. § 12.080 ....................................................................................... 2

Or. Rev. Stat. § 72.7250 ..................................................................................... 2

Or. Rev. Stat. §§ 646.605 *et seq.* .................................................................... 47

Or. Rev. Stat. § 646.638(6) ................................................................................. 2

Or. Rev. Stat. 646.605(9) .................................................................................. 48

S.D. Cod. Laws § 15-2-13 .................................................................................. 2

S.D. Cod. Laws § 37-24-33 ................................................................................ 2

S.D. Cod. Laws § 57A-2-725 ............................................................................. 2

S.D. Code. Laws §§ 37-24-1 *et seq.*. ............................................................. 50

S.D. Codified Laws §§ 37-24-6 ........................................................................ 50

Tex. Bus. & Com. Code Ann. §§ 17.46, 17.50 ............................................. 52, 53

Tex. Bus. & Com. Code Ann. § 17.565 .............................................................. 2

Tex. Bus. & Com. Code §§ 17.41 et seq. ......................................................... 52

Tex. Civ. Prac. & Rem. Code § 16.003 ................................................................. 2

Nev. Rev. Stat. U.C.C. § 2-725 ............................................................................. 2

**RULES**

Fed. R. Civ. P. 12(b)(6) .............................................................................. 36, 43

Fed. R. Civ. P. 23 ............................................................................................. passim

**OTHER AUTHORITIES**

Henry N. Butler and Jason S. Johnston, *Reforming State Consumer
    Protection Liability: An Economic Approach*, 2010 Colum. Bus. L. Rev.
    1, 62-64 (2010) ...................................................................................... 62

Jean Braucher, *Deception, Economic Loss and Mass-Market Customers:
    Consumer Protection Statutes as Persuasive Authority in the Common
    Law of Fraud*, 48 Ariz. L. Rev 829, 829 (2006) ................................... 67

7AA Wright & Miller's Fed. Prac. & Proc. Civ. § 1778 (3d ed.) ........................ 51

## I.   INTRODUCTION

Defendant ConAgra Foods, Inc. ("Defendant" or "ConAgra") sells millions of containers of Wesson Canola Oil, Wesson Corn Oil, Wesson Vegetable Oil, and Wesson Best Blend (collectively, "Wesson Oils" or the "Products") to consumers throughout the United States every year.   ConAgra prominently and uniformly represents that its Wesson Oils are "100% Natural."   Plaintiffs allege that Wesson Oils are not "100% Natural" because, as Plaintiffs now know, Wesson Oils are made from corn, soy, and canola seeds that come from plants whose DNA was altered through the application of bioengineering technology.   These plants are commonly referred to as "genetically modified organisms" or "GMOs."   The ultimate common and predominant question in this case is whether the label on Wesson Oils is false, deceptive, misleading, and/or unfair because it states the Products are "100% Natural" when, in fact, they are made from GMO ingredients.

Robert Briseño, Michele Andrade, Jill Crouch, Julie Palmer, Pauline Michael, Cheri Shafstall, Dee Hopper-Kercheval, Kelly McFadden, Necla Musat, Maureen Towey, Erika Heins, Rona Johnston, and Anita Willman ("Plaintiffs") are each ordinary consumers, living in eleven different states, who purchased Wesson Oils between January 2007 and the date they entered this case.   All of these Plaintiffs saw the phrase "100% Natural" printed on the label of Wesson Oils that they purchased and based their purchasing decisions, at least in part, on the veracity of that "100% Natural" phrase.   All of these Plaintiffs were deceived and misled by ConAgra's 100% Natural claim and, because of that false claim, did not get what they paid for.

Plaintiffs (i) assert causes of action under the consumer protection, warranty, and unjust enrichment laws of the states in which they respectively reside (the "Class States"),[1] (ii) seek certification of eleven separate statewide classes (the "Classes") under Fed. R. Civ. P. 23(b)(3) for damages and other relief, and under

---

[1] The "state by state, claim by claim" analysis requested in the Court's August 1, 2014 Order (Dkt. 350) is set forth in Section IV.C.

Fed. R. Civ. P. 23(b)(2) for injunctive and declaratory relief, and (iii) propose that the Court define the Classes as:

> All persons who reside in the States of California, Colorado, Florida, Illinois, Indiana, Nebraska, New York, Ohio, Oregon, South Dakota, or Texas who have purchased Wesson Oils within the applicable statute of limitations periods established by the laws of their state of residence (the "Class Period") through the final disposition of this and any and all related actions.[2]

Plaintiffs also alternatively seek certification of the Classes under Fed. R. Civ. P. 23(c)(4) on the issue of whether ConAgra's use of the term "100% Natural" is objectively false, unfair, deceptive, and/or misleading to reasonable consumers because of the fact that Wesson Oils are made from GMO ingredients.

Whether ConAgra's labeling of Wesson Oils as "100% Natural," despite making them from GMO ingredients, is false, unfair, deceptive, and/or misleading to a reasonable consumer (the "Falsity Question") is the predominant question in this litigation because this threshold question must be answered affirmatively by

---

[2] The relevant statutes of limitations are: Cal. Civ. Code § 1783 (3 years for CLRA claim), Cal Bus. & Prof Code § 17208 (4 years for UCL claim), Cal. Code Civ. Proc. § 338(a) (3 years for FAL claim), Cal. Com. Code § 2725 (4 years for California warranty claims); Colo. Rev. State. § 6-1-115 (3 years for CCPA claim), Colo. Rev. Stat. § 4-2-725 and Colo. Rev. Stat. § 13-80-101 (3 years for Colorado warranty and unjust enrichment claims); Fla. Stat. § 95.11(3)(f) (4 years for FDUPTA claim), Fla. Stat. § 95.11(3)(k) (4 years for Florida unjust enrichment claim); 815 ILCS 505/10a(e) (3 years for ICFA claim), 735 ILCS 5/13-205 (5 years for Illinois unjust enrichment claim); Ind. Code § 26-1-2-725 (4 years for Indiana warranty claims), Ind. Code § 34-11-2-7 (6 years for Indiana unjust enrichment claim); Neb. Rev. Stat. U.C.C. § 2-725 (4 years for Nebraska warranty claims), Neb. Rev. Stat. §25-206 or Neb. Rev. Stat. § 25-212 (4 years for Nebraska unjust enrichment claim); N.Y. C.P.L.R. § 214(2) (3 years for NY GBL § 349 claim), N.Y. U.C.C. § 2-725 (4 years for New York warranty claim), N.Y. C.P.L.R. § 213 (6 years for New York unjust enrichment claim); Ohio Rev. Code Ann. § 1345.10 (2 years for OCSPA claim); Or. Rev. Stat. § 646.638(6) (1 year for OUTPA claim), Or. Rev. Stat. § 72.7250 (4 years for Oregon warranty claim), Or. Rev. Stat. § 12.080 (6 years for Oregon unjust enrichment claim); S.D. Cod. Laws § 37-24-33 (4 years for South Dakota DTPA claim), S.D. Cod. Laws §57A-2-725 (4 years for South Dakota warranty claims), S.D. Cod. Laws § 15-2-13 (6 years for South Dakota unjust enrichment claim); Tex. Bus. & Com. Code Ann. § 17.565 (2 years for Texas DTPA-CPA claim), Tex. Civ. Prac. & Rem. Code § 16.003 (2 years for Texas unjust enrichment claim).

the finder-of-fact for Plaintiffs and the Classes to prevail on any of their claims. The Falsity Question is an objective question susceptible to common classwide proof because it concerns whether the claim is objectively false, unfair, deceptive, and/or misleading to a "reasonable person," and not whether the claim is subjectively false to any particular individual.[3]

Plaintiffs offer admissible expert opinion testimony that establishes and demonstrates methodologies for proving damages on a classwide basis without the need for any individualized inquiry of absent members of the Classes.   The Amended Declaration of Colin B. Weir ("Am. Weir Decl.") describes and demonstrates a hedonic regression analysis of the historical prices of Wesson Oils against the historical prices of competitor oils in order to test his hypothesis that the "100% Natural" claim on Wesson Oils caused them to have been priced higher at retail than they should have been but-for the "100% Natural" claim.  Based on his analysis, he has concluded that the data is consistent with his hypothesis that the "100% Natural" label on Wesson Oils causes a Price Premium.

Weir's hedonic regression methodology also addresses this Court's August 1, 2014 request that Plaintiffs provide a measure of damages that is tied to their case theory.  Plaintiffs maintain that under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), the appropriate measure of damages is the percentage of Wesson Oils' retail price attributable to the "100% Natural" label.  Weir demonstrates how to measure the amount of that "Price Premium" and thereby specifically isolates the percentage of Wesson Oils' retail price attributable to the misstatement that Plaintiffs allege is unlawful.  By multiplying the corresponding discount of the percentage Price Premium with the total retail dollar value of all Wesson Oil sold during the Class Period, Plaintiffs can compute the total dollar difference between what the Classes paid for (*i.e.*, Wesson Oils that were "100% Natural" as ConAgra represented them to be) and the value of what they actually received (*i.e.*, Wesson

---

[3] *See infra* Section IV.C.

Oils that were not, in fact, "100% Natural").[4]   This difference between what members of the Classes paid for and what ConAgra actually provided is a valid measure of total restitution damages for the consumer protection and warranty claims.   The damages methodology comports with the rule set forth by the Supreme Court in *Comcast* because it measures only those damages attributable to Plaintiffs' case theory: that ConAgra's unlawful labeling of Wesson Oils as 100% Natural caused Class members to pay for more than what they received.[5]

While Plaintiffs maintain that the proper measure of classwide damages is the amount of the dollar difference caused by ConAgra's false "100% Natural" claim, to the extent the Court requires Plaintiffs to present a methodology that isolates the amount of price premium associated with specifically misleading consumers about the non-GMO aspect of the "100% Natural" claim, *see* August 1, 2014 Order (Dkt. No. 350) at 62, the Amended Declaration of Dr. Elizabeth Howlett ("Am. Howlett Decl.") describes how the technique of conjoint analysis could be used to determine the portion of the price premium attributable only to that "non-GMO" aspect of ConAgra's false "100% Natural" claim.

Plaintiffs respectfully request that the Court grant Plaintiffs' amended motion for class certification, certify the proposed Classes, designate Plaintiffs as class representatives of the separate statewide classes they respectively seek to represent, appoint Plaintiffs' Interim Co-Lead Counsel as Class Counsel, and direct ConAgra to issue notice to the Classes in a form to be determined.[6]

---

[4] The Price Premium itself is the "extra amount consumers would have paid above a base amount had the claim not been made" and because the "sales data in this case are sales dollars that occurred *with* the claim," then in order to determine damages a corresponding discount must be calculated as [*premium* ] / [1+ *premium*]. *See* Am. Weir Decl. ¶ 103 n.49.

[5] To the extent the measure of Plaintiffs' damages is limited to the amount by which ConAgra was unjustly enriched, damages could be calculated by reference to ConAgra's profit or revenue for Wesson Oil sold during the Class Period and would, by definition, not be based on plaintiff-specific information. *See* Am. Weir Decl. ¶ 9 n.3.

[6] Alternatively, Plaintiffs request certification of these proposed classes under Fed. R. Civ. P. 23(c)(4), as fully discussed infra at Section IV.F.

## II.    SUMMARY STATEMENT OF FACTS

During the Class Period, Wesson Oil sales likely exceeded ███████.[7]
ConAgra admits that, throughout the Class Period, each and every bottle of
Wesson Oils claimed on its front label that it was "100% Natural."[8]  ConAgra
further admits that while it labels Wesson Oils as "100% Natural," it makes
Wesson Oils from bio-engineered oil seeds.[9]  Plaintiffs have presented evidence
that the bioengineering process is not natural, let alone "100% Natural."[10]

Plaintiffs have also presented extensive evidence showing that ConAgra's
false and misleading "100% Natural" claim on Wesson Oils is material to

---

[7] While no source has produced complete Wesson Oil retail dollar amounts for the entire class period, partial data produced by ConAgra, IRI, and Nielsen indicates that total nationwide Wesson Oil retail sales dollar amounts from 2007 through today ███████████████████. See Am. Weir Decl. at ¶ 48 (████████) (citing CAG0031949).

[8] Defendant ConAgra Foods, Inc.'s Answer to Second Consolidated Amended Class Action Complaint, dated Jan. 16, 2013 (Dkt. 145) ("Answer"), ¶¶ 2, 11-31, 33; see also Declaration of David E. Azar in Support of Plaintiffs' Amended Motion for Class Certification ("Azar Decl.") Exhibit 45, Deposition of Raquelle Hunter Pursuant to Rule 30(b)(6) (Apr. 29, 2014) ("Hunter Dep.") at 66:21-23 (confirming ████████████████████) (filed under seal).

[9] Azar Decl., Ex. 13, CAG0002222 at CAG0002243; see also Azar Decl., Ex. 14, CAG0004822 at CAG0004827.

[10] See Declaration of Dr. Charles Benbrook, Section IV (Dkt. No. 242) (also refiled in its original form with Plaintiffs' Amended Motion for Class Certification). Plaintiffs have retained Charles Benbrook, Ph.D. to opine on the science underlying genetically modified crops and why products manufactured or otherwise derived from those crops are not "natural," and the Court has accepted Dr. Benbrook's declaration for those purposes. See August 1, 2014 Order at 25. Other sources agree GMO crops and foods derived from them are not "natural." See Azar Decl., Ex. 15, CAG0002187 (filed under seal); WORLD HEALTH ORGANIZATION, 20 QUESTIONS ON GENETICALLY MODIFIED (GM) FOODS 1, available at http://www.who.int/foodsafety/publications/biotech/en/20questions_en.pdf (last visited April 29, 2014) (defining GMOs as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally"); EPA's Regulation of Biotechnology for Use in Pest Management (Jan. 2012), at http://www.epa.gov/oppbppd1/biopesticides/reg_of_biotech/eparegofbiotech.htm (stating genetically engineered products like corn are designed to produce a "pesticidal protein" that does not occur naturally); Monsanto Glossary, http://www.monsanto.com/newsviews/pages/glossary.aspx (last visited September 5, 2014) (defining GMOs as "[p]lants or animals that have had their genetic makeup altered to exhibit traits that are not naturally theirs")(emphasis added).

consumers.  Surveys from neutral third parties demonstrate that "natural" claims on packaged foods affect the purchasing decisions of most consumers.  Research commissioned by ConAgra itself establishes that the "100% Natural" claim specifically increases consumer demand for Wesson Oils.  ConAgra's belief in the materiality of the "natural" claim on Wesson Oils is vividly demonstrated by its repeated decisions to maintain the claim front and center on Wesson Oils bottles over the course of several decades and numerous label changes.  *See infra* at IV.B.  Plaintiffs' own survey is consistent with the above results, and further shows that the reasonable consumer does not believe that the 100% natural claim is consistent with the bioengineering processes used in Wesson Oils' ingredients.

## III.  PROCEDURAL HISTORY

On June 28, 2011, Robert Briseño filed a complaint against ConAgra.  Between October and December 2011, the court consolidated several cases filed against ConAgra under the above caption.  On December 19, 2012, Plaintiffs filed the operative Second Amended Complaint.  Dkt. No. 143 (the "Complaint").  On May 5, 2014, Plaintiffs moved for class certification.  Defendant opposed and, on July 14, 2014, the Court heard oral argument.  On August 1, 2014, the Court issued its Order denying Plaintiffs' motion for Class Certification. Dkt. No. 350.  In the August 1, 2014 Order, the Court found that Plaintiffs had established the necessary Rule 23(a) prerequisites for class certification, but noted certain deficiencies in establishing Rule 23(b) requirements.  The August 1, 2014 Order was without prejudice and expressly authorized Plaintiffs to present an amended Motion to the Court "address[ing] the deficiencies noted."  Dkt. No. 350 at 66.

## IV.  ARGUMENT

### A.  Plaintiffs Have Satisfied The Requirements of Rule 23(a)

For the reasons described in the Court's August 1, 2014 Order, Plaintiffs have met their burden of demonstrating Rule 23(a) numerosity, commonality, typicality, adequacy, and ascertainability.

Numerosity requires that the proposed classes be "so numerous that joinder of all members is impractical." FED. R. CIV. P. 23(a)(1).  This standard only requires a showing that joinder of all claims would be difficult or inconvenient, not impossible.  *See Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012).  Here, ConAgra admits that millions of consumers purchased Wesson Oils Products during the Class Period.[11]  It cannot be reasonably disputed that the numerosity requirement is satisfied for each of the Classes.

Commonality requires the existence of "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2).  For purposes of the Rule, "even a single question will do."  *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2556 (2011) (internal punctuation omitted).  All Class Members were exposed to the label claims on Wesson Oils and consequently purchased the Products.  Common questions resulting from this "common core of salient facts," *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)), include: (1) whether ConAgra's "100% Natural" assertion in the marketing and sale of Wesson Oils is false, unfair, deceptive, and/or misleading, or otherwise violates applicable law; (2) whether ConAgra acted knowingly or recklessly; (3) whether Plaintiffs and the Class Members are entitled to actual, statutory, or other forms of damages; and (4) whether Plaintiffs and the Class Members are entitled to equitable relief, including but not limited to injunctive relief and restitution.[12]

Typicality requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The typicality requirement is a "permissive standard[]" and "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; *see also In re*

---

[11] Answer at ¶ 57.

[12] *See* Complaint, ¶ 58.

