UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

IN RE CONAGRA FOODS, INC.    )
)
)
)
)
)
)    Case No. CV 11-05379-MMM (AGRx)
)
)    MDL No. 2291
)
)
)

**REPLY DECLARATION OF KEITH R. UGONE, PH.D.**

**October 6, 2014**

**REDACTED VERSION**

# REPLY DECLARATION OF KEITH R. UGONE, PH.D.

## October 6, 2014

I.    OVERVIEW OF ASSIGNMENT ................................................................ 1

II.   SUMMARY OF OPINIONS .................................................................... 5

      A.  Evaluation Of Mr. Weir's Proposed Hedonic Regression ........................... 6

      B.  Evaluation Of Dr. Howlett's Proposed Conjoint Analysis To Supplement Mr.
          Weir's Hedonic Regression ..................................................... 9

III.  OVERVIEW OF MR. WEIR'S PROPOSED HEDONIC REGRESSION
      MODEL ........................................................................... 11

      A.  Mr. Weir's Available Data ..................................................... 12

      B.  "Expansion" Of Data ........................................................... 14

      C.  Hedonic Regression Model and Results .......................................... 16

IV.   MR. WEIR'S PROPOSED REGRESSION MODEL DOES NOT PROVIDE A
      STANDALONE ESTIMATE OF A CLAIMED PRICE PREMIUM
      ASSOCIATED WITH CONAGRA'S ALLEGED MISCONDUCT ........................ 18

      A.  Mr. Weir's Proposed Regression Model Cannot Calculate A Price Premium
          Specifically Associated With Plaintiffs' Theory Of ConAgra's Alleged
          Misconduct .................................................................... 19

      B.  Mr. Weir Does Not Intend To Calculate A Price Premium Specifically Associated
          With Plaintiffs' Theory Of ConAgra's Alleged Misconduct ....................... 22

      C.  Summary ....................................................................... 24

V.    ADDITIONAL REASONS MR. WEIR'S PROPOSED REGRESSION MODEL
      IS INCAPABLE OF MEASURING A CLASS-WIDE PRICE PREMIUM
      ASSOCIATED WITH THE CHALLENGED CLAIM ................................ 24

      A.  Mr. Weir Used A Data Set That Contained Inaccuracies And Also Was
          Inappropriate To Use In The Current Context ................................... 26

          1.  The Product Attribute Data Are Incomplete And Do Not Accurately Reflect
              The Attributes Of The Products Used By Mr. Weir In His Regression
              Analysis .................................................................. 26

          2.  The Data Set Does Not Account For Historical Label Claims Or Changes ........ 30

          3.  The Data Set Chosen By Mr. Weir Does Not Control For Various
              Considerations That Affect Prices ........................................ 31

      B.  Mr. Weir's Proposed Regression Model Does Not Reflect The Specific Classes
          Plaintiffs Seek To Have Certified ............................................. 32

      C.  Mr. Weir Does Not Evaluate A Price Premium Specific To The Challenged
          Products ...................................................................... 33

      D.  Price Premiums (If They Exist) Across Numerous Dimensions Would Create
          Hurdles To Evaluating A Claimed Price Premium On A Class-Wide Basis ........... 36

          1.  Price Premiums (If They Exist) And Type Of Cooking Oil .................... 36

          2.  Price Premiums (If They Exist) And Time .................................. 38

3.  Price Premiums (If They Exist) And Type Of Cooking Oil Over Time............... 39

4.  Price Premiums (If They Exist) And Promotional Pricing ................................... 41

5.  Price Premiums (If They Exist) And Additional Dimensions Not Included In The Data Set Used By Mr. Weir................................................................... 43

VI.  **ADDITIONAL FLAWS IN MR. WEIR'S REGRESSION ANALYSIS RENDER IT INCAPABLE OF DEMONSTRATING THE LIKELY EXISTENCE OF A PRICE PREMIUM** ....................................................................................... 47

A.  Mr. Weir Performed An Inappropriate Expansion Of His Data – Leading Him To Wrongly Conclude A Statistically Significant Price Premium Exists ........................ 47

1.  Mr. Weir's Expansion Alters The Relative Proportions Of Unit Sales For The Products In His Regression................................................................. 48

2.  Mr. Weir's Expansion Dramatically Overstates The Number Of Observations In His Data Set ................................................................. 50

3.  Correcting For Mr. Weir's Incorrect Expansion Yields A Statistically Insignificant Result ........................................................................... 51

4.  Non-Econometric Observations And Conclusions ............................................. 53

B.  Mr. Weir's Proposed Regression Model Yields Results Inconsistent With Mr. Weir's Economic Theory........................................................................ 55

C.  Mr. Weir's Proposed Regression Model Relied Upon Unexplained Judgment Calls 57

1.  Mr. Weir Included And Excluded Products From His Regression Without Explanation ........................................................................................ 57

2.  Mr. Weir Included And Excluded Product Attributes Without Explanation........ 59

VII.  **MR. WEIR FAILED TO ADDRESS IMPLICATIONS OF HIS PRELIMINARY REGRESSION RESULTS THAT UNDERMINE PLAINTIFFS' POSITION** .................................................................................... 62

A.  Mr. Weir's Preliminary Regression Results Are Inconsistent With Plaintiffs' Theory Of ConAgra's Alleged Misconduct............................................... 62

B.  Under Mr. Weir's Preliminary Regression Results, Notice And Claims Administration Costs Likely Would Overwhelm The Benefit To The Classes.......... 64

VIII.  **OVERVIEW OF DR. HOWLETT'S PROPOSED SUPPLEMENT TO MR. WEIR'S HEDONIC REGRESSION METHODOLOGY** ........................................... 67

IX.  **METHODOLOGY PROPOSED BY DR. HOWLETT TO SUPPLEMENT MR. WEIR'S REGRESSION WOULD NOT YIELD A RELIABLE MEASURE OF CLAIMED DAMAGES** ........................................................................... 69

A.  Dr. Howlett's Proposed Conjoint Analysis Would At Best Measure Consumer Perception Of Relative Importance – With No Nexus To An Actual Price Premium Paid ........................................................................................................... 70

B.  Proposed Conjoint Analysis Cannot Provide A Value Tied To The Class Periods Over Time ........................................................................................... 74

C.  Proposed Conjoint Analysis Draws Attention To Certain Features That May Not Be Considered By Customers When Making Actual Purchase Decisions ................ 75

X.  **OVERVIEW AND EVALUATION OF DR. HOWLETT'S PROPOSED TWO-STEP CONJOINT ANALYSIS** ....................................................................... 76

A.  Overview Of Dr. Howlett's Proposed Two-Step Conjoint Analysis ......................... 77

B.  Dr. Howlett's Proposed Two-Step Conjoint Analysis Would Measure A Willingness To Pay And Not A Price Premium ......................................................... 78

C.  Dr. Howlett's Proposed Two-Step Conjoint Analysis Method Suffers From The Same Drawbacks As Her Proposed Two-Step Hybrid Method ................................. 79

## REPLY DECLARATION OF KEITH R. UGONE, PH.D.

### October 6, 2014

I, Keith R. Ugone, hereby declare:

1.    I am an economist and have been retained by counsel for ConAgra Foods,
Inc. ("ConAgra" or the "Defendant") to offer my opinions regarding various
economic and associated class certification issues relevant to the matter of *In
Re ConAgra Foods, Inc*.  I make this declaration in support of ConAgra's
Reply in Opposition to Plaintiffs' Amended Motion for Class Certification.
Except as otherwise indicated, I have personal knowledge of the following
facts and, if called to testify, could and would competently testify to the facts
set forth below.

## I.    OVERVIEW OF ASSIGNMENT

2.    I submitted a declaration in this matter on June 2, 2014 (the "Ugone
Declaration").  In the Ugone Declaration, I addressed whether the proposed
approaches presented by Mr. Colin Weir ("Mr. Weir") in the Weir
Declaration dated May 5, 2014 (i.e., a hedonic regression approach and a
conjoint analysis approach) could be used to evaluate and quantify claimed
damages in this matter on a Class-wide basis using common proof.  Given
the facts and circumstances of this case, my opinion was that Mr. Weir's
proposed approaches could not be used to reliably evaluate claimed Class-

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

wide damages using common proof.[1]   I provided deposition testimony in

this matter on June 18, 2014.

3.      On August 1, 2014, the Court denied without prejudice Plaintiffs' motion for

class certification.   The Court allowed Plaintiffs 30 days to address the

deficiencies of their motion for class certification and file an amended

motion for class certification.[2]

4.      On September 8, 2014, Plaintiffs filed an Amended Motion for Class

Certification and Appointment of Class Counsel ("Amended Motion for

Class Certification").    Along with the Amended Motion for Class

Certification, Plaintiffs filed (a) an amended declaration issued by Mr. Weir

on September 5, 2014 (the "Weir Amended Declaration") and (b) an

amended declaration issued by Dr. Howlett (a marketing expert retained by

the Plaintiffs) on September 8, 2014 (the "Howlett Amended Declaration").

    a.   <u>Weir Amended Declaration</u>.   In the Weir Amended Declaration, Mr.
      Weir presented a preliminary nationwide-based hedonic regression model
      in an attempt to demonstrate that (i) general "natural" claims carry a
      premium in the marketplace for cooking oils and (ii) "the hedonic
      regression technique is capable of making such a determination in this

_____

[1]  I incorporate the Ugone Declaration by reference.

[2]  Order Denying Plaintiffs' Motion for Class Certification; Granting In Part And
Denying In Part Defendants' Motion To Strike dated August 1, 2014, p. 66 ("Order
dated August 1, 2014").

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

case."[3]   Plaintiffs assert that the regression proposed by Mr. Weir "satisfies all of the concerns articulated by the Court in the August 1, 2014 Order" because "[n]othing in the law requires Plaintiffs to isolate the damages associated with a *particular attribute* of a false or misleading product claim."[4]

b.  <u>Howlett Amended Declaration</u>.  As an alternative to relying upon the hedonic regression proposed by Mr. Weir on a standalone basis, Plaintiffs presented the Howlett Amended Declaration which contains a proposed conjoint analysis to augment Mr. Weir's hedonic regression model "if required."[5]  Dr. Howlett proposed to determine the relative importance consumers place on the "non-GMO" attribute (i.e., component) of a "100% Natural" claim.   By multiplying (i) the relative importance of the "non-GMO" attribute and (ii) Mr. Weir's claimed price premium attributable to a "100% Natural" claim, Dr. Howlett asserts she can determine "the value of the Price Premium attributable solely to the 'non-GMO' aspect of the '100% Natural' claim."[6]  Dr. Howlett's proposed analysis assumes that "non-GMO" is a component of a "100% Natural" label claim.

_____

[3]  Weir Amended Declaration, p. 27.   Exhibit 5 to the Weir Amended Declaration is a rebuttal declaration dated June 30, 2014 (the "Weir Rebuttal Declaration"). This rebuttal declaration was not considered by the Court in the Order dated August 1, 2014.  (Order dated August 1, 2014, pp. 59 – 60.)  The preliminary regression included in the Weir Amended Declaration is the same regression that was included in the Weir Rebuttal Declaration.   (Weir Second Deposition, p. 7.)

[4]  Plaintiffs' Memorandum of Points and Authorities in Support of Amended Motion for Class Certification ("Plaintiffs' Memorandum"), pp. 63 – 64. (Emphasis added.)

[5]  Plaintiffs' Memorandum, p. 64.

[6]  Howlett Amended Declaration, p. 28.   Throughout my declaration I refer to this alternative proposed approach as a "two-step hybrid method" (i.e., combining Mr. Weir's proposed regression approach with Dr. Howlett's proposed conjoint analysis.   In addition to the two-step hybrid method, Dr. Howlett presented Plaintiffs' third method for calculating claimed damages – one does not rely upon Mr. Weir's hedonic regression.   This alternate (third) method also would be a two-step procedure.   However, both steps would involve a conjoint analysis.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

5.      I have been requested by counsel for ConAgra to evaluate from an economic

perspective Mr. Weir's proposed hedonic regression approach for evaluating

Class-wide damages as presented in the Weir Amended Declaration.[7]   I also

have been requested by counsel to evaluate from an economic perspective

whether Dr. Howlett's proposal (a) to determine the relative importance

consumers place on the "non-GMO" attribute (i.e., component) of a "100%

Natural" claim and (b) to apply such a figure to the results of Mr. Weir's

proposed hedonic regression model will cure the deficiencies that are present

in the hedonic regression approach presented by the Plaintiffs in this matter.

(Later in my report I also evaluate Plaintiffs' third proposed methodology –

the two-step process that only involves conjoint analysis.)

6.      My opinion and the bases for my opinions are contained in the remainder of

this declaration.[8]

---

[7]  Mr. Weir was deposed in this matter on May 23, 2014 ("First Weir Deposition")
and on September 16, 2014 ("Second Weir Deposition").

[8]  Attached as **Exhibit 1** is a true and correct copy of my current resume.
Attached as **Exhibit 2** is my trial and deposition testimony experience.   Attached
as **Exhibit 3** is a listing of the facts, data, and information available to me in
forming my opinions after the issuance of the Ugone Declaration.   Attached as
**Exhibit 4** is a listing of the deponents whose deposition transcripts are cited in the
text of my declaration.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

## II.    **SUMMARY OF OPINIONS**[9]

7.    Based upon (a) my review of the Weir Amended Declaration and the Howlett Amended Declaration, (b) my economics and damages quantification training and experience, (c) documentary evidence, (d) deposition testimony (including the Second Weir Deposition and the Howlett Deposition, among others), and (e) the detailed analyses presented in the Ugone Declaration,   I have reached the following conclusions relating to Plaintiffs' proffered Class-wide (or common proof) approach to evaluating claimed Class-wide damages using common proof.

a. <u>Mr. Weir's Proposal Is Not Reliable</u>.   On a stand-alone basis, the hedonic regression approach proposed by Mr. Weir will not reliably determine the economic injury (if any) suffered by putative Class members associated with the GMO-related label dispute in this matter (i.e., Plaintiffs' theory of liability).   Mr. Weir attempts to calculate a "Natural"-related price premium, not a price premium associated with an alleged GMO-related mislabeling.   In addition, Mr. Weir's proposed hedonic regression approach will not reliably determine a price premium associated with any alleged "Natural" claims.

b. <u>Dr. Howlett's Proposal Is Not Reliable</u>.   The conjoint analysis proposed by Dr. Howlett to cure the deficiencies in Mr. Weir's proposed hedonic regression approach (and thereby to calculate a Class-wide monetary recovery) does not provide a reliable or relevant technique for doing so. For example, Dr. Howlett did not address or prove in her report that the "relative importance" of one product attribute to another correlates mathematically with the ratio of price components associated with the

_____

[9] This Summary of Opinions is intended to be an overview.   A full description of my opinions is contained throughout my declaration (i.e., narrative and associated exhibits).

