UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| IN RE CONAGRA FOODS, INC. | Case No. CV 11-05379-CJC (AGRx) <br><br> MDL No. 2291 <br><br> <u>CLASS ACTION</u> |

**JOINT DECLARATION OF HENRY J. KELSTON AND ADAM J. LEVITT IN SUPPORT OF UNOPPOSED MOTION FOR ORDER DIRECTING NOTICE TO THE CLASSES**

We, HENRY J. KELSTON and ADAM J. LEVITT, declare as follows pursuant to 28 U.S.C. §1746:

1. Henry J. Kelston is a partner at the law firm of Milberg Tadler Phillips Grossman LLP ("MTPG") and Adam J. Levitt is a partner of the law firm of DiCello Levitt Gutzler LLC ("DLG").

2. The attorneys of MTPG and DLG, now seeking formal appointment as Class Counsel, were appointed Interim Class Counsel on November 1, 2011 (ECF No. 48) and have provided excellent representation to the Classes for over seven years.[1] We have been actively involved in the prosecution and settlement of the Action, are familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon our supervision and participation in all material aspects of the Action.

3. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, we submit this declaration in support of the Unopposed Motion for Order Directing Notice to the Classes.

---

[1] In their Amended Motion for Class Certification, Plaintiffs requested that the Court "designate Plaintiffs as class representatives of the separate statewide classes they respectively seek to represent, appoint Plaintiffs' Interim Co-Lead Counsel as Class Counsel." Judge Morrow explicitly ruled that "named plaintiffs and class counsel satisfy Rule 23(a)'s adequacy requirement" (ECF No. 245 at 57), but did not expressly appoint class representatives or class counsel.

4. Attached as Exhibit 1[2] to this declaration is the Settlement Agreement entered into in this Action, along with each of its exhibits ("Settlement Agreement" or "Settlement").[3]

5. Attached as Exhibit 2 is a true and correct copy of MTPG's firm resume, which describes the firm's experience in class actions and other complex litigation, and the biographies of attorneys in the firm who were involved in this Action.

6. Attached as Exhibit 3 is a true and correct copy of DLG's firm resume, which describes the firm's experience in class actions and other complex litigation, and the biographies of attorneys in the firm who were involved in this Action.

7. Attached as Exhibit 4 is the Declaration of Colin B. Weir.

## I. DESCRIPTION OF THE SETTLEMENT

8. After almost eight years of hard-fought litigation, in order to avoid the risks, burden, and costs of ongoing litigation, Class Representatives and Conagra have reached agreement to resolve this action on a class-wide basis. The Settlement was negotiated at arm's length with the assistance of Magistrate Judge Douglas F. McCormick. The Settlement provides for both injunctive relief and monetary damages to all Class Members.

9. In July 2017, six years into this litigation, Conagra removed the "100% Natural" claim from all Wesson labels, and stopped advertising the products as "natural." Plaintiffs contend that this litigation was a significant factor leading to Conagra's decision to institute labeling and marketing changes.

10. The injunctive relief agreed to by the Parties in November 2018 provided that Conagra would not label, advertise, or market Wesson Oils as "natural," absent future legislation or regulation permitting such a claim, thus guaranteeing that Conagra would not reverse the

---

[2] Citations to "Exhibit" or "Ex.___" herein refer to exhibits to this Joint Declaration. For clarity, citations to exhibits that have attached exhibits will be referenced as "Ex. __-__." The first numerical reference refers to the designation of the entire exhibit attached hereto and the second alphabetical reference refers to the exhibit designation within the exhibit itself.

[3] All capitalized terms used in this declaration that are not otherwise defined shall have the meanings provided in the Settlement Agreement.

significant labeling and marketing changes that it adopted in 2017. The Parties, with the assistance of Magistrate Judge McCormick as mediator, agreed that the value of the injunctive relief was $27 million. Approximately one month later, Conagra announced that it had agreed to sell the Wesson brand to Richardson International, a Canadian company. The sale was consummated on February 25, 2019. As a result of that sale, the Parties have revised the terms of the injunctive relief to clarify that it will apply to Conagra in the event it reacquires the Wesson brand.

