JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE CONAGRA FOODS, INC. | Case No.: CV 11-05379-CJC(AGRx)<br><br>MDL No. 2291 |
| ROBERT BRISEÑO, et al., individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>      v.<br><br>CONAGRA FOODS, INC.,<br><br>            Defendants. | ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT [Dkt. 660] AND DENYING MOTION TO STRIKE [Dkt. 684] |

## I.  INTRODUCTION

In this 2011 class-action lawsuit, Plaintiffs challenge Defendant ConAgra Foods, Inc.'s allegedly deceptive marketing of its Wesson Oil products as "100% Natural."

After years of investigation and litigation, including extensive mediation efforts with two separate judges, the parties reached a settlement, which this court preliminarily approved. (Dkt. 654.)  Plaintiffs now ask the court to grant final approval of the settlement and the requested attorney fees, costs, and incentive awards.  For the following reasons, the motion is **GRANTED**.

**II.  BACKGROUND**

For over ten years, bottles of ConAgra's Wesson Oil had a label calling the product "100% Natural."[1]  Plaintiffs sued in 2011, alleging that the "natural" claim was false and misleading because the oil contains genetically modified organisms (GMOs), and that they paid more for the oil because of that false and misleading claim.  After another judge of this court certified eleven consumer classes and the Ninth Circuit affirmed, *see Briseño v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017); *Briseño v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017), the parties conducted extensive settlement negotiations before both retired Judge Edward A. Infante and Magistrate Judge Douglas McCormick. (Dkt. 652 [Joint Declaration of Henry J. Kelston & Adam J. Levitt, hereinafter "Kelston/Levitt Decl."] ¶¶ 51–65.)

The resulting settlement—reached after a mediator's proposal from Judge McCormick—provided that Defendant will not label, advertise, or market Wesson Oils as "natural," absent future legislation or regulation.  (Dkt. 652, Ex. 1 [Settlement Agreement and Release, hereinafter "Settlement Agreement"] ¶ 3.3.)  It also provided class members the following monetary benefits:

---

[1] In July 2017, Conagra Foods, Inc. removed the "100% Natural" claim from all Wesson labels.

(a) $0.15 for each unit of Wesson Oils purchased to households submitting valid claim forms (to a maximum of thirty units without proof of purchase, and unlimited units with proof of purchase),

(b) an additional fund of $575,000 to be allocated to New York and Oregon class members submitting valid claim forms, as compensation for statutory damages under those states' consumer protection laws, and

(c) an additional fund of $10,000 to compensate those in all classes submitting valid proof of purchase receipts for more than thirty purchases, at $0.15 for each such purchase above thirty, with Class Counsel paying any non-funded claims (i.e. claims above the $10,000 provided by ConAgra) from any attorney fees awarded in this case.

(*Id.* ¶ 3.1.)

After the parties reached a settlement in principle, ConAgra sold the Wesson brand to Richardson International.  The parties thus revised the terms of the agreed injunctive relief to apply to ConAgra only in the event it reacquires the Wesson brand.  Plaintiffs' counsel represents, however, that "pursuant to industry custom and related facts," "it is virtually certain that Richardson will not restore the allegedly false '100% Natural' claim to the Wesson Oil packaging."  (Mot. at 4; *see* Dkt. 661-1 [Declaration of Larry Kopald].)

The Court granted preliminary approval of the Settlement Agreement on April 4, 2019, and appointed JND Legal Administration ("JND") as settlement administrator. (Dkt. 654.)  JND provided notice calculated to reach the class in all eleven states via print and digital publications, a press release, and a hotline, as outlined in the Settlement Agreement.  (Dkt. 661-2 [July 23, 2019 Declaration of Jennifer M. Keough Regarding Settlement Administration and Notice Plan, hereinafter "Keough 7/19 Decl."] ¶¶ 8–16; Exs. B–H.)  JND received 97,880 timely claims for 2,792,794 units, and one untimely

1 claim for 10 units.  (Dkt. 688-1 [September 24, 2019 Declaration of Jennifer M. Keough

2 Regarding Settlement Administration and Notice Plan, hereinafter "Keough 9/19 Decl."]

3 ¶ 10.)  One plaintiff opted-out, and one plaintiff objected.  (*Id.* ¶¶ 7, 9; Dkt. 666.)

