NO. 19-56297

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

ROBERT BRISENO, individually and on behalf of all others similarly situated,
*Plaintiffs-Appellees*,

v.

M. TODD HENDERSON,
*Objector-Appellant*,

v.

CONAGRA FOODS, INC.,
*Defendant-Appellee*.

---

On Appeal from the United States District Court
for the Central District of California, No. 2:11-cv-05379-CJC-AGR

---

Appellant M. Todd Henderson's
Motion for Panel to Clarify Opinion

---

HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
1629 K Street NW, Suite 300
Washington, DC 20006
(703) 203-3848
Ted.frank@hlli.org
*Attorney for Objector-Appellant M. Todd Henderson*

# Table of Contents

Table of Contents......................................................................................................... i

Table of Authorities .................................................................................................... ii

Introduction ................................................................................................................ 1

Argument..................................................................................................................... 3

I.     Henderson asks the Court to clarify that its references to "collusion" and "potential collusion" include self-dealing by the parties that may fall short of secret cooperation between the parties. ................................................................. 3

II.    The Court may wish to make some other edits. .................................................. 12

Conclusion................................................................................................................. 12

Certificate of Compliance........................................................................................ 14

Proof of Service ....................................................................................................... 15

# Table of Authorities

## Cases

*In re Bluetooth Headset Prods. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) ("*Bluetooth*") ...................................................1, 2, 4, 7

*In re Dry Max Pampers Litig.,*
    724 F.3d 713 (6th Cir. 2013) ......................................................................6, 7, 12

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.,*
    827 F.3d 223 (2d Cir. 2016) .......................................................................... 8

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) ................................................................2, 3, 6-9, 12

*Roes v. SFBSC Management, LLC,*
    944 F.3d 1035 (9th Cir. 2019) ......................................................................2, 4, 6-9

*In re Synthroid Mktg. Litig.,*
    264 F.3d 712 (7th Cir. 2001) .......................................................................... 8

## Rules and Statutes

Fed. R. Civ. P. 23(a) ...................................................................................... 2

Fed. R. Civ. P. 23(e) .................................................................................2, 3, 13

Fed. R. Civ. P. 23(e)(2)(C) ............................................................................. 5

## Other Authorities

"9th Circ. Strikes Down $7M Atty Fees in ConAgra," Law360, June 1, 2021 ............... 9

ABA Model Rule 3.3(a)(2) ............................................................................. 11

*Hamilton: An American Musical* (2016) .......................................................... 7-8

Amy Keller, Tweet (Jun. 11, 2021) ................................................................9-10

## Introduction

Appellant Todd Henderson moves the Court to clarify its opinion as it relates to its discussion of "collusion" or "potential collusion" between the settling parties.

The district court approved a settlement with "a bevy of questionable provisions":

> Class counsel will receive seven times more money than the class members; an injunction touted by an expert as worth tens of millions of dollars appears worthless; the defendant agrees not to challenge the plaintiffs' attorneys' fees amount; any reduction in those fees by the court reverts to the defendant; and on and on.

Slip op. 5.

On June 1, this Court issued an opinion reversing the district court's approval of the class-action settlement and remanding the case for further proceedings. The Court held that "district courts must apply the *Bluetooth* factors to scrutinize fee arrangements—even in post-class certification settlements—to determine if collusion may have led to class members being shortchanged. The class settlement here features all three red flags of potential collusion that we warned about in *Bluetooth*." Slip op. 21.

Clarification is needed to avoid unnecessary litigation on remand. The holding and the analysis throughout the opinion uses the word "collusion." But the decision uses that term to mean both "collusion" in the colloquial sense while also using the term to describe the broader self-dealing at the expense of the class that is more common in class-action settlements. As the panel correctly notes, such self-dealing can happen because "a defendant, no matter if a class has been certified, has 'no reason to

care about the allocation of its cost of settlement between class counsel and class members.'" Slip op. 19 (quoting *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), favorably). In other words, what the panel calls "collusion" (slip op. 19) requiring rejection of a class-action settlement can happen tacitly with no actual overt collusion.

The danger of the panel using the same word to describe two different concepts is that settling parties will try to persuade district courts that the only "collusion" judges need investigate in scrutinizing class-action settlements is that covered by the narrower definition. The term "collusion" is defined by Oxford Languages as "secret or illegal cooperation or conspiracy, especially in order to cheat or deceive others." This type of cloak-and-dagger collusion out of a John Grisham novel is certainly a hypothetical problem in class-action settlements that no one disputes should be verboten. But the far more common type of "collusive" activity is the self-dealing by class counsel that a defendant tacitly accedes to and leads to the same shortchanging of the class. This Court has taken care to distinguish between the two. *See Roes v. SFBSC Management, LLC,* 944 F.3d 1035, 1050 n.13 (9th Cir. 2019) (no "explicit" collusion or "secret cabals" necessary for settlement to be unfair); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) ("While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of actual fraud, overreaching or collusion, the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations" (internal quotation omitted)).

The precedent the Court relies on and the context of the Court's opinion reveals that it indeed intends the term "collusion" to include self-dealing by the plaintiffs or defendants as indicative of Rule 23(e) settlement unfairness or unreasonableness.

Henderson thus asks the Court to make that broader application express in its decision. It can do this by replacing the word "collusion" with the concept of a selfish settlement condemned both by the opinion and by *Pearson v. NBTY*. In the alternative, the Court can explicitly define "collusion" as a legal term of art to convey that "collusion" includes the simple open agreement to favor class counsel at the expense of the class. Doing so will provide better guidance to and minimize litigation in district courts over how to interpret this Court's use of the term "collusion" and protect class members from settlement gimmicks that deny them a fair recovery and allocation, as the opinion desires.

## Argument

### I.    Henderson asks the Court to clarify that its references to "collusion" and "potential collusion" include self-dealing by the parties that may fall short of secret cooperation between the parties.

The Court's opinion addresses the need for courts to scrutinize proposed class-action settlement agreements for "collusion" or "potential collusion." (If by "potential collusion" this Court means objective indications in an agreement's terms that the deal serves the interests of the negotiating parties rather than the class, it should explain that.) This analysis leads to the holding that "district courts must apply the *Bluetooth* factors to scrutinize fee arrangements—even in post-class certification settlements—to determine if collusion may have led to class members being shortchanged. The class settlement here features all three red flags of potential collusion that we warned about in *Bluetooth*." Slip op. 21.

Although this holding addresses the concern with collusion between the parties, the underlying precedent is clear that subjective collusion in the colloquial sense is only part of the concern; a court's scrutiny should apply to any self-dealing or prioritization of a party or attorney's self-interest over the class. In particular, the Court's holding builds upon and answers a question left open in *Bluetooth* that "explained that courts should scrutinize agreements for 'subtle signs that class counsel have allowed *pursuit of their own self-interests* … to infect the negotiations.'" Slip op. 15 (quoting *Bluetooth*, 654 F.3d 935, 947 (9th Cir. 2011) (emphasis added)). The holding also builds upon and also explains *Roes*. *See* slip op. 13, 29. *Roes*, too, was clear that a district court must investigate whether proposed settlement terms such as a reversionary clause "are justified by the unique benefits to the class and supported by provisions that ameliorate concerns about *perverse incentives*, in order to dispel any concerns that the clauses re the result of implicit collusion or *self-serving dealings*." 944 F.3d at 1060 (emphasis added).

That scrutiny is necessary both pre- and post-certification because in class-action settlements, as this Court recognized, there is "a heightened risk that self-interest, even if not purposeful collusion, will seep its way into the settlement terms." *Roes*, 944 F.3d at 1060. Because of these self-interested incentives, it is insufficient that the settlement happened to be at "arms' length" without express collusion between the settling parties; and because of the danger of conflicts of interests, the court must monitor the reasonableness of the settlement in the light of less overt but still sinister self-dealing. *Bluetooth*, 654 F.3d 935.

Why is this important? Imagine two scenarios settling *Coyote v. Acme*, a class action alleging Acme overcharged for defective Rocket Skates:

(1) Class counsel and the defendant expressly conspire to throttle class recovery in a settlement, limiting it to $1 million, while paying class counsel $7 million. They light cigars and celebrate with a jig while wearing top hats and monocles.

