Theodore H. Frank (SBN 196332)
HAMILTON LINCOLN LAW INSTITUTE
  CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

*Attorneys for Objector M. Todd Henderson*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| IN RE CONAGRA FOODS, INC. | Case No. CV 11-05379-CJC (AGRx) |
| | Date:        November 1, 2021 |
| | Time:        1:30 p.m. |
| | Court: |
| | Judge:       Hon. Cormac J. Carney |
| | MDL No. 2291 |
| | **CLASS ACTION** |

## RENEWED OBJECTION
## TO PROPOSED SETTLEMENT AND TO FEE REQUEST

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES .................................................................................. iv

INTRODUCTION ..................................................................................................... 1

I.    *Briseño* rejects the settling parties' arguments, heavily criticizes the settlement, and remands for a determination of whether class counsel unilaterally failed to sufficiently prioritize class interests—which it unfortunately calls "collusion." ............. 5

II.    The settlement flunks *Bluetooth*. ...................................................................... 7

    A.    The Settlement contains all the signs of impermissible self-dealing *Bluetooth* identified. ................................................................................ 7

        1.    Class counsel's self-interest won out over the class because the fee request represents 87% of the total settlement benefit. ................................. 8

        2.    The Settlement contains "clear-sailing" and "kicker" provisions designed to insulate the disproportionate fee from scrutiny. In combination, they demonstrate that class counsel "elevate[d] his or her own interest over those of the class members." ................................. 12

    B.    The settling parties know that this settlement cannot satisfy *Bluetooth* or a proportionality standard, which is why they asked this Court to commit reversible error by not applying *Bluetooth*. ................................................ 14

    C.    Not all settlements with *Bluetooth*'s red flags violate Rule 23(e), but the exceptions do not apply here. ................................................................ 15

    D.    A successful litigation would have richly rewarded class counsel, so a compromise of pennies on the dollar does not justify a disproportionate attorneys' fees. ........................................................................................ 17

    E.    Lodestar hours do not control the fairness of allocation; the fee must be proportionate to the class' recovery. ........................................................ 18

III.    Beyond the *Bluetooth* red flags, the Settlement has other unacceptable terms that the mediator's declaration and the parties' papers never address. ................................. 20

    A.    Settlement Section 8.2.4's stipulation of a fictional $27 million injunction value misled the class and the Court. ........................................................ 20

    B.    Settlement Section 2.20(c) creates a conflict of interest. ............................ 21

    C.    The misleading notice is an independent reason to reject the settlement. ......... 21

    D.    The Settlement attempted to deter objections. ............................................ 22

IV.  The parties' subjective evidence of good faith and lack of colloquial collusion is irrelevant to the objective standards of *Briseño*, *Bluetooth*, and Rule 23(e)(2)(C) on which Henderson bases his objection. ...............................................................24

    A.  Satisfying the requirement of arms' length negotiations is necessary, but not sufficient to satisfy the objective requirements of Ninth Circuit law and Rule 23(e)(2)(C). ..................................................................24

    B.  The Ninth Circuit fully understood that the mediator proposed settlement terms because this Court's opinion mentioned it and the appellees argued the point. Thus, the Court would be repeating its earlier reversible error if it repeated its reasoning to approve the settlement. ..............26

    C.  The mediator's opinion about "collusion" is both inadmissible and irrelevant. ..................................................................29

    D.  Judging settlements by objective standards is the superior rule for judicial administration of settlement approval. ..................................31

    E.  The settlement doesn't survive subjective review either. Smoking-gun documents demonstrate that class counsel "bargained away a benefit to the class in exchange for their own interests." ........................33

V.  The disproportionality of the settlement "was no surprise" and better distribution was possible. ..........................................................35

    A.  Conagra contradicts the law of the case with its irrelevant and implausible claim that it did not know the cost of the settlement. ...........................35

    B.  Direct distribution was possible. ..................................................37

CONCLUSION ..................................................................................39

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.,*
   52 F.R.D. 373 (D. Kan. 1971) ................................................................. 23

*Allen v. Bedolla,*
   787 F.3d 1218 (9th Cir. 2015) .........................................................1, 4, 11

*In re Baby Products Antitrust Litig.,*
   708 F.3d 163 (3d Cir. 2013) ...................................................................... 19

*Banks v. Nissan N. Am., Inc.,*
   No. 11-cv-2022-PJH, 2015 WL 7710297 (N.D. Cal. Nov. 30, 2015) ..........................10, 19

*Besinga v. United States,*
   923 F.2d 133 (9th Cir. 1991) ..................................................................... 22

*In re Bluetooth Headset Products Liability Litigation,*
   654 F.3d 935 (9th Cir. 2011) ......................................... 2, 6-8, 10-15, 19, 24-25, 29-30, 33-34

*Briseño v. Henderson,*
   998 F.3d 1014 (9th Cir. 2021) ................................................................ *passim*

*Campbell v. Facebook, Inc.,*
   951 F.3d 1106 (9th Cir. 2020). ................................................................. 15

*In re Carrier IQ, Inc., Consumer Privacy Litig.,*
   2016 WL 4474366 (N.D. Cal. Aug. 25, 2016) ........................................................ 36

*In re Chiron Corp. Sec. Litig.,*
   No. C-04-4293 VRW, 2007 WL 4249902 (N.D. Cal. Nov. 30, 2007) ................................. 23

*City of Riverside v. Rivera,*
   477 U.S. 561 (1986) ............................................................................... 17

*Crawford v. Equifax Payment Servs.,*
   201 F.3d 877 (7th Cir. 2000) ..................................................................... 17

*Dennis v. Kellogg Co.,*
   697 F.3d 858 (9th Cir. 2012) ............................................................. 1, 4, 10, 13

*In re Dry Max Pampers Litig.,*
   724 F.3d 713 (6th Cir. 2013) ...............................................................1, 6, 10, 13, 24

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) ...................................................................... 19

*Frank v. Gaos*,
    139 S. Ct. 1041 (2019) ............................................................................... 16

*In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.* ("*GMC Pick-Up*"),
    55 F.3d 768 (3d. Cir. 1995) ............................................................... 8-9, 23

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ............................................................. 7-8, 21

*Hecht v. United Collection Bureau*,
    691 F.3d 218 (2d. Cir. 2012) ..................................................................... 22

*In re HP Inkjet Printer Litig.* ("*HP Inkjet*"),
    716 F.3d 1173 (9th Cir. 2013) ............................................................ 8, 18-19

*Johnson v. Comerica*,
    83 F.3d 241 (8th Cir. 1996) ......................................................................... 9

*In re Katrina Canal Breaches Litig.*,
    628 F.3d 185 (5th Cir. 2010) ..................................................................... 21

*Keirsey v. Ebay, Inc.*,
    No. 12-cv-01200-JST, 2014 WL 644738 (N.D. Cal. Feb. 18, 2014) ................ 18

*Kim v. Allison*,
    8 F.4th 1170 (9th Cir. 2021) ...................................................... 1-3, 25, 28-29

*Kmiec v. Powerwave Tech.*,
    2016 WL 5938709 (C.D. Cal. Jul. 11, 2016) ................................................ 19

*Koby v. ARS Natl. Services, Inc.*,
    846 F.3d 1071 (9th Cir. 2017) ................................................................... 17

*Mahoney v. Endo Health Solutions, Inc.*,
    No. 1:15-cv-09841, Dkt. 90 (S.D.N.Y. Oct. 21, 2016) ............................. 37-38

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*,
    834 F.2d 677 (7th Cir. 1987) ..................................................................... 23

*McClintic v. Lithia Motors*,
    No. C11-859RAJ, 2012 U.S. Dist. LEXIS 3846 (W.D. Wash. Jan. 12, 2012) ..... 22

*In re McCormick & Co., Inc. Pepper Prods. Mktg. & Sales Pracs. Litig.*,
    No. 15-mc-01825, Dkt. 246-1 (D.D.C. Jan. 22, 2021) ................................. 38

*McDonough v. Toys "R" Us,*
    80 F. Supp. 3d 626 (E.D. Pa. 2015) ............................................................... 38

*McKinney-Drobnis v. Oreshack,*
    -- F.4th --, 2021 U.S. App. LEXIS 31524, *39 (9th Cir. Oct. 20, 2021) ................. 14, 24-25

*Nationwide Transp. Fin. v. Cass Info. Sys.,*
    523 F.3d 1051 (9th Cir. 2008) ...................................................................... 29

*Navistar Maxxforce Engines, Mktg., Sales Practices, and Prods. Liab. Litig.,*
    14-cv-10318, Dkt. 642 (N.D. Ill. Jun. 7, 2019) ............................................... 22

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999). ................................................................................. 8

*Ostrowski v. Amazon,*
    2016 WL 4992051, 2016 U.S. Dist. LEXIS 126532
    (W.D. Wash. Sept. 16, 2016) ...................................................................... 37

*Otey v. Crowdflower, Inc.,*
    No. 12-cv-05524-JST, 2014 WL 1477630 9 (N.D. Cal. Apr. 15, 2014) .................. 10

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) ....................................... 1, 3-4, 10-13, 24, 26, 36, 37

*Redman v. RadioShack Corp.,*
    768 F.3d 622 (7th Cir. 2014) .................................................................... 10, 23

*Rodriguez v. Disner,*
    688 F.3d 645 (9th Cir. 2012) ...................................................................... 21

*Roes v. SFBSC Mgmt., LLC,*
    944 F.3d 1035 (9th Cir. 2019) .......................................................... 2, 4, 6, 28

*In re Sony PS3 "Other OS" Litig.,*
    No. 10-cv-01811-YGR, 2017 WL 424716 (N.D. Cal. Jan. 31, 2017) .................... 10

*In re Southwest Air. Voucher Litig.,*
    898 F.3d 740 (7th Cir. 2018) .................................................................... 4, 15

*In re Southwest Air. Voucher Litig.,*
    799 F.3d 701 (7th Cir. 2015) ...................................................................... 15

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) .................................................................... 8, 13

*Thorogood v. Sears, Roebuck & Co.,*
    595 F.3d 750 (7th Cir. 2010) ...................................................................... 17

*Trabakoolas v. Watts Water Tech., Inc.*,
  No. 3:12-cv-01172-WHO (EDL) (Dkt. 276) (N.D. Cal. Feb. 14, 2013) ............................ 22

*In re Veritas Software Corp. Sec. Litig.*,
  496 F.3d 962 (9th Cir. 2007) ................................................................................. 21

*In re Walgreen Co. Stockholder Litig.*,
  832 F.3d 718 (7th Cir. 2016) ................................................................................. 18

*Weinberger v. Great N. Nekoosa Corp.*,
  925 F.2d 518 (1st Cir. 1991) ................................................................................. 12

*Wilson v. Playtika Ltd.*,
  No. 18-cv-05277-RSL, 2020 U.S. Dist. LEXIS 222843
  (W.D. Wash. Nov. 30, 2020) ................................................................................. 37

## Rules and Statutes

15 U.S.C. § 1692k ................................................................................................ 17

28 U.S.C. § 1654 ................................................................................................. 22

42 U.S.C. § 1988 ................................................................................................. 17

Fed. R. Civ. Proc. 23 ............................................................................. 11, 16, 17

Fed. R. Civ. Proc. 23(a)(4) ..................................................................................... 8

