**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE CONAGRA FOODS, INC. | Case No.: CV 11-05379-CJC (AGRx) |
| | MDL No. 2291 |
| ROBERT BRISEÑO, *et al.*, individually and on behalf of all others similarly situated, | ORDER DENYING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT [Dkt. 742] |
| Plaintiffs, | |
| v. | |
| CONAGRA FOODS, INC., | |
| Defendant. | |

## I.  INTRODUCTION

In this decade-old class-action lawsuit, Plaintiffs challenge Defendant ConAgra Foods, Inc.'s ("ConAgra") allegedly deceptive marketing of Wesson Oil products as "100% Natural."  After years of investigation and litigation—including extensive

discovery and motion practice, a Ninth Circuit appeal regarding the district court's order certifying eleven statewide consumer damages classes, and diligent mediation efforts with two separate judges—the parties reached a settlement by accepting a court proposal from Magistrate Judge Douglas F. McCormick.

The Court granted final approval of the parties' settlement, relying on, among other factors, the Court's concerns about the strength of Plaintiffs' case, the risks of further litigation, the enormous problems of managing the eleven certified classes, the efforts and judgment of Magistrate Judge McCormick, the prior extensive litigation, and the fact that Plaintiffs' attorneys were seeking less than half of their lodestar.  (Dkt. 695.) The Ninth Circuit reversed, concluding that courts must now scrutinize even post-class certification settlements for potentially unfair collusion in the distribution of funds between the class and their counsel.  *Briseño v. Henderson*, 998 F.3d 1014, 1019 (9th Cir. 2021).  The Circuit remanded to this Court to take a closer look at terms in the settlement that could indicate that the interests of class counsel and ConAgra were placed above the class' interests.  *Id.*

Class counsel now renews their request that the Court grant final approval of the same settlement agreement and the requested attorney fees, costs, and incentive awards. (Dkt. 742 [hereinafter "Mot."].)  ConAgra filed a response to the motion supporting final approval.  (Dkt. 745 [hereinafter "ConAgra Resp."].)  Class member Shiyang Huang, who previously filed a valid claim under the settlement agreement, filed an opposition. (Dkts. 751, 752.)  After the Court permitted Objector M. Todd Henderson ("Objector") to conduct limited discovery (Dkt. 750), he renewed his objection to the proposed settlement and fee request.  (Dkt. 759 [hereinafter "Obj."].)  Finally, Plaintiffs filed a notice of supplemental authority, citing a report and recommendation regarding a class action settlement from the Southern District of Florida.  (Dkt. 776.)  Unfortunately, with

all the information now before the Court, the Court cannot conclude that the settlement is fair, reasonable, and adequate.  For the following reasons, the motion is **DENIED**.

## II.  BACKGROUND

### A.      Plaintiffs' Complaint and Class Certification

For over ten years, bottles of Wesson Oil had a label touting the products "100% Natural."  In 2011, Plaintiffs sued ConAgra, alleging that the "natural" claim was false and misleading because the oil contains genetically modified organisms, and that they paid more for the oil because of that false and misleading claim.  They filed putative class actions asserting state-law claims against ConAgra in eleven states, and those cases were consolidated in this action.  *Briseño v. ConAgra Foods, Inc.*, 844 F.3d 1123 (9th Cir. 2017).

The case was originally assigned to Judge Margaret M. Morrow.  After their first motion for class certification was denied (Dkt. 350), Plaintiffs moved to certify eleven separate classes defined as follows:

> All persons who reside in the States of California, Colorado, Florida, Illinois, Indiana, Nebraska, New York, Ohio, Oregon, South Dakota, or Texas who have purchased Wesson Oils within the applicable statute of limitations periods established by the laws of their state of residence (the "Class Period") through the final disposition of this and any and all related actions.

*Briseño*, 844 F.3d at 1123–24.