*Northrop Grumman Corp. Erisa Litig.*, No. CV 06-06213, 2011 U.S. Dist. LEXIS 94451, at *34 (C.D. Cal. Mar. 29, 2011) (Morrow, J).  Plaintiffs' claims here are typical because they "arise[] from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (citation omitted)).  The named Plaintiffs were all exposed to the "100% Natural" claim on the label of Wesson Oils and allege that the claim was a material factor in their decisions to purchase the Products.  The named Plaintiffs will present common evidence, based on the same legal theories, to support their claims and the claims of other Class Members.

Adequacy requires that a class representative "fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  This requirement entails answering two questions:  "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citation omitted).  Plaintiffs easily meet both prerequisites.  First, Plaintiffs' interests do not conflict with the other Class Members' interests; indeed, each Class Member's claims arise under the same legal theories and each Plaintiff alleges that they were harmed in the same way as all Class Members.  Second, Plaintiffs have retained highly experienced counsel with significant experience in litigating class actions.[13]

Finally, although not mentioned in Rule 23, the judicially-created "ascertainability" requirement is satisfied if the characteristics of the members of the classes are adequately defined and can be identified by reference to objective criteria.  *See In re Nucoa Real Margarine Litig.*, Case No. CV 10-00927, 2012 U.S. Dist. LEXIS 189901, at *17-18 (C.D. Cal. June 12, 2012) (Morrow, J.). (class ascertainable when it is "administratively feasible for the court to determine

---

[13] *See* Azar Decl., Ex. 17 (firm resumes of Plaintiffs' Interim Co-Lead Counsel).

whether a particular individual is a member." (quoting *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998)).   In this case, there is a single objective criterion that determines whether an individual is a member of the class:  whether they purchased Wesson Oils during the Class Period.  This alone is sufficient to ascertain the class.  *See McCrary v. Elations Co., LLC*, No. 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443, at *25 (C.D. Cal. Jan. 13, 2014) (class ascertainable because "the class definition clearly defines the characteristics of a class member by providing a description of the allegedly offending product and the eligible dates of purchase"); *see also Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK (MRWx), 2014 U.S. Dist. LEXIS 50600, at *13 (C.D. Cal. Apr. 9, 2014) (class ascertainable because the plaintiffs "precisely defined their class based on objective criteria: purchase of Defendants' children's cold or flu products within a prescribed time frame." (citations omitted)).

### B. Plaintiffs Have Presented Classwide Evidence Establishing The Materiality of the "100% Natural" Claim on Wesson Oils

Plaintiffs here submit substantial and sufficient evidence to demonstrate that the materiality of ConAgra's misrepresentations can be established by common classwide evidence, curing the Court's August 1, 2014 criticism of Plaintiffs' showing of materiality.  Dkt. No. 350 at 58.[14]

### 1. The "100% Natural" Claim on Wesson Oils is Material to Wesson Purchasers

Objective third party surveys clearly demonstrate that "natural" claims on packaged foods are material to consumers in general.  In June 2014, the Consumer Reports National Research Center surveyed a nationally representative sample of consumers and found that 59% of them look for a "natural" claim when shopping for packaged or processed foods like Wesson Oils.  Azar Decl. Ex. 31, Consumer

---

[14]  As the Court noted, significant portions of the evidence previously submitted (including consumer survey evidence) were not considered by the Court in ruling on Plaintiffs' prior class certification motion.  *See* Dkt. No. 350 at 47 n. 112.

Reports National Research Center, Food Labels Survey (2014) at 17.  Similarly, a

2010 survey conducted by Mintel Group, Ltd. found that 65% of respondents were

"somewhat interested" or "very interested" in natural products and that 62% of

respondents who used natural products agreed that it was worth paying more for

certain types of products labeled "natural."  Azar Decl. Ex. 32, Mintel, Consumer

Attitudes Toward Natural And Organic Food And  Beverages (2010) at 15, 44.

     Moreover, market research commissioned by ConAgra and ConAgra's own

internal documents show the materiality of the "100% Natural" claim to Wesson

purchasers  in particular.

Azar

Decl. Ex. 36, CAG00003706 (filed under seal).

Azar  Decl.  Ex.  8,
CAG0000055 at 116, 118 (filed under seal).

*Id.* at 69

*Id*.  at

CAG0000066 (emphasis in original).

*Id*. at CAG0000084 (emphasis in original).

[redacted] Azar Decl. Ex. 3, CAG0001992 at CAG0001993 (emphasis in original) (filed under seal).

[redacted] Azar Decl. Ex. 12, CAG0000355 at 397 (filed under seal). [redacted] *Id.* at CAG0000366 (filed under seal) (emphasis in original). [redacted] *id.* at 413, further supporting Plaintiffs' contention that Wesson Oil packaging (including the "100% Natural" label claim) influences Wesson Oil price.

ConAgra commissioned other studies that reached similar conclusions. [redacted] Azar Decl. Ex. 25, CAG0000789 at 794 (filed under seal). [redacted] Azar Decl. Ex. 10, CAG0002537 at CAG0002539 (filed under seal). [redacted]

*Id.* at CAG0002547; *see also id.* at CAG0002552

*Id.* at CAG0002559.

ConAgra's internal documents demonstrate that ConAgra believed the "100% Natural" claim on Wesson Oils was material to consumers and motivated them to purchase Wesson Oils and ConAgra capitalized on this information.

Azar

Decl. Ex. 28, CAG0001228 at CAG0001246 (filed under seal).

Azar Decl. Ex. 24, CAG0000711 at CAG0000712 (filed under seal).

Tellingly, the conclusions of objective third party research and ConAgra's own documents point in only one direction: that the "100% Natural" claim is material to consumers. ConAgra can point to no valid study that concludes that the "natural" claim is not material to consumers, and even if it did, at best, ConAgra would be raising an ultimate issue of fact not appropriate for determination in this motion for class certification. Moreover, common sense dictates that ConAgra would not expend the substantial time and resources it committed to study, use, and retain a label claim that it considered anything but material to consumers.

### 2. Reasonable Consumers Believe That a "Natural" Label Includes A "Non-GMO" Claim

Plaintiffs have also adduced evidence linking consumers' understanding of "100% Natural" to the specific issue raised in this case—*i.e.*, whether an objective

reasonable consumer would believe the label means the product was not made from GMO ingredients.   Objective third party research demonstrates that consumers believe the "100% Natural" claim includes the representation that the product is "non-GMO."  Consumer Reports found in its June 2014 survey that 64% of respondents understood the "natural" claim meant, among other things, "no GMOs, that is, [no] genetically modified ingredients, were used."  Azar Decl. Ex. 31 at 19.  Moreover, 85% of respondents stated that the "natural" claim *should* mean no GMOs.  *Id.* at 20; *see also id.* at 17 (72% of consumers consider avoiding GMOs to be a "Crucial (Very important/Important)" objective when buying food).

The Hartman Group reached the same conclusion in two separate studies during the Class Period.  In 2010, Hartman concluded that 61% of consumers surveyed interpreted a "natural" claim to include the "absence of genetically modified foods."  Azar Decl. Ex. 33, 2010 Hartmann Survey at 34, 43.  In 2012, Hartman concluded that, although the percentage of consumers surveyed making that specific association dropped to 46%, the "absence of genetically modified foods" remained within "the top 6 associations with Natural," Azar Decl. Ex. 47, 2012 Hartmann Survey at 23, and that "[c]onsumers perceive [GMO] foods as *inherently unnatural* and worry about adverse health effects."  *Id.* at 33 (emphasis added).  Courts have found statements material to the reasonable consumer even when they deceive as few as 20% of survey respondents.[15]

---

[15] *See Oshana v. Coca-Cola Co.*, No. 04 C 3596, 2005 U.S. Dist. LEXIS 14184, at *24-26 (N.D. Ill. July 13, 2005) ("Coca-Cola provides no authority that a misrepresentation is immaterial if only 24% of consumers would behave differently."), *aff'd* 472 F.3d 506 (7th Cir. 2006); c*f. JTH Tax, Inc. v. H&R Block E. Tax Servs.*, 128 F. Supp. 2d 926, 938-39 (E.D. Va. 2001) (finding under the Lanham Act that statement deceived a "substantial" number of consumers where 22% of respondents were misled), *aff'd* in part, *rev'd* in part on other grounds, 28 F. App'x 207, 214-15 (4th Cir. 2002); *Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals Co.*, No. 91-7099, 1993 U.S. Dist. LEXIS 1016, at *31-32 (E.D. Pa. Jan. 29, 1993) (collecting cases under the Lanham Act finding that statements deceiving as few as 20% of respondents have a "not insubstantial" tendency to mislead intended audience), *aff'd* 19 F.3d 125, 134 n.14 (3d Cir. 1994).

Azar Decl. Ex. 34, 2011 Health Focus Survey at 17 (filed under seal).

*Id.*

ConAgra knew from numerous complaints it received that consumers believed the "natural" claim on Wesson Oils to include a "non-GMO" claim.  *See* Azar Decl. Ex. 5, CAG0005106

(filed under seal).[16]

Plaintiffs also commissioned a survey study (the "Kozup Survey") that produced results consistent with the materiality of the "100% Natural" claim to consumers, supporting Plaintiffs' claim that reasonable consumers are deceived by the "100% Natural" label. Am. Howlett Decl. ¶¶ 23, 65-92; *see also* Azar Decl. Ex. 40, the Kozup Survey.  The Kozup Survey was constructed as an experimental design, with a control and treatment (test) group. Consumer beliefs and perceptions were then assessed using self-contained survey questions regarding whether a

---

[16] ConAgra's knowledge is also evidenced by ConAgra personnel internal correspondence on GMOs.  *Compare* Azar Decl., Ex. 21, CAG002319

(filed under seal) *with* Azar Decl. Ex. 22, Claire Marris, *Public Views on GMOs: Deconstructing the Myths*, 2 EMBO REP. 545 (2001) (study that ConAgra employee circulated *confirming* supposed myth that "people are obsessed with the idea that GMOs are 'unnatural'" finding "GMOs were indeed frequently characterised [*sic*] as 'unnatural' by focus group participants. They expressed the feeling that directly modifying the genome was qualitatively different from any previously used technique.").

cooking oil made from bioengineered ingredients could honestly be described as "100% Natural." The results of the Kozup Survey demonstrate that cooking oils derived from bioengineered ingredients cannot be honestly (and non-misleadingly) labeled as "100% Natural." Am. Howlett Decl. ¶ 92; Azar Decl. Ex. 40.

## C.   Common Questions Predominate For Each and Every State Law Claim Plaintiffs Seek to Certify

The Court's August 1, 2014 Order directed Plaintiffs to "address, on a cause of action by cause of action basis, whether the laws of those states require individualized proof of reliance and/or causation" and further "demonstrate[] that with respect to all claims and all classes, they are entitled to a classwide inference of reliance and causation upon adducing appropriate proof." Dkt. 350 at 58. As set forth below, the laws upon which Plaintiffs rely do not require individualized proof of reliance or causation under the facts of this case.

Accordingly, the answers to common questions predominate over individualized issues, making the claims for which Plaintiffs seek certification appropriate for class treatment pursuant to Fed. R. Civ. P. 23(b)(3).[17]

### 1.   Common Questions Predominate for Each California Claim Plaintiffs Seek to Certify

Plaintiffs Robert Briseño and Michelle Andrade assert and seek certification of five California state-law based claims against ConAgra: violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq., violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., violation of the California False Advertising Law, Cal Bus. & Prof. Code §§ 17500 et seq. (collectively, the "California Consumer Protection Claims"); breach of express warranty, Cal. Com. Code § 2313; and breach of implied warranty, Cal. Com. Code. § 2314.

---

[17] As to some states, Plaintiffs are not moving to certify all of the claims they bring individually, as indicated in the state-specific discussions below.

### a.   Common Questions Predominate Plaintiffs' California Consumer Protection Claims

As applied to consumers, the elements of the California Consumer Protection Claims largely overlap. *See, e.g.*, *Forcellati*, 2014 U.S. Dist. LEXIS 50600, at *28-29 ("For purposes of class certification, the [Unfair Competition Law, False Advertising Law, and Consumers Legal Remedies Act] are materially indistinguishable."); *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 854 (N.D. Cal. 2012) (noting that "courts often analyze the[] three statutes together") (*citing Paduano v. Am. Honda Motor Co.*, 169 Cal.App.4th 1453, 1468-73, 88 Cal. Rptr. 3d 90 (Cal. App. Ct. 2009) and *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1124-25 (N.D. Cal. 2010)).

In the context of this case, those elements are: (1) whether use of "100% Natural" on the labels of Wesson Oils was a material misrepresentation such that members of the public are likely to be deceived or a reasonable man would attach importance to its existence or nonexistence in determining whether to purchase Wesson Oils; (2) whether ConAgra knew or should have known that the use of 100% Natural on Wesson Oils was likely to be deceptive; (3) whether plaintiffs are consumers;[18] (4) whether plaintiffs were exposed to ConAgra's use of "100% Natural" on Wesson Oils;[19] (5) whether plaintiffs relied on ConAgra's use of "100% Natural" on Wesson Oils; and 6) whether plaintiffs were injured as a result of ConAgra's use of "100% Natural" on Wesson Oils.[20]

Each statute "allows Plaintiffs to establish the required elements of reliance, causation, and damages by proving that Defendants made what a reasonable person

---

[18] Only the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq., requires plaintiffs to be consumers.

[19] Exposure is required by the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq.

[20] *Forcellati*, 2014 U.S. Dist. LEXIS 50600, at *28-29; *Elias*, 903 F. Supp. 2d at 854-55; *In re Tobacco II Cases*, 46 Cal.4th 298, 312, 93 Cal. Rptr. 3d 559 (Cal. 2009); *Kowalsky v. Hewlett-Packard Co.*, 771 F.Supp. 2d 1156, 1162 (N.D. Cal. 2011); *In re Toyota Motor Corp.*, 790 F.Supp. 2d 1152, 1168-69 (C.D. Cal. 2011); Cal. Civ. Code 1780.

would consider a material misrepresentation." *Forcellati*, 2014 U.S. Dist. LEXIS 50600 at *29 (citations omitted); *see also In re Toyota Motor Corp.*, 790 F.Supp. 2d at 1169 ("actual reliance may be presumed" when the alleged defect is material"); *Ortega v. Natural Balance, Inc.*, No. CV 13-5942, 2014 WL 2782329 at *5 (C.D. Cal., June 19, 2014) (a classwide inference of reliance and causation attaches to a misrepresentation if that misrepresentation is likely to be "material").

### (1)  Materiality Is Determined By A "Reasonable Consumer" Standard

A misrepresentation is material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Ortega*, 2014 WL 2782329 at *5 (citation and internal quotation omitted).  Materiality can thus be proven on a classwide basis. *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292-93, 119 Cal. Rptr. 2d 190 (Cal. Ct. App. 2002) (affirming certification because the record permitted "an inference of common reliance); *Blackie v. Barrack*, 524 F.2d 891, 906 n.22 (9th Cir. 1975) ("The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all.").

A "plaintiff need not demonstrate [the representation] was the sole or even the predominant or decisive factor influencing his conduct, but [only that it] 'played a substantial part, and so had been a substantial factor' in influencing his decision." *In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1169 (quoting *In re Tobacco II Cases*, 46 Cal.4th at 326, 93 Cal. Rptr. 3d 559).  As one court explained, "that a large number of factors may have gone into each consumer's decision to purchase Defendants' products is immaterial here given the objective materiality of the alleged misrepresentations." *Forcellati*, 2014 U.S. Dist. LEXIS 50600, at *35 (C.D. Cal. Apr. 9, 2014); *see also Werdebaugh v. Blue Diamond*

*Growers*, Case No. 12-CV-2724-LHK, 2014 WL 2191901 at * (N.D. Cal. May 23, 2014) (rejecting defendant's argument that "class members may have purchased its products for myriad other reasons and that therefore reliance cannot be presumed based on the allegedly misleading label statements ['All Natural' and 'Evaporated Cane Juice']," holding that "[t]he law is to the contrary").[21]

### (2)    Materiality Need Not Be Proven At The Class Certification Stage

Moreover, Plaintiffs need not *prove* materiality at the class certification stage in order to establish Rule 23(b)(3) predominance. *See, e.g., McCrary*, 2014 U.S. Dist. LEXIS 8443, at *42 ("[A]t the class certification stage Plaintiff need not prove that the [defendant's misrepresentations] were material to all consumers of [the product] or that they relied on those claims."). Materiality "is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man could have been influenced by it.'" *Ortega v. Natural Balance*, 2014 WL 2782329, at *5 (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 329). Furthermore, "It strains credulity to think that a merchant would select exclusively immaterial statements to print on its product's packaging. It therefore also appears likely that if Plaintiffs can demonstrate that Defendant's claims were misleading, they will also be able to demonstrate materiality." *Id*. And when, as here, the same alleged misrepresentations were made to the entire class, "materiality can be adjudicated

---

[21] As was true in *Blue Diamond*, the facts of this case – where identical misrepresentations regarding a consumer food product were made to each class member – are distinguishable from the facts of *In re Vioxx Class Cases*, 180 Cal.App.4th 116, 103 Cal. Rptr. 3d 83 (Cal. Ct. App. 2009). *Vioxx* involved "individualized representations to proposed class members" and class members who were "likely [to] rely on the advice of a doctor or [] other professional." *See Blue Diamond*, 2014 WL 2191901, at *14. Here, in contrast to *Vioxx* and like *Blue Diamond*, the identical "100% natural" misrepresentation was made to each class member and there is no medical professional as an intermediary; hence, "the objective inquiry into whether 'a reasonable consumer would attach importance' to [defendant's] label statements is a question common to the class." *Id*. (quoting *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir.2013)).