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

same attributes.   This is because there is no quantitative dictum that says "importance" and "price" are correlated in a discernible, systematic, persistent, or mathematical one-to-one consistent way.

8.    As discussed at length in the Ugone Declaration, individual inquiry is required to evaluate the claimed injury and/or damages suffered by putative Class members should the Challenged Claim be found to be misleading.   I still hold that opinion after reviewing the Weir Amended Declaration and the Howlett Amended Declaration.

### A. Evaluation Of Mr. Weir's Proposed Hedonic Regression

9.    Mr. Weir submitted an amended declaration in support of class certification in this matter.   However, Mr. Weir has not demonstrated that the claimed injury to putative Class members directly flowing from Plaintiffs' theory of liability (if any) can be reliably determined using common proof.

a.    Mr. Weir's Proposed Regression Approach Does Not (And Cannot) Evaluate The Relevant Measure Of Claimed Damages.   Mr. Weir's proposed regression model is not capable of providing a standalone estimate of a claimed price premium associated with ConAgra's alleged misconduct in this matter (i.e., that the "100% Natural" claim leads consumers to believe the Challenged Products are "GMO-Free").

i.    Mr. Weir's proposed regression model does not (and cannot) isolate the effect on retail prices of a "GMO-Free" interpretation of the Challenged Claim (i.e., 100% Natural) – even though a "GMO-Free" interpretation of "natural" is Plaintiffs' theory of liability.

ii.    Mr. Weir's stated position is that he does not intend to isolate the effect on retail prices of a "GMO-Free" interpretation of the Challenged Claim.   Instead, Mr. Weir intends to measure a claimed price premium associated with a mislabeled "Natural" claim.   Such a

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

measurement does not comport with Plaintiffs' theory of liability in this matter.

b. Mr. Weir's Proposed Regression Approach Does Not (And Cannot) Evaluate A Class-Wide Premium Associated With The "100% Natural" Claim. Mr. Weir developed his proposed regression model to measure a claimed price premium associated with the Challenged Products' "100% Natural" label claim (and not the "no GMOs" claimed interpretation). However, Mr. Weir's proposed regression model fails to even provide a relevant and reliable measure of a claimed price premium associated with a "Natural" claim.

i. Mr. Weir has presented no evidence to support any claim that an average "Natural" premium across all brands derived from a nationwide analysis would have any nexus to a claimed price premium (if any) associated with the Challenged Products in a particular geographic area (e.g., each of the putative 11 class states).

- Mr. Weir's regression analysis was performed on a nationwide basis rather than for the putative 11 class states in this case. No analysis was presented that the nationwide analysis conducted by Mr. Weir would yield a reliable price premium estimate for any of the putative 11 class states individually. However, it has been shown in the Ugone Declaration that significant price variation exists across geographic areas (which could influence a price premium analysis).

- Mr. Weir's proposed regression model does not (and cannot) evaluate a claimed price premium (if one exists) directly associated with the Challenged Products. This is because all Wesson Oil products have the "100% Natural" claim throughout the putative Class period(s).

ii. Variations in prices across numerous dimensions create hurdles to evaluating and determining damages (or claimed price premiums, if any) on a class-wide basis using common proof. Mr. Weir's regression model, when adjusted to include the effects of additional determinants of prices, yields estimated price differences (i.e., claimed price premiums in Mr.Weir's framework) that vary by (1) type of

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

cooking oil, (2) year of purchase, and (3) prommotion.[10]   These observations invalidate Mr. Weir's claim that he can calculate a single price premium associated with a "Natural" label that is a reliable measure of claimed damages.

iii. Mr. Weir used data that are inappropriate for answering the question he is attempting to answer.  Mr. Weir's attribute-related data (1) are incomplete and do not accurately reflect the attributes of products chosen by Mr. Weir for analysis (i.e., Mr. Weir's data set contains inaccurate attribute information for certain products), (2) do not control for historical label claims and label changes, and (3) do not control for other variables that have been shown to affect prices (e.g., geographic locations, sales channels, and retailers).

c. <u>Additional Flaws Render Mr. Weir's Preliminary Regression Analysis Unreliable</u>.  Mr. Weir's preliminary regression analysis suffers from additional flaws that render it incapable of reliably evaluating the existence of a price premium.

i. Mr. Weir performed an inappropriate "expansion" of his data in an attempt to proxy the number of transactions that took place.  This expansion (1) altered the relative proportion of sales for the products in his regression (relative to each other) and (2) yields an overstatement of the number of data points available to Mr. Weir.[11]  Correcting Mr. Weir's inappropriate "expansion" methodology results in his claimed price premium being <u>statistically insignificant</u> – demonstrating that his conclusion of a positive price premium is the result of errors in executing his analysis.

ii. Mr. Weir's regression model yielded negative coefficients associated with certain label claims (e.g., omega fatty acid claims and heart health claims) – meaning the presence of these attributes caused the

_____

[10]  The claimed price premium observations introduced in the text above are calculated within Mr. Weir's proposed analytical framework.  However, as discussed throughout my report, Mr. Weir's proposed analytical framework does not provide a reliable approach to evaluating claimed price premiums.

[11]  Mr. Weir constructed a data set for his regression that consists of 1.26 million observations.   Prior to the claimed "expansion," Mr. Weir had 3,480 observations.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

price of the product to be less (holding all other considerations constant). Mr. Weir's declaration did not address these results, which contradict his deposition testimony that a label claim should have a positive impact on price.[12]

iii. In developing his data set and regression model, Mr. Weir made certain "judgment calls" that are not explained in his report, including (1) which products to include in his regression and (b) which product attributes to include in his regression. For example, Mr. Weir included as explanatory variables in his regression model such label claims as "absence of specific fat", "fat free", and "low fat", but did not include a label claim named "reduced fat." (Additional examples are provided later in my declaration.)

d. <u>Mr. Weir's Regression Results Undermine Plaintiffs' Position</u>. Mr. Weir's regression results yield implications that undermine Plaintiffs' position in this case. Mr. Weir's preliminary regression results (as interpreted and reported by Mr. Weir) suggest that "GMO-Free" is not a significant or material interpretation of "100% Natural" for most consumers – given that Mr. Weir's regression results relating to "Natural" yield a small claimed price premium and "GMO-Free" at most would be one component of the claimed "Natural" price premium.[13]

B. <u>**Evaluation Of Dr. Howlett's Proposed Conjoint Analysis To Supplement Mr. Weir's Hedonic Regression**</u>

10. As an alternative to Mr. Weir's standalone hedonic regression, Dr. Howlett

presented a two-step hybrid method that she claimed would determine the

_____

[12] Mr. Weir takes the position that the presence of an attribute on a label should only cause upward pressure on the product's price. (Second Weir Deposition, p. 104.)

[13] As explained later in my declaration, Mr. Weir provides contradictory testimony as to whether "GMO-Free" is a component of a "Natural" claim. *See* Second Weir Deposition, p. 119. In addition, Mr. Weir's estimated price premium is sufficiently small such that notice and claims administration costs are likely to overwhelm any potential benefits to the Classes.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

"value of the [p]rice [p]remium attributed solely to the 'non-GMO' aspect of the '100% Natural' claim."[14]   This two-step hybrid method would involve (a) Mr. Weir performing a hedonic regression to determine a general price premium associated with "Natural" claims and (b) Dr. Howlett performing a conjoint analysis to determine what portion of that price premium can be attributed to the "GMO-Free" interpretation of "Natural" claims.

11.   Because the two-step hybrid method relies upon the results of two separate analyses, flaws in either analysis would render the two-step hybrid method incapable of producing relevant and reliable claimed damages.   First and foremost, the shortcomings of Mr. Weir's regression analysis, summarized above (and presented throughout my declaration), render it inappropriate for use in the two-step hybrid method.   In addition, Dr. Howlett's proposed conjoint analysis suffers from drawbacks that also render it inappropriate for use in the two-step hybrid method.

a.   <u>Inapplicability Of "Relative Importance"</u>.   Dr. Howlett's proposed conjoint analysis would, at best, measure consumers' average opinion of the "relative importance" of the "GMO-Free" component of a "Natural" claim (relative to other components of a "Natural" claim).   However, consumers' average "relative importance" opinion has no nexus to an actual price premium paid, if one exists.[15]   Dr. Howlett has not

_____

[14]   Howlett Amended Declaration, p. 28.

[15]   In economics, it generally is accepted that the price of any product (or feature of a product) arises from an interaction between demand factors (such as consumers'

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

demonstrated the validity of the primary assumption of the two-step hybrid approach – that a ratio of subjective "relative importances" is equal in some mathematical one-to-one way to a ratio of claimed price premiums.

b. <u>No Past Data</u>.  Dr. Howlett's proposed conjoint analysis would involve collecting data in the future (i.e., future to the date of her declaration and future to the overwhelming majority of the putative Class period(s)). This necessarily renders Dr. Howlett's conjoint analysis incapable of evaluating the importance of the claimed "GMO-Free" interpretation during the past portions of the putative Class period(s).

c. <u>Overemphasis On Tested Features</u>.  Dr. Howlett's proposed conjoint analysis draws attention to the attributes she chooses to include in her survey.  As a result, Dr. Howlett's proposed conjoint analysis overemphasizes minor features and may yield a conclusion that the "GMO-Free" interpretation is material when it was not.[16]

12. The details of my analyses and the bases for my opinions are contained in the remainder of this declaration and associated exhibits.

## III.  OVERVIEW OF MR. WEIR'S PROPOSED HEDONIC REGRESSION MODEL

13. Mr. Weir's proposed methodology for estimating a claimed price premium involves three steps: (a) using a data set containing sales and product

_____

valuation of a feature) and supply factors (such as the cost to provide a feature). Supply factors are absent from Dr. Howlett's proposed analysis.

[16] In addition to the two-step hybrid method (i.e., the use of hedonic regression and conjoint analysis in combination), Dr. Howlett presented a third method for calculating claimed damages – one does not rely upon Mr. Weir's hedonic regression.  This alternate (third) method also would be a two-step procedure. However, both steps would involve a conjoint analysis.  As discussed in more detail later in my declaration, this alternate two-step conjoint analysis suffers from similar flaws as those discussed above with regard to the conjoint step in the two-step hybrid approach.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

attribute data for Wesson Oil and other cooking oil products; (b) expanding the data set to give more weight to products that had higher sales volumes; and (c) performing a hedonic regression analysis on the final, expanded data set.

## A. **Mr. Weir's Available Data**

14.    As of the issuance of the Weir Amended Declaration, Mr. Weir had access to 12 spreadsheets of data produced by ConAgra.   Mr. Weir classified this data into two categories: (a) internal ConAgra data that focused on Wesson Oil products and (b) data collected by market research companies such as IRI and Nielsen.[17]

a.    Internal ConAgra Data.    Mr. Weir had access to four documents containing internal ConAgra data.[18]    Mr. Weir categorized two of these documents (e.g., "CAG0001411" [19] and "CAG0031949" [20]) as being useful for determining total Wesson Oil sales over the Class period, an input required for his calculation of total claimed Class-wide damages.[21]

---

[17]  Weir Amended Declaration, p. 11.   For a more detailed summary of the data available to Mr. Weir, see Weir Amended Declaration, pp. 11 – 17.

[18]   These documents are entitled "CAG0001411," "CAG0001412," "CAG0031948," and "CAG0031949" (described in Weir Amended Declaration, pp. 11 – 12 and 16).

[19]  Weir Amended Declaration, pp. 11 – 12.

[20]  Weir Amended Declaration, p. 16.

[21]  Weir Amended Declaration, p. 33.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

     b. <u>Market Research Data</u>.  Mr. Weir had access to eight documents from market research companies IRI and Nielsen. [22]  These documents included "quantifiable data" (i.e., "price, quantity, and other information about the products") that "can then be used in regression analysis."[23]  The documents contain market data that cover various samples (e.g., certain geographies, retailers, and years).[24]

15.    Of the IRI/Nielsen documents, Mr. Weir chose to use data from one document ("CAG0031947") to conduct his preliminary analysis.  The data set used by Mr. Weir contains nationwide sales, pricing, and product attribute data for shortening and cooking oil products from February 21, 2009 through February 15, 2014.[25]  Mr. Weir explained the reasons he chose to use this data set as follows.

> Because this data set combines price and attribute information (including specifically "natural" claim attribute information) for a wide variety of competitive cooking oil products, including Wesson, Crisco, Mazola, and private labels, [Mr. Weir is] able to input this data, after formatting, into a regression model to calculate hedonic values of various product attributes for particular products.[26]

---

[22]  These documents are entitled "CAG0005560," "CAG0005561," "CAG0005562," "CAG0031911," "CAG0031912," "CAG0031913," "CAG0031914," and "CAG0031947" (described in Weir Amended Declaration, pp. 11 and 13 – 16).

[23]  Weir Amended Declaration, p. 11.

[24]  Weir Amended Declaration, pp. 11 and 13 – 16.

[25]  Mr. Weir chose not to use a data set that had geographic-based data or retailer-based data.

[26]  Weir Amended Declaration, pp. 15 – 16.  (Bracketed text added for clarification.)

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

### B. "Expansion" Of Data

16.     The raw Nielsen data set contained information on 4,962 products that represented approximately 3.41 billion units sold.  Mr. Weir chose 513 of those products (representing approximately 1.26 billion units sold) for use in his regression analysis.  Mr. Weir described in his deposition his choice of the 513 products.