11. Thus, Wesson Oil purchasers have benefitted from the removal of the "100% Natural" claim since July 2017.

12. Plaintiffs' damages expert Colin Weir has calculated that Wesson purchasers in the eleven class states paid approximately $11,540,000 more *per year* for the products due to the presence of the "100% Natural" claim on the labels. *See* Weir Decl. ¶ 24. Thus, according to Weir's calculations, the value of the labeling change from July 1, 2017 to February 25, 2019, is approximately $19,080,000.[4]

13. There is no reason to believe that legislation or regulation permitting the use of a "natural" claim on Wesson Oils is imminent.[5] It is, therefore, reasonable to assume that, should Conagra reacquire the Wesson Oil brand, Class Members would accrue benefits of the label change for at least two more years, raising the total value of the labeling and marketing changes to more than $42,000,000.

14. In the absence of a reacquisition of the Wesson brand by Conagra, it is highly unlikely that Richardson International will resume labeling the products as "natural" without affirmative

---

[4] It should also be noted that the "100% Natural" label has benefitted Wesson Oil purchasers throughout the United States, not just in the eleven Class States (which represent approximately 44% of the national population).

[5] In another case involving a claim that a product containing GMOs was deceptively marketed as "natural," a court recently lifted a stay previously granted on the ground of "primary jurisdiction," observing that, while the FDA has stated that it "plans to publicly communicate next steps regarding Agency policies related to 'natural.'" in 2019, "this hardly suggests that rulemaking is imminent." The court further noted that "such agency action typically takes between two and five years to complete." *Kind LLC "Healthy and All Natural" Litigation*, Case No. 1:16-cv-00959-WHP, S.D.N.Y (Feb. 11, 2019).

legislative or regulatory authorization in the U.S. First, Richardson agreed to purchase the Wesson brand after the allegedly misleading "natural" claim was removed from the labels. Second, Richardson is surely aware of this litigation as well as myriad other litigations concerning "natural" labeling and, thus, cognizant of the likelihood that it would be embroiled in U.S. litigation should it revert to labeling Wesson Oils as "natural." Finally, the issuance of the requested injunction by this Court, combined with the award of monetary compensation to Class Members, will serve to further apprise Richardson of the potential liability it may face should it revert to labeling Wesson Oils as "natural."

15. Even allowing for the highly unlikely prospect that Richardson does consider rebranding Wesson oils as "natural," the process of market research, label redesign, production change, and physical rollout would take several months, at minimum.

16. According to the Weir estimate, if just one additional year passes without "natural" claims being restored to Wesson Oils labels – which Plaintiffs contend is a virtual certainty – the value of the labeling change that Plaintiffs claim was, at least in part, the result of this litigation, would reach approximately $30,600,000.

17. The Settlement also provides the following monetary benefits to Class Members: (a) $0.15 for each unit of Wesson Oil Product purchased by members of each of the eleven Classes to Households submitting Valid Claim Forms (for a maximum of 30 units without proof of purchase, and for unlimited units with proof of purchase); (b) an additional fund of $575,000 to be allocated to members of the New York and Oregon state classes who submit Valid Claim forms, as compensation for the statutory damages provided for in the consumer protection laws of those states that Plaintiffs would claim at trial; and (c) an additional fund of $10,000 to compensate those in all Classes who submit valid proofs of purchase for more than thirty (30) purchases at $0.15 for each such purchase above 30; should $10,000 be insufficient to cover such claims, Class Counsel shall pay the non-funded claims from any award of attorneys' fees in this case; should the $10,000 fund not be exhausted, the remaining funds will revert to category (b) herein for payment to claimants from the New York and Oregon state Classes.