4

5    Plaintiffs now move for final approval of the Settlement Agreement, attorney fees

6 and costs, and incentive awards.  (Dkts. 660–661 [hereinafter "Mot."]; Dkt. 662

7 [hereinafter "Fee Mot."].)

8

9 **III.  DISCUSSION**

10

11    **A.    Motion to Strike**

12

13    As a preliminary matter, Objector M. Todd Henderson moves to strike two expert

14 declarations from Colin B. Weir filed in support of Plaintiffs' motion (Dkts. 652-4 and

15 674-1).  (Dkt. 684 [Motion to Strike Declaration of Mr. Colin Weir Under *Daubert*,

16 hereinafter "Strike Mot."].)  Henderson argues these declarations fail to meet the

17 standards for admissible expert opinions because they "do not hinge on any scientific

18 methods or data," but rather are "based on an *ipse dixit*," "false assumption," and

19 "methodology [that] unscientifically and impermissibly gerrymanders data to avoid

20 risking falsification of his hypothesis."  (Strike Mot. at 1, 6.)

21

22    Specifically, Henderson contends that Weir's opinion rests on the "false

23 assumption" that the injunction prohibits anyone from advertising Wesson Oils as natural

24 in the future.  (Strike Mot. at 3–5.)  He maintains this assumption is false because the

25 Settlement Agreement binds only ConAgra, and since ConAgra no longer owns Wesson

26 Oil, "[t]he injunction is no more meaningful than an injunction against Ford Motor on the

27 marketing of the Edsel."  (*Id.* at 3.)  Without a meaningful prospective prohibition on

28

1 labeling Wesson Oil as natural, Henderson argues, consumers receive no benefit

2 whatsoever from the injunction.  (*Id.* at 4.)

3

4       The Court is not persuaded that it should strike Weir's declarations.  Henderson's

5 contention that Weir's declarations "cannot help the Court," (*id.* at 6), is simply incorrect.

6 Indeed, it is difficult for courts to "judge with confidence the value of the terms of a

7 settlement agreement, especially one in which, as here, the settlement provides for

8 injunctive relief." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003).  Having one

9 expert's opinion—however purportedly flawed—on the value of that injunction helps the

10 Court develop its own view.  Similarly, the arguments presented in the motion to strike

11 help the Court determine how much weight to give Weir's opinions.  The Court thus

12 **DENIES** the motion to strike.

13

14       **B.**      **Fairness of the Settlement**

15

16       The Court now evaluates the fairness of the settlement.  Although there is a "strong

17 judicial policy that favors settlements, particularly where complex class action litigation

18 is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a

19 settlement of class claims requires court approval.  Fed. R. Civ. P. 23(e).  This is because

20 "[i]ncentives inhere in class-action settlement negotiations that can, unless checked

21 through careful district court review of the resulting settlement, result in a decree in

22 which the rights of class members, including the named plaintiffs, may not be given due

23 regard by the negotiating parties." *Staton*, 327 F.3d at 959 (alterations and quotations

24 omitted).

25

26       Under Federal Rule of Civil Procedure 23, the Court must "determine whether a

27 proposed settlement is fundamentally fair, adequate, and reasonable." *Staton*, 327 F.3d at

28 959 (citation and quotation marks omitted).  In considering whether this standard is met,

a district court must consider a number of factors, including "the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement." *Id.* (citation and quotation marks omitted).  Having considered the *Staton* factors, the Court finds this Settlement Agreement fundamentally fair and reasonable.