(2) Class counsel and a defendant work with a mediator, who proposes several compromises that the defendant rejects. The mediator eventually proposes an extremely limited notice and claims process destined to limit class recovery to $1 million with over 99% of the class receiving nothing, and the parties agree. The parties negotiate attorneys' fees, and the mediator, disregarding the disproportionality, proposes a $7 million fee award and the parties agree to that and clear sailing. Class counsel chooses not to fulfill its fiduciary duties to the class and tell the defendant "Wait, if you're willing to put $8 million on the table, why isn't the class getting $6 million with $2 million in fees being paid? Let's restructure this." Instead, class counsel accepts the proposal, planning to tell the district court that it couldn't have colluded with Acme because the mediator came up with the terms for the settlement, and so the court should approve the settlement.

The two Acme settlements are economically identical and equally unfair in "shortchang[ing] the class" (slip op. 31) with its allocation. In both cases, class counsel has breached its fiduciary duty to the class by putting its own interests first—in one, by express malfeasance; in the other, by passive nonfeasance. The only cost to the parties to move from overt collusion to tacit collusion at arms' length is the additional time spent in mediation, which they use to tell the court about their "'hard-fought' negotiations." *Cf. In re Dry Max Pampers Litig.*, 724 F.3d 713, 717 (6th Cir. 2013)

(Kethledge, J.). If the Court's use of "collusion" means only the narrow dictionary definition of "collusion," and an objector must prove subjective bad intent, then a court can approve the second Acme settlement simply because the parties laundered it through a cooperative mediator who disregarded or was unaware of the likely results of the claims process. (Absent class members should not be required to request the deposition of a federal magistrate judge to find out.) But *Roes* and *Pearson* (and, Henderson contends, the new Rule 23(e)(2)(C)) would require courts to reject both settlements unless the settling parties could show that it was impossible to provide a less disproportionate allocation to the class.

From the context of the overall opinion and the long-standing precedents the Court cited, Henderson understands the Court's discussion of "collusion" to include times when plaintiffs or class counsel have objectively self-dealt or prioritized their own interests over those of the class even during a subjectively procedurally flawless arms'-length negotiation. Indeed, Henderson expressly disclaimed an allegation of subjective "collusion" in the narrow sense. Reply Br. 17-18. If the panel was using "collusion" to mean only the failure to negotiate at arms' length, Henderson would have lost. Such self-dealing might include, for instance, agreeing to a claims process where a disproportionate amount of the settlement funds go to class counsel; or insulating fee requests from challenge by agreeing to clear sailing and that any remaining funds should revert to the defendant rather than supplementing the class recovery.

On its own, however, the opinion's references simply to "collusion" without specifically defining the term are likely to encourage parties to argue that a settlement is fair and reasonable without an outright coordinated pact among the parties to harm the

class. *See, e.g.*, slip op. 5 ("In reviewing settlements struck before class certification, district courts must apply these so-called *Bluetooth* factors to smoke out potential collusion."); *id.* at 18 ("We have observed that courts should scrutinize pre-class certification settlements because plaintiffs' counsel may collude with the defendant to strike a quick settlement without devoting substantial resources to the case."); *id.* at 19 ("Even after a court has certified a class, class counsel still has the incentive to conspire with the defendant to reduce compensation for class members in exchange for a larger fee. A defendant goes along with this collusion because it cares only about the total payout, not the division of funds between class and class counsel."). Henderson's concern (and the concern of *Pearson* and *Roes* and *Pampers* before that) is not "How the sausage is made" (slip op. 31), but what is objectively and visibly in the sausage. One need not be in the room where it happens to know that. It is plain from the four corners of the settlement and the actuarial certainty that its notice and claims process would leave over 99% of the class uncompensated and with a small fraction of what Conagra was willing to give clear sailing to class counsel. Opening Br. 26-28. No "conspiracy" was necessary to reach that result, unless "conspiracy" includes the act of signing a settlement with these objectively unfair terms.

If courts interpreting this Court's decision incorrectly adopt a narrow focus on "collusion" in the colloquial sense, it will debilitate the decision's force and render this Court's holding inapplicable in nearly every class-action settlement. At a minimum, it will result in unnecessary litigation (and discovery disputes) before the district court both here and in many future cases. The list of red flags from *Bluetooth* alone, without a clear articulation of the underlying analytical framework for courts and a description of

when exceptions are appropriate, "is just a chopped salad." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001) (Easterbrook, J.). A rule of decision should treat settlements containing all three red flags as presumptively invalid unless the settling parties can offer an extraordinary justification to rebut the presumption of unfairness. *See Roes*, 944 F.3d at 1059-60; *Pearson v. NBTY, Inc.*, 772 F.3d 778, 786-87 (7th Cir. 2014).

Rarely do settling parties overtly conspire to harm the class. The Court's *Hamilton* quote makes sense given that some settlements are negotiated behind closed doors without evidence for any potential collusion that might occur. *See* slip op. 31. But it's also true that nearly every class-action settlement is reached in the presence of mediators, magistrate judges, and other neutral third parties precisely to guard against such accusations. The presence of such third parties—who owe no duty to the class and may not be versed in the intricacies of Rule 23 jurisprudence or the economics of the claims process—provides no guarantee that a settlement is fair, reasonable, and adequate. *Roes*, 944 F.3d at 1050 n.13 (quoting *Bluetooth*). "The mission of mediators is to bring together the parties and interest that come to them. It is not their role…to voice the interest of a group for which no one else is speaking." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 827 F.3d 223, 235 (2d Cir. 2016). This case demonstrates that reality. Yet if the parties need only show that they did not conspire with each other in reaching a settlement, any settlement that shortchanges the class might pass muster so long as the parties submit a declaration from the third party verifying that they reached settlement through arms'-length negotiations. Unfair settlements like those *Pearson* and *Roes* rejected could simply be laundered through a mediator eager to reach a deal and possibly oblivious to how settling parties can agree

to reduce claims rates. Class counsels will "lack any incentive to push back against the defendant's creating a burdensome claims process in order to minimize the number of claims" so long as it is the mediator who ostensibly proposed it. *Pearson*, 772 F.3d at 783 (explaining why proportionality between fees and actual class recovery is critical to align incentives).

Appellees here have already signaled that they will take this approach on remand before the district court. For example, plaintiffs' appellate counsel Sam Issacharoff commented to the press that plaintiffs would "make the necessary record on remand."[1] Plaintiffs' attorney Amy Keller publicly implied in a "tweet" criticizing the decision that plaintiffs would argue that a mediator's proposing attorneys' fees and the notice and claims process absolved the disproportionate settlement of any sins.[2] *See also* Plaintiffs'



Amy Keller
@amyekeller

Replying to @IJSanders @DavidLat and 2 others

Missing things: 1) could submit claims for up to 30 bottles w/o any proof of purch; 2) notice plan and claims process selected by mediator; 3) attorneys' fees (1/2 of lodestar) also based on mediator's proposal; 4) case was filed in 2011, went up to 9th Circuit 2x and SCOTUS 1x.

8:04 PM · Jun 11, 2021 · Twitter Web App

---

[1] "9th Circ. Strikes Down $7M Atty Fees in ConAgra," Law360, June 1, 2021, *available at* https://www.law360.com/articles/1389940/9th-circ-strikes-down-7m-atty-fees-in-conagra-label-deal (last visited June 2, 2021).

[2] *Available at* https://twitter.com/amyekeller/status/1403518564515160066 (last visited June 15, 2021).

Merits Br. 31 n.12. As Henderson notes above, and as the Ninth Circuit has held before, this is irrelevant; there should be no new record to make. If a mediator (knowingly or unknowingly) proposes a settlement that awards nearly 90% of the class benefit to the attorneys, a faithful class counsel has a fiduciary obligation to insist instead upon a proportional allocation. But class counsels are not saints, and will rarely volunteer to cost themselves millions of dollars of fees unless this Court establishes clear rules that preclude the approval of settlements where class counsels have not fulfilled that fiduciary duty.