Fed. R. Civ. Proc. 23(b)(2) .................................................................................... 15

Fed. R. Civ. Proc. 23(b)(3) .................................................................................. 4, 15

Fed. R. Civ. Proc. 23(c)(2)(B) ................................................................................ 25

Fed. R. Civ. Proc. 23(c)(2)(B)(iv) ........................................................................... 22

Fed. R. Civ. Proc. 23(e) ...........................................2, 4, 14, 17, 19, 24, 28, 32, 35

Fed. R. Civ. Proc. 23(e)(2) ......................................................................... 5, 14, 29

Fed. R. Civ. Proc. 23(e)(2)(C) ..............................................................2, 5, 17, 24-25

Fed. R. Civ. Proc. 23(e)(2)(C)(ii) ...............................................1, 7, 14, 25, 37

Fed. R. Civ. Proc. 23(e)(2)(C)(iii) ............................................................................ 7

Fed. R. Civ. Proc. 23(e)(2)(D) ................................................................................. 8

Fed. R. Civ. Proc. 23(h) ...................................................................................... 38

U.S. Const., Art. I ............................................................................................... 32

**Other Authorities**

American Law Institute,
*Restatement (Third) of Restitution and Unjust Enrichment* § 29 cmt c (2011) ............................. 17

Lester Brickman,
*Lawyer Barons* (2011) ........................................................................................ 12

Howard Erichson,
*Aggregation as Disempowerment*, 92 NOTRE DAME L. REV. 859 (2016) ...................................... 1

Federal Judicial Center,
*Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*
(2010) ............................................................................................................. 22-23

Federal Judicial Center,
*Manual for Complex Litigation* § 21.71 (4th ed. 2008) .................................................... 9

Ted Frank,
*Settlement Insurance Shows Need for Court Skepticism in Class Actions*,
OpenMarket blog (Aug. 31, 2016) ........................................................................... 36-37

Scott A. Kamber,
Declaration, *In re McCormick & Co., Inc. Pepper Prods. Mktg. & Sales Pracs.*
*Litig.*, No. 15-mc-01825, Dkt. 237-1 (D.D.C. May 20, 2020) ............................................... 37

Charles Silver,
*Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809 (2000) ...................................... 12

U.S. Court of Appeals for the Ninth Cir. YouTube Channel,
*19-56297 Robert Briseño v. ConAgra Foods, Inc.* (Dec. 8, 2020), available at
https://www.youtube.com/watch?v=o7qGuCRW2wE ......................................................... 27-28

## INTRODUCTION

The Ninth Circuit holds that reversal of settlement approval "is warranted when the settlement terms contain convincing indications that the class representative and class counsel's self-interest won out over the class's interest." *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021); *accord Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021); *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). An appeals court will reverse settlement approval if "the *terms of the agreement* contain convincing indications that self-interest rather than the class's interest in fact influenced the *outcome* of the negotiations." *Briseño*, 998 F.3d at 1022 (cleaned up and emphasis added). This is an *objective* standard: a settlement can fall solely because of the "settlement terms" or "terms of the agreement" and "outcome."

The settlement terms and outcome in this case permit no other "indication." "[T]he signs are not particularly subtle here." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013). The settlement "reeks." *Briseño*, 998 F.3d at 1018. This is a settlement where the class receives less than $1 million and injunctive relief the Ninth Circuit held worthless; over 99% of the class receives nothing though direct distribution to a greater percentage was possible; and the attorneys have clear sailing to receive $6.85 million, 87% of the settlement benefit. If the settling parties had created a common fund of $7.8 million and the attorneys made a fee request of 87%, this Court would surely reject it. *E.g.*, *Dennis v. Kellogg, Inc.*, 697 F.3d 858, 868 (9th Cir. 2012) (38.9% fee would be "clearly excessive"). The Court should see through the tactic of using a kicker to create the economically identical settlement through a constructive common fund—especially when a kicker is a "red flag" "gimmick" presumptively suggesting settlement unfairness. *Briseño*, 998 F.3d at 1027 (quoting *Pearson v. NBTY, Inc.*, 772 F.3d 778, 786 (7th Cir. 2014) (Posner, J.)). Plaintiffs provide no explanation of how the kicker benefits the class, rather than themselves. Plaintiffs provide no explanation why they did not insist on including a term in the settlement for the reversion to go to the class, instead of Conagra. (Indeed, plaintiffs contend that any such explanation is "privileged" and beyond discovery.) Neither the mediator's declaration nor the plaintiffs' **forty-page declaration** mentions the

kicker once. The settling parties forfeit the issue, and this by itself requires rejection of the settlement.

Similarly, Rule 23(e)(2)(C)(ii) requires a settlement's distribution be judged by its "effectiveness." Again, this is an *objective* standard: did the parties succeed in getting money to the class? It is irrelevant if the parties self-servingly claim that they worked really, really hard; or that they relied on the mediator to establish a claims procedure; or that they implausibly claim they had no idea that the claims rate would be low. (The Ninth Circuit has already rejected the last argument, and that finding is law of the case.) There is no "At least you tried" exception to Rule 23(e)(2)(C); there is no "empty head, pure heart" exception. What matters under the rule's text is results: the "effectiveness." The settlement flunks because it pays class counsel seven times as much as the class while leaving over 99% of the class with nothing. If class counsel could cajole only $7.8 million out of Conagra to settle the case through hard-fought negotiations, they had a fiduciary obligation and a Rule 23(e)(2)(C) obligation to figure out how to distribute $5.9 million of that to the class. Henderson argued in 2019 that direct distribution was possible. Other settlements demonstrate as a matter of law that this is true. (So does the limited discovery in this case. Declaration of Theodore H. Frank ¶ 26 & Ex. H.) The settling parties rely solely on subjective assertions, but present no evidence they could not have directly distributed money to the class, and thus forfeit any factual argument that they met Rule 23(e)(2)(C)'s standard. By instead acquiescing to a plan that would distribute seven times as much to themselves as to the class, class counsel failed the *Kim* test, *Bluetooth*, and Rule 23(e)(2)(C). It does not matter whether that allocation was proposed by Conagra, by the mediator, or by the plaintiffs. What matters is that the parties agreed to that misallocation. *Briseño*, 998 F.3d at 1025 (calling misallocation by agreement "collusion" and quoting *Pearson*).

The settling parties have the burden of proving settlement fairness. *Briseño*, 998 F.3d at 1030. Their briefing forfeited the issue by relying on the red herring of their reliance on the mediator—even as *Briseño* held that arm's length negotiations does not prove that Rule 23(e) is satisfied. *Id.* (quoting *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 n.12 (9th Cir. 2019)).

A settlement that fails Rule 23(e)(2)(C) standards doesn't become fair because a mediator proposed it—*especially* when the mediator admits he gave no consideration to satisfying Rule 23(e) in his role. Dkt. 739 at 8 ¶ 19; *Roes*, 944 F.3d at 1050 n. 13. The settling parties fail to put forward any evidence that they satisfied the objective proportionality standard of *Kim* and *Briseño* and *actually* put the class's interest first. (They do not even cite *Kim*.) It would be a jaw-dropping disregard of the Ninth Circuit's mandate to approve this settlement after the appeals court summarized it as "How to Lose a Class Action Settlement in 10 Ways." *Briseño*, 998 F.3d at 1018. *Cf. also Kim*, 8 F.4th at 1183 (Callahan, J., dissenting) (unsuccessfully arguing for affirmance of settlement because it wasn't nearly as disproportionate as *Briseño*).

The parties try to dodge this by asserting that the Ninth Circuit reached its decision without understanding what happened at the mediation, and if the appeals court had only known about the role of the mediator, it would have reached a different result. Even if that were true, it would reflect forfeiture by the parties: they could have argued for affirmance on the grounds of the mediation. If the settling parties felt the Ninth Circuit misunderstood this, they could have moved for rehearing. But it is absolutely false: this Court approved the settlement *because* of the mediation. Dkt. 695 at 8, 9, 10. And plaintiffs emphasized this in their appellate briefing and at oral argument. *See, e.g.,* Plaintiff-Appellees' Brief at 11, 31 n.12, *Briseño v. Henderson*, No. 19-56297 (9th Cir. Jul. 2, 2020). The Ninth Circuit rejected this Court's reasoning, and rejected the appellees' argument. It would violate both the mandate (and other Ninth Circuit decisions) to ignore this and repeat a reversed holding that the misallocation is acceptable because "the precise value of the settlement was reached by accepting a mediator's proposal." Dkt. 695 at 8.

Henderson's original objection asked this Court to follow *Pearson*. *Briseño* cited *Pearson* favorably. 998 F.3d at 1025, 1027. It is worth comparing the two cases.

|  | *Briseño* | *Pearson* |
|---|---|---|
| Attorneys' Fees | $6,850,000 | $2,109,676 |
| Payment to Class | $   993,919 | $   865,284 |
| Number of class members | 15 million | 12 million |
| Recovery/class member | $0.066 | $0.07 |
| Fee percentage of constructive common fund | 87% | 69%<br>(49% including *cy pres*) |
| *Cy pres* | $0 | $1,134,716 |
| Class members with direct notice from third-party subpoenas | 0 | 4.72 million |

(The class may be getting much less than $993,919. That figure is the amount calculated by the settlement administrator *before* "duplications" and "fraud checks." Fairness Hearing Tr. 13-14 (Oct. 7, 2019). In the *In re Southwest Airlines Voucher Litigation* case where Mr. Levitt was class representative, the settlement administrator's number represented at the fairness hearing was more than *three times as high* as the number of claims accepted for compensation. 898 F.3d 740, 743 (7th Cir. 2018). The parties have not disclosed the settlement administrator's final calculations yet. Henderson objects to crediting even the pathetic $993,919 number, which is exaggerated and misleading.)

Even if the Court were to disagree with Henderson and look at the subjective evidence beyond the four corners of the settlement, the limited discovery is dispositive and demonstrates exactly what is forbidden: an agreement "to reduce compensation for class members in exchange for a larger fee." *Briseño*, 998 F.3d at 1025. Smoking-gun documents from settlement counteroffers, improperly labeled "confidential," demonstrate this. *See* Section IV.E below. If Henderson were not represented by a public-interest lawyer, he would lead with the smoking-gun documents in his argument, but his interests are in the Court getting the decision right for the right reason. The appropriate standard that best protects class members is an objective one based on "convincing indications" in the "settlement terms," rather than a subjective one that relies on parol evidence. *Kim*, 8 F.4th at 1178.

No published Ninth Circuit opinion has *ever* affirmed a challenged approval of a Rule 23(b)(3) settlement as disproportionate as *Pearson* without meaningful injunctive relief compensating for the disproportion and other *Bluetooth* red flags. *E.g.*, *Roes*, 944 F.3d at 1051 (fee award of 45% of gross cash fund is "disproportionate" for Rule 23(e) settlement-approval purposes); *Allen*, 787 F.3d at 1224 n.4 (75%); *Dennis*, 697 F.3d at 868 (38.9%). This settlement is worse than *Pearson*'s in every respect. The Court must reject approval.

## I.  *Briseño* rejects the settling parties' arguments, heavily criticizes the settlement, and remands for a determination of whether class counsel unilaterally failed to sufficiently prioritize class interests—which it unfortunately calls "collusion."