In a 140-page opinion, Judge Morrow certified eleven statewide consumer damages classes under Federal Rule of Civil Procedure 23(b)(3).  *In re ConAgra Foods,*

*Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015); (Dkt. 545). The eleven subclasses involve violations of different state laws, different theories of recovery, and different class periods. (*See* Dkt. 545 at 139–40.) In an opinion and a separate memorandum disposition, the Ninth Circuit affirmed. *Briseño v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017); *Briseño v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017). The United States Supreme Court denied ConAgra's petition for writ of certiorari. *Conagra Brands, Inc. v. Briseño*, 138 S. Ct. 313 (2017).

## B.    ConAgra's Initial Agreement to Sell Wesson Oil and Removal of the Disputed Label

In May 2017, ConAgra agreed to sell Wesson Oil to the J.M. Smucker Company. *Briseño*, 998 F.3d at 1019. About two months later, ConAgra voluntarily removed the disputed label, and stopped marketing Wesson products as "natural." *Id.* ConAgra maintains that this litigation played no role in either decision. *Id.*

In early 2018, the J.M. Smucker deal fell through after a regulatory agency announced that it would oppose the transaction. *Id.*; (Dkt. 739 [Declaration of United States Magistrate Judge Douglas F. McCormick, hereinafter "McCormick Decl."] ¶ 8.b.) ConAgra began looking for a new buyer for Wesson Oil. *Briseño*, 998 F.3d at 1019.

## C.    Settlement Efforts

The parties then requested an opportunity to settle the case before litigation proceeded. Beginning in early 2018, the parties conducted settlement negotiations before retired Judge Edward A. Infante, until the Court referred the parties to Magistrate Judge McCormick for further settlement discussions. (Dkt. 743 [Joint Declaration of Class Counsel] ¶¶ 181–85); *see Briseño*, 998 F.3d at 1019. From June 2018 to November

2018, Magistrate Judge McCormick spent approximately 100 hours helping the parties reach a settlement agreement.  (McCormick Decl. ¶ 2.)

Magistrate Judge McCormick learned early on "that the dollar value of the injunctive relief contained within any settlement agreement would be an issue that needed to be resolved," and that because the issue "would be expensive for each side to litigate," "avoiding the costs of the injunctive-relief valuation litigation should be a primary factor in motivating both sides to resolve this action."  (*Id.* ¶ 8.)  He also "foresaw additional litigation about how to deal with the eleven different statewide classes that had been certified," and "believed that avoiding the costs of additional class-related litigation should be another primary factor in motivating both sides to resolve this action."  (*Id.* ¶ 9.)

Magistrate Judge McCormick's approach to helping the parties settle the case proceeded in two phases.  First, he helped the parties determine how much ConAgra would agree to pay as relief to the class members.  Second, and only after the first phase was substantially decided, he helped the parties determine how much Plaintiffs' attorneys would recover in fees.  (*Id.* ¶ 12; Conagra Response ¶ 1.)

By late October 2018, Magistrate Judge McCormick had helped the parties arrive at an agreement on a "claims-made" fund that would pay class members 15 cents for each unit of Wesson-brand product purchased, with no proof of purchase required for up to 30 units.  (McCormick Decl. ¶ 10.a.)  He "understood that the 15 cents per unit was an amount considerably more than the price premium attributed to the '100% Natural' label by Plaintiffs' own expert."  (*Id.*)  The agreement also included a fund of $575,000 to be allocated to members of the New York and Oregon state classes as compensation for statutory damages.  (*Id.* ¶ 10.b.)  At this point, given the parties' difficulty resolving "issues related to class administration and notice and the value of injunctive relief,"

Magistrate Judge McCormick "concluded that [he] would have to make a court proposal to resolve those issues as well as the issue of attorney's fees." (*Id.* ¶ 11.)

Settling the issue of fees was tricky. While "[c]lass counsel believed that the lodestar amount they would seek in any fee litigation would be substantially more than $10 million given the thousands of hours spent on this matter," ConAgra "maintained that the amount of attorney's fees they were willing to pay was limited." (*Id.* ¶ 13.)