on a class-wide basis because . . . it is based on the objective reasonable consumer standard." *Id.* Here, as in *Ortega*, "the statements alleged to be misrepresentations are not so 'obviously unimportant' that the Court should decide that question [at the class certification stage] against Plaintiffs." *Id.*

### (3)    There is Ample Evidence Here Of Materiality of the "100% Natural" Claim

Plaintiffs here have adduced sufficient evidence that Defendant cannot validly claim that the "100% natural" claim is so "obviously unimportant" as to be immaterial.  As discussed in Section IV.B above, there is more than sufficient evidence to affirmatively establish that a reasonable consumer would consider the "100% natural" claim to be material.  For example, ConAgra's own internal research has repeatedly shown that consumers value the "100% natural claim." Consumer Reports 2014 "Food Labels Survey" found that a majority look for a "natural" claim when shopping for food.  The Kozup Survey confirms that consumers of cooking oils do not consider the 100% Natural claim as consistent with a cooking oil made from GMO ingredients.  Finally, when all other variables are held constant, the "100% Natural" claim also caused the market price of Wesson Oils to have been higher than it otherwise should have been.  *See*, *e.g.*, Am. Weir Decl. ¶¶ 108-109.[22]

---

[22] Courts have held that plaintiffs sufficiently allege injury-in-fact under the UCL, FAL, and CLRA by asserting that the product they received was worth less than what they paid for it owing to defendants' misleading labels. *See*, *e.g.*, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 329-31, 120 Cal. Rptr. 3d 741 (Cal. 2011) (holding that locks that were falsely advertised as being made in the United States were worth less to a consumer even if the locks were fully functional and reasoning "if we were to deny standing to consumers who have been deceived by label misrepresentations in making purchases, we would impair the ability of consumers to rely on labels, place those businesses that do not engage in misrepresentations at a competitive disadvantage, and encourage the marketplace to dispense with accuracy in favor of deceit"); *Von Koenig v. Snapple Beverage Corp.*, 713 F.Supp.2d 1066, 10779 (E.D. Cal. 2010) (in proposed class action alleging Snapple misleadingly labeled products natural, "plaintiffs have sufficiently alleged that, due to defendant's labeling practices, they suffered a loss that benefitted defendants through more sales and a higher profits" (sic) because plaintiffs "did not receive the benefit of the bargain because they assert that the product they received was worth less than what they paid for it."). "For each consumer who relies on the truth and accuracy of a label and is deceived by

### b.     Common Questions Predominate Plaintiffs' California Express and Implied Warranty Claims

The elements of a breach of express warranty in California are:   (1) a statement of fact/promise; (2) the product did not satisfy the promise; (3) plaintiffs took reasonable steps to notify defendant within a reasonable time that the product was not as represented; (4) plaintiffs were harmed; and (5) the failure of the product to be as represented was a substantial factor in the harm.  Judicial Council Of California Civil Jury Instruction ("CACI") (2014) No. 1230.

A plaintiff bringing an express warranty claim must be exposed to the false label or advertisement, but reliance is generally not required.  *Rosales v. FitFlop USA, LLC*, 882 F.Supp. 2d 1168, 1178 (S.D. Cal. 2012) ("Product advertisements, brochures, or packaging can serve to create part of an express warranty.  While this does not require that plaintiff relied on the individual advertisements, it does require that plaintiff was actually exposed to the advertising.")(citations omitted); *Weinstat v. Dentsply Intern., Inc.*, 180 Cal.App.4th 1213, 1227, 103 Cal. Rptr. 3d 614 (Cal. Ct. App. 2010) ("[B]reach of express warranty arises in the context of contract formation in which reliance plays no role."); *c.f. Keegan v. American Honda*, 284 F.R.D. 504, 546, 549 (C.D. Cal. 2012) (finding reliance requirement in absence of privity, but nonetheless certifying a California express warranty class).

Thus, "[d]eterminations of whether Defendant misrepresented its products and, as a result, whether warranties were breached, are common issues appropriate for class treatment."  *Astiana v. Kashi Co.*, 291 F.R.D. 493, 504-505, 509 (S.D. Cal. 2013) (certifying a "nothing artificial" class, as proposed by plaintiffs, and an "all natural" class, with regard to three ingredients, on (among other theories) a breach of express warranty claim).

---

misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if *the product had been labeled accurately.*   This economic harm—the loss of real dollars from a consumer's pocket—is the same whether or not a court might objectively view the products as functionally equivalent."  *Kwikset Corp.*, 51 Cal. 4th at 329 (emphasis in original).

To prevail on a claim for breach of implied warranty, Plaintiffs must establish that (1) plaintiffs bought Wesson Oils; (2) at the time of purchase, ConAgra was in the business of selling Wesson Oils; (3) Wesson Oils did not conform to the promises or affirmations of fact on the label that it was "100% Natural"; (4) plaintiffs took reasonable steps to notify ConAgra within a reasonable time that the Wesson cooking oil did not have the expected quality; (5) plaintiffs were harmed; and (6) the failure of Wesson Oils to be "100% Natural" was a substantial factor in causing plaintiffs' harm.  *See* CACI No. 1231.

Breach of implied warranty also has been applied to false labeling class cases like this one where the challenged product failed to live up to its label promise, such as being a "healthy" or "nutritious" food.  *See In re Ferrero Litig.*, 794 F.Supp. 2d 1107, 1118 (S.D. Cal. 2011) (denying motion to dismiss plaintiffs' claim for breach of implied warranty of merchantability where plaintiffs alleged that goods did not "conform with the promises or affirmations of fact made on the container or label"); *see also Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (enumerating foodstuff and representation-made-on-label exceptions to privity requirement under California warranty law) (citations omitted).

Under both the express and implied warranty theories, Plaintiffs can demonstrate that every purchaser of Wesson Oils was harmed by paying a price premium.  Thus, the breach of warranty claims are susceptible to common proof and appropriate for class treatment.

### 2.   Common Questions Predominate For Each Colorado Claim Plaintiffs Seek to Certify

Plaintiff Jill Crouch asserts and seeks to certify four Colorado state-law based claims against ConAgra: violation of the Colorado Consumer Protection Act (the "CCPA"), Colo. Rev. Stat. §§ 6-1-101, *et seq.*; breach of express warranty,

Colo. Rev. Stat. § 4-2-313; breach of implied warranty, Colo. Rev. Stat. § 4-2-314; and a common law equitable claim of unjust enrichment.

### a.   Common Questions Predominate Plaintiffs' CCPA Claim

To prove a claim "under the CCPA, a plaintiff must show: '(1) the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered the injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.'" *HealthONE of Denver, Inc. v. UnitedHealth Group, Inc.*, 805 F.Supp.2d 1115, 1120 (D. Colo. 2011) (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003), other internal citations omitted). Reliance is thus not an element of a CCPA claim.

The CCPA prohibits a wide variety of "deceptive trade practices," including [k]nowingly mak[ing] a false representation as to the characteristics . . . of goods," "[r]epresenting that goods . . . are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another," and "advertise[ing] goods . . . with intent not to sell them as advertised." C.R.S. § 6-1-105(1)(e), (g), and (i); *see also Showpiece Homes Corp. v. Assur. Co. of Am.*, 38 P.3d 47, 53 (Colo. 2001) ("[i]n determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct. That assumption is appropriate because of the strong and sweeping remedial purposes of the CCPA.") (citations omitted). Plaintiffs allege that the Defendant engaged in these deceptive trade practices by knowingly labeling Wesson Oils as "100% Natural" while failing to provide Plaintiffs with a "100% Natural" Wesson Oil product.[23]

_____

[23] The third prong of the Colorado test – whether the practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or

Plaintiffs have a method to establish, on a classwide basis, that ConAgra *caused* injury to Wesson Oil purchasers by falsely labeling Wesson Oil as 100% Natural.  *See Farmers Ins. Exch. v. Benzing*, 206 P.3d 812, 820 (Colo. 2009) (holding, under the Colorado equivalent of Rule 23, that class representatives must advance "a theory by which to prove or disprove 'an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position.'") (quoting *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 580 (D. Minn. 1995)).  While direct proof of individual reliance is sometimes used to establish causation, under Colorado law, classwide causation may also be established through circumstantial evidence of the fraudulent conduct's capacity to mislead a reasonable consumer – direct evidence or a presumption of reliance is not required.  *See Patterson v. BP Am. Prod. Co.*, 240 P.3d 456, 465-467 (Colo. Ct. App. 2010) ("[W]e conclude that even without a presumption of reliance, named plaintiffs in a class action may demonstrate ignorance or reliance on a classwide basis, using circumstantial evidence that is common to the class.")(citations omitted);  *see also Rhino Linings*, 62 P.3d at 148 n. 11 (indicating that CCPA plaintiffs must show that a reasonable person would have relied on the misrepresentation at issue).  *But see Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92, 98 (Colo. 2011) (noting circumstantial evidence could establish reliance but holding trial court erred by failing to consider "evidence that face-to-face interactions did occur between each Plaintiff and a Medved sales representative").  In this case, classwide proof of causation comes by way of Weir's expert testimony and the other evidence showing the materiality of the "100% Natural" claim.   Weir's testimony demonstrates that the "100%

property – is by definition  a classwide inquiry.  *See*, *e.g.*, *HealthONE*, 805 F.Supp.2d at 1121-22 (enumerating factors considered in making the determination, including "the number of consumers affected"); *see also Hall v. Walter*, 969 P.2d 224, 236 (Colo. 1998) (holding "deceptive practices implicated the public as consumers because the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers.").

Natural" claim caused the market price of Wesson Oils to be higher than it otherwise would have been for every purchaser.  In other words, Plaintiffs have isolated the *market* price impact of ConAgra's deceptive marketing from common evidence.  Because all class members purchased Wesson Oil in the market (that is, they did not, nor could they, individually negotiate the retail price they paid for Wesson Oil at retail), Plaintiff has produced classwide, common evidence of causation and damages.

### b.   Common Questions Predominate Plaintiffs' Colorado Express and Implied Warranty Claims

In the context of this case, the elements of a claim for breach of express warranty in Colorado are: (1) the defendant sold Wesson Oils; (2) the defendant expressly warranted that Wesson Oils were "100% Natural"; (3) Plaintiffs are persons who were reasonably expected to use, consume or be affected by Wesson Oils; (4) Wesson Oils were not as warranted; (5) this breach of warranty caused the plaintiffs damages; and (6) within a reasonable time after the plaintiffs discovered or should have discovered the alleged breach of warranty, the plaintiffs notified the defendant of such breach.  Colo. Jury Instr., Civil 14:8 (4th ed. 2014).  For a breach of implied warranty claim, instead of an express warranty element, the defendant must be a merchant of the product and the product at issue did not conform to a promise or affirmation of fact made on the container or label.  *See* Colo. Jury Instr., Civil 14:10 (4th ed. 2014).

Reliance is not an element of either claim.  *See Lutz Farms v. Asgrow Seed Co*., 948 F.2d 638, 645 (10th Cir. 1991) (citing Official Cmt. 3 to Colo. Rev. Stat. § 4–2–313(1) and authorities from other jurisdictions in affirming trial court's submission of express warranty claim to jury despite lack of evidence of reliance by buyer).  Neither is privity.  *Hansen v. Mercy Hospital, Denver*, 40 Colo. App. 17, 18, 570 P.2d 1309, 1311 (Colo. Ct. App. 1977) ("lack of privity no longer presents an obstacle to recovery for breach of implied warranty") (*citing* Colo.

Rev. State. Ann. § 4-2-318 ("A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty.")).

Here, the predominant element of both claims is resolution of the Falsity Question – that is, whether Wesson Oils are actually "100% Natural" as ConAgra expressly warranted and labeled them.

### c. Common Questions Predominate Plaintiffs' Colorado Unjust Enrichment Claim

The elements of a claim for unjust enrichment in Colorado are (1) the defendant received a benefit; (2) at the plaintiff's expense; (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation. *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (en banc); *Salzman v. Bachrach*, 996 P.2d 1263, 1265-66 (Colo. 2000). Causation, materiality, and reliance are not explicit elements of the Colorado unjust enrichment cause of action. In addition, the  unjust enrichment "theory does not require any promise or privity between the parties." *Salzman*, 996 P.2d at 1265 (citations omitted).

The Colorado Supreme Court has affirmed certification of Colorado claims of unjust enrichment on behalf of a class in previous cases. *See Jackson v. Unocal Corp.*, 262 P.3d 874, 877, 890 (Colo. 2011) (en banc) (affirming certification of class that included claims for unjust enrichment); *see also Francis v. Mead Johnson & Co.*, No. 1:10-CV-00701-JLK, 2010 WL 3733023, at *1 (D. Colo. Sept. 16, 2010) (denying motion to strike class allegations in case including enrichment claims because defendant had not established that it would be "*impossible* to certify" case as a class action) (internal quotation marks omitted; emphasis in original).

### 3.      Common Questions Predominate For Each Florida
### Claim Plaintiffs Seek to Certify

Plaintiff Julie Palmer asserts and seeks certification of two Florida state-law based claims against ConAgra: violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. §§ 501.201, *et seq.*, and a common law equitable claim of unjust enrichment.

### a.      Common Questions Predominate Plaintiffs
### FDUTPA Claim

The FDUTPA is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2). "A deceptive practice is one that is 'likely to mislead' consumers. *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. Dist. Ct. App. 2000)(citations omitted omitted).  An unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So.2d 489, 499 (Fla. Dist. Ct. App. 2001) (quoting *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976)).

A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *KC Leisure, Inc. v. Haber*, 972 So.2d 1069, 1073 (Fla. Dist. Ct. App. 2008).  Reliance is not an element of a FDUTPA claim.  *Davis v. Powertel, Inc.*, 776 So. 2d at 974 ("The objective test adopted by the Federal Trade Commission and the federal courts applies, as well, in a suit in state court under the [FDUPTA].  The plaintiff need not prove the elements of fraud to sustain an action under the statute. That is so because the question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances.") (citations omitted)

FDUTPA embraces a "reasonable consumer" standard for assessing liability and proof of individual reliance by a particular consumer is not required. *See Office of the Attorney Gen. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. Dist. Ct. App. 2004) ("When addressing a deceptive or unfair trade practice claim, the issue is not whether the plaintiff actually relied on the alleged practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances . . . . [U]nlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.") (citation omitted); *Davis v. Powertel, Inc.*, 776 So. 2d at 974 ("[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.") (citations omitted); *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703-4 (Fla. Dist. Ct. App. 2000) (remanding with directions to certify and quoting *Dix v. Am. Bankers Life Assurance Co.*, 415 N.W. 206, 209 (Mich. 1987)("It is sufficient if the class can establish that a reasonable person would have relied on the representations.")); *see also Keegan*, 284 F.R.D. at 542; *Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687, 701 (S.D. Fla. 2010) (finding predominance where "classwide proof" supplied "an answer to the paramount question of whether Yo–Plus works as advertised," which "will directly and substantially impact every class member's liability case and entitlement to relief under the [Act].")*, reasoning expressly adopted but vacated on other grounds*, 635 F.3d 1279, 1282-83 (11th Cir. 2011).

Florida appellate decisions in which the class certification of FDUTPA claims has been approved have involved, like the facts at issue here, allegations of a single defect in a standard consumer product (here, a false and misleading "100% Natural" claim) or a single improper charge imposed uniformly on all consumers purchasing the product or service at the point of sale (here, a common price premium created by the false "100% Natural" marketing). *See*, *e.g.*, *Turner Greenberg Assocs., Inc. v. Pathman*, 885 So.2d 1004, 1009 (Fla. Dist. Ct. App.

2004) (undisclosed profit in "freight/insurance" collected by high-end furniture retailer); *Powertel*, 776 So.2d at 974 (seller of cellular telephone failed to disclose to its subscribers that telephone had been programmed to work only with the seller's wireless communications service); *Latman*, 758 So.2d at 704 (cruise line collected "port charge" and passed through only a portion of the port charges to port authorities and kept the remainder for itself); *W.S. Badcock Corp. v. Myers*, 696 So.2d 776, 784 (Fla. Dist. Ct. App. 1996) (collection of charge for unnecessary "non-filing" insurance). In these cases, each of the consumers was treated alike, and individual issues about liability for alleged violations of FDUTPA did not arise, just like the factual situation presented here.

Plaintiffs can prove the case of the thousands of other class members by proving their own case because ConAgra's conduct with respect to each of them (marketing Wesson Oil as "100% Natural" even though such marketing was false) was completely identical. Furthermore, Plaintiffs here have isolated the *market* price impact of ConAgra's deceptive marketing from common evidence. Because all class members purchased Wesson Oils in the market (that is, they did not, nor could they, individually negotiate the retail price they paid for Wesson Oils at retail), Plaintiff has similarly produced classwide, common evidence to demonstrate causation and damages.

**b.    Common Questions Predominate Plaintiffs' Florida Unjust Enrichment Claim**

The elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. *See Swindell v. Crowson*, 712 So.2d 1162, 1163 (Fla. Dist. Ct. App. 1998). Reliance is thus not an element of a Florida unjust enrichment claim.