> First of all, we started with the four types of oil that Wesson manufactures and are the products at issue in this case, so corn, canola, vegetable, and the best blend style, blended oil.  So observations that didn't match those product types were dropped.  As I note here in footnote 51, observations with limited transactions for the year, since we were dealing with annual data, 99 or less were dropped, or if there seemed to be some curious result in the data set such as a price of zero, even though there were recorded sales, and we eliminated aerosol pump style products that don't match with the type of format of the product that Wesson sells.[27]

17.     Mr. Weir "expanded" those 513 products into a final count of approximately 1.26 million observations for his regression.  Mr. Weir testified in his deposition about this process.

> In order to analyze this data I used a technique called expansion which weights each of the original spreadsheet rows by the number of units sold for that row.  So if a row in the original spreadsheet reflected ten sales, we would expand that into ten

_____

[27] Second Weir Deposition, p. 72.  Mr. Weir's deposition testimony and one footnote in his Amended Declaration (i.e., Weir Amended Declaration, p. 28, footnote 51) are the only descriptions Mr. Weir has provided of how he chose products for inclusion in his regression analysis.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

unit observations. That technique which I've used before, it's a standard statistical weighting technique. When I did that technique on the full units sold the data set became 1.26 billion observations, which resulted in on my standard office computer a herculean effort to run any regression, *so we did the expansion divided by an order of magnitude*.[28]

18.  Based upon Mr. Weir's deposition testimony and my attempt to replicate Mr. Weir's final data set, it appears that Mr. Weir performed the following steps after identifying the 513 products.[29]

a.  <u>Separate Observations By Year</u>. Mr. Weir turned each product into 5 observations, to account for the 5 separate years of data contained in his data set. This yielded 2,565 observations from the original 513 products.

b.  <u>Separate Observations By Promotional Status</u>. Mr. Weir further turned each observation into 2 observations in order to separate promotional sales from non-promotional sales. This yielded 5,130 observations from the 2,565 observations in the prior step.

c.  <u>Apply Exclusion Rules</u>. Mr. Weir then excluded from consideration any observation with (i) "fewer than 99 units sold for that year"[30] or (ii) "a recorded price per unit of 0."[31] Applying these rules dropped 1,650 observations – leaving 3,480 observations.

_____

[28] Second Weir Deposition, p. 40. (Emphasis added.) Mr. Weir later clarified that the statement "we did the expansion divided by an order of magnitude" meant that he divided unit sales by one thousand. (Second Weir Deposition, p. 44.)

[29] Mr. Weir did not describe in detail the process that he used to prepare the Nielsen data for his regression analysis. Mr. Weir did not provide a file that recorded the commands he used to go from the raw Nielsen data to the data set that he used to run the regression. As a result, this overview is an attempted recreation of Mr. Weir's process.

[30] Mr. Weir's rule also dropped observations with exactly 99 units sold.

[31] Weir Amended Declaration, p. 28, footnote 51.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

   d. <u>Expansion Of Data</u>.   Mr. Weir "expanded" his data by creating "copies" of observations as follows.

      i. <u>Determine Number Of "Copies" To Make</u>.   For the remaining 3,480 observations, Mr. Weir determined the number of "copies" by first dividing the unit sales by 1,000.   If a product had 3,000 units sold in a year, Mr. Weir would create 2 additional "copies" for a total of 3 final observations.[32]   Mr. Weir testified that he divided unit sales by 1,000 due to computational difficulties associated with using a full data set containing 1.26 billion data points.

         [G]iven the computer that I was using, it was more expeditious from a computational standpoint to go through the process that we just discussed…rather than run a specification at 1.26 billion transactions and come back three hours later for the results.[33]

      ii. <u>Create "Copy" Observations</u>.   After determining the total number of copies to make, Mr. Weir created those "copy" observations.   This process expanded Mr. Weir's data set from 3,480 observations to approximately 1.26 million observations.[34]

   **C. <u>Hedonic Regression Model and Results</u>**

19.   Mr. Weir performed his hedonic regression analysis using his "expanded" data set.   Mr. Weir describes hedonic regression by stating:

_____

[32]  This division, combined with the actual expansion performed by Mr. Weir, altered the proportion of sales in the data.   For example, a hypothetical product with 3,000 sales would result in 3 final observations.   Meanwhile, a product with only 100 sales would not be copied, but would result in 1 final observation.   As a result, the 30:1 ratio of these two products was altered to a 3:1 ratio by Mr. Weir's expansion rules.   I discuss this point and its implications in further detail later in my declaration.

[33]  Second Weir Deposition, pp. 48 – 49.

[34]  The final count is 1,269,823 observations, as provided in Mr. Weir's regression results.   (Weir Amended Declaration, Exhibit 3, p. 1.)

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

In a hedonic regression, regression analysis is run on historic pricing and attribute data. The result is the determination of which attributes explain which portions of the price.[35]

20.    For the preliminary hedonic regression presented by Mr. Weir, the price per ounce of the Challenged Products and comparator products (in natural logarithm form) was "regressed" against variables accounting for:

> oil variety (canola, corn, blend, or vegetable), size, promotional price, brands (with each of the 111 brands listed in the regression constituting a separate dummy variable),[36] five (5) different years, and twenty (20) different product attributes, including the "natural" label that is the subject of this litigation.[37, 38]

---

[35] Weir Amended Declaration, p. 20.

[36] Mr. Weir included 111 brand variables and an indicator for private label products ("CTLBR") in his hedonic regression, with the remaining brand (Wesson) used as the reference brand.   (Weir Amended Declaration, Exhibit 3, pp. 2 – 6.)

[37] Weir Amended Declaration, p. 28.   Based upon Mr. Weir's description and his regression command (Weir Amended Declaration, p. 29), the twenty product attributes appear to be, in the order used by Mr. Weir in his regression: (1) GMO-Free, (2) gluten-free, (3) natural, (4) organic, (5) cholesterol-free, (6) absence of specific fats, (7) fat-free, (8) low-fat, (9) natural source of omega fatty acids, (10) omega-3 presence, (11) omega-6 presence, (12) preservative-free, (13) excellent source of vitamins, (14) good source of vitamins, (15) "PRVTLBLSMART," (16) "HEARTHEALTHY," (17) "HEARTHLTH," (18) "HEARTHLTHRECIPES," (19) "CTLBR" (an indicator that a product is from a private label), and (20) the constant (which Mr. Weir appears to count as an "attribute").

[38] Of note, Mr. Weir's regression contains a variable (i.e., "GMO-Free") that indicates whether a product explicitly claims to be free from GMO ingredients. Simply using the coefficient on this variable would not be an appropriate measure of claimed damages (which is consistent with Mr. Weir not discussing this variable in his declaration).   As the Challenged Products do not explicitly claim to be free from GMO ingredients, a GMO-free claim may carry very different value in the

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

21.    Mr. Weir estimated a claimed 2.28% nationwide price premium associated with a "natural" label.  Mr. Weir does not claim that this result is an estimate of the specific value of the price premium at issue in this matter.  Rather, Mr. Weir interpreted this result as "directional."

> [D]emonstrating the general directional nature of the Natural Claim coefficient (i.e., the fact that there is a positive, significant coefficient—indicating that there is a price premium associated with the Natural Claim).[39]

## IV.    MR. WEIR'S PROPOSED REGRESSION MODEL DOES NOT PROVIDE A STANDALONE ESTIMATE OF A CLAIMED PRICE PREMIUM ASSOCIATED WITH CONAGRA'S ALLEGED MISCONDUCT

22.    Plaintiffs allege that the "100% Natural" claim on the Challenged Products misled consumers by allegedly representing that the Challenged Products contained no genetically-modified organisms ("GMO") or GMO ingredients. [40]   Mr. Weir's proposed hedonic regression model is an inappropriate method for calculating a price premium associated with that claimed liability theory (i.e., alleged misrepresentations relating to GMO ingredients).

_____

marketplace and would not appropriately value the potential allegedly misleading interpretation of the Challenged Claim as containing no GMO ingredients.  I further address the differences between Mr. Weir's "GMO-Free" and "Natural" variables in **Section VII.A.**

[39]  Weir Amended Declaration, p. 31.

[40]  Plaintiffs' Memorandum, p. 1.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

a. Mr. Weir's proposed regression model cannot calculate a price premium specifically associated with Plaintiffs' theory of ConAgra's alleged misconduct.

b. Mr. Weir does not intend to calculate a price premium associated with ConAgra's alleged misconduct.

A. **Mr. Weir's Proposed Regression Model Cannot Calculate A Price Premium Specifically Associated With Plaintiffs' Theory Of ConAgra's Alleged Misconduct**

23.    "Natural" claims can indicate a variety of attributes to consumers.[41] However, the specific theory advanced by Plaintiffs is that "100% Natural" represents that a product is GMO-free.[42]   Plaintiffs do not object to ConAgra representing Wesson Oil products as having any of the other attributes that consumers may interpret from a claim of "100% Natural." Hence, based upon Plaintiffs' theory, the relevant price premium (if one exists) in this matter is not the price premium associated with "100% Natural" and the numerous interpretations of that claim that consumers may have.   Rather, the relevant price premium (if one exists) is the price

---

[41] Order dated August 1, 2014, pp. 61 – 62.   Mr. Weir testified that his "understanding of the general claim of 'All Natural' is that it has many implications."   (First Weir Deposition, p. 66.)   Similarly, Dr. Howlett testified: "some of the work, for example, that [Dr.] Hanson did it shows that there's a lot of confusion on the term genetically modified, just like there's a lot of confusion, actually, if you look at what natural means."   (Deposition of Elizabeth Howlett taken on September 24, 2014 ("Howlett Deposition"), pp. 80 – 81.)

[42] Plaintiffs' Memorandum, p. 1.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

premium associated with the interpretation of "100% Natural" as including GMO-free when it is not (if such allegations were found to be true).

24. As an example, suppose that in a hypothetical world there existed a commonly-used term "100% Natural With GMOs."  Also suppose that this term allowed for GMO ingredients but otherwise indicated the same attributes indicated by the term "100% Natural."  One relevant price premium for consideration in that hypothetical world would be the price change associated with the Challenged Products bearing a "100% Natural" claim rather than a "100% Natural With GMOs" claim.  Conceptually, that is the price premium under consideration here.

25. The aforementioned approach to evaluating claimed damages was specifically required by the Court.  In the Order dated August 1, 2014, the Court stated:

> Plaintiffs' specific theory of liability in this case is that the "100% Natural" label misled consumers and caused them to believe that Wesson Oils contained no genetically modified organisms or GMO ingredients.  Under Comcast, therefore, Weir must be able to isolate the price premium associated with misleading consumers in that particular fashion.  It does not appear from his declaration and deposition testimony that he intends to do so.  Rather, it appears he intends merely to calculate the price premium attributable to use of the term

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

"100% Natural" and all of the meanings consumers ascribe to it.   This does not suffice under Comcast.[43]

26.    Mr. Weir's hedonic regression model, as developed, does not (and cannot) calculate the appropriate price premium (if one exists).   Mr. Weir's preliminary regression calculates a "price premium attributable to use of the term '100% Natural' and all of the meanings consumers ascribe to it."   Mr. Weir does not apportion this claimed price premium to the various meanings that consumers ascribe to a "100% Natural" claim (nor does Mr. Weir provide a methodology to do so).   As a result, Mr. Weir's regression analysis does not (and cannot) provide a standalone method for calculating the relevant measure of damages in this matter.[44]

_____

[43]   Order dated August 1, 2014, p. 62.

[44]   Another expert for Plaintiffs, Dr. Howlett, proposes a method for apportioning Mr. Weir's regression results.   (*See, e.g.,* Howlett Amended Declaration, pp. 26 – 27.)   However, as discussed below, Mr. Weir's proposed regression analysis is not even an appropriate method for calculating a reliable and relevant measure of a claimed price premium associated with a natural claim (in addition to not being an appropriate method for calculating a reliable and relevant measure of a claimed price premium associated with an alleged and mislabeled presence of GMSs). Therefore, Mr. Weir's proposed regression analysis would be an inappropriate input into Dr. Howlett's proposed method of calculating damages.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

### B. Mr. Weir Does Not Intend To Calculate A Price Premium Specifically Associated With Plaintiffs' Theory Of ConAgra's Alleged Misconduct

27.    Mr. Weir's declarations and testimony[45] indicate that he intends to calculate

a price premium associated with all of the meanings of the term "100%

Natural."   In his Amended Declaration, Mr. Weir stated:

> The presence of a "100% Natural" label claim is a binary "yes
> or no question" -- the label either says "100% Natural" or it
> does not.   As such, we are dealing with a simple but-for
> question: What did the Class pay for Wesson Oil with the
> "100% Natural" Claim (i.e., the actual, historical sales data),
> and what would they have paid had the Claim not been made
> (the but-for, hypothetical price had ConAgra not violated the
> law).   Calculating a but-for price premium does not depend on
> an individual interpretation of the Claim because there is no
> middle ground.   If the market price for Wesson Oils was higher
> as a result of the "100% Natural" Claim, then ALL consumers
> will have paid a higher price than if the claim had not been
> made.[46]

28.    Similarly, in his Second Deposition, Mr. Weir testified that he believes the

Court's application of Comcast is incorrect from an economic perspective.

> I understand that the judge in this case believes that there
> should be an additional step taken in order to go one level down
> from what I have proposed here.   With all due respect to Judge
> Morrow, that may be the correct perspective from a legal

---

[45]  *See*, *e.g.*, First Weir Deposition, p. 167: "GMO free is not an attribute of
Wesson Oil.   So it can't be a relevant product attribute specifically to Wesson
Oil."

[46]  Weir Amended Declaration, p. 7.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

perspective, but it's not the correct analysis from an economic perspective.[47]

29.    Contrary to Mr. Weir's assertion, the analysis requested by the Court is the correct analysis from an economic perspective.   Under Plaintiffs' theory of liability, if ConAgra had disclosed the alleged GMO ingredients in dispute, the Challenged Products still would have had other attributes that are attributes of "Natural" products.   Therefore, the Challenged Products would have captured appropriately any potential price premiums associated with those attributes.   The only potential source of claimed damages is associated with the asserted "GMO-Free" aspect of "Natural" claims (if any). Therefore, from an economic perspective, the Court is correct to request that claimed damages be calculated as only the portion of a potential "Natural" price premium that might arise due to an alleged "GMO-Free" interpretation within a "100% Natural" claim.