4

18. The compensation of $0.15 per unit is significantly more than the best-case result at trial, which would have yielded maximum damages of approximately $0.102 (10.2 cents) per unit. See Weir Decl. ¶ 35. This figure takes into account Judge Morrow's ruling that the appropriate measure of damages in the case was not the price premium paid by Class Members due to the presence of the "100% Natural" claim, as plaintiffs has claimed, but only the portion of that premium attributable to consumers' belief that "100% Natural" meant that the products were GMO-free.

19. To satisfy this requirement, Mr. Weir's firm supervised the conduct of a conjoint survey, the results of which indicated that approximately 27% of the value of the "natural" claim on Wesson Oils was due to its "non-GMO" meaning. Weir Dec. ¶ 34. Judge Morrow's ruling on damages thus reduced the maximum per-unit compensation Class Members could seek at trial by 73%, to approximately $0.102 per unit.[6] Thus, the $0.15 per-unit compensation available to Class Members in the Settlement is approximately 36% higher than the maximum they could have obtained at trial.

20. The Plaintiffs and Class Counsel respectfully submit that the Settlement represents a favorable result for the Classes in light of the significant benefit achieved for the Classes and the risks of a lesser, or no, recovery after continued prosecution of the Action.

21. The Settlement recovers per-unit damages approximately 36% higher than the maximum they could have obtained at trial. This is an excellent result, particularly when compared to the risks that continued litigation might result in a vastly smaller recovery, or no recovery at all.

22. In entering into the Settlement with the Defendant, the Class Representatives and Class Counsel were fully informed about the strengths and weaknesses of the case. The Parties reached an agreement in principle to settle the Action in November 2018—more than seven years after the commencement of the Action—and only after extensive litigation before this Court, the

---

[6] Plaintiffs contend that Judge Morrow's ruling on this point was incorrect and would seek to have it reversed on appeal after any trial.

U.S. Court of Appeals for the Ninth Circuit, and the United States Supreme Court, and two separate rounds of mediation. Class Counsel has:

- litigated numerous motions to dismiss and motions to stay;
- conducted extensive, fiercely-contested discovery;
- retained various experts to support class certification and this Motion;
- litigated two rounds of class certification motions, ultimately obtaining certification of eleven separate state classes;
- successfully opposed Conagra's appeal of class certification to the Ninth Circuit (thereby obtaining a groundbreaking decision on the hotly contested issue of "ascertainability" in class actions);
- opposed Conagra's writ of certiorari to the United States Supreme Court for review of the Ninth Circuit decision; and
- engaged in two separate mediations to obtain this Settlement, which ensures that Conagra will not resume marketing and labeling Wesson Oils as "natural," and provides monetary compensation to Class Members in excess of what they could obtain at trial.

23. As discussed in further detail below, given the facts, the applicable law, and the risk and expense of continued litigation, the Class Representatives and Class Counsel submit that the proposed Settlement is fair, reasonable, and adequate, represents a very favorable result, and is in the best interests of the Classes.

## II. THE ALLEGATIONS AND HISTORY OF THE LITIGATION

### A. Plaintiffs' Allegations

24. Plaintiffs in this Action, residents of eleven different states, allege that from at least June 27, 2007 until July 1, 2017, Conagra deceptively and misleadingly marketed its Wesson brand cooking oils, made from genetically-modified organisms ("GMO"), as "Natural." Throughout the Class Period, every bottle of Wesson Oil carried a front label stating that the product was "100% Natural." Plaintiffs allege that foods containing GMOs are not natural.

25. Plaintiffs further allege that Wesson Oils commanded a premium price due to the presence of the "100% Natural" claim on the label and, consequently, every Class Member was induced to pay more for Wesson Oils due to that false and deceptive claim. Accordingly, Plaintiffs brought this Action on behalf of themselves and other similarly-situated consumers seeking to end

Conagra's use of the "100% Natural" claim and obtain monetary compensation for the Classes, *i.e.*, the price premium they allegedly paid for Wesson Oils due to presence of the "100% Natural" claim.