> *1.  Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation*

The strength of Plaintiffs' case and the obstacles inherent in continued litigation weigh heavily in favor of granting final approval of the Settlement Agreement.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *as amended* (June 19, 2000) (affirming final approval where, among other reasons, "[t]he district court properly found that the Plaintiffs' case was weak and the risk, expense, and complexity of trial weighed against them"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041–42 (N.D. Cal. 2008) (discussing how a class action settlement offered an "immediate and certain award" in light of significant obstacles posed through continued litigation); *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal. 2007) ("Additional consideration of increased expenses of fact and expert discovery and the inherent risks of proceeding to summary judgment, trial and appeal also support the settlement.").

This case had difficulties from the beginning, including problems of proof—on both liability and damages—and problems of management.  Indeed, Plaintiffs wisely acknowledge that the path to recovery was not without significant risk.  (Mot. at 12.) ConAgra has challenged Plaintiffs' case at every turn over the past eight years, (*see* Fee

Mot. at 4), beginning with its challenge to the sufficiency of Plaintiffs' complaint. ConAgra first moved to dismiss the case in August 2011.  (Dkt. 24.)  After Judge Margaret Morrow granted that motion (Dkt. 54), Plaintiffs amended their complaint (Dkt. 80), and ConAgra once again moved to dismiss in February 2012 (Dkt. 84).  Judge Morrow granted in part and denied in part this second motion to dismiss.  (Dkt. 138.)

Then, there was extensive discovery, including multiple discovery motions filed over the years.  (*See, e.g.*, Dkts. 196, 202, 426, 511, 550; *see generally* Kelston/Levitt Decl. [describing history of case, including discovery].)  Plaintiffs' first motion for class certification (Dkt. 241)—which was denied (Dkt. 350)—involved dozens of under-seal documents and related filings, on top of the already-complex issues related to class certification.  Its second (Dkt. 363), which Judge Morrow granted in part and denied in part (Dkt. 545), was a similarly protracted effort.  ConAgra appealed this decision, and the Ninth Circuit affirmed in a 24-page opinion (Dkt. 595) and a separate 6-page memorandum disposition (Dkt. 596).  The initial grant of ConAgra's motion to dismiss, and the initial denial of the class certification motion, reflect that Plaintiffs' claims were less than airtight.

Here, continued litigation would involve not only cost—for example, of updating discovery and further motion practice—but also risk.  (*See* Mot. at 12-13.)  Indeed, the Court was seriously considering decertifying one or more classes because of the difficulty managing them as currently certified.  At the hearing, ConAgra also represented they were considering a motion for summary judgment, and motions to sever and remand to the different states.  The Court also has reservations regarding Plaintiffs' price premium damages methodology.

1    Given the substantial cost and risks of further litigation, and the Court's serious

2    doubts about the strength of Plaintiff's case, this factor weighs in favor of approving the

3    settlement.

4

5         *2. Amount Offered in Settlement*

6

7         Although at first blush the $0.15 per unit award appears modest, this amount is

8    more than fair and reasonable in this case.  Plaintiffs sought a "price premium" for the

9    damages caused by ConAgra's alleged misleading labeling, rather than a full refund for

10   products purchased.  This theory alone would have yielded a relatively low award.  But

11   Judge Morrow narrowed the theory even further, ruling that the appropriate measure of

12   damages was not the full price premium paid, but rather only the portion of that premium

13   attributable to consumers' belief that "100% Natural" meant that the products were

14   GMO-free.  (Dkt. 350 at 61–62.)  Given this ruling and other weaknesses in Plaintiffs'

15   case, the per-unit award reflected in the Settlement Agreement is substantial.