The panel's statement (slip op. 24) that settlements with all three red flags can sometimes be acceptable is true, but the opinion gives no guidance *when* courts can approve such settlements. The Court should clarify what it means. Of course, fair settlements that are not proportionate are hypothetically possible. One can imagine a different case involving Mos Eisley Cantina's sale of GMO-modified blue milk, and a settlement using data from Mos Eisley Cantina loyalty cards to compensate every single class member their full measure of alleged damages with direct deposits—but those payments to the class add up to only $12 million. Mos Eisley agrees to pay lodestar with a multiplier, and its previous scorched-earth litigation tactics has caused class counsel to incur $14 million in lodestar. That settlement allocation is disproportionate relative to this Court's 25% benchmark whether Mos Eisley pays class counsel a multiplier or even sub-lodestar. But the Mos Eisley settlement is fair despite the red flags because, unlike here, and unlike in the two hypothetical Acme settlements, class counsel did not unfairly *compromise* the class's claims to get a bigger fee for itself.

Appellees propose no rule of decision dividing acceptable settlements with red flags from unacceptable settlements; the panel does not identify when red flags are just yellow flags. Class counsels bringing meritorious litigation will have no fear of Henderson's proposed clarification prohibiting self-dealing or more expressly defining "collusion" to include self-dealing. We believe the panel held that this settlement is unacceptable and should be rejected on remand. Slip op. 5. But plaintiffs have made it clear that they will implausibly litigate the ambiguities in the opinion to save their fee.

Even if there were procedurally proper arms'-length negotiations and there was not an improper overt conspiracy between plaintiffs and Conagra, the settlement terms remain substantively unfair because class counsel agreed to a settlement structure that favors its own recovery over that of its clients, shortchanging them. Class counsel still negotiated a settlement that resulted in recovery for themselves of "seven times more money than the class members," reverted any reduction in attorneys' fees—which defendants agreed not to challenge—to defendant; and tried to hide all this with an injunction of illusory value. Slip op. 5. That these terms result from an arms'-length negotiation and a mediator's involvement exemplifies why objective self-dealing is and must be the standard, rather than solely subjective intent. The Court can save potentially years of litigation by clarifying this point rather than letting appellees misinterpret it to a district judge and possibly a second appeal and panel. (The Ninth Circuit may wish to adopt the time-saving rule of some other circuits that the same panel handles successive appeals, which will deter gamesmanship on remands, thus reducing the chance of successive appeals seeking a second bite at the apple with a different panel.) Perhaps the Court does not want to state definitively that this settlement must be rejected, as

*Pearson* did for a settlement with a superior ratio and as *Pampers* did. But if so, the parties will avoid much collateral litigation if the Court clarifies what it thinks is missing from the record and who must prove what on remand below.

## II.  The Court may wish to make some other edits.

There are some minor edits in the slip opinion that the Court may wish to make if it issues a new opinion.

On page 5, the second sentence of the first paragraph has a subject-verb agreement error. The context suggests that it is the questionable provisions that individually reek, rather than the singular "bevy."

On page 9, the Court states "Only one class member opted out of the settlement." This is true; a Georgia attorney named Willis A. Johnson was the only class member who wasted postage opting out. R.688-1. But the reference in the next sentence to Professor Henderson suggests to some that the Court was referring to Professor Henderson as the opt-out. Of course, opt-outs cannot object; one reporter incorrectly asserted to the undersigned that the Court had confused the two concepts. We suggest adding the transitional phrase "In addition," to the beginning of the second sentence of the paragraph to cure the ambiguity.

The analysis of *Star Wars* sequels on page 24 is beyond cavil and needs no correction.

## Conclusion

For these reasons, Henderson asks the Court to clarify, consistent with existing Ninth Circuit precedent, that its references to "collusion" include uncoordinated self-

dealing by class counsel and plaintiffs to favor class counsel's self-interest ahead of the interests of the class.

Henderson agrees that it is hypothetically possible for a settlement to include red flags and be acceptable under Rule 23(e) when class counsel has not compromised the class's interests on behalf of a disproportionate fee, but asks that the Court clarify what district courts should be looking for when such red flags are present.

Dated:  June 15, 2021    Respectfully submitted,

        /s/ Theodore H. Frank
        Theodore H. Frank
        Anna St. John
        HAMILTON LINCOLN LAW INSTITUTE
         CENTER FOR CLASS ACTION FAIRNESS
        1629 K Street NW, Suite 300
        Washington, DC 20006
        Telephone:  (573) 823-5377
        Email:  ted.frank@hlli.org
        Attorney for Appellant M. Todd Henderson

## Certificate of Compliance

I certify that: This brief complies with the length limits permitted by Ninth Circuit Rule 40-1(a) or Rule 27. The brief is 3407 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Executed on June 15, 2021.

*/s/ Theodore H. Frank*
Theodore H. Frank

**Proof of Service**

I hereby certify that on June 15, 2021, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.

/s/ *Theodore H. Frank*

Theodore H. Frank

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT BRISEÑO; CHRISTI TOOMER; KELLY MCFADDEN; JANETH RUIZ; BRENDA KREIN; ALEXIS JUSTAK; LEONORA ULITSKY; ANNE COWAN; JULIE PALMER; PATTY BOYER; NECLA MUSAT; PAULINE MICHAEL; RONA JOHNSTON; CHERI SHAFSTALL; JILL CROUCH; ERIKA HEINS; MAUREEN TOWEY; MICHELE ANDRADE; ANITA WILLMAN; DEE HOPPER-KERCHEVAL; LIL MARIE-BIRR, individually and on behalf of all others similarly situated, *Plaintiffs-Appellees*, | No. 19-56297 <br><br> D.C. No. 2:11-cv-05379-CJC-AGR <br><br><br> OPINION |
| v. | |
| M. TODD HENDERSON, *Objector-Appellant*, | |
| v. | |
| CONAGRA FOODS, INC., *Defendant-Appellee.* | |

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted December 7, 2020
Pasadena, California

Filed June 1, 2021

Before: John B. Owens and Kenneth K. Lee, Circuit
Judges, and David A. Ezra,[*] Senior District Judge.

Opinion by Judge Lee

## SUMMARY[**]

## Class Action Settlements

The panel reversed the district court's approval of a class
action settlement in an appeal brought by a class member
Objector in a diversity action where the class alleged that
ConAgra Foods, Inc. used a misleading "100% Natural"
label on Wesson Oil.

The panel held that the class settlement agreement raised
a squadron of red flags that required further review. The
panel held further that under the newly revised Fed. R. Civ.
P. 23(e)(2) standard, courts must scrutinize settlement
agreements – including post-class certification settlements –
for potentially unfair collusion in the distribution of funds
between the class and their counsel.

---

[*] The Honorable David A. Ezra, Senior United States District Judge
for the Western District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It
has been prepared by court staff for the convenience of the reader.

The panel held that the district court erred by failing to apply the newly revised Fed. R. Civ. P. 23(e)(2). Specifically, the panel held that under the newly revised Rule 23(e)(2), courts must apply the heightened scrutiny in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011), to post-class certification settlements in assessing whether the division of funds between the class members and their counsel was fair and adequate. The panel held further that district courts must apply the *Bluetooth* factors to scrutinize fee arrangements to determine if collusion may have led to class members being shortchanged. The panel concluded that the class settlement here featured all three red flags of potential collusion that was noted in *Bluetooth*: plaintiffs' counsel received a disproportionate distribution of the settlement; the parties agreed to a "clear sailing arrangement" in which ConAgra agreed not to challenge the agreed-upon fees for class counsel; and the agreement contained a "kicker" or "reverter" clause in which ConAgra, not the class members, received the remaining funds if the court reduced the agreed-upon attorneys' fees.

The panel held that the district court erred by failing to approximate the value of the settlement's injunction. Specifically, the panel held that it was reversible error when the district court, rather than attempting to quantify the value of the injunctive relief, instead concluded that it had "some" value. The panel held further that the district court erred by placing even "some value" on the injunction because it was, and is, virtually worthless.

The panel next addressed – and rejected – appellees' argument that the *Erie* doctrine precluded the application of Rule 23(e)(2) to a class settlement where state substantive law governed attorney's fees in fee shifting cases. In any

4                         BRISEÑO V. HENDERSON

event, the Objector challenged settlement fairness under
Rule 23(e), rather than an award of attorney's fees under
Rule 23(h). Thus, *Erie*'s effect on fee-shifting law, if it even
had one, was not implicated in this appeal.