Objector Todd Henderson[1] argued on appeal that this Court erred in holding *Bluetooth* did not apply to a post-certification settlement and erred in applying Fed. R. Civ. Proc. 23(e)(2)(C).

Thirteen state attorneys general filed an *amicus* brief supporting Henderson and asking for reversal.

Conagra did not file a Ninth Circuit brief defending the settlement or the Court's opinion approving the settlement.

Plaintiffs shifted their argument. Unlike what plaintiffs told this Court, they no longer argued that the injunction justified the settlement. Instead, plaintiffs argued that Supreme Court precedent required affirmance, an argument they did not present to this Court. The Ninth Circuit rejected that argument. *Briseño*, 998 F.3d at 1029-30.

The Ninth Circuit reversed this Court's approval of a settlement that contained a

> bevy of questionable provisions that reeks of collusion at the expense of the class members: Class counsel will receive seven times more money than the class members; an injunction touted by an expert as worth tens of millions of dollars appears worthless; the defendant agrees not to challenge the plaintiffs' attorneys' fees amount; any reduction in those fees by the court reverts to the defendant; and on and on.

---

[1] Henderson incorporates in full his previous filings documenting his earlier objection, class membership, and standing to object. *See* Dkt. 666, 677, 685 and associated exhibits.

*Id.* at 1018. The "settlement presented a Murderers' Row of provisions out of left field that seemingly favor class counsel and the defendant at the expense of the class members." *Id.* at 1027. In particular, it agreed with Henderson that *Bluetooth* applied not just to pre-certification settlements, but post-certification settlements under the new Rule 23(e)(2). *Id.* at 1022-24. The Ninth Circuit also agreed with Henderson that the injunction was "worthless." *Id.* at 1028-29. So was the Weir expert report. *Id.* at 1029.

The parties' papers focus less on the "seven times more money" that was dispositive, but on the word "collusion" *Briseño* repeatedly used. At the July 19 hearing, Henderson noted that "collusion" means "the concept of two people acting in secret to do something nefarious" but that the Ninth Circuit was using the word to mean other things, including the objective concept of misallocation, and the Court indicated that it understood this. Dkt. 743-1 at 36-40 ("I agree with you"). So, for example, *Briseño* speaks of the "collusion over divvying up funds between class counsel and the class (rather than the size of the settlement fund or relief)." 998 F.3d at 1025. It speaks twice on a single page of the "collusion" of class counsel unilaterally choosing to agree to a settlement where the allocation favors the attorneys over the class. *Id.* Unilateral "collusion" is of course an oxymoron. One party cannot collude with itself.

Previous Ninth Circuit cases more clearly distinguished between the two concepts. "The incentives for the negotiators to pursue their own self-interest and that of certain class members are implicit in the circumstances and can influence the result of the negotiations *without any explicit expression or secret cabals*." *Roes*, 944 F.3d at 1050 n.13 (cleaned up and emphasis added); *accord In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 949 (9th Cir. 2011) (noting that a defendant has "little or no interest" in the allocation between the class and the class counsel); *id.* at 647 (distinguishing between "explicit collusion" and misallocation); *see generally Pampers*, 724 F.3d at 717-18; Dkt. 685 at 9. Thus, courts must look for signs that "self-interest, even if not purposeful collusion" has "seep[ed] its way into the settlement terms." *Roes*, 944 F.3d at 1060.

But now under *Briseño*, that same situation when the settling parties happen to agree to a settlement structure that results in impermissible misallocation is called "collusion."

Ironically, *Briseño* explicitly labels as "collusion" the *Roes*/*Bluetooth* scenario of unilateral behavior by class counsel that the defendant accedes to by tacitly agreeing to a disproportionate settlement: "A defendant goes along with this collusion because it cares only about the total payout, not the division of funds between class and class counsel." 998 F.3d at 1025 (providing example). The phrasing is unfortunate. In this Court and at the Ninth Circuit Henderson disclaimed any allegation of the nefarious colloquial sense of "collusion" and simply argued about misallocation as he does in this paragraph. Dkt. 685 at 9. Briseño and Conagra have every right to be offended that the Ninth Circuit has expanded a term with disreputable connotations to include the less morally fraught concept of misallocation. But what the settling parties cannot do is pretend that being exonerated of "collusion" in the narrow colloquial sense means that the settlement satisfies the broader definition of "collusion" that *Briseño* invented. It doesn't.

"Collusion" under *Briseño* includes class counsel unilaterally choosing to agree to a settlement where the allocation favors the attorneys over the class. 998 F.3d at 1025. Here, class counsel chose to agree to a settlement where the allocation favors the attorneys over the class, and did nothing to fix the misallocation. That ends the game—which is why plaintiffs ask this Court to disregard Ninth Circuit law on disproportionality. As noted in the July 19 hearing, Henderson has no objection to the Court issuing an opinion noting the difference between the two concepts and relying upon misallocation and failing to sufficiently prioritize class interests to reject the settlement while disclaiming the colloquial sense of collusion. But, as discussed below and in Henderson's original objection, the settlement does not satisfy Ninth Circuit law.

## II. The settlement flunks *Bluetooth*.

### A. The Settlement contains all the signs of impermissible self-dealing *Bluetooth* identified.

The parties concede, as they must, that this settlement has all three red flags of *Bluetooth*. *Briseño*, 998 F.3d at 1026. This Settlement features all three indicia of impermissible self-dealing identified by the Ninth Circuit: (1) a disproportionate distribution of fees to counsel; (2) a "clear

sailing agreement" that defendants will not challenge the fee request; and (3) a "kicker" that ensures any reduction in fees will revert to the defendant. *See Bluetooth*, 654 F.3d at 947; *see also* Fed. R. Civ. P. 23(e)(2)(C)(ii) and (iii).

### 1. Class counsel's self-interest won out over the class because the fee request represents 87% of the total settlement benefit.

The first sign of impermissible self-interest in this Settlement is counsel's receipt of a "disproportionate distribution of the settlement." *Bluetooth*, 654 F.3d at 947 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998)). As plaintiffs previously recognized (Dkt. 662 at 4), the benchmark for a reasonable award in the Ninth Circuit in a case alleging economic injury is 25% of the class benefit. *E.g.*, *Bluetooth*, 654 F.3d at 942; *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1190 (9th Cir. 2013).

Here, class counsel bargained for attorneys' fees of $6,850,000. *See* Settlement ¶ 6.1.1.1. But the class will receive under $1 million. (Note that claimants in Oregon and New York will receive several times that of other class-member claimants. This is independent grounds for scrutiny.[2]) This means that class counsel stands to receive more than 87% of the net settlement funds—more than three times this Circuit's 25% benchmark. Attorneys' recovery outstrips

---

[2] Many of the class member claimants appear to have claimed the maximum number of bottles allowed without proof of purchase (30), because average number of bottles per claimant is slightly more than 27, each bottle worth $0.15. Dkt. 662 at 16. Class members in Oregon and New York will receive several times this amount because the Settlement provides an additional cash fund of $575,000 to be distributed *pro rata* to claimants in these states as compensation for the statutory damage claims these class members surrender in the Settlement, apparently not available to class members in the nine other states.

Objector takes no position on whether funding for the *de facto* subclass of Oregon and New York claimants is fair to other class members, like Henderson, who receive no dedicated fund for their claims. *See* Fed. R. Civ. P. 23(e)(2)(D) (requiring equitable intraclass treatment). While named plaintiffs exist from all 11 states, "intraclass equity" is also a "requirement" of any settlement under Rule 23(a)(4). *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 863 (1999). When disparate subgroups exist, separate counsel should be appointed to negotiate the competing interests of these subclasses. *Id.*

1   class recovery by nearly seven-fold.

2       Class counsel may argue (contrary to their fee motion, Dkt. 662 at 7) that the Settlement

3   does not actually create a common fund. This makes no difference. "That the defendant in

4   form agrees to pay the fees independently of any monetary award or injunctive relief provided

5   to the class in the agreement does not detract from the need carefully to scrutinize the fee

6   award." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003). A "defendant is interested only

7   in disposing of the total claim asserted against it." *Id.*; *accord Briseño*, 998 F.3d at 1025. "The

8   rationale behind the percentage of recovery method also applies in situations where, although

9   the parties claim that the fee and settlement are independent, they actually come from the same

10  source." *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.* ("*GMC Pick-Up*")*,* 55 F.3d 768,

11  820-21 (3d. Cir. 1995). "[P]rivate agreements to structure artificially separate fee and settlement

12  arrangements cannot transform what is in economic reality a common fund situation into a

13  statutory fee shifting case." *Id.* at 821; *see also id.* at 820 (severable fee structure "is, for practical

14  purposes, a constructive common fund"). (Plaintiffs misleadingly quote *GMC Pick-Up* for the

15  opposite proposition. Dkt. 742 at 12. Henderson is comfortable with the Court reading the full

16  passage and coming to its own conclusions about what the Third Circuit said.)

17      "[I]n essence the entire settlement amount comes from the same source. The award to

18  the class and the agreement on attorney fees represent a package deal." *Johnson v. Comerica*, 83

19  F.3d 241, 246 (8th Cir. 1996). "If an agreement is reached on the amount of a settlement fund

20  and a separate amount for attorney fees" then "the sum of the two amounts ordinarily should

21  be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount

22  constituting the upper limit on the fees that can be awarded to counsel." *Manual for Complex

23  Litigation* § 21.71 (4th ed. 2008).

24      The settling parties *knew* that the disproportion could be a problem because they agreed

25  through the mediator to a fictional stipulation of $27 million for injunctive value—

26  coincidentally just enough to rationalize the $6.85 million fee request. Class counsel *knew* that

27  the settlement was indefensible before the Ninth Circuit without a factual finding that the

28  injunction was worth this much—that's why they paid for a (similarly worthless) expert report

and resisted Henderson's motion to strike the expert. But as the Ninth Circuit found, the actual value of the injunction is zero. Class counsel will have this Court believe that they spent all that money on an expert and time litigating gratuitously, because, they claim, the settlement can be approved even with a worthless injunction. Surely the Court can see through this. Class counsel's actions demonstrated that they did not believe in 2019 that the settlement could withstand district-court or appellate review with a worthless injunction. The Court should resist the parties' second invitation to commit reversible error.

A fee award that vastly exceeds the class relief is disproportionate and renders the settlement unfair. *E.g.*, *Bluetooth*, 654 F.3d at 945 (vacating approval where fees amounted to more than 83% of the constructive common fund); *Pampers*, 724 F.3d 713 (vacating settlement where fees consumed $2.7 million of the $3.1 million constructive common fund value); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014) (69% fee is "outlandish"). Indeed, the Ninth Circuit has even stated that an attorneys' fee of 38.9% would be "clearly excessive." *Dennis*, 697 F.3d at 868.