On November 8, 2018, Magistrate Judge McCormick made the following court proposal to the parties: (1) Plaintiffs' counsel would agree to seek and ConAgra would agree not to oppose attorney fees and expenses of $6,850,000, (2) the parties would agree that injunctive relief would be valued at $27,000,000, and (3) Magistrate Judge McCormick would review final proposals from the parties' proposed claims administrators and select a claims administrator by November 30, 2018. (*Id.* ¶ 14.) Both sides accepted the proposal, and Magistrate Judge McCormick selected Plaintiff's choice, JND Legal Administration ("JND"), to serve as the settlement administrator. (*Id.* ¶ 16.)

In December 2018, ConAgra agreed to sell the Wesson brand to Richardson International. *Briseño*, 998 F.3d at 1019; (McCormick Decl. ¶ 18). The deal closed in February 2019. *Briseño*, 998 F.3d at 1019. After the sale, the parties revised the terms of the settlement agreement to clarify that the negotiated injunctive relief would apply to ConAgra only if it reacquired the Wesson brand. (Mot. at 6 n.3.) In March 2019, Plaintiffs filed a motion for preliminary settlement approval. (Dkt. 650.)

**D.    The Proposed Settlement**

The proposed settlement—again, reached after a court proposal from Magistrate Judge McCormick—provided that ConAgra would not label, advertise, or market Wesson

-6-

Oils as "natural," absent future legislation or regulation.  (Dkt. 652, Ex. 1 [Settlement Agreement and Release, hereinafter "Settlement Agreement"] ¶ 3.3.)  It also provided class members the following monetary benefits:

> (a) $0.15 for each unit of Wesson Oils purchased to households submitting valid claim forms (to a maximum of 30 units without proof of purchase, and unlimited units with proof of purchase), with no cap,
> (b) an additional fund of $575,000 to be allocated to New York and Oregon class members submitting valid claim forms, as compensation for statutory damages under those states' consumer protection laws, and
> (c) an additional fund of $10,000 to compensate those in all classes submitting valid proof of purchase receipts for more than thirty purchases, at $0.15 for each such purchase above 30, with class counsel paying any non-funded claims (i.e. claims above the $10,000 ConAgra provided) from any attorney fees awarded in this case.

(*Id.* ¶ 3.1.)

The agreement also provided that "Class Counsel shall make a Fee and Expense Application to the Court for an award of $6,850,000, to be paid by Conagra."  (*Id.* ¶ 8.1.1.1.)  ConAgra agreed to "take no position" with respect to the application, "consistent with its agreement negotiated with the assistance of Magistrate Judge McCormick as mediator."  (*Id.* ¶ 8.1.1.2.)  If the amount of attorney fees awarded was less than $6,850,000, the parties agreed that "the relevant amount of the overpayment of attorneys' fees and costs paid by Conagra shall be returned to Conagra."  (*Id.* ¶ 8.1.1.3.)

### E.    The Court's Original Approval of the Settlement Agreement

On April 4, 2019, the Court granted preliminary approval of the Settlement Agreement and appointed JND as settlement administrator.  (Dkt. 654.)  As outlined in the Settlement Agreement, JND provided notice calculated to reach the class in all eleven states via print and digital publications, a press release, and a hotline.  (Dkt. 661-2 [July

23, 2019 Declaration of Jennifer M. Keough Regarding Settlement Administration and Notice Plan] ¶¶ 8–16; Exs. B–H.)  After giving notice, JND received 97,880 timely claims for 2,792,794 units, and one untimely claim for 10 units, for a total maximum payout of $993,919.  (Dkt. 688-1 [September 24, 2019 Declaration of Jennifer M. Keough Regarding Settlement Administration and Notice Plan] ¶ 10.)  One plaintiff opted out, and one plaintiff objected.  (*Id.* ¶¶ 7, 9; Dkt. 666.)