Privity is also not required. *See MacMorris v. Wyeth, Inc.*, No. 2:04-CV-596-FtM-29DNF, 2005 WL 1528626, at *4 (M.D. Fla. June 27, 2005) ("indirect purchasers have been allowed to bring an unjust enrichment claim against a manufacturer").   The claim is valid if a benefit "flow[s]" from plaintiff to defendant. *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 929 (E.D. Pa. 2012) (concluding Florida law "does not appear to require the conferral of a direct benefit exclusively," but rather "that *some* benefit must *flow* to the party sought to be charged'") (emphasis in original) (quoting *Coffee Pot Plaza P'ship v. Arrow Air Conditioning & Refrigeration, Inc.*, 412 So. 2d 883, 884 (Fla. Dist. Ct. App. 1982)).   Profits derived by a manufacturer from plaintiffs' purchases of consumer goods from nonparty retailers is sufficient to show the manufacturer received the requisite "direct benefit."   *Romano v. Motorola, Inc.*, No. 07-CV-60517, 2007 U.S. Dist. LEXIS 86472, at *6 (S.D. Fla. Nov. 26, 2007) ("while there was no direct *contact* between the manufacturer Motorola and Plaintiff, by purchasing the Razr phone, Plaintiff directly conferred a benefit on Motorola in the form of payment for the phone.") (emphasis in original) (internal citations and quotation marks omitted).[24]

Courts have found that common questions predominate for Florida unjust enrichment claims where defendant's conduct was the same as to all class members. *James D. Hinson Elec. Contr. Co. v. BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 647 (M.D. Fla. 2011) ("[C]ommon questions can predominate in unjust enrichment claims where the defendant's conduct is the same as to all members of the putative class. . . . [W]hen the defendant's conduct is the same, it

---

[24] Some courts have suggested that plaintiff must have conferred a "direct" benefit upon defendant where plaintiff has "absolutely no" relationship with defendant. *Extraordinary Title Servs., LLC v. Fla. Power & Light Co.*, 1 So. 3d 400, 404 (Fla. Dist. Ct. App. 2009) (action against parent company improper where subsidiary contracted with plaintiffs for services and parent provided no services to plaintiff). As the ultimate manufacturer and supplier of the product in question, as well as a direct advertiser to consumers, ConAgra has a relationship with Plaintiffs, albeit an indirect one. *See MacMorris*, 2005 WL 1528626, at *4.

is difficult to conceive of any significant equitable differences between class members.") (internal citations and quotations omitted).

### 4. Common Questions Predominate For Each Illinois Claim Plaintiffs Seek to Certify

Plaintiff Pauline Michael asserts and seeks to certify two Illinois state-law based claims against ConAgra: violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1 *et seq.*, and a common law equitable claim of unjust enrichment.[25]

### a. Common Questions Predominate Plaintiff's ICFA Claim

The elements of an ICFA claim are "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 235 Ill. 2d 544, 550, 922 N.E. 2d 309, 313 (Ill. 2009) *citing Zekman v. Direct Am. Marketers, Inc.*, 182 Ill.2d 359, 373, 695 N.E.2d 853, 860 (Ill. 1998); *see also Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 180, 835 N.E.2d 801, 850 (Ill. 2005); *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 501, 675 N.E.2d 584, 593 (Ill. 1996). The ICFA requires the plaintiff to show that the allegedly deceptive act "proximately caused any damages." *De Bouse*, 922 N.E.2d at 314 *citing Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 149, 776 N.E.2d 151, 160 (Ill. 2002).

While proximate cause is an element of an ICFA claim, Plaintiffs' individual reliance is not an ICFA element. *Connick*, 174 Ill.2d at 501-502, 675 N.E.2d at 593-94; *see also Martin v. Heinhold Commodities*, 163 Ill. 2d 33, 76, 643 N.E.2d

---

[25] Pauline Michael, like every other Plaintiff, has standing in this litigation because she bought Wesson Oils during the Class Period and was injured by paying too much. *See* Declaration of Pauline Michael, previously filed as Dkt. No. 286 and included again as Exhibit D to the Declarations of Named Plaintiffs In Support of Plaintiffs' Motion for Class Certification.

734, 754 (Ill. 1994) ("[ICFA] does not require actual reliance. . . ."); *Hayna v Arby's, Inc.*, 99 Ill App. 3d 700, 711 425 N.E.2d 1174, 1183 (Ill. App. Ct. 1981) (certifying class of all persons who purchased fast-food restaurant's simulated "roast beef" sandwiches misrepresented as actual "roast beef" because allegedly improper advertising practices were uniform and general in their application to all class members); *see also Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 576 (7th Cir. 2001) ("[T]he Illinois Supreme Court has repeatedly held that, unlike a claim for common law fraud, reliance is not required to establish a consumer fraud claim.")(citations omitted); *Garner v. Healy*, 184 F.R.D. 598, 602 (N.D. Ill. 1999) (certifying class of consumers who purchased a substance represented as "car wax" that allegedly contained no wax, holding that the alleged fraud "was perpetrated in a uniform manner against members of the class," such that individual reliance issues would not predominate).

In addition, under the ICFA, materiality is tested with a reasonable person standard — i.e., whether the omission "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Connick*, 675 N.E.2d at 595; *see also Cirone–Shadow v. Union Nissan of Waukegan*, 955 F.Supp. 938, 944 (N.D. Ill. 1997) ("The standard for materiality under the ICFA is an objective standard."); *see also Walczak v. Onyx Acceptance Corp.*, 365 Ill.App.3d 664, 677, 850 N.E.2d 357, 369 (Ill. App. Ct. 2006) ("A class action is not defeated solely because of some factual variations among class members' grievances.  After the litigation of common questions, questions that are peculiar to individual class members may be determined in ancillary proceedings.") (internal citations omitted).

As the court in *Walczak v. Onyx* noted in approving certification of an ICFA class, "class actions are often the last barricade of consumer protection.  Consumer class actions provide restitution to the injured and deterrence to the wrongdoer, thus attaining the ends of equity and justice." *Walczak*, 850 N.E.2d at 371 (*citing*

*Clark v. TAP Pharm. Prods., Inc.*, 343 Ill.App.3d 538, 552, 798 N.E.2d 123, 134 (Ill. App. Ct. 2003)).[26]

Here, Plaintiffs have presented common evidence demonstrating that ConAgra's "100% Natural" claim misleads consumers, that the "100% Natural" statement *is* a proximate cause of consumer purchasing decisions, and that the "100% Natural" statement *is* a proximate cause of a portion of the total price of Wesson Oils that consumers, in the but-for world, would otherwise not have had to pay. Furthermore, Plaintiff Michael has testified that she was actually deceived by ConAgra's "100% Natural" claim to believe that Wesson Oils really were "100% Natural," and that this belief was a reason for her purchase of Wesson Oil at the price at which it was sold to her. *See* Azar Decl. Ex. 16, Michael Dep. at 78:3-19; 114:15-25. Accordingly, certification of Plaintiffs' ICFA claim is appropriate.

### b.   Common Questions Predominate Plaintiff's Illinois Unjust Enrichment Claim

An Illinois unjust enrichment claim is established upon a showing that "defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 160, 545 N.E.2d 672, 679 (Ill. 1989). Privity is not required to state an Illinois unjust enrichment claim, as "the focus is on the defendant's retention of benefits." *Muehlbauer v. General Motors Corp.*, 431 F. Supp. 2d 847, 853 (N.D. Ill. 2006) (citing *Schlosser v. Welk*, 193 Ill. App. 3d 448, 450, 550 N.E.2d 241, 242-43 (Ill. Ap. Ct. 1990)).

---

[26] The Illinois Supreme Court's decision in *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 879 N.E. 2d 910 is not to the contrary: there the Court held that Intel's representation of its then newest processor as a "Pentium IV" was "nothing more than puffery, and therefore is not a 'deceptive act' within the purview of the ICFA, while explicitly declining to consider "Intel's other argument regarding the individualized purchasing decisions of plaintiffs preventing any predominant questions and damages." *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 73, 77, 879 N.E. 2d 910, 927-928 (Ill. 2007).

Illinois courts have certified or affirmed certification of Illinois unjust enrichment claims as class actions where defendant's uniform practices or policies were at issue, even though individual damages issue were present.  In *Nicholson v. UTI Worldwide, Inc.*, No. 3:09-cv-722-JPG-DGW, 2011 U.S. Dist. LEXIS 49890, at *21-22 (S.D. Ill. May 10, 2011), wherein forklift operators alleged they were denied compensation for work performed, the court rejected defendant's argument that the unjust enrichment claim would require "specific inquiries into *each* [employee class member's] payment expectations for the work he performed and [its] value." Although the case would "clearly involve individual issues regarding damages" to be paid to each employee, "the common issues predominate[d] over the damages issues and [we]re good candidates for unitary adjudication," given that the case presented "common questions of law and fact regarding the implementation of [defendant's] … work policies and whether those policies resulted in [employees] working … without being paid properly" and given that "[t]he predominant question revolve[d] around whether [defendant] had or did not have uniform policies" at issue.  *Id.*; *see also Clark*, 798 N.E. 2d at 132-133 (concluding that "common issues, regarding both the plaintiffs' consumer fraud claim and the plaintiff[s'] unjust enrichment claim," involving fraudulently inflated drug costs "predominate over the issues that affect only individual members.").  So too, here, the common questions of whether Defendant was unjustly enriched by falsely or misleadingly advertising that Wesson Oils were "100% Natural" and the amount of profit Defendant reaped predominate over any issues affecting individuals.

### 5. Common Questions Predominate For Each Indiana Claim Plaintiffs Seek to Certify

Plaintiff Cheri Shafstall asserts and seeks to certify three Indiana state-law based claims against ConAgra: breach of express warranty, Ind. Code. § 26-1-2-

313, breach of implied warranty, Ind. Code. § 26-1-2-314, and a common law equitable claim of unjust enrichment.

### a. Common Questions Predominate Plaintiffs' Indiana Unjust Enrichment Claim

Indiana courts articulate three elements for an unjust enrichment claim: (1) a benefit conferred upon another at the express or implied consent of such other party; (2) allowing the other party to retain the benefit without restitution would be unjust; and (3) the plaintiff expected payment. *Woodruff v. Ind. Family & Social Servs. Admin.*, 964 N.E.2d 784, 791 (Ind. 2012); *see also Zoeller v. E. Chi. Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009).

Indiana courts have certified class actions asserting unjust enrichment claims where the allegedly fraudulent acts were the same for all class members. *See ConAgra, Inc v. Farrington*, 635 N.E.2d 1137, 1143 (Ind. Ct. App. 1994) ("Here, the essence of the class claims is whether ConAgra engaged in fraudulent conduct in wheat and soybean transactions. The facts surrounding the misconduct would be largely the same for all class members. Hence this common nucleus of facts satisfied the predominance requirement.") (internal citations omitted). Variances among the class members' damages will not prevent certification where plaintiffs present "evidence that the same formula may be applied to all of the class members to determine their individual awards," as is the case here. *See id.* at 1140.

### b. Common Questions Predominate Plaintiffs' Indiana Express and Implied Warranty Claims

The elements of a claim for breach of express warranty in Indiana are: (1) a description of the goods; (2) which is made part of the basis of the bargain; (3) the warranty was broken; (4) the breach of warranty was the proximate cause of the loss sustained by the plaintiff; and (5) within a reasonable time after he discovered or should have discovered any breach, the plaintiff notified the defendant of the breach. *Richards v. Goerg Boat and Motors, Inc*., 384 N.E.2d 1084, 1090 (Ind. Ct. App. 1979), *abrogated on other grounds by Hyundai Motor Am., Inc. v. Goodin,*

822 N.E.2d 947, 958-59 (Ind. 2005); Ind. Code § 26-1-2-313; Ind. Code § 26-1-2-607(3).   The elements of a breach of implied warranty in Indiana are: (1) a warranty (that goods conformed to the promises and affirmations of fact made on the container or label); (2) breach of that warranty; (3)   notice to the warrantor of the breach within a reasonable time; and (4) damages proximately caused by the breach. *Hughes v. Chattem, Inc*., 818 F.Supp. 2d 1112, 1122 (S.D. Ind. 2011); Ind. Code § 26-1-2-607.

"In order to prevail in a cause of action based on breach of warranty, the plaintiff must provide 'evidence showing not only the existence of the warranty but that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained.'" *U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co*., 719 F. Supp. 2d 1020, 1027 (S.D. Ind. 2010) (citation omitted); *Anderson v. Gulf Stream Coach, Inc*., 662 F.3d 775, 784-85 (7th Cir. 2011) (implied warranty of merchantability is a warranty that goods shall be "merchantable," i.e., fit for the ordinary purposes for which such goods are used, but "[i]t also means that the goods conform to promises or affirmations of fact made on the container or label, if any.") (citing Ind. Code § 26-1-2-314).  Reliance is not required on a warranty claim. *Essex Group, Inc. v. Nill*, 594 N.E.2d 503, 506-07 (Ind. Ct. App. 1992) ("Generally, a party may allege an action for breach of contract by pleading: 1) the existence of a contract; 2) the breach thereof by the defendants; and 3) damages. … [Plaintiff] correctly points out that reliance is not an element of a breach of warranty claim."); *Shordan v. Kyler*, 87 Ind. 38, 1882 WL 6505, at *2 (1882) (a buyer may recover for breach of express warranty in sale of goods, though he was not induced by the warranty).

### 6.   Common Questions Predominate For Each Nebraska Claim Plaintiffs Seek to Certify

Plaintiff Dee Hopper-Kercheval asserts four Nebraska state-law based claims against ConAgra: violation of the Nebraska Consumer Protection Act, Neb.

Rev. Stat. §§ 59-1601, *et seq.*,[27] breach of express warranty, Neb. Rev. Code. § 2-313, breach of implied warranty, Neb. Rev. Code. § 2-314, and a common law equitable claim of unjust enrichment.   Plaintiff Hopper-Kercheval seeks certification of only her warranty and unjust enrichment claims.

### a.   Common Questions Predominate Plaintiffs' Nebraska Unjust Enrichment Claim

To recover on a claim for unjust enrichment under Nebraska law, plaintiff must show that (1) defendant received money, (2) defendant retained possession of the money, and (3) defendant in justice and fairness ought to pay the money to plaintiff. *Bel Fury Inv. Group, L.L.C. v. Palisades Collection, L.L.C.,* 814 N.W.2d 394, 400 (Neb. Ct. App. 2012) (citing *Kanne v. Visa U.S.A.*, 272 Neb. 489, 501, 723 N.W.2d 293, 302 (Neb. 2006)).

Where these elements can be established by common evidence, as in this case, an unjust enrichment claim under Nebraska law may proceed as a class action.   In  *Cortez v. Neb. Beef, Inc.*, 266 F.R.D. 275 (D. Neb. 2010), the court, in certifying a class on state law claims including unjust enrichment, rejected defendants' argument that individual issues predominated on the basis of "individual experiences" of the class of employees who sued for compensation for pre- and post-shift work.  *Cortez*, 266 F.R.D. at 293.  The "common issues [we]re the same in all class members' cases"; thus, the same issue "predominated over their individual cases.  Because the same issue was common to all class members, the predominance element was satisfied, "regardless of the differences."  *Id.*  Here, too, the common treatment of Class members – labeling of Wesson Oils with the

---

[27]  On November 15, 2012, this Court dismissed Plaintiff Hopper-Kercheval's Nebraska Consumer Protection Act Claim with prejudice under Fed. R. Civ. P. 12(b)(6).   *See* Dkt. No. 138 at 14-17.   Plaintiffs reserve all rights to seek certification of a Nebraska Consumer Protection Claim should, after a final judgment is issued, Plaintiffs take and prevail on an appeal of this Court's November 15, 2012 Order.

100% Natural claim, while providing a GMO-containing product – gives rise to common questions that predominate over individual cases.

### b. Common Questions Predominate Plaintiffs' Nebraska Express and Implied Warranty Claims

In this case, the elements of a claim for breach of express warranty in Nebraska are: (1) that the defendant sold Wesson Oils; (2) that the defendant expressly warranted that Wesson Oils are "100% Natural"; (3) that plaintiffs are persons who could have been expected to use, consume, or be affected by Wesson Oils; (4) that Wesson Oils did not conform to the warranty; (5) that, within a reasonable time after plaintiffs discovered the breach, they gave the defendant notice of breach; and (6) that the breach of this warranty was a proximate cause of some damage to the plaintiffs.  1 Neb. Prac., NJI2d Civ. 11.40 (2012-2013 ed.); *Divis v. Clarklift of Nebraska, Inc.*, 256 Neb. 384, 393, 590 N.W.2d 696, 702 (Neb. 1999).

Although reliance is required for a claim of breach of express warranty, *Hillcrest Country Club v. N.D. Judds Co.*, 236 Neb. 233, 241, 461 N.W.2d 55, 61 (Neb. 1990) (since an express warranty must have been made part of the basis of a bargain, it is essential that plaintiffs prove reliance upon the warranty), plaintiffs in this case will prove class wide reliance through circumstantial evidence of the materiality of the "100% Natural" claim to reasonable consumers.

In the context of this case, the elements of a breach of implied warranty in Nebraska are: (1) that the defendant sold Wesson Oils; (2) that, at the time of the sale, the defendant was a merchant with respect to goods of that kind; (3) that, at the time the Wesson Oils were delivered by the defendant, they were not merchantable (did not conform to the promises or affirmations of fact made on the container or label); (4) that, within a reasonable time after the plaintiffs discovered or should have discovered the breach, they gave the defendant notice of breach; (5) that the failure of the goods to perform as warranted was a proximate cause of

some damage to the plaintiffs.  *See* 1 Neb. Prac., NJI2d Civ. 11.42 (2012-2013 ed.); Neb. Rev. Stat. § 2-314(2)(f).

Reliance is not an element of an implied warranty claim.  *El Fredo Pizza, Inc. v. Roto-Flex Oven Co*., 199 Neb. 697, 702, 261 N.W.2d 358, 362 (Neb. 1978) ("In order for goods to be merchantable under section 2-314, they must be at least such as are fit for the ordinary purposes for which such goods are used. Under this implied warranty, no reliance upon the seller need be shown.")