30.    Mr. Weir's proposed approach inappropriately ignores the price premium (or price effects) attributed to other characteristics conveyed by a "100% Natural" claim.   Mr. Weir's proposed approach would evaluate damages based upon the removal of the "100% Natural" claim, rather than the price difference between "100% Natural" and "100% Natural With GMOs"

_____

[47]   Second Weir Deposition, pp. 112 – 113.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

claims.  Mr. Weir's proposed measure of damages does not reflect (a) the
Plaintiffs' specific theory of ConAgra's alleged misconduct, (b) the express
instructions of the Court, or (c) a reliable nexus between the alleged
wrongful conduct and economic harm to the putative Class members.

### C. **Summary**

31.    It should be noted that while I discuss other failings associated with Mr.
Weir's proposed hedonic regression approach in the remainder of my
declaration, the discussion of these failings are for completeness.  The
limitations presented above (i.e., not measuring the claimed economic harm
associated with the Plaintiffs' theory of liability), from an economic
perspective, is enough to indicate that Mr. Weir's proposed approach will
not allow for a reliable determination of putative Class-wide damages using
common proof.

## V.    **ADDITIONAL REASONS MR. WEIR'S PROPOSED REGRESSION MODEL IS INCAPABLE OF MEASURING A CLASS-WIDE PRICE PREMIUM ASSOCIATED WITH THE CHALLENGED CLAIM**

32.    As discussed, Mr. Weir's proposed regression model does not (and cannot)
evaluate a price premium associated with the Challenged Claim on a Class-
wide basis using common proof in this matter.  Plaintiffs recognize this
shortcoming.  It is my understanding that "if required" to isolate a claimed
price premium associated with the allegedly misleading interpretation,

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

Plaintiffs have proffered an alternative two-step damages approach involving hedonic regression and conjoint analysis. Under the two-step method, Mr. Weir first would use hedonic regression to calculate a claimed price premium associated with general "Natural" claims. Then, Dr. Howlett would use conjoint analysis to determine what share of that estimated price premium was due to Plaintiffs' interpretation of "Natural" (i.e., including "GMO-Free").

33. However, the drawbacks to Mr. Weir's proposed regression analysis, discussed in detail below, render his proposed regression analysis inappropriate for use either as a final value or as an input into an augmented claimed damages calculation. These drawbacks include at least the following.[48]

    a. Mr. Weir used a data set that contained inaccuracies and also was inappropriate to use in the current context (e.g., certain products had or have attributes different than the attributes contained in the data set used by Mr. Weir for his analysis, *inter alia*).

    b. Mr. Weir's proposed regression model does not analyze the specific Classes Plaintiffs seek to have certified (i.e., Mr. Weir conducted a nationwide claimed price premium analysis rather than one associated with the putative 11 state classes in this matter).

    c. Mr. Weir does not evaluate a price premium specific to the Challenged Products. Mr. Weir's proposed regression would evaluate one single price premium for all products coded as "natural" by Nielsen.

_____

[48] *See, e.g.*, Howlett Amended Declaration, pp. 26 – 27.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

    d. Variations in prices across multiple dimensions create hurdles to evaluating a claimed price premium on a Class-wide basis using common proof.

### A. **Mr. Weir Used A Data Set That Contained Inaccuracies And Also Was Inappropriate To Use In The Current Context**

34.    Mr. Weir used a Nielsen data set containing nationwide pricing data and product attribute data for his regression analysis.[49]  Mr. Weir's use of these data was inappropriate in this context.

    a. The product attribute data are incomplete and do not accurately reflect the attributes of the products used by Mr. Weir in his regression analysis.

    b. The data set does not account for historical label claims or changes.

    c. The data set chosen by Mr. Weir does not control for various considerations that affect prices.

### 1. **The Product Attribute Data Are Incomplete And Do Not Accurately Reflect The Attributes Of The Products Used By Mr. Weir In His Regression Analysis**

35.    The Nielsen data set that Mr.Weir used contains variables (or information) defining various product attributes.  These variables that define various product attributes either are coded as having certain information (i.e., attributes) or they are left blank.  For example, the "HWMP Natural" claim that serves as the basis for Mr. Weir's "NATURAL" variable takes two values: Natural and blank values.  Mr. Weir interpreted (a) a "Natural" value as meaning that the product made a Natural claim and (b) a blank

_____
[49] *See*, *e.g.*, Weir Amended Declaration, p. 15.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

value as meaning that a product did not make a Natural claim. However, blank values may indicate that Nielsen does not know (or has not captured the data as to) whether the product made a Natural claim.

36.    Below, I present evidence that at least some products with blank values for the "HWMP Natural" variable did make "Natural" claims on the label. (This demonstrates that products treated as not making "Natural" claims may not be treated correctly by Mr. Weir.)   In addition, I present evidence that even when a product is coded as "Natural" by Nielsen, the product may not make a "Natural" label claim, or may make a different claim that Nielsen may code as a "Natural" claim.   The illustrative products presented are (a) Wesson products <u>coded as not</u> making a "Natural" claim when they <u>do</u> have a natural claim, (b) a Crisco product <u>coded as not</u> making a "Natural" claim when it <u>does</u> have a natural claim, and (c) a Nutrioli product <u>coded as making</u> a "Natural" claim when it <u>does not</u> have a natural claim.

a.    <u>Wesson Oil Products</u>.   Mr. Weir states that he has been advised by Plaintiffs' counsel that "on the outside packaging of each unit of the Wesson Oils, ConAgra, throughout the time period relevant to this litigation, represented that such Wesson Oils are '100% Natural.'"[50] However, the Nielsen data used by Mr. Weir treats 6 Wesson products as having blank values for the "HWMP Natural" variable.   Mr. Weir interpreted the Nielsen data as meaning that these 6 Wesson products do not make a "Natural" claim.   (**Exhibit 5**.)   It appears Mr. Weir did not

_____

[50]  Weir Amended Declaration, p. 5.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

reconcile these data (or his interpretation of the data) with his understanding of the facts of the case.

b.  <u>Crisco Canola Oil</u>.   A Crisco product that claims to be "All Natural" and "Pure Canola Oil" on the label was not coded as making a "Natural" claim.[51]   (**Exhibit 6**.)

c.  <u>Nutrioli</u>.  A Nutrioli product that makes no "Natural" claim on its label is coded as being "Natural" in the Nielsen data.[52]   (**Exhibit 6**.)   The product does claim to be "Pure," which suggests that either (i) Nielsen coded the product incorrectly or (ii) "Pure" claims are treated the same as "Natural" claims by Nielsen.[53]   In either case, the data are unreliable for use as Mr. Weir intends.  Mr. Weir provided no evidence in his report that consumers interpret "Pure" the same as "Natural."

37.  <u>Inaccurate Coding</u>.   If some products are coded differently than their demonstrated labels, then the data must be verified before use in order for that use to be reliable.   Mr. Weir did not report any such verification or provide any indication that he was aware of discrepancies between the information contained in the data set he used as compared to the information

_____

[51]  The product in question is "Crisco Pure Canola Oil," 48 Fl. Oz., with UPC code 005150025151.   This product is on row 4705 in the raw Nielsen data used by Mr. Weir.   Product images were obtained online at http://www.amazon.com/Crisco-Pure-Canola-Oil-48/dp/B00I8G79ES/ref=sr_1_fkmr2_2?i on September 18, 2014.

[52]  The product in question is "Nutrioli Pure Soybean Oil," 32 Oz., with UPC code 084291800136.   This product is on row 4530 in the raw Nielsen data used by Mr. Weir.   Photographs of this product were taken on September 19, 2014 at the Walmart located at 6185 Retail Road, Dallas, TX.

[53]  A third possibility exists.   The Nutrioli product may have been labeled "Natural" when Nielsen collected product attribute data, but then underwent a label change (whereby the "Natural" claim was removed) without changing the UPC.   I discuss this possibility below in **Section V.A.2**.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

on certain product labels.   As a result, Mr. Weir's use of the data is unreliable.

38.     Multiple Claims Treated As Equivalent To "Natural."   If products labeled "Pure" are treated as "Natural" by Nielsen, then using Nielsen's "Natural" variable in a regression model will treat a variety of non-equivalent claims as equivalent.   To properly calculate a general "Natural" effect, Mr. Weir would need to separate "Pure" claims from "Natural" claims.   Mr. Weir failed to address this possibility or provide any indication that he was aware of this "Pure" / "Natural" discrepancy in his data set.   As a result, Mr. Weir's use of the data is unreliable.

39.     Mr. Weir did not discuss (in his report or deposition) any attempts to verify that the product attribute data he used was complete and accurate.   As a result, Mr. Weir used data that do not reflect the true attributes of the products they represent.   As a specific example, the data clearly contradict Mr. Weir's understanding of the facts of the case (i.e., that all Wesson Oil products have a "100% Natural" claim).   Mr. Weir's regression is unreliable in light of his use of unverified and inaccurate product attribute data.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

### 2. <u>The Data Set Does Not Account For Historical Label Claims Or Changes</u>

40.    The Nielsen data used by Mr. Weir contain one set of product attributes for all 5 years of data (February 2009 – February 2014).[54]   This means that the data does not account for label changes that may have occurred during the time period in question.   For example, Mr. Weir states that at least some comparator products sold by Crisco carried a "Natural" label claim "at least until 2014."[55]   A Crisco vegetable oil included in Mr. Weir's regression (i.e., a "Crisco Pure Vegetable Oil" product) is coded as making a "Natural" claim.[56]   However, the actual labels on this product contradict how the product is designated in the data set used by Mr. Weir:

   a.   one set of labels for the product includes an "All Natural" claim as well as a "Pure" claim;[57] and

   b.   another set of labels for the product, carrying the same UPC code, makes a "Pure" claim but does not make a "Natural" claim.[58]   (**Exhibit 7**.)

_____

[54]   Weir Amended Declaration, p. 1.

[55]   Weir Amended Declaration, p. 22.

[56]   The product in question is "Crisco Pure Vegetable Oil," 64 oz., with UPC code 005150017665.   This product is on row 4479 of the raw Nielsen data used by Mr. Weir.

[57]   Images of the product bearing the "All Natural" label claim were obtained online at http://www.soap.com/p/crisco-pure-all-natural-vegetable-oil-64-oz-210970? site=CA&sku on September 23, 2014.

[58]   Photographs of the product not bearing the "All Natural" claim were taken on September 19, 2014 at the Walmart located 6185 Retail Road, Dallas, TX.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

The above observations suggest that products in the Nielsen data may have undergone label changes without having UPC code changes.  The above observations also suggest that products with different labels (and different labeling claims) may be sold simultaneously.

41.  Because the Nielsen data only include one set of product attributes, the data are incapable of addressing label changes and multiple labels during the relevant time period.  Mr. Weir treated the data as though label claims were constant for all products throughout the time period covered by his regression model.  As a result, Mr. Weir's use of the data is unreliable.

### 3. <u>The Data Set Chosen By Mr. Weir Does Not Control For Various Considerations That Affect Prices</u>

42.  Mr. Weir used a Nielsen data set containing nationwide sales and pricing data.  The Nielsen data set used by Mr. Weir lacks data on variables shown (and known) to influence price.  Such variables influencing price include but are not limited to (a) the state where the product was purchased, (b) the retail (i.e., distribution) channel where the product was purchased, and even (c) the within-state geography where the product was purchased.[59]  By failing to include these explanatory variables as control considerations, Mr. Weir's regression analysis is prone to an "omitted variable bias."

_____
[59] *See, e.g.,* Ugone Declaration, Appendix E.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

43.    Omitted variable bias occurs when one or more relevant explanatory variables (e.g., in this case, state, retail channel, and within-state geography considerations as described above) are omitted from a regression model (or equation).   If this occurs, the results of that regression generally are biased in that the impact of the omitted considerations are "spread across" the considerations that are included in the regression analysis.[60]   For example, by failing to control for retail channel (as one consideration), Mr. Weir's regression will conflate the effect of a "Natural" claim with the effect of being sold in different retail (i.e., distribution) channels – some of which are higher priced.

**B. Mr. Weir's Proposed Regression Model Does Not Reflect The Specific Classes Plaintiffs Seek To Have Certified**

44.    Plaintiffs request certification for 11 separate state-specific Classes.[61]   However, Mr. Weir's proposed regression model attempts to calculate a single, nationwide price premium associated with "Natural" claims.   This

_____

[60] *Undergraduate Econometrics*, Second Edition, Hill, R.C., Griffiths, W.C., and Judge, G.G. ("Undergraduate Econometrics"), pp. 185 – 187.   One exception is when the omitted variable is uncorrelated with the included variables.   However, "uncorrelated explanatory variables are rare," and unlikely in this context for the reasons discussed above.   (Undergraduate Econometrics, p. 185.)

[61] Amended Motion for Class Certification, pp. 4 – 5.   The relevant states are California, Colorado, Florida, Illinois, Indiana, Nebraska, New York, Ohio, Oregon, South Dakota, and Texas.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

single, nationwide estimate is inconsistent with the Classes that Plaintiffs request.   A nationwide price premium estimate cannot be taken as evidence of the existence of price premiums specific to the putative state Classes for at least the following reasons.

   a.   <u>Irrelevant Data</u>.   Mr. Weir's nationwide regression includes data from relevant states (i.e., those for which Plaintiffs are seeking class certification) <u>and</u> irrelevant states (i.e., those for which Plaintiffs are not seeking class certification).   Mr. Weir has not demonstrated in his report that his results are not driven (or at least influenced) by price variations that occur in the other 39 states.   As a result, he has not demonstrated a price premium specific to the putative Class members.

   b.   <u>Separate Regressions May Show That The 11 States Have A Different Result</u>.   Aggregate, average values (such as a nationwide price premium) can mask variation across smaller groups.   If Mr. Weir were to perform his regression analysis separately for each of the putative 11 Class states (or geographic areas that sufficiently proxy these 11 states), he may not have obtained the same claimed positive, significant estimates that he did with his nationwide analysis.   Mr. Weir does not reconcile the aforementioned issue in his report.   As a result, Mr. Weir's preliminary regression does not demonstrate the existence of a "Natural" price premium for the putative state classes at issue.