26. Conagra denies plaintiffs' allegations and believes that it has a variety of meritorious defenses.

B. **History of the Litigation**

1. **Creation of the MDL**

27. The first complaint in this action was filed by Robert Briseño on June 28, 2011 (ECF No. 1). Similar cases across the country followed, including some in the Central District of California. After five cases pending in the Central District were consolidated, Conagra moved the JPML on August 4, 2011 to transfer six additional cases then pending in four different districts to the Central District, where they were eventually consolidated before Judge Morrow (ECF Nos. 56, 59).

28. On August 24, 2011, Conagra moved to dismiss the initial complaint in the Briseño case. Alternatively, Conagra moved for a stay on primary jurisdiction grounds, the first of four unsuccessful bids Conagra would make to stay this litigation, all unsuccessful.

29. On October 13, 2011, the JPML issued a Transfer Order centralizing the pending actions before Judge Morrow in the Central District of California. In November and December 2011, Judge Morrow issued a series of consolidation orders.[7] On November 23, 2011, Judge Morrow granted Conagra's motion to dismiss with leave to replead. (ECF No. 54). On December 9, 2011, Judge Morrow consolidated all pending actions and ordered the filing of a Consolidated Amended Complaint. (ECF No. 59).

---

[7] Order Consolidating Cases, Docket No. 56 (Nov. 28, 2011); Order Re Stipulation to Consolidate Related Actions, Docket No. 59 (Dec. 9, 2011); Amended Order Granting Stipulation Re Amended Consolidated Complaint, Response to Amended Consolidated Complaint, and Consolidation of Additional Action, Docket No. 61 (Dec. 9, 2011).

**2. Early Proceedings and Discovery**

30. Plaintiffs filed the Consolidated Amended Complaint (ECF No. 80). Conagra moved to dismiss on February 24, 2012. After being fully briefed, the motion was granted in part and denied in part on November 15, 2012, with leave to replead certain claims. (ECF No. 138). On December 19, 2012, Plaintiffs filed a Second Consolidated Class Action Complaint (ECF No. 143). Conagra answered the complaint on January 16, 2013, (ECF No. 145).

31. On August 7, 2013, Conagra filed an *ex parte* application for an order staying the action under the primary jurisdiction doctrine (ECF No. 171). Plaintiffs filed a brief in opposition the following day (ECF No. 172), and Conagra's application was denied on August 12, 2012 (ECF No. 173).

**3. Discovery**

32. Over the course of nearly eight years, the parties have engaged in extensive, and often highly contentious, discovery, including multiple motions and hearings before Magistrate Judge Rosenberg.

33. On July 24, 2012, prior to the cases being consolidated, Magistrate Judge Rosenberg held a hearing and granted Plaintiffs' motion for a protective order related to document preservation demands issued by Conagra (ECF. No. 110).

34. After the Second Consolidated Class Action Complaint was filed and answered, the parties attempted and failed, over a period of five months, to negotiate a protective order. The order was completed only after Plaintiffs filed a motion (ECF No. 160) and Magistrate Judge Alicia Rosenberg held a hearing and issued a protective order on June 25, 2013 (ECF No. 163).

35. On July 1, 2013, two years after the first complaint was filed, Conagra made its first document production – 99 documents comprising 1,410 pages. Between July 1, 2013 and May 14, 2015, Conagra made 25 document productions totaling approximately 36,000 pages. Plaintiffs produced 3,594 pages from seventeen different plaintiffs (four of whom later withdrew from the case. Fact discovery closed on May 1, 2015.

36. On March 10, 2014, after a hearing, Judge Rosenberg granted, in part, motions to compel production of documents filed by both parties (ECF No. 208). On March 28, 2014, Judge Rosenberg granted in part Plaintiffs' *Ex Parte* Application for an Order Compelling Conagra to Comply with Judge Rosenberg's March 10 ruling. On May 5, 2015, Plaintiffs filed an *ex parte* application for clarification of Judge Rosenberg's March 10 ruling.