16

17        In addition to this award, there is also a $575,000 fund to be allocated among New

18   York and Oregon class members for statutory damages under those states' consumer

19   protection laws, and ConAgra's $10,000 contribution to help pay those who can show

20   they purchased more than 30 units.  The settlement amount offered provides an

21   immediate and tangible benefit to class members and eliminates the risk that they could

22   receive less than that amount, or nothing at all, if litigation continued.  Moreover, it is not

23   irrelevant that Judge McCormick carefully oversaw this settlement, and that the precise

24   value of the settlement was reached by accepting a mediator's proposal.  (*See* Mot. at 3;

25   Fee Mot. at 3.)

26

27        Aside from monetary relief, Plaintiffs also secured injunctive relief.  Although

28   there is vigorous dispute over the precise valuation of the injunctive relief—with

Plaintiffs' expert valuing it at tens of millions and the Objector valuing it at nothing—the Court finds the injunction adds at least some value to the amount offered in settlement. (Mot. at 15; (Dkt. 666 [Objection to Proposed Settlement and to Fee Request, hereinafter "Obj."].) at 7–8.)  But even if there were no injunctive relief, the Court would likely find that the amount offered in settlement was fair and reasonable given the likely obstacles to Plaintiffs recovering, including those described in Section III.B.1.

In the Court's view, the amount offered in settlement—even when not giving the injunctive relief the valuation Plaintiffs urge—is more than reasonable.  This factor weighs in favor of approving the settlement.

> 3. *Extent of Discovery Completed, Stage of Proceedings, and Experience and View of Counsel*

The Settlement Agreement is also reasonable in light of the advanced stage of this litigation.  Where the "parties have sufficient information to make an informed decision about settlement," this factor weighs in favor of approving the settlement.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (internal citation and quotation marks omitted).  Indeed, "[a] settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 889 (C.D. Cal. 2016).

The parties here gathered more than enough information over nearly eight years of substantial discovery and litigation to make an informed decision about whether the terms of this Settlement Agreement were fair.  Plaintiffs' counsel are experienced class-action litigators from multiple firms, the parties conducted extensive discovery and motion practice, and there were multiple mediations with multiple mediators.  These facts, among others, make the Court confident that the parties were able to realistically value

ConAgra's liability and assess the risk of continuing to litigate.  The parties' extensive litigation and negotiation allowed them to reasonably evaluate the cost, duration, and risk of further litigation.  That evaluation was further supported by the recommendation of an experienced mediator, who set the settlement amount in a mediator's proposal.

The Court is satisfied that the parties reached the Settlement Agreement after developing a full and fair understanding of the merits and risks of the case, and negotiating at arm's length.  This factor weighs in favor of approving the settlement.

### 4. Reaction of Class Members

Following the Court's preliminary approval, JND used a multi-pronged notice campaign to reach people who purchased Wesson Oils.  According to JND's CEO, it:

- Created a settlement website with links to the claim form, notice, pleadings, and other litigation documents, and frequently-asked questions, which tracked 168,165 unique visitors who registered 786,246 page views as of September 19, 2019, Keough 7/19 Decl. ¶¶ 15–16; Keough 9/19 Decl ¶¶ 1–2;
- Launched a print effort by having the Publication Notice published in the *Los Angeles Daily News* and *People* magazine, Keough 7/19 Decl. ¶ 8;
- Launched a digital effort by promoting posts about the settlement on Google Display Network and Facebook, delivering 205,946,126 impressions, *id.* ¶ 9, Exhibit C, and causing paid ads to appear on results pages when people Googled keywords or phrases related to the lawsuit, like "canola oil settlement" or "Wesson cooking oil," delivering 27,000 impressions in class states, *id.* ¶ 10, Exhibit D;
- Distributed a press release about the settlement to about 11,000 English and 150 Spanish media outlets nationwide, yielding 244 pickups with an estimated potential audience of over 59.8 million, *id.* ¶ 11, Exhibits E–F; and

- Created a toll-free helpline where class members could get more information about the Settlement Agreement and request a copy of the class notice that, as of September 19, 2019, had received 327 calls for approximately 847 minutes, Keough 7/19 Decl. ¶¶ 13–14; Keough 9/19 Decl. ¶¶ 2–3.

Separately, class action and financial websites picked up news of the settlement, creating 30 additional public mentions with a potential reach of over 16.7 million people. (Keough 7/19 Decl. ¶ 12, Exhibits G–H.)