The panel held that the district court did not err by
determining that the Objector failed to rebut its own
conclusion that the settlement satisfied Rule 23(e)(2). The
record demonstrated that the district court conducted its own
independent analysis, and then considered, and dismissed,
the Objector's objections. The district court never
improperly shifted to the Objector the burden of rebutting
the settlement's fairness, reasonableness, and adequacy at
the fairness hearing.

The panel remanded for further proceedings.

---

## COUNSEL

Theodore H. Frank (argued) and Melissa A. Holyoak, Center
for Class Action Fairness, Hamilton Lincoln Law Institute,
Washington, D.C., for Objector-Appellant.

Samuel Issacharoff (argued), New York, New York; Robert
Klonoff, Portland, Oregon; Ariana J. Tadler, A.J. de
Bartolomeo, and Brian R. Morrison, Tadler Law LLP, New
York, New York; Adam J. Levitt and Amy E. Keller,
DiCello Levitt Gutzler LLC, Chicago, Illinois; David Azar,
Milberg Phillips Grossman LLP, Irvine, California; for
Plaintiffs-Appellees.

Angela M. Spivey (argued), Alston & Bird LLP, Atlanta,
Georgia, for Defendant-Appellee.

Mark Brnovich, Attorney General; Oramel H. Skinner,
Solicitor General; Kate B. Sawyer, Assistant Solicitor
General; Keena Patel, Assistant Attorney General; Office of
the Attorney General, Phoenix, Arizona; Steve Marshall,
Kevin G. Clarkson, Leslie Rutledge, Lawrence G. Wasden,
Curtis T. Hill Jr., Daniel Cameron, Jeff Landry, Eric
Schmitt, Dave Yost, Mike Hunter, Alan Wilson, and Ken
Paxton, Attorneys General; as and for Amici Curiae
Attorneys General of Arizona, Alabama, Alaska, Arkansas,
Idaho, Indiana, Kentucky, Louisiana, Missouri, Ohio,
Oklahoma, South Carolina, and Texas.

---

# OPINION

LEE, Circuit Judge:

We can perhaps sum up this case as "How to Lose a
Class Action Settlement in 10 Ways." The parties crammed
into their settlement agreement a bevy of questionable
provisions that reeks of collusion at the expense of the class
members: Class counsel will receive seven times more
money than the class members; an injunction touted by an
expert as worth tens of millions of dollars appears worthless;
the defendant agrees not to challenge the plaintiffs'
attorneys' fees amount; any reduction in those fees by the
court reverts to the defendant; and on and on.

While courts should not casually second-guess class
settlements brokered by the parties, they should not
greenlight them, either, just because the parties profess that
their dubious deal is "all right, all right, all right." We
reverse the district court's approval of the class settlement
because the agreement raises a squadron of red flags
billowing in the wind and begging for further review. We

6 BRISEÑO V. HENDERSON

hold that under the newly revised Rule 23(e)(2) standard, courts must scrutinize settlement agreements — including post-class certification settlements — for potentially unfair collusion in the distribution of funds between the class and their counsel.

## BACKGROUND

For many years, ConAgra, then-owner of Wesson Oil, labeled that product as "100% Natural." In 2011, Robert Briseño and others sued ConAgra, alleging that "100% Natural" was misleading because Wesson Oil contains ingredients made from genetically modified organisms ("GMOs").

Three years later, plaintiffs sought class certification. Relying on the expert report of Colin B. Weir, they argued that they overpaid for Wesson Oil based on the "100% Natural" label. ConAgra responded that its market research showed that less than 3 percent of consumers bought the product because of that label. Although Weir testified that hedonic regression could quantify the supposed price premium charged for that label, he did not try to calculate it at first.

Unsurprisingly, ConAgra then challenged the admissibility of Weir's report. Enlisting its own expert, ConAgra asserted that historical price data showed that the label did not affect the price of Wesson Oil. According to ConAgra, if the public had cared about the "100% Natural" claim, then the price of Wesson Oil should have declined after ConAgra removed that claim from the product's label. The district court agreed, denying plaintiffs' first certification request.

Still hoping to strike oil, plaintiffs filed an amended motion for class certification. This time, however, they supplemented Weir's expert material with a supporting opinion by Dr. Elizabeth Howlett. Together, plaintiffs' experts asserted that consumers paid a 2.28% price premium for the allegedly mislabeled products. Furthermore, Dr. Howlett suggested that a conjoint analysis could help determine how consumers value "GMO content." Plaintiffs, however, never submitted that conjoint analysis. ConAgra, again, sought to strike plaintiffs' experts and opposed class certification.

This time, the court denied ConAgra's motions and certified a Rule 23(b)(3) damage class, though it refused to certify a 23(b)(2) injunctive class for lack of standing. ConAgra twice pursued Rule 23(f) interlocutory review of class certification. It lost both appeals and an attempt to seek certiorari. The parties began settlement negotiations shortly after that.

Meanwhile, ConAgra agreed to sell Wesson Oil to The J.M. Smucker Company in May 2017. About two months later, ConAgra voluntarily removed the disputed label, and stopped marketing Wesson products as "natural." ConAgra maintains that this litigation played no role in either decision. In early 2018, the Smucker deal hit an insurmountable regulatory jam. Undeterred, ConAgra sought a new suitor for Wesson. At the same time, it engaged in mediation with the certified class. The district court assigned Magistrate Judge McCormick to help the parties grease the wheels of justice, and they emerged with an agreement-in-principle in November 2018. A month later, ConAgra agreed to sell Wesson to Richardson International. The deal closed in February 2019. The next month, the parties proposed a settlement agreement.

8                    BRISEÑO V. HENDERSON

ConAgra agreed to provide, in relevant part:

> (a) $0.15 for each unit of Wesson Oils
> purchased to households submitting valid
> claim forms (to a maximum of thirty units
> without proof of purchase, and unlimited
> units with proof of purchase) (b) an
> additional fund of $575,000 to be
> allocated to New York and Oregon class
> members submitting valid claim forms,
> as compensation for statutory damages
> under those states' consumer protection
> laws, and (c) an additional fund of
> $10,000 to compensate those in all
> classes submitting valid proof of
> purchase receipts more than thirty
> purchases, at $0.15 for each such
> purchase above thirty, with Class
> Counsel paying any non-funded claims
> (i.e., claims above the $10,000 provided
> by ConAgra) from any attorneys' fees
> awarded in this case.

With a class of nearly 15 million consumers, ConAgra
claimed that it theoretically exposed itself to nearly
$67.5 million in claims if every consumer submitted a claim.
(Spoiler alert: that never happens — not even close). The
settlement agreement established a fund on a claims-made
basis — *i.e.*, ConAgra would pay out for only those claims
submitted by consumers. The settlement, however, did not
require ConAgra to identify or provide direct notice to class
members.

The settlement agreement also provided injunctive
relief: Should ConAgra have seller's remorse and decide to
reacquire the Wesson brand in the future, it agreed not to

advertise or market Wesson Oil as "natural," unless the FDA permits the use of the term to describe oil derived from GMO seeds. Relying on Mr. Weir's analysis, the parties asserted that the "the value of the injunctive relief to the Classes" is *$27 million.*

Finally, the settlement stated that plaintiffs would request — and ConAgra would not contest — $6.85 million in attorneys' fees and expenses. That amount would come directly from ConAgra and be separate from the class settlement fund. If the court, however, sliced the agreed-upon attorneys' fees, that reduction would revert to ConAgra rather than the class.

The parties thus represented that their settlement could theoretically be worth over $100 million — around $95 million in value to the class ($67.5 million in potential payout and $27 million in injunctive relief value), along with another $6.85 million for the attorneys. Yet, when the dust settled, ConAgra shelled out less than $8 million, with a mere $1 million of that going to the class. Class counsel's fees swallowed $5.85 million, and expenses devoured another $978,671. Of the 15 million class members, barely more than one-half of one percent of them submitted a claim.