The relevant ratio for determining attorneys' fees is "(1) the fee to (2) the fee plus what the class members received." *Pearson*, 772 F.3d at 781 (cleaned up). Here, that is 87%, nearly seven times class recovery. *Briseño*, 998 F.3d at 1018. Class action settlements may not confer such preferential treatment upon class counsel to the detriment of class members. "Such inequities in treatment make a settlement unfair" for neither class counsel nor the named representatives are entitled to disregard their "fiduciary responsibilities" and enrich themselves while leaving the class behind. *Pampers*, 724 F.3d at 718-21 (citation and internal quotation omitted) (reversing settlement where class counsel received $2.73 million and absent class members were offered a money-back refund program with a likely small claims rate, prospective labeling changes, and a *cy pres* donation).[3]

---

[3] *See also In re Sony PS3 "Other OS" Litig.*, No. 10-cv-01811-YGR, 2017 WL 424716 at *1 (N.D. Cal. Jan. 31, 2017) (rejecting constructive common fund settlement that would have sustained counsel with $2.25 million fee while absent class member claimants would have obtained less than 10% of that total); *Banks v. Nissan N. Am., Inc.*, No. 11-cv-2022-PJH, 2015

Negotiating disproportionate fees suggests self-dealing, which infects the entire settlement, not just the fee request. *Bluetooth*, 654 F.3d at 945-46. Class counsel's 87% fee request is a *Bluetooth* sign of excessive self-interest, and their efforts to disguise this fact with an audacious $27 million valuation of the injunction ignored binding Ninth Circuit precedent requiring that "the attorney's fee award [be] examined in terms of 'economic reality.'" *Allen*, 787 F.3d at 1224 & n.4 (internal citation and quotation omitted).

The settling parties may argue that Conagra would never agree to reallocate the $7.8 million fund, so the disproportion is irrelevant. This is both wrong as a matter of law and irrelevant. It is wrong as a matter of law, because Ninth Circuit law is precisely that a defendant

> cares only about the total payout, not the division of funds between class and class counsel. After all, a defendant, no matter if a class has been certified, has "no reason to care about the allocation of its cost of settlement between class counsel and class members." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 783 (7th Cir. 2014) (Posner, J.). Instead, "all it cares about as a rational maximizer of its net worth is the bottom line — how much the settlement is likely to cost it." *Id.*

*Briseño*, 998 F.3d at 1025. The settling parties did not appeal this Ninth Circuit holding, and it is law of the case: they cannot ask the Court to make a contrary finding.

But the claim is also irrelevant. If Conagra came to class counsel and said "We will write you a $10 million check to waive all of the class's claims, but refuse to pay the class a penny," class counsel cannot shrug and suggest this satisfies Rule 23. Class counsel is "ethically forbidden from sacrificing the class members' interests" (*Briseño*, 998 F.3d at 1025), and must reject the unfair settlement offer. What is true for the obviously impermissible $10M/$0 settlement offer is just as true for the almost-as-obviously impermissible $6.85M/$0.99M

---

WL 7710297 at *13 (N.D. Cal. Nov. 30, 2015) (characterizing constructive common fund settlement that allowed class counsel to obtain 80% of the gross settlement as the "tail wagging the dog"); *Otey v. Crowdflower, Inc.*, No. 12-cv-05524-JST, 2014 WL 1477630 at *9 (N.D. Cal. Apr. 15, 2014) (finding that constructive common fund fees of "74.3 of the total settlement payment … grossly exceed the 25% benchmark"); *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014).

settlement offer. There is no basis for the disproportionality when 99% of the class is receiving nothing, and the settlement must be rejected.

Class counsel argues that the Court should simply ignore Ninth Circuit law on disproportionality for public-policy reasons regarding fee-shifting statutes. Dkt. 742 at 11-14. Plaintiffs made that argument to the Ninth Circuit. Plaintiff-Appellees' Brief at 30-32, *Briseño v. Henderson*, No. 19-56297 (9th Cir. Jul. 2, 2020). The Ninth Circuit rejected it, agreeing with Henderson that disproportionality in fees for *judgments* does not justify disproportionality in fees for *compromises* under Rule 23, instead relying on *Pearson* and other cases Henderson argued to this Court. Class counsel controls settlement, and cannot compromise class recovery in order to secure a full measure—or even a disproportionate half-measure—of its own fees. The Court should reject class counsel's invitation to ignore the law of the case. *See also* Section I.D below.

> **2.      The Settlement contains "clear-sailing" and "kicker" provisions designed to insulate the disproportionate fee from scrutiny. In combination, they demonstrate that class counsel "elevate[d] his or her own interest over those of the class members."**

The Settlement includes a "clear sailing" agreement, under which "Conagra shall take no position with respect to the Fee and Expense Application" for fees of $6.85 million. Settlement ¶ 8.1.1.2. This "red-carpet treatment on fees" creates a substantial incentive for class counsel to accept an unfair settlement on behalf of the class. *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524-25 (1st Cir. 1991) ("[T]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class."); *accord Bluetooth*, 654 F.3d at 947-48.

Moreover, the Settlement segregates attorneys' fees from class recovery with a "kicker" provision. That is, any reduction in fees reverts, or is "kicked back," to the defendant *See* Settlement ¶ 8.1.1.3 ("In the event the Fee and Expense Award is … reduced for any reason, the relevant amount of the overpayment of attorneys' fees and costs paid by Conagra shall be returned to Conagra"). These clear sailing and kicker provisions ensure that "fees not awarded revert to the defendant[]" rather than the class' recovery. *Bluetooth,* 654 F.3d at 947.

Especially when combined with "clear-sailing" provisions, "kicker" provisions have the self-serving effect of protecting class counsel by deterring scrutiny of the fee award. The combination ensures that the only beneficiary of a fee reduction (the defendant, due to the kicker) cannot argue for reduced fees—leaving *no one* with the both the incentive and ability to make those arguments. *See* Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809, 1839 (2000) (arguing that such a fee arrangement is "a strategic effort to insulate a fee award from attack"); Lester Brickman, *Lawyer Barons* 522-25 (2011) (same; further providing reasons why a reversionary kicker should be considered *per se* unethical); *Pearson*, 772 F.3d at 786-87 (describing a kicker as a "gimmick" to unfairly prejudice class members and holding that there "should be a strong presumption of its invalidity").

The "kicker," in addition to being an indicia of unfairness under *Bluetooth*, also makes the Settlement substantively unfair. The "economic reality is that a settling defendant is concerned only with its total liability." *Pampers*, 724 F.3d at 717 (cleaned up); *accord Staton*, 327 F.3d at 964. This Settlement demonstrates that defendant is willing to pay at least $7.8 million to make this case go away. Even if this were a fair number, the kicker makes it impossible for this Court to give the class the relief *that defendant is willing to pay.* There is "no apparent reason the class should not benefit from the excess allotted for fees." *Bluetooth*, 654 F.3d at 949. It would be reversible error to approve a fee of $6.85 million out of, say, an $7.8 million common fund: that would be "clearly excessive" under this Circuit's 25% benchmark. *Dennis*, 697 F.3d at 868. If the Court instead reduces the fee, it cannot pass that money on to the class; that money reverts to the defendant. The parties have prevented the Court from returning the fees and class relief to their natural equilibrium.

Indeed, plaintiffs themselves prove that the kicker was meant to benefit themselves rather than the class and shield their illegitimately high fees from scrutiny, because they *expressly argued to the Court that the kicker prevented Henderson from arguing that the fee was too high*. Dkt. 672 at 9-10.

There is "no apparent reason" for the kicker. "No plausible reason." *McKinney-Drobnis v. Oreshack*, -- F.4th --, 2021 U.S. App. LEXIS 31524, *38 (9th Cir. Oct. 20, 2021). And the

parties do not argue otherwise; they have forfeited their opportunity to argue that the kicker provided some benefit to the class; indeed, they argue that they cannot disclose the reason for the kicker because it is privileged work product.

**B.** **The settling parties know that this settlement cannot satisfy *Bluetooth* or a proportionality standard, which is why they asked this Court to commit reversible error by not applying *Bluetooth*.**

When this settlement was first before this Court, Henderson argued that (1) the settlement flunked all three *Bluetooth* factors; (2) the settlement's disproportionality when a fairer allocation was possible failed Rule 23(e); and (3) the injunctive relief was worthless. In response, the settling parties argued that *Bluetooth* does not apply; that there was no obligation to distribute money to the class proportionately; and that the injunctive relief was worth $27 million. Dkt. 672. At no point did the settling parties argue in the alternative that the Court could approve the settlement if Henderson were correct on the law and *Bluetooth* applied; plaintiffs persuaded the Court that *Bluetooth* was "inapplicable." Dkt. 672 at 11-12.

The Court adopted the first two of the settling parties' arguments, holding *Bluetooth* did not require scrutiny in this case and that the disproportion was permissible. Dkt. 695 at 15, 16. The Ninth Circuit reversed. *Briseño* agreed with Henderson that *Bluetooth* applied not just to pre-certification settlements, but post-certification settlements under the new Rule 23(e)(2). *Id.* at 1022-24. Courts had an obligation to look at the effectiveness of distribution methods under Rule 23(e)(2)(C)(ii).

Now on remand, the settling parties make a new argument: *Bluetooth* applies, but it doesn't matter because the settlement can be approved notwithstanding *Bluetooth*. The Court should see through this: if the settling parties really believed this, they could have made the argument in the alternative the first time around. The parties knew that this settlement cannot possibly satisfy *Bluetooth*, which is why they fought so hard to keep this Court and the Ninth Circuit from applying *Bluetooth* in the first place.

### C. Not all settlements with *Bluetooth*'s red flags violate Rule 23(e), but the exceptions do not apply here.

Henderson agrees: there are rare situations when *Bluetooth* red flags do not forbid approval of a good deal. *Briseño,* 998 F.3d at 1027. But class counsel argues that, because *Bluetooth* red flags "do not *per se* invalidate settlement approval," they do not bar *this* settlement approval. Dkt. 742 at 9-10. The *non sequitur* should be evident. Not all American vice presidents are men, but the occasional Kamala Harris does not make Lyndon Johnson a woman. Class counsel provides absolutely no legal rule for determining when *Bluetooth* red flags bar a settlement. There's good reason for that: the only exceptions to the *Bluetooth* "red flags" that appellate courts have identified do not apply to this settlement.

One exception to *Bluetooth* in the Ninth Circuit comes when class counsel settles a Rule 23(b)(2) class action for injunctive relief that has value and "damages were also not part of the class release." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1126-27 (9th Cir. 2020). "An injunctive-relief-only class settlement, by definition, has no fund into which any fees not awarded by the court could possibly revert," thus clear-sailing clauses and kickers cannot have deprived the class of monetary relief. *Id.* at 1127. In such a case, an objector must prove that the fees are disproportionate to the injunctive relief or that the plaintiffs surrendered valuable injunctive relief in exchange for clear sailing. The *Campbell* exception is irrelevant here for three reasons. There was no valuable injunctive relief; damages are part of the class release in this Rule 23(b)(3) settlement; and it was entirely possible to award the excess disproportionate fees to the over 99% of class members who released their damages claims without receiving any cash at all. Conagra put $7.8 million on the table, and class counsel expropriated all but just under $1 million for itself by failing to negotiate for a common fund and by agreeing to a kicker. Of course class counsel "bargained away" better relief for the class. *Campbell,* 951 F.3d at 1126.

The other exception to *Bluetooth* comes if the entire class receives "essentially complete relief." *In re Southwest Air. Voucher Litig.*, 799 F.3d 701, 704 (7th Cir. 2015). If the settlement fully compensates *every* class member without compromising colorable claims, then there was no cost to the class from disproportionality, clear-sailing, or kicker clauses, and the settlement

is the sort of "good deal" *Briseño* discusses as a *Bluetooth* exception. 998 F.3d at 1027. (As it turns out, the *Southwest* panel later admitted it was factually incorrect about its "belief that the class could have done no better" and considered recalling the mandate from its affirmance of settlement approval. *In re Southwest Air. Voucher Litig.*, 898 F.3d 740, 746-47 (7th Cir. 2018).)