On October 8, 2019, the Court granted final approval of the Settlement Agreement, including attorney fees, costs, and incentive awards.  *In re Conagra Foods, Inc.*, 2019 WL 12338387 (C.D. Cal. Oct. 8, 2019); (Dkt. 695).  The Court reasoned that the amount offered in settlement was fair and reasonable given its serious doubts about the strength of Plaintiffs' case and the obstacles inherent in continued litigation, including problems of proof and management and risks of decertification or dispositive motions.  *In re Conagra Foods*, 2019 WL 12338387, at *3.  The Court placed great weight on the fact that the parties' agreement had resulted from a court proposal from Magistrate Judge McCormick.  *See id.* at **1, 4, 5.  Indeed, the Court assumed—in retrospect wrongfully—that in helping the parties negotiate the Settlement Agreement, Magistrate Judge McCormick took into account the interests of the class and what was fair.

The Court also concluded that the attorney fees were fair and reasonable, especially considering the extensive litigation that had taken place in the case and the fact that Plaintiffs' counsel sought only about half of their lodestar.  *Id.* at *6.  Although it recognized and "appreciate[d] Objector's high-level concerns regarding an apparent trend toward class action settlements disproportionately benefitting attorneys," the Court explained that "the amount of attorney fees in the Settlement Agreement, while high, reflects the long history of this case and the impressive result achieved given the weakness of Plaintiffs' case."  *Id.* at **7–8.

### F.    The Ninth Circuit's Opinion

The Ninth Circuit reversed.  *Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021).  It "h[e]ld that under the newly revised Rule 23(e)(2) standard, courts must scrutinize settlement agreements—including post-class certification settlements—for potentially unfair collusion in the distribution of funds between the class and their counsel."  *Id.* at 1019.  As explained in more detail throughout this Order, the Circuit expressed concern that the Settlement Agreement provides a "disproportionate distribution" to counsel and contains a "clear sailing" agreement and a "reverter."  *Id.* at 1026–27.  Accordingly, the Circuit stated that this Court "should give a hard look at the settlement agreement to ensure that the parties have not colluded at class members' expense."  *Id.* at 1027–28.

### G.    Discovery

After the Ninth Circuit's reversal, Magistrate Judge McCormick filed a declaration describing the settlement negotiations in this case, including how the parties reached their settlement by accepting his court proposal.  (McCormick Decl.)  The parties had submitted a "list of important issues for Magistrate Judge McCormick to consider addressing in his Declaration."  (Dkt. 929 at 1; *see* Dkt. 931.)

In Magistrate Judge McCormick's declaration, it became clear that the Court was mistaken in its belief that Magistrate Judge McCormick had considered the interests of the class and what outcome was fair or right in making his court proposal.  As Magistrate Judge McCormick put it, the court proposals he makes to resolve cases "do not represent [his] evaluation of what is the 'right' outcome," and instead "represent [his] evaluation of the terms that have the best chance of being accepted by both sides."  (McCormick Decl. ¶ 14.)

After Magistrate Judge McCormick's declaration was filed, Plaintiffs renewed their request that the Court grant final approval of the same Settlement Agreement. (Mot.)  ConAgra filed a response supporting approval of the settlement.  (ConAgra Resp.)

Before his objection was due, Objector asked the Court to permit him to seek discovery for two purposes:  (1) to test a statement in ConAgra's Response that "[a]t the time the settlement agreement terms were reached, Conagra did not know—and could not have known—the ultimate cost of the settlement," (ConAgra Resp. ¶ 2), and (2) to "fill in the gaps" created when Magistrate Judge McCormick did not address in his declaration several issues Objector put in the list of issues for him to consider addressing.  (Dkt. 746.)  To address the Ninth Circuit's concerns and to develop the record for appeal, the Court allowed Objector to conduct limited discovery into discussions between Plaintiffs and ConAgra, and information or material shared with Magistrate Judge McCormick. (Dkt. 750 at 4.)