Further, Nebraska has no privity requirement for warranty claims.  *See*, *e.g*., *Peterson v. North American Plant Breeders*, 218 Neb. 258, 264-65, 354 N.W.2d 625, 631 (Neb. 1984) (adopting rule that "lack of privity between the buyer and manufacturer does not preclude an action against the manufacturer for the recovery of economic losses caused by breach of warranties") (citations omitted).

### 7.    Common Questions Predominate For Each New York Claim Plaintiffs Seek to Certify

Plaintiffs Kelly McFadden and Necla Musat assert and seek certification of three New York state-law based claims against ConAgra: violation of the New York Consumer Protection Act, N.Y. Gen. Bus. L. §§ 349, et seq. ("NY GBL § 349"), breach of express warranty, N.Y. U.C.C. Law § 2-313, and a common law equitable claim of unjust enrichment.

### a.    Common Questions Predominate Plaintiffs' NY GBL § 349 Claim

The elements of a NY GBL § 349 claim are: (1) whether Defendant made a materially misleading statement; (2) directed to consumers; (3) resulting in an injury to plaintiffs.  *See*, *e.g., Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941-42, 967 N.E.2d 675, 675 (N.Y. 2012); *Ebin v. Kangadis Food, Inc*., 297 F.R.D. 561, 568 (S.D.N.Y. 2014).

To prevail on a NY GBL § 349 claim, plaintiffs must prove that "the defendant made misrepresentations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances. . .  and that as a result the

plaintiff suffered injury." *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 476 (E.D.N.Y. 2009) (citations omitted); *see also Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG) (RML), 2010 WL 2925955, at *15 (E.D.N.Y. July 21, 2010) ("each claim [under § 349], includes the requirement that a reasonable consumer could have been misled by defendants' conduct"). The proof needed to establish this objective standard will be the same for all plaintiffs. *Ebin*, 297 F.R.D. at 568 (finding that because "every class member saw the same representation that Capatriti was '100% Pure Olive Oil' . . . in large letters on the front, back, left, right, and top of the tin …[, t]he same generalized evidence will be used to establish whether Capatriti's label is false, and if so, whether it was likely to mislead a reasonable consumer acting under the circumstances").

Proof of reliance and scienter are not elements of a NY GBL § 349 claim. *Koch*, 18 N.Y.3d at 941, 967 N.E.2d at 675 ("Justifiable reliance by the plaintiff is not an element of the statutory claim."); *Pelman v. McDonald's Corp.*, 396 F. Supp. 2d 439, 445 (S.D.N.Y. 2005) ("[R]eliance is not a necessary element of a GBL § 349 claim."); *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 55, 720 N.E.2d 892, 897 (N.Y. 1999) (intent to defraud and justifiable reliance by the plaintiff are not elements of the statutory claim).[28]

New York law also permits causation and damages to be established by class-wide proof. *Ebin v. Kangadis Food, Inc.*, 297 F.R.D. 561, is particularly on point. In certifying a class under New York's GBL § 349, the court found that a classwide presumption of causation and injury was appropriate because "even if a

---

[28] ConAgra has previously cited *Ackerman v. Coca-Cola Co.*, No. 09 CV 395(DLI)(RML), 2013 WL 7044866, at *2 (E.D.N.Y. July 18, 2013), for the proposition that "individualized proof of reliance is essential to the cause[ ] of action . . . under General Business Law § 350." Plaintiffs are not asserting a NY GBL § 350 claim, and moreover, a year before the district court decision in *Ackerman*, the New York Court of Appeals, New York's highest court, held that reliance was not an element under either N.Y. G.B.L. § 349 or § 350. *Koch*, 18 N.Y.3d at 941-42, 967 N.E.2d at 675 ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law §§ 349 and 350 claims, it was error.").

class member actively wanted to buy pomace instead of 100% pure olive oil, they nevertheless paid too much for it."  *Id.* at 568-69 (accepting testimony of Colin Weir, Plaintiffs' expert in this case).

Numerous other New York cases have certified consumer fraud cases like the instant one as class actions.  *See, e.g., Rodriguez v. It's Just Lunch, Int'l*, Case No. 07 Civ 9227 (SHS), 2014 U.S. Dist. LEXIS 66409, at *21 (S.D.N.Y. May 14, 2014); *Ersler v. Toshiba Am., Inc.*, No. CV-07-2304 (SMG), 2009 WL 454354, at *4 (E.D.N.Y. Feb. 24, 2009) ("[T]his is a consumer fraud case and thus the type of action in which '[p]redominance is a test readily met.'") (alteration in original); *Taylor v. Am. Bankers Ins. Group, Inc.*, 267 A.D.2d 178, 178 (N.Y. App. Div. 1999) ("[T]here was ample justification for the motion court's finding that the solicitations in question did not differ materially.  Accordingly, given the nature and uniformity of defendants' offers of coverage, any matters relating to individual reliance and causation are relatively insignificant, if not irrelevant, and, as such, do not preclude class certification.") (*citing Pruitt v. Rockefeller Ctr. Props.*, 167 A.D.2d 14, 22 (N.Y. App. Div. 1991)); *Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 114 F.R.D. 48, 52 (S.D.N.Y. 1987) ("[I]f the liability issue is common to the class, common questions are held to predominate over individual questions.") (internal quotation marks omitted).

### b. Common Questions Predominate Plaintiffs' New York Unjust Enrichment Claims

The elements of a claim for unjust enrichment in New York are: (1) the defendant was enriched; (2) at the plaintiff's expense; and (3) it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.  *Georgia Malone & Co., Inc. v. Ralph Rieder*, 19 N.Y.3d 511, 516, 973 N.E.2d 743, 747 (N.Y. 2012). "The essential inquiry in any action for unjust enrichment … is whether it is against equity and good conscience to permit the

defendant to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182, 944 N.E.2d 1104, 1110 (N.Y. 2011).

Under New York law, "[i]t does not matter whether the benefit is directly or indirectly conveyed." *Manufacturers Hanover Transp. Co. v. Chem. Bank*, 160 A.D.2d 113, 117 (N.Y. App. Div. 1990). Moreover, New York does not require privity. *Georgia Malone & Co., Inc.*, 19 N.Y.3d at 516, 973 N.E.2d at 746 ("a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment, [but] there must exist a relationship or connection between the parties that is not too attenuated") (quotation marks omitted); *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d at 930 (New York does not require "direct relationship" or conferring of a "direct benefit"; an "'indirect purchaser can assert … an unjust enrichment claim against the manufacturer of the product'") (quoting *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403-04 (E.D.N.Y. 2010)).

Courts have granted class certification for New York unjust enrichment claims. In *Seekamp v. It's Huge, Inc.*, the court ruled that common questions of law and fact predominated with respect to plaintiffs' unjust enrichment claim because it did not appear that individual issues would be unique to each plaintiff: "The predominant issue for the unjust enrichment claim is whether Defendants were enriched at the class' expense by selling them the [vehicle discounts] for $295.00 each, and then failing to perform the guarantees enumerated in the [discounts]." *Seekamp v. It's Huge, Inc.*, 1:09-CV-00018 (LEK/DRH), 2012 U.S. Dist. LEXIS 33295, at *41 (N.D.N.Y Mar. 13, 2012); *see also Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 436 (S.D.N.Y. 2009) (certifying subclass and recognizing that "predominant issue for the unjust enrichment claim is whether Best Buy was enriched at the class' expense by using an undisclosed policy of aggressively discouraging and denying customers' valid price match requests"). Here, a similar individual question predominates:  Whether Defendant was unjustly enriched by selling, at the Class' expense, products labeled "100% Natural" while

providing products that failed to live up to that representation.  The predominance requirement is thus met.

### c.    Common Questions Predominate Plaintiffs' New York Express Warranty Claim

"To state a claim for breach of express warranty under New York law, a plaintiff must allege (1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach." *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 13-CV-3073 NSR, 2014 WL 1285137, at *12 (S.D.N.Y. Mar. 27, 2014) (citations omitted); N.Y. U.C.C. § 2–313 ("Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."). In addition, "a buyer must provide the seller with timely notice of the alleged breach of warranty." *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 544 (S.D.N.Y. 2013); *see* N.Y. U.C.C. § 2–607(3)(a) ("Where a tender has been accepted the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.").

Plaintiffs can satisfy each requirement.  As an initial matter, ConAgra's labeling of Wesson Oil as "100% Natural" is an actionable warranty. *Ault v. J.M. Smucker Co.*, 13 CIV. 3409 PAC, 2014 WL 1998235, at *6 (S.D.N.Y. May 15, 2014) ("Defendant's labeling of Crisco Oil as 'All Natural' is an actionable warranty.").

With respect to reliance, New York requires "no more than reliance on the express warranty as being a part of the bargain between the parties"; plaintiffs need not show they believed the truth of the representation but only that they "believed that the assurances of fact made in the warranty would be fulfilled." *CBS, Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d 496, 503, 553 N.E.2d 997, 1000-01 (N.Y. 1990)

("The critical question is not whether the buyer believed in the truth of the warranted information, but 'whether [it] believed [it] was purchasing the [seller's] promise [as to its truth].') (alterations in original, citation omitted).   "[A]s has been oft-times stated, in fraud cases, 'where identical representations are made in writing to a large group,' individual questions of reliance do not justify denial of class status." *Pruitt v. Rockefeller Ctr. Props.*, 167 A.D.2d 14, 21, 574 N.Y.S.2d 672, 676 (N.Y. App. Div. 1991) (*quoting King v. Club Med, Inc.*, 76 A.D.2d 123, 127, 430 N.Y.S.2d 65, 67 (N.Y. App. Div. 1981)) *and citing Weinberg v. Hertz Corp.*, 116 A.D.2d 1, 7 (N.Y. App. Div. 1986) ("[O]nce it has been determined that the representations alleged are material and actionable . . . the issue of reliance may be presumed, subject to such proof as is required on the trial.").

Privity is not required.  Rather, "[a] buyer may bring a claim against a manufacturer from whom he did not purchase a product directly, since an express warranty 'may include specific representations made by a manufacturer in its sales brochures or advertisements regarding a product upon which a purchaser relies.'" *Goldemberg*, 2014 WL 1285137, at *12 (*quoting Arthur Glick Leasing, Inc. v. William J. Petzold, Inc.*, 51 A.D.3d 1114, 1116, 858 N.Y.S.2d 405 (N.Y. App. Div. 2008)); *see also Randy Knitwear, Inc. v. Am. Cyanamid Co.*, 11 N.Y.2d 5, 14, 181 N.E.2d 399 (N.Y. 1962) (no privity requirement where manufacturer made express representations to induce reliance by remote purchasers)).

### 8. Common Questions Predominate For Each Ohio Claim Plaintiffs Seek to Certify

Plaintiff Maureen Towey asserts two Ohio state-law based claims against ConAgra but only seeks certification of her Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code §§ 1345.01, *et seq.* claim at this time.[29]

---

[29]   On November 15, 2012, this Court dismissed Plaintiff Towey's unjust enrichment claim with prejudice under Fed. R. Civ. P. 12(b)(6).  *See* Dkt. No. 138 at 14-17.  Plaintiffs reserve all rights to seek certification of an Ohio unjust enrichment claim should, after a final judgment is issued, Plaintiffs take and prevail on an appeal of this Court's November 15, 2012 Order.

### a.   Common Questions Predominate Plaintiffs' OCSPA Claim

The elements of an OCSPA claim are: (1) whether ConAgra is a "supplier" of Wesson Oils; (2) whether ConAgra's use of "100% Natural" on the label of Wesson Oils was likely to induce a state of mind in the consumer that is not in accord with the facts; (3) whether plaintiffs were consumers and purchased Wesson Oils for purposes that are primarily personal, family, or household; and (4) a nexus between the Plaintiffs' claims and their injuries, whether established by reliance or by inferences or presumptions of inducement and reliance.[30]   Further, O.R.C. 1345.09(B), permits class actions to be maintained only:

> [w]here the violation was an act or practice declared to be deceptive or unconscionable by rule adopted [by the Ohio Attorney General] under division (B)(2) of section 1345.05 of the Revised Code before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate section 1345.02 , 1345.03 , or 1345.031 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code.

A class action is maintainable here because "100% Natural," as it appears on Wesson Oils, constitutes an unsubstantiated "representation[], claim[], or assertion[] of fact . . .which would cause a reasonable consumer to believe such statements are true," in violation of Ohio Admin. C. § 109:4-3-10, a substantive rule adopted by the Ohio Attorney General.  *See* Ohio Admin. Code § 109:4-3-01; *see also State ex rel. Brown v. Hartman*, No. 81-CV-1587, OPIF # 10000070

---

[30] *Cope v. Metro. Life Ins. Co.*, 696 N.E.2d 1001, 1004 (Ohio 1998); *Shumaker v. Hamilton Chevrolet, Inc.*, 920 N.E.2d 1023, 1030-31 (Ohio Ct. App. 2009) *Washington v. Spitzer Mgmt.*, 2003-Ohio-1735, 2003 Ohio App. LEXIS 1640, at *15-17 (Ohio Ct. App. Apr. 3, 2003); *see also Ferron v. MetaReward, Inc.*, 698 F. Supp. 2d 992, 1001 (S.D. Ohio 2010).

(Ohio Ct. Com. Pl. Nov. 15, 1982) (supplier enjoined from "misrepresenting the quality, grade, or standard of any food products, including with regard to imitation cheese products); *State ex rel. Brown v. Town & Country Food Distributors*, No. 73840, OPIF # 100000432 (Ohio Ct. Com. Pl. Nov. 5, 1979) (grocer enjoined, *inter alia*, from misrepresentations concerning quality of produce in advertising); *State ex rel Cordray v. The Dannon Company, Inc*., No. 10 CVH-12-18225, OPIF # 10002917 (Ohio Ct. Com. Pl. Dec. 22, 2010) (food producer enjoined from using misleading labeling claims).

Under Ohio's statute, "[a] deceptive act has the likelihood of inducing a state of mind in the consumer that is not in accord with the facts.  Courts shall apply a reasonableness standard in determining whether an act amounts to deceptive, unconscionable, or unfair conduct."  *Shumaker*, 920 N.E.2d at 1031 (internal quotation marks omitted).

Ohio courts permit a classwide inference of reliance where fraud was accomplished on a common basis.  *Washington v. Spitzer Mgmt. Inc*., 2003 WL 1759617, at *6  ("If a fraud was accomplished on a common basis, there is no valid reason why those affected should be foreclosed from proving it on that basis.  In such cases, reliance may be sufficiently established by inference or presumption. Thus, appellants' argument that individualized proof of reliance is necessary is without merit.") (internal citations and quotation marks omitted).

In *Cope v. Metropolitan Life Insurance Co*., the Supreme Court reviewed the law of several states and concluded that:

> Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all.  Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action. . . .  It is now well established that a

claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position. . . .   Courts also generally find that a wide variety of claims may be established by common proof in cases involving similar form documents or the use of standardized procedures and practices.

*Cope*, 696 N.E.2d at 1003-04.   The *Cope* court clarified the holding of *Schmidt v. Avco Corp.*, (1984), 473 N.E.2d 822 (Ohio 1984), explaining that "*Schmidt* did not purport to establish a rule that any claim containing a necessary element of reliance is *ipso facto* excluded from class action treatment,"   696 N.E.2d at 1007, allowing an inference of reliance where there was uniform nondisclosure of a material fact, satisfying predominance.   *Cope*, 696 N.E.2d at 1008.

While individual and direct evidentiary showings of reliance and causation *are not* required to state a claim under the OCSPA, *see Ferron v. Metareward, Inc.*, 698 F. Supp. 2d at 1001 and *Shaver v. Standard Oil Co.*, 623 N.E.2d 602, 608-609 (Ohio Ct. App. 1993), some nexus is required between the defendant's violation of the OCSPA and the plaintiff's injuries.   *See Butler v. Sterling, Inc.*, 210 F.3d 371, 2000 WL 353502, at *6 (6th Cir. 2000) (unpublished) (concluding that, while "a showing of subjective reliance is probably not necessary to prove a violation of the OCSPA . . . some form of nexus [is required] between a defendant's conduct and a plaintiff's alleged injuries"); *Reeves v. PharmaJet, Inc.*, 846 F. Supp. 2d 791, 798 (N.D. Ohio 2012) ("'there must be a cause and effect relationship between the defendant's acts and the plaintiff's injuries'") (*quoting Lilly v. Hewlett–Packard Co.*, N. 05–cv–465, 2006 WL 1064063, at *5 (S.D. Ohio Apr. 21, 2006)); *Temple v. Fleetwood Ent., Inc.*, 133 Fed. Appx. 254 (6th Cir. 2005) (unpublished) (holding that in order to make out a *prima facie* claim under the OCSPA, the plaintiff must "show a material misrepresentation, deceptive act or

omission that impacted his decision to purchase the item at issue.") (citation and quotation omitted).   Here, Plaintiffs' evidence of materiality, *see* Section IV.B *supra*, and Mr. Weir's testimony establishing the causal relationship between the "100% Natural" claim and the Price Premium in Wesson Oil's retail price, readily establishes the required nexus.

### 9.   Common Questions Predominate For Each Oregon Claim Plaintiffs Seek to Certify

Plaintiff Erika Heins asserts three Oregon state-law based claims against ConAgra but only seeks certification of her Oregon Unfair Trade Practices Act, Or. Rev. Stat. §§ 646.605 et seq. ("OUTPA") claim and her unjust enrichment claim.