### C. **Mr. Weir Does Not Evaluate A Price Premium Specific To The Challenged Products**

45.   Mr. Weir's proposed regression analysis does not evaluate a claimed price premium associated with the Challenged Claim <u>on the Challenged Products</u>. Rather, Mr. Weir's proposed regression analysis would calculate <u>one</u> single (i.e., average) price premium for <u>all products</u> coded as "Natural" by Nielsen.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

This value has no nexus with the Challenged Products (or the Challenged Claim).

46.  Mr. Weir's regression calculated a single average price premium across all brands for products that make "Natural" claims.  In his deposition, Mr. Weir did not acknowledge that his value is an average price premium, stating that he "would not call it an average, and the effects of brand have been accounted for in the regression.  So [he] would consider the price premium to be applicable as it stands for any brand."[62]

47.  Contrary to Mr. Weir's assertions, economic theory suggests that price premiums may vary across brands.  Different brands have different brand loyalties and consumer bases.  Additionally, different brands may face different cost structures.  As a result, some brands may receive a premium for a "Natural" claim whereas others may receive no premium at all.  Calculating an average price premium for general "Natural" claims (or for "any brand") can mask significant variations over smaller groups (such as across different brands).

48.  In addition, as briefly discussed above, in order to calculate a brand-specific value associated with a "Natural" claim, a brand must have sold both

_____

[62]  Second Weir Deposition, p. 115.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

"Natural" products and "Non-Natural" products (otherwise what is being calculated are price premiums associated with other brands). Therefore, in order for Mr. Weir's regression analysis to calculate a price premium specific to the Challenged Products, ConAgra would have had to sell both "Natural" and "Non-Natural" Wesson products.

49.     However, ConAgra only sold Wesson products with a "Natural" claim. This is consistent with Mr. Weir's understanding. As Mr. Weir stated:

> [he has] been further advised by Plaintiffs' counsel that, on the outside packaging of each unit of the Wesson Oils, ConAgra, throughout the time period relevant to this litigation, represented that such Wesson Oils are '100% Natural.'[63]

50.     Therefore, Mr. Weir's regression methodology would not be able to calculate a Wesson-specific "Natural" effect. Given the potentiality of variation in an estimated price premium associated with a "Natural" claim across brands, there is no reason to believe that the average premium presented by Mr. Weir would have any nexus to the price premium (if any) specific to the Challenged Products.

---

[63] Weir Amended Declaration, p. 5.    (Bracketed text added for clarification.)

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

### D. **Price Premiums (If They Exist) Across Numerous Dimensions Would Create Hurdles To Evaluating A Claimed Price Premium On A Class-Wide Basis**

51.     Mr. Weir's preliminary regression analysis calculated one single, nationwide claimed price premium for all purchasers of cooking oils.  This approach dismisses various dimensions over which a price premium (if one exists) might vary.  Using the data set selected by Mr. Weir, Mr. Weir could have evaluated (but did not evaluate) separate price premiums across three of these dimensions: (1) type of cooking oil, (2) time, and (3) promotion.  (In addition, the data used by Mr. Weir lack information that would allow him to evaluate different price premiums over other important dimensions.)

### 1. **Price Premiums (If They Exist) And Type Of Cooking Oil**

52.     In his proposed regression model, Mr. Weir assumes that there is one price premium that applies to all cooking oil products.  However, there are four types of cooking oils in his data: corn oils, canola oils, blended oils, and vegetable oils.  These product types tend to be priced differently, with equal-sized products (e.g., 48 oz. products) having prices varying by up to 37% within one state.[64]  The same factors that lead to different prices across

_____

[64] Ugone Declaration, Exhibit 11.  This exhibit shows average prices for 48 oz. versions of the four Wesson product types (i.e., canola, corn, blend, and vegetable oils).  This comparison is done separately for 9 of the states at issue and using 2013 data.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

these oil types may also lead to different price premiums (if they exist) across these oil types. Calculating an average price premium for all oil types would mask these differences in price premiums (if they exist) across different oil types.

53.    To investigate the aforementioned issue and for illustrative purposes only, I have adjusted Mr. Weir's regression to evaluate price premiums specific to each type of oil.[65]    (I note that for the purposes of this analysis, I use Mr. Weir's hedonic regression framework and models, even though I have demonstrated that the approach used by Mr. Weir is unreliable.) The results for this analysis can be seen in **Exhibit 8**.  The results vary widely by type of cooking oil.  For example, within Mr. Weir's regression framework, the price of blended oils appear to be over 10% more when such oils are "Natural" as compared to when they are not.  On the other hand, within Mr. Weir's regression framework, corn-based oils appear to be priced 1.2% less when such oils are "Natural" as compared to when they are not.  At a minimum, "Natural" corn-based oils appear not to have a price premium.

_____

[65]  To do so, I interact indicators for each type of oil (i.e., canola, corn, blend, and vegetable) with the "Natural" variable.    In other words, I replace the "NATURAL" variable in Mr. Weir's regression with four variables, "CORN×NATURAL," "CANOLA×NATURAL," "BLEND×NATURAL," and "VEGETABLE×NATURAL."    The result for each interaction represents the relationship between "Natural" claims and prices for each type of oil.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

Mr. Weir's proposed regression approach of evaluating a unitary price premium masks this variation across types of oils (and would overcompensate purchasers of corn-based oils and undercompensate purchasers of blended oils).

## 2. __Price Premiums (If They Exist) And Time__

54.   Mr. Weir assumed that there was one price premium over the entire length of time covered by his data.   However, many factors that influence the price (and the price differences associated with specific characteristics) may have changed over Mr. Weir's 5 years of data.

55.   To investigate the aforementioned issue and for illustrative purposes only, I have adjusted Mr. Weir's regression model to evaluate year-specific premiums.   (As with the analysis I presented earlier where I adjusted Mr. Weir's analysis for different types of oils, I have (for illustrative purposes only), accepted Mr. Weir's framework and data set.) The results for this analysis can be seen in **Exhibit 9**.   Similar to the oil type-specific analyses, the time-based results vary by year.   For example, within Mr. Weir's regression framework, "Natural" products tended to be priced 3.76% more than "Non-Natural" products in 2009. [66]   However, within Mr. Weir's

_____

[66] As Mr. Weir discussed, his data do not line up perfectly with calendar years. Rather, the "2009" data covers February 2009 through February 2010.   This

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

regression framework, in 2010, "Natural" products tended to be priced only 0.25% more than "Non-Natural" products. At a minimum, purchasers of "Natural" products in 2010 appear to have paid little-to-no price premiums. Mr. Weir's proposed regression approach of evaluating a unitary price premium masks this variation over time (and would overcompensate purchasers of cooking oils in some years and undercompensate purchasers of cooking oils in other years).[67]

### 3. Price Premiums (If They Exist) And Type Of Cooking Oil Over Time

56.    In addition, price premiums may vary across both oil types and years. Given 5 years of data and 4 oil types, this means that there may be 20 different price premiums to evaluate. To investigate the aforementioned issue and for illustrative purposes only, I have adjusted Mr. Weir's regression model to evaluate these 20 yearly, oil-type-specific price premium potentialities. The results are displayed in **Figure 1**. Within Mr. Weir's regression framework, estimated price premiums vary both across oil type and over time. Four of the estimated price premiums are negative (i.e.,

_____

corresponds to Mr. Weir's "Year1." Similarly, the "2010" data corresponds to Mr. Weir's "Year2," and so forth. (Weir Amended Declaration, pp. 13 and 15 – 17.)

[67] This creates a conflict across putative Class members who purchased the Challenged Products at different points in time.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

corn products in 2010 and 2013, and canola products in 2009 and 2010), implying at a minimum that (within Mr. Weir's regression framework) "Natural" versions of those products in those years did not carry a price premium. (**Exhibit 10**.) Mr. Weir's proposed regression approach of evaluating a unitary price premium masks this variation in claimed price premiums by type of cooking oil over time (and would overcompensate purchasers of certain types of cooking oils in some years and undercompensate purchasers of other types of cooking oils in other years). In addition, while one may not expect price premiums to remain constant across oil types by year, the very large variation in claimed price premiums depicted in **Figure 1** (within Mr. Weir's regression framework) provide evidence of the unreliability of Mr. Weir's proposed approach.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____



**Figure 1**
**Variation Of Claimed Price Premiums Across Time And Oil Type**
**Based Upon Mr. Weir's Data And Methodology**

### 4.  **Price Premiums (If They Exist) And Promotional Pricing**

57.    Mr. Weir calculated only one price premium attributable to sales of cooking

oils, regardless of whether the cooking oils were purchased on promotion or

not.  However, many factors may lead to a substantially different alleged

premium attributable to a "natural" claim (if one exists) for consumers who

have purchased on promotion as compared with consumers who have not

purchased on promotion.  For example, it is reasonable to expect that

consumers who typically purchase cooking oil products that are on sale may

pay a much smaller (or no) price premium for a "natural" claim.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

58.    Mr. Weir failed to address how his single price premium calculation would overcome the hurdle of potential windfall gains to consumers who purchased the Challenged Products at a significant discount (i.e., a lower sale price).   I present several illustrative examples below.



59.    To further investigate the aforementioned issue and for illustrative purposes only, I have adjusted Mr. Weir's regression model to evaluate price premiums specific to promotional and non-promotional purchases.   (As with the analysis I presented earlier where I adjusted Mr. Weir's analysis for different types of oils and / or different years, I have utilized Mr. Weir's

_____

[68]  This calculation is discussed in **Section VII.B.** of my declaration.

[69]  This calculation is discussed in **Section VII.B.** of my declaration.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

framework and data set.)   The results for this analysis can be seen in **Exhibit 11**.   Similar to the previous analyses, within Mr. Weir's framework, estimated price premiums vary for non-promotional and promotional purchases.

a. Within Mr. Weir's regression framework (with which I do not agree), the claimed "Natural" price premium for non-promotional sales was 11.39%. In other words, non-promotional units of "Natural" products tended to be priced 11.39% more than non-promotional units of "Non-Natural" products.   However, within Mr. Weir's regression framework, the claimed "Natural" price premium for promotional sales was -7.18%.   In other words, promotional units of "Natural" products tended to be priced 7.18% less than promotional units of "Non-Natural" products.

b. Within Mr. Weir's regression framework, Mr. Weir's unitary price premium would have overcompensated putative Class members who purchased Challenged Products on promotion and undercompensated putative Class members who purchased Challenged Products while not on promotion.   In Mr. Weir's data set, approximately 66% of Wesson Oil purchases were on promotion.   Therefore, within Mr. Weir's framework (and without individual inquiry), at least 66% of consumers may be compensated when there was no injury.

## 5. Price Premiums (If They Exist) And Additional Dimensions Not Included In The Data Set Used By Mr. Weir

60.    In addition to these dimensions for which separate values may be estimated using Mr. Weir's data and methodology, price premiums (if they exist) likely vary across other dimensions that Mr. Weir's data do not include.   As demonstrated in the Ugone Declaration, prices of cooking oil products tend

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

to vary across many dimensions.  Other dimensions that may affect price premiums include but are not limited to the following.

a. <u>Sales Channel and Retailer</u>.  Cooking oil prices vary by up to 62% across sales channel (e.g., grocery stores, drug stores, and mass merchandisers)[70] and up to 101% across retailer.[71]  Price premiums (if they exist) likely vary in the same way.  For example, natural grocery stores may be able to obtain a higher price premium for "Natural" products than regular, non-natural grocery stores.

b. <u>Geography</u>.  In addition to sales channels and retailers, price premiums may vary based on the geographic location of the putative class members.  Price premiums may vary geographically in at least two ways, (i) across states and (ii) within states.

i. <u>Across States</u>.  Prices for cooking oils in 2013 varied by up to 66% across states.[72]  Price premiums (if they exist) also likely vary across states.  For example, Florida consumers may experience a different price premium (if one exists) than New York consumers.

ii. <u>Within States</u>.  Additionally, prices for cooking oils vary by up to 51% within states.[73]  Price premiums (if they exist) also likely vary

---

[70] *See, e.g.,* Ugone Declaration, Exhibit 8.  This exhibit shows, for each oil type, nationwide average prices by retail channel (i.e., grocery stores, drug stores, and mass merchandisers).  This comparison is performed separately for years 2009 – 2014.

[71] *See, e.g.,* Ugone Declaration, Exhibit 9.  This exhibit shows, for each oil type, nationwide average prices by large retailers (e.g., Kroger, Publix).  This comparison is performed separately for years 2009 – 2014.

[72] *See, e.g.,* Ugone Declaration, Exhibit 11.  ██████████████████████
████████████████████████████████████████████████████████████████.

[73] *See, e.g.,* Ugone Declaration, Exhibit 10.  This exhibit shows, for each oil type, price differences among metropolitan areas within states at issue (e.g., Albany MSA, Buffalo/Rochester MSA, and New York City MSA for New York).  This comparison is performed with 2013 data.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

within states.  For example, New York City consumers may experience a different price premium (if one exists) than consumers in the Buffalo/Rochester metropolitan area.

61.  Fully accounting for all of these dimensions would result in a very large number of premiums to evaluate.  Accounting for both oil type and year resulted in 20 price premiums (4 oil types and 5 years).  Accounting for states (in addition to oil type and year) would result in 220 price premiums (11 states, 4 oil types, and 5 years).  Accounting for sales channel or retailer would further increase the number of price premiums to evaluate.  For example, allowing for only 10 separate retailers (in addition to state, oil type, and year) would result in 2,200 price premiums to evaluate.

62.  Mr. Weir has not indicated that he will evaluate price premiums (if they exist) across these dimensions or any dimensions.  In fact, Mr. Weir testified that he intends to calculate only one value, stating "I don't think the aggregate price premium for the class, however you choose to define the class[,] is going to vary.  It will be one singular price premium"[74]  By calculating a single, average value for a claimed price premium, Mr. Weir's proposed methodology risks over-compensating some putative Class Members and under-compensating others (as I have demonstrated

_____

[74]  Second Weir Deposition, p. 100.    (Bracketed punctuation added for clarity.)

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

throughout my declaration).    Mr. Weir did not analyze or investigate in his declaration the aforementioned likelihoods.