37. On November 12, 2014, Plaintiffs filed an *Ex Parte* Application Regarding Conagra's Late Production of Documents Material to Class Certification (ECF No. 412), which was denied by Judge Morrow (ECF No. 441). On December 9, 2014, Plaintiffs filed a Motion to Compel Document Production Relating to Conagra's Late Production of Documents (ECF No. 426), which Judge Rosenberg granted, in part, after a hearing on January 13, 2015 (ECF No. 508).

38. On January 15, 2015, Plaintiffs filed a Motion to Compel Production of All Non-Privileged Documents Responsive to Plaintiffs' Second Request for Production of Documents (ECF No.  ), which Judge Rosenberg granted in part (ECF No.  ). On April 27, 2015, Judge Rosenberg granted in part another motion to compel filed by Plaintiffs and ordered an additional deposition of a Conagra employee (ECF No. 570).

39. In all, Plaintiffs took depositions of ten (10) Conagra employees or former employees, including one Rule 30(b)(6) deposition. Plaintiffs also took three depositions of two experts for Conagra. Conagra deposed six named plaintiffs and two of plaintiffs' experts.

**4. Class Certification Proceedings**

40. On May 5, 2014, Plaintiffs filed their initial Motion for Class Certification, supported by three expert reports from a professor of agriculture, an economist, and a professor of marketing. Judge Margaret Morrow denied Plaintiffs' initial class certification motion and granted them leave to amend. In denying Plaintiffs' initial class certification motion, Judge Morrow ruled, among other things, that Plaintiffs' proposed damages methodology did "not satisfy "Comcast" because Plaintiffs' economist intended to conduct a hedonic regression to calculate "the price premium attributable to use of the term '100% Natural' and all of the meanings consumers ascribe to it," without isolating the price premium associated with the "no-GMO" meaning of "natural,"

which Plaintiffs did, filing their Amended Motion for Class Certification with amended expert reports on September 8, 2014.

41. Plaintiffs' amended class certification motion and amended expert reports included a report from a marketing professor that described how a choice-based conjoint analysis survey could isolate the value of a "no-GMO" meaning of the "natural" claim on Wesson Oils. Plaintiffs also submitted various internal ConAgra marketing studies and third-party surveys regarding factors that motivated purchase of Wesson Oils and consumer understandings of natural claims. In a preliminary order issued on November 24, 2014 (ECF No. 424), and at a hearing held the same day, the Court indicated that it was inclined to grant the bulk of Plaintiffs' amended class certification motion.

42. On December 17, 2015, Conagra filed yet another *ex parte* application seeking to stay the litigation (ECF No. 433). After opposition by Plaintiffs (ECF No. 436), Conagra's application was denied (ECF No. 442).

43. On February 23, 2015, after reviewing Plaintiffs' amended motion, a second round of briefing, amended and supplemental expert reports, a host of other evidentiary submissions (including deposition transcripts, fact-witness declarations, and documentary discovery material), and additional oral argument, Judge Morrow issued a 140-page opinion certifying eleven statewide damages classes based on 22 separate state law claims. Judge Morrow ruled, among other things, that Plaintiffs had made a sufficient showing that consumers generally understood the "natural" claim to mean that Wesson Oils do not contain GMOs, and that Plaintiffs' damages methodology adequately measured, on a class-wide basis, the difference between what the Classes paid for (*i.e.*, Wesson Oils that were "100% Natural" as ConAgra represented them to be) and the value of what they actually received (*i.e.*, Wesson Oils made from GMOs). In re ConAgra Foods, Inc., 90 F. Supp. 3d 919 (C.D. Cal. 2015) (ECF No. 545).