The deadline for class members to submit a claim form was August 22, 2019. (Keough 9/19 Decl. ¶ 10.)  JND received 97,880 timely claims for 2,792,794 units, and one untimely claim for 10 units.  (*Id.*)  Of the timely claims, 247 have claimed more than 30 units.  (*Id.*)

As of September 19, 2019, only one class member requested to opt out of the settlement class, with another class member objecting to the settlement.   The reaction of the class has thus been overwhelmingly positive, and this factor favors final approval. *See In re Mego Fin. Corp.*, 213 F.3d at 459 (concluding that this factor supported conclusion that district court did not abuse its discretion in approving settlement where "[o]nly one of the 5,400 potential class members to whom notice of the proposed Settlement and Plan of Distribution was sent chose to opt-out of the class"); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members.").  Accordingly, the Court finds the Settlement Agreement fair, adequate, and reasonable under the *Staton* factors.

5. *Rule 23(e)(2) Factors*

The Court must also find the settlement "fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other."

Fed. R. Civ. P. 23(e)(2).  There is substantial overlap between these factors and the *Staton* factors, so the Court does not repeat itself here.  The Court has considered these factors and finds that the settlement is fair, reasonable, and adequate.

**C.     Attorney Fees and Costs & Plaintiffs' Incentive Award**

Plaintiffs' counsel also seek final approval of their proposed attorney fees and expenses (a total of $6.85 million), and the representative plaintiffs' service awards (a total of $25,000).  (Dkt. 662.)  The Court found at the preliminary approval stage that the request for attorney fees and incentive awards was reasonable, (Dkt. 654 at 6–7), and the Court makes the same finding here.

*1. Attorney Fees and Costs*

A district court has the authority and the duty to determine the fairness of attorney fees in a class action settlement.  *See Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1329 (9th Cir. 1999).  The amount of fees awarded rests ultimately in the court's sound discretion.  *Evans v. Jeff D.*, 475 U.S. 717, 736 n.26 (1986), *superseded by statute on other grounds*.

Plaintiffs' counsel seek $6,875,000 for attorney fees, expenses, and incentive awards.  (Fee Mot. at 1.)  The attorney fees and costs will be paid separate from and in addition to the settlement proceeds given to class members.  (Fee Mot. at 2.)  Plaintiffs justify the amount of fees under the settlement on both a percentage-of-the-fund method and a lodestar method.  (*See* Fee Mot. at 2.)  Given the difficulty of valuing the injunctive relief obtained, the Court relies on the lodestar method.

As the Court recognized at the preliminary approval stage, Plaintiffs' counsel seeks only about half of their actual lodestar.  (Dkt. 654 at 6–7.)  Plaintiffs represent that the actual time spent and fees Plaintiffs' counsel incurred creates a lodestar of nearly $11.5 million.  They seek $6.85 million.  The Court finds this amount is both fair and reasonable given factors including the amount of hours reasonably spent on the litigation, counsel's efforts in litigating this years-long complex action, the results achieved, and the risks inherent in continued litigation.  Plaintiffs' counsel in this case took claims saddled with problems of proof and management, and managed to negotiate a settlement of significant monetary and injunctive relief.  Although $0.15 per Wesson Oil product purchased may seem negligible, the fact that Defendant is willing to pay anything at all given the many liability and damages issues this case has had from the beginning is noteworthy.

1

        2. *Plaintiffs' Incentive Award*

2

3        Plaintiffs also seek an incentive award to reward representative plaintiffs for their

4 time and effort, in the amount of $3,000 for each of the six plaintiffs deposed in this case,

5 and $1,000 for each of the seven plaintiffs not deposed, for a total incentive award of

6 $25,000.  Courts routinely approve this type of award to compensate representative

7 plaintiffs "for the services they provide and the risks they incurred during the course of

8 the class action litigation."  *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 499

9 (E.D. Cal. 2010).  When evaluating the reasonableness of an incentive award, courts may

10 consider several factors, including "the actions the plaintiff has taken to protect the

11 interests of the class, the degree to which the class has benefitted from those actions," and

12 the time the plaintiff spent pursing the litigation.  *Staton*, 327 F.3d at 977 (citation and

13 quotation marks omitted).