Only one class member opted out of the settlement. M. Todd Henderson, a law professor at the University of Chicago, objected to the settlement under Rule 23(e), arguing that attorneys hoarded 88% of the class's actual recovery. He asserted that our precedent required the court to treat the settlement as a constructive common fund (*i.e.*, the settlement effectively establishes one common fund to pay out both the class members and their counsel). Henderson also contended that the settlement's "clear sailing" provision (*i.e.*, ConAgra's refusal to challenge the agreed-upon attorney's fees) and "kicker" clause (*i.e.*, any

10          BRISEÑO V. HENDERSON

reduction in fees reverting to ConAgra, not the class members) raised the specter of collusion. He also objected to the stipulated value of the injunctive relief, describing it as "illusory." Likewise, Henderson castigated Mr. Weir, stating that his failure to conduct a price comparison rendered his opinion unreliable.

Plaintiffs sought final approval of the settlement in July 2019. Based on Mr. Weir's declaration, they valued ConAgra's label change at $19,080,000. They also contended that, if Wesson's new owner, Richardson, continued to refrain from labeling the product as "natural" for *even a year*, the value of the injunction would surge to *$30.2 million.* And for each year that Richardson did not label Wesson Oil as "natural," the class would obtain an annual benefit of over $11 million, according to Mr. Weir. Plaintiffs argued that the fee request "represent[ed] approximately 25.4% of the parties' estimated value of the injunctive relief or 23% of Plaintiffs' conservative estimate[]." They also calculated their own lodestar fee at around $11.499 million.

When the claims deadline passed, class members made 97,880 timely claims for $418,919, a shadow of the $67.5 million potential liability that ConAgra touted in seeking approval of the settlement. Even with separately funded pools for New York and Oregon, ConAgra would pay class members a maximum of $993,919. Out of a class of 15 million consumers, fewer than 100,000 would receive a single cent.

The district court held its final fairness hearing in October 2019. Henderson and class counsel remained loggerheads on almost every issue. The parties disputed whether Henderson as an objector, or plaintiffs as proponents, bore the burden of establishing that the

settlement satisfied Rule 23(e).  Henderson argued that the
"kicker" demonstrated ConAgra's willingness to settle for
roughly $8 million, and that class counsel bargained away
absent class members' rights in exchange for much of the
settlement.  The district court disagreed.

Rejecting Henderson's motion to strike Mr. Weir's
expert report, the district court explained that "[h]aving one
expert's opinion — however purportedly flawed — on the
value of that injunction helps the Court develop its own
view."  Despite recognizing the parties' "vigorous dispute
over the precise valuation," it still found that "the injunction
adds at least some value to the amount offered in
settlement."  It continued, "even if there were no injunctive
relief, the [c]ourt would likely find that the amount offered
in settlement was fair and reasonable given the likely
obstacles to Plaintiffs recovering [at trial]."

The district court went on to evaluate the settlement for
fairness under our decision in *Staton v. Boeing Co.*, 327 F.3d
938, 959 (9th Cir. 2003).  It explained that the length and
nature of the suit allowed both sides to evaluate the costs and
benefits of protracted litigation, supplemented by the
recommendation of a court-appointed mediator.  Again, the
court's concerns over the merits of the plaintiffs' suit heavily
influenced its analysis.  The court, however, stopped short of
conducting a Rule 23(e) inquiry.  Instead, it merely held that
"[t]here is substantial overlap between [Rule 23(e)(2)]
factors and the *Staton* factors."

The court, "rel[ying] on the lodestar method," found
class counsel's $6.85 million reasonable given the lodestar
amount of "nearly $11.5 million."    Indeed, the court
appeared impressed that "Defendant [was] willing to pay
anything at all given the many liability and damages issues
this case has had from the beginning."    The court also

pointed to "the amount of hours reasonably spent on the litigation, counsel's efforts in litigating this years-long complex action, the results achieved, and the risks inherent in continued litigation."

It also emphasized the "substantial" nature of "the [$0.15] per-unit award," given that it had restricted relief to "only the portion of [the] premium attributable to consumers' belief that '100% natural' meant that the products were GMO-free." It thus concluded that "[t]he settlement amount offered provide[d] an immediate and tangible benefit to class members and eliminate[d] the risk that they could receive less than that amount, or nothing at all, if litigation continued."

And while the court "appreciate[d] Objector's high-level concerns regarding an apparent trend [sic] toward class action settlements disproportionately benefitting attorneys," it was "not persuaded" that "the disproportionate attorney fee award under the settlement render[ed] the entire settlement unfair." Rather, the court maintained that "the record in this case sufficiently 'dispel[s] the possibility that class counsel bargained away a benefit to the class in exchange for their own interests.'" Henderson timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review for abuse of discretion a district court's decision to approve a class action settlement. *Roes, 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1043 (9th Cir. 2019). "A [district] court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011). Even so, "[a]ppellate review of a settlement agreement is generally 'extremely

limited.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1988)). We, however, "hold district courts to a 'higher procedural standard when making [a] determination of substantive fairness.'" *Roes, 1–2*, 944 F.3d at 1043 (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015)). *See also Dennis*, 697 F.3d at 864 (explaining that "'[t]o survive appellate review, the district court must show it has explored comprehensively all factors,' and must give 'a reasoned response' to all non-frivolous objections" (citing *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982))). Thus, this court "will rarely overturn an approval of a" compromised settlement "unless the terms of the agreement contain convincing indications that . . . self-interest rather than the class's interest in fact influenced the outcome of the negotiations." *Staton*, 327 F.3d at 960; *Allen*, 787 F.3d at 1223.

"We also review for abuse of discretion a district court's award of fees and costs to class counsel, as well as its method of calculation." *Labatz v. U.S. Cellular of Cal., Inc.*, 22 F.3d 1142, 1148–49 (9th Cir. 2000).

## ANALYSIS

**I. The district court erred by failing to apply the new Rule 23(e)(2), which requires courts to scrutinize attorneys' fee arrangements.**

A. *Under the newly revised Rule 23(e)(2), courts should apply the Bluetooth factors even for post-class certification settlements.*

Rule 23(e) imposes on district courts an independent obligation to ensure that any class settlement is "fair, reasonable, and adequate," accounting for the interests of

absent class members. Fed. R. Civ. P. 23(e)(2). Likewise,
we recognize "an independent obligation to ensure that [any
attorneys' fee] award, like the settlement itself, is
reasonable, even if the parties have already agreed to an
amount." *In re Bluetooth Headset Products Liability
Litigation*, 654 F.3d 935, 941 (9th Cir. 2020); *see also
Staton*, 327 F.3d at 960–64. Indeed, settlement agreements
"warrant special attention when the record suggests that
settlement is driven by fees; that is, when counsel receive a
disproportionate distribution of the settlement." *Hanlon*,
150 F.3d at 1021. Regardless of "whether the attorneys' fees
come from a common fund or are otherwise paid, the district
court must exercise its inherent authority to assure that the
amount and mode of payment of attorneys' fees are fair and
proper." *Zucker v. Occidental Petroleum Corp.*, 192 F.3d
1323, 1328 (9th Cir. 1999).[1]

Before the 2018 amendment, Rule 23 stated that class
settlements should be "fair, reasonable, and adequate" but
did not elaborate. Like our sister circuits, we filled in the
gaps, instructing courts to consider the following factors
(sometimes called "*Hanlon* factors" or "*Staton* factors") in
assessing whether a settlement is "fair, reasonable, and
adequate":

> [T]he strength of the plaintiffs' case; the risk,
> expense, complexity, and likely duration of

---

[1] While we do not address whether the settlement agreement
amounts to a constructive common fund as alleged by Henderson, the
district court on remand should review the settlement structure to
determine whether to apply common fund principles to its 23(e) inquiry.
*See Bluetooth*, 654 F.3d at 948–49 (explaining that "[e]ven when
technically funded separately, the class recovery and the agreement on
attorneys' fees [are] a package deal . . . for purposes of analyzing . . . the
settlement's overall reasonableness") (internal quotations omitted).

> further litigation; the risk of maintaining
> class action status throughout the trial; the
> amount offered in settlement; the extent of
> discovery completed and the stage of the
> proceedings; the experience and views of
> counsel; the presence of a governmental
> participant; and the reaction of the class
> members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026; *Staton*, 327 F.3d at 959 (internal
citations and quotations omitted). Admittedly, we never
explicitly mandated consideration of the terms of attorneys'
fees in the *Hanlon/Staton* factors.

On the other hand, we have recognized the risks in
allowing counsel to bargain on behalf of the entire class,
especially pre-class certification when counsel may try to
strike a quick settlement on behalf of the class. *See Staton*,
327 F.3d at 960. In *Bluetooth*, we explained that courts
should scrutinize agreements for "subtle signs that class
counsel have allowed pursuit of their own self-interests . . .
to infect the negotiations." 654 F.3d at 947. We identified
three of those signs: (1) "when counsel receive[s] a
disproportionate distribution of the settlement"; (2) "when
the parties negotiate a 'clear sailing arrangement,'" under
which the defendant agrees not to challenge a request for an
agreed-upon attorney's fee; and (3) when the agreement
contains a "kicker" or "reverter" clause that returns
unawarded fees to the defendant, rather than the class. *Id*.
In reviewing settlements struck before class certification,
district courts must apply these so-called *Bluetooth* factors
to smoke out potential collusion.

Last year, we noted that "*Bluetooth* therefore left open a
question no subsequent case has answered," whether its

16          BRISEÑO V. HENDERSON

heightened inquiry applies to *post-class certification* settlements. *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1125–26 (9th Cir. 2020). We now answer that question: indeed, it does.

That answer flows from the revised Rule 23(e). In December 2018, Congress and the Supreme Court amended Rule 23(e) to set forth specific factors to consider in determining whether a settlement is "fair, reasonable, and adequate," including:

> 23(e)(2)(C): **[Considering whether] the relief provided for the class is adequate, taking into account:**
>
> (i)   the costs, risks, and delay of trial and appeal;
>
> (ii)  th**e effectiveness of any proposed method of distributing relief to the class**, including the method of processing class-member claims;
>
> (iii) **the terms of any proposed award of attorney's fees**, including timing of payment; and
>
> (iv)  any agreement required to be identified under Rule 23(e)(3).
>
> 23(e)(2)(D): the proposal treats class members equitably relative to each other.

Fed. R. Civ. P 23(e)(2)(C)–(D) (emphasis added).

Under this revised text, district courts must now consider "the terms of any proposed award of attorney's fees" when determining whether "the relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2)(C)(iii). While none of our sister circuits has yet directly addressed what this provision specifically requires,[2] the plain language indicates that a court must examine whether the attorneys' fees arrangement shortchanges the class. In other words, the new Rule 23(e) makes clear that courts must balance the "proposed award of attorney's fees" vis-à-vis the "relief provided for the class" in determining whether the settlement is "adequate" for class members.

Nothing in the Rule's text suggests that this requirement applies only to pre-certification settlements. Congress required courts to scrutinize attorney's fees, even if the settlement occurred after class certification. And for good reason, too: The specter of collusion still casts a long shadow

---

[2] The Second Circuit provided some guidance in *Fresno Cty. Emps.' Ret. Assoc. v. Isaacson/Weaver Family Trust*, 925 F.3d 63, 71–72 (2d Cir. 2019) (describing 23(e)(2), in a post-certification class settlement context, as a "backstop that prevents unscrupulous counsel from quickly settling a class's claims to cut a check" and involving "judicial review of class-action settlements with a 'searching assessment' of counsel's fee award") (internal citations omitted). But several district courts have conducted limited Rule 23(e)(2)(C)(iii) analyses, albeit without fulsome inquiry into its textual requirements. *See In re MyFord Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2019 WL 1411510 at *8–9 (N.D. Cal. Mar. 28, 2019) (citing *Hanlon*, 150 F.3d at 1026); *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 693 (S.D.N.Y. Nov. 7, 2019); *Gumm v. Ford*, No. 5:15-CV-41-MTT, 2019 WL 479506, at *3 (M.D. Ga. Jan 17, 2019) (quoting Fed. R. Civ. P. 23 Advisory Comm.'s Note, 2018 amend.); *In re J.P. Morgan Stable Value Fund ERISA Litig.*, No. 12-CV-2458 (VSB), 2019 WL 4734396, slip op. at *2–5 (S.D.N.Y. Sept. 23, 2019).

18                       BRISEÑO V. HENDERSON

over post-class certification settlements when they involve
divvying up funds between class members and class counsel.

We have observed that courts should scrutinize pre-class
certification settlements because plaintiffs' counsel may
collude with the defendant to strike a quick settlement
without devoting substantial resources to the case. *See, e.g.*,
*Hanlon*, 150 F.3d at 1026 (adopting other circuits' "more
probing inquiry" for "settlement approval that takes place
prior to formal class certification").    The potential for
collusion reaches its apex pre-class certification because,
among other things, (1) the court has not yet approved class
counsel, who would owe a fiduciary duty to the class
members; and (2) plaintiffs' counsel has not yet devoted
substantial time and money to the case, and may be willing
to cut a quick deal at the expense of class members' interests.
*See generally In re General Motors Corp. Pick-Up Truck
Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 788–90 (3d Cir.
1995).

In contrast, by the time a court has certified a class — the
theory goes — the parties have vigorously litigated the
dispute, reducing the chance that class counsel will settle on
the cheap for a quick buck. By devoting substantial time and
resources to the case, class counsel has skin in the game,
guaranteeing his or her interest in maximizing the size of the
settlement fund.    Likewise, because a district court has
appointed class counsel who owes a fiduciary duty to the
class members, class counsel would be ethically forbidden
from sacrificing the class members' interests. *See Allen*,
787 F.3d at 1223.

All of this is true — but also beside the point. Simply
put, class certification does not cleanse all sins, especially
when it involves potential collusion over divvying up funds
between class counsel and the class (rather than the size of

the settlement fund or relief). *See Staton*, 327 F.3d at 972 n.22 (recognizing "the inherent tensions among class representation, defendant's interests in minimizing the cost of the total settlement package, and class counsel's interest in fees").

Even after a court has certified a class, class counsel still has the incentive to conspire with the defendant to reduce compensation for class members in exchange for a larger fee. A defendant goes along with this collusion because it cares only about the total payout, not the division of funds between class and class counsel. After all, a defendant, no matter if a class has been certified, has "no reason to care about the allocation of its cost of settlement between class counsel and class members." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 783 (7th Cir. 2014) (Posner, J.). Instead, "all it cares about as a rational maximizer of its net worth is the bottom line — how much the settlement is likely to cost it." *Id.*

Consider this example. What would any rational defendant do if faced with these two settlement options: (1) establish a $10 million fund for class members and pay $3 million in fees to class counsel for a total payout of $13 million, or (2) set up a $7 million fund and pay $4 million to class counsel for a total payout of $11 million. A defendant would choose the second option because it would save $2 million, even though it shortchanges class members. Nothing about class certification can make a defendant care more about its opponents than its own bottom line.

Put another way, a post-class certification settlement only ensures that the parties litigated aggressively to arrive at an adequate total fund size; it does not, however, address the inherent incentives that tempt class counsel to elevate his or her own interest over those of the class members. As one

20          BRISEÑO V. HENDERSON

prominent academic who supports class actions put it, "the
profit motive will give class action lawyers incentives to do
sneaky things, just like it gives businesses incentives to do
sneaky things." Brian T. Fitzpatrick, *The Conservative Case
for Class Actions* 72 (2019). The potential for this type of
collusion is no hoax — it is real, whether a class has been
certified or not.

Congress sought to end this practice by changing the text
of Rule 23(e)(2)(C). We thus now hold that courts must
apply *Bluetooth*'s heightened scrutiny to post-class
certification settlements in assessing whether the division of
funds between the class members and their counsel is fair
and "adequate." Fed. R. Civ. P. 23(e)(2)(C).

B. *The settlement had all the hallmarks of a potentially
collusive settlement giving short shrift to the class.*

Despite holding its final approval hearing after the new
version of Rule 23(e)(2) took effect, the district court did not
apply it and instead relied on this court's *Staton* factors.
True, as the district court recognized, many of the *Staton*
factors fall within the ambit of the revised Rule 23(e). But
Congress provided district courts with new instructions —
such as analyzing the "terms of the settlement" and "terms
of any proposed award of attorney's fees" — that require
them to go beyond our precedent. Although we need not
decide whether a district court always abuses its discretion
by applying the judicially manufactured factors in *Staton* and
*Hanlon*, we must follow the law that Congress enacted. And
that means scrutinizing the fee arrangement for potential
collusion or unfairness to the class. Fed. R. Civ. P.
23(e)(2)(C)(iii).

Perhaps because our court had not clarified whether the
*Bluetooth* factors apply to post-class certification

settlements, the district court did not adequately scrutinize the fee arrangement for collusion. It instead noted that the fee request amounted to less than half of the lodestar amount. But the lodestar amount alone cannot tell us if the requested fees are reasonable. Counsel may have frittered away hours on pointless motions or unnecessary discovery, padding the lodestar. *See Chambers v. Whirlpool Corp.*, 980 F.3d 645, 665 (9th Cir. 2020) ("asymmetrical nature of discovery in class actions . . . can lead to excessive billing"). Or maybe counsel devoted tremendous hours but achieved very little for the class. *See id.* at 667. And in any event, even attorneys' fees based on a reasonable percentage of an unreasonable number of hours are still unreasonable.

We hold that district courts must apply the *Bluetooth* factors to scrutinize fee arrangements — even in post-class certification settlements — to determine if collusion may have led to class members being shortchanged. The class settlement here features all three red flags of potential collusion that we warned about in *Bluetooth.*

First, plaintiffs' counsel "receive[d] a disproportionate distribution of the settlement." *Bluetooth*, 654 F.3d at 947. The lion's share of the money — almost $7 million — will end up in the pockets of attorneys, while the class receives relative scraps, less than a million dollars. So little goes to the class members in a claims-made settlement, such as this one, because the redemption rate is notoriously low, especially when it involves small-ticket items. The redemption rate shrinks even further if the settlement, as here, provides for no direct notice to class members.[3]

---

[3] Although Henderson did not object to the lack of direct notice, we have an independent duty to examine the "effectiveness of any proposed method of distributing relief to the class." Fed. R. Civ. P. 23(e)(2)(C)(ii).

22                        BRISEÑO V. HENDERSON

Despite ConAgra's claim that it could potentially provide over $95 million in payments and value to the class members, they ended up receiving only about 1% of that touted amount. And that was no surprise, given how the parties knowingly structured the settlement. This gross disparity in distribution of funds between class members and their class counsel raises an urgent red flag demanding more attention and scrutiny.

Second, the parties agreed to a "clear sailing arrangement" in which ConAgra agreed not to challenge the agreed-upon fees for class counsel. This flashes yet another red flag under *Bluetooth*. *Id*. A clear sailing provision signals the potential that a defendant agreed to pay class counsel excessive fees in exchange for counsel accepting a lower amount for the class members. *Id.* at 949. Indeed, the "very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *Id.* at 948 (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991)). When faced with a clear sailing provision, courts thus have a "heightened duty to peer into the provision and scrutinize closely the relationship between attorney's fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Id.*

---

We, however, do not hold that parties must provide direct notice, especially for low-cost items bought by millions of consumers. A contrary ruling would likely not be cost-effective, with administrative and notice costs devouring most of the settlement fund. But we mention the lack of direct notice to underscore that the parties here knew that the redemption rate would be extremely low and that the agreed-upon attorneys' fees would swamp the actual recovery for class members.

Finally, the agreement contains a "kicker" or "reverter" clause in which ConAgra, not the class members, receives the remaining funds if the court reduces the agreed-upon attorneys' fees. *Id*. We identified this, too, in *Bluetooth*, as a warning sign. The reason is obvious: If ConAgra is content to pay nearly $7 million to class counsel but the court finds the full amount unreasonable, there is no plausible reason why the class should not benefit from the spillover of excessive fees. As we warned in *Bluetooth*, "[u]nless the district court is able to conclude that in this particular case, a kicker provision is in the class' best interest as part of the settlement package, the kicker makes it less likely that the settlement can be approved if the district court determines the clear sailing provision authorizes unreasonably high attorneys' fees." *Id.* at 949.

Here, the parties managed to run afoul of all three *Bluetooth* factors. That also raises the question of whether the parties colluded to prevent any direct challenge to excessive fees. Typically, class members can challenge an excessive fee award under Rule 23(h). But when parties agree to a "kicker," a 23(h) challenge cannot increase class recovery because the excessive fees wind up back in the defendant's pockets. That means that a class member may not have standing to object to the excessive fees because any action taken by the court would not redress the class member's purported injury.[4] Meanwhile, by agreeing to the "clear sailing" clause, the defendant has also waived its right to challenge the attorneys' fees, foreclosing *any* action under Rule 23(h). *See Pearson*, 772 F.3d at 786 (describing this combination as "a gimmick for defeating objectors").

---

[4] Henderson thus could only reach this court by challenging the totality of the settlement, rather than just attorneys' fees.

24          BRISEÑO V. HENDERSON

We stress that nothing in this opinion suggests that courts should unnecessarily meddle in class settlements negotiated by the parties or that courts have a duty to maximize the settlement fund for class members. Far from it. We instead follow the rules of our involvement in the class action process as set by Congress. Under those rules, the parties can agree on any "fair, reasonable, and adequate" settlement amount. Fed. R. Civ. P. 23(e). Nor do we seek to make any of the identified signs of collusion an independent basis for withholding settlement approval. Disproportionate fee awards, clear sailing agreements, and kicker clauses all may be elements of a good deal. But, as we explained in *Bluetooth*, they may also signal a collusive settlement, and district courts must scrutinize them where they appear. And here, the parties did more than just check every *Bluetooth* box; their settlement presented a Murderers' Row of provisions out of left field that seemingly favor class counsel and the defendant at the expense of the class members. The district court thus should give a hard look at the settlement agreement to ensure that the parties have not colluded at class members' expense.

## II. The district court erred by failing to approximate the value of the injunction.

Next, we address Henderson's argument that the district court erred by failing to recognize the settlement's injunctive relief as worthless. Rather than attempt to quantify the value of the injunctive relief, it instead concluded that it had "some" value. We agree with Henderson that this constitutes reversible error. *See Roes, 1–2*, 944 F.3d at 1055 (explaining that a district court must either quantify and explain the value of injunctive relief or exclude it from calculations).

We go further and also hold that the district court erred by placing even "some value" on the injunction because it

was, and is, virtually worthless. A district court abuses its
discretion when it approves a settlement despite "no
evidence that the relief afforded by [a] settlement has any
value to the class members, yet to obtain it they had to
relinquish their right to seek damages in any other class
action." *Koby v. ARS Nat. Servs., Inc.*, 846 F.3d 1071, 1079
(9th Cir. 2017).

Certainly, "the relief provided to the class cannot be
assessed in a vacuum." *Campbell*, 951 F.3d at 1123. After
all, a "class [does] not need to receive much for [a]
settlement to be fair [when] the class [gives] up very little."
*Id.* at 1124. And "[i]n evaluating what class members
relinquished in [a] settlement, [courts] must also consider
whether class members were required to release claims that
were more meritorious than the theories Plaintiffs pursued in
[the present] litigation." *Id*. at 1124.

But, critically, we also find illusory any injunction that
"does not obligate [the bound party] to do anything it was
not already doing . . . voluntarily . . . for its own business
reasons . . . not because of any court-or settlement-imposed
obligation. . . [when a defendant] would therefore be
unlikely to revert back to its old ways regardless of whether
the settlement contained the stipulated injunction." *Koby*,
846 F.3d at 1080. ConAgra would like us to believe that, by
agreeing to the settlement's injunctive relief, it bound its
own hands and threw away the key. In reality, it did that
years before reaching an agreement with the class.

Under the settlement, ConAgra agreed to refrain from
marketing Wesson Oil as "100% Natural." That sounds
great, except that ConAgra already abandoned that strategy
in 2017 — two years before the parties hammered out their
agreement — for reasons it claims were unrelated to this or
any other litigation. Even worse, ConAgra's promise not to

26 BRISEÑO V. HENDERSON

use the phrase "100% Natural" on Wesson Oil appears meaningless because ConAgra no longer owns Wesson Oil. In reality, this promise is about as meaningful and enduring as a proposal in the Final Rose ceremony on the *Bachelor*. Simply put, Richardson — the new owner of Wesson Oil — can resume using the "100% Natural" label at any time it wishes, thereby depriving the class of any value theoretically afforded by the injunction. ConAgra thus essentially agreed not to do something over which it lacks the power to do. That is like George Lucas promising no more mediocre and schlocky Star Wars sequels shortly after selling the franchise to Disney. Such a promise would be illusory.[5]

Granted, ConAgra also promised to abide by the injunction if it reacquires Wesson. Yet at the fairness hearing, ConAgra's counsel emphasized the company's lack of interest in buying back the brand. Indeed, ConAgra's attempts to sell Wesson predated the parties' first mediation. Thus, for the injunction to have any value, ConAgra would not only need to abandon its long-term corporate strategy, purchase the brand, possibly at a premium, but then also redesign and execute a brand-new labeling and marketing campaign. We find this unlikely and speculative at best.

We do not question the district court's view of the plaintiffs' likelihood of success in future litigation. But even if the class gave up very little, it has a right to receive something in exchange. Here, they did not because the injunctive relief is practically worthless.

Nothing in the testimony of the plaintiffs' expert, Mr. Weir, convinces us otherwise. As Professor Fitzpatrick of

---

[5] As evident by Disney's production of *The Last Jedi* and *The Rise of Skywalker.*

Vanderbilt Law School explained, "[n]onmonetary relief is much more difficult to put a number on than a pot of cash is, and lawyers may give the court rosy numbers to justify fee awards." Fitzpatrick, *The Conservative Case for Class Actions* 71. Here, the lawyers relied on an expert to provide a rosy number untethered to reality. Courts must "stamp [] out" such attempts. *Id.* at 72.

Mr. Weir concluded that the *annual* value of the injunctive relief is a staggering *$11.54 million*. In other words, ConAgra had been charging a price premium — to the aggregate tune of $11.54 million a year — for the "100% Natural" label, and, because of the injunction, that full amount accrues to the class each year. So, according to Mr. Weir, this settlement is essentially minting money to the tune of eight figures each year for the class members. Despite ample opportunity, he never tested his theory. That failure is more telling because he had a real-life example he could have examined: ConAgra dropped the "100% Natural" label years ago, so he could have studied whether that led to the removal of the price premium. Mr. Weir claims other real-life market factors made performing a post-labelling price-check futile. But that admission appears to doom his own expert conclusion that the label led to a price premium — if he cannot separate other market factors to figure out a price premium in real-life, how can he do so in a hypothetical study that he did not conduct? In short, Mr. Weir effectively admits that his expert testimony turns on "unverifiable evidence." *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002). Because Mr. Weir's testimony is unverifiable, it is ultimately worth as little as the settlement's injunctive relief.

## III. *Erie* does not preclude the application of Rule 23(e)(2).

We next address — and reject — appellees' argument that the *Erie* doctrine precludes the application of Rule 23(e) to a class settlement where state substantive law governs attorney's fees in fee-shifting cases.

Every year, tens of thousands of first year law students learn about *Erie R. Co. v. Tompkins*, and, soon after that, they become second-and-third-year law students with poor understanding of the doctrine. 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938). Some of these students take the bar exam, fail, and try again or do other things. Others pass and become attorneys who still do not understand *Erie*. Granted, the difference between substantive and procedural law is sometimes fuzzy. While we seek to provide clarity when an *Erie* question presents itself to this court, we leave most of the work to professors like M. Todd Henderson and Samuel Issacharoff. That said, a "Federal Rule of Procedure is not valid in some jurisdictions and invalid in others — and valid in some cases and invalid in others — depending [solely] upon whether its effect is to frustrate [state law]." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 409 (2010).

In any event, Henderson challenges settlement fairness under Rule 23(e), rather than an award of attorney's fees under Rule 23(h). Thus, *Erie*'s effect on fee-shifting law, if it even has one, is simply not implicated in this appeal. Instead, this case concerns Congress's simple command that all federal district courts must withhold approval of any class settlement, absent a finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

## IV.     The district court did not err by determining that Henderson failed to rebut its own conclusion that the settlement satisfied Rule 23(e)(2).

Finally, we address Henderson's argument that the district court improperly shifted to him the burden of rebutting the settlement's fairness, reasonableness, and adequacy at the fairness hearing.     Contrary to his contentions, however, the district court never required Henderson to show that the settlement was "clearly inadequate."

Rule 23(e)(2) assumes that a class action settlement is invalid. *See Roes, 1–2*, 944 F.3d at 1049 n.12 (explaining that "[a] presumption of fairness . . . is very likely inappropriate under the standards now codified in Rule 23(e)(2)"). It also instructs that "[i]f the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). As class counsel points out, this is exactly what the district court tried to do.   The record demonstrates that the district court conducted its own independent analysis, and then considered, and dismissed, Henderson's objections.

In *Roes, 1–2*, we reversed a district court that applied a "'*presumption that [a] settlement is fair and reasonable*'" to a pre-certification class that "is the product of arms-length negotiations."  944 F.3d at 1049.  Noting that this court has "never endorsed applying a broad presumption of fairness, but ha[s] actually required that courts do the opposite . . . when it comes to settlements negotiated prior to class certification," we held that "the district court failed to apply the correct legal standard and to conduct the searching inquiry required, thereby abusing its discretion."   *Id*. Critically, we explained that our decision turned on the

30          BRISEÑO V. HENDERSON

amended text of Rule 23(e)(2). *Id*. at 1049 n.12 ("Rule
23(e)(2) now identifies 'whether . . . the proposal was
negotiated at arm's length' as one of four factors that courts
must consider and does not suggest that an affirmative
answer to that one question creates a favorable presumption
on review of the other three") (citing Fed. R. Civ.
P. 23(e)(2)(B)). In contrast, though the district court did
allude to a presumption of fairness, it confined it to its
analysis of one of the *Staton* factors. It did not shift the
burden to Henderson. Henderson's objection stems from the
following textual juxtaposition:

> In most situations, unless the settlement is
> clearly inadequate, its acceptance and
> approval are *preferable* to lengthy and
> expensive litigation with uncertain results.'
> *Nat'l Rural Telecommunications*, 221 F.R.D.
> at 526 (quoting 4 A Conte & H. Newberg,
> *Newberg on Class Actions*, § 11:50 at 155
> (4th ed. 2002)). The Objection fails to
> persuade the Court that this Settlement
> Agreement is clearly inadequate.

Were that the crux of the district court's ruling, Henderson
would have a point. But the district court already concluded,
albeit improperly, that the settlement satisfied Rule 23(e)(2).
Moreover, an assumption of invalidity does not demand
disfavoring settlement. Quite the opposite, "we have
repeatedly noted that 'there is a strong judicial policy that
favors settlements, particularly where complex class action
litigation is concerned.'" *Allen*, 787 F.3d at 1223 (quoting
*In re Syncor ERISA Litig*., 516 F.3d 1095, 1101 (9th Cir.
2008) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d

1268, 1276 (9th Cir. 1992))). We do not intend to revisit that
policy.**[6]**

## CONCLUSION

"Two Virginians and an immigrant walk into
a room/ diametrically opposed/ foes/ They
emerge with a compromise/ Having opened
doors that were previously closed/ Bros/ . . .
No one else was in the room where it
happened . . . No one really knows how the
game is played/ The art of the trade/ How the
sausage gets made/ We just assume that it
happens/ But no one else is in the room where
it happens."

*Hamilton: An America Musical* (2016).

Though that process suffices for political compromise
and even most settlements, it does not for class action
settlements. Because they impose binding judgments on
absent class members, federal courts must approve class
action settlements and ensure that they are fair, reasonable,
and adequate. And under the newly enacted Rule 23(e),
federal courts must scrutinize attorneys' fees for potential
collusion that shortchanges the class, even in post-class
certification settlements. We **REVERSE** the district court's
approval of the settlement, and **REMAND** this case for
further proceedings consistent with this opinion.

---

**[6]** Nor do we intend to grant Henderson's motion for sanctions. (Dkt.
No. 31). That motion is **DENIED**.