The *Southwest/Briseño* "good deal" exception does not apply here. The *class* has not been fully compensated, though a tiny percentage of class members may be. 99% of the class received nothing. As the Ninth Circuit found, *Briseño*, 998 F.3d at 1026, the parties intended a settlement where the vast majority of the class got nothing, though it was possible to compensate a far larger percentage of the class with direct notice or direct distribution. *See* Section V below.

The Ninth Circuit asked this Court to "give a hard look at the settlement agreement to ensure that the parties have not colluded [sic] at class members' expense." *Briseño*, 998 F.3d at 1028. *Briseño* requires "scrutinizing" not just for "potential collusion," but "unfairness." 998 F.3d at 1026. The Court does not have to look too hard. The settlement has a kicker and disproportionality; both benefit class counsel at the expense of the class and create "unfairness." The identical $7.8 million settlement without a kicker and without disproportionality would have provided an additional $4.9 million to class members. The parties provide no justification for this result other than to argue that the Court should simply repeat its reversed error from the first approval and disregard Ninth Circuit law on disproportionality. Dkt. 742 at 10-13 (repeating arguments that the Ninth Circuit rejected). (Further distribution to the class is feasible as discussed in Section V. But even if it weren't feasible, Ninth Circuit law permits *cy pres* distribution as a class benefit. Yes, Henderson would object to *cy pres* distribution. *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019) (Thomas, J., dissenting). The point is: nothing is inevitable about disproportionality in a compromised settlement unless the parties improperly choose to insist upon disproportionality.) Because of the kicker and the disproportionality, the "defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members," which even plaintiffs concede require settlement rejection. Dkt. 742 at 14.

### D. A successful litigation would have richly rewarded class counsel, so a compromise of pennies on the dollar does not justify a disproportionate attorneys' fees.

Plaintiffs express concern that a disproportionality rule would mean that plaintiffs could not profitably bring litigation to vindicate low-dollar claims in fee-shifting cases. They made this argument to the Ninth Circuit, and the Ninth Circuit correctly rejected it. That's because plaintiffs are conflating *litigated judgments* under fee-shifting statutes with *compromises* under Rule 23.

Henderson is challenging the disproportionality of a *settlement*. Rule 23(e)(2)(C) requires settlements to be proportional. But that Rule has nothing to say about jury verdicts and litigated judgments, where fee-shifting statutes permit recovery of fees disproportionate to class recovery, and Henderson does not argue otherwise. *E.g.*, *City of Riverside v. Rivera*, 477 U.S. 561, 564-65 (1986) (42 U.S.C. § 1988). Rivera's attorneys did not *compromise* their clients' claims, and there was thus no risk of self-dealing when attorneys then *litigated for* and won a fee award greater than their clients' recovery, and no Rule 23(e) analysis was needed.

This is because, in a class action, as the Restatement recognizes, a "proposed settlement transforms the action, so far as fees are concerned, from a 'fee-shifting case' to what is called a 'common-fund case.' The fee award is no longer statutory, because statutory fee-shifting provisions impose a liability only upon judgment." American Law Institute, *Restatement (Third) of Restitution and Unjust Enrichment* § 29 cmt c (2011). Thus, the argument for fees in excess of a plaintiffs' relief does not apply unless it is "relief ordered by a court rather than relief provided by a settlement." *Thorogood v. Sears, Roebuck & Co.*, 595 F.3d 750, 752 (7th Cir. 2010) (citing *Riverside*). *E.g.*, *Koby v. ARS Nat'l Servs.*, 846 F.3d 1071, 1081 (9th Cir. 2017) (protecting class members from attorney-driven settlement of FDCPA litigation though FDCPA provides for fee-shifting under 15 U.S.C. § 1692k); *Crawford v. Equifax Payment Servs.*, 201 F.3d 877, 882 (7th Cir. 2000) (same).

Plaintiffs unsuccessfully argued in the Ninth Circuit that there shouldn't be a distinction between the evaluation of fees in settlements and judgments, and will likely repeat that

argument here, but of course there is a distinction. Class counsel themselves strike agreements for settlements and fee terms, and courts must adjudicate approval of them under Rule 23(e). Post-judgment fee awards require no such scrutiny. No risk of Rule 23(e) self-dealing exists in a judgment, because plaintiffs' counsel does not settle absent class members' rights while negotiating protection for their own fees, and the defendant's liability to absent class members is not compromised an iota post-judgment. When class counsel compromises the class's claims, they must accept that they are compromising on their own fees such that the two are proportional under Rule 23.

In any event, this is not the sort of case where class counsel could never have been paid proportionately. Weir testified (if implausibly) that the label caused $13.5 million/year of damages, and Conagra stipulated to that damages figure in Section 8.2.4 of the settlement. With a class period of seven to eleven years, a jury verdict adopting Weir's calculations would have produced a verdict of over $100 million, and entitled class counsel to a fee award of $20 to $35 million—well over their lodestar. *See also* Frank Decl. ¶ 13. If class counsel isn't realizing their lodestar here, it's because they *lost* a weak case and had to settle for a nuisance amount lest they lose entirely through class decertification or summary judgment or jury verdict. But, as a public policy matter, courts should want to be incentivizing strong claims and not weak ones.

### E. Lodestar hours do not control the fairness of allocation; the fee must be proportionate to the class' recovery.

Class counsel appeals to the fact that the fee award is below their lodestar in order to justify a fee award currently over 87% of the constructive common fund. Dkt. 662 at 9-10. But a high lodestar (i.e. a fractional lodestar multiplier) cannot substitute for making sure that the fee award does not dwarf the actual recovery by the class. *See, e.g.*, *HP Inkjet*, 716 F.3d at 1182 ("[A]lthough class counsel's hard work on an action is presumably a necessary condition to obtaining attorney's fees, it is never a sufficient condition. Plaintiffs' attorneys don't get paid simply for working; they get paid for obtaining results."). "[H]ours can't be given controlling weight in determining what share of the class action settlement pot should go to class counsel."

*Redman*, 768 F.3d at 635. The reason for that is basic fairness. "Just as the Court would not deprive Class Counsel of all of their potential profit in cases [where their recovery is substantial], it cannot insulate Class Counsel from the risk of pursuing an unprofitable case." *Keirsey v. Ebay, Inc.*, No. 12-cv-01200-JST, 2014 WL 644738, at *3 (N.D. Cal. Feb. 18, 2014). When injunctive relief "may be largely or even entirely worthless" then "even a modest award of attorneys' fees … is excessive." *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 721 (7th Cir. 2016).

While the ultimate outcome of the case may be risky, if it were litigated, class counsel has earmarked nearly all of the settlement value for itself. Risk may justify a smaller fund, but not a lopsided allocation. Thus, numerous cases have rejected efforts to excuse a disproportional fee simply because counsel only seeks a fraction of its lodestar. *See, e.g.*, *Bluetooth*, 654 F.3d at 943 (reversing even though lodestar "substantially exceed[ed]" fee award); *HP Inkjet*, 716 F.3d at 1177 (fee award not justified merely because it was less than one third of the base lodestar); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 n.14 (3d Cir. 2013) (lodestar multiplier of 0.37 not "outcome determinative"); *Kmiec v. Powerwave Tech.*, 2016 WL 5938709 (C.D. Cal. Jul. 11, 2016) (Carney, J.) (large lodestar "is not a compelling reason to depart from the Ninth Circuit's benchmark, particularly absent evidence of exceptional risk or difficulty"); *Banks v. Nissan N. Am., Inc.*, 2015 WL 7710297 (N.D. Cal. Nov. 30, 2015) (0.76 fractional multiplier doesn't justify fee that is 80% of the constructive common fund).

*Eubank v. Pella Corp.* is directly on point. 753 F.3d 718 (7th Cir. 2014) (Posner, J.). Just like this case in 2019, the Seventh Circuit was reviewing a disproportionate settlement in litigation that began "almost eight years ago." *Id.* at 721. Just like this case, the *Eubank* plaintiffs defeated interlocutory appellate review and a petition for certiorari on class-certification issue. Unlike this case, the *Eubank* settlement provided millions of dollars of relief for the class. Nevertheless, the Seventh Circuit reversed: among other fatal problems, the settlement had an impermissible kicker and a disproportionate distribution. *Id.* at 727. Class counsel won an important Ninth Circuit appeal here in 2017, but that does not give them the excuse to unfairly compromise the class's claims under Rule 23(e)—any more than class counsel could have

collected fees if they had gone on to lose at trial. (Similarly, Henderson will not collect attorneys' fees for winning *Briseño* in the Ninth Circuit unless that success causes class benefit.)

## III.   Beyond the *Bluetooth* red flags, the Settlement has other unacceptable terms that the mediator's declaration and the parties' papers never address.

### A.   Settlement Section 8.2.4's stipulation of a fictional $27 million injunction value misled the class and the Court.

As *Briseño* found, the injunctive relief was worthless. Yet, the settling parties agreed to stipulate to a fictional $27 million value for the worthless injunctive relief. Indeed, McCormick testified that this fiction was the subject of extensive settlement negotiations—even though the stipulation provided nothing to the class except the creation of the illusion of value. Dkt. 739 ¶ 11.

The only conceivable reason for this clause was to attempt to mislead the Court and the class. If class counsel admitted the truth that the injunction was worthless, they'd be admitting that they were seeking 87% of a constructive common fund—and that would draw scrutiny from class members and the Court. Only by creating the *illusion* of relief would plaintiffs be able to rationalize the $6.85 million fee request and perhaps deter objections. The parties agreed to an insanely inappropriate fictional valuation of worthless injunctive relief so that class counsel could make a stronger argument for attorneys' fees. And this clause was negotiated *instead* of actual relief for the class.

The mediator acknowledges that this term was an important subject of negotiation. But he does nothing to explain how this clause to provide the illusion of relief to justify attorneys' fees was not by itself conclusive evidence of wrongdoing of class counsel putting their own interests ahead of the class.

The settling parties provide no explanation for the clause in their briefs on remand, even though the Ninth Circuit singled out this clause as one of many "reek[ing]" of what it misnamed "collusion." 998 F.3d at 1018. They have forfeited the issue, and should not be allowed to

sandbag new arguments on reply—especially when plaintiffs refused to provide deposition testimony on the issue on grounds of privilege.

**B.    Settlement Section 2.20(c) creates a conflict of interest.**

Under Section 2.20(c), class counsel agrees to reimburse Conagra if too many class members make documented claims above the $4.50 cap. This shows both (1) the settling parties knew and intended that the settlement would have a disproportionately low claims rate (*see* Section V below) and that and (2) class counsel had a financial interest in ensuring that not too many class members made claims after settlement was reached. The Ninth Circuit affirmed eliminating attorneys' fees in a far better settlement with a more minor conflict. *Rodriguez v. Disner*, 688 F.3d 645 (9th Cir. 2012) (affirming $0 fee for $49 million settlement fund because of comparatively minor breach of fiduciary duty relating to class representative incentive fees).

**C.    The misleading notice is an independent reason to reject the settlement.**

FAQ 8 of the settlement notice tells the class that there is injunctive relief valued at $27 million. Dkt. 652-1 at PageID #18901. This is unquestionably misleading—arguably even more misleading than the labeling controversy underlying the lawsuit. Class members reading this without investigating the truth as Henderson did would believe that the settlement is fair and not disproportionate because of the valuable injunctive relief that was in fact worthless as a matter of law.

The settlement webpage, https://www.wessonoilsettlement.com/, as of December 3, acknowledges that "the Ninth Circuit Court of Appeals reversed the District Court's final approval of the Settlement," but provides no link to that decision as one of the thirteen filings listed in "Important Documents."

The Ninth Circuit has condemned "misleading notice." *In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 972 (9th Cir. 2007) (PSLRA). "The absence of adequate notice injects a fatal flaw into the entire settlement process and undermines the district court's analysis of the fairness of the settlement under the *Hanlon* factors. While the district court has substantial

discretion in approving the details of a class action settlement, it may not do so without giving class members an adequate opportunity to object." *Id.*; *accord In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197-98 (5th Cir. 2010) (vacating settlement approval when notice failed to accurately describe class benefit).

Indeed, the notice is so misleading to class members that it may not pass constitutional muster, which would put defendant Conagra at legal risk of losing the benefit of its settlement release. *See, e.g.*, *Hecht v. United Collection Bureau*, 691 F.3d 218 (2d. Cir. 2012) (permitting relitigation of class action because of inadequacy of class notice in previous settlement); *Besinga v. United States*, 923 F.2d 133, 136-37 (9th Cir. 1991) (same) (citing cases).

### D. The Settlement attempted to deter objections.

"One hallmark of a reasonable settlement agreement is that it makes participation as easy as possible, whether class members wish to make a claim, opt out, or object." *McClintic v. Lithia Motors*, No. C11-859RAJ, 2012 U.S. Dist. LEXIS 3846, at *17 (W.D. Wash. Jan. 12, 2012). Here, the settling parties created three unnecessary and burdensome objection procedures calculated to discourage objections. *First*, the Settlement requires objections to contain the objecting class member's signature even if they are represented by an attorney. *See* Settlement ¶ 5.4.2. This provision is contrary to Federal Rule of Civil Procedure 23(c)(2)(B)(iv), which provides that a class member "may enter an appearance through an attorney if the member so desires," and 28 U.S.C. § 1654, which allows individuals to appear and conduct their cases through counsel.

*Second*, the Settlement requires that objections include a list of "previous objections that the Class Member [and his or her counsel] has filed in class action settlements in the past five years and the results of those objections (including any settlements that were reached concerning his or her objection)." *Id.* Such requirement is ineffective at preventing bad-faith objectors but merely creates an additional hurdle for good-faith objectors to jump through. *See Trabakoolas v. Watts Water Tech., Inc.*, No. 3:12-cv-01172-WHO (EDL) (Dkt. 276), at *4 (N.D. Cal. Feb. 14, 2013) (excising from class notice the requirement to list past suits in which the

objector or his attorney has objected); *Navistar Maxxforce Engines, Mktg., Sales Practices, and Prods. Liab. Litig.*, 14-cv-10318, Dkt. 642 (N.D. Ill. Jun. 7, 2019) (similar); *see generally* Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide, 5 (2010), available at https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last visited December 3, 2021) (directing courts to avoid notice language that places "burdensome hurdles" for "free exercise of rights, such as onerous requirements to submit a 'satisfactory' objection or opt-out request").

*Third*, the long-form notice requires class members to send copies of the objection to four different addresses, even if the objection is filed with the court and served through ECF. Settlement ¶ 5.4.1. This requirement is unnecessary and burdensome on the clerks who will have to grapple with an unnecessary paper mailing (either filing it redundantly to the docket or correctly perceiving it to be a verbatim paper copy needlessly required by settling parties).

The inclusion of these onerous procedures demonstrates that the parties wished to undermine the autonomous decisions of class members, serving as yet another indicator that the parties wished to avoid scrutiny of the objection. At a minimum, the Court should assign no weight to the low number of objections. *Cf. In re Chiron Corp. Sec. Litig.*, No. C-04-4293 VRW, 2007 WL 4249902 at *10 (N.D. Cal. Nov. 30, 2007) ("Frustrating the settlement is exactly what class members are entitled to do, if they think the settlement is not fair. The class' 'frustration rights' should not themselves be frustrated.").

Even with superior notice, and even when a settlement is objectionable as this one is, class members rationally rarely object to class action settlements. It is "naïve" to infer class approval from a low objection rate." *Redman*, 768 F.3d at 628. Moreover, "where notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a fait accompli." *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 680-81 (7th Cir. 1987). "[T]he absence or silence of class parties does not relieve the judge of his duty and, in fact, adds to his responsibility." *Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373, 375 (D. Kan. 1971).

The Court should draw no inference in favor of the settlement from the raw number of objections. *GMC Pick-Up*, 55 F.3d at 812-13.

## IV. The parties' subjective evidence of good faith and lack of colloquial collusion is irrelevant to the objective standards of *Briseño*, *Bluetooth*, and Rule 23(e)(2)(C) on which Henderson bases his objection.

### A. Satisfying the requirement of arms' length negotiations is necessary, but not sufficient to satisfy the objective requirements of Ninth Circuit law and Rule 23(e)(2)(C).

Yes, parties may not collude, and must engage in arm's length negotiations. But in "class-action settlements, the adversarial process—or what the parties here refer to as their 'hard-fought' negotiations—extends only to the amount the defendant will pay, not the manner in which that amount is *allocated* between the class representatives, class counsel, and unnamed class members." *Pampers*, 724 F.3d at 717 (emphasis in original). Henderson's argument has never been one of the lack of arm's length negotiations. He is not arguing that the lawsuit claiming over $100 million in damages should be settled for $80 million or $18 million instead of $7.8 million. He is arguing that, when arm's length negotiations produce a settlement with a $7.8 million value, Rule 23(e) and Ninth Circuit law and *Pearson* require that that $7.8 million to be proportionally allocated between the class and the attorneys.

An appeals court will reverse settlement approval if "the *terms of the agreement* contain convincing indications that self-interest rather than the class's interest in fact influenced the *outcome* of the negotiations." *Briseño*, 998 F.3d at 1022 (cleaned up and emphasis added). What is relevant are the objective "terms of the agreement" and the "outcome" of the negotiations. The outcome here is the impermissible "seven times more money than the class members" with a kicker precluding the Court from fixing the misallocation.

*Briseño* does not stand alone in requiring an objective inquiry. In addition to *Kim*, 8 F.4th at 1178, the Ninth Circuit recently repudiated a settlement approval where the district court, despite a clear-sailing provision, wasn't "prepared to find that there was collusion." *McKinney-Drobnis v. Oreshack*, -- F.4th --, 2021 U.S. App. LEXIS 31524, *39 (9th Cir. Oct. 20, 2021)

(quoting district court). *McKinney-Drobnis* reversed: the district court had failed to recognize that although "such clear-sailing arrangements are not *per se* prohibited," their "*very existence*" "increases the likelihood that class counsel will have bargained away something to the class." *Id.* (quoting *Bluetooth* and adding emphasis).

Similarly, Rule 23(e)(2)(C)(ii) requires the "proposed method of distributing relief to the class" be judged by its "effectiveness." Again, this is an *objective* standard: how effective were the parties in getting money to the class? It is irrelevant if the parties self-servingly claim that they worked really, really hard, or that they relied on the mediator to establish a claims procedure, or that they implausibly claim they had no idea that the claims rate would be low. There is no "At least you tried" exception to Rule 23(e)(2)(C); there is no "empty head, pure heart" exception; there is no requirement for an objector to show scienter. What matters under the rule's text is results: the "effectiveness." The settlement flunks because it pays class counsel seven times as much as the class while leaving over 99% of the class with nothing.

Plaintiffs argue that they satisfied Rule 23(e)(2)(C)(ii) because the "notice" was effective. Dkt. 742 at 23. But the word "notice" appears nowhere in the rule. Effectiveness of "notice" is an issue for Rule 23(c)(2)(B). As it turns out, notice here was misleading as a matter of law— far more misleading than the consumer fraud claims in the complaint. This is an independent reason to reject the settlement. *See* Section III.C above.

If class counsel could cajole only $7.8 million out of Conagra to settle the case through hard-fought negotiations, they had a fiduciary obligation and a Rule 23(e)(2)(C) obligation to figure out how to distribute $5.9 million of that to the class. Henderson argued in 2019 that direct distribution was possible. Other settlements demonstrate as a matter of law that this is true. *See* Section V below. The settling parties rely solely on subjective assertions about their putative good faith and hard work and ignorance and reliance on the mediator, but present no evidence they could not have directly distributed money to the class, and thus forfeit any factual argument that they met Rule 23(e)(2)(C)'s standard. By instead acquiescing to a plan that would distribute seven times as much to themselves as to the class, class counsel failed the *Kim* test, *Bluetooth*, and Rule 23(e)(2)(C). It does not matter whether that allocation was proposed by

Conagra, by the mediator, or by the plaintiffs. What matters is that the parties agreed to that misallocation. *Briseño*, 998 F.3d at 1025 (calling misallocation by agreement "collusion" and quoting *Pearson*).

There are narrow exceptions when misallocation in a class-action settlement is permissible—but each of those narrow exceptions, discussed in Section II.C above, depend upon the *outcome* of the negotiations, not whether a mediator is responsible for the misallocation.

**B.  The Ninth Circuit fully understood that the mediator proposed settlement terms because this Court's opinion mentioned it and the appellees argued the point. Thus, the Court would be repeating its earlier reversible error if it repeated its reasoning to approve the settlement.**

Plaintiffs argue that the Ninth Circuit reached its decision on an "incomplete understanding" about the mediation, apparently asking this Court to believe that if the appeals court had only known about the role of the mediator, the Ninth Circuit would have affirmed. Dkt. 742 at 1. Even if that were true, it would reflect forfeiture by the parties: they could have argued for affirmance on those grounds. If the settling parties really felt the Ninth Circuit "misapprehended" the facts of the case, they could have moved for rehearing. Fed. R. App. Proc. 40(a)(1). But it is false: this Court approved the settlement *because* of the mediation, and said so. And the parties *asked* the Ninth Circuit to affirm because of the mediation.

The Court's order approving the settlement repeatedly emphasizes the fact that a mediator had overseen the settlement and had made the critical proposals.

> Judge McCormick carefully oversaw this settlement, and that the precise value of the settlement was reached by accepting a mediator's proposal.

Dkt. 695 at 8.

> Plaintiffs' counsel are experienced class-action litigators from multiple firms, the parties conducted extensive discovery and motion practice, and there were multiple mediations with multiple mediators.

*Id.* at 9.

> That evaluation was further supported by the recommendation of an experienced mediator, who set the settlement amount in a mediator's proposal.

*Id.* at 10.

Plaintiffs repeatedly emphasized this in their appellate brief.

> The court found that … "Judge McCormick carefully oversaw th[e] settlement"; and that "the precise value of the settlement was reached by accepting a mediator's proposal."

Briseño Appellate Merits Br., No. 19-56297 (9th Cir.) at 11.

> Appellant also ignores that Magistrate Judge McCormick reviewed competing proposals for notice and claims admiration [sic], and that he ultimately selected the settlement administrator that provided notice. Mem. in Supp. of Unopposed Mot. for Order Directing Notice to Class, ECF No. 651 at 3.

*Id.* at 31 n.12.

> [T]he parties commenced settlement negotiations, first privately and then with the assistance of Magistrate Judge McCormick, who was assigned by the district court.

*Id.* at 8.

At oral argument, the appellees repeatedly relied on the mediator's decisions (often improperly relying on the judicial status of the mediator to call the mediator "the Court") and how they were "painstakingly negotiated" and litigated without collusion. *See* U.S. Court of Appeals for the Ninth Cir. YouTube Channel, *19-56297 Robert Briseño v. ConAgra Foods, Inc.* (Dec. 8, 2020), available at https://www.youtube.com/watch?v=o7qGuCRW2wE.

> It shows how hard fought the negotiations are. Ms. Spivey and I could not agree on the allocation of time, let alone could we agree on how the notice would be structured or anything of those sort. So the Court had to intercede on those points.

Briseño Arg., Time Stamp 17:57.

> [In response to question about lack of direct notice and the poor claims rate.] The notice was chosen through the Court and it yielded this result.

Briseño Arg., Time Stamp 17:19.

…the claims administrator—who, by the way, was not of our choosing, was chosen by the magistrate judge…

Briseño Arg., Time Stamp 15:22.

…the atmospherics do not control in the cases in which you have hard-fought litigation pursuant to a [inaudible] statute where you had to end up fighting all the way to the Supreme Court. That happens sometimes. Every one of the cases that Mr. Frank relies on comes back to the question of collusion. He says he's not alleging collusion here, but the very language from *Bluetooth* was to look for subtle signs that class counsel have allowed pursuit of their self-interest and infect the negotiations. We would have made the same application for attorneys' fees, statutory attorneys' fees, even if this case hadn't settled.

Briseño Arg., Time Stamp 19:24.

We painstakingly negotiated every single element of this settlement.

ConAgra Arg., Time Stamp 27:35.

In short, every argument the plaintiffs make on remand about the mediator and lack of collusion is an argument that they could have made—and often did—in the Ninth Circuit.

The Ninth Circuit has already rejected these arguments. *Briseño* did not hold that there wasn't evidence that the parties didn't mediate enough or that the mediator didn't present enough evidence. Indeed, *Briseño* expressly noted Magistrate Judge McCormick's role and recognized that this Court "explained that the length and nature of the suit allowed both sides to evaluate the costs and benefits of protracted litigation, supplemented by the recommendation of a court-appointed mediator." 998 F.3d at 1019, 1021. *Briseño* expressly noted that arm's length negotiations do not prove that Rule 23(e) is satisfied. *Id.* at 1030 (quoting *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 n.12 (9th Cir. 2019)).

Other Ninth Circuit cases agree. In *Kim*, for example, "the district court emphasized the mediator's awareness of the decision and the parties' extensive discussion of its impact at mediation as evidence that its impact was properly considered by the parties in reaching their agreement." 8 F.3d at 1182 (Callahan, J., dissenting). No matter: it was error to provide excess reliance on "deference to the mediation proceedings" and on the fact that "the parties had delayed negotiating attorneys' fees in mediation until after they had reached agreement on

substantive settlement terms." *Id.* at 1178, 1180. Rather, reversal of settlement approval "is warranted when the settlement terms contain convincing indications that the class representative and class counsel's self-interest won out over the class's interest." *Id.* at 1178. The "the mere presence of a neutral mediator" is not dispositive. *Bluetooth*, 654 F.3d at 948.

The settling parties are inviting the Court to ignore the mandate and repeat the opinion that was reversed. The only issue before the Court on remand is the objective question of whether the problematic terms and disproportion of the settlement resulted in the prioritization of the class's interest, or class counsel's self-interest. The settling parties have forfeited any argument that the class benefited from the kicker and clear-sailing clauses, much less the disproportionality. They have forfeited any argument that the precedential exceptions to *Bluetooth* apply. They have forfeited any argument that the class benefited from Section 2.20(c) of the settlement. They have forfeited any argument that the class benefited from Section 8.2.4 of the settlement, where the parties agreed to mislead the class and the court about the value of the injunction with a fictional $27 million figure that not-so-coincidentally allowed plaintiffs to claim that their fee request was within the benchmark. Dkt. 662 at 4. All that's left are settlement terms that in plain English and arithmetic demonstrate the self-interest of class counsel being put ahead of the interests of the class.

## C.    The mediator's opinion about "collusion" is both inadmissible and irrelevant.

As an initial matter, whether what the settling parties did was "collusion" as *Briseño* idiosyncratically defines it is a legal conclusion. A fact witness cannot offer legal opinion testimony. *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1060 (9th Cir. 2008). Henderson objects to the McCormick Declaration to the extent it offers legal conclusions.

Henderson objects that the mediator is improperly trying to give weight to his opinion and the settlement negotiations by presenting himself as a "court" in the negotiation process. *E.g.* McCormick Decl. ¶¶ 11, 14 (describing a "court proposal"). The mediator expressly acknowledges that his settlement proposal was his "evaluation of the terms that have the best

chance of being accepted by both sides" without any attempt to have the settlement satisfy Ninth Circuit law or the requirements of Rule 23(e)(2). *Id.* ¶¶ 14, 19. The fact that the mediator happened to be a magistrate judge should be given no weight to the fairness of a settlement when the magistrate judge was acting as a mediator, and not as a judicial officer attempting to obtain settlement fairness. *Id.*

The mediator testified that there was no "collusion," but never defines the term. There is no evidence that the mediator is referring to the Ninth Circuit idiosyncratic definition of collusion relating to misallocation, rather than the colloquial sense of the term that is not at issue in Henderson's objection.

Moreover, the "collusion"—or misallocation—that Henderson complains of, is evident from the objective terms of the settlement and outcome of negotiations. If a fact witness testified "I saw O.J. Simpson stab Nicole Brown dozens of times, but in my opinion he did not commit homicide," the legal conclusion would surely be disregarded. The misallocation and *Bluetooth* violations and other flaws demonstrating self-interest are present in the agreement (Sections II and III above) and law of the case, and it's a *non sequitur* to conclude that they do not demonstrate class counsel's self-interest when the mediator's testimony does not address those settlement flaws or give any explanation *why* they benefit the class, rather than class counsel.

The mediator's testimony ignored the settlement provisions Henderson complained about and asked the mediator about. The mediator's declaration gives no rationalization for the kicker, the clear-sailing clause, the disproportionality, Section 8.2.4, Section 2.20(c), or Section 5.4.2. There is no evidence the mediator considered these terms of the settlement when reaching his conclusions.

The mediator's conclusions are thus not relevant to Henderson's objection. Henderson is not accusing and has not accused the settling parties of failing to negotiate at arm's length. The mediator's attestation that the parties negotiated at arm's length is simply beside the point. And one cannot interpret the mediator's ambiguous declaration to mean that the parties did not act at the class's expense, when the black-and-white evidence of the settlement shows that

they did and the mediator's declaration makes no effort to reconcile the conclusion with the evidence.

### D. Judging settlements by objective standards is the superior rule for judicial administration of settlement approval.

If settlements cannot be judged by objective standards, then objectors must be granted intrusive discovery into privileged work product to address subjective factual disputes. This unfairly advantages bad-faith objectors objecting to legitimate settlements and unfairly disadvantages good-faith objectors objecting to bad settlements. Here, discovery would also require a deposition of a magistrate judge. This is a public-policy reason why judging settlements by objective standards is the superior rule.

The mediator failed to answer numerous questions Henderson posed, and Mr. Levitt professed to be unable to recall communications he had with the mediator, including *ex parte* communications about the remand and Henderson's objection. Henderson was not allowed to ask the mediator follow-up questions about what he meant by ambiguous phrasing in his declaration, about settlement-negotiation evidence that the mediator did not discuss or may not have been aware of, or about evidence produced in November by the settling parties that contradicted the mediator's September testimony. Henderson provides an offer of proof what discovery of the mediator might have shown. Frank Decl. ¶¶ 74-76. Henderson objects to any reliance on the mediator's conclusions without permitting a deposition of the mediator testing his conclusions.

If subjective intent trumps objective manifestations of the settlement, then class members must be permitted to conduct discovery into the settling parties' motivations for problematic settlement clauses. Here, the parties have argued, and the Court has agreed, that discovery into these internal motivations are privileged work product. Thus, Mr. Levitt refused to answer questions about class counsel's unstated reasons for including certain settlement terms. Henderson provides an offer of proof of what the forbidden discovery would show, and objects to any effort by the settling parties to use privileged work product as both a sword

and a shield, and any reliance by the Court on the settling parties' self-serving declarations of good faith when he was not allowed to conduct discovery into internal motivations.

Even the limited discovery the Court did allow was extraordinarily burdensome for both Henderson's counsel (who was forced to ignore medical advice after heart surgery to avoid asking for an extension of the discovery deadline, which the settling parties indicated they would fight) and the settling parties, who complained about having to screen years of documents for privilege.

All of these discovery disputes, which could spill into the Ninth Circuit if the settlement is approved, demonstrate the difficulties of judicial administration of a subjective test on the fairness of a settlement with a "Murderers' Row" of problematic clauses that the parties do nothing to defend objectively. Granting discovery deposing an Article I judge or into attorney work product is obviously awkward; but forbidding it would be reversible error if the settlement is approved based on the one-sided self-serving subjective evidence. The limited discovery the Court did grant revealed other potential problems that requires additional disclosures by this Court. Frank Decl. ¶ 76. If Magistrate Judge McCormick is a fact witness in this case, Henderson requests this Court disclose the timing and nature of post-remand communications between this Court and the magistrate to determine whether those communications were substantive.

A subjective standard creates perverse incentives. Bad-faith objectors seeking to extort settling parties proposing good settlements would be able to credibly threaten imposing expensive discovery and a risky appeal unless paid not to make a motion for discovery. And settling parties with bad settlements can create expensive wars of attrition with good-faith objectors bringing legitimate objections as Henderson did. (As much as the settling parties complain about the burden of discovery, Henderson engaged in a fraction of the discovery the Court's order permitted—conducting discovery was extraordinarily burdensome on his nonprofit counsel.)

Sound judicial administration alone suggests that the Court should cut the Gordian knot created by a subjective standard simply by following Ninth Circuit law and evaluating the

Rule 23(e) question based on "the terms of the agreement" and "outcome" (*Briseño*, 998 F.3d at 1022), rather than subjective issues requiring additional discovery.

E.    **The settlement doesn't survive subjective review either. Smoking-gun documents demonstrate that class counsel "bargained away a benefit to the class in exchange for their own interests."**

Henderson has focused on the objective components of the settlement because, as discussed above, that's what the law is and should be with respect to the objective components of the settlement to which he objects. The Court rejected much of Henderson's requests for discovery; class counsel used the Court's discovery order to block discovery into such basic questions as the intended purpose of controversial settlement clauses. Frank Decl. ¶¶ 70-72. Henderson has provided an extensive offer of proof why that denied discovery would have supported his objection. Frank Decl. ¶¶ 71-76.

But even with the limited discovery, there is dispositive evidence that class counsel "bargained away a benefit to the class in exchange for their own interests." *Bluetooth*, 654 F.3d at 938. The "defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members" (Dkt. 742 at 14) in exchange for agreeing to an illusory valuation of a worthless injunction that would rationalize giving class counsel a larger fee. The Smoking Gun documents—Frank Decl. Exs. D & E, and class counsel's deposition testimony about them—demonstrate this beyond a shadow of a doubt. Frank Decl. ¶¶ 15-21. These documents and settlement proposals are omitted from class counsel's joint declaration. There is also no indication that the mediator's declaration considered this evidence or this settlement negotiation history from before he was involved in the case in reaching his conclusions—another independent reason to reject those conclusions. (Had Henderson been permitted to depose the mediator and ask him about these documents, the mediator might well have reached a different conclusion if he was willing to admit error.)

The Smoking Gun documents are so damning that the settling parties' demand that the Court consider subjective evidence instead of the objective evidence of the settlement borders

on the frivolous. The settling parties knew that this evidence existed, tried to hide it from the Court and the objector by resisting discovery, and submitted a misleading declaration that omitted the relevant facts. There's no telling what other evidence exists that the settling parties have successfully hidden from discovery, but what has been disclosed is more than sufficient to reject the settlement by itself, even if one rejects Henderson's proposed legal framework and holds that objectors must engage in burdensome discovery to find similarly abusive practices that are plain from the face of the settlement.

Other documents and deposition answers support other of Henderson's arguments against settlement approval, and demonstrate that the mediator's testimony about his legal conclusions are inconsistent with the evidence. *See* Frank Decl. ¶¶ 11-68 & Exs. A through BB. Because the settling parties have improperly designated this information as confidential, Henderson won't discuss the details in this public filing, and restricts his discussion to references to the Frank Declaration.

But the limited evidence produced, and limited cooperation provided at the deposition (Frank Decl. ¶¶ 69-70), are by far enough to require rejection of this settlement. If this subjective evidence—on top of an objectively ludicrously abusive settlement—isn't enough to demonstrate placing class counsel's self-interest ahead of that of the class, what is? Class counsel is not going to send an email to opposing counsel stating "I am growing a handlebar mustache so I can twirl it with evil glee as we collude to deprive class members of benefit at the settlement. Bring the cigars so the room will be smoke-filled." Instead they are going to play the tacit games of trading settlement offers that establish how much a defendant is willing to pay and then using *Bluetooth* red-flag settlement terms to negotiate over how much to throttle class recovery so that there will be enough left over to pay the fees class counsel wants; negotiations over stipulating to fictitious valuations of settlement relief that are understood as a mechanism to create the illusion of relief to mislead the class and the Court; and then failing to negotiate a reallocation when the results are wildly disproportionate.

The Court should not consider any of this parol evidence: a bad settlement doesn't magically satisfy Rule 23 if settling parties can provide sufficient kabuki theater pretending that

they had nothing to do with the settlement terms they agreed to. But what subjective evidence the parties have hesitantly produced is damning (and unprecedented, since no appellate court has ever previously relied on subjective evidence rather than "settlement terms"), and the Court should both reject the settlement and the settling parties' attempt to seal materials of public interest, at least to the millions of class members. No reason exists to keep them confidential other than the parties' understandable embarrassment.

## V.   The disproportionality of the settlement "was no surprise" and better distribution was possible.

As Henderson argued in 2019 (Dkt. 685 at 7-8; Dkt. 743-5 at 18-19 (fairness hearing transcript)), faithful class counsel seeking a proportional settlement would have subpoenaed third-party retailers and improved the effectiveness of distribution with either direct notice or, better, direct payments to known class members.

True, as *Briseño* holds that direct notice is not *mandatory*; Henderson entirely agrees. 998 F.3d at 1026 n.3. But that just means that settling parties can agree to throttle the claims process in a weak case by refusing to use direct notice or direct distributions. If class counsel is willing to accept a $333,000 fee, it has every right to agree limit class recovery to $1 million, so long as the settlement is otherwise fair, adequate, and reasonable. But if class counsel is seeking millions, it has the fiduciary obligation under Rule 23(e) and Ninth Circuit law to *actually get money to the class* proportional to its own fee. It may not prioritize its own self-interest above the class's interests by agreeing *both* to a disproportionate fee *and* to a throttled claims process where "fees would swamp the actual recovery for class members." *Id.*

### A.   Conagra contradicts the law of the case with its irrelevant and implausible claim that it did not know the cost of the settlement.

The settling parties tried to argue to the Ninth Circuit that the disproportion should not be held against them because the class could potentially recover tens of millions of dollars. They try to repeat that argument here. But the Ninth Circuit rejected the settling parties' argument and found that the low claims rate "was no surprise, given how the parties knowingly

structured the settlement." *Briseño*, 998 F.3d at 1026. The settling parties did not challenge that holding, and it is now law of the case. The Court must follow the mandate and reject the settling parties' request to have this Court overrule the Ninth Circuit.

The Ninth Circuit was correct. Any claim that experienced class counsel was not aware of the near-certainty of a low claims rate in this publication-notice settlement was wildly implausible.

- It was publicly known in 2014, and reported in judicial opinions, Reuters, and *Forbes*, that the median claims rate for class-action settlements with publication notice was well under 1%. *E.g.*, *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014) (citing authorities); *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366 at *4 (N.D. Cal. Aug. 25, 2016) (same).

- Generally accepted accounting principles (GAAP) required Conagra to estimate and book the contingent liability once the settlement was signed. Discovery would have shown that Conagra accountants made that estimate and almost certainly predicted a cost consistent with a disproportionate payment to class counsel versus class members.

- Both class counsel and Conagra's counsel are experienced class-action attorneys who have negotiated several class-action settlements. Disclosure of the claims rates of settlements negotiated in the five years before the settlement here would have shown that both class counsel and defense counsel knew or should have known that the claims rate would be low here; furthermore, Conagra has likely had other class-action settlements with claims rates under 1%.

- The settlement administrator has even more experience with claims-made class-action settlements and discovery would have produced records showing that the majority of such settlements with publication notice would have claims rates under 1%.

- It is implausible that businesspeople at Conagra were indifferent between a $1 million settlement payout to the class and a $50 million payout. Surely someone at Conagra

investigated the likely claims rate. And claims rates in class-action settlements can be predicted with actuarial certainty—indeed, there are former actuaries who sell "settlement insurance" guaranteeing a defendant will not have to pay above a certain claims rate. Ted Frank, *Settlement Insurance Shows Need for Court Skepticism in Class Actions*, OpenMarket blog (Aug. 31, 2016).

And indeed, the limited discovery the Court permitted did demonstrate the parties' expectation whether the claims rate would produce substantially less money for the class than for the attorneys. Frank Decl. ¶¶ 26-35 & Exhibits H and J-M.

In any event, the putative ignorance would have been no excuse for the low claims rate: Rule 23(e)(2)(C)(ii) requires the objective evaluation of "effectiveness," not the subjective evaluation of how hard the parties tried to get money to the class. *See* Section IV.A above.

## B.      Direct distribution was possible.

Direct distribution to class members was possible to pay millions of dollars more to class members. It is both feasible and common to subpoena third-party retailers for the identity of some class members, and then do a direct distribution to identifiable class members. Several cases have used this process, including two on remand from appellate decisions Henderson's counsel has won reversing settlement approvals involving less disproportionate settlements than this one. *See, e.g., Pearson*, 772 F.3d at 784 (using "loyalty programs" to provide direct postcard notice to 4.72 million class members); *Wilson v. Playtika Ltd.*, No. 18-cv-05277-RSL, 2020 U.S. Dist. LEXIS 222843 (W.D. Wash. Nov. 30, 2020) (stipulated discovery protective order between class plaintiffs and Amazon "for the purpose of providing notice to and verifying and paying the recovery amount owed to each member of the Settlement class"); Declaration of Scott A. Kamber, *In re McCormick & Co., Inc. Pepper Prods. Mktg. & Sales Pracs. Litig.*, No. 15-mc-01825, Dkt. 237-1 at 4 (D.D.C. May 20, 2020) (subpoenaing Target and Safeway "yielded extensive customer data that appears likely to yield electronic cash distributions to a substantial number of Class Members who did not file claims"); *Ostrowski v. Amazon*, 2016 WL 4992051, 2016 U.S. Dist. LEXIS 126532 (W.D. Wash. Sept. 16, 2016)

(granting motion to compel retailer to produce class-member information so that *In re NVIDIA GTX 970 Graphics Chip Litigation*, No. 15-cv-00760 (N.D. Cal.) parties could provide direct notice of settlement to class members); *Mahoney v. Endo Health Solutions, Inc.*., No. 1:15-cv-09841, Dkt. 90 at 10 (S.D.N.Y. Oct. 21, 2016) ("Plaintiff's counsel issued subpoenas to the nineteen largest providers of retail pharmacy services in the United States (*e.g.*, Walmart, Walgreens, CVS) to obtain electronic files of the names and addresses of Class members that purchased the Tablets.").

For example, in *McCormick*, by subpoenaing two retailers, a settlement administrator identified 768,686 additional customers. *Id.* at 2. Not all of these customers were class members and not all class members could be matched with sufficient data to enable payment, but the administrator was able to use the data to pay 124,920 additional class members—more than tripling the claims rate. *In re McCormick & Co., Inc. Pepper Prods. Mktg. & Sales Pracs. Litig.*, No. 15-mc-01825, Dkt. 246-1 at 1-2 (D.D.C. Jan. 22, 2021).

Where there is a will, there is a way. When courts demand more of settling parties on behalf of class members, the class gets more. For example, after *Baby Products* rejected a settlement tilted disproportionately in favor of class counsel and *cy pres*, class counsel on remand appropriately restructured the settlement to eliminate superfluous *cy pres* in favor of direct class distributions. This constituted an improvement of nearly $15 million to the class. *McDonough v. Toys "R" Us*, 80 F. Supp. 3d 626, 660 (E.D. Pa. 2015). 1.1 million class members received direct distributions, up from the 40,000-50,000 claimants under the initial settlement.

As mentioned previously, it's a matter of actuarial science to structure the claims process to fine-tune class recovery. The parties are entitled to use arm's length negotiations to agree to the *size* of the total settlement. If that agreed-upon size is solely that obtainable through a claims process and publication notice, so be it—*if and only if* the attorney Rule 23(h) award is proportionate. What settling parties may not do is misallocate the funds so that the class is not the primary beneficiary and class counsel receives a disproportionate share of the total, or use a kicker to shield the class from recovering any excess attorney-fee request.

## CONCLUSION

This court should follow the Ninth Circuit's mandate and deny final approval of the settlement and the motion for attorneys' fees.

Dated: December 3, 2021          Respectfully submitted,

                                 */s/ Theodore H. Frank*
                                 Theodore H. Frank (SBN 196332)
                                 HAMILTON LINCOLN LAW INSTITUTE
                                     CENTER FOR CLASS ACTION FAIRNESS
                                 1629 K Street NW, Suite 300
                                 Washington, DC 20006
                                 Voice: 703-203-3848
                                 Email: ted.frank@hlli.org

                                 *Attorney for Objector M. Todd Henderson*

PROOF OF SERVICE

I hereby certify that on this day I electronically filed the foregoing Objection using the CM/ECF filing system thus effectuating service of such filing on all ECF registered attorneys in this case.

DATED this 3rd day of December, 2021.

*/s/ Theodore H. Frank*
Theodore H. Frank