## III.  LEGAL STANDARD

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e).  This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up).

A proposed class action settlement must meet the requirements of Federal Rule of Civil Procedure 23(e)(2), which requires a proposed settlement to be "fair, reasonable, and adequate."  In considering whether this standard is met, courts must consider whether (A) the class representatives and class counsel have adequately represented the class, (B) the proposal was negotiated at arm's length, (C) the relief provided for the class is adequate, and (D) the proposal treats class members equitably relative to each other.  Fed. R. Civ. P. 23(e)(2)(A–D).[1]  "Rule 23(e)(2) assumes that a class action settlement is invalid" until a court concludes that it is fair, reasonable, and adequate.  *Briseño*, 998 F.3d at 1030.

A court must also consider "the terms of any proposed award of attorney's fees" when determining whether "the relief provided for the class is adequate," Fed. R. Civ. P. 23(e)(2)(C)(iii), specifically looking for "potential collusion or unfairness to the class," *Briseño*, 998 F.3d at 1026.  This means "that a court must examine whether the attorneys' fees arrangement shortchanges the class," i.e. that a court "must balance the proposed award of attorney's fees vis-à-vis the relief provided for the class in determining whether the settlement is adequate for class members."  *Id.* at 1024.  The concern is that "class counsel [ ] has the incentive to conspire with the defendant to reduce compensation for class members in exchange for a larger fee."  *Id.* at 1025; *id.* (expressing concern over "the inherent incentives that tempt class counsel to elevate his or her own interest over those of the class members").

---

[1] The factors in Federal Rule of Civil Procedure 23(e)(2)(A), (B), and (D) are not in dispute.  Objector does not argue that the class representatives or class counsel failed to adequately represent the class (except in connection with accepting the proposal), that the proposal was not negotiated at arm's length, or that the proposal treats class members inequitably relative to each other.  Indeed, the Court concludes that the class representatives and class counsel adequately represented the class (except in connection with accepting the proposal), that the proposal was negotiated at arm's length, and that the proposal treats class members equitably relative to each other.

When evaluating the fairness of an attorney fees award, courts consider "subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." *Briseño*, 998 F.3d at 1023; *see In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011); *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1060 (9th Cir. 2019). Those signs include (1) when counsel receives a disproportionate distribution of the settlement, (2) when the parties negotiate a "clear sailing arrangement," under which the defendant agrees not to challenge a request for an agreed-upon attorney fee, and (3) when the agreement contains a "kicker" or "reverter" clause that returns unclaimed funds to the defendant rather than to the class. *Briseño*, 998 F.3d at 1023; *Bluetooth*, 654 F.3d at 947; *Roes,* 944 F.3d at 1060. These, however, are just signs of *possible* collusion, not automatic bases for rejection of a settlement. *Briseño*, 998 F.3d at 1027. When they are present, courts must scrutinize the settlement even closer to look for signs that self-interest, even if not purposeful collusion, has seeped its way into the settlement terms. *Roes,* 944 F.3d at 1060.

## IV. DISCUSSION

The Court has received substantial additional information regarding the Settlement Agreement. After analyzing all of the new information, the Court concludes that the Settlement Agreement includes too many indicators that class counsel's and ConAgra's self-interest unduly influenced the outcome of the negotiations. The disproportion between the amount the class recovered and the amount of fees class counsel recovered is staggering—with class claims totaling less than $1 million while class counsel received almost seven times that amount—and is especially concerning given the parties' knowledge that the claims rate under the settlement would be low. The fact that class counsel previously rejected a settlement offer with equal payments to the class and class counsel adds to the Court's discomfort with the Settlement Agreement. The clear sailing provision and the reverter clause only compound the appearance that self-interest infected

the negotiations.  Not only that, but most of the concerning provisions were proposed by
Magistrate Judge McCormick, who expressly stated that he did not consider what was
fair or right in proposing the terms, but rather only considered what terms "ha[d] the best
chance of being accepted by both sides."  (McCormick Decl. ¶ 14.)  While none of the
concerning terms is a *per se* death knell to the Settlement Agreement, taking all of them
together and adding Magistrate Judge McCormick's explanation of how he arrived at his
court proposal, the Court cannot grant final approval of the Settlement Agreement.

### A.    Disproportionate Distribution

The Settlement Agreement provides for a payment to the class that, after all the
claims were made, ended up totaling at most $993,919, and attorney fees totaling
$6,850,000.  *Briseño*, 998 F.3d at 1021.  "This gross disparity in distribution of funds
between class members and their class counsel raises an urgent red flag demanding more
attention and scrutiny."  *Id.* at 1026.  To approve a settlement with such a disproportion, a
court must give "a clear explanation of why the disproportionate fee is justified and does
not betray the class's interests."  *Bluetooth*, 654 F.3d at 949.  The Court cannot do so
here.

The Court must be clear about one thing: there is no question that this settlement is
not the product of collusion in the traditional sense.  In other words, there is no evidence
that class counsel and ConAgra intentionally schemed to enrich themselves at the
expense of the class.  (McCormick Decl. ¶ 20; ConAgra Resp. ¶ 1.)  Indeed, even
Objector has never contended that this settlement was not the product of arm's length
negotiations.  (Obj. at 7 ["In this Court and at the Ninth Circuit Henderson disclaimed
any allegation of the nefarious colloquial sense of 'collusion' and simply argued about
misallocation."].)  Rather, he argues that the money the parties negotiated for ConAgra to
pay must be allocated more proportionally between the class and the attorneys.  (*Id.* at

24.)  The allocation presented in the Settlement Agreement, he argues, reflects "excessive self-interest."  (*Id*. at 11.)

The Court agrees.  The fact that attorneys will receive nearly $7 million while the class receives less than $1 million is too disproportionate to ignore.  This is particularly true when the structure of the settlement relied on compensating class members based on claims made, but the incentive for making such claims was extremely low.  Even if a person submitted a claim, the most they could receive without a receipt (and the likelihood that someone would have a receipt for a $3 bottle of oil purchased years ago is extremely low) was $4.50.  Many people would not find such a nominal payout worth the effort of making a claim.  To make matters worse, the parties structured the settlement so that even *class counsel* would have an incentive to limit claims.  Specifically, the parties agreed that if $10,000 was not enough to compensate class members seeking $0.15 per unit above the 30 units with no proof of purchase required, class counsel would pay the unfunded claims out of the fees awarded.  (Settlement Agreement § 2.20(c).)

ConAgra asserts that the parties did not know how much it would ultimately have to pay the class because the settlement created "essentially unlimited potential exposure depending on the number of claims made."  (ConAgra Resp. ¶ 2.)  The Court has its doubts about ConAgra's assertion.  Courts must be careful not to calculate settlement value based on unrealistic claims rates.  *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021).  And it is much more likely that the parties knew that the claims rate would be low, given the fact that the settlement "involves small-ticket items" purchased between four and fifteen years ago and "provides for no direct notice to class members."  *Briseño*, 998 F.3d at 1026.  Class counsel's agreement to pay claims exceeding the amount ConAgra agreed to pay for people making claims above 30 units with proof of purchase also suggests that the parties had an indication of what the claims rate would be, and that the rate would likely be relatively low.

Indeed, the discovery Objector conducted revealed that the parties *did* know the claims rate was likely to be only around 2 or 3%. Class counsel "requested a short memo from the claims administrator discussing anticipated number of claims and the basis," (Dkt. 758-15), and ConAgra's counsel also "had lengthy discussions with the class administrator" regarding the number of likely claims, (Dkt. 758-13). According to an email from JND's founder to class counsel describing a "chat" he had with Magistrate Judge McCormick, JND's opinion was that "this kind of case was unlikely to yield a claims rate above 5% (and that 2-3% was more likely)." (Dkt. 758-12.) JND's founder further reported that Magistrate Judge McCormick "seemed to agree." (*Id.*)

Also troubling is the valuation the parties placed on injunctive relief. "[A] disproportionate cash allocation makes it all the more important for the district court closely to examine the claimed value of the non-cash portions of the settlement that were used to justify the requested attorneys' fees," including to be careful of "the danger that parties will overestimate the value of injunctive relief in order to inflate fees." *Roes*, 944 F.3d at 1051. Here, at the time of the settlement, the parties agreed that the injunction would be valued at $27 million. (McCormick Decl. ¶ 14.) But the injunction was worthless because ConAgra stopped marketing Wesson Oil as natural in 2017 for reasons it claimed were unrelated to the litigation and because ConAgra no longer owns Wesson Oil. *Briseño*, 998 F.3d at 1028. The fact that the class obtains no value from the injunction only underscores the concerning disparity in recovery between the class and class counsel.

Another indicator that self-interest infected the negotiations is that class counsel rejected a settlement offer that would have given $4 million to the class and $4 million to class counsel. (Dkt. 758-6.) In other words, ConAgra offered an $8 million settlement distributed evenly between the class and counsel, and class counsel rejected it. However, when ConAgra offered a settlement with roughly the same payout, but with $7 million to

class counsel, and terms that class counsel knew would likely not result in much money to the class (and ended up being less than $1 million), class counsel accepted it.[2]

Withholding settlement approval "is warranted when the settlement terms contain convincing indications that the class representative and class counsel's self-interest won out over the class's interest." *Allison*, 8 F.4th at 1178.  Here, the likely low claims rate, class counsel's incentive to make sure claims did not get too high, and the worthless injunction—plus the evidence that the parties knew the claims rate would be extremely low and class counsel's rejection of a more proportional settlement offer—strongly indicate that the disproportionate allocation between class members and counsel reflects excessive self-interest.  *See Bluetooth*, 654 F.3d at 947; *Allison*, 8 F.4th at 1178.

## B.     Clear Sailing & Reverter Clauses

The likelihood that the disproportion between class member relief and attorney fees reflects excessive self-interest is increased by the presence of two other provisions in the Settlement Agreement:  (1) the "clear sailing" agreement, under which "Conagra shall take no position with respect to the Fee and Expense Application" for fees of $6.85 million, (Settlement Agreement ¶ 8.1.1.2), and (2) the "reverter" or "kicker" provision, under which if the agreed-upon fee award is "reduced for any reason, the relevant amount

---

[2] In reply, class counsel argues that there were good reasons to reject this proposed settlement, including that the rejected settlement paid less per unit to class members without proofs of purchase, that class members with proofs of purchase could only get coupons and vouchers for purchases above 20 units (rather than the unlimited amount in the Settlement Agreement), and that in the end much of the $4 million for class members' benefit would have gone to *cy pres.*  (Reply at 21–22.)  The Court is not persuaded that this makes a difference.  As explained, under the Settlement Agreement, the most anyone without a receipt could expect to receive was $4.50.  From an individual class member's perspective, the difference between what an individual could recover under the rejected settlement compared to what the individual could recover under the Settlement Agreement was really not material.  Neither provided much of an incentive to an individual class member to make a claim.

of the overpayment of attorneys' fees and costs paid by Conagra shall be returned to Conagra" (*id.* ¶ 8.1.1.3).

"Although clear sailing provisions are not prohibited, they by their nature deprive the court of the advantages of the adversary process in resolving fee determinations and are therefore disfavored." *Roes*, 944 F.3d at 1050–51; *see McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021). They are also "important warning signs of collusion" because "[t]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *Roes*, 944 F.3d at 1050–51. The presence of a clear-sailing provision is not a "death knell." *McKinney-Drobnis*, 16 F.4th at 610. Rather, when faced with such a provision, courts have a "heightened duty to peer into the provision and scrutinize closely the relationship between attorney's fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Briseño*, 998 F.3d at 1027. The court has this heightened duty even when "the parties claim[ ] to negotiate the 'core terms' of the settlement agreement with a neutral mediator before turning to fees." *Bluetooth*, 654 F.3d at 948.

A "reverter" clause is a warning sign because it shows that the parties agreed that the defendant, rather than the class, should benefit from a decrease in awarded fees. "Unless the district court is able to conclude that in this particular case, a kicker provision is in the class' best interest as part of the settlement package, the kicker makes it less likely that the settlement can be approved if the district court determines the clear sailing provision authorizes unreasonably high attorneys' fees." *Id.* at 949 (internal quotation omitted).

Clear-sailing and reverter provisions together are even more dangerous. Together, they present a "risk that class counsel will unreasonably raise the amount of requested

fees, and the class members will have less incentive to push back because the recovery of any unawarded fees will inure to the benefit of the defendants, not the class members." *McKinney-Drobnis*, 16 F.4th at 610.

Class counsel urge that the "clear sailing" provision in the Settlement Agreement is not concerning because Magistrate Judge McCormick suggested it, rather than the parties negotiating it.  (Mot. at 15.)  But Magistrate Judge McCormick disclaimed any notion that he proposed terms that he thought were fair and just.  Rather, he expressly stated that his court proposals "represent [his] evaluation of the terms that have the best chance of being accepted by both sides."  (McCormick Decl. ¶ 14.)  And it is no wonder he thought that the parties would be more likely to accept the terms of his court proposal with the clear sailing provision.  Class counsel received a high amount of fees with a guarantee that ConAgra would not oppose, and ConAgra got out of the litigation for a set amount.

ConAgra's benefit arguably did not end there.  Rather, ConAgra stood to benefit from the possibility that the Court could find the agreed-upon fees unreasonable.  There is no indication that the reverter provision here is in the class's best interest, *Bluetooth*, 654 F.3d at 949, and "there is no plausible reason why the class should not benefit from the spillover of excessive fees."  *Briseño*, 998 F.3d at 1027.

In sum, the great disparity in the settlement between class relief and attorney fees, together with the clear sailing agreement and the reverter provision—all present in a settlement crafted around a court proposal based only on Magistrate Judge McCormick's assessment of what the parties would accept, not what was fair or right—make it too likely that self-interest, even if not purposeful collusion, seeped its way into the parties' settlement terms.  *See Roes*, 944 F.3d at 1060; *Briseño*, 998 F.3d at 1023; *Bluetooth*, 654

F.3d at 947.  Consequently, the Court cannot grant Plaintiffs' motion for final approval of the Settlement Agreement.[3]

Nothing in the Court's decision, however, should be interpreted to indicate that lawyers can never recover more than the class.  *See Bluetooth*, 654 F.3d at 945 ("[W]e cannot say the disproportion between the fee award and the benefit obtained for the class was per se unreasonable"); *Roes*, 944 F.3d at 1060 (explaining that a "disproportionate attorneys' fee does not mean the settlement cannot still be fair, reasonable, or adequate").  Nor should it indicate that clear sailing agreements or reverter provisions automatically doom a settlement.  The Court concludes only that the features and circumstances presented by this Settlement Agreement, especially as illuminated by statements from Magistrate Judge McCormick and other discovery on remand, are not fair, reasonable, and adequate with respect to class members in light of the recent guidance by the Ninth Circuit.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for final approval of the Settlement Agreement is **DENIED**.

DATED:      December 22, 2021

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[3] Because the Court concludes that the relief provided for the class was not fair, reasonable, and adequate given the terms of the proposed attorney fee award under Federal Rule of Civil Procedure 23(e)(2)(C)(iii), the Court need not analyze the other factors in Rule 23(e)(2)(C), namely the costs, risks, and delay of trial and appeal, the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, or any agreement required to be identified under Rule 23(e)(3).  Fed. R. Civ. P. 23(e)(2)(C)(i), (ii), (iv).