### a.   Common Questions Predominate Plaintiffs' Oregon Unfair Trade Practices Act Claim

In the context of this case, the elements of a claim under the OUTPA are: (1) whether ConAgra's use of "100% Natural" on the label of Wesson Oils was likely to deceive; (2) whether ConAgra knew or should have known that using "100% Natural" on Wesson Oils was unlawful; (3) whether plaintiffs are consumers; and (4) whether plaintiffs suffered an ascertainable loss as a result of ConAgra's use of "100% Natural" on the label of Wesson Oils.  *Pearson v. Philip Morris, Inc*., 306 P.3d 665, 672-73, 699 (Or. App. 2013) (*en banc*), *review allowed*, 319 P.3d 696 (Jan. 16, 2014); *Feitler v. Animation Celection, Inc*., 13 P.3d 1044, 1050 (Or. Ct. App. 2000); Or. Rev. Stat. Ann. §§ 646.607, 646.605(10), 646.608(1)(e); 646.638(1).

In *Pearson v. Philip Morris, Inc*., 306 P.3d 665, the Oregon appellate court explained "as a general matter, it is possible to prove reliance on a class-wide basis" and held that smokers could prove common reliance on "light" cigarette claims.  306 P.3d at 695, 698 ("Ultimately, whether plaintiffs and the other putative class members relied on defendant's representations is a question for the jury.")  The court went on to reverse the trial court's denial of class certification, concluding that "the entire liability portion of the claim can be litigated through

common evidence.  Because those common issues are vastly more significant to the litigation than the remaining individual issues, common issues predominate." *Id.*, 306 P.3d at 699.

Defendant previously relied on *Newman v. Tualatin Devel. Co., Inc.*, 597 P.2d 800, 804 (Or. 1979), to argue that individual questions of reliance predominate under the Oregon Statute.  But, as the Oregon Supreme Court later explained, "*Newman* expressly disavowed that individual evidence of reliance was required as a matter of law in all class actions."  *Strawn v. Farmers Ins. Co. of Or.*, 258 P.3d 1199, 1211 (Or. 2011) ("when the same misrepresentation was made to all individual class members and was sufficiently material or central to the plaintiff's and the defendant's dealings that the individual class members naturally would have relied on the misrepresentation" reliance can be determined from common proof).  "*Newman* [] turned on its particular facts, while leaving other class actions requiring proof of reliance to do the same."  *Id.*, 258 P.3d at 1211; *see also Pearson*, 306 P.3d at 695 (citing *Newman* to assert that Oregon Supreme Court recognized that reliance is "susceptible to classwide proof.").

Thus, class treatment of Plaintiffs' claims under the OUTPA is appropriate here because whether the "100% Natural" label "logically" had a common understanding that consumers "naturally" would have relied upon is an objective question that is susceptible to classwide proof.

In addition, whether ConAgra knew or should have known that using "100% Natural" was unlawful is a question common to the class and can be based on common evidence.  Indeed, it is likely to be determined through ConAgra's own documents.  *See State ex rel. Redden v. Discount Fabrics*, 615 P.2d 1034, 1039 (Or. 1980)) ("the term 'willful,' as defined by ORS 646.605(9), requires no more than proof of ordinary negligence by a defendant in not knowing, when it should have known, that a representation made by him was not true.").

1     With respect to the element of "ascertainable loss," Oregon Courts have held

2 that "'[a]scertainable loss' under the UTPA is amorphous.  Any loss will satisfy

3 that requirement so long as it is 'capable of being discovered, observed, or

4 established."  *Feitler*, 13 P.3d at 1050 (quotation and citation omitted).  Here,

5 Plaintiffs suffered an ascertainable loss in paying an unwarranted premium for the

6 false "100% Natural" claim on Wesson Oils.

7              **b.**    **Common Questions Predominate Plaintiffs'**

8                     **Oregon Unjust Enrichment Claim**

9     The elements of a claim for unjust enrichment in Oregon are: (1) the plaintiff

10 conferred a benefit on the defendant; (2) the defendant was aware that it had

11 received a benefit; and (3) under the circumstances, it would be unjust for the

12 defendant to retain the benefit without paying for it.  *Winters v. Cnty. of Clatsop*,

13 150 P.3d 1104, 1106 (Or. App. 2007) *citing Volt Servs. Group v. Adecco Emp't*

14 *Servs.*, 35 P.3d 329, 337 (Or. App. 2001).

15     Privity is not required.  *Rosenblum v. First State Bank*, 581 P.2d 515, 518

16 (Or. 1978) ("[P]rivity of the contractual type need not exist between the parties.")

17 (*quoting Smith v. Rubel*, 13 P.2d 1078, 1080 (Or. 1932)).  Nor must plaintiff

18 directly confer a benefit on the defendant.  *See Volt*, 35 P.3d at 337-38.

19     Here, Defendant's knowledge of the benefit cannot be gainsaid: ConAgra's

20 own documents show that it knows "100% Natural" motivates consumers to

21 purchase Wesson Oils.  *See* Section IV.B, *supra*.  Furthermore, Oregon courts have

22 certified unjust enrichment claims for class treatment.  *See Phelps v. 3PD, Inc.*,

23 261 F.R.D. 548, 563 (D. Or. 2009) ("[T]he evidence will be common because of

24 defendant's uniform treatment of [the class members].  All of the [class members']

25 contracts will be adjudged in the same fashion on this issue.  Thus, common issues

26 predominate in the unjust enrichment/quantum meruit claim.").  Likewise, here,

27 the "uniform treatment" of all Class members through ConAgra's consistent

28 misrepresentation of Wesson Oils as "100% Natural" permits all Class members'

purchases to be adjudged in the same manner on the issue of whether this labeling constitutes a misrepresentation whereby Defendant was unjustly enriched.

### 10.  Common Questions Predominate For Each South Dakota Claim Plaintiffs Seek to Certify

Plaintiff Rona Johnston asserts four South Dakota state-law based claims against ConAgra, but only seeks certification of her South Dakota Deceptive Trade Practices and Consumer Protection Law, S.D. Code. Laws §§ 37-24-1 et seq. ("SDDTPL") claim and her common law equitable claim of unjust enrichment.

### a.  Common Questions Predominate Plaintiffs' South Dakota Deceptive Trade Practices Claim

Although there is little case law on the SDDTPL, a claim requires "proof of an intentional misrepresentation or concealment of a fact on which plaintiff relied and that caused an injury to plaintiff." *Nw. Pub. Serv. v. Union Carbide Corp.*, 236 F. Supp. 2d 966, 973-74 (D.S.D. 2002); *see also Rainbow Play Sys., Inc. v. Backyard Adventure, Inc*., No. CIV. 06–4166, 2009 U.S. Dist. LEXIS 93623, at *23-25 (D.S.D. Sept. 28, 2009); *Young v. Wells Fargo & Co*., 671 F. Supp. 2d 1006, 1032-33 (S.D. Iowa 2009); *Brookings Mun. Utils., Inc. v. Amoco Chem. Co*., 103 F. Supp. 2d 1169, 1178 (D.S.D. 2000); S.D. Codified Laws §§ 37-24-6; 37-24-31.

In *Thurman v. CUNA Mutual Ins. Soc'y*, the South Dakota Supreme Court reversed the denial of certification of a consumer class, explaining that:

> The common questions need not be dispositive of the entire action.  In other words, 'predominate' should not be automatically equated with 'determinative.'   Therefore, when one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'

*Thurman v. CUNA Mutual Ins. Soc'y*, 836 N.W.2d 611, 620 (S.D. 2013) (*quoting* 7AA Wright & Miller's Fed. Prac. & Proc. Civ. § 1778 (3d ed.) (footnotes omitted)); *see also Thurman*, 836 N.W.2d at 618 ("In general, class certification 'is favored by courts in questionable cases.'") (*quoting Beck v. City of Rapid City*, 650 N.W.2d 520, 525 (S.D. 2002)).

Here, Plaintiffs will demonstrate classwide reliance through circumstantial evidence of materiality, *see* Section IV.B., *supra*, and adverse impact through the Weir testimony, which establishes causal linkage between ConAgra's "100% Natural" claim and a Wesson Oil Price Premium that *all* consumers paid. Furthermore, the Falsity Question remains as a central issue, thus justifying certification of the SDDTPL claim under South Dakota class certification jurisprudence.

### b.  Common Questions Predominate Plaintiffs' South Dakota Unjust Enrichment Claim

The elements of a claim for unjust enrichment in South Dakota are: (1) a benefit was received; (2) the recipient was cognizant of that benefit; and (3) the retention of the benefit without reimbursement would unjustly enrich the recipient. *N. Valley Commc'ns, LLC v. Qwest Commc'ns Corp.*, 659 F. Supp. 2d 1062, 1071 (D.S.D. 2009); *Hofeldt v. Mehling*, 658 N.W.2d 783, 788 (S.D. 2003).

In South Dakota, unjust enrichment does not require privity.   *Anderson v. Dunn*, 4 N.W.2d 810, 812 (S.D. 1942).

Unjust enrichment claims under South Dakota law have been tried as class actions.  In *In re Terazosin Hydrochloride Antitrust Litig.*, a district court certified a class of indirect purchasers of a medication based on the alleged unjust enrichment that was obtained through a conspiracy to delay market entry of a generic version.  *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 695, 697 n.40, 702 (S.D. Fla. 2004).  The court found "the requirements of Rule 23(b)(3)'s predominance test … met" for the unjust enrichment claims of the

proposed classes, including a South Dakota class, finding that resolution of class-wide issues would have a substantial impact on each class member's underlying case and that common questions of law and fact predominated over individual issues. *Id* at 695.

Here, the same circumstantial evidence used to prove Plaintiffs' SDDTPA claim can be used to establish how the "100% Natural" claim ConAgra knowingly placed on Wesson Oils created a Price Premium that inured, at least in part, to ConAgra, that would be unjust for ConAgra to retain, because ConAgra's 100% Natural" claim was not true.

### 11. Common Questions Predominate For Each Texas Claim Plaintiffs Seek to Certify

Plaintiff Anita Willman asserts and seeks certification of two Texas state-law based claims against ConAgra: violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("TDTPA"), Tex. Bus. & Com. Code §§ 17.41 et seq., and a common law equitable claim of unjust enrichment.

#### a. Common Questions Predominate Plaintiffs' Texas Deceptive Trade Practices Claim

To establish their claim under the TDTPA plaintiffs will need to prove that (1) ConAgra's "100% Natural" claim falsely represented that Wesson Oils were of a particular standard, quality, or grade or that Wesson Oil had characteristics, ingredients, uses, or benefits that it did not have; (2) plaintiffs, as consumers, relied to their detriment on ConAgra's false labeling; and (3) the false labeling was a producing cause of plaintiffs' economic damages. *See Robinson v. Match.com, L.L.C.*, 3:10-CV-2651-L, 2012 U.S. Dist. LEXIS 150116, at *27-28 (N.D. Tex. Oct. 17, 2012); Tex. Bus. & Com. Code Ann. §§ 17.46, 17.50.   The elements of a TDTPA claim are intentionally designed to be less onerous than those of a claim for common law fraud.  *See Smith v. Baldwin*, 611 S.W.2d 611, 616 (Tex. 1980) ("A primary purpose of the enactment of the DTPA was to provide consumers a cause of action for deceptive trade practices without the burden of proof and

numerous defenses encountered in a common law fraud or breach of warranty suit.").

Although a plaintiff must establish a violation of the specific prohibitions in the statute, Tex. Bus. & Com. Code Ann. §§ 17.46, 17.50, the Texas Supreme Court  has approved an instruction defining the term "false, misleading, or deceptive acts or practices" to mean "an act or series of acts which has the capacity or tendency to deceive an average or ordinary person, even though that person may have been ignorant, unthinking, or credulous." *Spradling v. Williams*, 566 S.W.2d 561, 562-64 (Tex. 1978).

Texas requires some showing that the defendant's act or omission was a cause in fact of the plaintiff's injury. *See Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 502 (Tex. 2001).  The Texas Supreme Court has held that "[t]his does not mean, of course, that reliance or other elements of their causes of action cannot be proved class-wide with evidence generally applicable to all class members; class-wide proof is possible when class-wide evidence exists." *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2003).  The court there ultimately concluded that "class-wide reliance ... [was] not supported by the record," *id*. at 694, where the misrepresentations differed among plaintiffs and "problems ranged from the failure of bells-and-whistles performance to basic dysfunctions." *Id*. at 683. Similarly, in *McManus v. Fleetwood Enters., Inc*., 320 F.3d 545, 549 (5th Cir. 2003), the court quoted *Henry Schein* for the proposition that class-wide reliance was possible, but ultimately found that reliance could not be presumed where the named plaintiff suffered no injury because of Defendant's misrepresented towage capacity.

Here, by contrast, the "100% Natural" representation was the same for every consumer and class wide proof *does* exist confirming that the claim motivated consumer purchasing decisions and caused a Price Premium in the retail price of Wesson Oils. *See* Section IV.B, *supra*; *see also* Am. Weir Decl.

### b. Common Questions Predominate Plaintiffs' Texas Unjust Enrichment Claim

Under Texas law, unjust enrichment occurs when the defendant wrongfully secures a benefit or passively receives a benefit which would be unconscionable to retain. *Tex. Integrated Conveyor Sys. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App. 2009).

Privity between plaintiff and defendant is not required. *See Miekow v. Faykus*, 297 S.W.2d 260, 264 (Tex. App. 1956) ("For a quasi contract neither promise nor privity, real or imagined, is necessary.")

Courts have permitted class certification of unjust enrichment claims under Texas law. *See Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009) (holding that the "district court did not abuse its discretion by certifying the class as to the state law claims" that included unjust enrichment under Texas law); *In re Great S. Life Ins. Co. Sales Prac. Litig.*, 192 F.R.D. 212, 221 (N.D. Tex. 2000) ("[T]he Court finds that questions of law and fact predominate and certifies this cause of action [unjust enrichment] at this time."). Here, because ConAgra received a benefit, in the form of increased revenues from higher prices resulting from ConAgra's false "100% Natural" claim, Plaintiffs will be able to prove their Texas unjust enrichment claim from common proof.

### D. Plaintiffs' Damages Model Satisfies The *Comcast* Standard.

In the August 1, 2014 Order, the Court cited *Comcast*, 133 S. Ct. 1426 (2013), in rejecting Plaintiffs' assertion that class-wide damages could be measured based upon the price premium attributable to the "100% Natural" claim. Dkt. No. 350 at 61-62. *Comcast* has been interpreted as "reiterat[ing] a fundamental focus of the Rule 23 analysis: The damages must be capable of determination by tracing the damages to the plaintiff's theory of liability." *Lindell v. Synthes USA*, 11-CV-02053-LJO-BAM, 2014 U.S. Dist. LEXIS 27706, at *47-

48 (E.D. Cal. Mar. 4, 2014).    In deciding *Comcast*, the Supreme Court did not reformulate plaintiffs' theory of liability.

If Plaintiffs prove that the "100% natural" claim on Wesson Oils is false or misleading under applicable state law then Plaintiffs' damages model suffices under *Comcast* because the damages flow directly from ConAgra's wrongful act. *Comcast* requires only that Plaintiffs' damages model "not measure damages 'unrelated' to plaintiffs' claim." *Vaccarino v. Midland Nat'l Life Ins. Co.*, Case No. 2:11-CV-05858-CAS(MANx), 2014 U.S. Dist. LEXIS 18601, at *40 (C.D. Cal. Feb. 3, 2014) (emphasis added), citing *Comcast*, 133. S. Ct. at 1435.[31] Moreover, the facts in *Comcast* are clearly distinguishable from the facts of the present case.

### 1.    Plaintiffs' Proposed Damages Model Is Not Analogous To The Model Offered By The Comcast Plaintiffs

The plaintiffs in *Comcast* alleged that the cable company acted unlawfully by "clustering" its cable operations in the Philadelphia area, which had the effect of reducing competition and allowing Comcast to overcharge subscribers in that area.  Plaintiffs claimed that Comcast's unlawful act had four different types of antitrust impact that resulted in four different theories of damages:

> First, Comcast's clustering made it profitable for Comcast to withhold
> local sports programming from its competitors, resulting in decreased
> market penetration by direct broadcast satellite providers. Second,
> Comcast's   activities   reduced   the   level   of   competition   from
> "overbuilders," companies that build competing cable networks in
> areas where an incumbent cable company already operates. Third,

---

[31] "[P]laintiffs' damages model need only calculate damages as accurately as required by California law—*Comcast* did not authorize federal courts to rewrite state substantive laws of damages. Here, California 'law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Vaccarino*, 2014 U.S. Dist. LEXIS 18601 at *35-36 (citations omitted).

> Comcast reduced the level of "benchmark" competition on which cable customers rely to compare prices. Fourth, clustering increased Comcast's bargaining power relative to content providers. Each of these forms of impact, respondents alleged, increased cable subscription rates throughout the Philadelphia DMA.

*Comcast*, 133 S. Ct. at 1430-31.  The district court certified the class but accepted only one of the plaintiffs' four damages theories, the "overbuilder" theory. Plaintiffs' damages model, however, calculated the damages resulting from all four theories of injury instead of just the one theory certified.  The Supreme Court held:

> The Court of Appeals simply concluded that respondents "provided a method to measure and quantify damages on a classwide basis," finding it unnecessary to decide "whether the methodology [was] a just and reasonable inference or speculative." Under that logic, at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity.
>
> There is no question that the model failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised.

*Id*. at 1433.  The circumstances in the present case are clearly distinguishable from those in *Comcast*.

Plaintiffs here have alleged a single theory of how damages resulted from ConAgra's allegedly wrongful act.[32]   The wrongful act alleged is the "100%

---

[32] This case would be analogous to *Comcast* if Plaintiffs alleged that the natural claim on Wesson labels caused multiple types of harm – for example, in addition to causing purchasers to overpay for Wesson oil, the natural claim also discouraged competitor products that were truly natural from entering the marketplace, and that Wesson's inflated price resulting from the natural claim cause other brands also to charge higher prices – and Plaintiffs offered only a damages model calculating the

Natural" assertion by Defendant. *See Parker v. J.M. Smucker Co*., Case No. C 13-0690 SC, 2013 U.S. Dist. LEXIS 120374, 2 (N.D. Cal. Aug. 23, 2013) (where plaintiffs claimed that product was not natural due to presence of GMOs and chemical processing that rendered them unnatural, "Plaintiff's claims are based on a single fact: all of the Oils include the label "All Natural" next to the Oil's name on the packaging.").

Plaintiffs' theory of liability here is that the "100% Natural" label on Wesson Oils is false and misleading. *If Plaintiffs can prevail on this theory of liability, the hedonic regression described by Weir will measure the damages resulting from the precise injury on which ConAgra's liability is premised.* Plaintiffs' damages model is not arbitrary or speculative.

To the extent that the Court's prior application of *Comcast* in this case reflects a concern that it would be unjust to hold ConAgra liable for making the natural claim if only some class members believe that "natural" includes a non-GMO claim, *Comcast* does not address that concern. In any event such a concern is obviated by the prerequisite of the materiality of the misrepresentation. A misrepresentation must be material to be actionable, and materiality requires that misrepresentation be likely to mislead a reasonable consumer. In its August 1, 2014 Order, the Court held that, to show materiality, Plaintiffs need to submit evidence that "link[s] consumers' understanding of '100% Natural' to the specific issue raised in this case – *i.e.*, whether consumers believe the label means the product contains no genetically modified organisms or GMO ingredients." Although Plaintiffs do not believe that *Comcast* requires Plaintiffs to go to that length (because the label is false on its face), Plaintiffs do that and more here. *See* Section IV.B.2 (discussing evidence linking "natural" and "non-GMO" claims).

---

total damages from all theories of harm despite the Court's rejection of one or more of the theories. That is not the case here.

All of the applicable state consumer protection laws require proof that a statement is either literally false or likely to mislead a reasonable consumer. *See See supra* Section IV.C. For example, under California law, the "100% natural" claim is unlawful if it has "a capacity, likelihood or tendency to deceive or confuse the public." *Parker*, 2013 U.S. Dist. LEXIS 120374, at *17-18 *quoting Kasky v. Nike, Inc.,* 27 Cal. 4th 939, 951, 119 Cal. Rptr. 2d 296, 304 (Cal. 2002). "'[L]ikelihood' here is measured in terms of whether a significant portion of the general consuming public might be misled." *Id.* at *17 (*citing Lavie v. Procter & Gamble Co*., 105 Cal. App. 4th 496, 508, 129 Cal. Rptr. 2d 486, 495 (Cal. Ct. App. 2003)). No more is required.

Under California law, for example, if Plaintiffs are unable to prove at trial that the "100% Natural" claim on Wesson labels has the capacity, likelihood or tendency to deceive the public, then Plaintiffs will lose on that ground at trial. As courts, including the Seventh Circuit Court of Appeals, have observed, "Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win." *Suchanek v. Sturm Foods, Inc.*, No. 13-3843, --- F.3d ---, 2014 WL 4116493 at *6 (7th Cir. Aug. 22, 2014), *quoting Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010).

## 2. Post-*Comcast* Case Law Supports The Viability of Plaintiffs' Damages Theory

None of the "natural" labeling decisions since *Comcast,* whether granting or denying class certification, require a damage model that isolates damages attributable to only the portion of the "natural" claim relating to the specific ingredient alleged to render the claim false and misleading. For example, in *Blue Diamond*, plaintiffs alleged that an "all natural" label was false and misleading because the product contained potassium citrate, and that listing the sweetener in the product as "evaporated cane juice" rather than "sugar" was misleading and unlawful as well. *Blue Diamond*, 2014 U.S. Dist. LEXIS 71575 at *7. Plaintiffs'

expert, Dr. Oral Capps, proposed to perform a regression analysis to "determine Blue Diamond's gains from its alleged misrepresentations by examining sales of its accused products before and after Blue Diamond placed the alleged misrepresentation on its product labels, using regression analysis to control for other variables that could otherwise explain changes in Blue Diamond's sales." *Id.* at \*83. The court certified a class under Rule 23(b)(3), finding that Plaintiffs' damages model satisfied *Comcast*. Plaintiffs were *not* required to isolate the damages attributable specifically to Blue Diamond's deception regarding the inclusion of potassium citrate in the product.[33]

Similarly, in *Jones v. ConAgra*, Case No. C 12-01633 CRB, 2014 WL 2702726 (N.D. Cal. June 13, 2014), plaintiffs claimed Hunts products were not natural because they contained citric acid and/or calcium chloride. While the court rejected plaintiffs' proffered damages model for not providing a clearly defined list of variables, it did not require a model that isolated the portion of the "all natural" claim relating solely to those two ingredients, *Jones v. ConAgra*, 2014 WL 2702726 at \*20.

In *Astiana v. Ben & Jerry's Homemade, Inc.*, Case No. C 10-4387 PJH, 2014 U.S. Dist. LEXIS 1640 (N.D. Cal. Jan. 7, 2014), plaintiff claimed that the "all natural" labeling was deceptive and misleading due to the presence of a synthetic alkalizing agent. The court denied class certification, based in part on plaintiffs' failure to satisfy the *Comcast* standard, citing plaintiff's failure to "offer[] any expert testimony demonstrating a gap between the market price of Ben & Jerry's

---

[33] Significantly, Dr. Capps' proposal was far less detailed than the damages model Plaintiffs have submitted here through Weir. *See* Azar Decl. Ex. 48, Declaration of Dr. Oral Capps, Jr. in Support of Motion for Class Certification in *Werdebaugh v. Blue Diamond Growers,* Dkt. No. 77-4. Dr. Capps had no actual sales data; he explained that a regression analysis could be performed, using data he expected would be obtained in discovery or, alternatively from IRI or Nielsen. He further explained that it is possible, using a regression analysis, to control for factors other than the challenged product claims that are associated with sales, "namely price of the product, prices of competing an complementary products, income, advertising, seasonality, and regional differences."

'all natural' ice cream and the price it purportedly should have sold for if it had not been labeled 'all natural'[.]"  *Astiana*, 2014 U.S. Dist. LEXIS at *39.  This is precisely the type of damages analysis that Plaintiffs have proposed to quantify the damages resulting from the "100% Natural" claim on Wesson Oils.

In *Brazil v. Dole Packaged Foods, LLC*, Case No. 12-CV-01831-LHK, 2014 U.S. Dist. LEXIS 74234 (N.D. Cal. May 30, 2014), plaintiff alleged that Defendants' products were mislabeled because they contained ingredients that precluded the use of the term "natural," including ascorbic acid, citric acid, malic acid and added flavors. *Brazil*, 2014 U.S. Dist. LEXIS 74234 at *59-60.  The court did not require the damages model in that case to isolate the damages from each of the allegedly unnatural ingredients.  Instead, the court found that the regression model, which compared prices of the same product with and without the "natural" label, "sufficiently ties damages to Dole's alleged liability under *Comcast*."  *Id.*  In *Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013), the Court certified a "Nothing Artificial" class based on the presence of specific ingredients and an "All Natural" class based on the presence of other specific ingredients.  Once the Court found that the presence of the challenged ingredients was sufficiently material to support the allegations that the claims were false or misleading, the Court did not require Plaintiffs to show they could isolate damages resulting from the inclusion of the particular ingredients that allegedly caused those claims to be false. Plaintiffs' representation "that they can calculate the total restitutionary damages based upon sales, profits and prices data from records generally maintained by Kashi" was held to be a sufficient showing of damages methodology for purposes of class certification.  *Astiana v. Kashi*, 291 F.R.D. at 506.

In sum, courts considering the issue since *Comcast* have held that plaintiffs in "all natural" labeling cases need only propose a damages methodology to isolate the effects of the "all natural" claim and have not required plaintiffs to isolate the

portion of those damages attributable to the presence of the specific ingredient(s) that are alleged to render the "all natural" claim false and misleading.

### 3. ConAgra's Argument on The Merits of Plaintiffs' Damages Does Not Make Plaintiffs' Damages Model Run Afoul of *Comcast*

ConAgra previously disputed that the price (whether retail or wholesale is unclear) of Wesson Oil would not have been any different in the past had ConAgra *not* labeled Wesson Oils as "100% Natural,"  asserting that it extracts no 'natural' label premium and does not make price determinations on the basis of the presence of the presence of the '100% Natural' claim.  However, any such assertion that the "100% Natural" claim had nothing to do with the price consumers paid to purchase Wesson Oil in the past is a dispute about the merits of Plaintiffs' claims.  It is an issue of fact not appropriate for resolution on a motion for class certification.

In any event, it does not challenge Plaintiffs' economic methodology for demonstrating, through evidence, that ConAgra's conduct injured consumers by making them pay more for Wesson Oil than they otherwise would have had to pay.[34]  Reduced to its essence, ConAgra's argument must be that marketing a product as "100% Natural" does not matter.  But ConAgra's own conduct and decades of economic research are to the contrary: false marketing hurts consumers because, among other harmful consequences, false marketing improperly raises demand, causing all consumers to pay more than they otherwise would have had to pay for the product they purchased when all other variables are held constant.  *See* Am. Weir. Decl. ¶¶ 23-33.[35]

---

[34] The methods employed by Plaintiffs' experts are widely accepted by courts. Hedonic regression is "generally accepted, ha[s] been tested, and [is] part of peer-reviewed studies."  *In re Toyota Motor Corp. Hybrid Brake Mktg.*, No. MDL 10-02172-CJC(RNBx), 2012 U.S. Dist. LEXIS 151559, at *18 (C.D. Cal. Sept. 20, 2012).  Conjoint analysis is also a widely accepted economic methodology. *See, e.g. Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 12-CV-00630-LHK, 2014 U.S. Dist. LEXIS 24506, at *60-76 (N.D. Cal. Feb. 25, 2014).

[35]  Even the most vocal consumer class action critics (with whom Plaintiffs disagree on nearly everything else) recognize the harm caused by dishonest misrepresentation of credence attributes resulting in "wrong" price signals and the

ConAgra's assertions are also contradicted by ConAgra's conduct of placing the "100% Natural" claim on every bottle of Wesson Oil in the first place. No regulatory body forced ConAgra to label Wesson Oil "100% Natural." Placing a "100% Natural" claim on a food product is not a universal practice within the industry – some of ConAgra's competitors claim (rightly and wrongly) that their oils are "100% Natural" and some do not. Thus, neither regulation nor industry custom explain why ConAgra chose to label Wesson Oils as "100% Natural."

Instead, the most logical explanation for why ConAgra chose to label Wesson Oils as "100% Natural" is the explanation that accords with evidence. ConAgra labels Wesson Oils as "100% Natural" to motivate consumers to purchase Wesson Oil over its competitors as ConAgra's internal market research states and as is consistent with the findings of third party surveys about consumer desire for "natural" food products. *See* Am. Weir Decl. ¶¶ 23-33.

While ConAgra claims it extracted no positive price premium from consumers as a result of the "100% Natural" claim, the results of the preliminary hedonic regression analysis of historical cooking oil prices, based on the available data, shows that the total aggregated dollar value of Wesson Oil retail sales was measurably higher than it would have been had ConAgra not claimed Wesson Oils were "100% Natural." Indeed, ConAgra achieved its intended purpose to the tune of millions of dollars in extra consumer expenditures on Wesson Oil.

In sum, (1) because Plaintiffs can prove, from common proof, that ConAgra's false marketing caused consumers to pay more than they would have for Wesson Oils without the "100% Natural" claim, (2) because Plaintiffs have

social importance of combating such deception. *See* Henry N. Butler and Jason S. Johnston, *Reforming State Consumer Protection Liability: An Economic Approach*, 2010 Colum. Bus. L. Rev. 1, 62-64 (2010) ("Because of this extreme form of information asymmetry [with credence attributes], it is possible for disreputable providers to charge the consumer for goods or services never provided, or provide the wrong quantity or type of goods or services to the consumer. . . . the practical consequence of consumer deception is to shrink the market in a socially undesirable way.").

shown how ConAgra's marketing is deceptive to consumers as a whole and the named-Plaintiffs in particular, and (3) because each of the causes of action upon which Plaintiffs seek class certification allow proof of causation and damages from this type of indirect evidence, Plaintiffs damages model comports with their liability case theory in accord with the Supreme Court's *Comcast* rule.

### 4. Weir's Amended Declaration Satisfies All of the Concerns Articulated By The Court in the August 1, 2014 Order

In the Court's August 1, 2014 Order, the Court criticized Weir for (1) not having employed the identified methods to identify the price premium he believes will provide the classwide measure of relief; and (2) failing to identify the factors he seeks to isolate in the models he proposes to create. August 1, 2014 Order at 59-60. Weir's Amended declaration remedies both identified deficiencies. In his Amended declaration, Weir describes the well-accepted economic technique of hedonic regression and, using multiple years' worth of retail price and attribute data for Wesson Oils and other competitive cooking oils (some of which contained a "natural" claim and some of which did not), (a) concludes that this data is consistent with the hypothesis that the "100% Natural" claim on Wesson Oils *caused* purchasers to overpay for Wesson Oils; and (b) demonstrates how to calculate the price premium associated with the "100% Natural" claim. Am. Weir Decl. at ¶¶ 1, 92-101. Weir described the hedonic regression analysis in great detail and included in his amended declaration an identification of the factors he isolated in this analysis. Am. Weir Decl. at ¶ 97-109 and Ex. 3 (Weir isolated oil variety, size, promotional price, brands, six different years, and 20 different product attributes, including label claims). The regression isolates and separately measures the effects on prices of each attribute and accounts for differences between the price of the Wesson Oils and the prices of other competitor oils in the marketplace. Am. Weir Decl. at ¶ 77.

By multiplying the discount associated with this percentage Price Premium with the total actual retail dollar amount of all Wesson Oils sold in the states at issue during the Class Period, Plaintiffs could compute the total dollar difference between what the Classes paid for and the value of what they actually received (Wesson Oils that were not, in fact, "100% Natural"). This difference between what members of the Class paid for and what ConAgra actually provided is a valid measure of Plaintiffs' and the other members of the Classes' total classwide restitution damages. Weir's robust analysis demonstrates that price premium can be, and preliminarily[36] has been, determined on a classwide basis.

### E. Plaintiffs Can Measure Damages Caused By Misleading Consumers in a Particular Fashion If Required

Nothing in the law requires Plaintiffs to isolate the damages associated with a particular attribute of a false or misleading product claim (as explained above). If, however, Plaintiffs are required to narrow their damages methodology such that it isolates the percentage price premium attributable solely to the effect of the "100% Natural" claim in misleading consumers to believe that Wesson Oils contained no GMOs (a conclusion Plaintiffs respectfully submit is contrary to law, as explained above), Plaintiffs have a mechanism for doing so. Dr. Elizabeth Howlett describes how the premium resulting from only the "non-GMO" aspect of the "100% Natural" claim can be determined on a classwide basis using conjoint analysis. Am. Howlett Decl. ¶¶ 93-139.

Conjoint analysis is one of the most widely-used quantitative methods in marketing research and is commonly used to measure how consumers perceive and value the different product features (called "attributes") that make up an individual product or service. Am. Howlett Decl. ¶¶ 93-96. Choice-Based Conjoint ("CBC")

---

[36] Weir's calculations are deemed "preliminary" because there is a possibility that, in presenting final damages calculations to the finder-of-fact at the merits stage, more geographically or temporally specific data may be input into the hedonic regression model, potentially leading to more specific and potentially different coefficient measurements of the price premium caused by the "100% Natural" claim on Wesson Oils in particular markets at particular times.

analysis is a type of conjoint analysis in which survey respondents are presented with sets of product descriptions (called product "profiles") and asked to choose one in answer to a specific question (often, but not always, "Which product would you buy?"). Each profile describes a product as including a unique combination of the attributes being studied. An illustration of this technique is at . http://www.sawtoothsoftware.com/component/content/article/189-products/solutions/571-conjoint-choice-analysis. The validity of conjoint analysis is well-recognized by the courts. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.,* 735 F.3d 1352, 1368 (Fed. Cir. 2013) (finding abuse of discretion where district court failed to consider conjoint analysis by plaintiff's expert and noting "there may be a variety of ways to show that a feature drives demand, including with evidence that a feature significantly increases the desirability of a product incorporating that feature"); *Khoday v. Symantec Corp.,* Civil No. 11-180,  2014 U.S. Dist. LEXIS 43315, at *106 (D. Minn. Mar. 31, 2014) (citing *Vaccarino*, 2013 U.S. Dist. LEXIS 88612); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 U.S. Dist. LEXIS 24506, at *68-69 (conjoint survey used to assess demand for patented features and to calculate how many customers would not have bought devices without patented features); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1019-20 (N.D. Cal. 2013) (conjoint survey used to determine consumer willingness to pay for patented component); *Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012) (same).

In her amended declaration, Dr. Howlett describes how, through Choice-based Conjoint ("CBC") analysis, she would make a quantitative determination of how much importance Wesson consumers place on the non-GMO aspect of the "100% Natural" label as compared to the other meanings they ascribe to that label. In short, based on her study of the background literature on consumers' interpretation of "natural" claims on food labels, supplemented by focus groups and online testing, Howlett would select the meanings consumers ascribe to the

"100% Natural" claim found on Wesson Oils.  Using these meanings as the attributes in a CBC study, Howlett would determine the relative importance of the tested meanings of the "100% Natural" claim, including its meaning that Wesson Oils do not contain GMOs or GMO ingredients.

The relative importance of the non-GMO factor, as found by the CBC analysis, can then be used to determine the value of the "non-GMO" portion of the Price Premium for the "100% Natural" label on Wesson Oils.  If, for example, consumers consider the non-GMO meaning of the "100% Natural" label to constitute 30% of the importance of that claim, and the Price Premium is calculated to be 3% of the retail price of Wesson Oils, then the value of the Price Premium attributed to the "non-GMO" aspect of the "100% Natural" claim is .9% of the retail price of Wesson Oils.

### F.    A Class Action Is Superior to Other Methods for Fairly and Efficiently Adjudicating this Controversy, Satisfying Rule 23(b)(3)'s Superiority Requirement

In its August 1, 2014 Order, the Court determined that the following factors favored a finding of superiority of the class action mechanism in this case:  (1) the interests of each class member in controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; and (3) the desirability of concentrating the litigation of the claims in a particular forum.

The only aspect of the superiority analysis that the Court left open is the question of the difficulties likely to be encountered in the management of the class action.  As an initial matter, the Court would be certifying eleven separate classes, thus alleviating any potential problems concerning the appropriate law to be applied within each class.

Moreover, as demonstrated in the state-by-state analysis above, the elements of different states' consumer protection, warranty, and unjust enrichment claims substantially overlap.  Indeed, the state consumer protection acts derive from

common sources and fall into consistent patterns. *See Pecover v. Electronic Arts Inc.*, No. C 08–2820 VRW, 2010 WL 8742757 at *20 n.5 (N.D. Cal. Dec. 21, 2010) (certifying nationwide class under California law and noting lack of "true conflict" between California consumer protection law and laws of other states) (internal citations omitted); *Keilholtz v. Lennox Hearth Products Inc.*, 268 F.R.D. 330, 341 (N.D. Cal. 2010) ("Defendants have not met their burden of showing that the differences between California law and that of the other jurisdictions are material.") (citation omitted); *see also* Jean Braucher, *Deception, Economic Loss and Mass-Market Customers: Consumer Protection Statutes as Persuasive Authority in the Common Law of Fraud*, 48 Ariz. L. Rev 829, 829 (2006).

Similarly, Plaintiffs' warranty claims are all based on the same statutory texts, U.C.C. §§ 2-313 & 2-314, which have been widely adopted by the relevant states. The same is true for Plaintiffs' unjust enrichment claims, for which courts nationwide have recognized that "a universal thread throughout all common law causes of action for unjust enrichment" is "a focus on the gains of the defendants." *Rodriguez v. It's Just Lunch, Int'l*, 2014 U.S. Dist. LEXIS 66409, at *21.

Furthermore, the Ninth Circuit has held that "the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate [or undermine superiority] over the shared claims." *Hanlon*, 150 F.3d at 1022-23; *see also Ebin v. Kangadis*, 297 F.R.D. at 570 ("even if [a c]ourt must apply the law of numerous states, common issues [may] still predominate" with regard to consumer fraud claims); *Rodriguez v. It's Just Lunch, Int'l*, 2014 U.S. Dist. LEXIS 66409, at *38 ("'A claim . . . can implicate common issues and be litigated collectively, despite the existence of state law variations, so long as the elements of the claim . . . are substantially similar and any differences fall into a limited number of predictable patterns which can be readily handled by special interrogatories or special verdict forms.'") (citation omitted).

Given that the variations in state law are not a significant obstacle, the Court will have little difficulty in the management of this case at trial. And, as discussed in detail above, the questions at issue concerning liability and damages are all objective questions determinable from common, class-wide evidence.

Finally, it is likely no other realistic opportunity exists for adjudicating this controversy.[37] Thus, the Rule 23(b)(3) superiority requirement is met here.

### G.    Certification of a Rule 23(b)(2) Class for Injunctive and Declaratory Relief Is Appropriate

In addition to seeking certification of damages Classes under Rule 23(b)(3), Plaintiffs also seek certification under Rule 23(b)(2) for declaratory and injunctive relief. "[I]n an appropriate case, a Rule 23(b)(2) class and a Rule 23(b)(3) class may be certified where there is a real basis for both damages and an equitable remedy." *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 538 n.37 (N.D. Cal. 2012) (certifying claims under both (b)(2) and (b)(3)) (quoting *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 895 (7th Cir. 2011) (citations omitted)); *Brazil*, 2014 U.S. Dist. LEXIS 74234, at *36 (certifying consumer class for damages and injunctive relief on behalf of purchasers of "All Natural" products).

An injunctive relief class can be certified under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. Proc. 23(b)(2). There can be little dispute that ConAgra has acted or refused to act on grounds that apply generally to the class – specifically, ConAgra has continued to label GMO-

---

[37] *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("the more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.").

containing Wesson Oils as "100% natural" despite the fact that they are made with genetically-modified ingredients.

Plaintiffs seek declaratory and injunctive relief that enjoins ConAgra from continuing to market its Wesson Oils as being "100% Natural" as long as those oils contain GMO ingredients.  Complaint, Request for Relief, ¶ D.  ConAgra has two ways to comply with an injunction against deceptive labeling of Wesson Oils as "100% Natural."  ConAgra could cease using GMO ingredients to make Wesson Oils, in which case Plaintiffs will no longer be concerned about these ingredients in ConAgra's products,[38] or, ConAgra could continue using GMOs to make Wesson Oils but remove the false "100% Natural" claim from the label and any other marketing.  This type of relief generally applies to all Class Members, because ConAgra does not customize the labels on Wesson Oils for each individual consumer, and an injunction barring ConAgra from continuing to label Wesson Oils as being "100% Natural" is an appropriate and logical form of relief for the Classes as a whole.  As such, the Classes for declaratory and injunctive relief meet the Rule 23(b)(2) requirements.

### 1.    Some Plaintiffs Would Purchase Wesson Oil In the Future If It Were Truthfully Labeled

In the August 1, 2014 Order, the Court found that Plaintiffs were not entitled to injunctive relief because it found no evidence that any plaintiff had indicated an intention to purchase Wesson Oils in the future and thus no plaintiff had established Article III standing.  Plaintiffs will discuss in the next section why the Court should reconsider its standing analysis as a matter of law, but much of the Court's analysis in the August 1, 2014 Order was guided by the perceived absence of evidence in the record regarding future intent to purchase.  Plaintiffs **Briseno,**

---

[38] ConAgra has, in fact, changed the ingredient formulations in other products as part of a settlement agreement before. *See In re Alexia Foods, Inc. Litigation*, No. 4:11-cv-06119-PJH (N.D. Cal. 2013) (settlement agreement included a provision that ConAgra would cease using disodium dihydrogen pyrophosphate in Alexia potato products in favor of citric acid or another "naturally-sourced compound").

***Crouch, Hopper-Kercheval, McFadden, Palmer, Towey, Johnston and Willman*** *submit here evidence of their future intent to purchase Wesson Oils again* if it is truthfully labeled. *See* Declarations of Named Plaintiffs in Support of Plaintiffs' Amended Motion for Class Certification.  Accordingly, Plaintiffs have standing under the Court's Article III analysis to pursue injunctive relief on behalf of the ***California, Colorado, Nebraska, New York, Florida, Ohio, South Dakota, and Texas classes*** because the named Plaintiffs from those states have presented evidence of their future intent to purchase should ConAgra cease its challenged conduct.  *See*, *e.g.*, *Blue Diamond*, 2014 WL 2191901 at *9  (explaining that "[s]everal courts in this district have held in similar cases that 'to establish standing, [a plaintiff] must allege that he intends to purchase the products at issue in the future' [and that] 'it is not impossible that a consumer would be interested in purchasing the products at issue if they were labeled correctly.' (Citations omitted.)").

  **2. Article III Standing Does Not Depend on Future Intent to Purchase and Plaintiffs Continue To Be Harmed Regardless of Their Knowledge of ConAgra's Deception**

  Plaintiffs respectfully disagree with the Court's conclusion that Article III standing in this consumer case—indeed, in any consumer case—turns on whether or not a plaintiff intends to become a customer of the offending company.  While future intent to purchase can be closely intertwined with future harm, the two are not identical as a matter of law.

  All plaintiffs in this litigation brought suit because they were harmed by a false, deceptive, unlawful and misleading label on ConAgra's product. Many of them take great effort to avoid buying GMO-foods where possible, and none of them continue to buy Wesson Oils. It is a logical result of deceptive labeling that many consumers who were misled may not want to purchase the same products again in the future, either because of the indignity of the deception or because they

intended to buy something that the product simply is not.[39]  But that does not mean that no threat of future harm can exist to them.

Judge Breyer, in deciding *Jones v. ConAgra Foods, Inc.*, noted the inherent contradiction created by the theory that future purchase intent is required to establish Article III standing: "This is somewhat problematic, policy-wise: if a plaintiff bought a product that claimed to be 'nutritious' but actually contained arsenic, would he have to claim that he intends to buy it again?" *Jones v. ConAgra Foods, Inc.*, Case No. C 12-01633 CRB, 2014 U.S. Dist. LEXIS 81292 at 47 (N.D. Cal. June 13, 2014); *see also Henderson v. Gruma Corp.*, 2011 U.S. Dist. LEXIS 41077, at *19-20.[40]  Many consumers avoid GMOs because of concerns about possible health effects or environmental effects. Where a plaintiff seeks to prevent other similarly-situated consumers from suffering the same deception that led him to inadvertently consume an unnatural GMO product labeled "100% Natural" that he perceives to be less healthy, he should not be prevented from obtaining such relief unless and until he agrees to put himself at risk again in the future.

---

[39] Several courts have considered, and rejected, the proposition that a consumer's mere knowledge of a deception defeats standing for injunctive relief, and have "correctly recogniz[ed] the limitation this places on federal courts to enforce . . . consumer laws." *Rasmussen v. Apple Inc.*, Case No. C-13-4923 EMC_, 2014 U.S. Dist. LEXIS 35352, *39 (N.D. Cal. Mar. 14, 2014).  Indeed, "were the Court to accept the suggestion that plaintiffs' mere recognition of the alleged deception operates to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases, a wholly unrealistic result." *Ries v. AriZona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012); *see also Henderson v. Gruma Corp.*, Case No. CV 10-04173 AHM (AJWx), 2011 U.S. Dist. LEXIS 41077, at *19-20 (C.D. Cal. Apr. 11, 2011) ("If the Court were to construe Article III standing for FAL and UCL claims as narrowly as the Defendant advocates, federal courts would be precluded from enjoining false advertising under California consumer protection laws because a plaintiff who had been injured would always be deemed to avoid the cause of the injury thereafter ('once bitten, twice shy') and would never have Article III standing."); *Lanovaz v. Twinings N. Am., Inc.*, Case No. C-12-02646-RMW, 2014 U.S. Dist. LEXIS 1639, at *32 (N.D. Cal. Jan. 6, 2014) ("The court finds the reasoning of *Henderson v. Gruma* and the cases following it more convincing and accordingly finds that [plaintiff] has standing to seek injunctive relief.").

[40] *See also Lanovaz*, 2014 U.S. Dist. LEXIS 1639, at *32 ("The court finds the reasoning of *Henderson v. Gruma* and the cases following it more convincing and accordingly finds that [plaintiff] has standing to seek injunctive relief.").

Named plaintiffs who avoid improperly-labeled Wesson Oils are and will continue to be harmed, despite their knowledge of the deception (and regardless of their future purchase intent), *because of their desire to avoid* improperly-labeled "100% Natural" genetically modified Wesson Oils. They cannot rely on the representations on the Wesson Oil label with any certainty, and therefore suffer deprivation of choice in the supermarket. *See, e.g., Ries*, 287 F.R.D. at 533 ("The fact that they discovered the supposed deception some years ago does not render the advertising any more truthful. Should plaintiffs encounter the denomination 'All Natural' on an AriZona beverage at the grocery store today, they could not rely on that representation with any confidence. This is the harm California's consumer protection statutes are designed to redress."). Moreover, if ConAgra commands a premium based on a deceptive claim, it follows that their competitors may (and very well do, given the large volume of Wesson Oils sold per year) adjust the price and quality of their products to compete with Wesson Oils for market share, to the consumers' detriment. All plaintiffs in this litigation, whether they intend to buy Wesson Oil again in the future or not if the product is truthfully labeled, share in this ongoing and future harm.

Most importantly, the classes of consumers that named plaintiffs seek to represent are in threat of future injury of ConAgra's deceptive labeling. All shoppers continue to pay a premium for the product, and many of them may not even know that what they are buying is in fact an oil which is not "100% Natural" because it is made from GMO ingredients.[41] Injunctive relief for all putative classes, and not just the ones where a Plaintiff has submitted evidence of future

---

[41] The district court's analysis in *Algarin v. Maybelline, LLC*, for example, that "Plaintiffs… are now well aware of the realities of the products. . . [because] consumers can readily discern whether or not the claimed duration is true," *Algarin v. Maybelline, LLC*, Civil No. 12cv3000 AJB (DHB), 2014 U.S. Dist. LEXIS 65173, at *31 (S.D. Cal. May 12, 2014), is not applicable here – purchasers of Wesson Oil cannot easily discern whether the product was made from GMO ingredients and are led to believe that they were not by the presence of the "100% Natural" label.

intent to purchase, is appropriate here because there is no other way to prevent those consumers from being misled in the future other than to require truthful labeling from the ConAgra. *See Ackerman*, 2013 WL 7044866 at *15 n. 23 (citing numerous California district court cases and noting that "courts have consistently held that plaintiffs have standing to seek injunctive relief based on the allegation that a product's labeling or marketing is misleading to a reasonable consumer").

### H. Alternatively, The Court Should Employ Rule 23(c)(4) to Resolve the Falsity Question

In the event this Court holds that any particular class claim fails to satisfy the requirements of Rule 23(b), Plaintiffs alternatively move again for certification of relevant issue classes under Rule 23(c)(4). Where such certification is sought, there is no need to engage in the predominance inquiry as to the action as a whole. Instead, the court must simply be satisfied that common issues predominate as to each issue that plaintiffs seek to certify. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4) and proceed with class treatment of these particular issues.") (citation omitted); *In re Nassau County Strip Search Cases*, 461 F.3d 219, 226-27 (2d Cir. 2006) (holding that predominance only needs to be satisfied as to the individual issues the court certifies for class treatment); *McDaniel v. Qwest Communications Corp.*, Case No. 05 C 1008, 2006 WL 1476110, at *16 (N.D. Ill. May 23, 2006).

The Court previously declined to certify a Rule 23(c)(4) class on the basis that "[t]rying this issue would not necessarily determine even the question of ConAgra's liability." Dkt. No. 350 at 66. The Court's concerns should be satisfied given Plaintiffs' demonstration that resolution of the Falsity Question using an objective reasonable consumer standard is an essential element of every

claim Plaintiffs seek to certify, *see* Section IV.C, and ConAgra's refusal to concede the falsity of its "100% Natural" label on Wesson Oils.  Determining "whether ConAgra has misled consumers by labeling Wesson Oils as '100% natural' when, in fact, they are made from GMOs," would significantly ease the burden on consumers seeking to establish ConAgra's ultimate liability, making later individual damages actions against ConAgra exponentially more efficient.  This neat and tidy common issue is the very type to be served by Rule 23(c)(4).

## V.   CONCLUSION

ConAgra chose to label Wesson Oils as "100% Natural."  ConAgra's label is false, deceptive, and misleading to reasonable consumers because Wesson Oils are not 100% Natural; instead, they are made from GMO ingredients.  ConAgra's labeling improperly increases consumer demand for Wesson Oils and thereby improperly increased the market price of Wesson Oils.  ConAgra should stop misleading consumers with its false label and pay back the money it was able to charge consumers as a result of its false label.  A class action is the most efficient, fair, and effective way to resolve this dispute between the millions of consumers – who overpaid for Wesson Oils because of that false label – and ConAgra.  For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' amended motion for class certification in the form of the proposed Order submitted contemporaneously herewith.

DATED:   September 8, 2014          **MILBERG LLP**
                                    DAVID E. AZAR


                                         */s/ David E. Azar*
                                    DAVID E. AZAR

One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90071
Telephone:   (213) 617-1200
Facsimile:    (213) 617-1975
dazar@milberg.com

**MILBERG LLP**
ARIANA J. TADLER (pro hac vice)
HENRY J. KELSTON (pro hac vice)
One Pennsylvania Plaza
New York, New York  11030
Telephone: (212) 594-5300
Facsimile:   (212) 868-1229
atadler@milberg.com
hkelston@milberg.com

**GRANT & EISENHOFER P.A.**
ADAM J. LEVITT (pro hac vice)
EDMUND S. ARONOWITZ (pro hac vice)
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
Telephone:   (312) 214-0000
Facsimile:    (312) 214-0001
alevitt@gelaw.com
earonowitz@gelaw.com

**GRANT & EISENHOFER P.A.**
MARY S. THOMAS (SBN 175110)
123 Justison Street, 7th Floor
Wilmington, Delaware 19317
Telephone:   (302) 622-7000
Facsimile:    (302) 622-7100
mthomas@gelaw.com

*Plaintiffs' Interim Class Counsel*