63.    In addition, the use of a single price premium fails to account for the possibility that varying degrees of economic harm (if any) may arise because of different reasons for purchasing and different perceptions of the Challenged Claims.[75]   For example, consumers who purchased Wesson products for reasons unrelated to the "natural" claim received the value that was paid for, and thus were not economically injured.   Similarly, consumers who placed a premium on Wesson products because of a non-misleading interpretation of the Challenged Claim received the value paid for. Providing compensation without establishing reliance on the allegedly misleading interpretation of the Challenged Claim would necessarily compensate uninjured putative Class members.   Mr. Weir's proposed single price premium fails to account for the substantial variation across consumer purchasing motivations and perceptions.

_____

[75]  Ugone Declaration, Section VII.B.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

## VI.   ADDITIONAL FLAWS IN MR. WEIR'S REGRESSION ANALYSIS RENDER IT INCAPABLE OF DEMONSTRATING THE LIKELY EXISTENCE OF A PRICE PREMIUM

64.   Mr. Weir's preliminary regression analysis suffers from additional flaws that

render it incapable of demonstrating that a reliable price premium associated

with Challenged Claim exists.

   a. Mr. Weir performed an inappropriate "expansion" of his data, leading him to wrongly conclude that a statistically significant price premium exists in his preliminary analysis.

   b. Mr. Weir's proposed regression model yields results that are inconsistent with his economic theory.

   c. Mr. Weir relied upon unexplained subjective determinations (i.e., "judgment calls") relating to the data set used to perform his regression.

### A. Mr. Weir Performed An Inappropriate Expansion Of His Data – Leading Him To Wrongly Conclude A Statistically Significant Price Premium Exists

65.   Mr. Weir made certain transformations to the raw Nielsen data to prepare it

for his regression analysis.   The data transformation process utilized by Mr.

Weir involved the following steps.

   a. Mr. Weir separated the observations by year, converting 513 products into 2,650 "product-year" observations.

   b. Mr. Weir then separated products by promotional / non-promotional status, leading to 5,130 "product-year-type of pricing" observations.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

c. Mr. Weir dropped 1,650 observations from his data set for various reasons, leaving 3,480 observations.[76]

d. Mr. Weir then expanded his data set, a process that involved 2 steps.

   i. First, Mr. Weir divided unit sales by 1,000. This calculation determined the number of copies to make (i.e., the "expansion" of the data set).

   ii. Second, Mr. Weir made copies of the line items in his data set based upon the previous step.

66.   Mr. Weir's data expansion (i.e., step d above) leads to incorrect point estimates and statistical properties for Mr. Weir's regression. As a result of the data expansion, Mr. Weir claims to have obtained a statistically significant estimated price premium – but he has not. Mr. Weir's data expansion is inappropriate for at least the following reasons.

a. Mr. Weir's expansion alters the relative proportions of units sold for the various products included in his regression.

b. Mr. Weir's expansion dramatically overstates the number of observations in his data set.

c. Correcting for Mr. Weir's incorrect expansion yields a statistically insignificant result.

### 1. <u>Mr. Weir's Expansion Alters The Relative Proportions Of Unit Sales For The Products In His Regression</u>

67.   The expansion that Mr. Weir performed altered the relative proportion of products sold in the data. By dividing the number of units sold by 1,000,

---

[76] Mr. Weir stated that he would drop observations if (i) there were fewer than 99 unit sales in a year, (ii) the price was 0, or (iii) the product was an aerosol or a pump. (Weir Amended Declaration, p. 28, footnote 51.)

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

Mr. Weir produced values that were no longer whole units (i.e., 1,984 units sold became 1.984 "thousands of units sold").   However, it is not possible to create fractional observations.   As a result, Mr. Weir's expansion involved two types of rounding, each of which altered the ratio of products sold in the data.



_____

[77] The specific product is titled "CONCHITA VEG OIL PL 96 OZ" with UPC 007537000578.    This product is on row 828 in the raw Nielsen data ("CAG0031947").

[78] The specific product is titled "EL MEXICANO VEG OIL PURE PL 48 OZ" with UPC 004274328033.   This product is on row 2509 in the raw Nielsen data ("CAG0031947").

[79] The specific product is titled "DELALLO CNLA OIL PL 48 OZ" with UPC 007236871138.    This product is on row 1012 in the raw Nielsen data ("CAG0031947").

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

██████████████████████████████████████

### 2. **Mr. Weir's Expansion Dramatically Overstates The Number Of Observations In His Data Set**

68.    Mr. Weir asserts that he has 1.26 billion data points,[80] from which he constructed a data set with 1.26 million observations.   Mr. Weir is not properly describing the data set.   As discussed above, Mr. Weir has annual average prices for (a) 513 products, (b) over 5 years, and (c) sold on promotion and not on promotion.   This combines to a maximum of 5,130 data points.[81]   After applying Mr. Weir's sample selection criterion (i.e., removing certain observations due to limited sales or a price of $0), he has 3,480 data points.   Each of these data points contains one average price from one year of sales on one promotional status.   While the raw Nielsen data on these 3,480 data points was constructed from 1.26 billion transactions, Mr. Weir <u>does not</u> have data on those specific transactions.   Instead, Mr. Weir has <u>3,480 data points</u> that represent average annual prices.

69.    By performing the previously described expansion, Mr. Weir replicated 3,480 data points into 1.26 million observations.   As a result, Mr. Weir

_____

[80]  Weir Amended Declaration, p. 1.   ("[B]ased on [Mr. Weir's] preliminary analysis of historical (February 2009 – February 2014) retail price data (<u>over 1.26-billion transaction data points</u>) and product attribute data…")   (Underline added for emphasis.)

[81]  The relevant calculation is 513*5*2 = 5,130.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

incorrectly weighted his regression analysis.[82]   This inappropriate expansion artificially inflates the t-statistics of Mr. Weir's regression, leading Mr. Weir to incorrectly conclude his results are statistically significant when they are not.[83]   As discussed below, correcting for Mr. Weir's improper weighting procedure results in an estimate that is no longer significant at the standard 95% confidence level.

### 3. Correcting For Mr. Weir's Incorrect Expansion Yields A Statistically Insignificant Result

70.    I demonstrate the effect that Mr. Weir's expansion had on his regression results by performing a regression (within Mr. Weir's regression framework) that (a) uses actual units sold rather than Mr. Weir's artificial and rounded measure of units (i.e., units sold divided by 1,000 and then rounded) and (b) uses the proper weighting commands (i.e., "aweights" rather than "fweights"

_____

[82]  Mr. Weir's expansion is equivalent to using the "fweights" (i.e., frequency weights) command in STATA. According to the STATA guide, "When you specify frequency weights, you are treating each observation as one or more real observations."

STATA recommends "aweights" (i.e., analytic weights) when "you have one observation and know only that the [observation] arose as the average of [some number of] underlying observations."   As Mr. Weir's pricing data represent average prices, STATA documentation directs users to apply "aweights."   (Stata User's Guide, Release 13 ("Stata User's Guide"), pp. 318 – 319.)

[83]  Weir Amended Declaration, p. 26.   ("Each explanatory variable [in the regression] will produce a result from the model -- a "coefficient" -- and a T-statistic to evaluate whether the result is statistically significant.")

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

or Mr. Weir's equivalent data expansion).   The effects of this expansion can be seen in **Exhibit 12**.  By adjusting Mr. Weir's expansion to accurately reflect the number of units sold of each product, the coefficient for a "Natural" claim decreased to 0.0194.  This represents a 1.96% effect of general "Natural" claims on price, or a decrease from Mr. Weir's original estimate of approximately 14%.[84]

71.    More importantly, the t-statistic for the "Natural" effect is 1.79.  This t-statistic implies that the estimated effect of "Natural" claims on prices is not statistically significant at the standard 95% confidence level.  When Mr. Weir's data expansion approach is corrected (as described earlier), his proposed regression model yields no statistically significant price premium associated with a general "Natural" claim for cooking oils.

72.    Mr. Weir asserts that "[f]rom this preliminary regression, it is evident that ConAgra's decision to label Wesson Oil '100% Natural' label [sic] does indeed result in a positive, statistically significant, market wide price premium for Wesson Oil."[85] However, this conclusion was reached as a result of the approach Mr. Weir utilized to expand his data.  Correcting for Mr. Weir's expansion methodology shows no statistically significant

_____

[84]  Calculation: (2.28-1.96)/2.28=14%.

[85]  Weir Amended Declaration, p. 34.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

premium arising from a "100% Natural" claim, and thus Mr. Weir has failed to proffer a proposed methodology that yields a reliable and statistically valid price premium attributable to the Challenged Claim.

### 4. Non-Econometric Observations And Conclusions

73. Stepping back from the econometric and statistical issues discussed above, the problem with Mr. Weir's expansion analysis is on a more fundamental level that transcends the aforementioned econometric issues.   Mr. Weir used average annual data for his analysis and expanded his data set (i.e., he replicated the average annual data many times).   His expansion is an effort to "weight" his observations by the number of transactions.   However, using average annual data (and duplicating the annual data based upon units sold) masks the weekly, or even transaction-specific, variations that occur in prices regardless of any weighting procedure used.   For example, rather than using annual averages, Mr. Weir could have used IRI or Nielsen data compiled in weekly or 4-week increments to better capture the variation in prices and somewhat alleviate the econometric and statistical disagreement discussed above.[86]   However, he chose not to.

_____

[86] If Mr. Weir had chosen to use the weekly or 4-week data, Mr. Weir may have performed a similar expansion of his data.   For all of the reasons detailed above, such an expansion would be inappropriate.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

---

74.    To investigate the aforementioned issue and for illustrative purposes only, I used IRI data from the spreadsheet CAG0005560 <u>within Mr. Weir's regression framework</u>.   This spreadsheet contains sales data in four-week or five-week periods[87] between June 29, 2009 (i.e., the beginning of the four-week period ending July 26, 2009) and February 23, 2014.   I used the four-week and five-week sales data for a Wesson vegetable oil product[88] to construct annual average prices for the six years in the data set (i.e., 2009 through 2014, with partial coverage for 2009 and 2014).    A graph comparing the four-week and five-week average prices with these annual average prices is contained in **Exhibit 13** and **Figure 2**.

75.     By using annual data in the way he does, Mr. Weir is incapable of accounting for price variations such

---

[87]  Some periods are four weeks long while others are five weeks long.

[88]  The product is "WESSON VEGETABLE COOKING/SALAD OIL RP 64OZ" with product code 2700061284.

[89]  This figure represents the average price for the four-week period ending October 21, 2012.

[90]  This figure represents the average price for the four-week period ending July 22, 2012.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

as those demonstrated in **Figure 2**. Moreover, by expanding his data set utilizing annual average prices, Mr. Weir has treated all of the purchases of a given product as occurring at the same price for a given year. **Figure 2** demonstrates that this is not correct.



**B. Mr. Weir's Proposed Regression Model Yields Results Inconsistent With Mr. Weir's Economic Theory**

76.   Mr. Weir testified that "it just seems like marketing 101 basics to me, that you wouldn't put a claim on a product unless it was subject to a regulatory mandate that would cause the price of your product to be lower." [91]

---

[91]   Second Weir Deposition, p. 104.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

However, Mr. Weir's preliminary regression yielded several negative results for product attributes and label claims.  Products claiming to be low-fat or fat-free, products that claim to be sources of omega fatty acids, products that claim to be free of preservatives, and products that claim to be good for the heart all had negative and significant coefficients in Mr. Weir's regression results.[92]  Under Mr. Weir's interpretation of his regression results, this means that each of those product attribute label claims led to a reduced price for that product.  However, this contradicts Mr. Weir's assertion that products would not carry label claims that "would cause the price of your product to be lower."[93]  Mr. Weir provided no explanation for these results in his report. Such inconsistent results present additional indicators that Mr. Weir's econometric model is not functioning properly.

---

[92] Weir Amended Declaration, Exhibit 3, pp. 1 – 2.  The variables for (a) fat claims ("ABSENCEOFSPECIFICFAT," "FATFREE," and "LOWFAT"), (b) omega fatty acid claims ("NATURALSOURCEOFOMEGA," "OMEGA3PRESENCE," and "OMEGA6PRESENCE"), (c) preservative claims ("PRESERVATIVEFREE"), and (d) heart health claims ("PRVTLBLSMART," "HEARTHEALTHY," and "HEARTHLTH") all have negative and significant coefficients.

[93] Second Weir Deposition, p. 104.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

### C. **Mr. Weir's Proposed Regression Model Relied Upon Unexplained Judgment Calls**

77.    In the process of preparing his data for analysis, Mr. Weir made various subjective determinations or "judgment calls."   Mr. Weir did not explain in his report the rationales behind these judgment calls.   In fact, Mr. Weir did not provide <u>any</u> description of these choices.   The reliability of Mr. Weir's proposed regression analysis depends upon the reliability of these unexplained decisions made by Mr. Weir – which include at least the following.

  a.   Mr. Weir included and excluded products from his regression analysis without explanation.

  b.   Mr. Weir included and excluded product attributes without explanation.

### 1. **Mr. Weir Included And Excluded Products From His Regression Without Explanation**

78.    Mr. Weir used data from one document (i.e., "CAG0031947") in his regression analysis.[94]   This document contains market information for 4,960 products in the shortening or cooking oil category.   However, Mr. Weir's final regression analysis included information for only 513 products.   Mr. Weir did not fully describe how he determined the final sample used in his data set.

_____

[94]   Weir Amended Declaration, p. 15.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

79.   Mr. Weir did indicate some of the decision rules for including or excluding observations.  Mr. Weir stated that "[o]bservations were dropped from the data set if there were fewer than 99 unit sales in a year; if the recorded price per unit was zero, and for aerosol/pump style products." [95]   Mr. Weir additionally implies that he included 4 types of cooking oils (i.e., canola, corn, blended, and vegetable). [96]   However, the aforementioned decision rules are not sufficient for recreating Mr. Weir's data set.

80.   Mr. Weir made two types of decisions without explanation: (a) excluding products that appear to be similar to products that he included and (b) including products that that he does not consider appropriate comparators for the Challenged Products.

   a.   Excluding Products That Appear Similar To Included Products.   The raw data used by Mr. Weir included a variety of product types.  Mr. Weir included products whose type was one of four values: "CANOLA", "CORN", "CORN & CANOLA" (or blended oils), or "VEGETABLE." [97] The raw (i.e., underlying) data set had additional varieties of cooking oil, including "CANOLA & CORN" and "VEGETABLE OIL."  Despite their similarity to product types that Mr. Weir did include, he did not include any products that were of these types.  Mr. Weir did not explain why he chose to include products from the first four categories but not these other, apparently similar, categories.

_____

[95]   Weir Amended Declaration, p.28, footnote 51.

[96]   Weir Amended Declaration, p. 28.

[97]   Mr. Weir relabeled "CORN & CANOLA" as "BLEND."

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

b. <u>Including Products That He Does Not Consider Appropriate Comparator Products</u>.  Mr. Weir chose to include products that he does not believe are reasonable substitutes for the Challenged Products.  When discussing "Fat-Free" products included in his regression analysis, Mr. Weir testified "I don't think it might be a reasonable substitute for -- in other words, it may be a somewhat different product than what you would get from Wesson."[98]   If Mr. Weir did not believe that fat-free products were reasonable substitutes for the Challenged Products, then Mr. Weir should not have included them in his regression analysis.[99]

81.     As presented above, Mr. Weir made numerous judgment calls when deciding which products to include in his regression analysis.  Because Mr. Weir did not describe the decisions he made when choosing his data set for analysis, the regression result that he presented must be interpreted with caution.

### 2. **Mr. Weir Included And Excluded Product Attributes Without Explanation**

82.     Mr. Weir made numerous judgment calls concerning the product attributes to include in his preliminary regression model.    Mr. Weir stated "identification of explanatory variables is an ongoing process that starts with economic theory, and then involves collecting and reviewing data, and then analyzing the data to make an empiric determination about the use of the

---

[98]  Second Weir Deposition, p. 66.

[99]  Mr. Weir has not addressed whether other products that are not reasonable substitutes for the Challenged Products were included in his regression analysis.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

variable."[100]    However, Mr. Weir provided no description of how that process led to his set of explanatory variables, nor did he keep records of his decision process.[101]    As a result, Mr. Weir's regression omitted without explanation at least the following variables.

a.  <u>Reduced Fat</u>.    The raw Nielsen data contained a variable named "HWMP Fat Presence."   This variable had 5 values for the sample to be chosen by Mr. Weir: "Absence of Specific Fat," "Fat Free," "Low Fat," "Reduced Fat," and no claim.   Mr. Weir included variables for the first 3 values but not for "Reduced Fat."   As a result, Mr. Weir's regression considers "Reduced Fat" products as being equivalent to products making no claims about fat presence.   Mr. Weir did not explain this "reduced fat" decision.

b.  <u>Vitamin Presence</u>.    The raw Nielsen data contained a variable named "HWMP Vitamin Mineral Presence."   This variable had 4 values for the sample to be chosen by Mr. Weir: "Excellent Source of Vitamins," "Good Source of Vitamins," "Vitamin Presence," and no claim.   Mr. Weir included variables indicating that a product was either an excellent or a good source of vitamins, but he grouped "Vitamin Presence" with no claim without explanation.   Mr. Weir did not explain this "vitamin presence" decision.

c.  <u>"Great For You"</u>.    The raw Nielsen data contained a variable named "HWMP Nutritional Hlth Clm" (Nutritional Health Claims).   This variable contained several values, including "Heart Healthy" and "Heart Health Recipes," which Mr. Weir included in his regression.   However, this variable also included the value "Great For You" that Mr. Weir did not include in his regression.   Mr. Weir did not explain this "great for you" decision.

_____

[100]  Weir Amended Declaration, p. 29.

[101]  Second Weir Deposition, p. 88.   Mr. Weir testified: "I don't think I would have a separate note file that identified each of those, you know, methodological steps."

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

d. <u>Carb Conscious</u>.  The raw Nielsen data included a variable named "HWMP Carb Conscious" that indicated whether a product was marketed toward carb-conscious consumers.  Mr. Weir did not include this variable in his regression.

e. <u>Vegetable Presence</u>.  The raw Nielsen data included a variable named "HWMP Fruit And Veg Presence."  In Mr. Weir's sample, this took 2 values: "Vegetable Presence" and no claim.  Mr. Weir did not include a variable for "Vegetable Presence" in his regression.

f. <u>Salt And Sodium Free</u>.  The raw Nielsen data included a variable named "HWMP Salt Or Sodium Presence."  In Mr. Weir's sample, this took 2 values: "Salt And Sodium Free" and no claim.  Mr. Weir did not include a variable for "Salt And Sodium Free" in his regression.

g. <u>Soy</u>.  The raw Nielsen data included a variable named "HWMP Soy" that indicated whether a product was soy-based.  Mr. Weir did not include a variable for "Soy" in his regression.

83. Mr. Weir did not discuss how he decided to omit these variables from his preliminary regression.  The only statement Mr. Weir made was that "identifying explanatory variables is an ongoing process…"[102]  Such a statement is not helpful to the Court in determining whether a proposed claimed damages approach can reliably evaluate claimed Class-wide damages using common proof.  Without further description of Mr. Weir's decision process for including or excluding variables, Mr. Weir's regression results (and guidance for the Court) must be interpreted with caution.

_____
[102] Weir Amended Declaration, p. 29.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

## VII.  MR. WEIR FAILED TO ADDRESS IMPLICATIONS OF HIS PRELIMINARY REGRESSION RESULTS THAT UNDERMINE PLAINTIFFS' POSITION

84.  Mr. Weir's preliminary regression results yield implications that undermine Plaintiffs' position.  Mr. Weir does not address or acknowledge these implications, which include at least the following.

   a. Mr. Weir's preliminary regression results are inconsistent with Plaintiffs' theory of ConAgra's alleged misconduct.

   b. Based upon Mr. Weir's preliminary regression results, notice and claims administration costs likely would overwhelm any claimed benefits to the Classes.

### A. Mr. Weir's Preliminary Regression Results Are Inconsistent With Plaintiffs' Theory Of ConAgra's Alleged Misconduct

85.  The preliminary regression results that Mr. Weir presents are inconsistent with Plaintiffs' theory of ConAgra's alleged misconduct (i.e., labeling products as "100% Natural", which according to Plaintiffs' theory of liability, represent them as being "GMO Free").  Plaintiffs contend that, at a minimum, the claim "100% Natural" represents that a product is GMO-free.

86.  Under Plaintiffs' interpretation, a "100% Natural" claim should have at least as large an effect on price as a "GMO-Free" claim because the "GMO-Free" claim is a subset of the "100% Natural" claim.  Because "100% Natural" may have additional components that can increase prices, a "100% Natural" claim would have a larger effect on price than a "GMO-Free" claim (under

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

Plaintiffs' theory where a "GMO-Free" attribute is a subset of all attributes that make up an alleged proper "100% Natural" claim).

87.    However, Mr. Weir's preliminary regression results (<u>within Mr. Weir's regression framework</u>) suggest that GMO-free claims are almost ten times as important as "Natural" claims.[103]    This can only be the case if "100% Natural" claims are not commonly understood to represent a product as being GMO-free – an interpretation that Plaintiffs' theory of liability rejects.

88.    In fact, Mr. Weir agrees, in part, with this interpretation of his regression results.    Mr. Weir testified:

> It depends on -- again, **[consumers] treat affirmative GMO-Free claims differently than they treat natural claims**…    If anything, this coefficient highlights that GMO -- **the GMO interpretation is not a subset from an economic perspective of the natural claim**, even though the natural claim can be true or false because of GMO status.[104]

89.    Mr. Weir's testimony is contradictory.    If consumers treat GMO-free claims differently than "Natural" claims (as Mr. Weir stated), then consumers must not consider the "GMO-Free" interpretation of "Natural" to be material to their purchase decision.    Similarly, if the "GMO-Free" interpretation is not

_____

[103]    The "Natural" coefficient is approximately 0.0226, while the "GMO-free" coefficient is approximately 0.212.    Therefore, according to these results, GMO-free claims have a significantly greater impact on price than "Natural" claims.

[104]    Second Weir Deposition, p. 119.    (Bracketed text added for clarification; emphasis added.)

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

a subset of the "Natural" claim (as Mr. Weir stated), then consumers do not consider "GMO-Free" to be a material aspect of "Natural" – rendering Mr. Weir's proposed regression analysis as invalid.   Mr. Weir's regression results and his testimony are in contradiction to Plaintiffs' theory in this case.

**B. Under Mr. Weir's Preliminary Regression Results, Notice And Claims Administration Costs Likely Would Overwhelm The Benefit To The Classes**

90.  Mr. Weir's preliminary regression results suggest a claimed nationwide price premium of 2.28%.[105]   In other words, Mr. Weir's preliminary results suggest that the Challenged Products were priced 2.28% higher than they would have been had they not carried the Challenged Claim.   Under this interpretation, the difference between Challenged Products' historical prices and Challenged Products' prices without the Challenged Claim would be determined by multiplying the historical prices by 2.23%.[106]

_____

[105]  Weir Amended Declaration, p. 30.   As stated above, once corrected for coding errors, Mr. Weir's regression yields a <u>statistically insignificant</u> estimate of 1.96%. For ease of discussion, I utilize Mr. Weir's estimates rather than the corrected estimates presented above.

[106]  Weir Amended Declaration, p. 30, footnote 53.   Mr. Weir stated: "The price premium calculated here [2.28%] is the extra amount consumers would have paid above a base amount had the claim not been made.   The actual available sales data in this case are sales dollars that occurred *with* the claim.   To determine damages, you need the corresponding discount, which is . . . 2.23%."   For example, under Mr. Weir's interpretation, a $10.00 product without the "100%

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014



Natural" claim would have been priced 2.28%, or $0.228, higher if it had carried the "100% Natural" claim.   The $0.228 represents only 2.23% of the higher $10.228 price.   (Calculation: ($0.228/$10.228) x 100% = 2.23%.)

[107] This product is described as "WESSN VEG OIL 16 OZ" and has UPC 002700061295. ███████████████████████████████████████

[108] This product is described as "WESSN CNLA OIL NT NC PL 160 OZ" and has UPC 002700069065. █████████████████████████████████████

[109] CAG0031947.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

Plaintiffs do not address this issue other than to describe Mr. Weir's preliminary regression as "more useful for determining the general directional nature of the Natural Claim coefficient..., than it is for determining its specific value."[113] Given the unreliable nature of Mr. Weir's proposed regression analysis (as described throughout my declaration), Mr. Weir cannot provide any assurances to the Court that the claimed price premium would be larger if Mr. Weir continued to refine his regression model.

93.    Furthermore, based upon Mr. Weir's regression results, the 2.23% value (to be multiplied by Challenged Product retail prices) may represent the largest that the claimed premium could be.   Plaintiffs have advanced a procedure to apportion this premium amongst the various aspects of a "Natural" claim.[114] If this procedure were to be used, the relevant percentage would decrease from 2.23%.   Under that apportionment scenario, notice and claims administration costs are even more likely to overwhelm any potential benefit to the classes.

_____

[113]   Weir Amended Declaration, p. 31.

[114]   *See, e.g.,* Howlett Amended Declaration, pp. 26 – 27.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

## VIII. OVERVIEW OF DR. HOWLETT'S PROPOSED SUPPLEMENT TO MR. WEIR'S HEDONIC REGRESSION METHODOLOGY

94.    As an alternative to relying upon Mr. Weir's hedonic regression model on a standalone basis, Plaintiffs proposed to combine the results of Mr. Weir's hedonic regression model with Dr. Howlett's proposed conjoint analysis.

> To the extent that Plaintiffs are required to narrow their damages methodology such that it isolates the percentage price premium attributable solely to the effect of the '100% Natural' claim in misleading consumers to believe that Wesson Oils contained no GMOs (a conclusion Plaintiffs respectfully submit is contrary to law, as explained above), Plaintiffs have a mechanism for doing so.   Dr. Elizabeth Howlett describes how the premium resulting from only the "non-GMO" aspect of the "100% Natural" claim can be determined on a classwide basis using conjoint analysis.[115]

95.    Dr. Howlett proposed a two-step hybrid method to "determine the percentage of the Price Premium for the '100% Natural' claim that is attributable to consumers' belief that '100% Natural' claim on Wesson Oils means that the products are not made from genetically modified ingredients."[116]    However, Dr. Howlett testified that "[r]ight now [Dr. Howlett is] unaware of anyone that has exactly done this same thing."[117] The two steps to this proposed hybrid approach are as follows.

_____

[115]    Plaintiffs' Memorandum, p. 64.

[116]    Howlett Amended Declaration, p. 1.

[117]    *See, e.g.,* Howlett Deposition, p. 242.    (Bracketed text added for clarification.)

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

    a. First, Mr. Weir would perform his proposed hedonic regression analysis to provide an estimated price premium for "Natural" claims.

    b. Second, Dr. Howlett would use conjoint analysis to determine what share of the overall "Natural" price premium (if one exists) is attributable to the claimed "GMO-Free" component of "Natural" claims.

96.   Dr. Howlett's conjoint analysis relies on identifying the various characteristics consumers attribute to a "100% Natural" claim. Based upon various surveys, Dr. Howlett identified six likely attributes that she anticipates including in her conjoint analysis:

    a. presence of artificial colors;

    b. presence of artificial flavors;

    c. presence of artificial preservatives;

    d. presence of pesticides;

    e. presence of GMOs; and

    f. whether artificial materials or chemicals (other than colors or flavors) are used during processing.[118]

97.   Dr. Howlett's proposed conjoint analysis will present to survey participants various hypothetical products that have combinations of the above attributes. According to Dr. Howlett, the conjoint analysis will yield the "relative importance" consumers place on each of these attributes when considering purchasing a "100% Natural" Wesson Oil product.[119] Dr. Howlett then

_____

[118] Howlett Amended Declaration, p. 23.

[119] Howlett Amended Declaration, p. 27.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

assumes that these consumer perceptions of "relative importance" equate to the proportion of the price premium for a "100% Natural" claim attributable to each attribute.   In order to determine the price premium attributable solely to the "non-GMO" aspect of the Challenged Claim, Dr. Howlett will multiply the "relative importance" percentage consumers place on the "non-GMO" aspect by the price premium resulting from Mr. Weir's regression analysis.[120]

## IX.  METHODOLOGY PROPOSED BY DR. HOWLETT TO SUPPLEMENT MR. WEIR'S REGRESSION WOULD NOT YIELD A RELIABLE MEASURE OF CLAIMED DAMAGES

98.  Dr. Howlett's proposed two-step hybrid method relies upon two separate analyses (i.e., Mr. Weir's hedonic regression and her own conjoint analysis) to determine the price premium (if any) that is specifically attributable to the claimed "GMO-Free" component of the "100% Natural" claim. Unaddressed flaws in either Mr. Weir's regression methodology or Dr. Howlett's conjoint analysis would render the proposed two-step hybrid method incapable of evaluating a relevant and reliable measure of claimed damages in this case.   As discussed previously, Mr. Weir's proposed hedonic regression analysis suffers from numerous flaws that would render it inappropriate for use in Dr. Howlett's proposed two-step hybrid method.

_____
[120]  Howlett Amended Declaration, p. 28.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

Even if there were no issues with Dr. Howlett's analysis, her analysis would not cure the issues present in Mr. Weir's econometric analysis.

99.     However, in addition to the flaws in Mr. Weir's hedonic regression, Dr. Howlett's proposed conjoint analysis suffers from drawbacks that prevent it from evaluating what portion of a "Natural" price premium (if one exists) is due to a claimed "GMO-Free" component of "Natural" claims.    Dr. Howlett's conjoint results are inappropriate for use in her proposed two-step hybrid method because of these drawbacks, which include at least the following.

    a.  Dr. Howlett's proposed conjoint analysis would at best measure consumers' average opinion of the "relative importance" placed on each characteristic of a feature – which has no nexus to an actual price premium paid, if one exists.

    b.  Dr. Howlett's proposed analysis cannot provide a value for the claimed "GMO-Free" interpretation tied to the Class periods which go back many years.

    c.  Dr. Howlett's proposed analysis draws attention to certain features that may not be considered by consumers when making actual purchase decisions.

### A.  Dr. Howlett's Proposed Conjoint Analysis Would At Best Measure Consumer Perception Of Relative Importance – With No Nexus To An Actual Price Premium Paid

100.    According to Dr. Howlett, the key result from her conjoint analysis would be the "Relative Importance percentages [which] indicate[] the importance consumers assign to each attribute (relative to the others) regarding its effect

Reply Declaration of Keith R. Ugone, Ph.D.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

on the 'naturalness' of Wesson Oils."[121]    In other words, Dr. Howlett's conjoint results would represent consumer perceptions of the relative values associated with the various components of a "Natural" claim.   Dr. Howlett proposed to use these "relative importance" measures to indicate the amount of a "Natural" price premium explained by the different attributes that comprise a "Natural" claim.[122]   In order to use her conjoint analysis results in this manner, Dr. Howlett testified that she relied upon the <u>assumption</u> that the proportions of "relative importance" provided by the conjoint analysis is the same as the proportions of the price components for the various aspects of the "100% Natural" claim.[123]   In making this assumption, Dr. Howlett assumed that only consumer perceptions (and not other considerations, such as supply factors) determine market price premiums.[124]    Dr. Howlett acknowledged that her proposed analysis does not capture all of the factors that influence price or a price premium (e.g., it "has nothing to do with supply factors").  Dr. Howlett testified:

_____

[121]  Howlett Amended Declaration, p. 27.

[122]  Howlett Amended Declaration, pp. 27 – 28.

[123]  *See, e.g.,* Howlett Deposition, p. 249.

[124]  Dr. Howlett did not discuss in her declaration that she would consider any other factors that may influence price premiums (if they exist).

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

Q: In attempting to use conjoint analysis in this manner [i.e., the two-step approach], is it an underlying assumption that the combination method that the proportion of relative importance provided by the conjoint analysis is the same as the proportion of the price components for the various aspects?

A: Yes.

Q: Your combination method does not account for ways that supply factors might affect the price premium you're trying to calculate?

A: What I'm focusing on has nothing to do with supply factors.

Q: Okay, that's what I'm asking.   So your combination method that you're proposing does not take into account ways that supply factors might affect the price premium?

A: Correct.

Q: Do you agree that price premiums depend on both supply and demand considerations?

A: Yes.

Q: But you don't take these into account in your price premium calculation?

A: That's so far outside the realm of what I was asked to do.

Q: So that's a no, you don't take that into account in your price premium calculation?

A: Correct.[125]

101.  Dr. Howlett's assumption conflates two fundamentally different economic concepts: (a) the "relative importance" a consumer may place on any particular attribute of a label claim and (b) the <u>actual price</u> charged for the

_____

[125]  Howlett Deposition, p. 249.    (Objections omitted.)

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

attribute of a label claim in the marketplace. As Dr. Howlett acknowledged, consumer perceptions do not, alone and without other input, determine observed prices or price premiums. Observed prices or price premiums are determined by the interaction of consumer preferences and costs associated with the product or attribute in question, among other considerations. Although a consumer's perception of "relative importance" for a product or feature may be one (demand) factor that influences prices, it is one of many factors that influence prices. As a result, these consumer opinions of the value of a feature are not the same as the *price* of (or the *price premium* associated with) that product or feature. Other economic factors that might influence prices (and therefore price premiums) include:

a. the value of other features or attributes associated with "Natural" claims (including features or attributes not tested in the proposed survey);

b. features and prices of other products that consumers might choose as alternatives;

c. costs of production and distribution;

d. practical pricing considerations, including interactions with other products that may be offered by the same manufacturer; and/or

e. other strategic considerations that can affect the pricing decisions of manufacturers and retailers (including the pricing associated with competing products).

102. Dr. Howlett's proposed conjoint analysis fails to take into account supply considerations and/or other market forces that may be present (such as

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

competition from other products).   Dr. Howlett's proposed conjoint analysis

fails to take into account how the relative costs associated with providing the

different attributes of a "natural" claim influence these attributes' relative

contribution to a potential "natural" price premium.   Consequently, there

may be no nexus between (a) some consumers' perception of the "relative

importance" of a particular attribute of "100% Natural" and (b) a

manufacturer's or retailer's ability to charge an actual price premium (or the

market's actual determination of a price premium) on that specific attribute

of the "100% Natural" claim.   Hence, any claimed "relative importance"

derived by Dr. Howlett from a conjoint analysis is likely to have little or no

correlation with any <u>actual</u> price premium observed in the market associated

with the claimed "non-GMO" component of the "100% Natural" claim.

## B. <u>Proposed Conjoint Analysis Cannot Provide A Value Tied To The Class Periods Over Time</u>

103.   Survey methodologies such as conjoint analysis generally measure the value

of features of the product at the point in time of the survey and cannot easily

determine the value of features in the past.   To the extent that the value

consumers place on the asserted "GMO-Free" component of the Challenged

Claim varies over time, Dr. Howlett's proposed methodology would be

unable to measure reliably the value of the claimed "GMO-Free" component

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

to individuals who purchased Wesson Oil products earlier in the putative Class periods (which began as early as 2007).

104.  Dr. Howlett provided no support for her implicit assumption that the value consumers would attribute to the claimed "GMO-Free" component has remained constant over time.   In fact, Dr. Howlett testified that she believed (based upon anecdotal evidence) that consumer awareness of GMO ingredients in food products had been increasing over the past five years.[126] Dr. Howlett's belief suggests that the "relative importance" measures she proposes to calculate at some point in the future would not be representative of the "relative importance" associated with attributes of the "100% Natural" claim seven years prior to Dr. Howlett's proposed survey (or would be correlated with actual price premium over time, if any).

C. **Proposed Conjoint Analysis Draws Attention To Certain Features That May Not Be Considered By Customers When Making Actual Purchase Decisions**

105.  Conjoint analysis necessarily draws attention to features used in the survey exercise (e.g., the claimed "GMO-Free" component of the "100% Natural" claim).   By drawing additional attention to the "GMO-Free" aspect of the Challenged Claim, the conjoint analysis runs the risk of assigning a larger

_____

[126] Howlett Deposition, p. 324.   Dr. Howlett further testified that "in today's environment … there is greater attention being paid to genetic modification." (Howlett Deposition, p. 222.)

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

value to the "GMO-Free" aspect than that which would be actually observed in the marketplace.  Presented with a description of the components or interpretations of the "100% Natural" claim in a survey, respondents may ascribe more value to the claimed "GMO-Free" component in the survey setting than they would when making actual purchase decisions.[127]   Dr. Howlett did not address how she will overcome this drawback.  A survey necessarily places emphasis on product attributes that consumers may or may not place emphasis while shopping.

## X.    OVERVIEW AND EVALUATION OF DR. HOWLETT'S PROPOSED TWO-STEP CONJOINT ANALYSIS

106.   In addition to the two-step hybrid method (i.e., use of hedonic regression and conjoint analysis in combination) evaluated above, Dr. Howlett also proposed that conjoint analysis can be "used to determine the full value of the Price Premium for the '100% Natural' label on Wesson Oils in the event that an alternate method is needed for the hedonic regression proposed by Colin Weir."[128]   This approach would be similar to the two-step hybrid method described above, except that the first step would use a conjoint

_____

[127]  In a store environment (when an actual purchase is being considered), the consumer chooses the product attributes upon which to focus; in a survey environment, the consumer is told the product attributes upon which to focus.

[128]  Howlett Amended Declaration, p. 28.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

analysis as opposed to a hedonic regression.  As a result, much of the criticism discussed in **Section IX** above applies to this method in addition to specific drawbacks discussed below.

## A. <u>Overview Of Dr. Howlett's Proposed Two-Step Conjoint Analysis</u>

107.   Dr. Howlett proposed a method for calculating claimed damages that does not rely upon Mr. Weir's hedonic regression.[129]  This alternate conjoint analysis method also would be a two-step procedure.  However, for this method, both steps would involve a conjoint analysis.

   a.   <u>Step 1: Performing Conjoint Analysis To Determine The Value Of A "100% Natural" Claim</u>.  As a first step, Dr. Howlett stated that she would perform a conjoint analysis to determine "how much value consumers place on the 100% Natural claim when they purchase Wesson Oils."  Dr. Howlett proposed to include in the conjoint analysis the following attributes of Wesson Oil products:

   i.   "Pure";

   ii.   "100% Natural";

   iii.  "No Preservatives";

   iv.  "Cholesterol Free"; and

   v.   price.[130]

   b.   <u>Step 2: Performing A Second Conjoint Analysis To Apportion The Value Of A "100% Natural" Claim</u>.  After the first step, Dr. Howlett would perform a second conjoint analysis to determine the relative importance of different aspects of a "100% Natural" claim to consumers.  This step

_____
[129]  Howlett Amended Declaration, p. 28.

[130]  Howlett Amended Declaration, p. 28.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

would be the same as the second step in Dr. Howlett's hybrid method described above (in **Section VIII**).[131]

B.   **Dr. Howlett's Proposed Two-Step Conjoint Analysis Would Measure A Willingness To Pay And Not A Price Premium**

108.   Dr. Howlett's proposed two-step conjoint analysis method would, at best, provide an average "willingness to pay" for a "GMO-Free" component or interpretation of a "100% Natural" claim rather than an actual price premium.   Dr. Howlett acknowledged that "willingness to pay" and "price premium" are different concepts.

> Q: Is price premium and a positive willingness to pay the same concept or are they different?
> A: I -- I believe they're separate.
>
> Q: Okay.   What's the difference?
> A: When you use the term willingness to pay that would seem like in a broader sense that's more like an overall measure, like your willingness to pay would be like your purchase intention, it's a broader measure.   And a price premium is a more specific aspect of that.
>
> Q: Okay.   Does conjoint analysis generally determine a willingness to pay as opposed to a price premium?
> A: Conjoint analysis can be used in lots of different ways.   One of them is typically willingness to pay, other things are to parse apart different constructs so it can be used in different ways.

_____

[131]   Howlett Amended Declaration, p. 28.   ("The rest of the preceding description of CBC [Choice-Based Conjoint] would then be used as a step 2 analysis to figure out the percentage of the Price Premium attributable to the non-GMO attribute of a 100% Natural claim.")

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

> Q: So we agree conjoint analysis has traditionally been used to show a willingness to pay as opposed to a price premium?
>
> A: In the literature that's correct, there's more willingness to pay studies.
>
> Q: In fact we're unaware of anything in the literature where conjoint analysis was used to determine a price premium for a specific attribute?
>
> A: I'm not aware off the top of my head, that's correct.[132]

109.   As discussed above for the "relative importance" measures, a "willingness to pay" measure does not reflect the actual prices (or price differences) associated with any one attribute of a product. Prices and observed price differences (and price premiums) are determined by the interaction of supply factors and demand factors. Dr. Howlett did not discuss any way in which her two-step conjoint analysis method would consider supply factors. Dr. Howlett provided no methodology that would allow her to convert a "willingness to pay" figure into a claimed price premium (if any) that actually occurred in the marketplace.

### C. **Dr. Howlett's Proposed Two-Step Conjoint Analysis Method Suffers From The Same Drawbacks As Her Proposed Two-Step Hybrid Method**

110.   Several of the criticisms discussed in **Section IX** relating to Dr. Howlett's proposed two-step hybrid method (i.e., use of hedonic regression and conjoint analysis in combination) would hold even more strongly for this

_____

[132]   Howlett Deposition, pp. 231-232.    (Objections omitted.)

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014
_____

proposed two-step conjoint analysis. For example, both conjoint analyses in this proposed method would be unable to determine values that apply to the range of time covered by the Class periods. Additionally, both conjoint analyses in this method would potentially overemphasize the attributes included in the surveys while ignoring potentially relevant characteristics.

111. Furthermore, the second step in Dr. Howlett's proposed two-step conjoint analysis suffers from the primary drawback discussed in **Section IX**. Specifically, Dr. Howlett's second conjoint analysis assumes that the proportion of "relative importance" provided by the conjoint analysis is the same as the proportion of the price components for the various aspects of a "Natural" claim. Dr. Howlett has provided no analytics in her report to support such an assumption.

* * * * * *

112. My analyses, observations, and opinions contained in this declaration are based upon information available to date. I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the Parties to this dispute and to supplement my opinions based upon that review.

Reply Declaration of Keith R. Ugone, Ph.D.
October 6, 2014

_____

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Dallas, Texas on October 6, 2014.


*Keith R. Ugone*
Keith R. Ugone, Ph.D.