44. On March 13, 2015, Conagra sought to stay the case stayed while it attempted to obtain permission from the Ninth Circuit under Rule 23(f) to appeal the District Court's class

certification ruling. After the Ninth Circuit granted Conagra's Rule 23(f) petition, the parties stipulated to have the case stayed pending the outcome of Conagra's appeal. (ECF No. 547).

### 5. Appeals

45. Conagra sought and obtained permission from the United States Court of Appeals for the Ninth Circuit to bring an interlocutory appeal of Judge Morrow's class certification order. Conagra appealed on five grounds, including: (i) that that Plaintiffs' proposed "hybrid" damages methodology, involving a combination of hedonic regression and conjoint analysis, did not satisfy Comcast; and (ii) that Rule 23 includes a requirement that classes be "ascertainable;" ascertainability, in turn, requires that the identification of individual class members be administratively feasible; and the identification of class members is not administratively feasible where it relies on self-identification by class members rather than documentary proofs-of-purchase.

46. The Ninth Circuit granted review and, after briefing and oral argument, issued two separate opinions affirming the decision of the District Court on each issue Conagra raised. In an unpublished memorandum decision, *Briseño v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017), the Court of Appeals affirmed the District Court on multiple issues, including that Plaintiffs' proffered damages model tracked their theory of liability and was therefore sufficient to satisfy Comcast).

47. In a separate, published opinion, *Briseño v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), the Ninth Circuit clarified that it has never adopted an implied "ascertainability" requirement for class certification under Rule 23 and rejected the argument that argument that Rule 23 imposes a freestanding administrative feasibility requirement.

48. After Conagra's petition for *en banc* review by the Ninth Circuit was denied, Conagra filed a petition for *certiorari* with the United States Supreme Court seeking review of the Ninth Circuit's decision. After reviewing the parties' submissions, the Supreme Court denied

Conagra's petition on October 10, 2017. On November 9, 2017, the parties then agreed to stay the case pending mediation.[8]

**C. Ancillary Litigation**

49. Judge Morrow retired from the bench on January 6, 2016, necessitating reassignment of this MDL case to a new judge prior the resumption of active litigation. On January 19, 2018, prior to the first scheduled mediation session, Conagra filed a motion with the JPML seeking to have this case transferred from the Central District of California to the Northern District of Illinois (MDL 2291 ECF No. 27). On February 1, 2018, the JPML reassigned the case to Judge Carney (MDL ECF No. 36). Notwithstanding the reassignment, Conagra continued to seek retransfer of the case to the Northern District of Illinois. After multiple rounds of briefing, on April 4, 2018, the JPML denied Conagra's motion (MDL ECF No. 45).

50. In the course of briefing Conagra's motion for retransfer, Plaintiffs notified the JPML that Conagra had failed to notice a related action in the District of Massachusetts —*Lee v. Conagra Brands, Inc.* (Case 1:17-11042)—as a potential tag-along action as required by Panel Rule 7.1(a). Conagra argued that notice was not required because the dockets in both the Central District of California and the MDL were administratively closed when Lee was removed to and litigated in the District of Massachusetts. The JPML found this dispute "moot because Lee is no longer a pending civil action. It was dismissed and currently is on appeal. Conagra is directed to notice Lee as a potential tag-along action in [this MDL] should the First Circuit overturn the dismissal of that action or otherwise remand it for further proceedings in the district court, in accordance with the Panel Rules." (MDL ECF No. 45). At present, Lee remains pending in the First Circuit (No. 17-2131).

---

[8] Conagra removed the "100% Natural" claim from all Wesson Oil labels and ceased marketing the products as "natural" in 2017.

D.  **Mediation and Settlement**

51. On January 29, 2018, the parties held an all-day mediation session before the Honorable Edward A. Infante (Ret.), under the auspices of JAMS in San Francisco. Between January 29 and March 19, 2018, Judge Infante engaged in extensive correspondence and held numerous telephone conferences with each party but was ultimately unable to forge a settlement.

52. On June 8, 2018, this Court referred the parties to Judge McCormick for further settlement discussions. Judge McCormick met with both parties at that time and, after extensive correspondence and telephone conferences, Judge McCormick held an another in-person settlement conference with the parties on August 30, 2018; no settlement was reached at that time. Judge McCormick continued conferring with the parties and, in mid-October, 2018, the Parties reached agreement in principle regarding monetary relief to Class Members and the provisions of injunctive relief to ensure that the labeling and marketing changes instituted by Conagra would continue in the future. With Judge McCormick's substantial assistance, the Parties agreed that the value of the injunctive relief was $27,000,000.

53. Judge McCormick then assisted the parties in extended and difficult negotiations on the issues of the value of the injunctive relief, attorneys' fees for Class Counsel, plaintiffs' service awards, and the costs of settlement notice and administration. Judge McCormick ultimately offered a "mediator's proposal" on the material issues, which both parties accepted on November 12, 2018, resulting in this Settlement Agreement.

III.  **FACTORS IN SUPPORT OF SETTLEMENT**

54. Negotiation of the Gross Settlement Proceeds, the injunction, and separate payment of the costs of notice and administration was hard fought and at arm's-length.

55. Due to the extensive discovery efforts which occurred during this litigation, we know the strengths and weaknesses of the claims in this Action. We have worked extensively with experts to best understand those claims, as well as to value those claims.

56. We believe the proposed Settlement is extremely beneficial for Class Members and is a fair, adequate, and reasonable settlement.

13

57. Importantly, each proposed Class Representative supports the Settlement reached here.

58. We have carefully examined the facts of each proposed Class Representative to ensure that none of them have any conflicts with his or her Class.

59. Class Counsel is requesting service awards of (a) up to $3,000 for each of the six Class Representatives who were deposed (Robert Briseño, Michele Andrade, Jill Crouch, Pauline Michael, Necla Musat, and Maureen Towey) and (b) up to $1,000 for each of the seven Class Representatives who were not deposed (Julie Palmer, Cheri Shafstall, Dee Hooper-Kercheval, Kelly McFadden, Erika Heins, Rona Johnston, and Anita Willman), to compensate them for their commitment and time on behalf of the Classes in this litigation. These plaintiffs have been supportive and involved in this litigation for more than eight years, including responding to discovery requests seeking detailed information regarding their dietary habits and food purchasing habits, and labels from empty food containers in their homes. Six of the plaintiffs sat for depositions.

60. While we believe that plaintiffs had a reasonably good chance of proving that "100% Natural" claim, which appeared on every bottle of Wesson Oil sold during the relevant class periods, was false and misleading because consumers interpreted the claim to mean that the products did not contain GMOs, that the "100% Natural" claims was material to consumers, and that and that every Class member paid a premium price for Wesson Oils due to the presence of the "100% Natural" claim on the label, we are also cognizant of the risks that plaintiffs faced in further litigation. Those risks include (1) the possible success of Conagra's vigorous defense to plaintiffs' assertions that the challenged claims are misleading and continued denial of all allegations of wrongdoing; (2) the chance of Conagra moving to decertify the certified litigation classes; (3) the need for both Parties to engage in further discovery; (4) further motion practice, including Daubert motions, motions for summary judgment, and motions in limine; (5) Conagra's likely aggressive challenges to Plaintiffs' price premium damages methodology; and (6) a possible adverse outcome at trial.

61. Having worked on behalf of the Classes since the inception of the Action, and having dedicated thousands of hours to the case, and having carefully the benefits of the proposed settlement and the risk, expense, complexity and duration of further litigation, posed Class Counsel endorse the Settlement without reservation as being fair, reasonable and adequate.

62. Plaintiffs seek the appointment of DiCello Levitt Gutzler LLC and Milberg Tadler Phillips Grossman LLP as Class Counsel. This group of attorneys has substantial experience litigating complex class cases of various natures, including consumer class actions.

63. The mediated maximum amount for attorneys' fees and unreimbursed costs in this case of $6,850,000 represents approximately 50% of Plaintiffs' counsel's actual total combined lodestar and unreimbursed expenses. Where, as here, a significant component of the relief provided is injunctive relief, the appropriate method to use is the lodestar method. However, it should also be noted that the requested total for fees and unreimbursed costs represents approximately 23% of the more *conservative* estimate of the total value of the labeling and marketing changes attributable to this litigation, $30,600,000, well within the range of reasonableness for similar cases. The motion for an award of attorneys' fees and expenses will be supported with detailed lodestar information and an accounting of expenses. Conagra is paying any Court-awarded attorneys' fees and expenses separately from the Gross Settlement Proceeds paid directly to the Classes.

64. The Parties each solicited confidential bids from companies to provide notice and administration services in conjunction with the proposed settlement. These companies were provided the material terms of the settlement and asked to formulate a notice and media plan that would provide the best notice practicable to reach the Classes.

65. The bids were submitted to Judge McCormick. Judge McCormick ultimately chose JND Legal Administration to propose to the Court to serve as the Settlement Administrator. It is our belief that JND's proposed notice and administration plan will allow for the effective dissemination of notice to the Classes, efficient administration of Claim Forms, and will do so in an economical matter.

66.     Reasonable Fees and costs of the Settlement Administrator, anticipated not to exceed $623,940, will be paid by Conagra separate from and in addition to the other settlement benefits provided to the Class Members. Should the Settlement Administrator anticipate an increase in costs, fees, or expenses to more than $660,000, or other significant deviation from the proposed Notice Plan, the Settlement Administrator must secure the prior approval of Conagra, which will not be unreasonably withheld or delayed. Should Conagra not agree with the increased cost or deviation, Judge McCormick shall retain authority to resolve any such dispute. S.A., §4.4.

67.     Both counsel for the Parties and JND have reviewed the proposed Publication Notice and Posted Notice. The notices clearly explain the background of the case, the terms of the settlement, the process and deadlines for submitting a Claim Form, the deadlines for objecting or opting out and how to do so, and how to obtain additional information. Thus, the notices provide all the information necessary for Class Members to make informed decisions with respect to whether they remain in or opt-out of the Settlement, or object to the proposed Settlement.

68.     Any Class Member may elect to opt out of the Settlement by submitting an Opt-Out Request by the Opt-Out Deadline in accordance with the instructions provided in the Posted Notice. S.A., §5.3, Exhibit A-2. The Parties propose that the Opt-Out Deadline be set 114 days after First Publication of Class Notice. Any Class Member may object to the Settlement, Class Counsel's application for attorneys' fees and expenses, and/or the request for plaintiff service awards by filing a written objection by the Objection Deadline in accordance with the instructions provided in the Posted Notice. The Parties propose that the Objection Deadline be set 114 days after First Publication of Class Notice.

69.     Both counsel for the Parties and JND have also reviewed the Notice Plan and believe it will effectively meet and exceed the Due Process requirements for notifying Class Members. The Notice Plan was developed by a provider with significant experience in designing notice plans in large and national class actions similar to this one, Jennifer M. Keough.

70.     Ms. Keough has reviewed the proposed notices and offered her input as to tailoring them to clearly and effectively notify the Class Members of their rights under the Settlement.

## IV. CONCLUSION

71. In view of the significant recovery to the Classes and the substantial risks of this litigation, the Class Representatives and Class Counsel respectfully request that the Court grant the Motion and enter the proposed order directing notice to the Classes certified under Fed. R. Civ. P. 23(b)(3), which would also appoint Class Representatives for each of the eleven Classes, appoint DiCello Levitt Gutzler LLC and Milberg Tadler Phillips Grossman LLP as Class Counsel, and appoint JND Legal Administration as the Settlement Administrator to administer the notice and claims process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 11, 2019

By: _____
    Henry J. Kelston

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 11, 2019

By: _____
    Adam J. Levitt