14

15        Plaintiffs have devoted substantial time and effort to monitoring the litigation and

16 assisting their counsel.  They reviewed pleadings, helped respond to discovery requests,

17 prepared for and testified at depositions, communicated with counsel, and evaluated the

18 terms of the settlement agreement.  (Fee Mot. at 20.)  Under comparable circumstances,

19 courts have approved similar awards to lead plaintiffs.  *See, e.g.*, *Vasquez*, 299 F.R.D. at

20 491 (awarding $5,000).  The Court finds, as it did at the preliminary approval stage (Dkt.

21 654 at 7), that the requested $25,000 aggregate award is reasonable in light of the

22 significant time and effort Plaintiffs expended over this eight-year litigation.

23

24      **D.**    **The Objection**

25

26        Objector Professor M. Todd Henderson objects to the settlement and the proposed

27 fee request.  Henderson contends that the injunction has no value at all because ConAgra

28 no longer owns Wessen Oil, and thus, according to Henderson, the settlement "provides a

speculative, nearly illusory, injunction." (Obj. at 7.) Henderson also maintains that the disproportionate attorney fee award under the settlement renders the entire settlement unfair. (Obj. at 10–11.) Although the Court appreciates Objector's high-level concerns regarding an apparent trend trend toward class action settlements disproportionately benefitting attorneys, the Court is not persuaded that this Settlement Agreement is unfair, inadequate, or unreasonable. This is especially true given that the classes were certified before the settlement was reached. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (noting that before class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement," so agreements reached before that stage "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the courts approval as fair").

First, as discussed in more detail Section III.B.1., *supra*, this was a weak case, with difficulties of proof relating to liability and damages, and issues of management. That Plaintiffs' counsel secured any relief at all on behalf of the class is an impressive result.

Second, setting a precise value on the benefits achieved for class members is difficult. *See Staton*, 327 F.3d at 959 ("[A]ssessing the fairness, adequacy and reasonableness of the substantive terms of a settlement agreement can be challenging," given that "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."). This endeavor is doubly difficult where, "as here, the settlement provides for injunctive relief." *Id.* But the benefits achieved here—both injunctive and monetary—were substantial. And the Court is assured that the fee here is "not unreasonably excessive in light of the results achieved." *See Bluetooth*, 654 F.3d at 941.

Finally, the amount of attorney fees in the Settlement Agreement, while high, reflects the long history of this case and the impressive result achieved given the weakness of Plaintiffs' case.  The Court appreciates proportionality concerns, but the record in this case sufficiently "dispel[s] the possibility that class counsel bargained away a benefit to the class in exchange for their own interests."  *Bluetooth*, 654 F.3d at 938.

The law favors settlements in complex class action litigation.  *Linney*, 151 F.3d at 1238 (9th Cir. 1998).  "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural Telecommunications*, 221 F.R.D. at 526 (quoting 4 A Conte & H. Newberg, *Newberg on Class Actions,* § 11:50 at 155 (4th ed. 2002)).  The Objection fails to persuade the Court that this Settlement Agreement is clearly inadequate.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for final approval of the Settlement Agreement is **GRANTED**.  Plaintiff's counsel are awarded $6,850,000 in attorney fees and costs, and Plaintiffs Robert Briseño, Michele Andrade, Jill Crouch, Pauline Michael, Necla Musat, and Maureen Towey are awarded $3,000 each, and Plaintiffs Julie Palmer, Cheri Shafstall, Dee Hooper-Kercheval, Kelly McFadden, Erika Heins, Rona Johnston, and Anita Willman are awarded $1,000 each for their service as class representatives.

DATED:     October 8, 2019

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE